D8qnjoh1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

BRANDI JOHNSON,

                    Plaintiff,

          v.                          12 CV 4460(HB)

LISA STEIN, ROB CARMONA and
PHIL WEINBERG,

                    Defendants.

------------------------------x
                                      New York, N.Y.
                                      August 26, 2013
                                      9:45 a.m.

Before:

                    HON. HAROLD BAER, JR.,

                                        District Judge

                         APPEARANCES

PHILLIPS & PHILLIPS
     Attorneys for Plaintiff
BY:  MARJORIE MESIDOR
     ALEX UMANSKY

GORDON & REES, LLP
     Attorneys for Defendants
BY:  DIANE KREBS
     KUUKU ANGATE MINNAH-DONKOH

Also present:  Daphney Guillaume, Esq.

1                    (Case called; in open court)

2                    THE COURT:  Good morning, everybody.  We have a

3        variety of housekeeping problems to resolve.

4                    First, since I don't think you have ever selected a

5        jury here, you should know that I have read your voir dire and

6        most of what you do I do.  A couple of questions from you I

7        have added.

8                    After I do that, you get five or ten minutes to ask

9        whatever you would like to ask.  As you know the federal rules

10       don't require that you get any time, but I find that lawyers

11       somehow think they can bind with the jury in ten minutes.

12                   I am not at all clear if that is true, but be that as

13       it may.  Then we will go to the sidebar.  You will have very

14       little time to make your decisions other than the fact that I

15       will give them a little information about what there are in the

16       way of challenges and you will have a few minutes, and

17       obviously while I am doing my voir dire you will be taking

18       notes.  So I don't think that will prejudice you.

19                   Hopefully we can pick the jury within an hour and a

20       half or so.  We are the only jury picking, so in fact we ought

21       to get the jury on time.  Sometimes you don't get the jury

22       until 11 o'clock in the morning, but that ought not be the case

23       here.

24                   THE DEPUTY CLERK:  10:15 they said.

25                   THE COURT:  They have to see a movie or something.

D8qnjoh1

1          Let me go through the in limine motions.  I think my

2     law clerk has given you a set of the way, in fact, we come out

3     on the exhibits.

4          So obviously where the exhibit item says "out," that

5     means you may not offer it.  On the other hand, where it's in,

6     all you need to do is say this exhibit has been admitted.  You

7     don't have to go through any long, pro forma lengthy -- not

8     that lengthy -- but any preliminaries.  It's done.  Nothing

9     goes to the jury unless you use it.  I think my rules tell you

10    all about that.  Although, from what I have read from you, I am

11    not that clear that you have read my rules, but hopefully

12    between us there will be no problems on that score.

13         I get in limine motions, albeit I have given you more

14    time, but generally a couple weeks before trial, so the one I

15    got on Saturday from plaintiff, that looks like essentially a

16    disqualification motion is a little late, especially since most

17    of the allegations of wrongdoing are allegations that are part

18    of your in limine motions, and that may have been why you

19    submitted it at least in part to begin with, it gives you sort

20    of an extra opportunity to plead your case.  However, I made my

21    decisions prior to Saturday evening when your missive arrived.

22         While I think some of what was said in the in limine

23    motions and repeated is at least of concern, if indeed it turns

24    out in the last analysis that any of the allegations or the

25    significant ones are true, I will, as I have done heretofore,

D8qnjoh1

simply notify the grievance committee of this Court as to my
thoughts on that score.  But as of now I am denying that
motion.

Moving right along, there are five or six motions in
limine.  Interestingly, there is one motion which I am not even
sure is responded to that I think we ought to make sure I know
what we are talking about, and that's the one that has to do
with plaintiff's motion to preclude defendants from offering or
soliciting testimony regarding plaintiff's prior conviction.

What interested me most about that is that nobody told
me what the conviction was for.  It seems a little unfortunate
for lawyers to act in that manner, although maybe they knew
what they were doing and thought I shouldn't know.  But perhaps
we'll resolve that if you just tell me what the conviction was.

I now know that it's 13 years old, and I got the
impression, although it required some thinking on my part --
which is something I didn't have to do for the most part in
your in limine motions -- I think there were only fines paid
but it would be nice to know what the conviction was for as
well as the sentence.  So maybe the plaintiff could tell me
that.

MS. MESIDOR:  Good morning, your Honor.

THE COURT:  Good morning again.

Would you go to the microphone when you talk.  That
would make it a lot easier.

1          MS. MESIDOR:  Your Honor, can you hear me?

2          THE COURT:  Yes, indeed.

3          MS. MESIDOR:  The conviction was for grand larceny.

4    It was 13 years ago.  My client had five years' probation and

5    she paid restitution.  Apologies that our actual, the substance

6    of our papers did not contain it.  We had included exhibits

7    which included the 609(b) notice that defendants had served on

8    us, and it indicated the conviction on that.

9          THE COURT:  Never to me.

10         MS. MESIDOR:  I'm sorry, your Honor?

11         THE COURT:  I never saw that.

12         There's a lot that apparently was served on one

13   another that wasn't provided to the Court.  But at the moment I

14   had no idea from the in limine motion, which is all I saw, what

15   the conviction was for.  I did know it was 13 years old, and I

16   did know that it was a fine I gather.  You didn't mention that,

17   but I gather there was a fine because you mentioned it in the

18   papers.

19         MS. MESIDOR:  Yes.

20         THE COURT:  What was that?

21         MS. MESIDOR:  The fine was restitution.

22         THE COURT:  I see.  How much was that.

23         MS. MESIDOR:  I believe it was in the sum of $200,000.

24         THE COURT:  OK.  What's the defendants' view on that

25   score.

D8qnjoh1

1            MR. MINNAH-DONKOH:  Your Honor, as your Honor knows,

2     Federal Rule of Evidence 609(b) does not automatically

3     disqualify prior convictions just based on how old the

4     conviction is.  If the probative value outweighs the

5     prejudicial value, then the courts have deemed that conviction

6     is permitted to be allowed as evidence.

7            Here plaintiff did testify that she was convicted of

8     grand larceny approximately 13 years ago.  As plaintiff's

9     counsel has just indicated, the restitution that she was

10    required to pay was in the sum of $200,000.  Moreover, she just

11    finished paying the restitution approximately two years ago

12    based on her testimony.  So surely that goes towards not only

13    her credibility but also her financial motive for bringing this

14    very lawsuit.

15            THE COURT:  I am granting the plaintiff's motion.

16    We'll keep it out.

17            Let's go along to the others so that we can make some

18    forward motion here.  With respect to the specific sums of

19    damages, I guess your first one is now moot, because the

20    plaintiff has told us that she has no intention of suggesting

21    specific amounts.  So we don't need to tarry on that one.

22            Jamar Cooks' testimony is a little more complicated.

23    That's number 2 amongst the in limine motions.  I have no

24    reason to suggest or to think that you can't instruct Cooks so

25    that we don't get into any difficulty.  I'm prepared pursuant

D8qnjoh1

1  primarily to the state of mind exception in 803(3) to let him

2  testify.  I just want to be absolutely clear that you

3  understand that he may not invade the province of the jury.  He

4  may not provide opinions as to whether any specific witness has

5  or will testify truthfully.  That's just not his role.  So, if

6  I hear anything that comes close to that, we will probably stop

7  his testimony altogether, because who knows what would be next.

8          I don't know how to tell you that more cogently, but I

9  am prepared to let him testify to his conversations with STRIVE

10  employees with, once again, their state of mind as the major

11  focus and the opinion as to their demeanor at the time, that

12  is, if they were crying or if they were screaming, I suppose he

13  can tell us that.  But you better be very careful, because if I

14  get the feeling that in any way, shape, or form he's providing

15  either other evidentiary problems or invading the province of

16  the jury, it will be all over for Mr. Cooks.

17          Is that perfectly clear?

18          MS. MESIDOR:  Absolutely, your Honor.

19          THE COURT:  OK.  With respect to the plaintiff, the

20  testimony of plaintiff's doctors, I really don't want to go

21  through the various concerns that your discovery activities

22  provide for me, but to suggest that they can testify as lay

23  witnesses is just no longer, if ever, the law.  Indeed,

24  26(a)(2)(C) provides that you have to disclose the subject

25  matter on which each witness is expected to present evidence

D8qnjoh1

1    and a summary of the facts and opinions which the witness is

2    expected to testify.  You have done none of that.  Whether or

3    not you have provided the names is an issue of fact, which I

4    really have gotten both sides of the story.  I think we asked

5    you on the telephone to produce some documentary evidence of

6    your September 10 disclosure or its receipt by the other side.

7    If you have that, you can pass it up to my deputy clerk.  But

8    the fact is that the testimony of the plaintiffs' doctors is

9    out.  That's not to say that the plaintiff can't testify to her

10   emotional concerns or problems, but in my view she can testify

11   that she saw two doctors or three doctors for that purpose or

12   those purposes.  They will not be testifying.

13        With respect to the punitive damage, I actually

14   utilized the bifurcated method, but I think what happens is

15   that should the jury mark yes, that punitive damages are

16   appropriate, then we will have a separate hearing basically

17   devoted to the wherewithal of the defendant to pay punitive

18   damages, not another trial with respect to whatever it is the

19   plaintiff is suffering or allegedly suffering from.

20        Let's move along I guess to the audio recordings.

21        I should tell you, because it was something somebody

22   mentioned in their voir dire, what happens is, when the jury is

23   in the box and I begin my voir dire, I ask each counsel to tell

24   me their names, their names, and the names of everybody at

25   their counsel table as well as the names of any witnesses,

1  obviously, not the same witnesses if they are the same as are

2  at the table.  By the time I ask whether the jurors know

3  anybody that may testify, they will have heard all of the names

4  of the witnesses and of STRIVE, which I will tell them, if

5  indeed it doesn't come up, but I think it does.  Because one of

6  you, the plaintiff will say you represent or the defendant will

7  say you represent STRIVE, so they will obviously have the

8  corporate, or what's not a corporation, the organization's name

9  as well as the names of all of the witnesses.  So when I ask

10  them if they know any of them, they can answer.  Hopefully you

11  will go slowly so that they can digest the names.

12        So I think that takes care of everything but the

13  motion to preclude.  We have now taken care of the plaintiff's

14  motion in limine.

15        On that issue I didn't mean to sound quite so brusque.

16  My general philosophy is that if there's been ten years without

17  another incident and there's no direct connection between the

18  conviction and the cause of action on trial that I do not let

19  the conviction in.  Here it seems to me that the claims for

20  discrimination are really not tied in any way, shape, or form

21  to grand larceny.  That does not mean I condone the conviction

22  for $200,000 of stealing, but it does in my view not have the

23  kind of connection that would take it into the 609 permissive

24  area for use.

25        In terms of the audio recordings, it seems to me that

D8qnjoh1

1    we went through this on the telephone, and then we got some

2    more information and another piece of paper from each of you.

3    I don't want to go through the details, because again, just

4    like the experts, the doctors, there's really no way that I'm

5    going to decide who's pulling my leg here as to the production,

6    but there isn't much doubt that there was disobedience to the

7    magistrate judge's order on at least one and maybe on two

8    occasions.

9           There is also probably a likelihood, and again I'm

10   really not a psychiatrist, but it would seem that what the

11   defendant says makes some sense, that the reason for this

12   delay, and I'm not sure there isn't some indication from some

13   of the plaintiff's material, the reason in part at least for

14   this delay was to make sure that there was no tailoring.  And,

15   as you saw from the order from the magistrate, he didn't see

16   any, and he made it clear in any event that the material was to

17   be fully disclosed by the 25th of February.

18          However, those are not my major concerns.  Well, they

19   are major, but they are not the only major concerns.  I denied,

20   as I did on the phone, the admissibility of these based on a

21   variety of different concerns.  One, I listened to a potpourri

22   of the recordings.  My clerk listened to all of them.  They

23   were riddled with problems, not only problems in terms of being

24   able to hear audibly, but also in terms of hearsay and much of

25   it was the plaintiff's discussion.

D8qnjoh1

1    There was, it seemed to me, a problem with respect to

2    the transcripts.  I would listen to a recording and it had

3    nothing to do with the transcript I had in front of me which

4    was denominated the transcript for that recording.  Obviously,

5    the concerns with 402 and 403 are even clearer to me from an

6    overview of what was on those recordings.

7    So, as I said on the phone, I'm not letting them in.

8    On the other hand, if you would like to parse out those audible

9    portions that you believe are admissible and we can listen to

10   them after court tonight, I will be happy to let them in.

11   But at the moment, I have no reason to let any of them

12   in.  I think they violated the discovery rules.  I think they

13   are inaudible.  I think the transcripts don't coincide with the

14   tapes.  I think you violated the orders of the magistrate judge

15   in producing them, and why you produced 12 or 13 on the first

16   occasion and then 30, all of them on the next occasion with

17   overlapping on each occasion, indeed overlapping in what you

18   provided to me, I just don't know.  But every lawyer has his

19   own way of doing his own work, and those are my reasons.  I

20   think probably, as I say, the only conceivable way I could

21   listen to others -- there are a couple that everybody agreed

22   to.  I'm obviously not doing anything to anything to anything I

23   can actually hear.

24   I think that completes the in limine motions and my

25   decisions with respect to them.  I don't choose to have any

D8qnjoh1

1    further argument.  I do hope that you have listened carefully

2    so that you don't have any problems during the trial.

3              Where is the jury?

4              THE DEPUTY CLERK:  10:15.

5              THE COURT:  I think probably a couple of other

6    housekeeping items which I guess I will also tell the jury.  I

7    have to leave tomorrow at 3, actually I guess at 2:30.  So what

8    I propose is to ask the jury if they can work at 9:30, which is

9    when we start, as a regular course of business, to 2 o'clock so

10   that we save the lunch hour and another hour as a matter of

11   fact and almost are in the same situation that we would be if

12   we were to stay until 4.

13             Generally I stay until 5 or 5:30 depending on what is

14   happening.  I gather that you have, if I counted correctly, 10

15   or 15 witnesses -- including the doctors, who are now not going

16   to testify -- and I want to make it perfectly clear that we

17   move with some alacrity here, not for my purposes, because I am

18   not going anywhere, sad to say, even though it's Labor Day

19   weekend, but that's the fact.  However, I find that jurors,

20   aside from those that may be going somewhere, I find that

21   jurors get it as a regular course of business.  That's my

22   feeling about juries, and that they get it better if we move

23   along.

24             So in part that's why I spend all the time concluding

25   admissibility with respect to exhibits before we start so that

1    there's no argument in front of me or either in or outside the

2    presence of the jury about admissibility.

3           In terms of any objections to testimony, the way it

4    works is you get up when you feel it is appropriate to object,

5    and you give a one-word or two-word objection, like "hearsay"

6    or "cumulative."  Those are two that you might be using with

7    some frequency.  I just happened to think of them.  In any

8    event, I rule, and we move right along.  We do not have sidebar

9    conferences.  Maybe I have had one, two or three maybe at the

10   most in about 15 or so years.  So don't expect that there will

11   be any with respect to this case.

12          I am trying to think if there is anything else that

13   might be valuable in terms of the voir dire.

14          With respect to openings, I will, of course, tell the

15   jury in a preliminary charge how the trial works or moves on.

16   But I think you ought to understand, as I'm sure you do, that

17   openings are not argument.  They are simply akin to a roadmap,

18   and they are usually quite brief.

19          When I say that, I don't cut you off.  Sometimes I do,

20   but I don't remember ever cutting anybody off in an opening

21   statement.  But as a general rule the statistics show that

22   after 15 or 20 minutes the jury isn't listening anyway, so you

23   can take that for what it's worth.

24          I think the other thing that you should understand is

25   that while you're welcome to object if it is a very important

D8qnjoh1

1  concern, as arises during usually summations, but even in

2  opening statements, the fact is that it's the only time that

3  the jury gets an opportunity to have a narrative from the

4  lawyers of what's happening or what they plan to have happen or

5  what has happened.

6          So I rarely countenance objections, as I say, unless

7  they are indeed vital.  And even there, unless it's something

8  that can be countered once the genie is out of the bottle, it

9  is a little difficult to put the genie back in the bottle so we

10  can actually resolve it at the end of the summation.  For

11  instance, you can then come up if there is an objection, if you

12  controlled yourself from standing and putting forth, and I can

13  give a limiting thought or two to the jury.  But it doesn't

14  happen often, and I expect it not to happen here.  But you

15  never know.

16          So that's pretty much where I am in terms of how this

17  can operate, and the jury will be here in about five minutes.

18  So I'm going to get dressed.

19          MS. KREBS:  Your Honor, I apologize.  If I may for

20  just a moment before you go get dressed.

21          THE COURT:  At the podium.

22          MS. KREBS:  Yes, your Honor.

23          THE COURT:  Preferably.

24          What are you standing to do here for this moment?

25          MS. KREBS:  I have two things that I want to address.

D8qnjoh1

1    First, obviously I just want to make sure that the record notes

2    any objections that we have to any of your Honor's rulings that

3    went against the defendants, just so we preserve our right on

4    appeal.

5           But I have another issue that has arisen that I

6    discovered yesterday that I just wanted to bring to the Court's

7    attention before the jury came in.

8           One of my clients, Mr. Carmona, has a medical issue,

9    an issue with his lower back, that it locks up every now and

10   then, and he needs to stand and move for a moment so that he

11   can loosen it up.  If need be, we can provide a doctor's note

12   to your Honor to demonstrate that.  I just wanted to address

13   that because it may arise during the course of the trial as the

14   parties sit for a very long period of time that he may need to

15   stand and just walk for a moment to loosen up his back.  I

16   wanted to respectfully request permission to do that,

17   obviously, in a quiet and noninterruptive way, as a medical

18   accommodation to him.

19          THE COURT:  That is fine with me.  Indeed, if I don't

20   mention it to the jury, you can mention it to them in your

21   opening.

22          MS. KREBS:  Thank you.

23          THE COURT:  I will be back momentarily.

24          MS. MESIDOR:  Your Honor, one more thing.

25          (Recess)

D8qnjoh1

1          MS. MESIDOR:  Your Honor, prior to the jury coming in,

2     there was one clarification that I wanted to make for the

3     record.

4          THE COURT:  I don't think I can hear you.  I know I

5     can't hear you.

6          MS. MESIDOR:  Apologies, your Honor.

7          I said prior to the jury coming in there was one

8     clarification that I wanted to make for the record.  When your

9     Honor inquired as to how much that my client had to pay in

10    restitution, I said $200,000.  That is incorrect.  My client

11    clarified me and said $100,000.  I know you have already ruled,

12    but for the purposes of just clarifying it, I wanted to make

13    sure you knew that.

14         THE COURT:  And everybody has objections to any of my

15    rulings.  You don't have to even mention it.  At the end all

16    your requests will be denominated as court exhibits and

17    everything that is in them, as we will discuss at the charging

18    conference that I don't charge is automatically objected to, so

19    we don't spend a lot of time at the sidebar after I give a

20    charge talking about whether or not I said A, B, or C.

21         OK.  You can sit while we get the jury situated.

22         (Jury selection follows)

23

24

25

D8q6joh2

1          THE DEPUTY CLERK:  Jurors, will you please stand and

2     raise your right hand.

3          (A jury of 8 was impanelled)

4          THE COURT:  The rest of the panel that we had, we can

5     excuse them.

6          THE DEPUTY CLERK:  All the potential jurors, please go

7     back to to Room 160.

8          THE COURT:  This is going to be a very brief

9     preliminary charge.  You will get lots more before it is over,

10     but for the time being there are a couple of things you have to

11     keep in mind.  One is don't discuss the case amongst yourselves

12     or with anyone else, including your mother, your father, your

13     girlfriend, whomever, nobody until you have come to deliberate

14     with all of you in the jury room at the end of the case.

15          Once again let me emphasize that you are the finders

16     of the facts and nobody can tell you what the facts are.  It is

17     a job for you and you alone.  Let me tell you also that you may

18     not conduct any kind of independent research about this case,

19     not that I think that would be particularly valuable, but the

20     matters in this case and the individuals or organizations

21     involved in this case are simply to be understood from the

22     standpoint of what you hear from the witness stand.  You may

23     not search the Internet, websites, blogs or use any other

24     electronic tools to obtain information about the case or to

25     help you decide the case.  If what you need to know for your

D8q6joh2

 1    deliberations is not made clear by the lawyer, that is too bad

 2    for the lawyer.  It is their job.  It is not your job.

 3            I want to be clear as well that while many of you may

 4    use cell phones and BlackBerrys as well as the Internet, not

 5    only should you not use those, but you must not talk to anyone

 6    about the case or use those tools to communicate electronically

 7    with any of those people.  I don't know how to make a broader

 8    direction, but I think you get my gist.

 9            If anyone at any time during the course of this trial

10    attempts to talk to you or to communicate with you about the

11    case then it is your job to tell either Bill or me about it

12    forthwith and in this regard the lawyers cannot talk to you so

13    it is best that you say nothing to them otherwise they will be

14    stuck for an answer including good morning.  So just leave them

15    alone if you happen to be with them.  Actually, they should be

16    sure that you are not on the same elevator with them and simply

17    take the next elevator since the jury should go first.  If that

18    should happen don't talk to any of them, the witnesses or the

19    parties of whom there will be several witnesses I dare say.  In

20    other words, some of the witnesses will be parties.

21            We go quickly if I find the jurors prefer that we move

22    along.  So that we have already marked out all the exhibits

23    that they provided and turned to admissibility will not take

24    any time.  Those that I have admitted they will simply say this

25    is admitted as whatever the number or letter is and move right

D8q6joh2

1    on into identification of that document.

2            There is only a short time period for the lawyers to

3    talk to me because I don't have side bar conferences.  In other

4    words, all they do when they object is they stand up and say,

5    "Objection, irrelevant" and I rule and we move on.  So if they

6    have some kind of legal problem, it is only during the recess

7    period that they can explain it to me.  So you should move

8    expeditiously into the jury room, which provides probably as

9    good a view as the other side of town as you will ever see.  So

10    it shouldn't be a heartache.  If I have a problem so that I

11    have to have a side bar, which is a rare, I guarantee we will

12    not keep you there twiddling your thumbs for more than a minute

13    or two.

14            I doubt that you will see any media publicity but all

15    I can suggest is if you do or think you do, you should put it

16    down or turn it off whatever type of media it happens to be.

17            Let me explain to you in criminal cases, which is more

18    often what you might see on television, I think probably more

19    of you who have sat have sat on criminal cases, the burden of

20    proof is quite different than it is in a civil case.  As you

21    know, I guess at least from television, the criminal burden for

22    the government is proof beyond a reasonable doubt.  That is a

23    very, very high burden.  The burden in a civil case is not that

24    difficult.  It is really what we call a preponderance of the

25    evidence of the credible evidence.  So if you put the

D8q6joh2

plaintiff's evidence, the plaintiff has the burden, on one side

and the defendant's evidence on the other, in order for the

plaintiff to sustain its burden of proof, all that needs happen

is that the scales tip in the plaintiff's favor ever so gently,

lightly, whatever another synonym is so it is a very different

and much lesser burden than the burden in a criminal case.

