D8R6JOH1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   BRANDI JOHNSON,

4                    Plaintiff,

5            v.                          12 CV 4460(HB)

6   LISA STEIN, ROB CARMONA and
    PHIL WEINBERG,
7
                 Defendants.
8
    ------------------------------x
9                                        New York, N.Y.
                                         August 27, 2013
10                                       9:05 a.m.

11  Before:

12                   HON. HAROLD BAER, JR.,

13                                       District Judge

14                          APPEARANCES

15  PHILLIPS & PHILLIPS
         Attorneys for Plaintiff
16  BY:  MARJORIE MESIDOR
         ALEX UMANSKY
17
    GORDON & REES, LLP
18       Attorneys for Defendants
    BY:  DIANE KREBS
19       KUUKU ANGATE MINNAH-DONKOH

20  Also present:  Daphney Guillaume, Esq.

21

22

23

24

25

1          (Case called; in open court)

2          MS. KREBS:  Your Honor, before the jury is brought in

3     a brief request if I may.

4          THE COURT:  Let me explain to you that I get here

5     early and I stay late and I am here at lunch and we have two

6     recesses a day.  That is with we can talk.  We don't keep the

7     jury waiting.

8          MS. KREBS:  This just arose right now otherwise I

9     would have approached you sooner.

10          THE COURT:  What is your problem?

11          MS. KREBS:  I have two things.  First of all, there is

12     a witness in the courtroom that is going be testifying and to

13     preserve the integrity of the record, I ask she be excused.

14          THE COURT:  If she is not a party, she should leave.

15          MS. KREBS:  The other is that this morning a juror

16     came into the room I guess unclear of where to go and directed

17     some questions at me, which I did not respond to in any way.

18     I respectfully request if the Court could please give a brief

19     reminder to the jurors that we cannot talk to them and they

20     shouldn't interpret that as being rude.

21          THE COURT:  I thought I did that originally.  If you

22     want me to do it again, I will be glad to do it again.  Bill

23     will do it, too.  So we will have done it at least three times.

24          MS. KREBS:  Thank you, your Honor.

25          THE DEPUTY CLERK:  Jury entering.

D8R6JOH1

1          (In open court; jury present)

2          THE COURT:  Good morning everyone.  Thank you for

3    getting here on time.  I gather that one of you came in this

4    room rather than the jury room and actually addressed Ms. Krebs

5    with questions.  I cannot imagine you did that, but she tells

6    me you did so I believe her.  I thought I made it clear to you

7    yesterday that you don't talk to the lawyers or the witnesses

8    or the parties and they don't talk to you.  And the room for

9    you to go into, which Bill will take you by the hand if you are

10   unclear about and show you personally, is not the courtroom

11   door but that is the door you come through and the door that

12   you enter is to the right.  Is it perfectly clear everybody?  I

13   don't understand how that could possibly have happened, but I

14   certainly hope it will not happen again.

15          Are you ready to roll guys?

16          MS. KREBS:  Yes, your Honor.

17          MR. MINNAH-DONKOH:  Your Honor, at this time we would

18   call the plaintiff back on the stand for the limited purposes

19   of the audio recording that we discussed yesterday.

20          THE COURT:  Very well.

21          You are still under oath to tell the truth.

22          MR. MINNAH-DONKOH:  May I proceed, your Honor?

23          THE COURT:  Absolutely.

24   CROSS-EXAMINATION

25   BY MR. MINNAH-DONKOH:

1   Q.  Good morning, Ms. Johnson.

2   A.  Good morning.

3   Q.  Now, you recall yesterday during cross-examination we were

4   discussing your June 11th, 2012 conversation with Phil

5   Weinberg?

6   A.  Yes.

7   Q.  Was that the conversation where Mr. Weinberg advised you

8   that your employment was ending pursuant to the grant?

9           THE COURT:  It is a yes or no question.  Please let's

10  not make this any longer than necessary.

11  A.  Yes.

12  Q.  And you tape-recorded that conversation?

13  A.  Yes, I did.

14  Q.  And you were asked questions yesterday as to how you

15  reacted when Mr. Weinberg informed you that your position was

16  coming to an end as a result of the grant, correct?

17  A.  Yes.

18          MR. MINNAH-DONKOH:  Plaintiff's counsel, will you

19  kindly play Recording No. 1, which is Plaintiff's Exhibit 49?

20          (Audio played)

21          THE COURT:  Do they have a transcript?

22          THE WITNESS:  There is more.

23  BY MR. MINNAH-DONKOH:

24  Q.  Ms. Johnson, that was your voice on the recording, yes?

25  A.  Yes, it was.

1  Q.  Was that Mr. Weinberg's voice on the recording?

2  A.  Yes, it was.

3  Q.  When you made the recording on June 11th you knew at that

4  time you were going to file a complaint in this case?

5  A.  Yes, I did.  The complaint was already --

6         MR. MINNAH-DONKOH:  There are no further questions.

7         THE COURT:  You are excused.  Thank you very much.

8         (Witness excused)

9         THE COURT:  You may call your next witness, Ms.

10  Mesidor.

11         MS. MESIDOR:  At this time the plaintiff would like to

12  call Maria Ortiz to the stand.

13         Your Honor, since the witnesses were excused from the

14  courtroom, she is not presently in the courtroom.  Could I ask

15  someone from my legal team to go and get her?

16         THE COURT:  Somebody is going to get her.  There are

17  four people at your counsel table.  Try and see if you cannot

18  get people yourself out of the witness room rather than my

19  deputy.

20         MS. MESIDOR:  Your Honor, we had the witness in the

21  courtroom ready to go when they were advised to leave.

22         THE COURT:  That's not where the witness is supposed

23  to be.

24         MS. MESIDOR:  That's understood, your Honor.

25         THE COURT:  You know there is a witness room?

1          MS. MESIDOR:  Yes, I am familiar.

2          THE COURT:  You know where it is?

3          MS. MESIDOR:  Yes, your Honor.  I am familiar with it.

4          THE COURT:  Do you have somebody at your counsel table

5     who can walk to the end of the courtroom and into the witness

6     room?

7          MS. MESIDOR:  Your Honor, we'll make the necessary

8     arrangements for someone from the counsel table to bring in all

9     remaining witnesses.

10          THE DEPUTY CLERK:  Ms. Ortiz, please raise your right

11     hand.

12      MARIA J. ORTIZ,

13          called as a witness by the Plaintiff,

14          having been duly sworn, testified as follows:

15     DIRECT EXAMINATION

16     BY MS. MESIDOR:

17     Q.  Good morning, Ms. Ortiz.

18     A.  Good morning.

19     Q.  Are you ready for me to proceed?

20     A.  I guess so.

21     Q.  Ms. Ortiz, where do you live?

22     A.  I live in the Bronx.

23     Q.  And how old are you?

24     A.  48.

25     Q.  What is your highest degree of education?

1    A.  I am -- I have an associates degree in human services.

2    Q.  Did there come a time when you worked at an organization by

3    the name of STRIVE?

4    A.  Yes, ma'am.

5    Q.  Approximately how long did you work there?

6    A.  Approximately about 15 years.  14, 15 years.

7    Q.  And do you currently still work at STRIVE?

8    A.  No, ma'am.

9    Q.  When did you leave?

10   A.  When did I leave?  I left February of this year, 2013.

11   Q.  What were the circumstances surrounding your departure?

12   A.  I resigned.

13   Q.  Why did you resign?

14   A.  I -- I got an offer and I thought it was -- it was a

15   10,000-dollar pay cut, but it was just -- I was just tired.  It

16   was just time for me to go.

17   Q.  When you say that you were tired and it was time for you to

18   go, what exactly do you mean?

19          MS. KREBS:  Objection, your Honor, relevance.

20          MS. MESIDOR:  Your Honor, if you would allow me some

21   brief leeway, I think you will find the witness's testimony is

22   relevant in regards to why she took a 10,000-dollar pay cut.

23          MS. KREBS:  Objection, your Honor.

24          THE COURT:  I am not sure that is relevant, but I will

25   let you ask a couple more questions along this line.

D8R6JOH1                          Ortiz - direct

1              MS. MESIDOR:  Your Honor, is the witness permitted to

2     answer this particular question?

3              THE COURT:  Yes.

4     A.  I was just tired of -- was just tired of the abuse.

5              MS. KREBS:  Objection, your Honor.  I ask that the

6     witness's answer be stricken.

7              THE COURT:  Overruled.

8              MS. KREBS:  It is not relevant to Ms. Johnson's case.

9     Q.  Ms. Ortiz, what is your cultural heritage?

10    A.  I am Puerto Rican.

11    Q.  And you are obviously female?

12    A.  Yes, ma'am.

13    Q.  And during the time that you were at STRIVE, you were

14    female?

15    A.  Yes, ma'am.

16    Q.  Did you have an opportunity to work with the defendant, the

17    founder, Rob Carmona during your time at STRIVE?

18    A.  Yes.  You can say that.

19    Q.  Did you have an opportunity to work with the plaintiff

20    Brandi Jackson -- apologies, Ms. Johnson -- Brandi Johnson

21    during your time at STRIVE?

22    A.  Yes, ma'am.

23    Q.  Did you have opportunities to have conversations or

24    discussions with the defendant Mr. Rob Carmona?

25    A.  Yes, ma'am.

1    Q.  And how would you characterize these conversations that you

2    had with Mr. Carmona?

3              MS. KREBS:  Objection, your Honor.

4              THE COURT:  I am not sure I understand that question.

5    Do you want to ask about a conversation?  That is okay.

6    Q.  Ms. Ortiz, I am going to draw your attention -- withdrawn.

7              What was your position at STRIVE?

8    A.  I was director of core training services.

9    Q.  During the time that you were director of core training

10   services, did you run training workshops?

11   A.  Yes, ma'am.

12   Q.  And did there come a time at all when you had a

13   conversation with Mr. Carmona regarding one of the participants

14   in one of your workshops?

15   A.  Yes, ma'am.

16   Q.  Can you please tell us what that conversation was

17   regarding?

18             MS. KREBS:  Objection, your Honor, relevance.

19             THE COURT:  Is there a joint pretrial order?  You

20   ought to read it.  Her testimony is supposed to be to which you

21   agreed?  Do you have it in front of you?

22             MS. KREBS:  Are you speaking to me, your Honor?  I

23   didn't know.

24             THE COURT:  I am talking to you.  You made the

25   objection, right?

1      MS. KREBS:  Yes.

2      THE COURT:  That is who I would be speaking to as a

3  regular course of business.  I would ask you to direct your

4  attention to the joint pretrial order, in particular to Ms.

5  Ortiz's paragraph with respect to her testimony.

6      MS. KREBS:  Yes, your Honor.  I have it in front of

7  me.

8      THE COURT:  It is a joint one.  That means you both

9  agreed to it, right?  That is usually what joint means.

10      Overruled.  Let's go.

11  Q.  Ms. Ortiz, do you understand which conversation we're

12  discussing?

13  A.  I got lost in that.

14  Q.  Very briefly.  I asked regarding a conversation that you

15  had with Mr. Carmona regarding a particular participant in your

16  workshop.

17  A.  Yes, ma'am.

18  Q.  I would like to know what took place in that conversation,

19  please.

20  A.  What took place was that Rob was upset and he wanted me to

21  terminate a -- it was an all-women's workshop at that time.

22  The woman he wanted me to terminate was an older

23  African-American woman who --

24      THE COURT:  A lady who was working there at STRIVE?

25      THE WITNESS:  No.  She was a workshop participant,

1  sir.

2        THE COURT:  Very well.

3  A.  And so he pulls me in this meeting that he wanted to talk

4  to me in regards to that and he pulled the CEO at the time

5  and -- Mr. Earnest Johnson and he wanted me to terminate her

6  because she didn't say good morning to him in the elevator.  So

7  he is like, you know -- excuse me -- Fuck that shit.  Fuck that

8  shit.  Um, she need to understand that she needs -- supposed to

9  say good morning to the president of the company.  And I -- I

10  was -- I said, I can't terminate her and she continues to do

11  everything and continues to do everything she is supposed to.

12  She does her work.  So the CEO also jumped in on the band wagon

13  and he started using profanity.  Like, Fuck that.  She is

14  supposed to say good morning to the president.

15        MS. KREBS:  Objection, your Honor.

16  A.  At the end of if all it turned out it was resolved that I

17  had to have a stern conversation with this woman who has worked

18  hard and I had to talk to her in regards to the -- she needs to

19  say good morning to the president every time she sees him.  So

20  that was --

21        THE COURT:  We got what it is.  Indeed, supposedly

22  indicative of culture.  I am not sure if is helpful, but it is

23  over.

24        MS. MESIDOR:  Your Honor, were you directing your

25  comments toward me or the witness?

1             THE COURT:  Actually, to the jury and to you and to

2     the witness.

3             MS. MESIDOR:  Okay.

4     Q.  Ms. Ortiz, how did that compare in your observation in the

5     way that Mr. Carmona addressed issues with the male

6     participants in the program?

7             MS. KREBS:  Objection, your Honor.

8             THE COURT:  Overruled.

9     A.  I remember a particular incident that in the workshop a

10    participant wasn't -- he just wasn't understanding -- not

11    understanding.  He wasn't liking what Rob Carmona he told said.

12    He told Rob Carmona -- excuse the French -- Listen, suck my

13    dick.  And Rob Carmona immediately had told staff to grab him

14    to make sure that he stayed in the workshop.

15    Q.  Ms. Ortiz, I am now going to draw your conversation that

16    you had with Mr. Carmona regarding -- withdrawn.

17            Did there come a time when an intern was going to be

18    assigned to your particular department?

19    A.  Yes, ma'am.

20    Q.  Do you recall having a conversation with Mr. Carmona

21    regarding that?

22    A.  Yes.

23    Q.  Could you please describe that conversation that you had

24    with Mr. Carmona regarding that particular issue?

25    A.  It was that Rob Carmona approached me and said that -- he

1    says, Yo, Maria.  Yo, Marie, check this out.  Check this out.

2    That shit you pulled in the senior staff meeting, that shit

3    ain't cute.  And so I asked him, Well, what are you talking

4    about?  He says, You had issues in regard to the intern as

5    director of training.  I needed to know especially at that

6    particular time it was an all-youth workshop who is this

7    person.  I don't -- I thought it was my job to interview who

8    this person was who is going to assist us in the training

9    department.  And so he continued and I just shut up because I

10   didn't have --

11   Q.  How far away was Mr. Carmona to you when you were having

12   this discussion?

13   A.  Rob tended to get pretty close.  So it was pretty close.

14   Q.  And how does your physical stature compare to Mr. Carmona's

15   own?

16   A.  Well, I have to say I have 5 feet.  So I am 5 feet and he

17   is like 6 feet.

18   Q.  How did you feel after this conversation?

19             MS. KREBS:  Objection, your Honor.

20             THE COURT:  Sustained.  She is not the plaintiff here.

21   We're prepared to take her state of mind with respect to what

22   was going on with respect to the culture, but we're not

23   interested in her as a defendant or a plaintiff.

24             MS. MESIDOR:  Your Honor, may I respond?

25             THE COURT:  No.

1  Q.  Ms. Ortiz, did there come a -- withdrawn.

2          During the workshops that you ran for STRIVE, are you

3  familiar with a segment called Five-Minute Video?

4  A.  Yes, ma'am.

5  Q.  Do you recall having a conversation with Mr. Carmona

6  regarding this particular portion of the workshop Five-Minute

7  Video?

8  A.  Yes, ma'am.

9  Q.  And could you please tell us what was the sum and substance

10  of that conversation?

11  A.  The substance of that conversation was I enter the workshop

12  to discover there were guests in the workshop observing this

13  very sensitive exercise.  So I looked at Rob and I asked him,

14  What is happening?  This is Five-Minute Video.  And is he

15  looking at me like, And?  Five-Minute Video is where

16  participants disclose themselves, whether it be that they were

17  raped, incest or battered or abused.  And this is an unburden

18  process.  So I am looking at him, like, They are talking about

19  themselves.  He knows the exercise.  So he pulled me out and he

20  says, What is the problem?  What is it?  Rob, this is

21  Five-Minute Video.  And?  We're going to have a discussion

22  about this shit later.

23  Q.  Did you have a discussion with him about it later?

24  A.  Yeah.

25  Q.  What was the sum and substance of that conversation?

D8R6JOH1                    Ortiz - direct

1   A.  The substance of the conversation was that he says to me

2   the manner in which I spoke to him that I could have been -- it

3   was on the verge of being insubordinate.  My view is that--

4               THE COURT:  We don't care what your view was.

5               THE WITNESS:  No.  That is what his said.  His view on

6   it was I am insubordinate.

7               THE COURT:  I don't need that either.

8               THE WITNESS:  Okay.

9   A.  So at the end of that was that I was assigned a supervisor.

10  Q.  Prior to this point were you under anyone's supervision?

11  Were you assigned a supervisor?

12  A.  No, ma'am.

13  Q.  Did you ever complain about the way that Mr. Carmona

14  treated you?

15              MS. KREBS:  Objection, your Honor.

16              THE COURT:  Sustained.

17  A.  No.

18              THE COURT:  When I sustain the objection -- I have a

19  very small role, here, ma'am.

20              THE WITNESS:  Yes, sir.

21              THE COURT:  The role I do have is to rule on

22  objections.  Little other role, but for your purposes that is

23  what I have.  So when you hear an objection, try and wait until

24  I rule.

25              THE WITNESS:  Oh.

D8R6JOH1                    Ortiz - direct

1          THE COURT:  If I overrule the objection, you go ahead.

2     And if I sustain it, then you don't answer.

3          THE WITNESS:  Okay.

4          THE COURT:  Is that clear?

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Good.

7     BY MS. MESIDOR:

8     Q.  Thank you, Ms. Ortiz.

9          During your time at STRIVE, did you ever have the

10    opportunity to observe any interaction between defendant Rob

11    Carmona, the founder, and the plaintiff, Ms. Brandi Johnson?

12    A.  Yeah.

13    Q.  What, if anything, did you observe?

14    A.  I observed him at times being very short with her, but

15    namely the interaction that I observed happened at the office.

16    I would just see the after effect of their interacts.

17    Q.  What after effect would you see after Ms. Johnson and Mr.

18    Carmona interacted?

19          MS. KREBS:  Objection, your Honor.

20          THE COURT:  She can tell us what she saw.

21          You can answer.

22    A.  I saw Brandi at times crying, upset.  She would call me to

23    her desk and she was physically shaking.  She had headaches.

24    She was -- it was terrible.  Yeah, it was terrible.  I am

25    trying to give her advice as to how to deal with it, but I just

1    tried to stay out of harm's way myself.

2    Q.  How often would you see Ms. Johnson physically upset and

3    crying and shaking after interactions with Mr. Carmona?  Only

4    what you observed.

5    A.  Only what I -- I mean I was at my desk mostly and in the

6    workshops.  If she called me, then I would -- I was able to

7    witness that.  Basically I just tried to keep my head low.

8           MS. KREBS:  Objection, your Honor.  Move to strike.

9    Nonresponsive.

10          THE COURT:  I will sustain the objection.

11          MS. MESIDOR:  Are you striking the entire answer, your

12   Honor?

13          THE COURT:  No.  Just the last portion about -- I

14   guess probably I can read it back to you.

15          She stated, Are you striking the entire answer.

16          Above that.

17          Only what I -- I mean, I was at my desk in the

18   workshops if she called me then I would -- I was able to

19   witness that -- which I don't know what she was talking

20   about -- basically I just tried to keep my head low.

21          All stricken.

22          MS. MESIDOR:  The entire answer, your Honor?

23          THE COURT:  Yeah, what I read.

24   BY MS. MESIDOR:

25   Q.  Ms. Ortiz, did there come a time where you saw the after

 1   affects of Ms. Johnson's conversations with Mr. Carmona in

 2   which he had called her a nigger?

 3   A.  Ask me the question again so I can make sure.

 4   Q.  Did there come a time where you were able to witnesses the

 5   after effects on Ms. Johnson after a conversation that she had

 6   had with Mr. Carmona in which he had called her a nigger?

 7           MS. KREBS:  Objection.

 8           THE COURT:  Were you present at that conversation.

 9           MS. MESIDOR:  Your Honor, I am asking if she saw the

10   after effect not the conversation.

11           THE COURT:  How would she know that was the

12   conversation?

13           MS. MESIDOR:  Your Honor, will allow me some leeway?

14           THE COURT:  Leeway?  You have to ask that first.

15   Q.  Ms. Ortiz, did there come a time that you learned that Mr.

16   Carmona had called Ms. Johnson a nigger?

17   A.  Yes.

18           THE COURT:  When was that?

19           THE WITNESS:  The date?

20           THE COURT:  Approximately.

21           THE WITNESS:  I don't remember the date.  She pulled

22   me into the bathroom and she told me that he called me a nigger

23   and she was crying all over the place.  He called her a nigger.

24   Q.  How long were you in the bathroom with Ms. Johnson?

25   A.  I would say 10 minutes because I have a workshop.

1    Q.  Did Ms. Johnson stay in the bathroom after you left?

2              THE COURT:  How would she know that?

3              MS. MESIDOR:  If she left first.

4              THE COURT:  She went to her workshop when she left.

5    Q.  Did you leave the rest room before Ms. Johnson?

6    A.  I left the rest room before Ms. Johnson.

7    Q.  Did there come a time when you learned from any source that

8    Ms. Johnson had filed a complaint against STRIVE?

9    A.  Yes.

10   Q.  How did you find that out?

11   A.  I heard it.  I heard it.  I forgot who or -- but I heard it

12   around the office.

13   Q.  When was that approximately?

14   A.  Sometime last year.  I don't remember exactly when.

15   Q.  After you had learned that Ms. Johnson had filed a

16   complaint against STRIVE, did you have the opportunity to

17   observe any interaction that Ms. Johnson had with other staff

18   after that complaint was filed?

19   A.  Yes.

20   Q.  What, if anything, did you observe?

21             MS. KREBS:  Objection, your Honor, relevance.

22             THE COURT:  You can go a little further.  This is part

23   of the leeway she requested.