For those of you who have not sat, let me tell you

something about the way a trial runs. This is pretty much a

criminal case also. First there are what we call opening

statements. They are essentially roadmaps telling you what the

party is going to proof. They are generally short both from a

tactical standpoint primarily because if they say something

that they don't prove, they will be embarrassed at some point

during the trial if not in summation, but you never know.

After openings the plaintiff will mount its case and it will

examine witnesses on what we call direct and the defendant will

cross-examine. On occasion there is redirect and recross, but

the deal is that if goes in ever smaller centric circles.

There is very little, if any, redirect and recross as a rule.

After the plaintiff has put in all of its evidence,

the defendant will mount its case. It will call witnesses who

it will examine on direct and the plaintiff will cross-examine.

At some juncture the plaintiff and the defendant will rest and

they will come before you again in summation. I should tell

you that while you are welcome to ask during your deliberations

1    for the exhibits and if necessary testimony, openings and

2    summations are not evidence.  So all you are looking to do is

3    make a decision based on the evidence, which is essentially

4    what you hear from the witnesses and exhibits that are admitted

5    into evidence.

6         Basically there is then a charge on the law from me

7    and then you get what is called a verdict sheet, which gives

8    you the questions that need to be answered in order to come to

9    a verdict and the case is yours.  You go into the jury room

10   with a verdict sheet or a copy of a verdict sheet and I will

11   give you much more in the way of instructions about that.  I

12   just want you to understand openings and closings are not

13   evidence so if you were to ask for a copy of the summation

14   while you were deliberating, you wouldn't get it because it is

15   not evidence.

16        There are a couple different kinds of evidence, that

17   is direct evidence, which essentially is what you hear, smell,

18   see and there is circumstantial evidence as well.

19   Circumstantial evidence is evidence that is based on an

20   inference but the inference is usually, maybe always, direct

21   evidence.  That is the example that I was always given by

22   judges when I sat on the other side of this bench long ago.  If

23   you were to get on the subway at 86th Street and go down to

24   59th Street and see people getting on the subway with raincoats

25   and umbrellas and raindrops dripping off of their raincoats and

D8q6joh2

1  umbrellas and you went on down to 42nd Street and saw more of

2  the same, you could draw the inference that if you were on the

3  sidewalk, it would be raining and that is circumstantial

4  evidence.  It is equally as potent as direct evidence so long

5  as the inference is as clear as that or the like.

6        You have a number of jobs as the finder of fact, but

7  probably the most important is to judge credibility.  So you

8  have to be extremely careful with respect to that aspect of

9  your role and listen very carefully to every witness and that I

10  suppose is mostly what I need to say.  I don't want you to get

11  the feeling that you are to leave your common sense at the door

12  because that is obviously not the case and in fact the way in

13  which juries operate best and the reason why we have this type

14  of diverse jury system is because basically it is your life

15  experience that counts.  That is how you come to the kind of

16  conclusions that are at least in my experience pretty much the

17  right decisions throughout the long time I've sat here.

18        We will talk to you some more about things as we go

19  along, but I think that is a good start.  We're ready for

20  opening statements.  If the plaintiff is ready, we're ready to

21  listen.

22        MS. MESIDOR:  I am ready, your Honor.  May I approach?

23        Good afternoon, ladies and gentlemen.  First and

24  foremost, I wanted to thank you for taking the time today to be

25  with us today and listening to this very important case we're

1    about to lay if your hands.

2              Ladies and gentlemen, this case is about a failure to

3    take responsibility.  Defendant corporation Strive Harlem

4    Employment Group failed to take responsibility in response to

5    the repeated complaints.

6              THE COURT:  Listen, ma'am, is this your summation?  We

7    will hear your summation later or we're going to hear it.  I

8    want to know what you are going to prove.

9              MS. MESIDOR:  Thank you, your Honor.

10             You are going to hear evidence about the numerous

11   complaints that plaintiff made to the individual defendants in

12   this case about her repeated discriminatory contact with the

13   founder of the organization, Mr. Rob Carmona.  You are going to

14   meet my client Ms. Brandi Johnson.  You will hear evidence

15   about her background and how she had dedicated the majority of

16   her career to helping those who have difficulty finding

17   employment.  You will hear evidence about within the first 30

18   days of joining Strive she was subjected to repeated comments

19   by the founder Mr. Carmona that she deemed offensive based on

20   her gender and on her race.  You will hear evidence regarding

21   comments that he would say things like, You are the type of

22   woman to throw a guy under the bus.  You will hear evidence of

23   comments that he made saying, Stop walking around here with

24   your fucking head down and get fucking to work.  You will hear

25   comments that he made when he saw that she was emotionally

1    reacting or would cry at what he would say.  Stop walking

2    around here because nobody is going to fucking feel sorry for

3    you.

4         You will hear that she made complaints to the then CEO

5    Eric Treworgy, and I decision was made for her to be

6    transferred from Mr. Carmona's supervisory authority to that of

7    Ms. Lisa Stein.  Defendant Lisa Stein was not only the head of

8    HR but was also the CFO of the company.  You will hear evidence

9    that Ms. Johnson complained to Ms. Stein about the way that Rob

10   had treated her, the way that he was speaking to her.  But you

11   will also hear evidence that these complaints went unaddressed,

12   unanswered and on occasion Ms. Stein would use the power that

13   Mr. Carmona had over plaintiff to reprimand her.  You will hear

14   evidence that Ms. Johnson brought a complaint that a

15   participant had of sexual harassment to the attention of Mr.

16   Carmona and one other individual.  You will hear evidence that

17   Mr. Carmona's responses to the sexual harassment complaint

18   saying that nothing would tell him that the girl didn't want it

19   and that she was ugly as fuck and the person who was accused of

20   doing these sexual harassing behavior wouldn't be interested in

21   her anyway.

22        You will also hear evidence regarding a conversation

23   that Ms. Johnson was having with another participant by the

24   name of Dwayne Hubbard in which Mr. Carmona abruptly

25   interrupted their conversation and escorted Mr. Hubbard.

1    you will hear evidence that when Ms. Johnson attempted

2    to close the door because there was an auditor walking around

3    the office that Mr. Carmona called her into his office and

4    said, Did I tell you to close my fucking door?  If I wanted my

5    fucking door closed, I would have fucking closed it myself.

6        Again, Ms. Johnson reported her treatment at the hands

7    of Mr. Carmona to Ms. Stein and nothing was done.

8        Because continuously she would complain and nothing

9    was being done, you will hear evidence that Ms. Johnson

10   recorded a conversation that she had with Mr. Carmona.  On the

11   first and only instance that she recorded Mr. Carmona, you will

12   hear evidence that Mr. Carmona called her a nigger eight times,

13   said that she acted like a nigger, that she was dumb as shit,

14   and she was a nigger.

15       When Ms. Johnson objected and said I am offended by

16   that, I have grown while I have been here, I think that I have

17   taken steps to become a better person, you will hear evidence

18   that Mr. Carmona said:  I don't care.  I told you you weren't

19   going to like it.  Ask anyone at STRIVE and they will agree

20   with me that you are a nigger.

21       Finally, when Ms. Johnson obtained legal

22   representation, you will hear evidence that STRIVE was formally

23   notified of the series of discrimination complaints that she

24   had.  At that point, you will hear evidence that the CEO

25   purportedly began an investigation.

1          Now, the defendants will tell you that STRIVE has a

2     clear antidiscrimination policy.  You will hear evidence that

3     the antidiscrimination policies prohibits slurs, it prohibits

4     harassment and the like.

5          You will hear evidence that although the CEO was doing

6     an investigation of Ms. Johnson's discriminatory complaints,

7     that a series of paybacks or what we lawyers like to call

8     retaliation began to occur.  Although Mr. Carmona was the

9     person in question who was purportedly doing the harassing

10    behavior, you will hear evidence that Mr. Carmona tried to get

11    other employees to separate themselves from Ms. Johnson.

12         You will hear evidence that Mr. Carmona told employees

13    not to be used by her and use whatever goodwill that he had

14    built with the employees to try to get them to isolate her.

15         You will hear evidence that, in addition to that, that

16    Mr. Carmona also spoke to a participant by the name of Jamar

17    Cooks and told him not to associate with Ms. Johnson, even

18    though you will hear evidence that he was told to keep this

19    investigation confidential, so that the integrity of the

20    investigation could be upheld, you will hear evidence that

21    Mr. Carmona told Mr. Cooks that because Ms. Johnson had a

22    situation with the company, and he didn't want him to get

23    wrapped up in it, that he should no longer come around STRIVE

24    and not come to see Ms. Johnson.

25         Further acts of retaliation, or payback, include you

1    will hear evidence that Mr. Carmona slammed the door in

2    Ms. Johnson's face in the presence of the CEO, Mr. Phil

3    Weinberg, who was conducting the investigation, and he did

4    nothing; in the presence of the CFO and head of HR, Ms. Lisa

5    Stein, and she did nothing.

6         You will hear evidence that Mr. Carmona would stare

7    Ms. Johnson down in the office.  He would make comments while

8    walking by her desk like, We're about to put this bitch in a

9    snatch.

10        You will hear evidence that on a particular occasion

11   when Ms. Johnson had a visitor, as it was a custom for her to

12   have visitors, that STRIVE started a brand-new policy the day

13   after her visitor came saying that visitors now were no longer

14   allowed.  As a result, each time an act of payback, or

15   retaliation, came along, you will hear evidence that

16   Ms. Johnson complained, and she complained directly to the CEO,

17   Mr. Weinberg.

18        But instead of admonishing Mr. Carmona, or anything of

19   the sort, you will hear evidence that Mr. Weinberg asked

20   Ms. Johnson to work from home.  Just a few short weeks after

21   Ms. Johnson made her written complaint via her attorney to

22   STRIVE, you will hear evidence that for the first time

23   Mr. Weinberg inquired as to what happens to people when their

24   grants expire.

25        It is for that reason, that excuse, or what we lawyers

 1   call pretext, that they used to terminate Ms. Johnson.

 2          They indicated that her grant, that a grant that her

 3   position was purportedly funded by, had ended, and that she no

 4   longer was needed by STRIVE.  You will hear evidence that

 5   Ms. Johnson was never notified or otherwise led to believe that

 6   her position was funded by any grant.  You will hear evidence

 7   that the grant was originally due to expire in January, and for

 8   a period of three to four months without being renewed,

 9   Ms. Johnson continued to work and be paid by STRIVE before an

10   extension actually came through.

11          You will hear evidence that others whose positions

12   were in a portion funded by this grant continued to work at

13   STRIVE, and you will hear evidence that STRIVE continues to

14   have a steady flow of grants that continue to come in.

15          Ladies and gentlemen, if I am able to bring this

16   evidence that I have represented to you that you will hear

17   during the course of this trial, when I come back to this

18   podium again to do a summation, we will be asking you to find a

19   determination for plaintiff and to award damages as well as

20   punitive damages.

21          Ladies and gentlemen, I thank you for your attention.

22   I ask that while you discern what is being placed at the

23   witness stand, that you discern the motives of each and every

24   one of those witnesses and their respective biases, and you

25   decide for yourselves who you believe is telling the truth and

1     who isn't.

2              Thank you.

3              THE COURT:  Does the defendant choose to open?

4              MS. KREBS:  Yes, your Honor.

5              Good afternoon, ladies and gentlemen of the jury.

6     Before I get started on my statement, let me just say thank you

7     again for your service here.  I know as the judge said you

8     didn't have much of a choice in showing up, but we do

9     appreciate it nonetheless, and we know that you, all of us here

10    know that you will pay close attention and deliver a just

11    verdict in this case.

12             Well, after hearing opposing counsel describe what she

13    expects to prove as the work environment that allegedly existed

14    at STRIVE, it seems a wonder that we don't just call out a

15    firing squad and get it over with right now.

16             But it is important, ladies and gentlemen, to remember

17    that sometimes a good story is just a story.  This case can

18    actually be boiled down to one simple concept:  No good deed

19    goes unpunished.

20             Now, of course, you will learn through this trial that

21    my clients don't really believe in that credo as a general

22    rule, because if they did, they would not have dedicated their

23    lives to performing good deeds on a daily basis in their

24    careers.  But you will learn through the evidence that in this

25    case, as applied to the plaintiff, it does hold true.

1          I would like to take a moment now to introduce you to

2     each of the defendants.

3          First, at the end of the table, you will learn that

4     this is defendant Lisa Stein.  You will learn that she is 45

5     years old, and she is the former chief financial officer and

6     chief operating officer of STRIVE.  You will learn that she is

7     one of the people who participated in the decision to hire the

8     plaintiff in the first place.  You will learn that she has

9     always been interested in working in the not-for-profit area

10    and that her entire adult professional career, approximately 20

11    years, has been in not-for-profit or public sector work.

12         Next to her you will learn this is the individual

13    defendant Philip Weinberg.  You will learn that Mr. Weinberg is

14    39 years old; he's married with a daughter.  He is, you will

15    learn, the current chief executive officer at STRIVE.  The

16    evidence will show that he has always been interested in public

17    service and having a career that makes a positive impact on

18    communities.  And he has a long history of work in both the

19    private, public, and not-for-profit sector.

20         Finally, next to him, is Mr. Rob Carmona.

21         You will learn that he is 61 years old, he's married

22    with two adult daughters.  As you can see, Mr. Carmona is a

23    black man, and you will learn he is also of Puerto Rican

24    descent.  You will learn that he is one of the cofounders of

25    STRIVE.  He as well was one of the people who participated in

1    the decision to hire the plaintiff in the first place.

2          You will learn that he has spent decades working in

3    the not-for-profit sector for more than 25 years with STRIVE.

4          I also do want to make one mention that was spoken

5    about with the Court beforehand.  Mr. Carmona has a medical

6    condition that he has, a lower spine injury.  Occasionally he

7    may need to stand up and walk for a moment to lessen the

8    stiffness in his back.  Please do not take that as any

9    disrespect or lack of attention to this matter.  It is simply

10   for medical reasons.

11         I am going to talk for a moment -- in another moment I

12   am going to talk a little bit more about Mr. Carmona because I

13   think that, as you will learn through this trial, his history

14   is very relevant to this case.  But first, now that I have

15   introduced you to the individual defendants I also want to

16   introduce you to the entity defendant, STRIVE.  The

17   not-for-profit organization that is the defendant in this case.

18         You will learn that STRIVE stands for Support and

19   Training Result In Valuable Employment.

20         The evidence will show that that is a not-for-profit

21   organization created in the 1980s in East Harlem for the sole

22   purpose of serving a segment of society that is in many ways is

23   invisible, those that are disconnected from the workforce,

24   whether due to poverty, due to former incarceration, due to an

25   individual being a recovering addict or having other personal

1   issues.  And its mission you will learn is to help these

2   individuals get into and stay in the legitimate workforce.

3         Now, this is not your typical job training and

4   placement agency.  You will learn that it was designed to

5   address a specific void that the founders found, which was that

6   when people of this segment of society were put into the

7   workforce, for some reason retention was very low.

8         You will learn that the determination that they

9   reached was that this was either because these individuals

10  didn't have an adequate understanding of what was really

11  expected of them in the atmosphere of the workforce, aside from

12  the specific skills associated with the job, or because they

13  had other external or mindset issues that were adversely

14  impacting their ability to stay in their jobs.

15        This was something that STRIVE designed, was designed

16  to address based on an empowerment model that's used by

17  therapeutic communities and residential rehab centers.  You

18  will learn that the simple concept behind this is that there is

19  a belief that every individual has the power to change and

20  simply sometimes all they need are the tools to do so.

21        So you will learn that there are a couple of things

22  about STRIVE that are a little unique.  First of all, they have

23  what is called attitudinal and job readiness training.  This is

24  about a monthlong training that teaches participants to

25  acclimate into the workforce when they really don't have a

1    frame of reference for it.  That will include, you will learn,

2    things like how to follow instructions, how to accept

3    criticism, how to work as a team, and other skills such as

4    interviewing, filling out a résumé, filling out a job

5    application, things that many of us may take for granted, but

6    that other individuals may have no concept of.

7            And you will learn that there is a therapeutic

8    component to this training.  The participants delve into root

9    causes of their inability to obtain or keep a job and it helps

10   them develop the correct attitude for the workplace to overcome

11   those employment obstacles and transform their lives.

12           THE COURT:  Ms. Krebs, I think this is all very

13   interesting now, but how it is connected to this discrimination

14   case?

15           MS. KREBS:  Thank you, your Honor.  I am going to be

16   getting up to that.

17           THE COURT:  You are going to get to that.

18           MS. KREBS:  I absolutely will, your Honor.

19           THE COURT:  Well, soon.

20           MS. KREBS:  Let me talk a little bit now about the

21   philosophy behind STRIVE as you will learn, because it is based

22   on a therapeutic community approach.  They take a very tough

23   love, no excuses stance.  Participants are required to own up

24   to their lot in life, to accept responsibility for the choices

25   they made, and how it made it that they've got to that

1   particular point, because only then will they be able to

2   strive, to grow and develop.

3        This requires complete honesty and truthfulness in

4   communications, without any sugarcoating.  You will learn that

5   this mode of communication at STRIVE is not only with the

6   participants, but it carries over with the employees as well.

7        Indeed, you will learn that approximately one-third of

8   the employees at STRIVE are former participants who are now

9   paying it forward to help others the way STRIVE helped them.

10  In fact, two-thirds you will learn of the employees, one-third

11  that are the participants and another third that were not, were

12  members of that disenfranchised segment of society that STRIVE

13  serves.  You will also learn that the majority of employees are

14  women and the vast majority of employees are people of color.

15       Now, this model based on the therapeutic community

16  that I just mentioned was designed by the defendant Rob

17  Carmona.  It was designed by him, as you will learn, because he

18  learned firsthand how effective it could be.

19       I am not going to give you his entire story,

20  Mr. Carmona.  You will hear him on the stand.  But you will

21  learn that Mr. Carmona was a drug addict by the time he was 15

22  years old and went through many troubles as a result, including

23  criminal problems.  He got arrested for robbery.  And when he

24  was in jail awaiting sentence, he had a meeting that changed

25  his life.  A therapeutic community representatives came to the

jail and spoke with the participants there about joining a

therapeutic community as an alternative to their sentence if it

was a crime that was connected with drugs and they had never

had therapy or treatment before.

          Mr. Carmona took them up on that.  And, quite frankly,

you will learn that at the beginning it was just to avoid jail,

he did the math and figured being in a therapeutic residential

community was better than being in jail.

          But it actually changed his life.  He went through

that tough-love, no-excuses training on himself.  It was a very

hardcore philosophy.  Everyone, from the other participants to

the counselors and the psychiatrists constantly held his feet

as well as everybody else's feet to the fire.  They wouldn't

allow him to blame others for his responsibility and for his

lot in life, to play the role of the victim.

          He was called out on his behavior when it was

inappropriate, when it was self-destructive and there was no

sugarcoating for excuses made for him.  He learned from that.

          Harsh language was often used during this process.  In

fact, sometimes other black participants, counselors and other

leaders, would tell him if he was acting like a nigger.

          You know what, this tough love, it all worked.  It

turned his life around.  The day that he went into that

therapeutic community was the last day he took drugs.

          While he was part of that community, he turned it

 1    around.  He got a job, he went to college.  He went to Columbia

 2    University to get his master's in social work, and he's been

 3    working in the not-for-profit sector every day since.

 4            It was all because of this therapeutic community that

 5    cared enough to reach out to him, one of the disenfranchised,

 6    and to teach him through tough love and plain sometimes very

 7    harsh talk that you're responsible for your own fate and you

 8    need to accept that to improve your lot in life.

 9            So when he was approached by the other founders with

10    an idea for an organization, for what became STRIVE based on an

11    empowerment model, is it any wonder that he chose to base it on

12    an organization whose philosophy had so impacted and as you

13    will learn during this trial that became his personal

14    philosophy as well, not just with the participants but with

15    everyone, the other employees.  Every time he would do that, he

16    would talk in that way to help people grow and improve the same

17    way it was done for him.  He did it the way he knew, the same

18    way it was done for him.

19            So it is very important to keep this in the backdrop

20    of your mind when you are listening and analyzing the

21    allegation that the plaintiff makes.

22            Now, I am going to turn very briefly to some of the

23    specific allegations in the case, but I don't want to take up

24    too much more of your time.

25            First, my opposing counsel has indicated that

1    plaintiff is going to have you believe that she was fired as a

2    result of some sort of discrimination or retaliation.  But the

3    evidence will show that that is not possible, because the

4    length of her position was predetermined at the time of the

5    hiring process.

6          You will learn that she was hired pursuant to a grant

7    that was received from the U.S. Department of Labor in

8    connection with a green jobs initiative which you will learn

9    more about.  That grant you will learn was internally at STRIVE

10   called pathways out of poverty.  The grant had a specific term.

11   It was set to end originally January 28, 2012, and then later,

12   when an extension was granted in January, the extension until

13   the end of June 2012.

14         You will learn and hear evidence that this position,

15   the plaintiff's position was created pursuant to that grant and

16   funded 100 percent by that grant.  You will also hear evidence

17   that plaintiff was well aware of this.  You will hear evidence

18   that all of the applicants for this position were told this

19   during the hiring process.

20         You will also find and learn evidence that in the past

21   when a position was 100 percent funded by a specific grant and

22   that the sole purpose of that job was only to carry out the

23   mission within that particular grant, that at the end of that

24   grant the position was sunsetted and therefore the person was

25   let go.  That is all that happened here, ladies and gentlemen

 1    of the jury, as the evidence will show.

 2              Now, with respect to the claims of this harassing

 3    environment, what the plaintiff is claiming is that, primarily

 4    through Mr. Carmona, there was a work environment that was

 5    created that was hostile to her because she was a woman and

 6    because she was black.

 7              Now, understand the judge will instruct you on the law

 8    later, but what she is claiming is that STRIVE in general and

 9    Mr. Carmona in particular had an animus against women and

10    against black people.

11              Of course, as you will learn, most of STRIVE's

12    employees are women and most of them are black.  And

13    Mr. Carmona is himself black, as you yourselves can see.

14              In hearing the allegations that plaintiff testifies to

15    during the trial, I want you to keep in mind this hardcore

16    nonsugarcoating philosophy that Mr. Carmona had in the way he

17    lived his life with all of those around him.  The evidence will

18    show that it was this philosophy that was the impetus for any

19    of the statements that were made and not race or gender.