24             MS. KREBS:  Yes, your Honor.

25   Q.  Do you need me to repeat the question?

1    A.  Yes.

2    Q.  I said what, if anything, did you observe regarding Brandi

3    Johnson's interaction with staff after the complaint -- after

4    you became aware that the complaint had been filed?

5    A.  It seemed very distant or cold, short as if she had Ebola

6    or something.  It was really quick.

7              THE COURT:  What does that mean?

8              THE WITNESS:  Like, she had Ebola, a virus.  I don't

9    want to touch you.

10             THE COURT:  I never heard that expression.

11             THE WITNESS:  Okay.

12   Q.  Ms. Ortiz, have you ever heard Mr. Carmona refer to himself

13   as a male chauvinist?

14   A.  Yes.

15   Q.  In what setting did you hear Mr. Carmona refer to himself

16   as a male chauvinist?

17   A.  I mostly remember he would refer to himself that way during

18   orientation.  If it were an all-women's workshop, he would say,

19   you know, I am guilty of being a male chauvinist.

20   Q.  One other question, Ms. Ortiz.  Who was the CEO at the time

21   when Mr. Carmona said, Fuck that shit.  She is supposed to say

22   good morning to the president?

23   A.  Eric Treworgy.

24   Q.  Ms. Ortiz, what is your relationship with Ms. Johnson?

25   A.  She is my supervisor.

1    Q.  And does Ms. Johnson have the ability to fire or hire you?

2    A.  No.  Not solely the ability, no.

3    Q.  And do you have a relationship with Ms. Johnson outside of

4    her supervisory role of you?

5    A.  Can you elaborate on that?

6    Q.  Other than her being your supervisor is Ms. Johnson also

7    your friend?

8    A.  I can consider her my friend.

9    Q.  Everything that you indicated to us today is that as you

10   observed it?

11   A.  Yes, ma'am.

12   Q.  Does the fact that Ms. Johnson is your friend affect your

13   testimony at all?

14   A.  No, ma'am.

15   Q.  Does the fact that Ms. Johnson is your supervisor affect

16   your testimony at all?

17   A.  No, ma'am.

18   Q.  When you left STRIVE and took a 10,000-dollar pay cut, did

19   you do that because Ms. Johnson was your friend?

20   A.  No, ma'am.

21          MS. MESIDOR:  No further questions.

22          THE COURT:  Any cross?

23          MS. KREBS:  Yes, your Honor.

24   CROSS-EXAMINATION

25   BY MS. KREBS:

1    Q.  Good morning, Ms. Ortiz.

2    A.  Good morning.

3    Q.  You and I have never spoken before other than meeting for a

4    moment in the courtroom, correct?

5    A.  Yes, ma'am.

6    Q.  You indicated that your position or at least your last

7    position at STRIVE was the director of core training services,

8    correct?

9    A.  Yes, ma'am.

10   Q.  And that made you a member of senior staff or senior

11   leadership, correct?

12   A.  Yes, ma'am.

13   Q.  That wasn't the position you started at when you came to

14   STRIVE, correct?

15   A.  No, ma'am.

16           MS. MESIDOR:  Objection.

17           THE COURT:  Overruled.

18   Q.  You received several promotions over the time that you

19   spent at STRIVE, correct?  You started out in other positions

20   and then moved up in terms of your positions over time at

21   STRIVE?

22           MS. MESIDOR:  Objection.

23   A.  No, ma'am.  One promotion.

24           THE COURT:  Overruled.

25   Q.  And when you said that you worked at STRIVE for 14 to 15

1    years, Mr. Carmona was there the entire time, correct?

2    A.   Yes, ma'am.

3    Q.   And that 14 to 15 years was not consecutive, correct?

4    A.   No, ma'am.

5    Q.   So you worked for a while, you left to pursue another

6    opportunity and then you returned to STRIVE, right?

7    A.   Yes, ma'am.

8    Q.   And during the time that you were at STRIVE, you received

9    pay raises, correct?

10   A.   Yes, ma'am.

11   Q.   When you were at STRIVE, didn't the company assist you to

12   get your daughter and/or your son into a program called Year

13   Up?

14            MS. MESIDOR:  Objection, your Honor.

15            THE COURT:  I suppose you can credit the lady.  I will

16   allow it.

17   Q.   Ms. Ortiz, do you need me to repeat the question?

18   A.   Yes.

19   Q.   Are you familiar with the a program called Year Up?

20   A.   Yes, ma'am.

21   Q.   That is a program that is for children or young adults who

22   are finishing secondary school but not necessarily quite ready

23   to go into college and it is sort of a preparatory program for

24   them, correct?

25   A.   Yes, ma'am.

1   Q.  STRIVE assisted your children or one or both of your

2   children at the appropriate time to have them participate in

3   this program, correct?

4   A.  Please define assist?

5               THE COURT:  Why don't you define it.

6               THE WITNESS:  Thank you.

7               THE COURT:  What they did for you or what they didn't

8   do.

9               THE WITNESS:  I appreciate that.  My daughter was told

10  about Year Up by Mr. Larry Jackson.  Larry Jackson had a

11  relationship with Year Up and he suggested and thought it was a

12  good fit for not only Year Up but also for my daughter.  My son

13  having had known Year Up through my daughter then I thought it

14  would be a good leeway before you entered college, which

15  started not through my son.  We found out about a Year Up

16  through Mr. Larry Jackson, yes.

17  BY MS. KREBS:

18  Q.  At STRIVE?

19  A.  Who works at STRIVE, yes.

20  Q.  And your daughter worked temporarily one summer at STRIVE

21  as well, didn't she?

22              MS. MESIDOR:  Objection.

23              THE COURT:  I think we've gone as far as we need to go

24  on this line if it is a line.

25              MS. KREBS:  Yes, your Honor.

1    Q.  When you resigned in January or February of this year, you

2    wrote a resignation letter, didn't you?

3    A.  Yes, ma'am.

4    Q.  And you indicated that your resignation was bittersweet,

5    correct?

6    A.  Yes, ma'am.

7    Q.  You actually made a recommendation for another individual

8    who might be able to fill the position of trainer?

9    A.  Yes.

10   Q.  That person that you recommended was a black Hispanic male,

11   correct?

12   A.  Yes, ma'am.

13   Q.  Now, you testified on direct about a conversation that you

14   had with Mr. Carmona about a black female participant who

15   didn't say good morning to him in the elevator.  Do you recall

16   that testimony?

17   A.  Yes, ma'am.

18   Q.  Isn't it a core part of the training program that these

19   participants go through that they need to be acclimated into

20   the workplace and to understand what regular workplace

21   requirements are?

22   A.  That is correct.

23   Q.  And would you agree with me that expressing good morning to

24   a supervisor in an elevator is something that should be

25   explained to -- is that someone should learn about in the

1   workplace in order to acclimate into that workplace?

2            MS. MESIDOR:  Objection.

3            THE COURT:  It is her opinion, but I guess it comes

4   from her experience.  So I will take it if you have some

5   experience in that area and have a thought.

6   A.  We do tell our participants to learn how to be cordial,

7   yes.

8   Q.  So Mr. Carmona's concern with respect to her response was

9   part of the purpose of the core training?

10           MS. MESIDOR:  Objection, your Honor.

11           THE COURT:  Overruled.

12  A.  The concern in which to have her fired?

13  Q.  No.  The concern that this was a person who needed to

14  understand that this is something that one should be doing in

15  the workplace?

16           MS. MESIDOR:  Objection.

17           THE COURT:  Overruled.

18  A.  I am not quite sure if that was his concern at the time,

19  ma'am.

20  Q.  But that would be an appropriate concern?

21           MS. MESIDOR:  Objection.

22           THE COURT:  Overruled.

23  A.  That would be an appropriate concern for the trainers.

24  Yes, ma'am.

25  Q.  Now, you are making a specification between the trainers

1    and Mr. Carmona.  Is it not an appropriate concern for Mr.

2    Carmona who runs part of those training programs as well?

3    A.   Should it be?  I guess.  I would think that that would be.

4    Okay.

5    Q.   Okay.  Thank you.

6            You are not privy to every conversation that Mr.

7    Carmona had with participants whether they be male or female,

8    whether they be black or white or Asian where there might have

9    been concerns about their acclimating to the program, are you?

10           MS. MESIDOR:  Objection.

11           THE COURT:  Overruled.

12   A.   Please repeat the question.

13           MS. KREBS:  Ms. Court Reporter, can you read back the

14   question.

15           (Record read)

16   A.   I would think as position of director core training that it

17   would be if there was conversations that took place without my

18   knowledge.  I guess.

19   Q.   Well, you specified two conversations that you had with Mr.

20   Carmona.  One about the black female participant and one about

21   a male participant.  Do you recall that testimony just before?

22   Do you recall that testimony?

23   A.   A conversation about?

24   Q.   That you had one conversation with Mr. Carmona about this

25   black female participant and you mentioned another conversation

1   with a male participant?

2   A.   In regard to a male intern, yes.

3   Q.   A male intern or participant?

4   A.   About the participant saying, Suck my Dick?

5   Q.   Yes.   That was about a male participant?

6   A.   Yes.   I didn't have conversation with Mr. Carmona in

7   regards to that person, no.   I used that as an example.

8   Q.   What is the basis for your testimony about Mr. Carmona's

9   reaction in response to that conduct if you didn't have a

10  conversation with him about it?

11  A.   The question was asked and I answered the question.   I

12  didn't have a conversation with Rob Carmona about a participant

13  doing that.   I had a conversation with Mr. Rob Carmona in

14  regards to him wanting me to terminate the female participant

15  and I was making the distinction between how one participant

16  was being treated, African-American female, as opposed to a

17  male.

18           MS. KREBS:   Your Honor, I move to strike her testimony

19  with respect to that male participant.   I don't know what his

20  race is.   Apparently it is not based on her personal knowledge.

21           MS. MESIDOR:   It is.   If I may respond.

22           THE COURT:   We'll talk about it at recess and see

23  whether we should strike it or not.

24           MS. KREBS:   I would like to reserve my right.

25           THE COURT:   Well, now you have reserved it.   Isn't

1    that what you thought I was saying?

2            MS. KREBS:  Yes.  Otherwise, I would like to continue

3    and get some additional --

4            THE COURT:  You can continue anyway.

5    BY MS. KREBS:

6    Q.  By the way, the male participant, do you know what his race

7    was?

8    A.  African-American.

9    Q.  And again just so I can understand, you were trying to

10   bring a contrast between those two situations?

11   A.  Yes, ma'am.

12   Q.  Are those the only two situations in which Mr. Carmona had

13   concerns about participants in the core practices training?

14           MS. MESIDOR:  Objection, your Honor.

15           THE COURT:  To the best of your recollection.

16   A.  With all those years of being at STRIVE, those are the only

17   two right now that I can remember, ma'am.

18   Q.  Those are the only two you can remember specifically, but

19   you are saying there were so many years at STRIVE there would

20   have been others?

21           MS. MESIDOR:  Objection, your Honor.

22           THE COURT:  Overruled.

23   A.  I am pretty sure all those years, of course, there would

24   have been others.

25   Q.  So there are other potential examples, though none you can

1  specifically remember right now, that could completely change

2  the contrast between these two specific examples, correct?

3          MS. MESIDOR:  Objection, your Honor.

4          THE COURT:  I am not sure I get the question.

5          MS. KREBS:  Your Honor, I will withdraw it.  Thank

6  you.

7  Q.  You also testified to a conversation that you had with Mr.

8  Carmona about an intern when he said something about the shit

9  you pulled in the senior staff meeting, that ain't cute?

10  A.  Yes, ma'am.

11  Q.  Have you been privy to every single conversation that Mr.

12  Carmona has had with other employees in the workplace with

13  respect to his assessment of their conduct?

14          MS. MESIDOR:  Objection, your Honor.

15          THE COURT:  Overruled.

16  A.  Please repeat the question.

17          MS. MESIDOR:  Ms. Court Reporter, can you read it

18  back.

19          (Record read)

20  A.  No, ma'am.

21  Q.  In that conversation that you just described, he didn't

22  make any reference to your gender, did he?

23  A.  No, ma'am.

24  Q.  He didn't make any reference to your race, did he?

25  A.  No, ma'am.

D8R6JOH1                    Ortiz - cross

1    Q.  You also testified about a conversation that you had with

2    him with respect to the Five-Minute Video situation.  Do you

3    recall that testimony?

4    A.  Yes, ma'am.

5    Q.  You said that after that conversation as a result of the

6    issues that you brought to his attention, he expressed to you

7    his opinion that the manner in which you spoke to him was

8    inappropriate, bordered on insubordinate and as a result you

9    were assigned a supervisor, correct?

10   A.  Yes, ma'am.

11   Q.  In that situation he didn't say anything about your race,

12   did he?

13   A.  I am not quite sure how that would come up in that kind of

14   conversation.

15   Q.  It is a yes or no question, ma'am.

16   A.  No, ma'am.

17   Q.  He didn't say anything about your gender?

18   A.  Gender.  Not quite sure how he could wiggle that in there,

19   but no.

20   Q.  You are to the privy to other conversations he may have had

21   with other employees where he felt that their conduct was

22   insubordinate, are you?

23   A.  No, ma'am.

24   Q.  I just want to clarify.  You said you heard about the

25   complaint in the office, but you don't have any recollection

1    who told you about it or where you found out about it, correct?

2    A.  No, ma'am.

3    Q.  You testified that Ms. Johnson is your current supervisor

4    at your job, correct?

5    A.  Yes, ma'am.

6    Q.  In fact, she helped you get this new job, didn't she?

7    A.  I don't understand.  She told me about the position.  I

8    went and interviewed with her and the director of CE.

9    Q.  She was part of the interview team that interviewed you for

10   the position?

11   A.  She was also part of the interview team, yes.

12   Q.  As a result after that you were hired under her

13   supervision, is that correct?

14   A.  It was her section.  She is coordinator of that section,

15   yes.

16   Q.  You also testified about an interaction or encounter that

17   you had with Ms. Johnson in the bathroom when she was crying to

18   you about a conversation she had with Mr. Carmona.  Do you

19   recall that testimony?

20   A.  Yes, ma'am.

21   Q.  You never actually heard the conversation between her and

22   Mr. Carmona, did you?

23   A.  No, ma'am.

24   Q.  You also testified about a comment that Mr. Carmona made.

25   I believe it was during an orientation program with

1    participants about being a male chauvinist.  Is that your

2    testimony?

3    A.   Female participants.  Yes, ma'am.

4    Q.   Isn't it also true that Mr. Carmona gave further context

5    and explanation to his statement that he was a male chauvinist?

6    A.   Yes.  That is true.

7    Q.   And didn't he actually talk about the fact that he is aware

8    of the culture that he came from and that it can lead to being

9    male chauvinists, but at the same time that he was raised by a

10   single mother who raised four children and that it was clear to

11   him that women are every bit as strong as men?

12            MS. MESIDOR:  Objection, your Honor.

13            THE COURT:  Overruled.

14   A.   I am sorry.  Your -- are you asking me that everything else

15   he did say during the orientation?

16   Q.   I am asking whether or not he has given that as an

17   explanation or a context for his male chauvinist statement?

18   A.   I am not quite sure as an explanation, as context.  Yes, he

19   has stated those things.

20            MS. KREBS:  Your Honor, may I have one moment?

21            THE COURT:  You may.

22            MS. KREBS:  Thank you.

23            (Pause)

24            MS. KREBS:  Thank you, your Honor.  I have no further

25   questions.  Thank you very much for your time, Ms. Ortiz.

1          THE COURT:  Any brief redirect?

2          MS. MESIDOR:  Thank you, your Honor.

3     REDIRECT EXAMINATION

4     BY MS. MESIDOR:

5     Q.  Ms. Ortiz, during the 15 years that you were at STRIVE, did

6     you have consistent interaction with Mr. Carmona throughout?

7     A.  Not -- no.  Not consistent.

8     Q.  In the beginning -- I am going refer to the first time you

9     were employed at STRIVE as T-1 and the second time you were

10    employed at STRIVE at T-2, okay?

11    A.  Okay.

12    Q.  In T-1 how much interaction did you have with Mr. Carmona?

13         THE COURT:  I thought I explained this to you

14    yesterday, but you really can't ask questions that you could

15    have asked on direct and that was certainly a question you

16    could have asked.  So those questions I am going to sustain

17    objections to.

18         MS. MESIDOR:  Your Honor, during the opposing

19    counsel's cross-examination, they insinuated that she stayed at

20    STRIVE for 15 years and actually came back and that Mr. Carmona

21    continued to work at STRIVE at that time.  I only want to

22    address that one issue.

23         THE COURT:  That's not what I heard.

24         MS. MESIDOR:  Would you allow me to rephrase the

25    question in a different way?

1            THE COURT:  Absolutely.

2     BY MS. MESIDOR:

3     Q.   Toward the -- you already testified that your -- the -- you

4     didn't have consistent interaction with Mr. Carmona during your

5     entire 15 years at STRIVE.  When did your interaction with Mr.

6     Carmona increase?

7            MS. KREBS:  Objection.

8            THE COURT:  Sustained.

9     Q.   When you were terminated -- sorry.  Withdrawn.

10           When you resigned from STRIVE were you having more

11    interaction with Mr. Carmona at that point?

12           MS. KREBS:  Objection.

13           THE COURT:  Sustained.

14    Q.   Opposing counsel asked you whether you had recommended a

15    black Hispanic for your position when you resigned at STRIVE.

16    In your observation, do black Hispanic males fare better at

17    STRIVE with Mr. Carmona?

18           MS. KREBS:  Objection.

19           THE COURT:  I am not sure, but I guess I understand.

20    You can answer.  Overruled.  Certainly a question you could

21    have asked on direct.

22    A.   There are two currently that I know -- two currently black

23    senior staff members of STRIVE and he has a real good

24    relationship with both of them.

25    Q.   Are both of them male?

A.  Yes, ma'am.

Q.  When you described the conversation that you had with Mr.

Carmona in the kitchen in which he said that shit that you

pulled in the conference room that ain't cute, have you ever

heard Mr. Carmona say that ain't cute to any male staffers?

          MS. KREBS:  Objection.

          THE COURT:  Sustained.

Q.  How did you interpret Mr. Carmona's use of that ain't cute?

          THE COURT:  Sustained.  She is not a party here.

          (Continued on next page)

D8rnjoh2                    Ortiz - redirect

1   Q.  Can you recall any other instance when Mr. Carmona said

2   that ain't cute?

3             MS. KREBS:  Objection.

4             THE COURT:  Sustained.

5   Q.  Did Ms. Johnson ever express any safety concerns to you

6   regarding her time at STRIVE?

7             MS. KREBS:  Objection.  Outside the scope.

8             THE COURT:  I am not sure where we are going, but the

9   objection is probably well taken.  But it is interesting.  If

10  you understand it, you can answer it.

11            THE WITNESS:  I think I do.

12            THE COURT:  That's about where I come out too.

13            THE WITNESS:  You want me to give it a shot?

14            THE COURT:  Yes.

15  A.  She did express at one point in time safety concerns, yes.

16            THE COURT:  Safety about what?

17            THE WITNESS:  This was at a time that --

18            THE COURT:  Really, safety with respect to her?

19            THE WITNESS:  The safety with respect to her, yes.

20            THE COURT:  OK.  I got it.

21            THE WITNESS:  OK.

22            THE COURT:  That is enough on that score.

23            MS. MESIDOR:  No further questions, your Honor.

24            THE COURT:  You are excused.  Thank you very much.

25            MS. KREBS:  I'm sorry, your Honor.  I have one

D8rnjoh2                    Ortiz - redirect

1    question.

2              THE COURT:  Not a chance.  You're done.

3              (Witness excused)

4              THE COURT:  Call your next witness.

5              MS. MESIDOR:  Your Honor, at this time plaintiffs call

6    to the stand Cammie Crawford.

7              THE COURT:  I am not sure I see her.  I do.  I don't

8    need five people going over the same incidents.

9              So if this lady as you suggest -- well, that is what

10   you have written here.  Do you want me to read it to you.  Just

11   look at 7, which is Maria, and 8, which is Cammie Crawford, and

12   tell me what the distinction is in your proposed testimony.

13             MS. MESIDOR:  Your Honor, if you are referring --

14             THE COURT:  It is a simple question.  Have you read

15   both 7 and 8?

16             MS. MESIDOR:  Absolutely, your Honor.  The reason why

17   the --

18             THE COURT:  I don't need reasons.  I am just telling

19   you that you will not be allowed to keep asking the same

20   questions to a variety of witnesses.  If you don't do it, we

21   are fine.

22             MS. MESIDOR:  Thank you, your Honor.  I think I can do

23   that.

24    CAMMIE CRAWFORD,

25        called as a witness by the Plaintiff,

D8rnjoh2                    Ortiz - redirect

1          having been duly sworn, testified as follows:

2     DIRECT EXAMINATION

3     BY MS. MESIDOR:

4     Q.   Good morning, Ms. Crawford.

5     A.   Good morning.

6     Q.   Ms. Crawford, are you currently employed?

7     A.   Yes.

8     Q.   I'm sorry, can you bring the microphone a little bit closer

9     to you.  I can't hear you.

10    A.   Yes.

11    Q.   Where are you currently employed?

12    A.   East Harlem Employment Services STRIVE.

13    Q.   Ms. Crawford, my questions for you today are going to be

14    very limited in nature, and I am going to draw your attention

15    to a particular instance.  OK?

16    A.   Yes.

17    Q.   Ms. Crawford, did there ever come a time when you were

18    having lunch with Ms. Lynette hall and Ms. Johnson in which

19    Mr. Carmona told you to wrap it up?

20    A.   Yes.

21    Q.   Could you please tell us about that circumstance.

22    A.   We were sitting at the desk eating and he walked past and

23    saw the three of us sitting there and said, Wrap it up, meaning

24    the lunch.

25    Q.   After he said wrap it up, what, if anything, took place

D8rnjoh2                    Crawford - direct

1   after that?

2   A.  I went to my desk.  We were already at Lynette's desk, and

3   Brandi went to her side of the office.

4   Q.  Did there come a time when you were called into

5   Mr. Carmona's office?

6   A.  Yes.

7   Q.  What, if anything, took place in the office with

8   Mr. Carmona?

9   A.  He basically just said, you know, don't allow yourselves to

10  be used and to take it for what it's worth.