20              Of course, the centerpiece of plaintiff's case, as was

21    already introduced to you by opposing counsel, was a

22    conversation in which Mr. Carmona during that conversation told

23    plaintiff that she was acting like a nigger.  The same thing

24    that had been told to him in the past when people were trying

25    to steer him straight.  But you do not need to take the

1  plaintiff's word for it, you do not need to take Mr. Carmona's

2  word for it in terms of the interpretation or the description

3  of that conversation, because it's been memorialized on tape,

4  so you will be able to hear the words, the tone, the

5  inflections and the overall message.

6      You will hear the tape, and you will be able to reach

7  your own conclusions.  And in listening to it the evidence will

8  show you that Mr. Carmona was trying to help the plaintiff in

9  this CHECK conversation and using tough words to get the

10  message across.

11      In fact, the evidence will show, you will hear him say

12  that he was telling her that she had the capacity to go

13  straight to the top if she would just stop letting her emotions

14  control her.  Again, ladies and gentlemen, I do not need you to

15  take my word for it either.  The evidence will show that.  You

16  will hear the tape.

17      Now, plaintiff apparently wants you to believe that

18  the use of the word nigger in that conversation was so shocking

19  and it shook her world, but the evidence will show that she

20  couldn't have been all that shocked because she used that word

21  all the time in STRIVE offices.

22      The evidence is also going to show the strange timing

23  of her internal written complaint to STRIVE, the first time the

24  evidence will show in almost two years of employment that she

25  took this step.  The evidence will show that she took this step

 1   and made this complaint just after she had had a string of

 2   conversations with various members of STRIVE about problems

 3   with her performance and with her conduct, such as attire

 4   issues, problems with the manner that she communicated with

 5   other employees in the office; and in fact, issues where she

 6   was counseling people, participants, when that was neither her

 7   role nor within her skill set and could have been contrary to

 8   the goals of the participants themselves.

 9          Timing is also interesting you will see because it was

10   only about two months before she knew her job was sunsetting,

11   and she was going to have to be out there looking for another

12   job and potentially unemployed for some time.  Only then did

13   she take the step of filing this complaint.

14          More so the evidence will show that Mr. Carmona was

15   actually one of the plaintiff's staunchest supporters.  The

16   evidence will show that when others expressed concern about her

17   performance and whether or not she could continue working

18   there, Mr. Carmona advocated to them on her behalf, believing

19   that she could turn her path around.

20          So you will see, ladies and gentlemen of the jury,

21   that the evidence will show there was no hostile work

22   environment based on race or gender.

23          My opponent also mentioned a claim of retaliation

24   arising out of this complaint that was suddenly filed less than

25   two months before her job was to end.

1          The evidence is going to show that STRIVE did exactly

2     the right thing upon receiving that complaint.  The evidence

3     will show that it was Mr. Weinberg who received the complaint

4     personally on behalf of STRIVE.  Upon reviewing it he

5     immediately advised the plaintiff that he had received it, that

6     he considered it important, that he would begun an

7     investigation, and that he would keep it confidential to the

8     best of his ability.

9          The evidence will show that Mr. Weinberg, with one of

10    STRIVE's board members Andy Rahl immediately embarked upon an

11    investigation speaking with many different people, individuals

12    that had been raised in that complaint as individuals with

13    knowledge.

14         The evidence will show that they did not speak to

15    anyone about the complaint unless it was necessary for the

16    investigation and that when doing so those individuals were

17    advised not to discuss it with others.

18         The evidence will show that, to the extent the

19    plaintiff felt isolated after filing her complaint, that was

20    due to her conduct.  She asked initially to work at home the

21    evidence will show.  In addition, the evidence will show that

22    she told others at STRIVE about her complaint.

23         Ladies and gentlemen of the jury, I want to end my

24    opening remarks with where I began.  The evidence will show

25    that this case is proof of the credo that no good deed goes

1   unpunished.  The evidence will show that plaintiff was given a

2   job, a wonderful opportunity, given several opportunities to

3   succeed and improve even when her performance was not up to

4   par.  She was given warnings, she was given counselings, and

5   she repaid this by filing this meritless lawsuit.

6           All I ask you, ladies and gentlemen, is that you keep

7   an open mind throughout this entire process.  Listen to each

8   one of the witnesses that come before you.  Listen to the

9   cross-examinations.  Examine those documents carefully.  Listen

10  to the recordings.  Consider them all against the backdrop of

11  STRIVE's purpose, its mission, and its philosophy.

12          And in the final analysis, at the end of this case I

13  will ask that you return with a just and true verdict in this

14  case one, in favor of the defense.

15          Thank you.

16          THE COURT:  All right.  Ladies and gentlemen, it's

17  really close enough to lunchtime.  Why don't we adjourn now and

18  return at 2:15.

19          Do not discuss the case amongst yourselves or with

20  anybody else.  I should tell you that tomorrow we have to

21  adjourn somewhere around 2 to 2:30.  I kind of like to not miss

22  any time if I can avoid it.  There really are a couple of

23  choices, but my preference is that we start at 9 o'clock and

24  the government provide coffee and doughnuts at around 11 and we

25  go until 2 and then be finished with the day.

1          So, if you can handle that, I just don't know whether

2     you can get here at 9 o'clock, but if you can all agree to do

3     that -- there are plenty of other options -- that would be my

4     choice.  In any event, you are excused now.  Do not discuss the

5     case amongst yourselves or with anybody else.  We will see you

6     at 2:15.

7          (Luncheon recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    A F T E R N O O N   S E S S I O N

2                      2:15 p.m.

3         THE COURT:  I am going to assume that we can start at

4    9:00 in the morning tomorrow and you will have appropriate

5    refreshments waiting for you, which ought to bring you on time

6    hopefully.  We'll have a recess and you can bring something or

7    there may be something left.  We'll go until 2:00 and it will

8    be over for the day.  We might not have lost more than an hour

9    more than what we might have had.

10        Are we ready for the plaintiff's first witness if the

11   plaintiff is ready to put her first witness on the stand?

12        MS. MESIDOR:  We're ready, your Honor.  The plaintiff

13   calls Ms. Brandi Johnson to the strand.

14        THE DEPUTY CLERK:  Raise your right hand.

15    BRANDI JOHNSON,

16        called as a witness by the Plaintiff,

17        having been duly sworn, testified as follows:

18   DIRECT EXAMINATION

19   BY MS. MESIDOR:

20   Q.  Good afternoon, Ms. Johnson.

21   A.  Good afternoon.

22   Q.  Are you comfortable?

23   A.  Not really, but I am okay.

24   Q.  Ms. Johnson, could you please state your full name for the

25   record?

1   A.  Brandi Johnson.

2   Q.  How old are you?

3   A.  38.

4   Q.  Where do you live?

5   A.  Manhattan, New York.

6   Q.  What is your highest level of education, Ms. Johnson?

7   A.  Masters degree.

8   Q.  What is your marital status?

9   A.  Single.

10  Q.  Do you have any children?

11  A.  Two.

12  Q.  What are their ages?

13  A.  My daughter is 15 and my son is 17.

14  Q.  Ms. Johnson, did there come a time when you began to work

15  at an organization known as STRIVE?

16  A.  Yes, ma'am.  Back in May 2010.

17  Q.  How is it that you came to work at STRIVE?

18  A.  I applied for a position as a director of affiliated

19  services of Ideal.org.

20  Q.  What is Ideal.org?

21  A.  It is a career or employment website that hold open

22  positions for nonprofit.

23  Q.  What, if anything, did you do to further your application

24  for a job at STRIVE?

25  A.  I sent in my resume and cover letter.

1  Q.  Did there come a time when you were actually brought in for

2  an interview?

3  A.  Yes.  I was contacted by Lisa Stein.

4  Q.  And during that interview, what was your understanding of

5  what you would be doing within your position?

6  A.  I was -- my understanding was I was going if I was hired

7  for the position I would be the director of affiliated services

8  that entails bringing STRIVE back nationally back online as

9  well as research and other grant opportunities for the

10  organization.

11  Q.  What do you mean by bringing them back online?

12  A.  Prior to me becoming employed at STRIVE, STRIVE national

13  has I believe 20 or 21 affiliate organizations and the

14  affiliates STRIVE national partnership to my understanding was

15  not in good standings.

16  Q.  What do you mean by it wasn't in good standing?

17           MR. MINNAH-DONKOH:  Objection.

18           THE COURT:  Sustained.

19  Q.  During the course of your interview what was your

20  understanding as to what the salary would be?

21  A.  We never discussed salary.

22  Q.  Did there come a time when the position was offered to you?

23  A.  Yes.  After the second interview -- at the close of second

24  interview, I was offered the position of coordinating

25  assistant, which was different than director of affiliated

1   services.  Lisa Stein assured me it was just a title change but

2   the same position.

3   Q.  What, if anything, in your work experience or background do

4   you believe qualified you for that position?

5              MR. MINNAH-DONKOH:  Objection.

6              THE COURT:  I will allow it.

7   A.  Answer?

8   Q.  Yes.

9              THE COURT:  You can answer.

10             THE WITNESS:  Thank you.

11  A.  Several years working for nonprofit, one of the

12  organizations being a partnership with STRIVE which is the

13  Consortium for Workers Education.

14  Q.  And how long did you work at CWE?

15  A.  I think two or three years.

16  Q.  What was your understanding as to what the funding source

17  of your particular position was?

18  A.  There was no understanding.  We never discussed funding

19  sources.  I can recall during the interview that I specifically

20  indicated that I did not want another position that had a time

21  period because my prior positon at Consortium Workers Education

22  was grant funded.  In addition, I had already -- I was offered

23  a position at the National League of nursing, which I would

24  have taken if it was discussed that the position was tied to a

25  particular grant.

1          THE COURT:  Excuse me.  Let's move on.

2          MS. MESIDOR:  Your Honor, could I have permission to

3    have the court reporter read back the last response?

4          THE COURT:  Sure.

5          (Record read)

6    BY MS. MESIDOR:

7    Q.  Ms. Johnson, I am going ask you as you are testifying to

8    keep your voice elevated and slow down a little bit so the

9    court reporter gets everything that you are saying, okay?

10   A.  Yes.

11   Q.  Now, you just indicated that your previous position at CWE

12   was grant funded?

13   A.  Yes.

14   Q.  And during your time at CWE did you have knowledge if your

15   position was grant funded?

16   A.  Yes.

17   Q.  At the time that you -- did there come a point in time when

18   you were offered the position at STRIVE?

19   A.  Yes.

20   Q.  Who was your supervisor when you were first hired at

21   STRIVE?

22   A.  Initially it was Robert Carmona.

23   Q.  What interactions, if any, did you have with Mr. Carmona

24   toward the beginning of your employment?

25          THE COURT:  I don't know what "interactions" mean.

D8Q6JOH4                    Johnson - direct

1  You want conversations, ask for conversations or if you want

2  something else, ask for something else.

3  Q.  Ms. Johnson I am going to draw your attention to the

4  first -- your first six months at STRIVE.

5  A.  Okay.

6  Q.  During your first six months at STRIVE, what conversations

7  did you have with Mr. Carmona during that period of time?

8  A.  Initially STRIVE was a great place to work.  I was happy

9  to --

10            THE COURT:  These are conversations?  Was that a sign

11  on the door?  In other words, just give us what you said to him

12  and he said to you.  Is that okay?

13            THE WITNESS:  Okay.

14            THE COURT:  In substance I am not suggesting verbatim.

15            THE WITNESS:  Okay.

16  A.  During the first week or two Mr. Carmona asked me to write

17  an introduction for me to introduce myself to all of the

18  affiliates.  I provided -- I e-mailed Mr. Carmona my

19  introduction.  He revamped it and submitted it to all the

20  affiliated 21 affiliates.  One -- during the 30 to 45 days at

21  STRIVE Mr. Carmona came to me at my desk and approached me at

22  my desk, Yo, Brandi, I need to talk to you.  Pardon me.  I

23  apologize.  I got up.  Followed Mr. Carmona into the conference

24  room where he was yelling and screaming at me in an offensive

25  tone in regards to a conversation he made me believe that he

1    had with Eric Treworgy who was at that time the CEO.  He

2    indicated that Eric had informed him that I told him something

3    regards to two other staff members working at STRIVE, Emmanuel

4    Pochecho and Maria Ortiz, and it was rumored that they was

5    having a romantic relationship, which was against STRIVE

6    policies and procedures.  And the manner in which he was

7    yelling and screaming at me I indicated that was in the

8    conversation that Eric and I had.  He told me I am the kind a

9    woman who throw a woman under the bus, I had a sick way about

10   myself.  And I asked him to go get Eric, I wanted to clear it

11   up.  He said if Eric comes back in the conference room and the

12   conversation is suggested he laid out I was going to be

13   terminated on the spot.  I asked him go get Eric.  He left out

14   the conference room, slammed the door.  Came back 15 minutes

15   later without Eric.  He indicated that Eric said that is not

16   the manner in which the conversation taking place that he

17   didn't believe him.

18           I am sorry.  He didn't believe him and if Eric was --

19   excuse me my French -- Eric was an asshole I would have put

20   Manny in the line of fire or something similar to that or

21   possibly cause Emmanuel his job.  He tells me if he ever hears

22   anything like that about me or I will be terminated on the

23   spot.

24   Q.  Did there come a time when you tried to resolve the issue?

25   A.  I did.  I was very bothered.  I never had a supervisor yell

1    and scream and curse at me like that especially if something

2    that I never said or in the manner in which he believed it was

3    presented to him.  So I at the time Robert Carmona and Eric

4    Treworgy was sharing an office.  I went to the office and I

5    asked Eric can I speak to him, and he told me, No, you fucking

6    can't.

7    Q.  Who said that to you?

8    A.  Robert Carmona.  I walked away, head down.  Extremely

9    bothered.  I went and sat at my desk.  I think I cried.  I

10   think I was crying.  Eric came out of the office and said give

11   him a couple minutes or something and he will talk to me and he

12   came back later that day and we spoke.  He indicated that was

13   manner in which he would handle the situation.  He didn't tell

14   Rob -- he didn't say that to Rob and possibly I would be the

15   one to put Rob in his place or put Rob in check or something

16   like that and I said something why me.  I didn't want to -- I

17   just wanted to do my job.

18   Q.  After that conversation with Mr. Treworgy when was the next

19   time that you recall having a conversation with Mr. Carmona?

20   A.  So it could have possibly been that week.  I was quiet.  I

21   just wanted to do my job.  I have seen Carmona blow up and I

22   was the blunt of the blowing up and I didn't want to go through

23   that again.  I was quiet.  I walked around the office possibly

24   not speaking, just trying to work.  He came past my desk and

25   said something, not a verbatim, similar to I am walking around

1    here with my head down like I want some fucking attention just

2    do my fucking job.

3    Q.  Did you respond to Mr. Carmona when he said that to you?

4    A.  I turned my back.

5    Q.  Did you ever complain to anyone regarding that?

6    A.  Eric.

7    Q.  And when you say "Eric," do you mean Eric Treworgy the CEO?

8    A.  Yes.

9    Q.  What, if any, steps you are aware of did Mr.Treworgy take

10   in response to your complaint?

11               MR. MINNAH-DONKOH:  Objection.

12               THE COURT:  If you know of your own personal knowledge

13   I will take it.

14   A.  I was -- Lisa Stein --

15               THE COURT:  No.  No.  You have to know because of the

16   conversation I suppose with Eric.

17               THE WITNESS:  I assumed.

18               THE COURT:  No.  That will not help.

19   Q.  Did Mr. Carmona continue to be your supervisor?

20   A.  No.

21   Q.  At what point did Mr. Carmona cease to be your supervisor?

22   A.  After these incidents.

23   Q.  Who became your supervisor after?

24   A.  Lisa Stein.

25   Q.  After Ms. Stein became your supervisor what conversation,

1  if any, do you recall having with Mr. Carmona?

2  A.  I don't recall having any conversations at that point.  I

3  was relieved that he was not my supervisor.

4  Q.  Does that cover the first six months of all the

5  conversations you recall having?

6  A.  Pretty much.

7  Q.  Now I am going to call your attention to the next six

8  months.  Do you recall at that point -- now we're speaking

9  about the period time after which Ms. Stein became your

10  supervisor -- whether the six months after that whether you

11  recall having any conversations with Mr. Carmona?

12  A.  For the most part, yes.  I tried to initiate a friendship

13  or something.  I just wanted Rob to leave me alone.  I

14  didn't -- I didn't say anything.  I wanted Rob to leave me

15  alone.

16  Q.  When you tried to initiate a friendship, what do you mean

17  by that?

18  A.  I would go to him and ask for advise that I didn't

19  necessarily need.

20  Q.  Does that cover the conversations that you had with Mr. --

21  are you all right?

22  A.  I'm fine.

23  Q.  Ms. Johnson, does that cover the conversations that you had

24  with Mr. Carmona the first six months that Ms. Stein was your

25  supervisor?

1   A.  I can't give you an exact details.  I just know it was a

2   hostile place for me.

3           THE COURT:  He wasn't your supervisor for these six

4   months, right?

5           THE WITNESS:  No.  Rob Carmona was not my supervisor.

6           MS. MESIDOR:  Ms. Johnson his Honor is offering you

7   some tissue.

8           THE COURT:  I want to see you, though, so push it this

9   way a bit.

10  A.  First six months.  For the six months.

11  Q.  After that period of time, did there come a time that you

12  brought any issues or concerns to Mr. Carmona's attention?

13  A.  Yes.  I brought several issues to Mr. Carmona's attention

14  in regard to how staff was feeling.  I guess staff morale

15  seemed low.  We pulled people in the conference room and he

16  indicated one -- he wanted to use the word loosely when his

17  colleagues loosely informed him --

18          MR. MINNAH-DONKOH:  Objection.

19          THE COURT:  This conversation that you had with an

20  individual or you are just telling us something you heard from

21  Mr. Carmona or.

22          THE WITNESS:  It was at a staff meeting.  I had

23  conversation with him.

24          THE COURT:  We'll be glad to take your language.

25  A.  He wanted to use the term loosely a colleague had informed

 1   him, I guess, something regards to the staff wasn't happy.  He

 2   made reference to we should just be -- the whole time the

 3   STRIVE has been in the black or red -- I guess some sort of

 4   financial term -- and none the staff has ever missed a paycheck

 5   especially with the economy where it was at.  So he inferred

 6   that we should just --

 7              MR. MINNAH-DONKOH:  Objection.

 8              THE COURT:  We can only take what you think he said,

 9   but I assume you are telling us in substance this is what he

10   said?

11              THE WITNESS:  Yes.

12              THE COURT:  Go ahead.

13   A.  We should be happy to be getting our check.  Some people

14   don't have that.  Some of the other nonprofits are not doing as

15   well so I guess be grateful that we're getting paid.

16   Q.  Did you ever bring any other concerns to Mr. Carmona?

17   A.  I brought several to Mr. Carmona.  I brought a concern to

18   Precious.  She was one the STRIVE participants.

19   Q.  Okay.  What is a participant?

20   A.  A client.  Precious was enrolled in the Greens training

21   program, but part of my responsibility was to -- we had some --

22   I apologize.  One of the performance measures was to make sure

23   that I believe it was 30 percent of woman participant and

24   graduate from the Greens training program.  So I spoke to Larry

25   Jackson in regards to an all woman's support group because we

1    had something similar to that.  So I -- I found a facilitator.

2    I co-facilitated the group.  Precious was part of the group.

3    Precious has a barrage of issues, as a lot of our clients did.

4    One day she called me and asked could she come talk --

5              MR. MINNAH-DONKOH:  Objection.

6              THE COURT:  Overruled.

7    A.  She asked if she could come speak to me.  I told her sure.

8    I had no idea she was coming in that day.  So she came in and

9    this is right before the staff meeting and she indicated to me

10   that one of the ex-trainers Angel Hill had made sexual passes

11   at her or sexual advances toward her during the training.  I

12   brought that to Rob's attention.  I asked him -- I didn't know

13   what steps to take if any steps should be taken at all.  I

14   didn't know what my role would be.  So I asked Rob to step into

15   the conference room.  I said we have a client Precious who

16   indicated --

17             THE COURT:  We don't need it twice.  What did he say?

18             THE WITNESS:  He said, Where is she?  I said, She is

19   at my desk.  He told me to hold on.  He went and got a senior

20   director supportive services, Earnest Johnson.  All three of us

21   went back to my desk.  Precious sat there.  She gave her

22   accounts of what happened.  Both Carmona and Earnest Johnson

23   seem disinterested.

24             THE COURT:  How did they evidence their disinterest?

25   A.  One of the questions was I believe -- I believe it was on

D8Q6JOH4                    Johnson - direct

Ms. Earnest Johnson, Why are you telling us now?  She indicated

that he was still here and she was uncomfortable telling when

he was here, but she just wanted to let us know now and Earnie

asked, What do you want us to do?  It was a nonchalant

attitude.

          THE COURT:  I don't know what that means so I will

strike the answer.

Q.  In what way, if any, did Mr. Carmona exhibit a disinterest

in the harassment complaint?

A.  I believe they said, Well, if you want us to do -- if you

want us to follow up with it, come back tomorrow or come back

to write and we'll look into it.  Both Rob and Earnie walked

away.  Precious sat at my desk and she was bothered.  So it

was -- it was almost at the close of day about 4:45, 4:30-ish.

I told -- I got an e-mail, text message from Lisa Stein why did

I not come to the meeting.  I indicated to her that the young

lady came to my desk while Earnie and Rob spoke to her and I

wanted to make sure she was okay, but Rob and Earnie would have

given her updates on it.  The very next day Lisa Stein pulled

me in the office and was disappointed in the manner in which I

handled the situation.  I didn't know how to handle the

situation.  I thought I was doing the appropriate thing.  I was

told not to counsel the participants because that was not in

any job description.  I didn't know.  What should I have done?

Q.  What, if any, subsequent conversations did you have with

Mr. Carmona regarding the complaint of the participant known as

Precious?

A.   After I spoke to Lisa, she told me it was a code yellow and

not a code red and I need to use better judgment.  I went back

to my desk.  Later on Rob came in and told me to walk with him

and told me that I used poor judgment and I said and I

indicated to him I think he -- I believe he said that I am

allowed my own personal judgments to skew my judgment and

Precious was ugly as shit and she -- she wasn't Angel's type,

but she would have enjoyed it anyway or something like that.

The next time I feel like using -- next time -- don't use --

don't use my judgment wrong.  Something about take my emotions

out of it or stop being so emotional.  I don't recall.

Q.   During your time at STRIVE, did you ever have any visitors

come to you?

A.   Clients as well as family members, yes.

Q.   Did there come a time where a visitor by the name of Dwayne

Hubbard?

A.   Yes.  He was an ex-STRIVE employee.

Q.   What, if anything, do you recall during your first two

years at STRIVE occurred when Dwayne Hubbard came to see you?