11  Q.  During that conversation did he make any mention about

12  catching Ms. Lynette Hall sleeping just a few days or a week

13  prior?

14  A.  I don't recall that.

15  Q.  Do you recall Mr. Carmona saying anything to you regarding

16  how you were doing at STRIVE and not allowing the circumstance

17  to affect it in any way?

18  A.  Say that again.

19          MS. KREBS:  Objection.  Leading.

20          THE COURT:  I didn't understand it, so maybe neither

21  did she.  If you would phrase it, we will all understand it and

22  I can rule if there is an objection.

23  Q.  When you said not to allow yourselves to be used --

24          THE COURT:  Do you know what that meant?

25          THE WITNESS:  At that time, I didn't.  I didn't

D8rnjoh2                    Crawford - direct

1   understand why he was saying that.

2   Q.  Do you now know as you sit here today what he meant by

3   that?

4   A.  Yes.

5          MS. KREBS:  Objection, your Honor.

6          THE COURT:  Sustained.

7   BY MS. MESIDOR:

8   Q.  After the conversation that you had with Mr. Carmona, did

9   you speak to anybody else about that conversation?

10  A.  Yes.

11  Q.  Who did you speak to about the conversation?

12  A.  Brandi Johnson.

13  Q.  Other than Ms. Johnson, did you speak to anybody else about

14  the conversation?

15  A.  No, I don't think so.

16  Q.  Did you ever make a complaint to Mr. Weinberg about the

17  conversation?

18  A.  OK.  So Brandi felt the way I believe about the

19  conversation, and went to Mr. Weinberg, and explained whatever

20  she explained to him, and he called me into his office to ask

21  me how I felt about the situation.

22  Q.  What did you express to Mr. Weinberg as to how you felt

23  about the situation?

24  A.  I told him that --

25         MS. KREBS:  Objection.

D8rnjoh2                    Crawford – direct

1   A.  It made me uncomfortable, because I didn't really

2   understand why we couldn't eat there.

3   Q.  Was it your habit to eat where you were eating?

4   A.  Sometimes, yes.

5   Q.  Had you ever been given any indication other than when

6   Mr. Carmona said that to you to wrap it up that it was

7   inappropriate for you to eat where you were eating?

8           MS. KREBS:  Objection.

9           THE COURT:  Sustained.

10  A.  Yes.

11  Q.  The conversation that you had with Mr. Carmona and

12  Ms. Lynette Hall in his office, you tape recorded that

13  conversation, correct?

14  A.  Yes.

15          MS. KREBS:  Objection.

16          THE COURT:  Sustained.

17  Q.  Did there come a time during the conversation that you had

18  with Ms. Lynette Hall and Mr. Carmona that that conversation

19  was recorded?

20          MS. KREBS:  Objection, your Honor.

21          THE COURT:  Sustained.

22  Q.  What, if anything --

23          THE COURT:  Have you told us everything about that

24  conversation?

25          THE WITNESS:  Have I told who?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D8rnjoh2                    Crawford - direct

 1              THE COURT:  The jury.

 2              THE WITNESS:  No.

 3              THE COURT:  No.  You can tell us what the conversation

 4     was, what you said to Carmona and what he said to you.

 5              THE WITNESS:  That we shouldn't allow ourselves to be

 6     used.

 7              THE COURT:  I thought we did hear that testimony.

 8              THE WITNESS:  Yes.

 9              THE COURT:  So you did tell us?

10              THE WITNESS:  That was the conversation, yes.

11              THE COURT:  Yes.  Is there something I'm missing?

12     Q.  Did you take that, when he said don't allow yourselves to

13     be used, did you take that to mean in reference to Ms. Johnson?

14              MS. KREBS:  Objection, your Honor.

15              THE COURT:  You can't ask leading questions.  This is

16     your witness.

17     Q.  What did you take that to mean, don't allow yourselves to

18     be used?

19              MS. KREBS:  Objection.  Asked and answered.

20              MS. MESIDOR:  Your Honor, that was not the previous

21     question I asked her.

22              THE COURT:  I can handle it.  Overruled.

23     A.  He said -- what was the previous question?

24              THE COURT:  She wants to know what did you think.  I

25     don't know that that is admissible, but what did you think he

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D8rnjoh2                    Crawford - direct

1    meant when he said that?

2    A.  I didn't understand.  That's why I asked Brandi, because I

3    wasn't clear on what was going on with them at the time, so I

4    didn't understand what he said.

5    Q.  Did you ever learn from any source that it was in reference

6    to Ms. Johnson?

7             MS. KREBS:  Objection.

8    A.  No.

9             THE COURT:  Overruled.  You can answer.  It is a yes

10   or no question.

11   A.  No.

12            THE COURT:  Is that it?

13            MS. MESIDOR:  Hold on one moment, your Honor.

14   BY MS. MESIDOR:

15   Q.  Ms. Crawford, where do you sit at STRIVE?

16   A.  I sit in a supportive service area.  We have a whole row.

17   Q.  What is the distance between where you sit and

18   Mr. Carmona's office?

19   A.  His office is behind my desk.

20   Q.  Do you see Mr. Carmona every day?

21   A.  Yes.

22   Q.  Are you returning to work tomorrow?

23   A.  Yes.

24   Q.  Do you have an expectation that you will see Mr. Carmona

25   every day?

D8rnjoh2                    Crawford - direct

1    A.  Yes.

2            MS. KREBS:  Objection, your Honor, relevance.

3            THE COURT:  Where are you going here?

4    Q.  Ms. Crawford, other than this discourse that we are having

5    here before the jury, have you and I ever had an opportunity to

6    speak?

7    A.  No.

8    Q.  Since Ms. Johnson has left STRIVE, have you had an

9    opportunity to speak to Ms. Johnson?

10   A.  Yes.

11           MS. KREBS:  Objection.  Relevance.

12           THE COURT:  Overruled.

13   Q.  During those conversations that you had with Ms. Johnson,

14   did you ever express any concern or fear regarding your

15   involvement in this matter?

16           MS. KREBS:  Objection, your Honor.  Relevance.

17   A.  Not that I recall.

18           THE COURT:  You don't mind that answer.

19           MS. KREBS:  I will accept it, your Honor.

20           THE COURT:  You withdraw the objection.  All right.

21   Q.  In regards to the recording that was made in of the

22   conversation that you had with Mr. Carmona and Ms. Hall, what,

23   if anything, did you do with that recording?

24           MS. KREBS:  Objection.

25           THE COURT:  Overruled.

D8rnjoh2                    Crawford - direct

1    A.  It's -- I don't have it anymore.

2    Q.  What did you do with it?

3    A.  I don't have that phone anymore.  That's when I had an

4    iPhone.  So everyone knows that I am always singing.  And I'm

5    at my desk singing before he called us in his office playing

6    with an app, and he called us in the office and as --

7              THE COURT:  You don't know what happened to it.

8    A.  As I -- you know, when I get up form my desk I put my phone

9    in my bra, when I get up.  He called us in his office.  I put

10   my phone in my bra still with the app open, not really aware,

11   and when I came out I saw that it was still recording.

12             THE COURT:  Ma'am, you don't know what happened to the

13   recording, do you?

14             THE WITNESS:  I don't have it.  I don't have the phone

15   anymore.

16             THE COURT:  Good.  It's over, right?

17             THE WITNESS:  It's over.

18   Q.  That wasn't his Honor's question.  What happened to the

19   recording, Ms. Crawford?

20   A.  The recording is destroyed I assume.  I don't have the

21   phone.

22             MS. MESIDOR:  Your Honor, permission to treat this

23   witness as a hostile witness.

24             THE COURT:  I haven't heard any reason for you to do

25   that.

1          MS. MESIDOR:  Your Honor, if you would permit me to

2    impeach the witness with the recording.

3          THE COURT:  No, ma'am.  I am taking her word for it.

4          MS. MESIDOR:  Your Honor, will you allow me to impeach

5    the witness?

6          THE COURT:  I don't know what you are talking about.

7    I don't even think that recording was part of your exhibits.

8          MS. MESIDOR:  Your Honor, I can use anything that I

9    have in my possession with something that was produced.

10         THE COURT:  If you have a recording, you can't play

11   it, but if you have language from it that is on a transcript I

12   suppose I can listen to it and see if it's worthwhile.

13         MS. MESIDOR:  Your Honor, I do have the recording, if

14   you want to listen to it to see whether it's worthwhile.

15         THE COURT:  I don't want to listen to it.

16         MS. MESIDOR:  I'm sorry, your Honor.  I misunderstood

17   as to what it is that you want.

18         THE COURT:  If you have some impeachment material for

19   this lady, you may ask her a question with respect to that

20   impeachment.  I gather what you are saying is that you know

21   something she doesn't know.  She apparently doesn't know

22   anything about the recording.  So whether or not you can

23   impeach her about that or not is difficult for me to conjure.

24   But in fact you think you can, so go ahead and try your hand.

25         MS. KREBS:  I'm sorry, your Honor.  I apologize, but I

D8rnjoh2                    Crawford - direct

1    must interject.  This is not one of the recordings that has

2    been the subject of anything, and we have never received any

3    disclosure of such a recording.

4              THE COURT:  I understand that.  But it's for

5    impeachment purposes.  I don't think you are entitled to

6    material that she happens to use for impeachment material if it

7    should arise tomorrow morning as you are doing your

8    examination.

9              MS. KREBS:  Yes, your Honor, except that it was

10   requested during discovery, and it was never turned over.

11             THE COURT:  What was requested?

12             MS. MESIDOR:  That is not true.

13             THE COURT:  Oh, please, guys.  You have a question

14   about this?

15             MS. MESIDOR:  Yes, your Honor.  I can wrap it up

16   really quickly.

17             THE COURT:  I certainly hope so.  Overruled.  If there

18   is an objection, we will talk about impeachment material

19   another time, ma'am.

20   Q.  Ms. Crawford, is it your testimony that on June 1, 2012, at

21   5:58 p.m. that you did not send the recording to Ms. Johnson?

22   A.  I don't know when exactly.  I don't know when exactly.

23   Q.  Are you then saying that you did send the recording to

24   Ms. Johnson?

25   A.  Yes, I did.  I said that.  I did.

D8rnjoh2                    Crawford - direct

1    Q.  I don't believe that during the course of your testimony

2    that you indicated that you sent it to Ms. Johnson.

3    A.  You asked the question, and I said yes.

4              MS. KREBS:  Objection, your Honor.

5              THE COURT:  OK.  I guess that's the end of that.

6              MS. MESIDOR:  OK.  No further questions for this

7    witness.

8              THE COURT:  Any cross?

9              MS. KREBS:  Thank you, Your Honor.  Just one moment.

10   CROSS EXAMINATION

11   BY MS. KREBS:

12   Q.  Good morning, Ms. Crawford.

13   A.  Good morning.

14   Q.  You and I have never spoken before today other than the

15   moment we met in the hallway before court this morning,

16   correct?

17   A.  Correct.

18   Q.  With respect to the conversation that you had with

19   Mr. Carmona about, after the wrap-it-up comment, you didn't ask

20   him what he meant by the wrap-it-up conversation or by the

21   not-let-yourself-be-used conversation, right?

22   A.  I just took what he said and we left the office.  I didn't

23   ask him anything after that.

24   Q.  OK.  That is fine.  When you spoke with Mr. Weinberg about

25   it afterwards, that -- and just so I understand correctly, you

1  didn't go to Mr. Weinberg.  You were called into his office to

2  ask you about it.  Right?

3  A.  Yes.

4  Q.  OK.  And when you were called into his office, you

5  indicated that it had made you uncomfortable and you also

6  indicated that you were confused by the conversation, correct?

7  A.  Yes.

8  Q.  And Mr. Weinberg told you that it was very important to him

9  that nobody feel uncomfortable in the workplace, correct?

10  A.  Correct.

11  Q.  And he wanted to make sure that you would tell him if you

12  felt uncomfortable, correct?

13  A.  Correct.

14  Q.  At any other time did you go and tell Mr. Weinberg that you

15  were feeling uncomfortable?

16  A.  No.

17          MS. KREBS:  I have no further questions, your Honor.

18          Thank you, Ms. Crawford.

19          THE COURT:  You are excused.  Thank you.

20          (Witness excused)

21          THE COURT:  You may call your next witness.

22          MS. MESIDOR:  Your Honor, my cocounsel is going to see

23  if our next witness is here.

24          At this time, your Honor, if I may proceed, your

25  Honor.

D8rnjoh2                    Crawford - cross

1            At this time, the plaintiff calls Jamar Cooks to the

2       stand.

3            THE COURT:  Very well.

4        JAMAR COOKS,

5            called as a witness by the Plaintiff,

6            having been duly sworn, testified as follows:

7            THE COURT:  Do you remember our discussion at the time

8       I ruled on your in limine motions with respect to this witness?

9            MS. MESIDOR:  Yes, your Honor.

10

11      DIRECT EXAMINATION

12      BY MS. MESIDOR:

13      Q.  Good morning, Mr. Cooks.

14      A.  Good morning.

15      Q.  Could you please put the microphone a little bit closer to

16      you.  I cannot hear you.

17      A.  Can you hear me now.

18      Q.  Yes, I can hear you now.

19            Good morning, Mr. Cooks.

20      A.  Good morning.

21      Q.  Could you please state your full name for the record.

22      A.  Jamar Cooks.

23      Q.  How old are you, Mr. Cooks?

24      A.  29.

25      Q.  Mr. Cooks, what relationship, if any, do you have with the

D8rnjoh2                    Cooks – direct

1    organization by the name of STRIVE?

2    A.   I was a participant.

3    Q.   How long were you a participant?

4    A.   For roughly three to six months.

5    Q.   How often did you go to STRIVE during that period of time?

6    A.   Almost every day.

7    Q.   Were you part and parcel to any program that was organized

8    by STRIVE?

9    A.   Yes.

10   Q.   Did you complete that program?

11   A.   Yes.

12   Q.   Did there come a time where you came to know someone by the

13   name of Brandi Johnson?

14   A.   Yes.

15   Q.   How did you meet?

16   A.   Repeat that?

17   Q.   How did you meet Ms. Johnson?

18   A.   She came to class, one of the workshops.

19   Q.   During this particular workshop, was there a segment by the

20   name of five-minute video?

21   A.   Yes.

22   Q.   Could you explain to the jury what a five-minute video is.

23           MS. KREBS:  Objection, your Honor.  Relevance.

24           THE COURT:  Yes.  Not only that, but we have already

25   had it once from your earlier witness, Maria Ortiz, so I don't

D8rnjoh2                    Cooks – direct

1   really need it again.  So let's move on.

2   Q.  Mr. Cooks, did you participate in five-minute video during

3   this workshop?

4   A.  Yes.

5   Q.  Did you do so in front of Ms. Johnson?

6   A.  Yes.

7   Q.  Could you very, very briefly tell us what you shared during

8   that five-minute video?

9            MS. KREBS:  Objection.  Relevance.

10           MS. MESIDOR:  Your Honor, it is relevant to the

11  discussion that he had with Ms. Johnson immediately preceding.

12           THE COURT:  I will allow it for the moment.

13  A.  On five-minute video I discussed the time I was

14  incarcerated for the 12 years, that I had just come home I

15  really didn't know anything about the streets or anything like

16  that.

17  Q.  How old were you when you were incarcerated?

18  A.  14.

19  Q.  Did you see Ms. Johnson after the workshop had been

20  completed?

21  A.  Yes.

22  Q.  What, if anything -- did you have a conversation with her

23  afterwards?

24  A.  Yes.

25  Q.  What, if anything, did you discuss?

D8rnjoh2                    Cooks - direct

1   A.  She said that she was going to help me more to just learn

2   anything that's needed to be learned.  She was just there.

3   Q.  How would you describe your relationship with Ms. Johnson?

4   A.  Platonic.

5   Q.  After you completed the program, did you continue to come

6   back to STRIVE?

7   A.  Yes.

8   Q.  Did there come a time when you stopped going to STRIVE?

9   A.  Yes.

10  Q.  What were the reasons why you stopped going to STRIVE?

11          MS. KREBS:  Objection.

12          THE COURT:  Wait a minute.  Just for my information,

13  when the program is over, do the participants generally stop

14  coming or do they keep coming?

15          THE WITNESS:  They allowed --

16          THE COURT:  I can't hear you.

17          THE WITNESS:  We allowed to continue to come to work

18  on our résumés and so the forth, like that.

19          THE COURT:  Is that what you did?

20          THE WITNESS:  Yes.  I was working with, Brandi was

21  actually helping me with helping me get the job that I have

22  now.

23          THE COURT:  Thanks.

24  BY MS. MESIDOR:

25  Q.  Mr. Cooks, what were the reasons why you stopped going to

1   STRIVE?

2           MS. KREBS:  Objection.

3           THE COURT:  Overruled.

4   A.  I was asked to stop coming.

5   Q.  Who asked you to stop coming?

6   A.  Rob.

7   Q.  I can't hear you, sir.

8   A.  Rob.

9   Q.  When you say Rob, do you mean the defendant Rob Carmona?

10   A.  Yes.

11   Q.  Did Mr. Carmona indicate to you why he wanted you to stop

12   coming to STRIVE?

13   A.  It was really to stop coming to see Brandi.  He said

14   because there is something going on with her and the company,

15   and he didn't really want me to get mixed up in it, so to stay

16   away from that whole thing.

17           THE COURT:  And you stopped?

18           THE WITNESS:  Yes.

19           MS. MESIDOR:  I'm sorry.  I didn't hear the witness's

20   response, your Honor.

21           THE WITNESS:  Yes.

22   Q.  What was your reaction to Mr. Carmona's request?

23           MS. KREBS:  Objection.

24           THE COURT:  Sustained.

25   Q.  Did you say anything to Mr. Carmona in response to his

D8rnjoh2                    Cooks - direct

1    request?

2    A.  No.

3    Q.  What did you do?  Was that the end of the conversation?

4    A.  After he requested that, yes, between me and him.

5    Q.  What, if anything, did you do after that conversation?

6    A.  I left --

7             MS. KREBS:  Objection.

8    Q.  Since leaving that conversation, since that conversation

9    was -- withdrawn.

10            THE COURT:  The objection is overruled.  I didn't rule

11   on it.  If you don't stand up, it is not often that I hear you.

12   Even if I hear you, it is courteous to stand when you object.

13            MS. KREBS:  I apologize, your Honor.  I am trying to

14   get close to the microphone.

15            THE COURT:  Both are admirable.

16            MS. MESIDOR:  I'm sorry, your Honor.  I lost my train

17   of thought.  Just give me one moment to review my notes.  I

18   just want to make sure that I ask the same question that there

19   was no ruling on.

20   Q.  What, if anything, did you do after your conversation with

21   Mr. Carmona?

22   A.  I briefly spoke to Crystal and then I left and called

23   Brandi on the office phone.

24   Q.  What was the sum and substance of that conversation?

25            MS. KREBS:  Objection.

D8rnjoh2                    Cooks - direct

1           THE COURT:  Well, what did she say to you and what did

2     you say to her is fair enough?

3           THE WITNESS:  Which person?

4           THE COURT:  We are only interested in the plaintiff.

5           THE WITNESS:  OK.

6           MS. MESIDOR:  Ms. Johnson.

7           THE COURT:  That's who you said you called, right.

8           THE WITNESS:  Yes.  I also had a conversation with

9     Crystal before leaving.

10          THE COURT:  I gather that was not her concern.

11          THE WITNESS:  OK.

12          THE COURT:  And it is not mine either.

13          THE WITNESS:  All right.

14          THE COURT:  OK.  Are you going to tell me what you

15    said to Brandi and what she said to you?

16          THE WITNESS:  Yes, sir.

17          I told her what Rob said and she was like, she heard

18    it, don't worry about it.  Just I had to go to work, and it was

19    stuff like that.

20          MS. MESIDOR:  No further questions for this witness,

21    your Honor.

22          THE COURT:  Any cross?

23          MS. KREBS:  Yes, your Honor.  Just a moment.

24    CROSS EXAMINATION

25    BY MS. KREBS:

D8rnjoh2                    Cooks - cross

1   Q.  Good morning, Mr. Cooks.

2   A.  Good morning.

3   Q.  You and I have not spoken at all before today, correct?

4   A.  Correct.

5   Q.  Now, you indicated that you were a participant for about

6   three to six months.  Could you just pinpoint the time frame

7   when that was?

8   A.  It was like -- what do you mean?

9   Q.  When were you a participant?  When did you participate in

10  the program at STRIVE?  Month, year, something like that.

11  A.  Oh, 2010.

12  Q.  You said it was in connection with a particular program.

13  Which program was that?

14  A.  The green construction.

15  Q.  You said that after you participated in that five-minute

16  video, Ms. Johnson came over to you and volunteered to help you

17  out with training, getting a job, things of that nature?

18  A.  Yes.

19  Q.  Now, you were assigned a case worker as part of your

20  participation at STRIVE, correct?

21  A.  Yes.

22  Q.  OK.  A case worker's role is to help plan a course of

23  action for you to get your life back on track, to decide on

24  training and help you with jobs and things of that nature,

25  correct?

D8rnjoh2                    Cooks - cross

1              MS. MESIDOR:  Objection.

2              THE COURT:  I will allow it.  Overruled.

3    A.  Yes.

4    Q.  And do you know what Ms. Johnson's job title, role was at

5    STRIVE?

6              MS. MESIDOR:  Objection.

7              THE COURT:  Overruled.

8    A.  No.

9    Q.  Do you know whether it was in her job duties or skill sets

10   to assist individuals, participants with things such as that,

11   what a case worker would help with?

12             MS. MESIDOR:  Objection.

13             THE COURT:  Sustained.

14   Q.  You indicated that you spoke for a moment with Crystal

15   Batista as well, correct?

16   A.  Yes.

17   Q.  Isn't it correct that after you successfully complete a

18   STRIVE program and then you become employed, for a year after

19   that one of the benefits that STRIVE gives the participants is

20   a MetroCard for each week that you travel so that they pay for

21   your travel expenses to and from work?