A.   The Dwayne Hubbard was a -- I don't know if I should say --

to my knowledge he was an exemplary employee.  He was the

maintenance guy who moved up to a assistant in core training.

Dwayne had started having family issues.  Then Dwayne was a

STRIVE participant, but he had relapsed and he had job

abandonment.  STRIVE gave himself 30 days to get involved in a

30-day in-patient or outpatient drug rehabilitation center.

I assisted Dwayne with on my off hours trying to

secure him a bed in one of the rehab programs.  I am sorry.  It

didn't work out.  Dwayne didn't meet the requirements to secure

his job so Dwayne came back to STRIVE.  He didn't come see me.

He came back to STRIVE, I guess, to see STRIVE.  He didn't have

an appointment is what I am saying.  When he came back at my

desk, it was during an audit.  We was being audited by the

Department of Labor.

A.  He came back to to my desk.  He cried.  Gave him a hug.  I

apologized for his circumstances.  Rob walked past and said,

Yo, in my office.  So Dwayne and I both looked at each other

and I thought it was me.  That is the normal manner in which

Rob spoke to me.

I am sorry.  Sorry.  When he came out of Lisa's office

he walked back and motioned for Dwayne to into his office.  At

that time Rob started yelling and screaming with Dwayne and he

start a confrontation with Dwayne in a loud fashion.  Both

Lisa' office and -- Rob and Lisa's office were directly next to

to each other so I was concerned about the auditor hearing that

we had a staff member that was a drug addict and, you know,

secured documents so I got up and closed Rob's door.  Dwayne

left out of the office.  Let me see you for a minute.

D8Q6JOH4                        Johnson - direct

1    Q.   Who said that?

2    A.   Rob to me.  I got up went to see Rob.  Danny was in this

3    the office.  Rob was getting his coat.  He pointed in my face.

4    If I would breathe, he was this close to my house.

5    Q.   Let the record reflect that the witness put her hand in

6    front of her face with a short distance between her nose and

7    hand.

8    A.   If I want my fucking door closed, I would have fucking

9    closed it myself.  I tried to explain to Rob we had an auditor

10   there and he said, The problem with you is that you always

11   coddling somebody.  I wasn't trying to coddle.  I was trying to

12   keep the auditor from hearing the conversation.  I tried to

13   explain that to him.  If I want my fucking door closed, I would

14   have closed my fucking door.  Lisa walked in and she walked

15   out.

16   Q.   When you say Lisa, are you referring to the defendant Lisa

17   Stein?

18   A.   Yes, I am.

19   Q.   What was Ms. Stein's position at the company at the time?

20   A.   She was human resources and CFO.

21   Q.   What, if anything, did Ms. Stein do?

22   A.   She left the office.

23   Q.   Did there come a time that you complained to anyone about

24   this incident?

25   A.   That very day after the auditor had left, I went to Lisa's

 1   office.  I was crying and explained to her Rob yelled and

 2   screamed.  I didn't explain to her you seen Rob yell and scream

 3   in my face and I explained to him why and she said, Well, you

 4   know, that is just Rob.

 5   Q.  Was there anything else said during that conversation?

 6   A.  She indicated that I needed to get tougher skin because

 7   that is just how -- that is who Rob is.

 8   Q.  So that is the first time that you complained to Ms. Stein?

 9   A.  No.

10   Q.  To your knowledge, and I only want you to testify to what

11   you personally know, did Ms. Stein ever take any action on any

12   of your complaints?

13   A.  Not to my knowledge.

14   Q.  What, if anything, did you do in response to the inaction

15   that was taking place in response to your complaints?

16           MR. MINNAH-DONKOH:  Objection.

17           THE COURT:  Overruled.

18   A.  Can you repeat?  I don't understand the question.

19   Q.  Sure.

20           THE COURT:  What did you do, if anything, as a

21   response to this kind of conversation.

22           THE WITNESS:  I didn't do anything.  I felt defeated.

23   What could I do?  She was human resources person.  Rob was the

24   founder of the organization.  I needed my job.  What could i

25   have done?  Every time I complained, it went unheard.  What

1    could I have done?

2    Q.   Did there come a time when you began recording your

3    conversations?

4    A.   I did.   After Rob pointed in my face, I went home and I

5    told my partner that this guy is really nasty to me and he said

6    it can't be that bad.   It was a time when an employee from CWE

7    came to STRIVE was inappropriately dressed.   The office was in

8    a buzz in regards to what her attire.   I -- I didn't know what

9    Rob seen what she had on.   I had no clue, but I am sure he did

10   call her.   I was standing by the reception desk with clients as

11   well as staff and Rob walked out and said, Yo, Brandi.   You and

12   Ms. Thomas, what is her name from CWE?   Y'all just alike.

13   Y'all just alike.   And I was bothered because I didn't see

14   myself coming to work with an inappropriate attire that

15   Ms. Thomas had on or I didn't see myself as being like

16   Ms. Thomas.

17   Q.   What race is Ms. Thomas?

18   A.   She is African-American.

19   Q.   And did there come a time when you required of Mr. Carmona

20   as to what he meant?

21   A.   Yes.   I waited because he told me, you know, check my

22   emotions at the door from the last conversation.   So I went

23   home to think about it, came back the next door and I asked Rob

24   and that is when I decided to tape the conversations.   I didn't

25   expect to get the nigger that he called me.

1          MS. MESIDOR:  Your Honor, at this time plaintiff would

2     like to play Exhibit 106, which is has already been admitted

3     into evidence, which is the tape-recording that Ms. Johnson

4     just testified to making.

5          THE COURT:  Ladies and gentlemen, you should

6     understand that the tape here has been admitted.  It is the

7     evidence in the case I believe, although I haven't heard it,

8     that the plaintiff was going to also provide a transcript for

9     each of you.  The transcript is simply for you to follow along

10    with.  It is not the evidence in the case.  It is just an aide.

11         MS. KREBS:  Your Honor, we have not agreed or

12    consented to the transcript.

13         THE COURT:  I let it in.  Isn't it on my exhibit list

14    as admitted?

15         MS. MESIDOR:  Yes, demonstrative.

16         THE COURT:  Can you read in and out?  I don't meant to

17    say that disparagingly?

18         MS. KREBS:  Your Honor, my --

19         THE COURT:  I can't hear.

20         MS. KREBS:  It was my understanding that there were

21    concerns about the accuracy of the transcription.

22         THE COURT:  If I let it in, those concerns are not

23    obviously uppermost.

24    BY MS. MESIDOR:

25    Q.  Ms. Johnson, before we hear what has been let into evidence

1    as Exhibit 106, do you remember what Ms. Thomas was wearing on

2    the day in question?

3    A.  Ms. Thomas was wearing a very short dress.  She had on hot

4    pink tights with these hot pink glitter shoes.  It was very

5    inappropriate for the office.

6            THE COURT:  My chart by the way seems just for your

7    information in case is incorrect.  It says to be admitted by

8    stipulation, which would have meant that you agreed or that is

9    what stipulation means to me.  Let's keep moving along.

10           MS. MESIDOR:  We'll now play Exhibit 106.

11           (Audio played)

12   BY MS. MESIDOR:

13   Q.  Ms. Johnson, is that the recording that you made of Mr.

14   Carmona?

15   A.  Yes.

16           THE COURT:  Is there a date?

17   Q.  Ms. Johnson do you recall when you made that recording of

18   Mr. Carmona?

19   A.  I don't have --

20           THE COURT:  Do you put dates on these or when you gave

21   them to you or when you took them or whatever happened?

22           MS. MESIDOR:  Your Honor, March 14th, 2012.  It is on

23   the front cover of the transcript.

24           THE COURT:  I have the front cover of the transcript.

25   It is not on mine.

1          MS. MESIDOR:  It says B. Johnson.  Underneath it says

2     2012 0314.  Your Honor, if you look at end of the transcript it

3     was done by a certified transcriber.  There is a certificate in

4     the back at the end also.  They lifted it specifically from the

5     files.

6          THE COURT:  I don't know what that means, but it is

7     okay.  I see the front now.  I can make out the numbers.  So

8     you are telling me it was March 14th, 2012.  Is that what you

9     are saying?

10          MS. MESIDOR:  Your Honor, are you inquiring of me or

11     the witness?

12          THE COURT:  You.

13          MS. MESIDOR:  Yes, your Honor.

14     BY MS. MESIDOR:

15     Q.  Ms. Johnson, how did you feel after this conversation?

16     A.  How did I feel after the conversation, or how do I feel

17     now?

18     Q.  How did you feel after the conversation with Mr. Carmona on

19     or about March 14th, 1212?

20     A.  I was offended.  I was hurt.  I felt degraded.  I felt

21     disrespected.  I was embarrassed.

22     Q.  Why were you embarrassed?

23     A.  Because I should have said something other than I am

24     offended.  I should have did something else other than that?

25          THE COURT:  Was there anybody else present?

1              THE WITNESS:  Danny Gonzalez.

2              THE COURT:  Was there in the room during the

3     conversation?

4              THE WITNESS:  Yes.

5              THE COURT:  Who is she?

6              THE WITNESS:  Danny Gonzalez is a consultant for

7     STRIVE.

8     Q.   Where did the conversation take place?

9     A.   In Danny's office.

10    Q.   I didn't hear?

11    A.   In Rob and Danny's office.

12    Q.   What, if anything, did you do immediately after the

13    conversation with Mr. Carmona?

14    A.   I gathered my dignity and tried to get out of that office

15    before I started crying because he made it a point that I was

16    too emotional and I was not going to allow this man to see me

17    emotional or break down again.  He wasn't going to get that

18    from me.  I got up.  I left.  I went to the bathroom.  I

19    started crying.  Maria Ortiz came in the bathroom.  I told her

20    this man just called me a nigger and I cried.

21    Q.   How long were you in the bathroom for?

22    A.   About 45 minutes.

23    Q.   Did there come a time when you left the bathroom?

24    A.   Yes.

25    Q.   What, if anything, did you do with the remainder of the

1  day?

2  A.  I was bothered.  I think I tried to go back to work.  I

3  really couldn't work.  I felt ashamed.  I went home, cried and

4  went to sleep.

5  Q.  Ms. Johnson, this conversation that you had with Mr.

6  Carmona in which he indicated that you acted like a nigger,

7  have you ever seen Mr. Carmona have similar conversations with

8  other STRIVE employees?

9  A.  I have never heard Rob call anyone else a nigger ever.

10 Q.  Was the conversation that you had with Mr. Carmona

11 characteristic of the other types of conversations that you

12 had -- withdrawn.

13         Did you ever complain to anyone about this

14 conversation with Mr. Carmona?

15 A.  I didn't complain to anyone about the nigger conversation,

16 no.  I just told Maria.  Why would I complain?  Who want to

17 help me thus far?  Who would I complain to?

18         THE COURT:  I think we got your drift.

19 Q.  Did there come a time that you are aware of that STRIVE

20 became aware of the complaint regarding the nigger

21 conversation?

22 A.  Yes.  When they were served, the lawsuit.  The complaint

23 that I lodged against them, yes.

24 Q.  And in that complaint did you detail the conversation that

25 you had with Mr. Carmona?

1    A.  Yes, I did.

2    Q.  Did you also detail the conversation that you had with Mr.

3    Carmona regarding the Dwayne Hubbard incident?

4    A.  Yes, I did.

5    Q.  What about the conversation that you had with Mr. Carmona

6    regarding the Precious incident?

7    A.  Yes, I did.

8    Q.  And what, if anything, changed after you became aware

9    that -- withdrawn.

10            How did you know that STRIVE was aware of that

11   complaint?

12   A.  Phil Weinberg pulled me in his office.  Actually, no.  The

13   initial reaction I believe someone served them papers.  One of

14   the senior directors said, Oh, here we go with this shit again,

15   and that is when I knew that it was me that was -- it was me,

16   my complaint that was being served to them.  Phil Weinberg

17   pulled me in the office.  I don't think it was that day.  It

18   could have been.  I know Phil told me he got the complaint and

19   he is going to look into it.

20   Q.  Who is Mr. Weinberg?

21   A.  Phil Weinberg was the new CEO.

22   Q.  Is this Phil Weinberg the CEO at the time, is this the same

23   Phil Weinberg that is an individual defendant in this case?

24   A.  Yes.

25   Q.  At the time you became aware that STRIVE knew about the

1    complaint what expectation, if any, did you have as to what

2    would take place at that time?

3    A.   I don't know.  I expected it to stop, but it didn't.  Rob

4    became infuriated and I was made to pay.

5    Q.   When you say that you were made to pay, what do you mean by

6    that?

7    A.   I was isolated.  Rob had informed two of my coworkers that

8    they were being used.

9                THE COURT:  How do you know that?

10               THE WITNESS:  It was taped.

11               THE COURT:  Did they tell you that?

12               THE WITNESS:  Yes.  And Cami told Phil Weinberg as

13   well.

14               THE COURT:  I am interested in what they told you not

15   what they told Phil.

16               THE WITNESS:  Yes.  Cami taped Rob and forwarded it to

17   me a tape and I forwarded it to my lawyer.

18               THE COURT:  I don't think you got my drift.

19               THE WITNESS:  I am sorry.

20               THE COURT:  What was it that was said to you?

21               THE WITNESS:  Oh, Rob just -- Cammie and myself was

22   having lunch.  Rob walked passed and told them why was I there.

23   Wrap it up.  Wrap it up now.  So naturally all three of us

24   being females was extremely nervous, but I thought it was just

25   me.  So I gathered my stuff and tried to get over to my desk.

1    Cammie came back and told me come here.  Rob just pulled me and

2    Layette in the office and said Layette is going to meet me --

3              MR. MINNAH-DONKOH:  Objection.

4              MS. MESIDOR:  Your Honor, witness is replying to your

5    Honor's question as to what was actually told her.

6              THE COURT:  I think I probably can handle it.

7              MS. MESIDOR:  I am sorry, your Honor.

8              THE COURT:  Overruled.  You can keep going with the

9    very narrow question.  What was said to you by Cammie and or

10   the other lady.

11             THE WITNESS:  Rob told them don't be used.  This is

12   what they told me, yes.

13             THE COURT:  I only want what they told you.

14             THE WITNESS:  Yes.  Yes.  This is what they told me.

15   Don't allow themselves to be used.  His anger is not at them.

16   When he -- when Layette indicated that he reminded her that

17   when she nodded off at her desk, there was no harm, no foul and

18   told Manny and Manny sent her home so she could get some rest.

19   That Phil, Lisa and others have told them that they have been

20   doing a good job.  Don't let this take away their good

21   standings that they have at STRIVE.

22             THE COURT:  I think that will do it for me.  I am not

23   sure were this -- we'll talk about that later.

24   BY MS. MESIDOR:

25   Q.  During your conversation with Cammie, is that Cammie

1    Crawford?

2    A.  Yes.

3    Q.  When you say that you had a conversation with Layette, do

4    you mean Layette Hall?

5    A.  Yes.

6    Q.  During your conversation with Cammie Crawford and Layette

7    Hall, did they indicate to you -- withdrawn.

8          What, if anything, did you do after that conversation?

9    A.  I went and spoke to Phil.

10   Q.  What was that conversation?

11   A.  I asked Phil -- I indicated -- I told Phil that Rob -- that

12   we was eating at Cammie's desk with Layette and Cammie.  Rob

13   came and told them to wrap it.  He told them not to be used.

14         THE COURT:  We don't need to try this case two or

15   three times since the discrimination aspect in my view is thin

16   in my view.  Let's not do it twice or three times.

17   Q.  Ms. Johnson, what, if anything, did Mr. Weinberg say after

18   you explained to him what happened?

19   A.  He asked me to get Cammie.

20   Q.  Did you do that?

21   A.  Yes, I did.

22   Q.  Did you return--

23   A.  I returned with Cammie.  Cammie, myself and Phil sat down

24   and Cammie told Phil what happened.  She also indicated to Phil

25   she didn't understand that why it is always an issue with me.

1   Q.  Did Ms. Crawford make the statement in your presence?

2   A.  Yes, she did.  She also told me that she is uncomfortable

3   with Rob and Rob slams the door.  She doesn't want Rob to know

4   she came and told this and Phil told her she will won't be

5   punished.

6           THE COURT:  Where are we going here?

7   Q.  After that conversation that you had with Mr. Weinberg,

8   what, if any, actions -- withdrawn.

9           At the time that you had this conversation with

10  Mr. Weinberg and Ms. Crawford, was Mr. Weinberg already aware

11  of your complaint?

12  A.  Yes.

13  Q.  Going back to your statement that you felt that you were

14  made to pay, what other examples, if any, do you have that you

15  were made to pay after filing your complaint?

16  A.  As a participant I helped -- I assisted.  He came to see

17  me.  Rob told him not to come back and see me.  Something is

18  going on between myself and STRIVE and not to see me anymore.

19  When I went to approach to tell Phil what had happened, Rob

20  slammed the door on my face in front of Phil and Lisa.  There

21  was a time he -- Rob and Earnie was walking past my desk and he

22  said, Put this bitch in a smash, and turned around and looked

23  at me.

24  Q.  What did you think that meant?  How did you take that?

25  A.  I took it as a theft.

1    Q.  Did you make this -- all the examples that you just made, I

2    am going to take them step by step.  The slamming the door in

3    the face, was Mr. Weinberg aware of that?

4    A.  Mr. Weinberg and Ms. Stein was there, yes.

5    Q.  Did they do anything to stop him?

6    A.  No.

7    Q.  Did they say anything?

8    A.  No.

9    Q.  Do you have any other examples?

10   A.  I told you the slamming of the door in the face.

11              THE COURT:  Let's not repeat what it is.  Are there

12   others?  You can tell us others?  If there are no others --

13   A.  Besides the ones I indicated to you?

14   Q.  Right.  Aside from the ones you already indicated to me.

15   A.  I was subsequently fired.

16   Q.  When you say that you were subsequently fired, when did

17   that take place?

18   A.  June 11th.  Mr. Weinberg had asked me to work from home.

19   He said he received a complaint that one of my visitors

20   intimidated or made some of the staff that were uncomfortable.

21   I questioned something as how that was possible as to our

22   population is formerly incarcerated clients, disenfranchised

23   clients.  So I even inquired as to what was it about my family

24   member's demeanor that made someone -- he said and it wasn't --

25   he indicated to me it was not someone who lodged a complaint

1   that brought this attention but that was untrue.

2   Q.  Who was it that brought to your knowledge that brought this

3   complaint to Mr. Weinberg's attention?

4   A.  Rob Carmona.

5   Q.  Now, these incidents that you just described, the telling

6   the participant not to see you and all these other examples

7   that you gave what was the time frame between that and when you

8   were terminated?

9   A.  Weeks.

10  Q.  During the period of time after your complaint, was there

11  any change at STRIVE in terms of how you were treated?

12  A.  Yes.  It was a hostile work environment.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  That is really a conclusion which I think

2    we have at least six or eight people here to determine.

3        THE WITNESS:  Can I speak to how it made me feel or

4    not?  Sorry.

5    BY MS. MESIDOR:

6    Q.  Ms. Johnson, at the time that you were fired, what, if

7    anything, were you told?

8    A.  The day I got fired?

9    Q.  Yes.

10   A.  Was the first time I was made aware that my position was

11   attached to the Pathways grant and that they no longer had

12   funding for my position.

13   Q.  To your knowledge, were there other people whose positions

14   were presumably tied to the Pathways Out of Poverty grant?

15   A.  Yes, Christina Saenz, yes.

16   Q.  And was Christina Saenz terminated?

17   A.  No, she currently still works at STRIVE.

18   Q.  When you were told that your position was linked to the

19   Pathways Out of Poverty grant, who indicated that to you?

20   A.  Phil Weinberg in front of Larry Jackson.

21   Q.  Did you believe him when he said that?

22   A.  No.  No, I didn't believe him.

23   Q.  Why?

24   A.  Because that would be indicated to me at hiring.

25   Q.  Did you know when the Pathways Out of Poverty grant was

1   ending?

2   A.   Initially the Pathways Out of Poverty grant was scheduled

3   to end January 28 or 29 of 2012?  Yes.  However we put in for a

4   no-cost extension.  We never received word if we was approved.

5   Lisa told me just continue to do my work in January as if we

6   were approved.  Don't worry about it.

7   Q.   Did there come a time that you actually became notified

8   that the extension was indeed approved?

9   A.   I believe it was March or April.

10  Q.   Between the period of time of when the grant was supposed

11  to end and when you actually got notification that it was

12  extended, how much time had elapsed?

13  A.   Roughly three to four months approximately.

14  Q.   During that three- or four-month period, did you continue

15  to be paid?

16  A.   Yes.

17  Q.   Ms. Johnson, at the time that you were terminated from

18  STRIVE, did Mr. Carmona continue to work with STRIVE?

19  A.   Yes, he did.

20  Q.   During the period of time that Mr. Carmona, during the

21  period of time that you -- at the time that you were terminated

22  at STRIVE, were you aware of Mr. Carmona's role changing in any

23  way?

24  A.   I'm sorry.  I didn't hear what you said.

25  Q.   At the time that you were terminated with STRIVE, did you

1  ever become aware that Mr. Carmona's role at STRIVE had changed

2  in any way?

3  A.  No, Mr. Carmona, his role never changed.  He was still the

4  face of STRIVE.  Mr. Carmona was just recently aired on CBS.

5  Q.  You had previously indicated that Mr. Weinberg had

6  represented to you that he was going to be investigating your

7  claims?

8  A.  Yes.

9  Q.  During the course of Mr. Weinberg's purported

10 investigation, were you ever asked to participate in that

11 investigation?

12 A.  Yes.

13 Q.  What was your response to Mr. Weinberg when he asked you?

14 A.  I told him I didn't have an issue with participating in the

15 investigation.  I just wanted my lawyer present.

16 Q.  Did Mr. Weinberg ever follow up with you about asking you

17 any questions in furtherance of his investigation?

18 A.  He asked questions about, when I said I would like to have

19 my lawyer present, I wasn't, there was -- I am not sure if

20 there was any investigation going on.

21 Q.  Were you ever approached to participate in the

22 investigation after that conversation?

23 A.  No.

24 Q.  Were you ever given the results of that investigation?

25 A.  No.

1   Q.  As you sit here today, do you know the results of that

2   investigation?

3   A.  No.

4   Q.  Ms. Johnson, what effect, if any, has all that has

5   transpired at STRIVE had on you?

6   A.  I really can't put it into words.

7   Q.  Try.

8   A.  I am bothered.  I am very bothered.  More so with Phil

9   because I've trusted him.  I thought that he was going to come

10  in here and evoke change and what he did was cover up

11  everything I told him.  Every time I lodged a complaint, he had

12  an excuse for why Rob did what he did.  It shakes your

13  character, your person, you know, your being for someone to be,

14  to call you a nigger and say like you low class.