22             MS. MESIDOR:  Objection.

23             THE COURT:  Sustained.

24             MS. KREBS:  Your Honor --

25             THE COURT:  I don't want to hear your argument.

1                MS. KREBS:  OK.

2                THE COURT:  I have ruled on the objection.

3    BY MS. KREBS:

4    Q.  Isn't it correct that there were certain circumstances in

5    which you were instructed that you needed to consult with

6    employees like Ms. Batista in the fiscal office in order to

7    obtain certain things through STRIVE?

8    A.  No.

9                MS. MESIDOR:  Objection.

10               THE COURT:  Do you want to withdraw your objection?

11               MS. MESIDOR:  I will withdraw my objection, your

12   Honor.

13   Q.  Isn't it correct that there were times at STRIVE where, in

14   order to obtain certain things, you and/or your case worker

15   would need to interact with people in the fiscal office for

16   benefits that you would get?

17               THE COURT:  Sustained.

18               MS. MESIDOR:  Objection.

19               THE COURT:  He answered the question no.

20   BY MS. KREBS:

21   Q.  You indicated in your conversation with Mr. Carmona that he

22   didn't ask you to come to STRIVE offices altogether, correct?

23   He just asked you to stop going to speak with Ms. Johnson,

24   correct?

25               MS. MESIDOR:  Objection.

1              THE COURT:  Overruled.

2    A.  Can I answer?

3    Q.  Is that correct?

4    A.  Oh, yes.  And -- yes, basically, but I was only there to

5    see really her so, yes.

6    Q.  But his comment was not that he wanted to exclude you from

7    the STRIVE offices altogether, isn't that correct?

8    A.  No.  No.

9    Q.  No, it's not correct; or, no, he didn't want to exclude you

10   from the STRIVE offices?

11   A.  No, it wasn't really to exclude me, I believe.  I'm not

12   sure.

13   Q.  Did you ever have any conversations with Mr. Carmona about

14   what he meant when he made the comment to you in connection

15   with his request for you not to come to the office?

16   A.  No.

17   Q.  I'm sorry.  To speak with Ms. Johnson?

18   A.  No.

19              MS. KREBS:  I have no further questions, your Honor.

20         Thank you very much for your time, sir.

21              THE COURT:  Anything further?

22              MS. MESIDOR:  No further questions for this witness,

23   your Honor.

24              THE COURT:  You are excused.  Thank you very much.

25              (Witness excused)

D8rnjoh2                    Cooks - cross

1              THE COURT:  You may call your next witness?

2              MS. MESIDOR:  Your Honor, our next witness was

3      scheduled to be here at around 12 o'clock.  We did not

4      anticipate going so quickly this morning through three

5      witnesses.

6              THE COURT:  Around when?

7              MS. MESIDOR:  12 o'clock, around noon.

8              THE COURT:  What is your plan for the next hour and a

9      half?

10              MS. MESIDOR:  Your Honor, after that we rest.

11              THE COURT:  No.  What are we going to do now?

12              MS. MESIDOR:  Your Honor, my understanding was that we

13      were going to take a break at approximately 11 o'clock, so I

14      had planned the morning with these three witnesses and then

15      anticipated that my next witness would be here around 12

16      o'clock.

17              THE COURT:  Well, I think the instructions are clear,

18      that you are always supposed to have enough witnesses to make

19      sure that you carry us through, so the jury -- well, in any

20      event, let's take a short recess.  We will come back soon and

21      tell you what is going to happen.

22              You're excused now.  Do not discuss the case amongst

23      yourselves.  We'll see you in 10 or 15 minutes.

24              (Jury not present)

25              THE COURT:  Well, we are not going to waste the

D8rnjoh2                    Cooks - cross

1   morning, so you are going to have to put on some of your

2   witnesses, Ms. Krebs.  You can choose.  You've got ten or

3   fifteen minutes to choose amongst the three that are here.  I

4   don't really care who it is.  But we are not going to let the

5   jury sit and do nothing.  So you have 15 minutes to figure out

6   who you would like to call first, second, and third.

7             MS. KREBS:  Your Honor, these were not going to be any

8   of my first witnesses.  We are going to see if our first

9   witnesses are actually here.

10            THE COURT:  I don't care whether they are your first

11  witnesses or they are not your first witnesses.  We are not

12  going to let the jury do nothing until 12 o'clock.  So you are

13  going to have to fill up the time.  I don't care with whom.

14  Clear?

15            MS. KREBS:  Yes, your Honor.  In addition, we had

16  anticipated making a motion at the close of plaintiff's case.

17            THE COURT:  Yes.  Let me tell you about that, just so

18  that you are all on the same wavelength.

19            What I do in an effort to make things move quicker,

20  although I must say I didn't think we would have all this time,

21  but the fact of the matter is, I make it clear, and I'm making

22  it clear now on the record, that any motions that can be made

23  at the end of plaintiff's case have been made.  Indeed, I have

24  reserved decision with respect to each and every one of them.

25  Clear?

1          MS. KREBS:  Yes.  Thank you, your Honor.

2          THE COURT:  See you in 10 minutes.

3          (Recess)

4          THE COURT:  I hear you have an application of some

5     sort.  Let's hear it.

6          MS. MESIDOR:  Your Honor, it has come to our attention

7     that defendants intend to call a Ms. Barr to the witness stand.

8     Your Honor, Ms. Barr was never disclosed on any prior

9     disclosures in the course of discovery.  She is not on the

10    joint pretrial order in terms of the list of witnesses.  Our

11    office did not have an opportunity to depose Ms. Barr as to

12    what the subject of her testimony is, your Honor.

13          To the extent that the defendants will represent that

14    Ms. Barr is here as some sort of rebuttal witness to anything,

15    unless they are prepared to specifically disclose what she is

16    here to rebut, your Honor, our position is that her addition

17    would be collateral at best.

18          THE COURT:  What is your position, Ms. Krebs?

19          MS. KREBS:  Thank you, your Honor.  Yes.

20          Ms. Barr is being called specifically as an

21    impeachment rebuttal witness and accordingly did not need to be

22    identified.  I am happy to identify the portions of plaintiff's

23    testimony that she is going to be rebutting in advance, but it

24    will become clear once she is on the stand.  I will take the

25    lead from your Honor as to what you prefer.

D8rnjoh2                    Cooks - cross

1          THE COURT:  In the fullness of time, I suppose, since

2     we are leaving at 2, I suppose if you have her available we

3     could let the plaintiff examine her.

4          MS. MESIDOR:  Your Honor, we will take that

5     opportunity.

6          THE COURT:  That is not a problem, is it?  I mean, it

7     is not going to change her impeachment testimony.  It will make

8     the plaintiff happy, even though you are quite correct that --

9     although you got it wrong an hour or two ago, you now have it

10    right in terms of impeachment being almost anything anytime.

11    If she's here, let her be deposed this afternoon at 2 o'clock.

12         MS. MESIDOR:  Thank you, your Honor.

13         MS. KREBS:  Your Honor, I would object to the

14    deposition taking place.  I don't see why a deposition is

15    necessary in the middle of a trial when it is being called

16    solely for impeachment purposes.

17         THE COURT:  It is not necessary.  It's simply that the

18    federal rules suggest that we try cases on their merits, and we

19    have time to try it now, so the impeachment will not come as a

20    surprise.  She is not in a situation in which anybody else is

21    going to testify, so I don't see the harm.  If you are going to

22    continue to feel the same as you do now, I will decide before

23    we adjourn this afternoon whether or not there should or

24    shouldn't be a deposition use.

25         MS. KREBS:  Thank you, your Honor.  I would just also

D8rnjoh2                    Cooks - cross

1   like to point out that she is in the courthouse today, as we

2   were planning on calling her before the end of the day today,

3   as it appears that we are going to be ending plaintiff's case

4   soon.

5           So that is another factor.  We were actually planning

6   on calling her within the next several hours.

7           THE COURT:  She is a rebuttal witness.  You don't call

8   her until after your case is over, right?  I mean you can --

9           MS. KREBS:  It is in rebuttal to the plaintiff's case,

10  your Honor.

11          THE COURT:  You can call her anytime now.  We are glad

12  to take a witness out of turn if you have a witness that is

13  coming here at noon.

14          MS. MESIDOR:  Your Honor, that was going to be the

15  second portion of what I was going to say, your Honor.  The

16  plaintiff will rest now.

17          THE COURT:  So if she's going to rest, you want to

18  call this witness, you can call her now, and then we won't have

19  any deposition because there won't be any opportunity to have

20  it.  Are you ready to do that, and then you're ready to call

21  another witness after that?

22          MS. MESIDOR:  Your Honor, clarification as to exactly

23  what the rebuttal testimony that this witness is going to be

24  proffered --

25          THE COURT:  She's going to give us a precis.

D8rnjoh2                     Cooks - cross

1          MS. MESIDOR:  I'm sorry, your Honor, I don't know what

2     that word means.

3          THE COURT:  She's going tell us something about it,

4     like a bola.

5          MS. MESIDOR:  I do understand what that word means,

6     your Honor.

7          THE COURT:  You are ahead of me.

8          MS. KREBS:  Your Honor, we are prepared to proceed.

9     We have another witness before Ms. Barr, and then we were

10    prepared to call Ms. Barr as well.

11         THE COURT:  So we will just keep going now, and you

12    can tell us now what Ms. Barr's testimony, the substance of her

13    testimony is.

14         MS. KREBS:  Sure.  In brief, Ms. Barr is going to

15    rebut --

16         THE DEPUTY CLERK:  Should we remove the witness here

17    first?

18         MS. KREBS:  This isn't her, but you're right.  There

19    is another witness in the courtroom.  Would you like me to ask

20    her to leave for this portion?

21         THE COURT:  As a general rule, going back to a rape

22    trial with Solomon as the judge, the thought is you don't let

23    the witness in the room so as to be able to tailor testimony.

24    Whether that ever happens or not is neither here nor there, but

25    the concept is sequestration of witnesses that aren't parties.

1          MS. KREBS:  Yes, thank you, your Honor.  The only

2    reason she was in the courtroom is we were unaware of this

3    application.  We thought the jury was coming in right away and

4    she was going to go right up on the stand.  Had I realized this

5    application was going to be made, we would have asked her to

6    stay outside before.  I apologize for that.

7          THE COURT:  Don't take it personally.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. KREBS:  In very brief, your Honor, Ms. Barr is

2     going to be rebutting the plaintiff's testimony that she never

3     used the word nigger in the office and she is also going to be

4     rebutting the plaintiff's testimony that she never made a

5     statement in the office that she was going to take this fucking

6     organization down.  Those are the basics of her testimony and

7     we don't expect it to be incredibly long.

8          THE COURT:  I would suggest that it will be incredibly

9     short.

10         MS. KREBS:  Yes.  I would imagine so, your Honor.

11         THE COURT:  Who are you calling to the stand?  Whoever

12    it is, you ought to put them on now.

13         THE DEPUTY CLERK:  She is right outside.

14         MS. KREBS:  Are you talking about Ms. Barr, or the

15    original witness we were calling?

16         THE COURT:  Whoever you want to call as long as the

17    plaintiff has rested.  It is your turn.  You can chose who it

18    is you want to put on the stand.  Just do it.

19         THE DEPUTY CLERK:  Jury entering.

20         THE COURT:  It must be my fault.

21         (Continued on next page)

22

23

24

25

1        (In open court; jury present)

2        THE COURT:  I should tell you, ladies and gentlemen,

3   plaintiff has rested so this is now the defendants' case.

4        THE DEPUTY CLERK:  Please stand and raise your right

5   hand.

6    APRIL BLAND,

7        called as a witness by the Defendants,

8        having been duly sworn, testified as follows:

9   DIRECT EXAMINATION

10  BY MR. MINNAH-DONKOH:

11  Q.  Good morning, Ms. Bland.

12  A.  Good morning.

13  Q.  Now, Ms. Bland, is this the first time you and I are

14  meeting?

15  A.  No.

16  Q.  On how many occasions have we met prior to today?

17  A.  Prior to today?  Two.

18  Q.  When was the first time you and I met approximately?

19  A.  Was it the beginning of this year?  End of last year?  I

20  really don't know, but I know I met you twice.

21  Q.  When was the second time?

22  A.  In the office -- at the office.  Both times at the office.

23  Q.  During those two occasions did I speak with you on both

24  occasions?

25  A.  Yes, you did.

1    Q.  And what was the sum and substance of our conversations?

2    A.  The substance --

3             MS. MESIDOR:  Objection.

4             THE COURT:  Well, you can rephrase it.

5             MR. MINNAH-DONKOH:  I will withdraw the question.

6    Q.  Ms. Bland, are you currently employed?

7    A.  Yes, I am.

8    Q.  Who are you employed by?

9    A.  STRIVE Resource Employment Service.

10   Q.  How long have you been employed by STRIVE?

11   A.  Come October will be 20 years.

12   Q.  What is your current position at STRIVE?

13   A.  Director of program compliance.

14   Q.  How long have you held that position?

15   A.  About three years.

16   Q.  Prior to holding the director of compliance what was your

17   position?

18            MS. MESIDOR:  Objection.

19            THE COURT:  We'll take a little pedigree information

20   from her.  I don't see what is wrong with that.  Overruled.

21   A.  Prior to that manager of -- what was it called? --

22   supportive service.

23   Q.  In the 20 years that you have been employed at STRIVE, have

24   you received any promotions?

25   A.  Yes, I have.

1    Q.  How many promotions have you received?

2            MS. MESIDOR:  Objection, your Honor.

3            THE COURT:  Sustained.

4    Q.  Ms. Bland, are you familiar with the plaintiff in this case

5    Brandi Johnson?

6    A.  Yes, ma'am, I am.

7    Q.  How are you familiar with Ms. Johnson?

8    A.  She used to work at STRIVE.

9    Q.  I am going to direct your attention to approximately March

10   of 2012.  Did you ever have a conversation at that time with

11   Ms. Johnson about a complaint she had filed?

12   A.  Yes.  If it was March, I cannot say; but I did have a

13   conversation about a complaint she had charged.

14   Q.  Now, I am not going to tell you what the testimony was

15   yesterday, but I want you to tell this jury did you approach

16   Ms. Johnson to talk about her complaint or did she approach

17   you?

18   A.  She approached me.

19   Q.  When she approached you, what did she tell you?

20   A.  That she filed a complaint against STRIVE.

21   Q.  Did you have any particular opinion about her filing a

22   complaint against STRIVE?

23   A.  All I could say is "wow."

24   Q.  When you say "wow," can you explain what that expression

25   meant?

1          MS. MESIDOR:  Objection, your Honor.

2          THE COURT:  Sustained.

3          Did she say anything more to you than that?

4          THE WITNESS:  That she just filed a complaint against

5    STRIVE.

6          THE COURT:  No.  No.  When she told you about the fact

7    that she had filed the complaint against STRIVE, did she say

8    anything to you about why or when or anything further in that

9    conversation?

10          THE WITNESS:  Not that I recall.  What I remember is

11    that she filed a complaint about STRIVE.

12    BY MR. MINNAH-DONKOH:

13    Q.  And while Ms. Johnson was employed at STRIVE, did there

14    ever come occasion where you sat in meetings with Ms. Johnson

15    and Mr. Carmona?

16    A.  Yes.

17          MS. MESIDOR:  Objection.

18          THE COURT:  Overruled.

19    Q.  And do you recall any such -- any of those meetings with

20    respect to Ms. Johnson's work attire?

21    A.  Yes.

22    Q.  On how many occasions did you sit in on meetings with Mr.

23    Carmona and Ms. Johnson about her work attire?

24    A.  One.

25          MS. MESIDOR:  Objection.

1          THE COURT:  Overruled.

2     Q.  How was it that you came to sit in in that meeting?

3     A.  Rob just wanted another senior person.  Lisa wasn't there

4     that day so he brought me in to speak -- have a conversation

5     while he was there.

6     Q.  Did Rob tell you why he specifically wanted a senior person

7     to be in there as well while having this conversation with Ms.

8     Johnson?

9     A.  Basically so nothing is misconstrued or said out of

10    context.  Just to have a witness that he spoke to them in the

11    presence of another woman and not just themselves.

12    Q.  And during that meeting what did Mr. Carmona say to

13    Ms. Johnson about her workplace attire?

14    A.  The basis of the meeting was about her work attire.  Now,

15    that day she was not dressed inappropriately, but it was about

16    prior times that she has been dressed inappropriately.

17    Q.  And when you say that the meeting was about prior times

18    that she had been dressed inappropriately, did you agree with

19    Mr. Carmona's assessment of Ms. Johnson's work attire?

20          MS. MESIDOR:  Objection.

21          THE COURT:  Sustained.

22    Q.  Did you ever observe Ms. Johnson dressed in a way that you

23    thought was inappropriate?

24          MS. MESIDOR:  Objection.

25          THE COURT:  Sustained.

1  Q.  At any time while Ms. Johnson was employed at STRIVE, did

2  you ever hear her use the word nigger in conversation?

3          MS. MESIDOR:  Objection.

4          THE COURT:  Overruled.

5  Q.  You may answer, Ms. Bland.

6  A.  In our -- just our personal conversations, just talking in

7  general, but not in the context of calling someone else at the

8  job that or anything like that.  It would just be an outburst

9  in the conversations, personal conversations.

10 Q.  Those conversations would be in the office?

11 A.  Yes.

12 Q.  When you say in your personal conversations in the office

13 she would use the word nigger, can you give more context?

14 A.  Well, I mean, if we were talking and you wanted to make

15 a -- she was making a statement, like, that N gets on my

16 nerves.  It could be me talking about boyfriends, friend,

17 cousins, family, you know, but not toward anybody in the

18 office.  It was just our conversations.

19 Q.  Did you ever hear her refer to her --

20         THE COURT:  This is your witness.  You know that means

21 you don't lead.

22         MR. MINNAH-DONKOH:  Yes, your Honor.

23         THE COURT:  I realize this is not a trial advocacy

24 cause.  If you ask how, what, when and where questions, you

25 avoid leading.

1          MR. MINNAH-DONKOH:  Yes, your Honor.

2          THE COURT:  As a rule.

3   Q.  During your approximately 20 years at STRIVE, how would you

4   characterize your relationship with Robert Carmona?

5          MS. MESIDOR:  Objection.

6          THE COURT:  I guess we'll allow it, but it really is a

7   little far out.  If you have a one- or two-word way in which to

8   describe your relationship with him, characterize it, we'll

9   take it.  I am not sure what it is worth, but we'll take it for

10  what it is worth.  Whatever that may be.

11         THE WITNESS:  It's been good.

12         THE COURT:  That's really perfect.

13  Q.  In the nature in which Rob communicates with employees or

14  staff at STRIVE, have you ever heard him yell in the office?

15         MS. MESIDOR:  Objection.

16         THE COURT:  I will allow it.  Overruled.  We don't

17  have to go over it again.  You can answer the question.

18  A.  At times, yes.

19  Q.  And was this limited to just communications with women?

20         THE COURT:  Sustained.  Try not to lead.

21  Q.  In what context have you heard Rob yell at times in the

22  office?

23         MS. MESIDOR:  Objection.

24         THE COURT:  I will allow it.

25  A.  Well, we've been in meetings and things weren't going

1   right.  People weren't making progress.  It would be in

2   frustration, not to yell at someone in a derogatory manner.  He

3   talks loud.  I talk loud at times.

4   Q.  Do you recall anything specific based on what you just

5   testified about him yelling in frustration on some occasions

6   during meetings?  Do you recall any specific conversations he

7   had with males in the context that you just testified to?

8            MS. MESIDOR:  Objection.

9            THE COURT:  I don't understand that question,

10  Mr. Donkoh.  Maybe she does.  If you understand it you can

11  answer it.

12  A.  When you are saying yelling at males -- is that what you

13  are saying, yelling at male staff?

14  Q.  Yes.

15  A.  Yeah.

16           THE COURT:  I like the way you answer the questions.

17           THE WITNESS:  Thank you.

18  Q.  Now, earlier today we had Mr. Cooks testify.  Did you ever

19  see a Mr. Cooks come into the STRIVE offices?

20  A.  Yes.  He is an old graduate, yes.

21  Q.  On the occasions that Mr. Cooks came into the STRIVE

22  offices, did you observe where he would go?

23           MS. MESIDOR:  Objection.

24           THE COURT:  I will allow it.  I am not sure where you

25  are going.  You can answer.

1    A.  He would stop by to see the job developers and say hello to

2    the people he got friendly and then he would go back to

3    Ms. Johnson's desk.

4    Q.  When you say he would stop to speak to job developers and

5    then go back to Ms. Johnson's desk, what frequency would he go

6    to Ms. Johnson's desk that you seen?

7            MS. MESIDOR:  Objection.

8            THE COURT:  Sustained.

9            Let's get on to it, Mr. Donkoh.  This is a rebuttal

10   witness if you couldn't tell.

11           MR. MINNAH-DONKOH:  Your Honor, she was identified on

12   the joint pretrial order.

13           THE COURT:  I see it.  I am reading it.  It is the

14   same as the other witnesses we seen this morning.  I am not

15   suggesting the testimony is the same.

16   BY MR. MINNAH-DONKOH:

17   Q.  Ms. Johnson, are you familiar with an employee at STRIVE by

18   the name of Latesha Smith?

19   A.  Yes.

20           MS. MESIDOR:  Objection.

21           MR. MINNAH-DONKOH:  I am permitted to ask structuring

22   questions.

23           THE COURT:  I have no idea where you are going at the

24   moment.  Since I gave you some leeway, I will give him some

25   leeway.

1           MS. MESIDOR:  I will withdraw my objection, your

2      Honor.

3      Q.  What is Ms. Smith's position at STRIVE?

4      A.  Right now she is a director of training.

5      Q.  What is Ms. Smith's race?

6           MS. MESIDOR:  Objection, your Honor.

7           THE COURT:  Overruled.

8      A.  African-American.

9           MR. MINNAH-DONKOH:  Just a moment to confer with

10     co-counsel, your Honor.

11          THE COURT:  Very well.

12          (Pause)

13     BY MR. MINNAH-DONKOH:

14     Q.  Ms. Bland, you testified that Ms. Johnson advised you or

15     came to you and told you that she had filed a complaint?