15          THE COURT:  I think the question is really what kind

16  of emotional distress did you suffer, and how did it manifest

17  itself?

18          THE WITNESS:  It shook my self-esteem.

19          I wasn't always an effective parent to my kids because

20  of this.  There were times when I would laugh to keep from

21  crying, times when I was in the house in my bed and didn't want

22  to be bothered and had to muster up the energy to get myself

23  together.  The confidence when you go out on another interview

24  are you going to be perceived as how these people perceive you.

25  Q.  Did there come a time where you sought the help or any

D81njoh5                    Johnson - direct

1    assistance regarding these issues that you were having?

2            MR. MINNAH-DONKOH:  Objection.

3            THE COURT:  Overruled.

4    A.  Yes, I went to seek therapy.  I sought help.  Diane

5    Schneider, my therapist, and Ethan Gorghaor.

6    Q.  And for how long did you treat with Dr. Gorghaor and --

7    A.  Mr. Gorghaor wasn't a long time.  His --

8            THE COURT:  How about the number of sessions.

9            THE WITNESS:  OK.  I seen, approximately three

10   sessions with Gorghaor.  His place was in his apartment, and I

11   was uncomfortable with that.

12   Q.  OK.

13   A.  Dr. Schneider, twice a week for months.  I don't --

14   Q.  Do you recall when you started seeing Dr. Schneider?

15   A.  I started seeing Dr. Schneider while I was employed at

16   STRIVE.

17   Q.  Do you know approximately when you were employed at STRIVE

18   that you were seeing Dr. Schneider?  For example, do you know

19   whether it was toward the tail end of your employment, the

20   beginning, the middle?

21   A.  It was in 2012.  Maybe February or March.

22   Q.  And when did you stop seeing -- withdrawn.  Do you continue

23   to see Dr. Schneider to this day?

24   A.  I do.  I haven't seen her in about two or three months

25   because she had some personal issue, but, yeah.

1  Q.  How often do you see Dr. Schneider when you do see her on a

2  regular basis?

3  A.  It depends on the week.  It could be two times a week or

4  once a week.

5  Q.  Are you taking any medication?

6  A.  Dr. Schneider gave me a referral to get prescription

7  medication.  I just don't want to be on prescription

8  medication.

9  Q.  Do you know the type of prescription medication that you

10  were --

11  A.  No.

12  Q.  -- prescribed?

13          Ms. Johnson, did there come a time when you were able

14  to find work?

15  A.  Yes.

16  Q.  When did you begin working?

17  A.  January 7 of this year, 2013.

18  Q.  Is it correct for me to say that between June 11, 2012 and

19  January 2013 that you were unemployed?

20  A.  Yes.

21  Q.  Did you earn any salary at all during that period of time?

22  A.  I received unemployment.

23  Q.  Did you know how much money that you lost during that

24  period of time?

25          MR. MINNAH-DONKOH:  Objection.

D81njoh5                    Johnson - direct

 1              THE COURT:  Sustained.

 2              If you know the number, but she won't know the number.

 3     So it seems better if I sustain it then to have her not do

 4     anything but guess.  If you have some documentation, maybe you

 5     can use that.

 6              MS. MESIDOR:  May I inquire if she knows the number,

 7     your Honor?

 8              THE COURT:  Sure.

 9     A.  I think it's close to $40,000.

10     Q.  Ms. Johnson --

11              THE COURT:  Close being like 30?  50?

12              THE WITNESS:  Close I think like 38,500.

13              THE COURT:  Do you have a piece of paper that supports

14     that?

15              THE WITNESS:  I did the math, but I don't have it.

16              THE COURT:  That's the problem.

17              THE WITNESS:  Sorry.

18     BY MS. MESIDOR:

19     Q.  How much do you earn in your current position?

20     A.  $50,000.

21     Q.  Is that more or less than what you earned at STRIVE?

22     A.  $10,000 less.

23     Q.  Where do you work now?

24     A.  I work for Harlem United Black Men's Initiative.

25     Q.  What do you do there?

1    A.  I am the program coordinator for YMSM and transgender,

2    workforce development.

3    Q.  Have you been consistently employed at Harlem United since

4    obtaining the position in January 2013?

5    A.  Yes.

6           MS. MESIDOR:  Your Honor, if I could have just a

7    moment to look over my notes.  I believe I don't have anything

8    further.

9           THE COURT:  Sure.

10          MS. MESIDOR:  May I, your Honor?

11   BY MS. MESIDOR:

12   Q.  During your time at STRIVE, Ms. Johnson, were you ever

13   given an employee handbook?

14   A.  Yes.

15   Q.  Does STRIVE have an antidiscrimination policy?

16   A.  Yes, they do.

17   Q.  Are you familiar with their antidiscrimination policy?

18   A.  Yes, I am.

19   Q.  Ms. Johnson, you were in the room before when defense

20   counsel was doing their opening statement, and a reference was

21   made to --

22          MR. MINNAH-DONKOH:  Objection.

23   Q.  -- the tough love --

24          MS. MESIDOR:  The question is --

25          THE COURT:  You think you ought to let her finish the

1    question?

2              MR. MINNAH-DONKOH:  Yes, your Honor.

3              THE COURT:  Good.  Me, too.

4    Q.  Ms. Johnson, a reference was made to a sort of tough love

5    culture at STRIVE.  Are you aware of any such culture at

6    STRIVE?

7    A.  For the participants, yes.

8    Q.  Is that a culture that is, based on your time at STRIVE and

9    what you have observed, is that a culture that extends to staff

10   members?

11   A.  No.

12   Q.  You previously described a conversation that Mr. Carmona

13   was having with Mr. Hubbard that was in an aggressive manner.

14   Do you recall that?

15   A.  Yes.

16   Q.  Was Mr. Hubbard a former participant at STRIVE?

17   A.  Yes.

18             MS. MESIDOR:  Your Honor, at this time, I would like

19   Exhibit 33 that has previously been admitted into evidence -- I

20   believe so I just want to confirm that, your Honor.  I don't

21   want to misrepresent.

22             THE COURT:  That is a good idea.

23             MS. MESIDOR:  Yes.  That has been previously admitted.

24   I would like to, if I can, approach the witness.

25             THE COURT:  You may.

1          I assumed you looked at my comments so we won't be

2     talking about anything other than Chapter 5.

3               MS. MESIDOR:  No, your Honor, we won't be.

4               THE COURT:  I beg your pardon?

5               MS. MESIDOR:  No, your Honor, we won't be discussing

6     anything else besides that, your Honor.

7     BY MS. MESIDOR:

8     Q.  Ms. Johnson, I am going bring your attention to Chapter 5

9     of STRIVE East Harlem's employment service employee handbook on

10    page 5.

11    A.  OK.

12    Q.  Do you have that before you?

13    A.  Yes.

14    Q.  Ms. Johnson, what is Chapter 5 of the STRIVE employee

15    handbook regarding?

16    A.  Employment opportunity and non-harassment policy.

17    Q.  I am going to draw your attention to subsection 2 of the

18    prohibited conduct?

19    A.  OK.

20    Q.  Ms. Johnson, I'm going to ask you to publish the first two

21    sentences of that section under prohibited conduct to the jury,

22    please?  I am going to ask you to read slowly so that the court

23    reporter can take down what it is that you are saying.

24               MR. MINNAH-DONKOH:  Objection, your Honor.  The

25    document speaks for itself.

D81njoh5                      Johnson - direct

1      THE COURT:  It doesn't speak for itself if nobody

2  knows what it says.  You put it into evidence.  I have no

3  problem about your reading it.

4      Go right ahead.

5  A.  "All forms of illegal discrimination, including

6  discriminatory harassment are prohibited at the company.

7  Conduct that creates a hostile work environment or that

8  unreasonably interferes with an individual's work performance

9  including sexual -- I'm sorry -- including racial, ethnic,

10  religious, suggestive, or lewd remarks, sexual advances

11  physical contact of a sexual nature, requests for sexual favors

12  rewards for granting (or punishing for not granting) sexual

13  favors, conditioning continued employment on the exchange of

14  sexual favors or other verbal or physical conduct of a sexual

15  nature including the display or viewing of sexually explicit,

16  derogatory, or pornographic material by any means has no place

17  at the company and will not be tolerated."

18      Continue?

19  Q.  Yes.

20  A.  "Harassment may include but not be limited to jokes, slurs,

21  innuendos, sexually explicit or racially derogatory material in

22  addition to commentary or conduct that would offend others on

23  the basis of religion, race, creed, color, sex, sexual

24  orientation, alienage or citizenship, national origin, age,

25  marital status, handicap, disability, veteran status or any

1    other protected feature or characteristic."

2    Q.  That's all.  Ms. Johnson, have you had an opportunity to

3    read this employment handbook?

4    A.  I skimmed through it.

5    Q.  Based on what you have read in the employee handbook, is

6    there anything in there regarding a culture of tough love at

7    STRIVE?

8              THE COURT:  Wait a minute.  It is in evidence.  If you

9    want to pass it out to the jury, you could do that, but we

10   won't let her go through it now since she only glanced at it to

11   begin with and go look for what you are looking for.  So move

12   along, unless you're done, which is what I thought, so I could

13   give the jury some time, a recess.  But if not, let's finish.

14   Q.  One last question.

15             THE COURT:  It is all right with me.  I just

16   misunderstood you.

17             MS. MESIDOR:  No.  This was my last section of my

18   direct examination, your Honor.

19   BY MS. MESIDOR:

20   Q.  Ms. Johnson, the culture of tough love that was previously

21   described, other than what you have already testified to in

22   terms of seeing it with participants, has this tough love

23   philosophy been used with any staff members at STRIVE?

24   A.  No.

25             MR. MINNAH-DONKOH:  Objection.

D81njoh5                    Johnson - direct

1          THE COURT:  It was asked and answered already.  So we

2     will strike it.

3          MS. MESIDOR:  No further questions, your Honor.

4          THE COURT:  Why don't we take ten minutes, everybody.

5     We will see you at a quarter to 4 I guess you may step down

6     after the jury passes before you.

7          MS. KREBS:  Your Honor, I'm sorry, I just wanted to

8     know, is there any indication of what time we are going to be

9     ending today?

10          THE COURT:  Not to my knowledge.

11          MS. KREBS:  Can we get any indication of what time we

12     might be ending today?

13          THE COURT:  Would you like an indication of when we

14     are ending today?

15          MS. KREBS:  If you could give us one, your Honor, that

16     would be great.

17          THE COURT:  My guestimate is 5:30.

18          MS. KREBS:  Thank you, your Honor.

19          (Recess)

20          THE COURT:  Any cross?

21          MR. MINNAH-DONKOH:  Yes, your Honor.

22          THE COURT:  This is a good time.

23     CROSS EXAMINATION

24     BY MR. MINNAH-DONKOH:

25     Q.  Good afternoon, Ms. Johnson?

D81njoh5              Johnson - cross

1   A.  Good afternoon.

2   Q.  Now, Ms. Johnson, this is the second time you and I are

3   meeting, correct?

4   A.  Yes.

5   Q.  We first met during your deposition on May 22, 2013?

6   A.  Yes.

7   Q.  Now, Ms. Johnson, you would agree with me that STRIVE does

8   a lot of good things for the community, correct?

9   A.  Yes.

10  Q.  STRIVE provides job training?

11  A.  Yes.

12  Q.  Provides counseling services?

13  A.  Yes.

14  Q.  Provides its participants, or clients, with jobs?

15  A.  No.

16  Q.  Is it your testimony that STRIVE does not look for jobs for

17  its participants?

18  A.  You said provide.

19          MS. MESIDOR:  Objection.

20  A.  Provide means that they give them jobs.  Am I correct or am

21  I wrong.

22  Q.  I will withdraw that question and ask you this question.

23  A.  All right.

24  Q.  Isn't it true that STRIVE looks for job opportunities for

25  its participants?

1    A.  Yes, it looks for jobs, yes.

2    Q.  Isn't it true that STRIVE also hires some of its former

3    participants?

4    A.  Yes.

5    Q.  So it does provide jobs for some of its participants,

6    correct?

7    A.  OK.

8    Q.  Is that a yes?

9    A.  Yes.

10   Q.  OK.  Now, your purpose in bringing this lawsuit is to bring

11   STRIVE down because your employment was ended, correct?

12   A.  Incorrect.

13   Q.  Ms. Johnson, have you ever made comments in the workplace

14   to the effect of, I'm going to bring this fucking organization

15   down?

16   A.  No, that was Angel Gaudio.

17   Q.  Ms. Johnson, while you were employed at STRIVE, you did

18   work with a lady by the name of Maxine Gelise, correct?

19   A.  Yes.

20   Q.  You also worked with a Virginia Barr, correct?

21   A.  Yes.

22   Q.  Is it your testimony that at no point in time while you

23   were employed at STRIVE did you tell either Ms. Barr or Ms.

24   Gelise that you were going to bring this fucking organization

25   down?

D81njoh5                    Johnson - cross

1    A.   That is definitely my testimony.  I never said that.

2    Q.   So if they were to come to this courtroom to testify to

3    that, are you saying both of them would be lying?

4              MS. MESIDOR:  Objection.  Calls for speculation.

5              THE COURT:  I suppose.  We'll strike it.

6    BY MR. MINNAH-DONKOH:

7    Q.   Now, let's deal with the main issue or main component of

8    your case, the use of the word nigga.

9              You have used the word nigga on several occasions

10   while employed at STRIVE, correct?

11   A.   Incorrect.

12   Q.   Ms. Johnson, I remind you that you are under oath.  You do

13   understand that?

14   A.   I know that.  I know that I am under oath.

15   Q.   It is your testimony that not once have you ever used the

16   word nigga while employed at STRIVE?

17             MS. MESIDOR:  Objection as to form.  Is counsel

18   implying that during --

19             THE COURT:  Did you hear my instructions at the

20   beginning of the meeting we had earlier today.  The answer is

21   yes.  The ruling is overruled.

22   BY MR. MINNAH-DONKOH:

23   Q.   Ms. Johnson, my question to you is, is it your testimony

24   before this jury under oath that not once did you ever use the

25   word nigga while employed at STRIVE?

1            THE COURT:  That's asked and answered.

2            I will sustain the objection to that question.  Do you

3    want to put a new question.

4    BY MR. MINNAH-DONKOH:

5    Q.  Well, let me start off by asking this, Ms. Johnson.  You

6    testified that you were offended when Mr. Carmona used the word

7    nigga during that conversation with you, correct?

8    A.  Yes.

9    Q.  So if you had used that word nigga before, that would be

10   something that you would recall, correct?

11            MS. MESIDOR:  Objection.

12            THE COURT:  Overruled.  We are not going too much

13   further down this path.

14   Q.  Is that a yes?

15   A.  I don't know what you are referring to.  Can you give me a

16   better context.

17   Q.  OK.  I am going to say it very slowly.

18   A.  Please.

19   Q.  If you had ever used the word nigga in the workplace, since

20   it is so offensive to you, you would remember it, correct?

21   A.  I would remember it.

22   Q.  Now, again, as you just testified, you were deposed this

23   case on May 22, 2013, correct?

24   A.  Yes.

25   Q.  Your attorney, Ms. Sharpe, was present?

1    A.   Yes.

2    Q.   I was present?

3    A.   Yes, you were.

4    Q.   I asked you questions throughout the day?

5    A.   Yes, you did.

6    Q.   Before you answered any of those questions, you took an

7    oath to tell the truth?

8    A.   Yes, I did.

9    Q.   The same oath that you have taken here today?

10   A.   Yes, sir.

11   Q.   After your deposition, you had an opportunity to review

12   your transcript?

13   A.   Yes.

14   Q.   For any errors in your testimony?

15   A.   Yes.  I have reviewed -- yes.

16   Q.   Directing the Court's attention --

17            MR. MINNAH-DONKOH:  And your Honor, I can provide you

18   with a copy of transcript if you would like.

19            THE COURT:  I would like.

20   Q.   Directing the Court's attention to page 155 of

21   Ms. Johnson's May 22, 2013 deposition transcript, line 25:

22   "Q.  OK.  Ms. Johnson, during your tenure at STRIVE did you

23   ever use the word nigga in your conversations with coworkers?

24   A.  I don't recall."

25            Were you asked that question and did you give that

D81njoh5                     Johnson - cross

1    answer?

2    A.  Is it in the transcript?

3    Q.  Yes.  Would you like me to show it to you?

4    A.  Yes, I would.

5            MR. MINNAH-DONKOH:  May I approach the witness, your

6    Honor?

7            THE COURT:  You may.

8            MR. MINNAH-DONKOH:  Moreover while Ms. Johnson looks

9    at the transcript, would her attorney stipulate that I read

10   that portion of the deposition transcript accurately?

11           MS. MESIDOR:  No.  I wasn't at the page when you read

12   it, so I have no way of stipulating to that fact.

13           MR. MINNAH-DONKOH:  You weren't reading?

14           MS. MESIDOR:  No, when you began --

15           THE COURT:  We are not having a conversation between

16   lawyers.  Do you have any reason to believe you didn't say

17   that?  I don't see the line.

18           What is the line that you are referring to?

19           MR. MINNAH-DONKOH:  Line 25 to the next page.

20           THE COURT:  The next page is, I see is 156.

21           MR. MINNAH-DONKOH:  Yes.

22           THE COURT:  OK.  Did you make that answer to that

23   question, Ms. Johnson?

24           THE WITNESS:  OK, yes.

25           MR. MINNAH-DONKOH:  OK.  Thank you.  May I have the

D81njoh5                    Johnson - cross

1    transcript back, please?

2               THE COURT:  I should explain to the jury what this is

3    about, since there may be more of it, even if there isn't.

4               This is a form of impeachment called prior

5    inconsistent statement.  What it does is it points out to you

6    sometimes an inconsistency between what the witness may have

7    said at a previous time and what she said on the witness stand.

8               It is for you and you alone to determine whether or

9    not that is impeachment of the witness's credibility.

10   Sometimes it is, and sometimes it is so minor it doesn't

11   matter, but, in any event, the ball is in your court.

12              You may proceed.

13              MR. MINNAH-DONKOH:  Thank you, your Honor.

14   BY MR. MINNAH-DONKOH:

15   Q.  Now, Ms. Johnson let's talk about your employment with

16   STRIVE, the beginning of your employment with STRIVE.  As you

17   testified to earlier, in order to become employed with STRIVE

18   you were interviewed, correct?

19   A.  Yes.

20   Q.  You were specifically interviewed by three of STRIVE's

21   executive staff, correct?

22   A.  Yes.

23              MS. MESIDOR:  Objection.

24              THE COURT:  Overruled.

25   Q.  One of those individuals who interviewed you was Eric

1   Treworgy?

2   A.  Yes.

3   Q.  The then-CEO of STRIVE?

4   A.  Yes.

5   Q.  Lisa Stein also interviewed you, correct?

6   A.  Yes.

7   Q.  And Robert Carmona also interviewed you, correct?

8   A.  Yes.

9   Q.  You mentioned that you were interviewed twice?

10          THE COURT:  You can move the podium forward, but it

11  would be nice if you stood behind it, wherever it is you would

12  like it to be.

13          MR. MINNAH-DONKOH:  Sure, your Honor.

14  BY MR. MINNAH-DONKOH:

15  Q.  You testified that you were interviewed on two separate

16  occasions, correct?

17  A.  Yes.

18  Q.  Now, on that first occasion that you were interviewed you

19  were interviewed by all three executive staff, correct?

20  A.  Excuse me.  Yes.

21  Q.  Mr. Treworgy, Ms. Stein and Mr. Carmona, correct?

22  A.  Yes.

23  Q.  Now, that second interview that you had was not with any

24  member of the executive staff, correct?

25  A.  Correct.

D81njoh5                    Johnson - cross

1    Q.  And after that second interview you were offered the

2    position of affiliate services coordinator, correct?

3    A.  Yes.

4    Q.  So we can agree that Mr. Treworgy, Ms. Stein and

5    Mr. Carmona as the executive staff made the decision to hire

6    you, correct?

7            MS. MESIDOR:  Objection, your Honor.

8            THE COURT:  Sustained.

9    Q.  Well, this may seem like sort of a silly question but it is

10   important that the jury gets to hear it.  Ms. Johnson, at the

11   time that you were hired by STRIVE you were still a woman,

12   correct?

13   A.  I believe so.

14   Q.  Are you unsure?

15   A.  It appears that you are unsure, yes.

16   Q.  I am not unsure.

17   A.  OK.

18   Q.  OK.

19   A.  Yes.  I was still a female.

20   Q.  OK.  You were still black, correct?

21   A.  Yes.

22   Q.  You have brought this case alleging that Mr. Carmona did

23   all these horrible things to you because you are a black

24   female, correct?

25           MS. MESIDOR:  Objection.

1          THE COURT:  Overruled.

2    Q.  Yes?

3    A.  Oh, part of it, yes.

4    Q.  But, again, Mr. Carmona was part of the executive team that

5    interviewed you, correct?

6    A.  And I got a high recommendation from Robert Medlock, his

7    best friend, yes.

8    Q.  Was Mr. Medlock an employee of STRIVE?

9    A.  No, he was not.

10   Q.  As a matter of fact, before you ever worked a day at

11   STRIVE, Ms. Stein expressed her happiness to have you join

12   STRIVE?

13   A.  Yes.  Yes, she did.

14   Q.  In addition to Ms. Stein, Mr. Carmona also expressed his

15   happiness to have you join STRIVE, correct?

16   A.  I don't know about that.

17          MR. MINNAH-DONKOH:  Permission to approach the

18   witness.

19          THE COURT:  Yes, indeed.

20   BY MR. MINNAH-DONKOH:

21   Q.  Ms. Johnson I have shown you what has been marked for

22   identification as Defendants' Exhibits U and F.

23   A.  Yes.

24   Q.  You recall receiving those e-mails, correct?

25   A.  Yes.

1  Q.  Turning your attention to Exhibit U, that is an e-mail from

2  Lisa Stein?

3  A.  Yes.

4  Q.  Dated April 23, 2010?

5  A.  Yes.

6  Q.  Your first day at work with STRIVE was May 3, 2010,

7  correct?

8  A.  Yes, I believe.

9  Q.  Why don't you read for the jury what Lisa Stein said in

10  that e-mail to you on April 232010?

11  A.  "Hello, Brandi.  We are so pleased to have you join our

12  organization.  We look forward to seeing you May 3.  I will

13  send you some program background next week."

14        MR. MINNAH-DONKOH:  At this time, your Honor, we move

15  Defendants' Exhibit U into evidence.

16        THE COURT:  It is in evidence.  Isn't it?

17        MR. MINNAH-DONKOH:  OK.

18  Q.  Turning your attention now to Defendant's Exhibit F --

19        THE COURT:  All you do is have it identified.  If it

20  is in in my group that I gave you, it's in.  If it's not in in

21  my group, then it is out.