16     A.  Yes.

17     Q.  At any time thereafter were you approached by anyone from

18     STRIVE with respect to the complaint?

19     A.  No.

20     Q.  Are you aware of any investigation that was conducted by

21     STRIVE into Ms. Johnson's complaint?

22     A.  Yes.

23     Q.  How are you aware of such an investigation?

24     A.  Mr. Weinberg let me know that this was happening and asked

25     me some questions.

D8R6JON3                    Bland - direct

1    Q.  Did Mr. Weinberg ask you some questions pertaining to the

2    complaint before or after the conversation you had with

3    Ms. Johnson where she told you about --

4    A.  It was after.

5    Q.  And do you recall in sum and substance what questions Mr.

6    Weinberg asked you with respect to the complaint?

7              MS. MESIDOR:  Objection.

8              THE COURT:  He is a defendant, isn't he?

9              Go ahead.  I overrule the objection.

10   Q.  You can answer, Ms. Bland, if you remember the question.

11   A.  How was Rob?  Was Rob a yeller?  It was so long ago.

12   Questions were asked, I mean, about the case.

13             THE COURT:  Is that it, Mr. Donkoh?

14             MR. MINNAH-DONKOH:  Just one last question, your

15   Honor.

16   Q.  In response to Mr. Weinberg's questions were you truthful?

17   A.  Yes, I was.

18             MR. MINNAH-DONKOH:  No further questions for this

19   witness, your Honor.

20             THE COURT:  Any cross?

21             MS. MESIDOR:  One moment, your Honor.

22   CROSS-EXAMINATION

23   BY MS. MESIDOR:

24   Q.  Ms. Bland, on the two occasions that you met with

25   defendant's counsel, approximately how long can you meet with

1    them?

2    A.  About maybe 15, 20 minutes.

3    Q.  Did they discuss with you the types of questions they would

4    be asking you today?

5    A.  Nope.  Not those two types, no.

6    Q.  What did they discuss with you?

7    A.  Just to go over, um, questions about Rob, questions about

8    Brandi.

9    Q.  Which were the topics of today's direct examination,

10   correct?

11   A.  If -- yeah.  I guess so.

12   Q.  You've been employed at STRIVE for 20 years.  You've been

13   employed there 20 years consecutively, right?

14   A.  Yes.

15   Q.  For 20 years you have been receiving paychecks from STRIVE?

16   A.  Yes.

17   Q.  Do you come to depend on those paychecks, ma'am?

18   A.  Who wouldn't?  That is my job.

19   Q.  The meetings with Mr. Carmona and Ms. Johnson regarding her

20   workplace attire, that meeting took place in around 2011,

21   correct?

22   A.  I can't recall the date.  I know we had a meeting.  What

23   year?

24   Q.  Ms. Johnson stopped working at STRIVE in June 2012,

25   correct?

1    A.  I believe so.

2    Q.  I am going to call your attention to Plaintiff's

3    Exhibit 27.  There books in front of you, Ms. Bland, that have

4    tabulations and numbers.  Go to the tab that says 27 kindly.

5    A.  In which book?

6    Q.  If you open the book, do you see the tabulation?

7    A.  Okay.

8    Q.  Do you see it before you?

9    A.  Yes.

10   Q.  Just to confirm that we're looking at the same thing, on

11   the bottom right-hand corner does it say STRIVE 172?

12   A.  Yes, it does.

13   Q.  Does it refresh your recollection as to when that meeting

14   took place between you, Mr. Carmona and Ms. Johnson?

15   A.  Yes.

16   Q.  And when did that meeting take place?

17   A.  He has here today.  So that was Friday, June 10th.

18   Q.  Of what year?

19   A.  2011.

20   Q.  What is the subject matter of the document that you are

21   looking at?

22   A.  It says disciplinary action RE Brandi Johnson.

23   Q.  Mr. Carmona wasn't Brandi Johnson's supervisor in 2011, was

24   he?

25              MR. MINNAH-DONKOH:  Objection.

1    A.  I am not sure.

2    Q.  But he did reprimand Ms. Johnson regarding her work attire

3    during that meeting that took place in 2011, correct?

4    A.  Yes.

5              MS. MESIDOR:  No further questions of this witness.

6              THE COURT:  Anything further, Mr. -Donkoh?

7              MR. MINNAH-DONKOH:  Yes, very briefly.

8    REDIRECT EXAMINATION

9    BY MR. MINNAH-DONKOH:

10   Q.  Ms. Bland, you were asked questions about what you and I

11   discussed during the times that we met.

12             At any time during any of those meetings, did I go

13   over specific questions that I intended to ask you here today?

14   A.  No.

15   Q.  Were you instructed or given or fed answers to give here

16   today before this jury?

17   A.  No, I wasn't.

18             MR. MINNAH-DONKOH:  No further questions, your Honor.

19             THE COURT:  You are excused.  Thank you very much.

20             THE WITNESS:  Thank you.

21             (Witness excused)

22             THE COURT:  What is next?

23             MR. MINNAH-DONKOH:  At this time, your Honor,

24   defendants call Ms. Virginia Barr.

25             THE DEPUTY CLERK:  Please raise your right hand.

1   VIRGINA BARR,

2        called as a witness by the Defendants,

3        having been duly sworn, testified as follows:

4   DIRECT EXAMINATION

5   BY MR. MINNAH-DONKOH:

6   Q.  Good morning, Ms. Barr.

7   A.  Good morning.

8   Q.  Ms. Barr, is this the first time you and I have met?

9   A.  Excuse me?

10  Q.  Is this the first time you and I have met in person?

11  A.  I am not -- no.

12          THE COURT:  Get a little closer to the microphone.

13  Pull your chair up closer or the microphone.

14          MS. MESIDOR:  Your Honor, could we have that answer

15  read back.  We didn't hear her.

16          THE COURT:  Sure.

17          (Record read)

18  Q.  Ms. Barr, are you currently employed?

19  A.  Yes, I am.  Part-time.

20  Q.  Who are you employed by?

21  A.  East Harlem Employment Training Program.

22  Q.  Is that also known as STRIVE?

23  A.  STRIVE.

24  Q.  When did you begin your employment with STRIVE?

25  A.  April 1st, 1998.

1   Q.  And what is your current position with STRIVE?

2   A.  Employment specialist.

3   Q.  Now, you've just testified that you work part-time.  Have

4   you always worked part-time since you began with STRIVE?

5   A.  No.  Only the last couple months was full-time.

6   Q.  As an employment specialist what are your duties and

7   responsibilities?

8            MS. MESIDOR:  Objection.

9            THE COURT:  Overruled.  You can answer.

10  A.  Developing jobs for our customers, clients.

11  Q.  Are you familiar with the plaintiff in this case, Brandi

12  Johnson?  Do you need me to repeat the question?

13  A.  Yes.  I couldn't hear you.

14  Q.  Are you familiar with the plaintiff in this case, Brandi

15  Johnson?

16  A.  Yes.

17  Q.  How are you familiar with Ms. Johnson?

18  A.  I worked with her at STRIVE.

19  Q.  And while you worked with Ms. Johnson at STRIVE, did you

20  have any particular opinions as to her conduct at work?

21           MS. MESIDOR:  Objection.

22           THE COURT:  Sustained.

23  Q.  Ms. Barr, have you ever heard Ms. Johnson make any comments

24  regarding STRIVE, negative comments regarding STRIVE?

25           MS. MESIDOR:  Objection.

1            THE COURT:  I will allow it.

2       Q.  You may answer?

3       A.  I can answer.  Not to me, no.  Not to me.

4       Q.  In what context have you or have you been made aware of

5       negative comments Ms. Johnson has made against STRIVE?

6            MS. MESIDOR:  Objection, your Honor.

7            THE COURT:  Sustained.  I am not sure I get it.  I am

8       sure she may, but maybe you will rephrase it.  What context?

9       Q.  What was the nature of the comments you've been made aware

10      of that Ms. Johnson made about STRIVE?

11           THE COURT:  Sustained.  We only want comments that you

12      heard from the plaintiff.  Have you heard any comments that the

13      plaintiff made that were derogatory about STRIVE?

14           THE WITNESS:  Not to me.  Not to me personally.

15           THE COURT:  Did you overhear any comments the

16      plaintiff made to somebody else about STRIVE?

17           THE WITNESS:  Just walking past I may overheard them

18      talking, you know, something negative.  But I will remove

19      myself from the conversation.

20           THE COURT:  I think that takes care of that,

21      Mr. Donkoh.

22      Q.  Well, when you say walking by you would hear conversations,

23      what specifically did you hear Ms. Johnson saying about STRIVE?

24           MS. MESIDOR:  Objection, your Honor.

25           THE COURT:  If in fact you heard her specifically say

1    something and you can tell us approximately when, I will take

2    it.

3              THE WITNESS:  Oh, I couldn't remember that.  Sorry.

4              THE COURT:  Sustained.

5    Q.  Ms. Barr, at any time while Ms. Johnson was employed at

6    STRIVE, did you ever hear her use the word nigger?

7              MS. MESIDOR:  Objection, your Honor.

8              THE COURT:  I will allow it.  You can answer.

9              THE WITNESS:  I can answer?

10             THE COURT:  You may answer.

11   A.  One day it was not job related and I asked how her son was

12   doing and she told me the little nigger is doing well.  That is

13   the only time.

14   Q.  Any other conversations you recall hearing directly from

15   Ms. Johnson or overhearing with you or coworkers that she used

16   the word nigger?

17   A.  No.

18             MS. MESIDOR:  I could not hear the witness's response.

19   Apologies.

20             THE COURT:  What would you like me to do about that?

21             MS. MESIDOR:  I am sorry.  I was actually requesting,

22   your Honor, if you could have the record read back, her

23   response.  I could not hear her.

24             THE COURT:  Fine.  Could you read it back.

25             (Record read)

1            THE COURT:  You can repeat it.  That will save time.

2    A.  She stopped by my cubical one morning and I asked her how

3    her son was doing and she just said the little N was doing

4    well.  That's it.

5    Q.  In other conversations have you overheard Ms. Johnson using

6    the N word?

7            MS. MESIDOR:  Objection.

8    A.  No.

9            THE COURT:  You want to withdraw your objection?

10           MS. MESIDOR:  Withdraw the objection, your Honor.

11   Q.  And, Ms. Barr, during your tenure with STRIVE, how would

12   you describe your relationship with Ms. Carmona?

13           MS. MESIDOR:  Objection, your Honor.  Brief side bar.

14           THE COURT:  Not a chance.  Overruled.  You can answer

15   if you can answer it briefly.

16   A.  Well, as an employment specialist, I had very little, you

17   know, to do with her in passing, hello or conversating with

18   her, but I didn't have no cross-dealing with her.

19   Q.  Ms. Barr, the question was how would you describe your

20   relationship with Robert Carmona?

21   A.  Great.

22   Q.  How would you describe the communication style with

23   Mr. Carmona, how he communicates with individuals?

24           MS. MESIDOR:  Objection, your Honor.

25           THE COURT:  Overruled.

1    A.  With Mr. Carmona it is great.

2    Q.  When you say "it is great," can you be more specific as to

3    whether he is direct?

4    A.  He is very direct, what you need to be in the type of

5    business that we are in.  You know, he is a direct person.

6    Q.  When you say that he needs to be direct in the type of

7    business that you are in, can you explain that a little

8    further?

9    A.  He explains things where we can understand, you know.  He

10   communicate well with his staff.

11   Q.  Well, specifically I am trying to get -- you mentioned in

12   the business that we're in and what is that business?

13          THE COURT:  Sustained.  We all know the business.  Is

14   that all, Mr. Donkoh?

15          MR. MINNAH-DONKOH:  Just a brief moment, your Honor.

16   Q.  Ms. Barr, has Mr. Carmona ever made any comments to you

17   that you felt offended by based on being an African-American

18   woman?

19   A.  Absolutely not.

20   Q.  Have you directly ever heard Mr. Carmona speak to an

21   African-American woman in a way that offended you?

22   A.  Absolutely not.

23   Q.  Ms. Barr, during the occasions that you would see

24   Ms. Johnson in the office, whether it be interacting with you

25   or see her interacting with other individuals, did there ever

1    come an occasion where you saw her acting in a way that

2    offended you?

3              MS. MESIDOR:  Objection.

4              THE COURT:  The last four questions, not that that is

5    the only four, but the last four have all been leading

6    questions.  I am not sure you understand what a leading

7    question is.  Although, I am sure you do.  Why don't you do

8    what I suggested and just ask how, what, when, and where

9    questions.

10             MR. MINNAH-DONKOH:  Sure.

11   Q.  How would you describe from your personal observations with

12   Ms. Johnson how she acted in the workplace?

13             MS. MESIDOR:  Objection, your Honor.

14             THE COURT:  Sustained.

15   Q.  From your personal observations, how would you describe the

16   manner in which Ms. Johnson communicated with her coworkers?

17             MS. MESIDOR:  Objection, your Honor.

18             THE COURT:  Sustained.

19             MR. MINNAH-DONKOH:  Just a moment, your Honor.

20             (Pause)

21             MR. MINNAH-DONKOH:  No further questions, your Honor.

22             THE COURT:  Anything from the plaintiff?

23             MS. MESIDOR:  Very briefly, your Honor.

24   CROSS-EXAMINATION

25   BY MS. MESIDOR:

1    Q.  Good morning, Ms. Barr.

2    A.  Good morning.

3    Q.  Ms. Barr, can you hear me?

4    A.  Yes.

5    Q.  Ms. Barr, has Mr. Carmona ever called you a nigger?

6    A.  Absolutely not.  No.

7    Q.  You say absolutely not?

8    A.  No.

9    Q.  Are you aware of the allegations in this claim here,

10   Ms. Barr?  Are you aware of what the case is about here today?

11   A.  To a degree.

12   Q.  What if I represented to you that Mr. Carmona admitted to

13   calling Ms. Johnson a nigger, would that change your perception

14   as to whether or not Mr. Carmona speaks to African-Americans in

15   a derogatory manner?

16          MR. MINNAH-DONKOH:  Objection.

17          THE COURT:  Overruled.  This is cross.  You heard what

18   I said.  Nevermind.  You can answer.

19   A.  No.

20   Q.  It wouldn't change your mind?

21   A.  No.  Because I never heard him speak like that.

22   Q.  Do you find the word nigger offensive?

23   A.  I don't use the word.

24   Q.  That wasn't my question, ma'am.  I just want to make sure

25   you are answering my question.  My question to you, please, is

1  do you find the word nigger offensive?

2          MR. MINNAH-DONKOH:  Objection.

3          THE COURT:  Overruled.

4  A.  It is also how you use the word, you know.

5  Q.  If I told you that you act like a nigger, do you find that

6  phrase offensive?

7  A.  Um, it all depends who called me, say that to me.

8  Q.  If it was your supervisor?

9          MR. MINNAH-DONKOH:  Objection.

10          THE COURT:  I suppose I will sustain that objection.

11  Q.  Have you ever had a supervisor tell you that you act like a

12  nigger?

13  A.  No.

14          MR. MINNAH-DONKOH:  Objection.  Move to strike as

15  well.

16          THE COURT:  Overruled and denied.

17          MS. MESIDOR:  Your Honor, I may be finished.  I am

18  just going to check with my co-counsel.

19          (Pause)

20          MS. MESIDOR:  I have no further questions for you,

21  Ms. Barr.  Thank you.

22          THE COURT:  Anything from the defendant?

23          MR. MINNAH-DONKOH:  No, your Honor.

24          THE COURT:  You are excused.  Thank you very much.

25          (Witness excused)

1          THE COURT:  What is next?

2          MS. KREBS:  Your Honor, with respect I was wondering

3    if we can take a two-minute break for personal reasons?

4          THE COURT:  Sure.  We'll all sit and wait.

5          MS. KREBS:  Thank you, your Honor.

6          MS. MESIDOR:  Your Honor, is counsel permitted to walk

7    away from counsel table during this break?

8          THE COURT:  You can do whatever you want within

9    reason.

10         MS. MESIDOR:  The reason is always contemplated,

11   Judge.

12         THE COURT:  My thought is that we'll take a break in a

13   little while after the next witness and then we'll try and go

14   until 2:00.  Although, I realize that we have had a variety of

15   interruptions, but I think we have to sort of placate everybody

16   and I suppose if we take a break at 12:15, half an hour, for 10

17   or 15 minutes, then it will be 12:30 and we'll have an hour and

18   a half and then it will be my turn to be placated happily.  If

19   any of you have to use the rest room now, you may as well join

20   the lawyers.

21         (Recess)

22         THE COURT:  We're all present and accounted for.

23         Do you have a witness?

24         MS. MESIDOR:  Yes.

25         MS. KREBS:  Yes, your Honor.  I appreciate your

1  indulgence at my request.

2          THE DEPUTY CLERK:  Please remain standing and raise

3  your right hand.

4   LISA STEIN,

5       called as a witness by the Defendants,

6       having been duly sworn, testified as follows:

7  DIRECT EXAMINATION

8  BY MS. KREBS:

9  Q.  Good morning, Ms. Stein.

10  A.  Good morning.

11  Q.  I would like to start with some brief biographical history

12  for you.  What is your highest degree of education?

13  A.  I have an MBA with a masters in nonprofit administration.

14  Q.  Where did you get that MBA?

15  A.  Boston University.

16  Q.  What year?

17  A.  1998.

18  Q.  And when you say that you have a certification or

19  specialization -- I apologize -- in nonprofit management, what

20  does that mean?

21  A.  So Boston University had a special program where you

22  developed requirements and receive a masters in business

23  administration and they have a special path for health care

24  administration and nonprofit management.  So it took up most of

25  what would normally be 11 classes, but to get an additional

1   masters certification in addition to the NBA.

2   Q.  What made you decide to collect this particular program

3   with the specialization in nonprofit management?

4   A.  I had been working for five years at a homeless and housing

5   organization in the bay area.  I spoke with people I considered

6   to be mentors and they highly recommended that I try to get a

7   business degree, that a degree was very important for the

8   sector.  At the time my mother was working at an agency in

9   Massachusetts where the executive director had graduated from

10  this program and I had a chance to have an informational

11  interview with him and the program really fit the -- my

12  specialization and my interest so I applied and was accepted.

13  Q.  When you say that it was in your interest, what were your

14  interests?

15  A.  I am very passionate about the sector, about doing work at

16  community organizations.  I have been for as long as I can

17  remember.  While I was in college, I participated in a

18  student-run volunteer organization that supported our host

19  city's social services and we operated like a nonprofit and I

20  just knew what I wanted to do when I graduated.

21  Q.  Have you attained any other certifications or certificates

22  in connection with your career?

23  A.  When I was employed by Local Initiative Support

24  Corporation, also know as LISC, they paid for me to go through

25  professional certification and federal grants management.

1    Q.  Can you explain what that is, please?

2    A.  It was a professional degree.  I participated in about

3    eight different training sessions that lasted about two days

4    each over a course and period of about a year and a half on how

5    to administer federal grants and work in an organization where

6    you were making several award to other organizations.

7    Q.  Did you find that relevant to the business that you were

8    in?

9    A.  Yes.  LISC is a large financial intermediary where they

10   received large sums of federal dollars and made grants to

11   organizations across the country.

12   Q.  When did you attain this additional certification

13   approximately?

14   A.  I believe that it would have been around 2004, 2003.

15   Q.  Now, you indicated that you always had an interest in

16   serving the not-for-profit or public sector.  Can you please

17   describe some of your work experiences in that regard?

18   A.  I started as a case manager in homeless shelters.  I then I

19   work for faith based communities where we would help sponsor

20   individuals.  I started as a case manager working with

21   homeless, residents of homeless shelters.  Then I worked with

22   faith-based communities -- churches, temples -- help to support

23   individuals coming out of a shelter and into permanent housing.

24   Q.  When were you engaged in that work?

25   A.  From 1991 to 1996.

1   Q.  You also mentioned that you were at an organization called

2   LISC?

3           MS. MESIDOR:  Objection, your Honor.

4           THE COURT:  Overruled.  This is the defendant.  She

5   can tell the story the way she wants to.

6           MS. MESIDOR:  Okay, your Honor.

7           THE COURT:  Just like your plaintiff.

8   A.  I began working for LISC in, I would say, 2003 to 2006.

9   Q.  And after you worked with LISC, did you go to any other

10  organizations?

11  A.  I then went to a small organization called Recycle a

12  Bicycle that did exactly that.  It was a youth training program

13  and we literally had four bike stores where we recycled old

14  donated bicycles and taught the youth a good paying skill and

15  then resold the bicycles and I was the executive director.

16  Q.  After that where did you go?

17  A.  After that position I came to STRIVE.

18  Q.  You are not currently at STRIVE, correct?

19  A.  Correct.

20          MS. MESIDOR:  Objection.

21          THE COURT:  Overruled.

22  Q.  What year did you begin working at STRIVE?

23  A.  I began working at STRIVE in February of 2009.

24  Q.  Into what position were you hired?

25  A.  I was hired as the chief financial officer.

1    Q.  Can you please describe generally your duties in that

2    regard?  Obviously I don't need you to tell us everything or

3    we'll be here forever.  Just a general summary, please.

4    A.  I was responsible for financial reporting and accounting, I

5    was responsible for compliance, I was responsible for human

6    resources, and I was responsible for our IT or computer

7    systems.

8    Q.  At any point in time did your title get longer?

9    A.  Yes.

10   Q.  What, if any, additions to your title did you receive?

11   A.  In the spring of 2010 I took on an additional title of

12   chief operating officer.

13   Q.  When you received that additional title what, if any, other

14   duties -- again, just a general summary -- did you take on?

15   A.  Data reporting, program operations, working very closely

16   with the senior leadership team in regards to all operations of

17   the organization.

18   Q.  And as part of your CFO, slash, COO duties, were you

19   involved with grants?

20   A.  Yes.

21   Q.  Could you describe the nature of your work duties as it

22   came to grants?

23   A.  When opportunities would be made public for organizations

24   to bid on, I would pull our senior leadership together, I would

25   distribute the requests for proposals, we would look at what

1   the funder was asking for, did we think it was a good match for

2   our organization, did they think we could do a good job at it,

3   what were some of the financial resources attached to the

4   grant, what would we be responsible for as a leadership team so

5   we could make smart and good choices about what we applied for.