22        MR. MINNAH-DONKOH:  Thank you, your Honor.

23        THE COURT:  And it says so.

24  BY MR. MINNAH-DONKOH:

25  Q.  Defendants' Exhibit F is an e-mail that Robert Carmona sent

1  to you on May 4, 2010, correct -- or May 3 rather?

2  A.  No -- yes, I'm sorry, yes.

3  Q.  Just for clarification, he sent that e-mail on May 3, 2010?

4  A.  May 4.

5  Q.  May 4, 2010, OK.

6         In addition to sending that e-mail to you, Mr. Carmona

7  sent it to STRIVE's affiliates?

8  A.  Yes.

9  Q.  Why don't you read that e-mail to the jury.

10  A.  Can I give you some context before I read it?

11  Q.  No.  Please read it for the jury.

12  A.  OK.  Sure.

13         "To all colleagues, it is my pleasure to introduce

14  STRIVE's affiliate services coordinator, Ms. Brandi Johnson.

15  Previously Brandi worked with one of STRIVE's closest partner

16  agencies in New York City, the Consortium for Worker Education.

17  In her new capacity, Brandi will serve as a liaison between our

18  respective organizations as well as our principal point of

19  contact for issues related to labor green jobs initiative.  She

20  will be providing technical and programmatic support as needed

21  and address any concerns that should manifest during the

22  initiative.  Brandi can be reached at 646-335-0817.

23         "Peace.  Rob."

24  Q.  Now, Ms. Johnson, we can agree that the terms "green jobs

25  initiative" is what was commonly referred to at STRIVE as

D81njoh5                    Johnson - cross

1    Pathways Out of Poverty?

2    A.  Yes.  Kind of.

3    Q.  OK.  We will get to that --

4    A.  OK.

5    Q.  -- in just a little bit.

6          In your role as affiliate services coordinator, one of

7    your essential duties and responsibilities was to specifically

8    monitor compliance with the Pathways Out of Poverty grant?

9    A.  I was supposed to assist Moria Mendoza, who was the

10   principal person for Pathways Out of Poverty.

11   Q.  That was not my question, Ms. Johnson.  My simple question

12   to you is, one of your essential duties responsibilities was to

13   monitor compliance with the grant?

14   A.  Incorrect.

15         MR. MINNAH-DONKOH:  Permission to approach the

16   witness, your Honor?

17         THE COURT:  Yes, indeed.

18         MR. MINNAH-DONKOH:   Ms. Johnson I've just handed to

19   you what is now in evidence as Defendants' Exhibit G.

20         THE COURT:  Could you identify it for us, Ms. Johnson.

21   A.  Yes.  I'm sorry.

22   Q.  That is a job description, correct?

23   A.  Yes, it is.

24   Q.  I want you to take a look at the first bullet point,

25   towards the end of the second line.

D81njoh5                    Johnson - cross

1              It states:  "Specifically monitor compliance with

2      Pathways Out of Poverty program requirements."

3              Is that a yes or no?  Does it state that?

4      A.  It states that, but I didn't receive this.

5      Q.  OK.  You claim you never received it, but I'm building up

6      to what I ultimately want to ask you.  Ms. Johnson, you did in

7      fact manage that Pathways Out of Poverty grant?

8      A.  After Moria Mendoza resigned, yes.

9      Q.  So that -- is it your testimony that the first time you

10     sort of became aware of the Pathways Out of Poverty grant was

11     after Ms. Mendoza retired?

12             MS. MESIDOR:  Objection.

13             THE COURT:  Would you stand behind the podium.

14             Overruled.

15     A.  No.

16     Q.  When was the first time you learned about the Pathways Out

17     of Poverty grant?

18     A.  I believe one of the meetings that I had with Rob, Eric,

19     Lisa and Ronelle.

20     Q.  How soon after you had been working for STRIVE?

21     A.  Was it two or three days?

22     Q.  Are you sure about that?

23     A.  I'm not sure of the time, but I'm sure that -- I recall

24     being in a meeting in regards to -- and the Pathways Out of

25     Poverty grant was mentioned, yes.

 1          MR. MINNAH-DONKOH:  Permission to approach the

 2   witness, your Honor.

 3          THE COURT:  Yes, indeed.

 4          Do you have a date or anything?  I asked her to

 5   identify it, but you kept on talking, so she didn't have a

 6   chance to do that.  So one of you ought to tell me what it is.

 7          MR. MINNAH-DONKOH:  Your Honor, the previous exhibit

 8   was a job description.

 9          THE COURT:  Is there a date?  Is it an e-mail?  Did it

10   come to her?  Who wrote it?  Maybe things like that.  I have

11   it, but it seems to me just for the record we ought to make

12   sure everybody else has it.

13          MR. MINNAH-DONKOH:  Sure.  Perhaps let me publish

14   copies of the exhibit to the jury as well so the jury can

15   follow along.

16          THE COURT:  Fine.

17          Keep asking questions.

18          MR. MINNAH-DONKOH:  Sure.

19          THE COURT:  I gather I'm the guy that doesn't get one,

20   right?

21          MR. MINNAH-DONKOH:  Going back to Defendants' Exhibit

22   G, do you have it in front of you, Ms. Johnson?

23          Ms. Johnson, on Defendants' Exhibit G, for "Job Title"

24   it states "Affiliate Services Coordinator"?

25   A.  Yes, but the department says --

D81njoh5                Johnson - cross

1    Q.  It states "Affiliate Services Coordinator," correct?

2    A.  Yes.

3    Q.  And under department it says physical?

4    A.  It says fiscal.  I was part of the national team.

5    Q.  At the time you were employed by STRIVE, were there any

6    other affiliate services coordinators employed at STRIVE?  Yes

7    or no.

8    A.  No, there was not.

9    Q.  OK.  Now, Ms. Johnson I have handed you a document before,

10   a few minutes ago.  Do you still have that document in front of

11   you?

12   A.  Which document?

13          MR. MINNAH-DONKOH:  Permission to approach the

14   witness.

15          THE COURT:  All right.

16   A.  These?

17   Q.  No.  OK.  You didn't have it before.  OK.

18          Ms. Johnson, I was previously asking you about when

19   you first became aware of the Pathways Out of Poverty grant,

20   and you testified that it was in a meeting approximately two or

21   three days after you had been working with STRIVE.  Yes?

22   A.  Yes.

23   Q.  Now, as part of your documents you had to submit to apply

24   for STRIVE you submitted, as you've testified, were a résumé?

25   A.  Yes.

1    Q.  An application?

2    A.  Yes.

3    Q.  At some point in time after you were hired or before you

4    were hired you submitted a contact sheet?

5    A.  After I was hired.

6    Q.  That contact sheet listed individuals that should be

7    contacted in case of emergency?

8    A.  Yes.

9    Q.  You filled out that contact sheet yourself?

10   A.  No.

11   Q.  Who filled out that contact sheet?

12   A.  I had assistance from Crystal Batista.

13   Q.  What did Crystal Batista assist you?

14   A.  With the department, which department should go on

15   emergency contact.  And I didn't get this on May 3.  I got this

16   maybe a week after I started at STRIVE.

17   Q.  Well, you just testified that you prepared that document

18   with Crystal Batista's assistance.

19   A.  Yes.

20   Q.  You filled out this document with Crystal Batista

21   allegedly?  Yes?

22   A.  Yes.

23   Q.  And that document is dated May 3, 2010?

24          MS. MESIDOR:  Objection, your Honor.  Plaintiff's

25   counsel still does not know what document he's referring to.

D81njoh5                    Johnson - cross

1    There's been no exhibit listed on the record as to what

2    document we are supposed to be looking at.

3               THE COURT:  Do you want to rephrase the question?

4               MR. MINNAH-DONKOH:  Sure.

5    BY MR. MINNAH-DONKOH:

6    Q.  You filled out that contact sheet with Crystal Batista on

7    May 3, 2010.  Yes?

8    A.  No.

9               MS. MESIDOR:  Objection, your Honor.

10              Which exhibit are we looking at, if counsel could

11   please tell me which exhibit he's looking at so I can follow

12   along with the testimony.

13              MR. MINNAH-DONKOH:  I will give you a copy.

14              MS. MESIDOR:  Which exhibit for the record, please.

15              MR. MINNAH-DONKOH:  Just give me one second and I will

16   get that for you.  That was Defendant's Exhibit DD.

17              THE COURT:  What are we waiting for?

18   BY MR. MINNAH-DONKOH:

19   Q.  For the portion of Defendants' Exhibit DD that states

20   department, it states Pathways Out of Poverty?

21   A.  It does.

22   Q.  That document is dated May 3, 2010?

23   A.  It was backdated.

24   Q.  It's dated May 3.  That is your testimony, but it's dated

25   May 3, 2010.  Yes?

D81njoh5                    Johnson - cross

1    A.  Actually, if you look, I put an initial by there.  I was

2    going to put the original date, and I was told to put the

3    backdate, so if you tell me which date.

4    Q.  Ms. Johnson, all I am asking you, yes or no, the date on

5    here is May 3, 2010.  Yes?  Yes?

6    A.  Yes.

7              MR. MINNAH-DONKOH:  May I publish this.

8              THE COURT:  No, did you read the exhibit list.  I

9    can't believe that we have to go through this.  I spend the

10   time making a decision with respect to hundreds of exhibits.  I

11   give you a list with respect to each admission and each denial

12   of an admissible document.  You are unable to even look at the

13   list to see whether DD is in or out of evidence.  It is, if you

14   look, out.

15             MR. MINNAH-DONKOH:  Understood, your Honor.  I was

16   using it for impeachment purposes.

17             THE COURT:  Yes.  But unfortunately it doesn't do much

18   on that score, like nothing.

19   BY MR. MINNAH-DONKOH:

20   Q.  Now, Ms. Johnson, while you were employed at STRIVE, you

21   did have several performance issues which were pointed out to

22   you?

23   A.  No.

24   Q.  At no point in time while you were employed at STRIVE were

25   performance issues pointed out to you?

1    A.   What do you mean by performance issues pointed out?  Can

2    you give me an example, please.

3    Q.   Sure.  About how you interacted with your colleagues and

4    supervisors?

5    A.   I had an issue -- it was a confrontation regarding one

6    colleague, yes.

7    Q.   As well as your workplace attire?

8    A.   Um --

9              MS. MESIDOR:  Objection, your Honor.

10             Is there a question there?

11             THE COURT:  What?

12             MS. MESIDOR:  He said, As well as your workplace

13   attire.  I didn't hear a question.

14             THE COURT:  I will allow it.  Ms. Mesidor, I think you

15   ought to understand that this is cross-examination.  I permit

16   very broad cross-examination.  So when you object, please be

17   sure that you know what you are doing.  Good.  We'll do better

18   that way.

19   BY MR. MINNAH-DONKOH:

20   Q.   You were counseled about your workplace attire while

21   employed by STRIVE?

22   A.   No, I was never counseled about my workplace attire.

23   Q.   Conversations were had with you about inappropriate

24   workplace attire?

25   A.   One conversation.

D81njoh5          Johnson - cross

1   Q.  Is it your testimony that there was only one conversation

2   about your workplace attire?

3   A.  I was one formal conversation between Rob, and he brought

4   April in and Lisa Stein.  On -- it was a dress down Friday.  He

5   came at sat at my desk and said something in regards to my red

6   shoes, yes, but it was not my attire.  It was my red shoes.

7   Q.  You also mentioned a conversation that Robert Carmona had

8   with you about your dress.  Yes?

9   A.  Yes.

10  Q.  And he actually had a meeting with you in his office?

11  A.  Yes, he yelled for me to come in his office.  He did.

12  Q.  The two of you weren't alone in his office --

13  A.  No.

14  Q.  Let me finish my question.  The two of you were not alone

15  in his office when he had that conversation with you.

16  A.  No.  He motioned for April to come as well.

17  Q.  April Bland is a high-level employee at STRIVE?

18  A.  Yes.

19  Q.  And she is a black woman?

20  A.  Yes, she is.

21  Q.  Is it your understanding that Mr. Carmona brought Ms. Bland

22  into that meeting so that anything he says to you could not be

23  misconstrued at any time later on?

24          MS. MESIDOR:  Objection, your Honor.

25          THE COURT:  Sustained.

D81njoh5                    Johnson - cross

1    BY MR. MINNAH-DONKOH:

2    Q.  Well, during that meeting in Mr. Carmona's office, he told

3    you that your dress for that particular day was inappropriate

4    for the workplace, didn't he?

5    A.  He did say something similar to that, and I questioned his

6    judgment.  Because I had on a blazer, so I didn't understand

7    what he was referring to.  How could he possibly see my dress

8    if my dress was covered up.

9    Q.  Well, you do plan on calling Ms. April Bland as a witness

10   during this trial?  Yes?

11   A.  I don't know --

12          MS. MESIDOR:  Objection.

13   A.  -- who my attorney is going to call as a witness, sir.

14   Q.  While you were employed at STRIVE, you were given

15   performance evaluations?

16   A.  Yes.

17   Q.  After you were given a performance evaluation, you were sat

18   down and a conversation was had about the written evaluation?

19   A.  Yes.

20   Q.  Lisa Stein would sit with you or sat with you on at least

21   one occasion?

22   A.  Yes, she did.

23   Q.  Permission to approach the witness?

24          THE COURT:  Very well.

25   Q.  Ms. Johnson, I have handed you what has been marked for

1   identification as Defendants' Exhibit J.  Ms. Johnson,

2   Defendants' Exhibit J, that is a performance evaluation that

3   was given to you on October 21, 2011, yes?

4   A.  Yes.

5   Q.  It was prepared by Lisa Stein?

6   A.  I assume so.

7   Q.  Well it states in the document on the first page that it

8   was prepared by Lisa Stein, yes?

9   A.  Yes.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. MINNAH-DONKOH:

2   Q.  And if you turn to the Bates number or page 36 of that

3   document, are you with me?

4   A.  Yes, I am, sir.

5   Q.  Do you see where it says number seven interpersonal

6   relations teamwork?

7   A.  Yes.

8   Q.  Why don't you read for us what Ms. Stein said?

9   A.  Read the number as well attached to it?

10  Q.  No.  Just the portion in italics.

11  A.  Brandi shows compassion and personal interest in her

12  colleagues.  However, I have had several conversations with

13  Brandi regarding her communications to colleagues and

14  management.  She is often confrontational and emotional in her

15  initial reaction towards situation where she had difference in

16  opinion.  She has not been able to demonstrate improvement in

17  this capacity.

18          She gave me a 2.5, which is above average.

19          MR. MINNAH-DONKOH:  Move to strike that portion.  It

20  is nonresponsive.

21          THE COURT:  It is not part of the exhibit.  I don't

22  have it in front of me.

23          MS. MESIDOR:  It is in the exhibit.

24          THE COURT:  It is what he asked you to read?

25          THE WITNESS:  Yes.  I read it.

1          MR. MINNAH-DONKOH:  Permission to publish it to the

2     jury, your Honor.

3          THE COURT:  Very well.

4     BY MR. MINNAH-DONKOH:

5     Q.  Again, Ms. Johnson, that portion you read for us was on

6     your evaluation on the 7th, yes?

7     A.  Yes.

8     Q.  I now want you to turn to the last page of that document.

9     Do you see where it says, Less any areas where the employee

10    should improve effectiveness on the job?

11    A.  Yes.

12    Q.  Why don't you read that into the record?

13    A.  Brandi must work on her communication style as identified

14    in her as identified in this evaluation.  It continues to be a

15    hinderance to her professional growth and development here at

16    STRIVE.  Furthermore, Brandi must improve both her attendance

17    and ability to separate personal issues from workplace

18    presence.  This will go along way to improving her

19    dependability and consistency.

20    Q.  Now, going back to the third page, number seven, which you

21    read for us before where you got a 2.5.

22    A.  Yes.

23    Q.  You testified that that was above average?

24    A.  Yes.

25    Q.  If you go to the second page of the exhibit, the top of the

1    page says a three rating mean expectations?

2    A.  Yes.  Three says expectations.

3    Q.  Two says needs improvement?

4    A.  Yes.  Two needs improvement.

5    Q.  So two is not above average, is it?

6    A.  It meets them but not all.

7    Q.  Now, just a few months after Ms. Stein in your

8    October 21st, 2011 performance evaluation advised you to

9    improve your communications with your colleagues and your

10   supervisors, you had an altercation with a coworkers Christina

11   Saenz?

12   A.  What do you mean by altercation?  I take altercation

13   meaning something physical.

14   Q.  You had a verbal altercation with Christina Saenz?

15   A.  No, I did not.

16   Q.  That was not an incident between you --

17   A.  There was.

18          THE COURT:  Can you wait until he finishes your

19   question.

20          THE WITNESS:  I am sorry.

21   Q.  There was an incident between you and Christina Saenz just

22   approximately two months after Ms. Stein advised you to improve

23   your communications with colleagues and supervisors, yes?

24   A.  There was an incident.

25   Q.  And Mr. Carmona was made aware of that incident between you

1    and Ms. Saenz, yes?

2    A.  I believe so.

3    Q.  By the way Ms. Saenz her race is Hispanic?

4    A.  I don't know what Christina's race is.

5    Q.  Have you ever testified before that she was Hispanic?

6    A.  I probably did, but I don't recall.  I don't know if it is

7    what her race is.  She could be Hispanic.

8    Q.  Let me direct your attention again to your May 22nd, 2013

9    deposition.  Page 148, line 15:

10   "Q.  What is Christina Saenz's race?

11   "A.  Hispanic."

12   A.  Okay.

13   Q.  During your deposition you never testified that you were

14   unsure about her race, did you?

15   A.  I don't believe so, no.

16   Q.  I just read it for you, right?

17   A.  Did you.

18   Q.  Yes.

19   A.  Okay.

20          MR. MINNAH-DONKOH:  Permission to approach the

21   witness?

22          THE COURT:  Very well.

23          MR. MINNAH-DONKOH:  As well as publish Defendant's

24   Exhibit K to the jury?

25   Q.  Now, Ms. Johnson, Defense Exhibit K in evidence is an

```
 1   e-mail that you received from Robert Carmona on December 28th,

 2   2011, yes?

 3   A.  I don't recall Rob's e-mail but I recall Lisa's.

 4   Q.  Do you see the two subjects at the top?

 5   A.  I see the two subjects, sir.  I didn't -- I don't see Rob's

 6   e-mail.  I do remember seeing Lisa's.

 7   Q.  Let me just finish up this line of questioning.  Your name

 8   appears in two subjects of Defendant's Exhibit K, does it not?

 9   A.  Yes, it does.

10   Q.  And in this e-mail Robert Carmona was talking about the

11   incident that you quoted between yourself and Christina Saenz?

12   A.  This is not the incident that I was referring to, sir.

13   Q.  So is that another incident between yourself and Christina

14   Saenz?

15   A.  No.  Christina and I didn't have an incident when Rob had a

16   meeting with myself and Christina.  It wasn't an incident.

17   Q.  Why don't you read into the record what Defense Exhibit K

18   says.  The top portion?

19   A.  After reading Lisa e-mails, both of you engendered just

20   adverse --

21            THE COURT:  It engendered, right?

22   A.  The communication was balanced and did not single out or

23   lay blame on either of you.  To reiterate our last conversation

24   both of you bring different value to our work, but those values

25   have to operate in tandem.  You are both changed -- you both
```

         charged with responsibilities that entail work communication

         with our affiliate colleagues in as representatives of the

         national office you guys have to present unified -- to present

         a unified front.  The mid to long term intent with the new CEO

         is to energize affiliate relations and both of you are a big

         part that.  Additionally you guys are going to be taking the

         show on the road in the very near future.  Let's not lose the

         fight but our sight on the larger issue.

    Q.   Now this e-mail appears to discuss a difference or

         difference in between you and Christina Saenz?

    A.   No.  Yes.

    Q.   Yes.  Okay.  You would agree based on the substance of

         Rob's e-mail that he was treating you and Christina Saenz who

         is Hispanic equally?

    A.   Am I to -- I don't understand the question.  I am sorry.  I

         don't see this as being --

    Q.   Let me ask you this:  Did he place blame on you over

         Christina Saenz?

    A.   No, he did not.

    Q.   Again, this e-mail was sent just two months after your

         October 21st, 2011 performance evaluation?

    A.   Yes.

    Q.   By the way, Ms. Johnson, I want to go back to your

         performance evaluation, which is Defendant's Exhibit J.

    A.   Okay.

1    Q.  Do you see the last page?

2    A.  Yes.

3    Q.  Section E, employee comments.  It states, After you have

4    reviewed and discussed this evaluation with your supervisor

5    please state your comments regarding this evaluation.  You may

6    use additional paper.  If you have no comment, please state

7    none.

8            You never wrote any comments to this evaluation, did

9    you?

10   A.  I also never wrote "none" either.

11   Q.  So that is a no, you never did?

12   A.  I never responded.

13   Q.  It is a yes or no?

14   A.  Sir, it is not a yes or no.

15   Q.  Ms. Johnson, listen to my question very carefully.  Yes or

16   no you never submitted any employee comments to your

17   October 21st, 2011 performance evaluation?

18   A.  And I never wrote neither either.

19   Q.  That was not my question.  Do you not understand my

20   question?  It is a very simple question.

21           MS. MESIDOR:  Objection, your Honor.

22           THE COURT:  Overruled.

23   A.  I understand your question.  I just think it is more

24   complex than that.

25   Q.  Now, so after your October 21st, 2011 performance

1   evaluation as well as an e-mail from yourself to Robert Carmona

2   in December of 2011, there was an incident with you and

3   Christina Saenz in January of 2012, yes?

4   A.  I believe so.

5   Q.  When you say you believe so, what leads you to not really

6   recall?

7   A.  Since time has passed if you can show me some information

8   for I don't recall the dates -- the date.

9   Q.  But you would agree that after your performance evaluation

10  in October 2011 as well as the e-mail from Robert Carmona in

11  December 2011 there was an incident between you and Christina

12  Saenz?

13          THE COURT:  Sustained.  Asked and answered.

14          MR. MINNAH-DONKOH:  Permission to approach the

15  witness?

16          THE COURT:  Sure.

17          MR. MINNAH-DONKOH:  Your Honor, I am also going to

18  publish what is already in evidence as Defendant's Exhibit L to

19  the jury.

20          THE COURT:  At the end of the day, ladies and

21  gentlemen, you can just put the exhibits that are being passed

22  out to you on your seat and they should be there tomorrow

23  morning.