6   I would lead and manage grant writers if we retained them or

7   work with staff to then respond to the proposals so there is

8   always a program narrative and financial narrative of how we

9   would do the job.  And then if we were lucky to be awarded, I

10  would begin implementation and rollout of the organization and

11  get the grant up and going.

12  Q.  Now, I am going to come back to STRIVE in a minute.  I want

13  to briefly get out of the way your current employment.  When

14  did you leave STRIVE?

15  A.  I left STRIVE at the end of March of this year.

16  Q.  And what is your current employ?

17  A.  I currently work for an organization called Seed Co.

18  Q.  And can you tell us briefly what is Seed Co.?  What do they

19  do?

20  A.  Seed Co. is also a nonprofit operation.  It operates in

21  four states.  It is also a financial intermediary where they

22  receive large grants and work with community partners in those

23  four states.  The portfolio that I manage is in regards to

24  benefits outreach and enrollment helping people know what

25  benefits they are eligible for and facilitate their enrollment

1    into them.

2    Q.  What is your current title at Seed Co.?

3    A.  Vice president for work and family supports.

4    Q.  What were with the circumstances under which you left

5    STRIVE to go to Seed Co.?

6    A.  I left STRIVE on very good terms and very happy.  I felt

7    that I had been with the organization and seen a lot of growth.

8    I cherished my time at STRIVE.  The people are really

9    wonderful.  The mission is so important and you get to see

10   every day the participants and their changes and the successes

11   that they have and it was an honor to be part of that.

12        My decision to move on was for professional reasons.

13   While I enjoyed CFO, COO title if you think what about the next

14   step was in the career keeping that title, it would be larger

15   amounts of financial reporting and that is not where I wanted

16   to go.  I wanted to say more in the program operations realm

17   and this opportunity really spoke to that desire.

18   Q.  In your last answer you talked a little bit about the

19   mission of STRIVE and how important the work is that it does.

20   Tell us a little bit about STRIVE.  Tell us about the type of

21   work, mission, its philosophy.

22        THE COURT:  I think we heard a little bit about STRIVE

23   and probably a lot more than we need to hear.

24        MS. KREBS:  Some of it came from my opening and I just

25   want today make sure we're backing it up with actual testimony.

1          THE COURT:  Well, you backed it up or the plaintiff

2     has.  One or the other.  Do you want to give a word or two you

3     are welcome.  But frankly between your job and everyone else's

4     testimony, we have plenty.  You can give us a short piece of

5     it.

6     A.   It is really about the people.  I think it is rare that you

7     get the gift to see somebody change, somebody who society has

8     written off, who may have faced a lot of barriers in their life

9     and despite all of that they changed and they grew and

10    sometimes they still stumble but they have changed and that is

11    a gift.

12    Q.   Thank you.

13         Could you talk briefly about the philosophy behind

14    STRIVE with respect to communications and mode of communicating

15    with others?

16    A.   During the first part of training, the core attitudinal

17    training, I think it is fair to say that it is about tough

18    love.  It is about honesty.  It is about self-assessment and it

19    is about speaking to people in a way that they can hear you

20    most effectively.

21    Q.   When you talk about this attitudinal training, could you

22    just very briefly explain what that is?  I talked about it in

23    your opening, but I would like to hear it from an actual

24    witness.

25    A.   I think it is some of what I certainly from my experience

1    might take for granted.  How do I act with colleagues?  What is

2    my demeanor?  How do people perceive me?  How do I respond to

3    feedback?  How do I communicate effectively with my supervisor,

4    with my fellow colleagues?  How do I get along in the

5    workplace?  These sorts of behaviors may not necessarily have

6    within role modeled or taught to a lot of the folks coming to

7    our program and it is an important basis from which to launch a

8    lot of other training and support.

9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D8rnjoh4                    Stein - direct

1   Q.  How, if at all, does that carry over into communications

2   between employees at STRIVE, in terms of the mode of

3   communication, that tough love honesty self-assessment that you

4   mentioned?

5           MS. MESIDOR:  Objection.

6           THE COURT:  Overruled.  We are going to move on.

7           MS. KREBS:  Absolutely, your Honor.

8   A.  A big piece of the culture at STRIVE is keeping it real.

9   There is a significant percentage of the staff who themselves

10  graduated from the program.  It's really important in the work

11  that we were doing to have that mix and so I -- that is how I

12  would answer the question.

13  Q.  At the time, let's just say in mid 2012 what was the

14  approximate majority/minority split in terms of how many

15  employees at STRIVE were female versus male?

16          MS. MESIDOR:  Objection.

17          THE WITNESS:  I am sorry, I didn't hear.  Was it --

18          THE COURT:  Overruled.  You can answer the question.

19  A.  I would say a significant percentage of the staff were

20  female, at least 50 percent is my recollection.

21  Q.  What about with respect to race, in terms of the

22  demographics of the staff?

23  A.  A majority of the staff were either Hispanic or

24  African-American.

25  Q.  Now, there's been testimony about something that was either

D8rnjoh4                    Stein - direct

1    called green jobs construction grant or Pathways Out of Poverty

2    grant.

3              First of all, are those the same thing?

4    A.  Can you clarify?

5    Q.  Sure.  Let's take a step back.  In or around 2010, did

6    STRIVE receive a particular grant in connection with what were

7    called green construction?

8    A.  Yes.

9    Q.  Could you please describe what that is when we say green

10   construction, green construction jobs?

11   A.  There was a lot of talk about the new green economy, new

12   alternative energy related jobs, such as installing solar

13   panels, better insulation to be more heat and cooling

14   efficient, some hazardous, you know, asbestos removal.

15             And when President Obama came to office, it was a big

16   priority, so a funding stream that came out was to help do job

17   training to help people obtain what was hoped would be a lot of

18   jobs in that sector.

19   Q.  The grant that we are talking about, who did that?  Who was

20   that funded by?

21   A.  The Department of Labor.

22   Q.  New York State or the United States Department of Labor?

23   A.  U.S. Department of Labor.

24   Q.  I just want to clarify.

25             Did you, in fact, apply for this grant?

D8rnjoh4                    Stein - direct

1    A.   STRIVE applied for this grant, yes.

2    Q.   Thank you for the clarification.  When you applied for the

3    grant what exactly were you looking for in terms of the grant

4    from the Department of Labor?  What was the purpose behind the

5    grant, the size of it, etc.?

6    A.   The intent of the grant was to provide green job skills

7    training in the STRIVE model, meaning that first you would go

8    through core and then you would receive skills training.  It

9    was a national initiative where you were required to operate in

10   multiple cities.  So we communicated to all of our affiliates

11   the opportunity and had an internal process to determine which

12   of those affiliates wished to participate in that opportunity.

13        We came to the decision of, I believe it was four

14   states and we put together a proposal, and for most of those

15   other states this would be their first time rolling out

16   specific green job skills training in addition to core.

17   Q.   Was the grant approved?

18   A.   It was.  And it was very competitive, and we were very

19   excited.

20   Q.   Do you recall when the grant was approved for?

21   A.   I believe we were notified sometime in and around February

22   of 2010, and the official grant start date was January 29,

23   2010.

24        MS. KREBS:  Your Honor, permission to approach?

25        THE COURT:  Yes, indeed.

1          MS. KREBS:  Thank you.

2          MS. MESIDOR:  Your Honor, can we be made aware of what

3     exhibit is being distributed to the jury and given to the

4     witness, please.

5          MS. KREBS:  Yes, your Honor.  I apologize.  I should

6     have announced it beforehand.  This was marked as Defendants'

7     Exhibit A, which is already in evidence.

8     BY MS. KREBS:

9     Q.  Do you have the document in front of you, Ms. Stein?

10    A.  I do.

11    Q.  Could you identify this document, please.

12    A.  This was our notification of award from the U.S. Department

13    of Labor.

14    Q.  It says, the date on the bottom of the award, that's

15    February 19, 2010?

16    A.  Yes.

17    Q.  Is that at or around the time that you received the

18    notification that the grant was awarded?

19    A.  Yes.

20    Q.  Looking towards the top but in the box that starts "The

21    Period of Performance," do you see that?

22    A.  Yes.

23    Q.  So is that indicating the length of the grant?

24    A.  Yes.  That is the grant term.

25    Q.  The grant term.  So when you talk about a grant term, can

1   you just explain what it means by grant term?

2   A.   A grant term is your official start date and end date and

3   that you can only incur costs in that period and have that be

4   allowable and allocable to the grant.

5   Q.   Now, in connection with this grant that was awarded, in

6   connection with the application awarded, were you required to

7   submit a proposed budget that ended up being the basis for the

8   monetary award?

9   A.   Yes.

10  Q.   As part of that budget, were you required to identify

11  personnel?

12  A.   Yes.

13  Q.   Now, we have heard testimony already, so I am going to just

14  sort of ask a leading question to get to it so I don't repeat,

15  that Ms. Johnson was hired as an affiliate services coordinator

16  at STRIVE.

17        Was that position contained in the budget that was

18  submitted to the Department of Labor for this grant?

19  A.   Yes.

20  Q.   Prior to the grant, did you have a position as affiliate

21  services coordinator immediately preceding?

22  A.   No.

23  Q.   In connection with this grant and this position, what

24  percentage of that position was funded by this grant?

25  A.   A hundred percent.

D8rnjoh4                    Stein - direct

Q.   Internally at STRIVE, did you often refer to this as

Pathways Out of Poverty?

A.   Yes.

Q.   So if we say Pathways Out of Poverty or the green jobs

grant, we are all talking about the same thing?  Is that

correct?  Or is it different?

A.   If you are talking about green jobs grant, yes, it's the

same thing.  But green jobs was an industry and a skill

training track.  So it could have been, it could also be

general, so we should probably be specific.

             MS. KREBS:  Thank you.

             THE COURT:  Were there other people hired in addition

to the plaintiff in connection with this grant?

             THE WITNESS:  There were existing staff who were

partially allocated to perform program duties, and there was

one other position created that had a significant portion of

their salary paid for from this grant, but not in its entirety.

Q.   Just so I can clarify, other than Ms. Johnson, the only

other new position created as a result of this grant was a

position that was partially funded by the grant, but not

entirely?

A.   Correct.

Q.   What was that other position?

A.   It was a data and outcomes manager position, but I believe

the official title was not outcomes manager.

D8rnjoh4                    Stein - direct

1    Q.  The person who filled that duty, did that person have

2    obligations outside of the grant as well?

3              THE COURT:  Sustained.  What do we care about the

4    other person?

5              MS. KREBS:  I don't care if you don't care, your

6    Honor.

7              THE COURT:  I certainly have no reason to care that I

8    can think of.

9    BY MS. KREBS:

10   Q.  So, after receiving the grant, the approval in the Exhibit

11   A that you just saw, what, if any, steps did you take, either

12   you individually or STRIVE as a whole, in order to fill this

13   affiliate services coordinator position that was created for

14   it?

15   A.  I posted on a nonprofit job site called Idealist.org, and I

16   posted the job internally and collected résumés.

17   Q.  When you posted the job on Idealist.Org, did you use the

18   title affiliate services coordinator, or do you remember?

19   A.  I used a variation of that title.

20   Q.  But at all times were you still looking to fill that same

21   position that we are talking about in the grant?

22   A.  That was the position title in the grant, yes.

23   Q.  What were the results of those initial efforts to secure

24   candidates for the position?

25              THE COURT:  Well, without rushing the defendant, did

D8rnjoh4                    Stein - direct

1    the plaintiff eventually obtain that position?

2                THE WITNESS:  Yes.

3    BY MS. KREBS:

4    Q.  Did you interview --

5                THE COURT:  So we won't go through that portion.  That

6    was my hope.

7                MS. KREBS:  Yes.

8                THE COURT:  That you would get the drift.

9                MS. KREBS:  Your Honor, the reason I need to ask this

10   witness some questions is because there's been some dispute

11   about what was discussed during the interview process with

12   respect to the origination of the position --

13               MS. MESIDOR:  Objection, your Honor.

14               MS. KREBS:  -- with the grant.

15               MS. MESIDOR:  To the extent that counsel is now making

16   speaking objections that may influence this particular

17   witness's response, we request that if counsel is going to ask

18   the question just to simply ask the question.

19               THE COURT:  Well, if that is an objection, I will

20   sustain it.  I don't have any feeling that you will be

21   prejudiced if we go right along now without going through the

22   interview process.

23               MS. KREBS:  Respectfully, your Honor --

24               THE COURT:  There is an objection.  You have an

25   objection, and I overruled it.  We move along now.

1          MS. KREBS:  OK.

2    BY MS. KREBS:

3    Q.  Do you recall your interview with Ms. Johnson?

4          THE COURT:  We aren't going through the interview.

5    She got the job in the last analysis.  We have heard about the

6    interview process from the plaintiff herself.

7          MS. KREBS:  Yes.  But there is a dispute about that

8    interview process, respectfully, your Honor.

9          THE COURT:  All right.  Sustained.

10         MS. MESIDOR:  Thank you, your Honor.

11         THE COURT:  If you have a specific thought that you

12   can actually articulate with respect to that objection or

13   problem that you believe has not been sufficiently covered and

14   you can ask the question succinctly, you should go ahead and

15   try your luck.

16         MS. KREBS:  I will do so, your Honor.

17   BY MS. KREBS:

18   Q.  During the interview with Ms. Johnson, did you advise her

19   that this was a grant-funded position?

20   A.  Yes.

21   Q.  During the interview with Ms. Johnson, did she at any time

22   make any statements about the fact that she did not want a

23   position that was grant funded?

24   A.  No.

25         THE COURT:  We have overcome that hurdle.

D8rnjoh4                    Stein - direct

1         MS. KREBS:  Thank you, your Honor.  I was just trying

2    to avoid leading questions.

3         THE COURT:  That is also commendable.

4         MS. KREBS:  There is an exhibit that has already been

5    utilized that I believe is up at the table.  I just wanted to

6    confirm.

7         THE COURT:  We call that the witness stand.

8         MS. KREBS:  Thank you, your Honor.  The witness stand.

9    BY MS. KREBS:

10   Q.  I believe it might be Exhibit G.  It was a job description.

11   A.  Yes.

12   Q.  Do you see that in front of you?

13   A.  Yes.

14   Q.  Is this document an accurate description of the job duties

15   for the position of affiliate services coordinator that

16   Ms. Johnson filled?

17   A.  Yes.

18   Q.  At the outset of her employment, did you give her a job

19   description?

20   A.  The posting in Idealist was the job description.  And, yes,

21   all candidates who came to interview were provided a paper

22   copy.

23   Q.  Now, in looking at this particular exhibit, it indicates

24   reports to CFO.  Do you see that?

25   A.  Yes.

1   Q.  At the beginning of Ms. Johnson's employment, did she

2   report to you as the CFO?

3   A.  No.

4   Q.  So is this the same job description that you gave her right

5   at the beginning?

6   A.  The --

7            THE COURT:  At the beginning of what?

8            MS. KREBS:  I apologize.

9   Q.  At the beginning of her employment.

10  A.  The duties and the qualifications are unchanged.  The

11  updates were the department and reports to as a result of the

12  change in supervision.

13           MS. MESIDOR:  Objection, your Honor.  Move to strike

14  as nonresponsive.  The question was, was this the same job

15  description that you gave to Ms. Johnson.

16           THE COURT:  Overruled.  You can answer the question or

17  you can put another.

18  BY MS. KREBS:

19  Q.  So you indicated that originally she did report to -- I'm

20  sorry, she originally reported to Mr. Carmona, is that correct?

21  A.  She originally reported to Mr. Carmona.

22  Q.  Do you recall approximately when her supervision changed to

23  you?

24  A.  About a month or so after we were into implementation, it

25  was clear there was a lot of details and a lot of

administration.  Therefore, it was decided that it would be
better supervised by myself due to my background and my
certification.

Q.  Did Mr. Carmona have day-to-day responsibilities with
respect to grant implementation?

A.  No.

Q.  Were there any other employees whose supervision was
changed at the same time?

A.  The other position on this grant that was created also
reported to me because they worked as a team together in
regards to data and program compliance.

Q.  Now, just turning your attention again to the job
description, it indicates the department as being fiscal.  Now,
there have been some discussions about fiscal and also the
department of national.  Could you explain the department
structure, and in particular with respect to those two
departments.

A.  So, work charts change as a reflection of staff changes
over time.  When I took over the responsibilities of CFO and
COO, the departments of administration, which would be the
janitor, the receptionist, fell under my supervision.  Any
position related to IT computer assistance, the fiscal
department compliance, program compliance, and what we call
national which was this grant, in the end they all reported up
to the CFO/COO.

D8rnjoh4                    Stein - direct

1    Q.  I am going to show you what has been already been marked

2    and is accepted into evidence as Defendants' Exhibit HH for

3    identification.

4            Do you have that document in front of you?

5    A.  I do.

6    Q.  Is this an organizational chart at STRIVE?

7    A.  Yes.

8    Q.  In the bottom left-hand corner there's the date of when it

9    was current for this chart.  Do you see that?

10   A.  Yes.

11   Q.  So this was an organizational chart that was updated in

12   some fashion as of April 9, 2012?

13   A.  Correct.

14   Q.  Now, in looking at the portion, the side that is under you

15   with you up at the CFO/COO level and the things that fall down

16   underneath, do you see that?

17   A.  Yes.

18   Q.  To the best of your recollection, approximately how long

19   had this been the structure for that branch of the

20   organizational chart?

21   A.  From the point that I took over the COO responsibilities.

22   Q.  You indicated that was in 2010?

23   A.  Correct.

24   Q.  I am going to be bringing up to you a document that has

25   been premarked as Defendant's Exhibit H and has been admitted

1    already into evidence.

2              Do you recognize this document?

3    A.  Yes.

4    Q.  What is it?

5    A.  It was a performance review, the first one that myself,

6    Mr. Carmona and Eric Treworgy presented to Ms. Brandi Johnson.

7    Q.  Just to clarify because this is a new name that has come up

8    in your testimony, Mr. Treworgy was then the CEO of STRIVE?

9    A.  Yes.

10   Q.  Now, I want to turn your attention specifically to the

11   section that is B, performance of essential job duties.

12             Do you see that section?  It's, I believe, the second

13   to last page.

14   A.  Yes.

15   Q.  If you know from personal knowledge, how is it that the

16   items of the essential job duties came to be included in

17   specifically Ms. Johnson's performance evaluation?

18             MS. MESIDOR:  Objection, your Honor.

19             THE COURT:  I would like to know.  I overrule the

20   objection.

21   A.  Section B is inserted into any employee's evaluation based

22   on the job description for which they are performing, so it is

23   specific to your job description.

24   Q.  So is it fair to say that section A is topics that are

25   general to everybody, and then section B is created separately

1  for each person based on their job position?

2  A.  Correct.

3  Q.  In looking at those items, and then you compare them to the

4  job description that you indicated you created and at some

5  point was given to Ms. Johnson, is this description the source

6  for the items in Section B?

7  A.  Yes.

8  Q.  You indicated that you supervised Ms. Johnson during this

9  time period.

10 A.  At the time of this review, yes.

11 Q.  Indeed since approximately one month or so after her

12 employment began, correct?

13 A.  Yes.

14 Q.  In the course of that supervision, did you ever have

15 opportunity or reason to speak with Ms. Johnson with respect to

16 any performance issues, behavioral issues or any other issues

17 that were contrary to your expectations of her at STRIVE?

18         MS. MESIDOR:  Objection.

19         THE COURT:  Overruled.

20 A.  Can you clarify what you are asking.

21 Q.  Absolutely.

22         Did you ever have any reason to have any meetings,

23 discussions, counselings, communications, etc., with

24 Ms. Johnson based on her performance or conduct at STRIVE?

25 A.  Yes.

D8rnjoh4                    Stein - direct

 1    Q.  Could you please describe as best as you can remember what

 2    those were.

 3    A.  I would meet with Brandi regularly.  She was a new

 4    employee.  This was a new grant.  It was a very important

 5    initiative, and it's important to onboard an employee in a

 6    supervised manner and to make sure that they're performing the

 7    way that you, in accordance with the goals and outcomes that

 8    you expect.  And so it would be in the context of that.  In

 9    addition, if there were incidents or work product that I felt

10    didn't meet the standard, I would use it as a learning

11    opportunity --

12             THE COURT:  Can we cut to the chase and tell us what

13    it was that you talked to her about in this connection.

14             THE WITNESS:  Several different things.  We had to

15    write on a quarterly basis a narrative report.  I had to do

16    significant editing to the narrative report, gave her feedback

17    around that.  We --

18             THE COURT:  She wrote the narrative report.

19             THE WITNESS:  She wrote the first draft, yes.

20    BY MS. KREBS:

21    Q.  You may continue.

22    A.  We were also rolling out the program in multiple states and

23    setting up systems and communication and compliance

24    infrastructure with our sub award sites.

25             So I would ask for progress reports.  I would ask for

D8rnjoh4                    Stein – direct

1   feedback on how that was going, and sometimes I felt that she

2   didn't accurately signal me if something was really urgent or

3   if it was just an ongoing concern.

4        Obviously, I had multiple responsibilities, and it was

5   important to let me know, sort of using a code system, like is

6   this code red, or is this code yellow.  Are you looking just to

7   keep me apprised, or do I need to intervene as well in terms of

8   escalating a situation.  And I gave her feedback that I did not

9   feel she was accurately signaling me and therefore I could not

10  manage my time effectively.

11       THE COURT:  All right.  I think we will take a break,

12  ladies and gentlemen.  We will come back in 15 minutes.

13  Hopefully you will have some hot coffee at least in the jury

14  room or anything else you may have brought and we'll go until 2

15  o'clock and then the day will be over.

16       (Continued on next page)

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  You may step down.

3              What is your prognosis with respect to the time for

4     the balance of this witness's direct?

5              MS. KREBS:  I believe we'll probably require until 2

6     o'clock at least in order to complete Ms. Stein's testimony.  I

7     don't know if I will finish it completely by then, but if I

8     don't, it would not be that much more tomorrow morning.  Then

9     we will proceed after that.

10             THE COURT:  My view is that you will finish by 2

11    o'clock, so be aware.  If you need to telescope any of your

12    testimony, this is a good time to do it.