24  BY MR. MINNAH-DONKOH:

25  Q.  Ms. Johnson, if you take a look at the first page of

 1  Defendant's Exhibit L, that is a letter or memorandum that Lisa

 2  Stein provided you with on January 27, 2012, yes?

 3  A.  Yes.  She gave this to me and Christina, yes.

 4  Q.  And that letter it states, There have been previous

 5  incidents of you not getting along with your colleague

 6  Christina Saenz.  These incidents involve excessive drama,

 7  involving other staff members and obstructed your ability to

 8  perform your essential job duties.  Up until this point there

 9  have been numerous discussions and assistance help you both to

10  move through these conflicts where you can work through work

11  schedule.  Prior to the holidays you indicated to me that you

12  had met together with Christina Saenz and made a resolution to

13  move forward and work better together in 2012.

14          However, on January 25th there was another incident

15  that demonstrated a continued inability to meet this status

16  quo.  Therefore, you are being given a written warning.  It is

17  essential to work respectfully and professionally with your

18  colleague in order to successfully carry out your job

19  functions.  Unwillingness or in ability to do so will lead to

20  further disciplinary action up to and including termination.

21          The following page provides a clear destruction and it

22  is expectation of how you are to proceed in this regard.

23  Furthermore, specific professional development areas were

24  identified in your performance evaluation dated October 21st,

25  2011.  Further expectations addressing these are also

1   identified on the following page.

2           You did receive this document?

3   A.  Yes, I did.

4   Q.  You also testified that Christina Saenz received the same

5   document, yes?

6   A.  Yes, I did.

7   Q.  So you would agree with me that Christina Saenz who is

8   Hispanic, not black was treated the same way that you were in

9   this particular incident?

10  A.  I would agree with you with that.

11  Q.  She was given the same corrective action?

12  A.  She was.  Christina and I was not the one who was initial

13  conversation.  It was Nancy Grant and Christina.  That is what

14  Nancy Grant indicated to Lisa.  I was brought in on the latter

15  part of this conversation.

16  Q.  In addition to Christina Saenz, Ms. Johnson, you also had

17  an argument with Layette Hall?

18  A.  When did I have an argument with Layette?

19  Q.  You don't recall having an argument with Layette where you

20  told her in sum and substance, Why don't you go find your

21  baby's daddy?

22  A.  I could have said that to Layette.

23  Q.  And when you quote/unquote could have said that to Layette,

24  there were student interns present in that incident?

25  A.  No.  That is incorrect.

D8Q6JON5                    Johnson - Minnah-Donkoh

1   Q.  So if a STRIVE employee who was present during that

2   particular incident were to testify that there were in fact

3   student interns present during this incident, it is your

4   testimony that that individual would belying?

5           MS. MESIDOR:  Objection, your Honor.

6           THE COURT:  Overruled.

7   A.  I don't know.  I can't testify to what someone else may

8   say.  So I don't know.

9   Q.  That was not the question?

10  A.  Can you repeat the question?

11  Q.  Sure.  You testified that there were no student interns

12  when you quote/unquote could have told Layette Hall that why

13  don't she go find her baby's daddy?

14  A.  I --

15  Q.  Ms. Johnson, you testified to that.

16          My following question was to you was:  Isn't it there

17  were student interns present and you answered no.

18  A.  So let me take that back.  I don't recall there being

19  anyone.  I have no recollection.  I apologize.  I don't recall

20  that.

21  Q.  You would now like to testify to you don't recall?

22  A.  I am not changing my testimony.  I don't recall student

23  interns being there.  I don't recall that.  That was an

24  incident after my brother died that Layette started saying he

25  wasn't my brother.

1          MR. MINNAH-DONKOH:  Your Honor, move to strike her

2     testimony.  That is nonresponsive.

3          THE COURT:  Stricken.

4     Q.  Ms. Johnson, the fact of the matter is your employment at

5     STRIVE was not the first time you had been admonished about

6     your inactions with coworkers?

7     A.  Sir, I am not here for --

8     Q.  Ms. Johnson, you have to answer my questions.  You answered

9     all of your attorney's questions.  I ask that you answer my

10    question again.

11         The fact of the matter is your employment at STRIVE

12    was not the first time you had been admonished about the way

13    you interacted with staff and supervisors?

14         MS. MESIDOR:  Objection.

15         THE COURT:  Overruled.

16    A.  Um --

17         THE COURT:  It is a yes or no question.

18    A.  No, it is not the first time.

19    Q.  As a matter of fact prior to working for STRIVE you worked

20    for an employer by the name of Carmisky?

21    A.  Yes.

22    Q.  And you were terminated from Carmisky for getting into an

23    argument with your boss, yes?

24    A.  I wasn't terminated for the argument, but I was terminated,

25    yes.

1   Q.  I am not sure if I heard you right.  So I am going to ask

2   or repeat your testimony again.  Is it your testimony that you

3   were not terminated from Carmisky because of an argument you

4   with your boss?

5   A.  It was not an argument.  It was a disagreement.  I wasn't

6   terminated.  I was told --

7   Q.  Ms. Johnson, I am going read from your May 22nd, 2013

8   deposition again.

9   A.  Okay.

10          THE COURT:  Your job, whether he asks you or not after

11   he finishes reading, is to tell us if you made those answers to

12   those questions.  Understood?

13          THE WITNESS:  Yes, sir.

14   Q.  Now, Ms. Johnson, just for clarification your deposition

15   testimony was just three months ago approximately, yes, in May?

16   A.  Yes.

17          MR. MINNAH-DONKOH:  Directing the Court's attention to

18   69, line 11.

19   Q.

20   "Q.  Why did your employment with Carmisky.com come to an end?

21   "A.  I was terminated.

22   "Q.  What were you terminated for?

23   "A.  Arguing with my supervisor."

24          You were asked those questions and you did give those

25   answers?

1   A.  I gave more context to the conversation.  Do you have that

2   recorded?

3   Q.  Were you asked those questions and did you give the answer,

4   yes?

5   A.  Yes, I did.  Can you also give the rest of the context?

6           MR. MINNAH-DONKOH:  Your attorney is free --

7           THE COURT:  No, you do it now.  We are not doing it in

8   pieces assuming you know what she is talking about.  Maybe your

9   attorney can tell us what you are talking about or maybe you

10  can.

11          Do you have a transcript in front of you?

12          THE WITNESS:  No, sir.

13          THE COURT:  Here is a transcript and here is page 69.

14  Tell us what it is you are referring to and let me read it

15  before anybody else does and then we'll decide what to do with

16  it.  It may be on another page.

17          MS. MESIDOR:  Your Honor, if I may.  I believe the

18  testimony that the witness may be looking for is on page 70.

19          THE COURT:  She is moving right in that direction.

20          You got 70 now, Ms. Johnson?

21          THE WITNESS:  Yes.

22          THE COURT:  Do you see what your lawyer suggests that

23  is where you will find it.

24          THE WITNESS:  Okay.

25          THE COURT:  Do you have it?

1          THE WITNESS:  Yes.

2          THE COURT:  Tell us the line numbers and give it back.

3    The whole page?  Let's read line 1 through line 10, which is

4    what I think she is talking about.

5          MR. MINNAH-DONKOH:  Perhaps, your Honor, I should page

6    69, line 24?

7          THE COURT:  Not for me, but if you think that is more

8    in context that is wonderful and you should do it.

9    BY MR. MINNAH-DONKOH:

10   Q.  Page 69, line 24:

11   "Q.  Okay.  I will repeat my question.  Were you terminated

12   because of one argument or because of a series of arguments

13   with your supervisor?

14   "A.  One argument.

15   "Q.  What was the argument about?

16   "A.  I didn't like the way he -- I don't -- I don't -- let me

17   see.  I think I came in late and the manner in which he spoke

18   to me, I didn't like it.

19   "Q.  What manner did he speak to you?

20   "A.  He yelled and screamed at me in front of the office."

21         THE COURT:  That's enough.  I think that is what you

22   had been indicating.

23         THE WITNESS:  Yes.

24   Q.  Ms. Johnson, before my question to you was you were

25   terminated because of an argument you had with your supervisor

1   so the answer to that question is yes?

2           THE COURT:  Are you testifying?  I didn't see anybody

3   swear you?

4           MR. MINNAH-DONKOH:  I am repeating her testimony, your

5   Honor.

6           THE COURT:  May be you understand what I said before

7   when the plaintiff was examined we're going to try and try this

8   case once.

9           MR. MINNAH-DONKOH:  Sure.

10  Q.  Ms. Johnson, even though from the portion of your

11  deposition testimony that I read to you, you alleged that you

12  didn't like the way your boss had commented or spoke to you

13  because he screamed and yelled at you.  You didn't perceive

14  that to be discriminatory, did you?

15  A.  No, I didn't.  May I also add that Jaffrey Prody was a

16  Caucasian man --

17  Q.  Ms. Johnson, there is no question pending.

18          Just to get this out of the way.  In this case you

19  sued Phil Weinberg as an individual defendant?

20  A.  Yes.

21  Q.  Mr. Weinberg never made any derogatory comments to you, did

22  he?

23  A.  No.  He never gave me tough love.

24  Q.  Ms. Stein never made any derogatory comments to you about

25  your gender, did she?

1   A.  No.  She never gave me tough love.

2   Q.  She never made derogatory statements to you about your

3   race?

4   A.  No she did not.

5   Q.  And as you -- as you testified on direct, the one and only

6   time in your two-year employment with STRIVE that Mr. Carmona

7   used the word nigga in conversation to or called you a nigga

8   was in the tape-recording that was played for jury early on?

9   A.  Yes.  That's the only time he called me a nigger, yes.  It

10  was three times in that conversation, but that was the one and

11  only time.

12  Q.  Now, in the taped recording that was played for the jury,

13  before Rob uses the word nigga, he specifically says, "And I

14  don't mean this derogatory," do you recall that?

15  A.  Yes, I do.

16  Q.  And Ms. Johnson --

17              THE COURT:  Because we don't get to the law here until

18  much later on, I think I should explain to you what this is all

19  about, this testimony, or at least what I think it is all

20  about.  One of the elements in several of the charges has to do

21  with and what is being talked about now is whether or not the

22  firing was indeed legitimate.  The way it happened and what

23  happens is and the way the law works if the defendant asserts

24  the legitimacy of the termination, it then befalls the

25  plaintiff, Ms. Johnson, to show that what he was telling you

1    about its legitimacy is what we all pretextual.  In other

2    words, it wasn't really word.  It was all made up.  So that is

3    what this conversation is really all about.  It is whether or

4    not there was a legitimate firing and then indeed the plaintiff

5    has and indeed testified to whether or not it was -- what the

6    defendant says was pretextual or it was legitimate way in which

7    she was terminated legitimately.

8            That is the way the fairly contorted law works.  We'll

9    talk about it again.  I just want to give you a little heads up

10   on what this was all about that we were listening to because

11   none of it is really the discriminatory aspect.  It is much

12   more the legitimate firing versus the pretextual aspect if any.

13           That's a little soft shoe for you, but we're really

14   anxious to move along.

15           MR. MINNAH-DONKOH:  Yes, your Honor.

16   BY MR. MINNAH-DONKOH:

17   Q.  Ms. Johnson, is it your testimony that starting from

18   approximately 30 days to 45 days after you started with STRIVE,

19   Rob yelled and belittled you and did horrible things, said

20   horrible things to you?

21   A.  Yes, he did.

22           MR. MINNAH-DONKOH:  Permission to a approach witness,

23   your Honor?

24           THE COURT:  You may.

25   Q.  Ms. Johnson, I have handed you Defense Exhibit N in

1    evidence.  Ms. Johnson Defendants Exhibit N is an e-mail from

2    you to Robert Carmona dated Friday, February 24th, 2012?

3    A.  Correct.

4    Q.  And you did in fact send that e-mail to Robert Carmona?

5    A.  I did, sir.

6    Q.  In that e-mail you state, I need you to critique my

7    admission essay?

8    A.  Yes.

9    Q.  That was an admission essay for grad school you were trying

10   to get into?

11   A.  Yes, sir.

12   Q.  Ms. Carmona, is it your testimony -- and I want a yes or no

13   answer --

14   A.  Ms. Johnson.

15   Q.  Sorry, Ms. Johnson.  It is your testimony that despite all

16   the horrible things that Robert Carmona said and did to you

17   beginning 30 days after you started with STRIVE in May 2010, in

18   February of 2012 you were asking him for guidance with respect

19   to your admission essay for us?

20   A.  I was scared of Rob.  Yes, I did ask him to critique my

21   essay.  I would have done anything for Rob to leave me alone to

22   befriend me so the harassment would stop.  Yes, I did.

23   Q.  Do you have any documents reflecting that you asked him to

24   review your essay because you were afraid of him?

25   A.  Have you ever been bullied.

1    Q.  I ask you to answer the question.

2    A.  Can you please repeat question.

3         THE COURT:  Do you have any documents that you were

4    asked him to review your essay simply because you wanted to get

5    on his good side?

6    A.  No.  I do not have any documents stating that, sir.

7    Q.  Now, again going back to the beginning of your employment,

8    approximately 30 days which is when you claim that Robert

9    Carmona started treating you horribly and making horrible

10   comments to you, you never reduced any of those complaints to

11   an e-mail or any other formal writing?

12   A.  I told Treworgy.

13   Q.  That is what you testified today.  My question to you is

14   you never reduced any of those alleged horrible statements that

15   Robert Carmona made to you in writing?

16   A.  I didn't have to.  I witnessed it.

17   Q.  So that is enough.  I want a simple answer.

18   A.  No.

19   Q.  The first time you ever reduced any complaints to writing

20   was in the draft complaint that your attorneys provided to

21   STRIVE in or around April of 2012, yes?

22   A.  Yes.

23   Q.  Now, you were asked questions during your direct

24   examination about Phil Weinberg's investigation of your

25   complaint.  And you testified that to the best of your

1    knowledge nothing was done to investigate your complaint.  Do

2    you recall that testimony?

3    A.  I testified that I was not given the findings of the

4    investigation, yes.

5    Q.  Ms. Johnson, would you agree with me that in order for

6    someone to fully investigate any complaint they have to have as

7    much information as possible?

8    A.  I would agree with you with that.

9    Q.  Now, that recording of that conversation between yourself

10   and Rob Carmona as your attorney indicated that was made on

11   March 14, 2012?

12   A.  Yes, sir.

13   Q.  Now, you did not make that recording to have something to

14   listen to on your train ride home, did you?

15   A.  Of course not.

16   Q.  You made it with the understanding that you would be

17   possibly be filing a lawsuit?

18   A.  Initially, no.

19   Q.  Well, you would agree with me that it would have been

20   important to provide Phil Weinberg with that recording during

21   his conversation, yes?

22   A.  Why would I give him the recording if nothing was being

23   done?  Why?

24   Q.  Ms. Johnson, do you not understand my question?

25   A.  Sir, you asked me the question that has more than just a

1    yes or no answer.

2    Q.  Okay.  Let's break it down then so you can answer it yes or

3    no.  You never provided Phil Weinberg with a copy of any

4    recordings that you took including the one with Mr. Carmona?

5    A.  Why would I give Phil a copy of the tape that Rob was

6    just --

7    Q.  Ms. Johnson.  Ms. Johnson, please.  I am not asking why you

8    would have or not have.  The simple question is yes or no.  Did

9    you or did not provide Mr. Weinberg a copy of the tape

10   recording?

11   A.  No.  My attorneys provided you a tape and still have not

12   done anything to this day.  Why would I?

13            MR. MINNAH-DONKOH:  Move to strike.

14            THE COURT:  Ms. Johnson, you really have to sort of

15   answer the question, but not go on because otherwise this is

16   not ever going to come to an end.

17            On that score, Mr. Minnah-Donkoh, how long do you have

18   left?

19            MR. MINNAH-DONKOH:  A decent amount that I will not be

20   able to complete today.

21            THE COURT:  You will be able to.  Take my word.  You

22   have a half hour to finish.

23            MR. MINNAH-DONKOH:  Okay.

24   Q.  Now, Ms. Johnson, you testified on direct that it was part

25   of your or you worked to obtain the extension from the federal

1  government of the Pathways Out of Poverty grant?

2  A.  Yes.

3  Q.  And you worked on that extension with Lisa Stein?

4  A.  Yes, I did.

5          MR. MINNAH-DONKOH:  May I approach the witness, your

6  Honor?

7          THE COURT:  Yes.

8          MS. MESIDOR:  Objection, your Honor.  I see a document

9  is being published to the jury and I still don't --

10         THE COURT:  I can't hear you.

11         MS. MESIDOR:  Sorry, your Honor.  Can you hear me now?

12         THE COURT:  Yup.

13         MS. MESIDOR:  I said that I see a document is being

14 published to jury.  Can plaintiff let us know what exhibit

15 defense counsel is referring to?

16         MR. MINNAH-DONKOH:  Plaintiff's Exhibit 40.

17         MS. MESIDOR:  Perhaps, your Honor, if counsel could

18 announce what the exhibit is before he gives it to the witness

19 so we don't take unnecessary time.

20         THE COURT:  Right.  I think that is valuable.  Let's

21 do that if we can, Mr. Minnah-Donkoh.

22 BY MR. MINNAH-DONKOH:

23 Q.  Ms. Johnson, I have handed you Plaintiff's Exhibit 40,

24 which was the final modification to the Pathways Out of Poverty

25 grants extended it until June 30th, 2012.

1          MS. MESIDOR:  Your Honor, I am not at the exhibit yet.

2    My apologies.

3    Q.  Ms. Johnson, that is the final modification that was made

4    to the Pathways Out the Poverty grants extended it until

5    June 30th, 2012?

6    A.  No.  I don't know.  I didn't -- I see this is addressed to

7    Lisa, not to Brandi.

8    Q.  On the first page of this document it is dated

9    January 24th, 2012?

10   A.  Yes.

11   Q.  You were still employed by STRIVE in January 2012, yes?

12   A.  Yes, I was.

13   Q.  Regardless of whether you received this document or notice,

14   you were aware the grant was extended to June 30th, 2012, yes?

15   A.  Yes, I was aware.

16   Q.  On June 11th, when Mr. Weinberg sat down with you to tell

17   you that your employment was ending, he told you that it was

18   ending pursuant to the Pathway Poverty grant ending, yes?

19   A.  Yes, he did.

20   Q.  He told you that your position was tied to the grant, yes?

21   A.  Yes, he did.

22   Q.  He tape-recorded that particular conversation?

23   A.  Yes, I did.

24   Q.  At no point in time during that conversation did you

25   express surprise?

1  A.  Can we hear the tape?

2  Q.  Sure.  Since it is exhibits that were proffered by your

3  attorney specifically Plaintiff's Exhibit --

4          THE COURT:  There is only two that are in.  So if this

5  is one of them that is fine.  If it is not, I would urge you to

6  go on along your merry way.

7          MR. MINNAH-DONKOH:  It is one of the exhibits, your

8  Honor.  It is Plaintiff's Exhibit --

9          THE COURT:  It can only be --

10          MR. MINNAH-DONKOH:  49.

11          THE COURT:  I am not at all clear if that is one of

12  them.  Let's see.  You have a list just like mine so you can

13  tell me or you have told my and I take your word for it.

14          MR. MINNAH-DONKOH:  Your Honor, since this was an

15  exhibit --

16          THE COURT:  They are all recorded by the plaintiff and

17  they are all inadmissible other than the couple I agreed to and

18  the ones you essential agreed to as with the.

19          MR. MINNAH-DONKOH:  Defense counsel will request

20  permission since counsel played a previous recording for the

21  jury.

22          THE COURT:  What is the number?

23          MR. MINNAH-DONKOH:  49.

24          MS. MESIDOR:  Your Honor, I don't have the ability to

25  play that recording on my computer unless he has a file he can

1    e-mail and use it.  Because it is not something I was using.  I

2    don't have it and my computer does not have a CD drive.

3                THE COURT:  Sorry.

4                MS. MESIDOR:  If somebody has an external drive I will

5    be more happy.

6                THE COURT:  I don't think you can.  I think you should

7    have brought them all.  You didn't know they were all going to

8    be inadmissible.  This is with one you agreed to.

9                MS. MESIDOR:  But today I only had my client's direct

10   testimony.

11               THE COURT:  You had all or should have had all the

12   recordings because you didn't know they were all inadmissible.

13               MS. MESIDOR:  I was only using one recording in my

14   client's --

15               THE COURT:  It doesn't matter what you were using.

16   You have an adversary who in fact has --

17               MS. MESIDOR:  Your Honor, how could I take

18   responsibility for what my adversary --

19               THE COURT:  They are your recordings.

20               MS. MESIDOR:  I am sorry?

21               THE COURT:  Do you have a transcript?

22               MR. MINNAH-DONKOH:  Yes, your Honor.

23               MS. KREBS:  Your Honor, I am taking steps to see if we

24   can get it e-mailed.

25               THE COURT:  No.  We're not going to spend the time

1   waiting.  Just move along.  We'll have to work something out so

2   maybe we can listen to it bright and early.

3           MR. MINNAH-DONKOH:  Well, your Honor --

4           THE COURT:  Unless you have a better way of

5   complaining it.  Once again my problem I am afraid is with the

6   plaintiff in terms of the recordings what should be here.  I

7   don't want to here anything why it wasn't.  I heard your view.

8   It doesn't appeal to me.  There is nothing we can do about it.

9           MR. MINNAH-DONKOH:  If I may suggest something.  Being

10  that plaintiff's counsel provided a transcript of the recording

11  at this point in time I know your Honor previously ruled

12  against it, but we'll stipulate to it what plaintiff counsel

13  has provided with respect to the conversation on the tape.

14          THE COURT:  Whatever has been stipulated to me is fine

15  with me.  You have 20 minutes left.  So use it anyway you

16  choose.

17  BY MR. MINNAH-DONKOH:

18  Q.  This is from Plaintiff's proposed Exhibit 50.  Starting

19  with line 12 from Phil Weinberg I will indicate which

20  individual is speaking.  Phil Weinberg:  Um so clearly--

21          THE COURT:  How many pages is this?  How much long is

22  this?

23          MR. MINNAH-DONKOH:  It is not very long, your Honor.

24  It is approximately six pages, but I am going to read a portion

25  of.

1          THE COURT:  If you read a page or two that is okay,

2    otherwise we'll hear it tomorrow morning.

3          MR. MINNAH-DONKOH:  Then we'll hear it tomorrow

4    morning, your Honor.

5          THE COURT:  But that will be all we hear in terms of

6    this witness's cross tomorrow morning.

7          MR. MINNAH-DONKOH:  Judge, so we have the record for

8    tomorrow morning, Ms. Johnson, I am going to ask you so we have

9    on record when Mr. Weinberg advised you that your employment

10   was coming to an end as a result of the grant which your

11   position was tied to ending you expressed no surprise about

12   what he was telling you, did you?

13   A.  I wasn't surprised.  I was told that -- I figured --

14   Q.  Did you or did you --

15         THE COURT:  She said she wasn't surprised.

16   Q.  Ms. Johnson, you've testified differently in the past as to

17   what your reaction was when he advised you your position was

18   coming to an end, haven't you?