13             MS. KREBS:  Thank you, your Honor.

14             (Recess)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1

2              (Jury present)

3              THE COURT:  We have a little over an hour, and the

4    defendant has promised to try and complete her testimony of

5    this witness in that period.  Let's go.

6              MS. MESIDOR:  Thank you, your Honor.

7    BY MS. MESIDOR:

8    Q.  Ms. Stein, right before the break we were talking a little

9    bit about Ms. Johnson's performance or behavioral issues in the

10   office.  But before we return to that topic, there was just one

11   thing I wanted to address and get out of the way first.  As

12   indicated in the document you were looking at before, the

13   initial grant, receipt of the grant --

14   A.  The notice of grant award.

15   Q.  Thank you, yes, the notice of grant award.  You indicated

16   that it was originally set to expire on January 28, 2012,

17   correct?

18   A.  Yes.

19   Q.  Did that end date ever change?

20   A.  Yes.

21   Q.  Can you please explain how that came about.

22   A.  As we were getting into the last quarter of 2011, we were

23   still struggling for the entire grant across all four states to

24   get some of the outcome numbers that we wanted to finish with,

25   to finish strong about placement and retention into jobs.

1    Therefore, an option you have with a federal grant is to

2    request what they call a no-cost extension, and so we requested

3    one and we were granted it.

4    Q.  So a no-cost extension, that means that they don't have to

5    give you any more money you can just use the money you already

6    got for another few months?

7              MS. MESIDOR:  Objection.

8              THE COURT:  Overruled.

9    A.  Yes.

10             THE COURT:  How many states were you working in?

11             THE WITNESS:  We had a program in Hartford,

12   Connecticut, we had a program in Michigan, and at times two to

13   three sites in Michigan.  We had a program in Baltimore and a

14   program in Philadelphia and in New York.

15             THE COURT:  Who was administering all of that?

16             THE WITNESS:  STRIVE.

17             THE COURT:  So that you would have to go or someone

18   would have to go and look at what was happening in each of

19   these cities?

20             THE WITNESS:  Yes.

21   BY MS. KREBS:

22   Q.  Was that part of Ms. Johnson's responsibilities?

23   A.  Yes.

24   Q.  Now, just to clarify, did Ms. Johnson have responsibility

25   for the program that was within New York or only for the other

D8rnjoh4                    Stein - direct

1   affiliates in other locations?

2   A.  Her responsibility was to manage program reporting and

3   compliance for the sites that were doing funded work under this

4   grant.  She did not manage the New York program.  However, she

5   did the reporting on New York numbers that were funded on this

6   grant into the reports, including the Michigan, the

7   Connecticut, Philadelphia, Baltimore.

8   Q.  Thank you.

9          Now, with respect to the extension, did you receive

10  written notification from the Department of Labor that the

11  extension was granted?

12  A.  Yes.

13  Q.  I would like you to look at what should already be in front

14  of you, in fact, it's probably in the -- it may actually be in

15  that stack.  It was Plaintiff's Exhibit 40.

16         The only problem is I don't know if it's been

17  distribute to the jury or not.

18  A.  I don't know if it is in one of these binders.

19  Q.  Yes.  I believe, if you look at those large binders of

20  plaintiff's exhibits, there should be a tab that's 40.

21         MR. MINNAH-DONKOH:  Permission to approach the

22  witness, your Honor.

23         THE COURT:  Why?

24         MR. MINNAH-DONKOH:  To show her the exhibit that is

25  being referred to.

1          THE COURT:  It is a plaintiff's exhibit, but all

2     right.

3          MS. KREBS:  I think she's got it.

4          THE WITNESS:  Tab 40?

5          THE COURT:  Yes.

6          MS. KREBS:  Yes.

7          THE WITNESS:  I am trying to do this and not rip

8     pages.  OK.  I'm there.

9     BY MS. KREBS:

10    Q.  The cover page of this, is this the letter that enclosed

11    the approval of the extension of the grant?

12    A.  Yes.  This was our notice that our no-cost extension had

13    been approved.

14    Q.  As originally indicated, the grant was supposed to go to

15    January 28, 2012.  What was it extended to?  What date?

16    A.  June 30, 2012.

17    Q.  What is the date on the cover letter indicating when the

18    extension approval was sent out?

19    A.  January 24, 2012.

20    Q.  January 24, 2012?

21    A.  Yes.

22    Q.  Prior to receiving this physical notification, had you had

23    any verbal communications with the Department of Labor with

24    respect to this application for the no-cost extension?

25    A.  Yes.

1    Q.   Would you please describe briefly the nature of those

2    communications.

3    A.   We had a federal program officer who I had a very good

4    working relationship with.  She had indicated to me that she

5    did not see that there would be an issue in granting the

6    no-cost extension, that other award recipients had requested

7    one as well, that officially we had to wait for notice for

8    there to be no risk in our spending beyond the grant term, but

9    that all indications were that it would be approved.

10             THE COURT:  Is that the only fear?  That you might

11   spend above your grant?

12             THE WITNESS:  Yes.

13             THE COURT:  Otherwise, there is no downside I suppose

14   to the government?

15             THE WITNESS:  You certainly did not want to incur cost

16   after the grant term because you would not be reimbursed for

17   it.

18             THE COURT:  Right.

19   BY MS. KREBS:

20   Q.   Looking back at this document, Plaintiff's Exhibit 40, if

21   you turn the page to the actual notice of the modification, the

22   second page in the exhibit, there is a reference to additional

23   pages called the revised 424-A and budget narrative.

24             Do you see that?

25   A.   Yes.

1    Q.  What is a revise424-A and budget narrative?

2    A.  Form 424-A is a consolidated budget template that the

3    government uses in grants.

4    Q.  What about the budget?  What about the narrative?

5    A.  The budget narrative was more detailed, produced by my

6    staff in regards to spending to date and how we wished to

7    modify, if we wished to modify spending among lines.

8    Q.  So, to understand, when you submitted your application for

9    the no-cost extension, you needed to provide to them an

10   allocation of the budget as it was and how you wanted to change

11   it to extend it to the additional time period?

12   A.  Yes.

13   Q.  So I want you to turn to the second to last page of this

14   exhibit, which is the first of the two pages of that budget.

15   A.  Just to clarify, the pages are upside down in the binder.

16   Can I remove it?

17   Q.  Please, if that would help you, of course.  Be careful.  It

18   is a big binder.

19   A.  OK.

20   Q.  Do you have it in front of you now?

21   A.  Yes.

22   Q.  So there is a first column that's personnel.  These are the

23   individuals that were included in your budget?

24   A.  Yes.

25   Q.  Specifically for this grant?

1   A.   Yes.

2   Q.   Then the first column, what does that represent?

3   A.   That was the original budget or the budget as it stood.

4   Q.   On a yearly basis or a total?

5   A.   Two year.

6   Q.   The second column, ITD as of 9/28, having looked at it in

7   context, do you know what this refers to?

8   A.   Yes.

9   Q.   What is that?

10  A.   That is what we had billed to the government and been

11  reimbursed for to date.

12  Q.   To date meaning as of 9/28?

13  A.   That is the date that is there, and that's correct.

14  Q.   Would that have been a date that was sort of close in time

15  to when you, after you filed your application for the

16  extension?

17  A.   Yes.

18  Q.   And then the next column current remaining.

19  A.   What still remained was budget minus what we had billed and

20  then reimbursed to date, and that's how you got that column.

21  Q.   And then mod plus slash minus?  What was that?

22  A.   If we wished to make a change, we had to indicate how much

23  money we were either going to decrease the line by or increase

24  the line by.

25  Q.   And then new budget would be whatever, I guess, doing all

D8rnjoh4                    Stein - direct

1    the math, what the current budget then would be?

2    A.  Correct.

3    Q.  I just want you to look down under personnel, the third

4    line, that says affiliate services coordinator, correct?

5    A.  Yes.

6    Q.  Is that Ms. Johnson's position?

7    A.  Yes.

8              THE COURT:  You didn't have a conversation with her

9    about this additional six months, did you?

10             THE WITNESS:  Yes, I did, on several occasions.

11             THE COURT:  What was the last such occasion?

12             THE WITNESS:  She was part of the discussions that we

13   needed to request the extension for more time for the

14   affiliates to produce the outcomes that were necessary.  She

15   and her colleague Christina would produce reports for me so we

16   could understand if we finished, you know, at any given point

17   in time how it would look and what we needed to come close to

18   hitting the targets or hitting a reasonable percentage of our

19   targets.  So I had very detailed conversations.  And, in

20   addition, Ms. Johnson came to me and indicated that she spoke

21   with former colleagues at CWE who had the same funding and they

22   had already heard about their extension.  Why hadn't we heard

23   about ours.

24             (Continued on next page)

25

1  BY MS. KREBS:

2  Q.  Do you recall approximately when that last conversation

3  that you had, do you recall approximately when that was?

4  A.  Close to the end of that fourth quarter of 2011.

5  Q.  Do you recall the specific date on which you received this

6  January 24th, 2012 packet that indicated that it was approved?

7  A.  I would assume in and around that date that is on the

8  document.

9          MS. MESIDOR:  Objection, your Honor.

10         THE COURT:  Overruled.

11 Q.  Was there any period in time that you were incurring costs

12 under this grant and the extended time period when you didn't

13 already know that the grant had been extended?

14 A.  No.

15 Q.  I am done with that exhibit.  So since you had to take it

16 apart a little bit, if you can put it back together.

17         Are you ready?

18 A.  Yes.

19 Q.  Thank you.  Going back to the topic right before the break,

20 with respect to Ms. Johnson's performance and conduct, were

21 there any conversations that you had with her with respect to

22 the way she interacted with her colleagues either generally or

23 specifically?

24 A.  Yes.

25 Q.  Could you please describe in any order of preference those

1    conversations?

2    A.  I spoke with Brandi that when you disagreed with your

3    colleagues or there is perhaps confusion or difference of

4    opinion over what is being discussed or analyzed or different

5    ways to look at something that there are effective ways to have

6    those discussions and there are less effective ways to have

7    those discussions.

8            THE COURT:  What precipitated that conversation?

9            THE WITNESS:  There was a specific incident I can

10   recall where we were analyzing outcomes and understanding how

11   those outcomes translated into a database that Department of

12   Labor required us to report to and you needed to kind of do

13   some data translation.  It can get confusing because there is

14   common nomenclature what you might call an outcome and there is

15   what the government says what they want to call it.  So you

16   have to roadmap and bridge.  At the time the outcomes manager

17   was Ronell Breeze and Brandi, Ronell and I were trying to

18   decipher some of that and she got very insistent and very loud

19   and very forceful in a nonproductive way that Ronell and I were

20   just wrong and she was right and this time we just had to

21   believe her she was just right.  And about 15 minutes later she

22   came back do my office and said, I apologize.  I was completely

23   wrong.  You and Ronell were correct.  And I tried to use that

24   instance with her since we were -- it was recent and it was

25   fresh that she understand how we possibly could have had a

1    better outcome in that conversation had she been more open to

2    us sharing ideas versus on her insisting on who was right and

3    who was wrong.

4    Q.  Did you have any other instances or communications with her

5    about situations in which she communicated in a more emotional

6    or less productive way?

7    A.  There was an incident where we had booked some hotel travel

8    for staff who were coming to affiliate sites to come for a

9    meeting in New York and in the course of doing business,

10   business to business, entities like to give you gifts.  So

11   apparently this hotel I believe had delivered a gift intended

12   for Brandi and it was some food item.  I don't recall exactly

13   what.  And Brandi had not been in the office and, yes, I

14   believe the receptionist did not give her the food item and the

15   food item was eaten.  She was upset as if money had been

16   stolen.  I tried to use that as an example of sort of volume to

17   the incident and use that as a learning example.

18   Q.  Were there ever any incidents between Ms. Johnson and

19   another employee by the name of Christina Saenz?

20   A.  Can you clarify what you mean by "incident"?

21   Q.  Any other situations that arose in which you wished to have

22   communications with Ms. Johnson about her interactions with

23   Ms. Saenz?

24   A.  Yes.

25   Q.  Now, you mentioned an individual by the name of Ronell

1    Breeze.

2    A.  Yes.

3    Q.  Did Mr. Breeze and Ms. Saenz work at the same time?

4    A.  Ms. Saenz was hired after Mr. Ronell Breeze left the

5    organization.

6    Q.  She was his replacement?

7    A.  Yes.

8    Q.  What were the nature of the issues that arose between

9    Ms. Johnson and Ms. Saenz that required your intervention?

10   A.  The first discussion I had that required my intervention

11   was that I expected Ms. Johnson to on-board this new employee

12   orient her to the program, orient her to the database, orient

13   her to the affiliates, and it was clear that Ms. Johnson was

14   not doing that, was not sharing information in a productive

15   manner.  And when I asked her directly about it she

16   acknowledged that she did not like Ms. Saenz and she didn't

17   like her.  I counseled her that you do not have to be best

18   friends with all of your colleagues.  I do not expect that.

19   But it is to the detriment that you cannot do work and we

20   cannot get done what needs to happen.  That is not acceptable.

21   And I expected her immediately to start sharing information,

22   communicating clearly.  There was a reporting deadline coming

23   up and if we failed to meet that deadline and could not produce

24   data for that report that I would hold her partially

25   responsible for not having followed my instruction.

1    Q.  Now, there has already been some testimony in the record,

2    and I don't want to spend a lot of time on it, but that

3    incident occurred in and around that happened in or around

4    December 11 that created some work difficulties between

5    Ms. Johnson and Ms. Saenz.  Do you recall that?

6    A.  Yes.

7    Q.  Do you recall the specifics of what it was that occurred

8    between them that created the drama as it was referred to?

9    A.  It was a continuation of an inability to work together and

10   in a respectful manner, share information and discuss

11   challenges.  We had sites that the numbers didn't look good and

12   if we couldn't analyze the data accurately, we couldn't

13   understand what was happening.

14   Q.  Now, with respect to that particular situation, did you

15   single Ms. Johnson out at fault for the result?

16   A.  I communicated to both Brandi and to Christina that they

17   needed to get along and I gave them each the same message.

18   Q.  Now, I would like you to look at what should be in front of

19   you in the pile, not in the binder.  Do you see the pile of

20   loose documents, as Exhibit L, as in Larry.  It should

21   hopefully be in letter order to be easier.

22   A.  I have got it.

23   Q.  There has also been some testimony about this so I am going

24   to very briefly address this issue.

25        Is this a counseling notice or warning?  Is this

1  notice that was given to Ms. Johnson with respect to another

2  incident involving her and Ms. Saenz?

3  A.  Exhibit L you are referring to?

4  Q.  Yes.

5  A.  This was an accumulation that I was not seeing significant

6  improvement.

7  Q.  It is dated January 27th, 2012?

8  A.  Correct.

9  Q.  Although this one is only addressed to Ms. Johnson, did

10 Ms. Saenz receive an identical ones addressed to her?

11 A.  She received an identical memo addressed to her, yes.

12 Q.  Can you please describe the incident that gave rise to the

13 decision to issue this memo?

14 A.  Again, I believed and experienced that the two of them were

15 not communicating and sharing information.  Ms. Saenz came to

16 me and indicated that her access in the Department of Labor

17 data base -- sorry that was I mouth -- kept getting turned on

18 and off that was under the direction of Brandi.  Therefore, she

19 could not do her work.

20 Q.  Did you speak with Ms. Johnson about that?

21 A.  I did.

22 Q.  What did she say?

23 A.  I told her explicitly that Christina was to have

24 administrative access equivalent to hers and I didn't want to

25 hear ever again that Christina no longer had that access in the

1    database.

2    Q.  Did Ms. Johnson admit that there was --

3              THE COURT:  Could we see if you could avoid leading

4    questions.

5              MS. KREBS:  Yes, your Honor.  I apologize.  I am

6    trying to walk the line between quick and nonleading.

7              THE COURT:  That's the secret word.

8              MS. KREBS:  Absolutely, your Honor.

9    Q.  What was Ms. Johnson's connection with your approach on

10   this issue?

11   A.  I didn't do it.  Somebody else did it.

12   Q.  Did you have a conversation with any other individual about

13   this issue?

14   A.  Yes.

15   Q.  Who was that?

16   A.  The other person was Nancy who reported to April and I

17   asked her if she had made the change and she indicated to me

18   that she had at the direction of Brandi.

19             THE COURT:  I lost you.  What change?

20             THE WITNESS:  She had changed access information in

21   the data system which is the DOL database.

22             THE COURT:  So that Ms. Saenz could get it or not get

23   it?

24             THE WITNESS:  Not get it.

25             THE COURT:  So it wasn't the plaintiff?

1    THE WITNESS:  It was at the direction of the

2    plaintiff.

3    BY MS. KREBS:

4    Q.  So Ms. Graham, just to clarify, Graham is the last name?

5    A.  Yes.

6    Q.  So Ms. Graham informed you that she had turned off

7    Christina's access to the DOL database at Ms. Johnson's

8    direction?

9    A.  That is my recollection, yes.

10   Q.  Do you recall an individual by the name of Dwayne Hubbard?

11   A.  Yes.

12   Q.  Who is Dwayne Hubbard?

13   A.  Dwayne Hubbard was an employee at STRIVE.

14   Q.  Do you recall an incident or a meeting involving

15   Mr. Hubbard and involving Mr. Carmona that took place on a day

16   where there was a Department of Labor auditor at the STRIVE

17   offices?

18   A.  Yes.

19   Q.  Could you please tell the jury about your recollection of

20   those events?

21   A.  Mr. Hubbard had abandoned his job because he had relapsed.

22   We had given him a period of time to seek treatment.  He had

23   not adequately kept in touch with the organization or secured

24   that treatment when the 30 days ended so his employment was

25   terminated.  He was unhappy about that and wanted to talk about

1    it more and so he came into the office to speak with Rob and I.

2    Q.  And were you present for any part of this conversation?

3    A.  I was present for the beginning of the conversation.

4    Q.  What part of the conversation were you present for?  What

5    happened during the part you were present for?

6    A.  We started to explain to Dwayne from our perspective why we

7    made the choices and decisions we had and he was very angry and

8    he had a strong difference of opinion and exhibited very

9    aggressive behavior and got very -- and started to rebut what

10   we were saying.

11   Q.  How, if at all, did the conversation turn or changed that

12   caused you to leave the meeting?

13   A.  Rob is himself someone who is living in recovery and really

14   can identify and self-identify.

15              MS. MESIDOR:  Objection, your Honor.  Move to strike.

16              THE COURT:  I will allow it.  Let's move along,

17   though.  We had a number of these now.  I think everybody gets

18   your drift.

19   A.  So Rob began to call Dwayne on his behavior and try to get

20   to have him to have some ownership as to what happened and see

21   that as an important piece of his recovery.  At that point I

22   excused myself because.  It was a conversation that I thought

23   would be more effective between the two of them.

24   Q.  At this time do you recall where the DOL auditor was

25   located within the STRIVE offices?

1    A.  At the time that we were having this meeting?

2    Q.  Yes.

3    A.  I cannot say exactly where she was at the time of this

4    meeting.  I can say that we set her up in a small conference

5    room on the other side of the office and provide her everything

6    that she requested; but from time to time she would get up to

7    go to the bathroom, to make copies, to perhaps come and ask

8    myself one of my staff members or Brandi for another item that

9    she needed.  But during the moment we were in that

10   conversation, I was not aware of where she was.

11   Q.  What about after you left and the conversation continued

12   with respect to just Mr. Carmona and Mr. Hubbard, did you have

13   any recollection of where she was at that point in time?

14   A.  No.

15   Q.  Were you able to hear anymore of this conversation after

16   you left?

17   A.  Can you clarify?

18   Q.  After you left the meeting and the meeting continued

19   between Mr. Carmona and Mr. Hubbard, where did you go?

20   A.  I went into my office.

21   Q.  How far is that?

22   A.  My office is next to the office that Rob was sitting in at

23   the time.

24   Q.  While you were in your office, could you hear the words or

25   the tone or the volume of the conversation that was taking

1    place in the next office?

2    A.  I could hear the volume, yes, but I could not hear words

3    specifically.

4    Q.  At any point in time -- were you approached at a later

5    point by Ms. Johnson with respect to Mr. Carmona and

6    Mr. Hubbard?

7    A.  Can you clarify?

8    Q.  At any point in time did Ms. Johnson come to talk to you

9    about a perception or incident or an exchange that she had with

10   Mr. Carmona about conduct that occurred while he was meeting

11   with Mr. Hubbard or immediately thereafter?

12   A.  She came to my office, but it was not in relation to the

13   nature of the conversation that Rob and Dwayne were conversing.

14   Q.  What did she come to talk to you about at that point?

15   A.  She indicated to me that she had gone to his office to shut

16   the door.

17   Q.  When you say "his"?

18   A.  I am sorry.  She indicated to had tried to shut the door to

19   Rob's office and that she did not appreciated the way he talked

20   to her.

21          THE COURT:  Did she tell you that she did that because

22   of all the noise getting to the auditor's office?

23          THE WITNESS:  Yes.

24   Q.  Did she also tell you that Mr. Carmona had apologized for

25   his conduct afterwards?

1          MS. MESIDOR:  Objection, your Honor.

2          THE COURT:  Sustained.

3    Q.  What, if anything else, did she say to you about her

4    interactions with Mr. Carmona on this day?

5    A.  Nothing.

6          THE COURT:  Is it conceivable that we're finished with

7    these incidents if there is anything to move onto or do you

8    have a few more stored up?

9          MS. KREBS:  Just a few more, your Honor.

10          THE COURT:  Let's settle for one.  So pick the best.

11   Q.  When she came to you to talk about her feelings about how

12   Mr. Carmona spoke with her, did she say anything about feeling

13   that she was doing it because of her race, that he was speaking

14   to her in that manner because she was black?

15   A.  Are you talking about the same day?

16   Q.  Yes.

17   A.  No, she did not.

18   Q.  Did she say anything to you because of it being her gender?

19   A.  No, she did not.

20   Q.  Did she say anything to you about it being discrimination?

21   A.  No, she did not.

22   Q.  At any point in time did she ever come to you to tell you

23   that she thought that Mr. Carmona was treating her negatively

24   because of her race?