19   A.  What I did testify to, sir.

20   Q.  Directing the Court's attention to page 145 of plaintiff's

21   May 22nd, 2013 deposition transcript, line 11:

22   "Q.  So, Ms. Johnson, isn't your testimony that the first time

23   you ever found out that your employment with STRIVE would be

24   coming to an end in 2012 was on June 11th?

25   "A.  Yes."

1          THE COURT:  Did you make that answer to that question?

2     Q.  Question--

3          THE COURT:  Wait a minute.  There is only one leader

4     here.

5          MR. MINNAH-DONKOH:  Sorry, your Honor.  I didn't hear

6     what you said.

7          THE COURT:  When you think you heard something, you

8     should say something and then you won't have that problem,

9     right?

10         MR. MINNAH-DONKOH:  Yes.

11         THE COURT:  Did you make that answer to that question?

12         THE WITNESS:  Yes.

13         THE COURT:  Do you want to go further?  Go right

14    ahead.

15    BY MR. MINNAH-DONKOH:

16    Q.

17    "Q.  And during that conversation on June 11th, with Phil

18    Weinberg what did he say to you?

19    "A.  I don't recall.  I don't remember the verbatim

20    conversation with Mr. Weinberg."

21         Were you asked that question and did you give that

22    answer?

23    A.  I-- I guess.  Yes.

24    Q.  Okay.

25    "Q.  Okay.  On the sum and substance what did he tell you?

1    "A.  The Pathways grant had come to an end and I will be

2    terminated, and I asked him was he serious and he think -- I

3    think he said yes or I believe.  I asked him if he was

4    serious."

5         Were you asked that and did you give that answer?

6    A.  I believe so.

7    Q.  Okay.

8    "Q.  And after he told you that, yes, he was serious, did you

9    say anything in response?

10   "A.  Probably something sarcastic.  I don't recall."

11        Were you asked that question and did you give that

12   answer?

13   A.  Yes.

14   Q.  So we should expect hear what you testified to at your

15   deposition on the audio recording?

16   A.  The tape in the entirety or portions of it?

17   Q.  We're going to play exactly what you provided to us?

18   A.  Okay.

19   Q.  So we should hear what you testified to in your deposition

20   on the audio recording tomorrow?

21   A.  I gave verbatim, but I did give to the best of my

22   knowledge, yes.

23   Q.  You would agree with me that whether you -- whether you

24   expressed sarcasm about what Mr. Weinberg was telling you is

25   pretty important, correct?

1   A.  Why would it be important?

2   Q.  You are saying today that you did not?

3   A.  I did not what, sir?

4   Q.  Your testimony today is that you did not stay or you did

5   not express any surprise when he told you that your employment

6   was coming to an end?

7   A.  Okay.

8   Q.  In your deposition transcript you testified that you asked

9   him are you serious and responded sarcastically?

10  A.  I said I couldn't give you verbatim but I probably did

11  respond sarcastically.  That is what is transcribed.

12  Q.  We should hear some form of sarcasm in the audio recording

13  tomorrow?

14  A.  I hope so, yes.

15  Q.  Before I forget, Ms. Johnson, you testified earlier that

16  after you filed your complaint Rob Carmona walked by you with

17  Earnest Johnson and made a comment and made a comment to the

18  effect, We're going to put this bitch in a smash.

19          Do you recall that testimony?

20  A.  Yes I do.

21  Q.  Ms. Johnson, the truth of the matter Rob Carmona never said

22  we're not going to put this bitch in a smash, did you?

23  A.  Was you there?

24  Q.  No.  I was not there.

25  A.  That is what I heard.

1    Q.  Okay?

2              MR. MINNAH-DONKOH:  Permission to approach the

3    witness?

4              THE COURT:  Yes, indeed.

5              MR. MINNAH-DONKOH:  Plaintiff's Exhibit 45.

6              THE COURT:  As I see it here that is inadmissible

7    hearsay.  In fact you have some special reason why it should

8    have a different result, we'll have to worry about it now

9    because we're not going to keep going like this.

10             MR. MINNAH-DONKOH:  Your Honor, she testified that Mr.

11   Carmona said we're going to put this specifically bitch in a

12   smash and this is a text message from Ms. -- well, this is a

13   text message from plaintiff.  So it is a party opponent

14   admission.  Furthermore, it is being used for impeachment

15   purposes.

16             THE COURT:  Let me see what you got.

17             Out.  Don't even think about it.

18             Next.  You have 15 minutes.

19   BY MR. MINNAH-DONKOH:

20   Q.  Now, Ms. Johnson, as part of your retaliation claim, you

21   testified that Rob Carmona went around telling other coworkers

22   at STRIVE about the complaint you filed?

23   A.  Yes, he did.

24   Q.  Ms. Johnson, you told the coworkers about the complaint you

25   filed, did you not?

1  A.  No.  I was asked.  I did not go around telling and I

2  indicated that to Phil.

3  Q.  Ms. Johnson, it is your testimony that you did not tell

4  April Bland?

5  A.  It is any testimony that April Bland came to me and I did

6  cooperate.  I did say, yes, I did.  I did not go for April

7  Bland.  She came to me after she heard the rumor.

8  Q.  Ms. Johnson, you also testified on several occasions that

9  you never complained because you did not know who to complain

10  to.  Do you recall that testimony?

11  A.  Yes.  I am sorry.  I complained but nothing was done so I

12  didn't take further action providing the tape.  So, yes.

13  Q.  That March 2012 incident with Rob Carmona conversation

14  where Carmona said you act like a nigga --

15  A.  Yes.

16  Q.  Phil Weinstein was working for STRIVE, by that time,

17  correct?

18  A.  Yes, he was.

19  Q.  Well, he started in November of 2011, yes?

20  A.  I wasn't there when he started.  I think when he came back

21  in January Phil was -- I don't know his official start date,

22  sir.

23  Q.  As of the date of conversation between yourself and Mr.

24  Carmona where he said you act like a nigga, Phil Weinberg was

25  already CEO?

1    A.  Yes, he was.

2    Q.  And you never went to Phil Weinberg to tell him about this

3    incident with Mr. Carmona and so again your attorneys served a

4    draft complaint in April of 2012, yes?

5    A.  Yes.

6    Q.  Ms. Johnson, even though your employment ended effective

7    June 11th, 2012, you were paid throughout the end of the month,

8    yes?

9    A.  Yes, I was.

10           MR. MINNAH-DONKOH:  Just a moment, your Honor, to

11   confer with my co-counsel.

12           THE COURT:  Very well.

13   Q.  Ms. Johnson, during the conversation that we're going to

14   hear tomorrow with Phil Weinberg when he told you that your

15   employment was going to end as a result of the grant ending,

16   did you tell Mr. Weinberg ahead of that conversation you were

17   taping him?

18   A.  No.

19   Q.  You secretly taped the conversation?

20   A.  I think -- I guess I taped my conversations, yes.  I had to

21   find some way to protect myself, yes.

22   Q.  Did you have that conversation with Mr. Carmona as well and

23   you secretly taped that conversation as well, yes?

24   A.  I kept a record.  I started to keep a record.  So if you

25   want to used the phrase secretly taped as a way to prove --

1   Q.   You secretly taped them?

2   A.   Yes.  I taped them to prove what was going on.

3   Q.   The first time you consulted with an attorney about

4   bringing this lawsuit was in March of 2012, yes?

5   A.   I believe so.

6   Q.   Again you started working for STRIVE in 2010?

7   A.   Yes, sir.

8   Q.   Even though you claim Rob started harassing you in May of

9   2010 you never discussed it with an attorney in 2010?

10   A.   No.

11   Q.   Even though you claim Mr. Carmona was harassing you

12   throughout the course of your employment, you never consulted

13   with an attorney in 2011, did you?

14   A.   No, I did not.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

D8qnjoh7                    Johnson - cross

1    Q.  You waited until approximately two months?

2    A.  I waited until --

3    Q.  You waited approximately until two or three months before

4    your employment was about on come to an end pursuant to the

5    grant to consult with an attorney?

6    A.  My employment was never coming to an end.  I was unaware of

7    that.  You guys keep saying that, but that was never the case.

8    Q.  Ms. Johnson, the jury will get to hear the tape tomorrow.

9    A.  OK, sir.

10   Q.  Ms. Johnson, do you know a lady by the name of Cammie

11   Crawford?

12   A.  I sure do.

13   Q.  She is a good friend of yours, correct?

14   A.  Yes.  Cammie and I used to be really good friends, yes.

15   Q.  Is it your testimony that you are no longer good friends?

16   A.  It is my testimony that our relationship is not as strong

17   as it was prior to me leaving STRIVE.

18   Q.  Do you still keep in touch with her?

19   A.  I do from Time to time.

20   Q.  Maria Ortiz, is that a friend of yours?

21   A.  She -- yes.

22           MR. MINNAH-DONKOH:  No further questions, your Honor.

23           THE COURT:  Very well.

24           MR. MINNAH-DONKOH:  Subject to playing the tape

25   tomorrow morning, your Honor.

1              THE COURT:  Very well.

2              Any brief redirect?

3              MS. MESIDOR:  Yes, your Honor.

4              THE COURT:  Just so that we have the ground rules,

5    your redirect is not with respect to anything you could have

6    asked and failed to ask on direct.

7    REDIRECT EXAMINATION

8    BY MS. MESIDOR:

9    Q.  Ms. Johnson, on your --

10             MS. MESIDOR:  Excuse me.  Can you hear me, your Honor?

11             THE COURT:  Yes.

12   Q.  Ms. Johnson, on your direct testimony you were asked

13   regarding whether or not you had ever used the word nigger in

14   the workplace?

15   A.  Yes.

16   Q.  Now, opposing counsel had read you a portion of your

17   deposition transcript and you attempted to correct him in terms

18   of the context of that deposition testimony.  Do you recall

19   that?

20   A.  Vaguely, yes.

21   Q.  I am going to draw your attention to the plaintiff's

22   deposition testimony, page 155, beginning at line 25.

23   Ms. Johnson, I am going to read a portion of your deposition

24   testimony, the portion that opposing counsel read as well as

25   the follow-up.

1          THE COURT:  I don't need to hear his again.  We should

2     have done it at the same time like we did with the other

3     excerpt.

4          MS. MESIDOR:  Your Honor, would you like me to then to

5     just start from the followup question?

6          THE COURT:  Yes.  But I wish we had done it in

7     context.

8          MS. MESIDOR:  It is one additional line, your Honor.

9     To put it into appropriate context, if you would still permit

10    me.

11         THE COURT:  Absolutely.

12         MS. MESIDOR:  Thank you.  Page 155 beginning at line

13    25:

14    "Q.  OK.  Ms. Johnson, during your tenure at STRIVE did you

15    ever use the word nigga in your conversation with coworkers?

16    "A.  I don't recall.

17    "Q.  You don't recall if you ever used the word nigga in the

18    conversation with coworkers?

19    "A.  I don't speak like that, no."

20         Is that your full testimony on whether or not you have

21    used the word nigger in your employment at STRIVE?

22    A.  Yes, ma'am.

23    Q.  Referring you quickly to Defendants' Exhibit F that's

24    already in evidence.  It is the e-mail from Rob Carmona to the

25    affiliates.

1          Do you have that before you, ma'am?

2    A.  Yes.  Yes.  I'm sorry.  Yeah, I have it.

3    Q.  Do you have it before you?

4    A.  Yes, I'm here.

5    Q.  Ms. Johnson, does it say anywhere in the e-mail that

6    Mr. Carmona is happy that you joined STRIVE or anything to that

7    effect?

8    A.  It said, "It is my pleasure to introduce STRIVE's affiliate

9    services coordinator."

10   Q.  Other than that, is there any other indication as to what

11   defense counsel was asking you as to whether or not Mr. Carmona

12   was excited about you joining STRIVE?

13   A.  No, there was just a generic e-mail I believe.

14   Q.  I am going to ask you now to bring your attention to

15   Defendants' Exhibit G --

16   A.  OK.

17   Q.  -- which was the purported job description that was brought

18   before you.  Do you have the job description, Ms. Johnson?

19         It says STRIVE at the top.  It says Bates stamp No.

20   STRIVE 00258.

21   A.  Yes, ma'am.

22   Q.  Do you have it?

23   A.  Yes.

24   Q.  Ms. Johnson, have you ever received this document?

25   A.  No.  I don't recall this document.  It says department

1    fiscal.  When I first came on board, it was national, and I

2    don't recall receiving this document.  I recall asking for my

3    job description, but this wasn't the job description.

4    Q.  Is it your testimony that this was not the job description

5    that was provided to you?

6    A.  Yes.

7    Q.  It also says here that you report to the CFO.

8    A.  Yes.

9    Q.  Do you see that?

10   A.  I do.

11   Q.  When you started at STRIVE, did you report to the CFO?

12   A.  No, I reported to Rob Carmona.

13   Q.  Was what Rob Carmona's position at STRIVE at the time?

14   A.  President.

15   Q.  Was this the first time that you indicated to opposing

16   counsel that you had never seen this document?

17   A.  No, I think I did this in deposition, I believe.

18   Q.  I am now going to call your attention to Exhibit J, which

19   was the performance appraisal.

20   A.  Yes.

21   Q.  Are you there?

22   A.  Yes, ma'am.

23   Q.  For Exhibit J, what department does it say that you belong

24   to as of the date of this performance appraisal October 21,

25   2011?

1   A.   National.

2   Q.   Turning your attention to the last page of Exhibit J.

3   A.   OK.

4   Q.   What does it say that the average numerical rating for your

5   performance evaluation is?

6   A.   A 3.5.

7   Q.   What is that categorized as?

8   A.   According to the second page, it says meets expectations is

9   a 3, so I guess it's between very good and meets expectations.

10  Q.   I'm going to turn your attention to Exhibit K.  It is the

11  e-mail from Rob Carmona dated December 28, 2011.

12  A.   OK.

13  Q.   Do you have it before you, ma'am?

14  A.   Yes.

15  Q.   I am going to draw your attention to the very last sentence

16  of Mr. Carmona's e-mail.  Do you see that, where it begins

17  "additionally"?

18  A.   Additionally, yes.

19  Q.   It says, "Additionally you guys are going to be taking the

20  show on the road in the very near future."

21       Do you know what Mr. Carmona meant by taking the show

22  on the road?

23  A.   I assume --

24       MR. MINNAH-DONKOH:  Objection.

25       THE COURT:  Sustained.

1   BY MS. MESIDOR:

2   Q.  Ms. Johnson, was there any particular event or anything

3   going on at STRIVE at the time of this e-mail that you can use

4   as a reference as to what taking the show on the road meant?

5   A.  I traveled for STRIVE to bring some of the affiliates

6   online, so my -- do I do a presumption or no?  Can I say?

7   Q.  You can speak.

8   A.  I'm sorry.

9        As the affiliate service person, I would be going to

10  some of the locations to help Christina bring the affiliates

11  online with ETO and/or for data collection and things of that

12  nature.

13  Q.  How often after the December 28, 2011 e-mail did you

14  continue to travel on behalf of STRIVE?

15  A.  Up until I had a meeting with Phil, Christina and I were

16  supposed to go away I think the 14th and the 15th.  I was

17  unsure in regards for health reasons if I was going to go, but

18  I believe I told them I was fine, and they cancelled the trip.

19  Q.  I'm going to bring your attention to a Defendants' Exhibit

20  11.  I'm sorry.  I'm very sorry.

21  A.  OK.

22  Q.  I had a very senior moment.  Exhibit L.

23  A.  OK.  Yes.

24  Q.  Do you have that before you, ma'am?

25  A.  Yes, I do.

1  Q.  Now, I am going to draw your attention to the first

2  paragraph, the last line, where it says, "However, on January

3  25 there was another incident that demonstrated a continued

4  inability to maintain this as a status quo."

5          Do you see that?

6  A.  Yes, ma'am.

7  Q.  Do you know what the January 25 incident refers to?

8  A.  Yes, I do.

9  Q.  What does it refer to, ma'am?

10  A.  Christina and Nancy got into an argument over -- I'm sorry.

11  Christina and Nancy got into an argument over some work.  Lisa

12  and April was in a meeting.  Nancy came in and got my opinion

13  in regards to did Corinne proceed to do something inaccurately.

14  I told Christina that it was inaccurate, but wait until Lisa

15  and April get out the meeting.  Christina blew up, she stormed

16  off, she started crying and yelling and screaming.  Nancy

17  locked Christina out of the RAG system.

18  Q.  What is the RAG system?

19  A.  It is the Department of Labor database.  She told April

20  that she was the one who locked Christina out of the RAG

21  system.  To my knowledge, April --

22          MR. MINNAH-DONKOH:  Objection.

23          THE COURT:  Sustained.

24  A.  To my knowledge, April --

25          MR. MINNAH-DONKOH:  Objection.

1          THE COURT:  I sustained the objection.

2          THE WITNESS:  OK.

3          THE COURT:  So you can't answer.

4          THE WITNESS:  I'm sorry.  I'm sorry.

5          THE COURT:  It's all right.  All right.  I think we

6     should move along, unless you are finished.

7          MS. MESIDOR:  No, your Honor.

8     BY MS. MESIDOR:

9     Q.  The document, Exhibit L, you had previously testified that

10    both you and Ms. Saenz had received the same document?

11    A.  Yes, ma'am.

12    Q.  After this document, were there any further incidents with

13    Ms. Saenz?

14    A.  Not with me.  I wanted to be quiet.  I was tired.

15    Q.  Does Ms. Saenz continued to be employed with STRIVE?

16    A.  Yes, she does.

17    Q.  Opposing counsel had previously asked you about an argument

18    that you had with your previous supervisor at Commerce Key.

19          Do you recall that?

20    A.  Yes.

21    Q.  Did your previous supervisor at Commerce Key ever call you

22    a nigger?

23    A.  Not once.

24    Q.  Opposing counsel had made a point during his

25    cross-examination to highlight the date of the recording that

1   you had with Mr. Carmona and its approximation as to when you

2   were terminated from STRIVE.  How much time did elapse between

3   the time that you made the recording with Mr. Carmona and when

4   your attorney made a complaint to STRIVE regarding

5   Mr. Carmona's behavior?

6   A.  It was --

7            MR. MINNAH-DONKOH:  Objection.

8            THE COURT:  You can answer if you know the answer.

9   A.  It was in April.

10  Q.  When was the recording made?

11  A.  March.

12  Q.  Do you know whether it was the beginning or end of April?

13  A.  It was right before my birthday.  April 15 is my birthday,

14  so I believe it was the middle of April.

15  Q.  To your knowledge, does Mr. Carmona continue to work on

16  STRIVE's behalf?

17  A.  Yes.

18           MR. MINNAH-DONKOH:  Objection.

19           THE WITNESS:  Can I --

20           MS. MESIDOR:  No further questions, your Honor.

21           THE COURT:  All right.

22           Everybody, I think you have had a long day.  We will

23  adjourn now, and I will see you at 9 o'clock for coffee and

24  cake.

25           Do not discuss this case amongst yourselves or with

D8qnjoh7                    Johnson - redirect

1    anybody else.  Hopefully we can start at 9 or as close

2    thereafter as possible.  If you come earlier, you get first

3    dibs.

4              Good night, everybody.

5         (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2                THE COURT:  You may step down.

3                THE WITNESS:  Thank you.

4                THE COURT:  I want you to both understand that this

5     tape which should have been here, should have been played today

6     by one or both of you as long as you had stipulated to it, is

7     the totality of what's left in the cross-examination world, and

8     by extension the redirect world.  Have a good evening.

9                MS. MESIDOR:  Thank you, your Honor.

10               MS. KREBS:  Thank you, your Honor.

11               MR. MINNAH-DONKOH:  Your Honor?

12               THE COURT:  Yes.

13               MR. MINNAH-DONKOH:  Just one very quick procedural

14    issue.  Again, with respect to the tape recording tomorrow,

15    since these were audio recordings that plaintiff produced and

16    wanted to use, we ask that we play it on the same medium that

17    they played their recording on.

18               THE COURT:  Say that again?

19               MR. MINNAH-DONKOH:  We would ask that, being that the

20    tape recording we wish to play tomorrow morning was a recording

21    that was obviously produced by plaintiff and proffered as an

22    exhibit by plaintiff, we would ask to play it on the same

23    medium that plaintiff's counsel used today.

24               THE COURT:  On the same what?

25               MR. MINNAH-DONKOH:  Medium.  In other words, the same

1   computer the same speakers.

2              THE COURT:  Yes.  Well, I assume you will produce it

3   right?

4              MS. MESIDOR:  Your Honor, we produced it.  They have a

5   copy.

6              THE COURT:  If you have anything different, you ought

7   to look and talk tonight.  It won't be the first time.  Indeed,

8   let's not have two different versions.

9              MS. MESIDOR:  There aren't two different versions,

10  your Honor.  There is only one version.

11             MS. KREBS:  Your Honor, the equipment.

12             MS. MESIDOR:  If opposing counsel would like to as me

13  as a courtesy if I can play on it at same medium, that is a

14  different request than what is certainly before the Court.

15             THE COURT:  It is fine if you play it on the same

16  medium.  I am not sure I know what that means.  But indeed I

17  will see you in the morning.

18             MS. MESIDOR:  Your Honor, is it all right that we

19  leave the exhibits and everything here?

20             THE COURT:  I think so.

21             I think she left a lot on the desk in front of her

22  that you might want to collect.  I assume they left it on the

23  chair.  Maybe somebody took them with them.

24             MS. MESIDOR:  Your Honor, we also have a copy of

25  exhibits for the witness.  Is it permissible to allow us to

D8qnjoh7                    Johnson - redirect

1    leave it there so we don't have to go back and forth?

2              THE COURT:  You are not going to use it anymore for

3    that witness because she's finished.

4              MS. MESIDOR:  No, she is indeed finished, your Honor.

5    I am talking about in general.  I made a separate binder of set

6    copies for the witness.  By your permission, if I could allow

7    it to be left at the witness stand, so I can direct the witness

8    to the exhibits as opposed to going back and forth?

9              THE COURT:  Those exhibits that are there?

10             MS. MESIDOR:  Not those particular exhibits.  I am

11   talking about plaintiff's exhibits.

12             THE COURT:  In the future?

13             MS. MESIDOR:  Yes, your Honor.

14             THE COURT:  Absolutely.

15             MS. MESIDOR:  Thank you.

16             THE COURT:  Anything else?

17             (Adjourned to Tuesday, August 27, 2013 at 9:00 a.m.)

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination of:                        Page

3    BRANDI JOHNSON

4    Direct By Ms. Mesidor  . . . . . . . . . . . .44

5    Cross By Mr. Minnah-Donkoh . . . . . . . . . .87

6    Redirect By Ms. Mesidor  . . . . . . . . . . 147

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25