25   A.  No, she did not.

1   Q.  Did she ever tell you that Mr. Carmona was treating her

2   negatively because of her gender?

3   A.  No, she did not.

4   Q.  Did she ever tell you that she felt Mr. Carmona was

5   treating her in a manner that was unlawful?

6           MS. MESIDOR:  Objection.

7           THE COURT:  They are all leading.  I don't know what

8   your objection is.  Sustained.  Do you understand what leading

9   questions are?  You cannot put the answer to the question in

10  the mouth of the witness so that all she needs to do is say

11  yes, which is exactly what you have been doing.

12          MS. KREBS:  Yes, your Honor.

13          THE COURT:  Great for cross.

14          MS. KREBS:  Yes, your Honor.

15  Q.  Do you recall an incident in which Ms. Johnson was supposed

16  to attend a group staff meeting but did not attend?

17          THE COURT:  This is it.  This is your last episode so

18  you can choose it or go onto another.

19          MS. KREBS:  I only have two, your Honor.

20          THE COURT:  Good.  Choose one.

21          MS. KREBS:  Your Honor, the only side of the story we

22  heard so far is from the plaintiff.

23          THE COURT:  Not in terms of what I have been listening

24  to most of the morning.

25          MS. KREBS:  With these incidents I mean.

1      THE COURT:  That's right.  I think you heard my

2  ruling.  I think we have had it.  If you read 402 and 403 you

3  will understand why we need not take anymore.  If you don't

4  read it, take my word because I am the fellow with the robe.

5      MS. KREBS:  Yes, your Honor.

6  BY MS. KREBS:

7  Q.  Do you recall an incident where she did not attend a staff

8  meeting?

9      MS. MESIDOR:  Objection.

10      THE COURT:  Overruled.  This is her one more incident

11  that we're going to hear from you about.  So we're going to let

12  it happen until we feel differently.

13  A.  Yes.

14  Q.  Did you have any communications with Ms. Johnson about her

15  failure to attend that meeting?

16  A.  I sent her a text from the meeting asking where she was,

17  that I was surprised she was not in attendance.

18  Q.  What, if anything, was her response?

19  A.  I am with Rob and Earnie.  They will explain later.

20  Q.  Is that verbatim or just sum and substance of what she

21  said?

22  A.  Sum and substance I would say.

23  Q.  Did you later have another conversation with her once you

24  had received your explanation as to why she was not in

25  attendance?

1          MS. MESIDOR:  Objection.

2          THE COURT:  Overruled.

3    A.  Can you clarify?

4    Q.  Did you in fact speak with Rob and or Earnie for the

5    explanation that she said they would give her -- that they

6    would give you?

7    A.  Yes.

8    Q.  And after you had that conversation with them, did you

9    speak again with Ms. Johnson about the incident and situation?

10   A.  Yes.

11   Q.  Please tell us about that conversation, the one with

12   Ms. Johnson.

13   A.  I explained to Ms. Johnson that while I understood that she

14   cared for and felt it was important to speak with the client,

15   that I did not agree with her timing.  The client was not in

16   any way in harm's way at the moment, that the nature of the

17   incident that she was relating to had occurred in the past.

18   The staff member to which she referred had long since been

19   terminated and there was no situation that could not have been

20   handled at a later date and scheduled and planned for with the

21   right people present.

22   Q.  And had you spoken with Ms. Johnson in the past about

23   issues of counseling clients?

24   A.  Yes.

25   Q.  Do you recall just date-wise approximately the first time

1    that you had a conversation with her about her counseling

2    clients?

3    A.   It would have to be the end of 2010, beginning of 2011 as

4    we had enough students go through the program.

5    Q.   Now, at some point in time did you learn that Ms. Johnson

6    had filed an internal complaint with STRIVE?  Sorry.

7            At some point in time did you learn that Ms. Johnson

8    had filed an internal complaint with STRIVE about harassing and

9    discrimination?

10   A.   Can you clarify internal to STRIVE?

11   Q.   Internal to STRIVE meaning as opposed to be actually out

12   there in the court.  I am not talking about this litigation.  I

13   am talking about before that.

14   A.   No.

15   Q.   At some point in time were you consulted with respect to an

16   internal investigation that would need to be done?

17   A.   Clarify, please.

18   Q.   At any point in time were you consulted because an internal

19   investigation of allegations that Ms. Johnson was making would

20   need be to done within STRIVE?

21   A.   Separate and beyond this particular matter that we're here

22   for today.

23   Q.   Let me clarify.  Not separate from the circumstances, but

24   before the actual pleading was filed with the court.  That is

25   the time is what you meant.  I apologize if I was confusing.

1   A.  No.  The response to the question was no, I was not made

2   aware of any internal investigation before the papers were

3   filed.

4   Q.  Before the papers were filed here in court?

5           MS. MESIDOR:  Objection, your Honor.

6   Q.  -- or internally?

7           THE COURT:  Overruled.

8   A.  I don't understand what you are asking me so can you

9   clarify again?

10  Q.  At some point in time were you made aware that Ms. Johnson

11  made allegations against STRIVE harassment discrimination?

12  A.  Yes.

13  Q.  Approximately when did you become aware of this?

14  A.  When STRIVE was served with papers.

15  Q.  When you say "served with papers," you are saying they were

16  sent to STRIVE?

17          MS. MESIDOR:  Objection, your Honor.

18          THE COURT:  Overruled.

19  A.  Yes, when we were in receipt of papers.  I did not witness

20  how they were delivered at the office.

21  Q.  At that time do you know whether or not they were also

22  simultaneously filed somewhere else?

23  A.  At what time?

24  Q.  At the point that they were received internally?

25  A.  No.

1    Q.  How did you find out about the fact that these complaints,

2    the written something of allegations came into STRIVE?

3            MS. MESIDOR:  Objection.

4            THE COURT:  Overruled.

5    A.  Phil showed me the packet that had come to STRIVE that was

6    a draft of the complaint.

7    Q.  When you say Phil, are you referring to Mr. Weinberg, one

8    of your codefendants?

9    A.  Yes.

10   Q.  What, if anything, did you do in response to learning of

11   these papers received at STRIVE?

12   A.  We had outside pro bono, which means we didn't have to pay

13   for it, legal counsel that assisted us with personnel matters

14   and so I informed them immediately.

15   Q.  I am not going to ask you about any substance of those

16   communications.  But other than the communications with your

17   counsel or STRIVE's counsel what, if anything, else occurred in

18   connection with the complaint and any investigation?

19   A.  The papers as they were served to us and we saw them for

20   the first time named STRIVE, named myself and named Rob Carmona

21   and so therefore Phil indicated to me that he would be leading

22   the investigation and that I was removed from leading the

23   investigation, but I obviously would be participating in the

24   investigation.

25   Q.  Did you in fact participate in the investigation?

1    A.   There was a time when I was called in to be asked

2    questions, yes.

3    Q.   Was the only form of your participation being one of the

4    individuals that was interviewed or asked questions by Mr.

5    Weinberg.

6               MS. MESIDOR:  Objection.

7    A.   Yes.

8    Q.   Was there any other --

9               THE COURT:  Overruled.

10   Q.   Was there any other individual present listening to your

11   statements with Mr. Weinberg during the investigation?

12   A.   Yes.

13   Q.   Who was that?

14   A.   It was a board member Andy Rahl.

15   Q.   Rahl, R-a-h-l.

16   A.   Yes.

17   Q.   Did you discuss the allegations or the existence of this

18   complaint on your own initiation with anybody other than when

19   you spoke with Mr. Weinberg and Mr. Rahl?

20   A.   No.

21   Q.   Did anybody else at STRIVE approach you to talk to you

22   about the complaint?

23               MS. MESIDOR:  Objection.

24               THE COURT:  Sustained.  How, what, when and where

25   questions is what we're going to try to stay with, not that we

1   have been successful thus far.

2   Q.  What if at all any other conversations did you have with

3   anyone at STRIVE that were not initiated by you relating to the

4   existence of the complaint?

5           MS. MESIDOR:  Objection.

6           THE COURT:  If any.  Overruled.

7   Q.  You may answer.

8   A.  No.

9   Q.  Now, do you recall a request by Ms. Johnson to work at

10  home?

11          MS. MESIDOR:  Objection.

12          THE COURT:  Overruled.

13  A.  Yes.

14  Q.  Can you please describe in your own words how that came

15  about to the best of your knowledge?

16  A.  To the best of my recollection she communicated that

17  request to Phil.

18          MS. MESIDOR:  Objection, your Honor.

19          THE COURT:  What is the ground for your objection?

20          MS. MESIDOR:  Your Honor, if she is going to be

21  testifying about a conversation that she was not a part of --

22          THE COURT:  I thought she was part of it.

23          MS. MESIDOR:  No.  She specifically said the

24  communication was made to Mr. Weinberg.

25          MS. KREBS:  This is a predicate, your Honor, for a

1    later conversation.

2              THE COURT:  She is a defendant.  So whatever she has

3    to say all Weinberg will have to say we'll be able to take with

4    some exceptions.  So that is where I thought we were.  That is

5    what we can take.  We can take what you said, we can take what

6    Weinberg said and we can take what the plaintiff said.  That is

7    a broadbrush rule.  It is broader but that is the way it ought

8    to be for now.  Indeed, that is what I thought where we were.

9    I guess I was mistaken.  Mr. Carmona, the other defendant, he

10   will make admissions or anything he says essentially.  Again,

11   with caveats as a condition.

12   Q.  Please continue.

13   A.  The way I learned about it was that Phil replied to Brandi

14   in an e-mail indicating that he acknowledged her request and

15   was granting it and he had copied me on an e-mail so I would be

16   aware.

17   Q.  And did you contribute at all to that communication with

18   respect to the orchestration of her time out -- or time worked

19   from home?

20   A.  It was communicated to me and I informed the bookkeeper and

21   the accounts payable clerk who maintained time sheets so that

22   they would understand.

23             THE COURT:  Are you coming down the stretch,

24   Ms. Krebs?

25             MS. KREBS:  Yes, your Honor.

D9R6JOH5                    Stein - direct

1    Q.  I am going to be showing you a document that has been

2    marked and already accepted into evidence as Defendant's

3    Exhibit P, Paul.

4             THE COURT:  You can ask questions while passing out

5    the document.

6             MS. KREBS:  Thank you, your Honor.

7    Q.  Ms. Stein, do you have that document in front of you?

8    A.  Yes.

9    Q.  Is this the e-mail communication that you were just

10   referring to?

11   A.  Yes.

12   Q.  At the top there is one e-mail that you participated that

13   you responded that says, Please e-mail Andrea.  She does the

14   timekeeping?

15   A.  Yes.

16   Q.  What was that in reference to?

17   A.  When someone was going to be on business travel or working

18   from home, I would let Andrea know so she wouldn't just assume

19   because you didn't see them in the office that they weren't in.

20   Q.  Thank you.  Now, at some point in time did Ms. Johnson's

21   employment come to an end?

22   A.  Yes.

23   Q.  And do you recall when that was?

24   A.  Yes.

25   Q.  When?

1  A.  June 11th, 2012.

2  Q.  Were you involve in any communications leading up to her --

3  this cessation of her employment?

4  A.  No.

5  Q.  Were you involved in any behind-the-scene communications

6  with, for example, Mr. Weinberg leading up the cessation of her

7  employment?

8  A.  Yes.

9  Q.  What conversations were those?

10  A.  We discussed where we were at with our spending, we

11  discussed where we were at with our outcomes, we discussed that

12  after June 30th there was no longer any activity to monitor,

13  and that the business need going forward did not exist.

14  Q.  When you say the business need did not exist, did not exist

15  for what?

16  A.  The business need for her position and her roles and

17  responsibilities did not exist.

18  Q.  And at that time in June of 2012, you indicated previously

19  in your testimony that the grant was set to expire on

20  June 30th, 2012; is that correct?

21  A.  Yes.

22  Q.  And after June 30th, 2012 would there have been any funding

23  for her position?

24  A.  No.

25  Q.  After June 30th, 2012, did the grant program, was it going

1    to continue in any way?

2              MS. MESIDOR:  Objection.

3              THE COURT:  Overruled.

4    A.  Can you clarify what you mean by grant?

5              THE COURT:  You had four million dollars.  Was there

6    any left?

7              THE WITNESS:  There was no more of the four million

8    dollars left.  We spent it.

9    Q.  After Ms. Johnson was let go, was any other person put into

10   this affiliate services coordinator position?

11   A.  No.

12   Q.  At that time did you have any other grants for a similar

13   program with a similar position?

14   A.  No.

15             MS. KREBS:  I have no further questions, your Honor.

16             I am sorry, your Honor.  I apologize.

17             THE COURT:  I just wasn't fast enough.

18   BY MS. KREBS:

19   Q.  You mentioned earlier that there was another position that

20   had been partially funded by this particular grant?

21   A.  Yes.

22   Q.  Is that person who we talked about whose name we know from

23   your testimony.

24   A.  Yes.

25   Q.  Who is that?

1   A.   Christina Saenz.

2   Q.   Ms. Saenz, did she continue to be employed after June 30th,

3   2012?

4   A.   Yes.

5   Q.   Can you explain why?

6   A.   There was a database that STRIVE as an organization used to

7   cross all of our affiliate sites that we paid for called ETO,

8   Efforts To Outcomes.  And it was important as an affiliate

9   network to continue to measure outcomes across all sites.  It

10  was important for New York as a New York base program to

11  measure outcomes of course training in the program we had

12  currently.  So the business need continued beyond the grant.

13  Q.   And the Pathways Out of Poverty program through the grant

14  that was at this other affiliate locations, did that program

15  continue at those other affiliate locations after June 30th,

16  2012?

17          MS. MESIDOR:  Objection.

18          THE COURT:  Overruled.

19  A.   No.

20          MS. KREBS:  May I have one moment, your Honor?

21          THE COURT:  You may.

22          (Pause)

23  BY MS. KREBS:

24  Q.   Ms. Stein, did there come a point in time where you were

25  terminating Ms. Johnson prior to the end of the grant period?

D9R6JOH5                    Stein - direct

1          MS. MESIDOR:  Objection.

2          THE COURT:  Overruled.

3   A.   Yes.

4   Q.   Could you please describe the reasons for that?

5          THE COURT:  Not for the reasons we've already heard

6   several times such as the incidents that we've gone through one

7   by one.  Are they the reasons in large measure?

8          THE WITNESS:  Not fully.

9          THE COURT:  In large measure?

10          THE WITNESS:  Yes.  But I think there is some

11   additional context.

12          THE COURT:  All right.  I will let you tell us about

13   the additional context.

14          THE WITNESS:  If we go back to Defendant Exhibit L,

15   the memo from January 27th, 2012, Brandi expressed to me that

16   she was "sick and tired of this" and that she didn't need to

17   work here at STRIVE, she had other job offers and she was

18   tired.  And so I asked her directly did she wish to terminate

19   her employment.

20   Q.   And what was her response?

21   A.   What can you offer me.

22   Q.   Please continue with your communication.

23   A.   In the spirit of amicable closure, I offered a month of

24   salary and benefits.

25   Q.   What was her response?

1   A.  Can I have some time to think about it.

2   Q.  Did you give her that time?

3   A.  I gave her 24 hours.

4   Q.  What happened when she came back after 24 hours?

5   A.  We had a meeting with Ms. Johnson, with Phil Weinberg and

6   Rob Carmona and myself.

7   Q.  Please describe that meeting.

8   A.  I reiterated the conversation I had with Ms. Johnson and

9   asked her if she had made a decision.

10  Q.  And what occurred?

11  A.  Rob started to speak and indicate that he had spoken with

12  Ms. Johnson, that she had come to him and asked his advice and

13  that he believed she would be able to continue to perform and

14  meet our expectations.

15  Q.  What, if anything, did Ms. Johnson say during this meeting?

16  A.  I had indicated very clearly -- I had put it, Are you in or

17  out?  And if you are in, are you really in?  And she asked me

18  to clarify what I meant by in.

19  Q.  And what did you respond?

20  A.  That I didn't want to hear anymore that she was sick of

21  STRIVE and that she didn't want to be here.  If she was in, she

22  was going to finish to the end on a high note and finish

23  strong.

24  Q.  What did she say in response to that?

25  A.  I'm in.

1   Q.  At any point in time in any of these communications did she

2   indicate that any other reason that she was thinking about

3   being out had to do with any unlawful conduct?

4              MS. MESIDOR:  Objection, your Honor.

5              THE COURT:  I don't know what that means.  But if you

6   mean the subject matter of this complaint, I suppose that is a

7   good enough question.  We're talking about discrimination.  Any

8   of that in part of her answer at any time?

9              THE WITNESS:  No.

10              MS. KREBS:  I have no more questions, your Honor.

11              THE COURT:  Any cross?

12              I didn't waste any time.

13              MS. MESIDOR:  Your Honor, I can cross the witness.  I

14   will not finish by 2:00, which is in 11 minutes.

15              THE COURT:  It was only the defendant who I was

16   anxious to finish direct.

17              MS. MESIDOR:  Your Honor, how much time are you

18   willing to give me on cross?

19              THE COURT:  We'll see how long you take.  My only

20   concern about timetables is I think really the law is that you

21   can't waste my time.

22              MS. MESIDOR:  I agree, your Honor.  I wanted to make

23   sure I was behaving within the purviews allotted to me.

24              THE COURT:  You can take as long as you want so long

25   as you don't repeat.

1          MS. MESIDOR:  Okay.

2          THE COURT:  Or ask questions that ask for inadmissible

3   answers.

4   CROSS-EXAMINATION

5   BY MS. MESIDOR:

6   Q.  Ms. Stein, did at any time you inform the plaintiff that

7   her position was going to ending on January 28th, 2012?

8   A.  No.

9   Q.  At any point did you tell the plaintiff that her position

10  was going to be ending June 30th, 2012?

11  A.  No.

12  Q.  Going to Exhibit G, Defendant's Exhibit G.

13  A.  Yes.

14  Q.  This isn't the job description that you gave to Ms. Johnson

15  at the time of her interview, is it?

16  A.  Can you clarify?

17  Q.  The job description that you have before you, that is not

18  the job description that you gave to Ms. Johnson at the time of

19  her interview, is it?

20  A.  No.

21  Q.  Have you provided a copy of the actual job interview --

22  withdrawn.

23          Have you provided a copy of the actual job description

24  that you did give to Ms. Johnson at your interview?

25          MS. KREBS:  Objection.

1          THE COURT:  Overruled.

2     A.  I guess my response I think requires a little context.

3     Q.  Ms. Stein, I only want to know whether you gave the actual

4     job description that you gave to Ms. Johnson at her interview

5     to your attorney.  That is all I want to know.

6     A.  No.

7     Q.  So we do not have an opportunity to compare the actual

8     job --

9          THE COURT:  Just ask questions.

10    Q.  I am going to refer your attention to Exhibit H.  That is

11    Ms. Johnson's performance evaluation, correct?

12    A.  Yes.

13    Q.  And the date of that evaluation is September 15th, 2010,

14    correct?

15    A.  Yes.

16    Q.  And Ms. Johnson had only been working at STRIVE for

17    approximately five months at that period of time, correct?

18    A.  Yes.

19    Q.  You had previously indicated that you had to consistently

20    rewrite narratives that Ms. Johnson had done, is that correct?

21    A.  Yes.

22    Q.  I am going to draw your attention to the second page of the

23    job description.  Under accuracy and thoroughness of work.

24    A.  The job description or the evaluation?

25    Q.  Sorry.  Evaluation.  Apologies.

1    A.  Sorry.  Which one are you looking at?

2    Q.  We're looking at --

3    A.  Which page?

4    Q.  The second page of Exhibit H on the bottom right-hand

5    corner it says STRIVE 00043.

6    A.  Which page in the document?

7    Q.  Second page of the document.

8    A.  Okay.

9    Q.  I am referring you to the specific section that says

10   "Accuracy and Thoroughness of Work."  Do you see that?

11   A.  Yes.

12   Q.  Ms. Johnson got a three for that, correct?

13   A.  Yes.

14   Q.  You previously mentioned that part of Ms. Johnson's duties

15   and responsibility was traveling outside of state, outside of

16   the state to different affiliates to make sure they were in

17   compliance, correct?

18   A.  Yes.

19   Q.  Ms. Johnson continued to do that up until the end of her

20   employment, right?

21   A.  Yes.

22          THE COURT:  This is as good a time as any and everyone

23   will have time to get their acts together by tomorrow.  See you

24   tomorrow.  Do not discuss this case with anybody else.

25          The Jury is excused.  Have a good afternoon and

1  evening.

2              (Jury excused)

3              THE COURT:  See you tomorrow morning at 9:30,

4  Ms. Stein.

5              THE WITNESS:  Yes, your Honor.

6              THE COURT:  Have a good evening everybody.

7              MS. MESIDOR:  Thank you, your Honor.

8              (Adjourned to August 28, 2013 at 9:30 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2   Examination of:                         Page

3   BRANDI JOHNSON

4   Cross By Mr. Minnah-Donkoh . . . . . . . . . . 163

5   MARIA J. ORTIZ

6   Direct By Ms. Mesidor . . . . . . . . . . . 166

7   Cross By Ms. Krebs . . . . . . . . . . . . . 181

8   Redirect By Ms. Mesidor . . . . . . . . . .194.

9   CAMMIE CRAWFORD

10   Direct By Ms. Mesidor . . . . . . . . . . . 199

11   Cross By Ms. Krebs . . . . . . . . . . . . . 209

12   JAMAR COOKS

13   Direct By Ms. Mesidor . . . . . . . . . . . 211

14   Cross By Ms. Krebs . . . . . . . . . . . . . 217

15   APRIL BLAND

16   Direct By Mr. Minnah-Donkoh . . . . . . . . . 230

17   Cross By Ms. Mesidor . . . . . . . . . . . . 240

18   Redirect By Mr. Minnah-Donkoh . . . . . . . . 243

19   VIRGINA BARR

20   Direct By Mr. Minnah-Donkoh . . . . . . . . . 244

21   Cross By Ms. Mesidor . . . . . . . . . . . . 250

22   LISA STEIN

23   Direct By Ms. Krebs . . . . . . . . . . . . 254

24   Cross By Ms. Mesidor . . . . . . . . . . . . 317

25