D8snjoh1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

BRANDI JOHNSON,

                    Plaintiff,

          v.                          12 CV 4460(HB)

LISA STEIN, ROB CARMONA and
PHIL WEINBERG,

                    Defendants.

------------------------------x
                                      New York, N.Y.
                                      August 28, 2013
                                      9:45 a.m.

Before:

                    HON. HAROLD BAER, JR.,

                                        District Judge

                         APPEARANCES

PHILLIPS & PHILLIPS
        Attorneys for Plaintiff
BY:  MARJORIE MESIDOR
     ALEX UMANSKY

GORDON & REES, LLP
        Attorneys for Defendants
BY:  DIANE KREBS
     KUUKU ANGATE MINNAH-DONKOH

Also present:  Daphney Guillaume, Esq.

1                  (Trial resumed)

2                  (In open court; jury present)

3    LISA STEIN, resumed.

4                  THE COURT:  Good morning, everybody.

5                  All right.  The plaintiff is in the midst of cross.

6                  We're ready to listen.

7                  MS. MESIDOR:  Thank you, your Honor.

8    CROSS EXAMINATION (Continued)

9    BY MS. MESIDOR:

10   Q.  Ms. Stein, you realize you are still under oath, correct?

11   A.  Yes.

12   Q.  Before we parted yesterday, we were discussing the job

13   description that you had given to Ms. Johnson.  We were

14   discussing the job description that you had given Ms. Johnson

15   at the time of her interview, correct?

16   A.  I guess so, yes.

17   Q.  That job description is not the same job description that

18   is in Defendants' Exhibit G, correct?

19   A.  No.

20   Q.  Now, the job description that you gave to Ms. Johnson at

21   her interview does not mention Pathways Out of Poverty, does

22   it?

23   A.  That's not my recollection.

24   Q.  Well, let me allow you to refresh your recollection.

25                  MS. MESIDOR:  May I approach the witness?

D8snjoh1                 Stein - cross

1          THE COURT:  You may.

2          MS. MESIDOR:  Your Honor, sir?

3          THE COURT:  I said you may.  Very rarely do I speak

4     too low that people don't hear me, but indeed I am inviting

5     you.

6          MS. MESIDOR:  Your Honor, I have a copy for you as

7     well.

8          May I approach?

9          THE COURT:  I think it is in the exhibit book.  So I

10    am fine.

11         MS. MESIDOR:  Your Honor, no, it is not in the exhibit

12    book.

13         MR. MINNAH-DONKOH:  Your Honor, we may have a sidebar.

14         MS. KREBS:  May we approach and have a sidebar for a

15    moment.

16         THE COURT:  No.

17         MS. KREBS:  I guess I will object in open court.  This

18    document was never produced during discovery.

19         MS. MESIDOR:  Your Honor, I have a Bates-stamped copy

20    of the document right here.  It was produced.

21         THE COURT:  If you were going to have this concern,

22    everybody knew where you were yesterday, everybody was talking

23    about the same piece of paper or pieces of paper.  Couldn't you

24    have gotten your act together before we came to court so that

25    we don't argue before the jury.  Haven't I made that concept

D8snjoh1                    Stein - cross

1    clear to you over the last few days?  Just quietly, together,

2    see if you can work it out, and don't take any time from the

3    jury.  They are in my view national treasures.

4              THE COURT:  Ms. Stein, you realize that you are still

5    under oath to tell the truth?

6              THE WITNESS:  Yes.

7              (Counsel conferred)

8              THE COURT:  Have we resolved that issue, for the

9    moment in any event?

10              Let's go.

11   BY MS. MESIDOR:

12   Q.  Ms. Stein, I have given you a document.  Now that job

13   description is the job description that you gave Ms. Johnson,

14   isn't it?

15   A.  I don't recall.

16              THE COURT:  Can you mark it.  I don't care what you

17   mark it.  You can mark it late for lunch.  But let's have it

18   identified.  We will mark it X.  All right.  I guess there is

19   an X.

20              MS. MESIDOR:  Right.

21              THE COURT:  We will mark it XX.  Is there a XX?

22              MS. MESIDOR:  No, your Honor, there is no XX.

23              THE COURT:  Now we know what we are talking about.

24              Go ahead.

25   BY MS. MESIDOR:

D8snjoh1          Stein - cross

1  Q.  I would like the document that I just have handed to you

2  marked for identification as Exhibit XX.  Do you have the

3  document before you?

4  A.  I do.

5  Q.  That document does not say anything about the Pathways Out

6  of Poverty grant, does it?

7  A.  This document does not.

8  Q.  But this document does correctly state that Ms. Johnson

9  reports to the president, as we know that she did when she

10  commenced her employment, correct?

11  A.  That's not what this document says.

12  Q.  The document that you have before you does not say reports

13  to president?

14  A.  It does not say Brandi Johnson on it.

15  Q.  That wasn't the question that I asked you.  I asked you

16  whether this document indicates that the person who was in the

17  affiliate services coordinator position reports to the

18  president.  Is that correct?

19  A.  In this document, correct.

20  Q.  And that is the person that Ms. Johnson was reporting to at

21  the time of her hire, isn't that correct?

22  A.  Correct.

23  Q.  I would like you to take this document and compare it to

24  Defendants' Exhibit G.

25  A.  Yes.

D8snjoh1                    Stein - cross

Q.  Do you have both documents in front of you?

A.  I do.

Q.  Now, both documents say affiliate services coordinator,

correct?

A.  Correct.

Q.  One says that she reports to the fiscal department, which

is not the one that you gave her at interview, correct?

        MS. KREBS:  Objection, your Honor.  This document

isn't in evidence.  She's now discussing and describing and

continuing to describe contents of a document that is not in

evidence.

        THE COURT:  Please.

        MS. KREBS:  I apologize.

        THE COURT:  You are into this three days already.  You

want this in evidence?  Is that what you are planning to do

eventually?

        MS. MESIDOR:  Yes, your Honor.

        THE COURT:  It is in evidence.

        (Plaintiff's Exhibit XX received in evidence)

        MS. MESIDOR:  Thank you, your Honor.

        MS. KREBS:  Your Honor it is not on the exhibit list.

        THE COURT:  I don't --

        MS. MESIDOR:  Your Honor, at this time we would like

to publish the document to the jury.

        THE COURT:  Very well.

D8snjoh1                    Stein - cross

1          We went through this with you yesterday in terms of

2     of impeachment.  I guess we said we would have a little

3     discussion about impeachment after class, but we didn't get

4     around to it, but we will do it this afternoon.

5          This is perfectly reasonable impeachment activity.  It

6     can happen at any time during the course of cross-examination

7     with almost any document or a milking stool.

8          OK.  Let's go.

9     BY MS. MESIDOR:

10    Q.  Ms. Stein, do you have Exhibit G in your hand?

11    A.  Yes.

12    Q.  Exhibit G was the document that you said you did not give

13    Ms. Johnson at the time of her interview, correct?

14    A.  Correct.

15    Q.  Exhibit G does not indicate Ms. Johnson's name on it, does

16    it.

17    A.  No.

18    Q.  When you compare it to, the exhibit that has now been moved

19    into evidence Exhibit XX --

20    A.  Yes.

21    Q.  -- to Exhibit G, Exhibit XX does not say the Pathways Out

22    of Poverty grant anywhere on it, does it?

23    A.  No.

24    Q.  In fact, Exhibit XX is a lot more general than that of

25    Exhibit G, isn't it?

D8snjoh1                    Stein - cross

1    A.  Yes.

2              THE COURT:  The jury decides, just to complete the

3    story for the future.  The jury then decides whether this is

4    impeachment material or it's not impeachment material, whether

5    it's material itself or not material, and it will all come out

6    in the charge.

7    Q.  Now, Ms. Stein, I'm going to call your attention to Exhibit

8    19.  It should be in the second binder that is before you.  It

9    is already a document that's been in evidence.  Do you have it

10   before you?

11   A.  Yes.

12   Q.  Now, Exhibit 19 is Ms. Johnson's offer letter, correct?

13   A.  Yes.

14   Q.  Within that offer letter Pathways Out of Poverty again is

15   not mentioned anywhere in that offer letter, is it?

16   A.  No.

17   Q.  Prior to working at STRIVE, Ms. Johnson had no prior

18   experience with dream jobs programs, isn't that correct?

19   A.  I don't --

20             THE COURT:  To your knowledge.

21             THE WITNESS:  To my knowledge, no, I don't think so.

22   BY MS. MESIDOR:

23   Q.  In fact, isn't it true that the Pathways Out of Poverty

24   grant had already been in implementation four months before

25   Ms. Johnson was even hired?

D8snjoh1                    Stein - cross

1   A.  I think that needs some clarification.

2   Q.  I'm going to draw you to Defendants' Exhibit A, which is

3   already in evidence, that we discussed yesterday?

4   A.  OK.

5   Q.  Now, Defendants' Exhibit A is the grant notification

6   letter.  Do you see that?

7   A.  Yes.

8   Q.  Do you see the date of January 29, 2010 on there?

9   A.  Yes.

10  Q.  And that's the start date of the grant, correct?

11  A.  Yes.  Except that the notification date --

12  Q.  Move to strike.

13  A.  -- that we received this document --

14  Q.  You have answered me question.

15  A.  -- was in January.  That's when we received it.

16          MS. MESIDOR:  Your Honor.

17          THE COURT:  Ms. Stein, you really can't talk when she

18  is talking because the reporter can't take it down.  If it were

19  you and me, it would be all right, because he would take me.

20  But in this instance he really doesn't know who to take, so he

21  takes nobody.

22          THE WITNESS:  I apologize.

23          THE COURT:  Do you want to start over again.

24          MS. MESIDOR:  Sure.

25  BY MS. MESIDOR:

D8snjoh1                    Stein - cross

1   Q.  Now, the date on the grant notification letter is January

2   29, 2010, correct?

3   A.  The start of the grant term is January 29.

4   Q.  OK.  Ms. Johnson began at STRIVE May 3, 2010, isn't that

5   correct?

6   A.  Yes.

7   Q.  Now, prior to Ms. Johnson arriving at STRIVE, there was a

8   woman by the name of Jill Poklemba who was working with the

9   green grants initiative, correct?

10  A.  She was the first person in the position, correct.

11  Q.  And Ms. Jill Poklemba had already some experience in green

12  jobs training, correct?

13  A.  No.  She was a grant writer.  She had an interest and a

14  passion --

15          MS. MESIDOR:  Move to strike as nonresponsive.  There

16  is no question pending.

17  BY MS. MESIDOR:

18  Q.  Jill Poklemba was the contact person for the green

19  initiatives grant, correct?

20  A.  Because she submitted the grant online.

21  Q.  When you submitted the grant online, were you the contact

22  person?

23  A.  If I made the submission, I would be the contact person,

24  correct.

25  Q.  But Jill Poklemba was also the person that was in charge of

D8snjoh1                    Stein - cross

1    the program, isn't that correct?

2    A.  No.

3            MS. MESIDOR:  May I approach the witness, your Honor.

4            THE COURT:  You may.

5            MS. MESIDOR:  Before I do that.

6            Ms. Stein, so if I submitted to you that Jill Poklemba

7    is on every press release and every documentation from the

8    Department of Labor regarding the green jobs grant as the

9    contact person for programming, would you say that that

10   information is incorrect?

11   A.  No.  To clarify, you said that that was not incorrect.  And

12   I said no, it's not incorrect.

13   Q.  Now, you have previously testified that you never indicated

14   to Ms. Johnson that her employment was coming to an end on

15   January 28, 2012, correct?

16   A.  Yes.  That's correct.

17   Q.  In Defendants' Exhibit A, there were a series of personnel

18   that was highlighted as being under that grant, correct?

19   A.  Exhibit A is the cover letter.  It is just one page.

20   Q.  Do you remember giving prior testimony about the budget

21   chart that was attached to the grant modification letter?

22   A.  Yes.

23   Q.  Do you remember that that same budget chart had a list of

24   personnel that was being paid under that grant?

25   A.  Yes.

D8snjoh1          Stein - cross

1    Q.  And one of the personnel that was listed was the president,

2    is that correct?

3    A.  Yes.

4    Q.  After the grant was terminated, did the president take a

5    pay cut?

6    A.  No.

7    Q.  After the grant was terminated, did any of the other

8    positions that were on the grant take a pay cut?

9    A.  No.

10   Q.  The only person who was affected in terms of their salary

11   by the cutting of the grant was plaintiff, isn't that correct?

12   A.  Yes.

13   Q.  Now, you don't have anything in writing that indicates that

14   Ms. Johnson's position was 100 percent funded by the Pathways

15   Out of Poverty grant, correct?

16   A.  Can you clarify.

17   Q.  Do you have a document in writing that indicates that Ms.

18   Johnson's position was a hundred percent funded by the Pathways

19   Out of Poverty grant?

20   A.  It was the budget line in the grant that was the

21   documentation.

22   Q.  Other than the budget line in the -- let's go back to that.

23   The budget line in the grant says that the position that Ms.

24   Johnson had had an allocation of $130,000, is that correct?

25   A.  Correct.

D8snjoh1                    Stein - cross

1    Q.  It was a two-year grant, correct?

2    A.  Correct.

3    Q.  And Ms. Johnson's salary was $60,000, correct?

4    A.  Yes.

5    Q.  So for two years, $60,000, that's $120,000, correct?

6    A.  Yes.

7    Q.  So there should have been $10,000 left, correct?

8    A.  Unless we modified it, yes.

9    Q.  Now, the modification that you saw on the budget line item

10   was not a decrease, but an increase, correct?

11   A.  I would have to look at the document again.  I don't want

12   to speak from memory.

13   Q.  OK.  I'm going to ask you to go through the packet of

14   exhibits that you have before you.  I believe it's Exhibit E.

15   This is a document that's already been published to the jury.

16   A.  I know.  I am just trying to find it up here.  Hold on a

17   second.

18   Q.  It should be in the pile of documents that's directly in

19   front of you.  The binders that you have before you are only

20   plaintiff's exhibits, and Exhibit E is a defendants' exhibit.

21   A.  OK.  My apologies.

22          THE COURT:  Here.  Why don't you take mine.  Let's

23   move this along.

24          THE WITNESS:  Sorry.  OK.

25          MR. MINNAH-DONKOH:  Your Honor, just for clarification

D8snjoh1                    Stein - cross

1    I believe the Exhibit is Plaintiff's Exhibit 40.

2              THE COURT:  Well, these are defendants' exhibits.

3    That's what she meant.  I haven't looked at it so you can't

4    prove it by me.

5    A.  Just to make sure we are looking at the same thing, this

6    has a cover letter dated January 24, 2012?

7    Q.  That is correct, ma'am.

8    A.  OK.

9    Q.  Do you see the subsequent documents that you already

10   indicated were enclosures?

11   A.  Yes.  So there's the grant mod., there's --

12   Q.  And those are the budget line items.  Do you see that?

13   A.  Yes.

14   Q.  Do you see where it has the coordinator position?

15   A.  Correct.

16   Q.  It was $130,000 that was originally requested, correct?

17   A.  Correct.

18   Q.  The modification actually becomes 135-plus thousand

19   dollars, isn't that correct?

20   A.  Yes.

21   Q.  Is there anything in the document -- withdrawn.

22   A.  But remember that this grant went longer than intended.

23   Q.  There's no question pending, Ms. Stein.

24   A.  It seems factual.

25             THE COURT:  She can finish her answer, but I don't

D8snjoh1                    Stein - cross

 1    think it is vital, so let's keep going.

 2                THE WITNESS:  Thank you.

 3    BY MS. MESIDOR:

 4    Q.  Moving along, Ms. Stein.  The incident that you described

 5    in which Ms. Johnson missed a staff meeting, that was the

 6    incident regarding a participant's purported sexual harassment

 7    complaint, correct?

 8    A.  Just to clarify, this is the incident where Brandi was not

 9    at a staff meeting and I texted her?

10    Q.  Yes.

11    A.  Correct.

12    Q.  Now, STRIVE has a sexual harassment policy, correct?

13    A.  Yes.

14    Q.  Compliance with that sexual harassment policy is important,

15    correct?

16    A.  Absolutely.

17    Q.  In fact, antisexual harassment and discrimination policies

18    are actually prerequisite of the Pathways Out of Poverty grant,

19    isn't it?

20    A.  Absolutely.

21    Q.  So when a participant complains about possible sexual

22    harassment, that is a potential red flag if there was actually

23    a violation, isn't it?

24    A.  Yes.

25    Q.  That potential red flag could actually cost you funding,

D8snjoh1                    Stein - cross

1    couldn't it?

2    A.   Yes.

3    Q.   So Ms. Johnson was in fact being prudent by highlighting

4    the situation to upper management, correct?

5              MS. KREBS:  Objection.

6              THE COURT:  If you know, you can answer.  If you don't

7    know, you can't answer.

8    A.   Again, as I indicated and testified earlier, in that

9    particular situation she did have the opportunity to make a

10   complaint and didn't file one in writing.

11   Q.   But that was something that was subsequent to Ms. Johnson

12   bringing the situation to the attention of managers, isn't that

13   correct?

14   A.   At the time the situation was brought --

15   Q.   Please answer my question, Ms. Stein.

16   A.   The context is pretty important to the answer.

17   Q.   The question is a yes-or-no answer.  The fact that the

18   complainant did not make a written complaint, isn't that

19   something that happened after the fact that Ms. Johnson brought

20   the issue to the attention of management?

21   A.   Yes.

22   Q.   OK.  Moving along to the situation with Dwayne Hubbard.

23   Yesterday you gave us an account that you had a meeting with

24   Mr. Carmona and Mr. Hubbard, correct?

25   A.   Correct.

D8snjoh1                    Stein - cross

1    Q.  And that during that meeting Mr. Carmona and Mr. Hubbard

2    were talking about Mr. Hubbard's relapse, and you exited that

3    meeting, is that correct?

4    A.  Yes.

5    Q.  Do you recall being deposed in this matter?

6    A.  Yes.

7    Q.  During that deposition you gave a completely different

8    account, isn't that correct?

9         THE COURT:  Please.  If you have it, don't

10   characterize it, unless you want to testify under oath.  You

11   have it in front of you.  Tell her or ask her if she made these

12   answers to these questions.

13        MS. MESIDOR:  I am going to call your attention to

14   page 177, lines 11 through 16 in your deposition.

15   A.  OK.  Where would I find that document.

16        THE COURT:  She's going to produce it.  Or she's going

17   to read it to you without producing it and simply ask you

18   whether or not you made these answers to these questions.

19   Q.  It is Exhibit 5 that is before you.  The lines again are

20   177, lines 11 through 16.  You were under oath during this

21   deposition just like you are today, correct?

22   A.  Yes.

23   Q.  Were you not asked the following questions and give the

24   following response.

25   A.  Could I please have a minute to get to the same place that

D8snjoh1                    Stein - cross

1   you are.

2   Q.  I am going to read it to you.

3   A.  I would like to see it.

4   Q.  177, line 11.

5   A.  OK.

6   Q.  "I don't know if you responded to this already, and if you

7   did my apologies.  Do you know who Mr. Carmona was speaking to

8   when he was being loud?

9   "A.  I really can't recall at this point in time."

10              Were you asked that following question and did you

11  give that following answer?

12  A.  Yes, if that's what's in the transcript.

13  Q.  This was the same day that you testified that you could

14  hear quote-unquote loudness coming from Mr. Carmona's office,

15  correct?

16  A.  Yes.

17  Q.  And after the loudness, Ms. Johnson came to you in tears

18  about how Mr. Carmona treated her, correct?

19  A.  Yes.  I can't have the piece of paper in front of me.  The

20  binder is too thick.  The pages won't move.

21  Q.  Moving along, yesterday you gave some testimony regarding a

22  tough love, no excuses approach that STRIVE takes, correct?

23  A.  Correct.

24  Q.  Isn't that tough love no excuses approach limited to just

25  the participants?

D8snjoh1                    Stein - cross

1    A.  I would say that it is part of the organizational culture

2    as well.

3    Q.  So the tough love no excuses approach that you indicated

4    that was part of the organizational culture, does that include

5    being called a nigger?

6            MS. KREBS:  Objection.

7            THE COURT:  Overruled.

8    A.  I think I need you to break that question down.  It

9    requires a little bit more context.

10   Q.  I gave you the context.  The tough love, no excuses

11   approach, as it relates to staff, does that include being

12   called a nigger?

13   A.  If the term was being used with derogatory intent, then

14   that would not be part of the tough love culture.

15   Q.  But not only just derogatory intent, but also perceived

16   derogatory indent, isn't that correct?

17   A.  Again, I think it would depend on the situation.

18   Q.  I am going to call your attention back to your deposition.

19   Page 157, line 19.

20   A.  Again, I can't get to and read along with you on the pages.

21   Q.  I am going to read it to you, Ms. Stein.

22   A.  Thank you.

23   Q.  Page 157, line 19, were you not asked the following

24   questions and did you not give the following response:

25           "Sure and I understand that.  Now, the very elaborate

D8snjoh1          Stein - cross

1    scenario that you just gave, participants speaking to them at

2    their own level and an employee reiterating what happened in a

3    participant meeting to a supervisor is not the context I was

4    discussing."

5            MS. KREBS:  I'm sorry, your Honor.  I apologize.  But

6    I object.  Before she reads it into the record, this is not an

7    excerpt that is impeaching of the answer that the witness just

8    gave.

9            MS. MESIDOR:  Your Honor, how could counsel possibly

10   know that until I finish reading it.

11           MS. KREBS:  Because I have it in front of me.

12           THE COURT:  It's really a jury question as to whether

13   that indeed impeaches the testimony of the witness or not.

14   Obviously, don't read something that has nothing to do with

15   what the questions are.  But they have to decide what its

16   weight is, if it has any weight.  Thank you very much.

17           MS. MESIDOR:  If I may continue, your Honor?

18           THE COURT:  You may.  But be careful, because we're

19   really going far afield from what I think might be relevant

20   here.

21           MS. MESIDOR:  I understand that, your Honor.

22   Q.  Continuing:  "The context is, that I was discussing is

23   supervisor employee in an office, not discussing participants.

24   Supervisor discussing the employee's behavior and the

25   supervisor calling the employees a nigger.  Would that be

D8snjoh1                    Stein - cross

1    violative of STRIVE's policies and procedures?"

2              And did you not give the following answer:

3              "If the intent and context of this use of the word,

4    was either intended as derogatory or perceived as derogatory,

5    then, yes."

6              Did you not give that hear that following --

7              THE COURT:  Did you make that answer to that question.

8    That is all you need to say.

9    Q.  Did you make that answer to that question?

10   A.  Yes.

11   Q.  Is calling people dumb as shit part of STRIVE's tough love?

12             THE COURT:  I think she's testified that it was sort

13   of the culture of this operation.  I am not sure whether or not

14   going through each and every item and language or piece of

15   language is really going to be valuable to anybody, but that's

16   what you are doing.  So let's move on.

17   BY MS. MESIDOR:

18   Q.  Now, STRIVE's antidiscrimination policy prohibits the use

19   of racial slurs, correct?

20   A.  Correct.

21   Q.  And nigger is a racial slur, correct?

22   A.  It can be a racial slur, correct.

23   Q.  Moving along to the Christina Saenz situation.  You

24   indicated that Exhibit L, which is already in evidence and

25   which has been produced to the jury, was given both to

1  Ms. Johnson and Ms. Saenz, isn't that correct?

2  A.  Yes.

3  Q.  And it is your testimony that there was no differentiation

4  between what was given to Ms. Saenz as it related to her and

5  that which was given to Ms. Johnson as it related to her,

6  correct?

7  A.  Correct.

8  Q.  But we don't have a copy of Ms. Saenz' writeup, do we?

9  A.  I can't answer that question.

10  Q.  Do you have a copy of Ms. Saenz's writeup with you here

11  today?

12  A.  I do not.

13  Q.  Now, the account that you gave us yesterday was that this

14  writeup was precipitated by Ms. Johnson ordering somebody to

15  lock Ms. Saenz out of a particular database, is that correct?

16  A.  It was sort of the straw that broke the camel's back in the

17  chain of events.

18  Q.  But this drama that you describe, you were not even there

19  for it, were you?

20  A.  Which drama?

21  Q.  The drama that broke the camel's back, so to speak?

22  A.  Again, I am going to ask you to specify.

23  Q.  OK.  You previously indicated that this was the incident

24  that broke the camel's back, correct?

25  A.  Correct.

D8snjoh1                    Stein - cross

1    Q.  When the incident occurred between Ms. Johnson and

2    Ms. Saenz, you were not there, isn't that correct?

3    A.  In particular, to clarify, you are specifying this incident

4    in January, correct?

5    Q.  Correct.  Not in January -- right, that's correct.

6    A.  Which is it?  I'm confused.

7    Q.  No, I was correcting myself.  In January.

8    A.  Yes.  I was in the office in January.

9    Q.  Prior to your testimony yesterday you had indicated that it

10   was indeed another situation that precipitated the writeup of

11   Ms. Saenz and Ms. Johnson, isn't that correct?

12   A.  It was continual ongoing behavior.

13   Q.  I am going to draw your attention to your deposition again,

14   page 100, line 24.

15          My apologies, page 104, line 16.  Were you not asked

16   the following question and did you not give the following

17   answer:

18   "Q.  When you became informed of the incident of drama between

19   Ms. Saenz and Ms. Johnson, did you speak to Ms. Saenz?

20   "A.  So when I came back to the office from being away, I spoke

21   to both of them because there was an analysis that needed to be

22   done and we needed to submit something, and I was disappointed

23   that there seemed to have been more time disagreeing amongst

24   themselves about how to proceed versus following the

25   instructions that I had clearly given to everybody.

D8snjoh1                    Stein - cross

1    "Q.  Did that culminate in the memo that you previously

2    testified to?

3    "A.  Not this alone.

4    "Q.  I understand that it was not this alone.  Did the memo

5    that you previously testified to, was it a culmination of all

6    of what you just indicated?

7    "A.  Yes.  And including that each had sworn to me that they

8    had a conversation and they were good and it was the end of the

9    year and it was holiday time and in the spirit of the holidays

10   they had made a resolution they were going to work better

11   together and like that, and it didn't last."

12          Was that the questions that you were asked and the

13   answers that you had given?

14   A.  Yes, but it is important to clarify.  Like, as my statement

15   indicated, that was in December before the holidays.

16   Q.  Ms. Stein, there is no question pending.

17   A.  I apologize.  The question was -- I'm sorry, your Honor.

18          THE COURT:  I am going to let her finish her answer.

19          MS. MESIDOR:  OK.

20   A.  I was out of the country at the time that the e-mail dated

21   in December was written.  I was back in the office.  The

22   incident that you are referring to with Ms. Graham was in

23   January.  So time and context is critically important in the

24   chronology.

25   Q.  But, Ms. Stein, the incident that you gave with Ms. Johnson

D8snjoh1          Stein - cross

1   and with Ms. Saenz was never brought up anywhere in your

2   deposition, was it?

3   A.  I didn't control the questions in my deposition.

4   Q.  But I certainly did ask you about the situation that

5   predicated the creation of the memo, did I not?

6           MS. KREBS:  Objection, your Honor.

7           THE COURT:  Overruled.

8   A.  Again, I indicated that it is an accumulation.

9   Q.  Yes or no, Ms. Stein.

10  A.  I am not sure it is a yes-or-no question.

11  Q.  The question was, did I not ask you what were the incidents

12  that predicated the memorandum that was placed in both

13  Ms. Saenz's and Ms. Johnson's personnel file?

14  A.  That is what you asked.

15  Q.  OK.  Now Exhibit, L which is the actual memorandum that was

16  placed in Ms. Brandi Johnson's personnel file, nowhere in that

17  exhibit does it say anything about Ms. Johnson locking

18  Ms. Saenz out of the database, does it?

19  A.  There is no specific incident listed at all.

20  Q.  However, on the second page of that exhibit, it does list a

21  very detailed code of conduct that was supposed to take place

22  with Ms. Saenz and Ms. Johnson, isn't that correct?

23  A.  Yes.

24  Q.  Nowhere in that detailed code of conduct does it mention

25  anything about locking somebody out of a database, isn't that

D8snjoh1          Stein - cross

1  correct?

2  A.  No, it does not.

3  Q.  Moving right along --

4          THE COURT:  That is refreshing.

5          MS. MESIDOR:  I'm sorry, your Honor?

6          THE COURT:  I said that's refreshing.

7          MS. MESIDOR:  I'm learning, Judge.

8  Q.  Ms. Stein, now you were present when Mr. Carmona slammed

9  the door in Ms. Johnson's face, correct?

10  A.  I wouldn't characterize it like that.

11  Q.  Were you present in an incident when Ms. Johnson approached

12  the door of your office and knocked on it?

13  A.  Yes.

14  Q.  And after she knocked on it, didn't Mr. Weinberg tell

15  Ms. Johnson to come in?

16  A.  I am not sure if that was exactly what was said.

17  Q.  Well, let me refresh your recollection.  Going to your

18  deposition again, page 136, line 20.

19  A.  I can't --

20  Q.  136 beginning at line 20:

21          MS. KREBS:  Excuse me, your Honor.  May we approach

22  and take the binder and take out her deposition transcript so

23  that she can have it in front of her when portions are read?

24          THE COURT:  She's welcome to have one if she needs it.

25  Even I am welcome to have one, but I don't have one either.

D8snjoh1                    Stein - cross

1          MS. MESIDOR:  Your Honor, it is Exhibit 5 in

2     plaintiff's binder.

3          THE COURT:  I just don't have the transcript of the

4     deposition.

5          MS. MESIDOR:  Yes, that's the transcript.  It's

6     Plaintiff's Exhibit 5, Lisa Stein's deposition.

7     BY MS. MESIDOR:

8     Q.  When you were deposed, you had previously indicated that

9     when Ms. Johnson knocked on the door that you had indicated

10    that you were in a meeting, is that correct?

11    A.  That's what I recalled, correct.

12    Q.  But that is not exactly what took place, is it?

13    A.  That is what I recalled in my deposition.

14    Q.  OK.  Now, going to page 136, line 20 to 25 --

15         MS. KREBS:  Your Honor, may I just ask that we wait

16    one moment while we give her the transcript.

17         THE COURT:  Absolutely.  She certainly asked you.

18         THE WITNESS:  Thank you.

19         MS. KREBS:  You're welcome.

20    BY MS. MESIDOR:

21    Q.  Ms. Stein, do you have a different recollection today than

22    you did at your deposition as to whether or not you had said we

23    are in a meeting?

24    A.  Can you please just give me the page number.  I apologize.

25    Q.  My question to you does not have to do -- I'm asking you,

D8snjoh1              Stein - cross

1    do you have a different recollection?  You just testified that

2    your recollection at the deposition was that when Ms. Johnson

3    knocked on the door that you said that you were in a meeting,

4    correct?

5    A.   Correct.

6    Q.   I'm asking you today --

7    A.   I'm simply asking for a reference of a page you're

8    referring to.

9    Q.   I'm not there yet.

10   A.   OK.

11   Q.   OK.  Now, I'm asking you, do you have a different

12   recollection today than what you had at your deposition as to a

13   response when Ms. Johnson knocked on the door?

14   A.   I am not sure what you mean by a different recollection.

15   Q.   Do you still maintain that when Ms. Johnson knocked on the

16   door that you said that you were in a meeting?

17   A.   I don't because you produced a tape that I was unaware of.

18   Q.   On that tape, nowhere does it indicate anyone saying to

19   Ms. Johnson after she knocked on the door that the two of you

20   were in a meeting, correct?

21   A.   Correct.

22   Q.   At one point Ms. Johnson opened the door, correct?

23   A.   Yes.

24   Q.   When Ms. Johnson opened the door, she said that she needed

25   to speak to you regarding an incident that just happened with

D8snjoh1                    Stein - cross

1    Jamar Cooks, isn't that correct?

2    A.  She was looking at Phil and speaking to Phil and not to me.

3    Q.  When I said you I meant in quotes?

4    A.  I am not sure what that means.

5    Q.  OK.  But she said it, isn't that true?

6    A.  To whom?

7    Q.  Now we are up to did she actually say it?

8    A.  Yes, that is what she said.

9    Q.  OK.  And in response to that, Mr. Carmona says, No, you do

10   not, isn't that correct?

11   A.  As I recall, that is what is on the tape, correct.

12   Q.  OK.  To which Ms. Johnson says, Don't close the door on me,

13   correct?

14   A.  To the best of my recollection of the tape, correct.

15   Q.  Then on the tape we hear the door close, isn't that

16   correct?

17   A.  Correct.

18   Q.  You did nothing, correct?

19   A.  No, I guess not.

20   Q.  By that time, Ms. Johnson had already filed a complaint

21   against you, correct?

22   A.  I believe so, yes.

23   Q.  Moving along, yesterday you testified that there was a time

24   after the January 27, 2012 memo that you indicated that you

25   were going to terminate Brandi, is that correct?

D8snjoh1          Stein - cross

1   A.  I'm sorry.  Can you clarify the question.

2   Q.  Sure.  Do you know the memo that I'm referring to, the

3   disciplinary memo?

4   A.  Are you referring to this, Exhibit L?

5   Q.  Yes.

6   A.  Yes.  In that memo it indicates disciplinary action up and

7   to termination.

8   Q.  That wasn't the question that I was asking.  What I was

9   asking you is yesterday during your direct examination you were

10  asked whether, prior to Ms. Johnson being terminated in June

11  2013, whether you had contemplated terminating Ms. Johnson,

12  correct?

13          MS. KREBS:  Objection, June 2013.

14          MS. MESIDOR:  Sorry, June 2012.  Apologies.

15  A.  Again I am not understanding what you're asking me.

16  Q.  OK.  Prior to June 2012 you previously testified that you

17  had considered terminating Ms. Johnson, isn't that correct?

18  A.  At the time of this memo we had a discussion, and

19  Ms. Johnson indicated that she was tired of hearing this

20  feedback and having this discussion and she had other job

21  offers and she didn't need this.

22  Q.  OK.  So it wasn't you that was contemplating terminating

23  Ms. Johnson; it was Ms. Johnson contemplating resigning.

24  Correct?

25  A.  Ms. Johnson indicated that possibility, yes.

D8snjoh1              Stein - cross

1  Q.  OK.  Now, at some point in April or May, Mr. Weinberg had a

2  conversation with you regarding the ending of Ms. Johnson's

3  position, isn't that correct?

4              THE COURT:  What year?

5              MS. MESIDOR:  2012, your Honor.

6              THE COURT:  It is helpful if you give years when we

7  have dates that go into each year.

8              MS. MESIDOR:  Apologies, your Honor.

9  A.  Mr. Weinberg asked me for some historical data and what we

10  had done when we had closed previous federal grants.

11  Q.  That was in direct relation to Ms. Johnson's position,

12  isn't that correct?

13  A.  It was in reference to when there was a position a hundred

14  percent funded.

15  Q.  Now, other than Ms. Johnson, was there anyone else at

16  STRIVE whose position was 100 percent funded purporting by a

17  grant at the time Mr. Weinberg asked you this question?

18              THE COURT:  Sustained.  Don't even answer the

19  question.

20              MS. MESIDOR:  Your Honor, I'm sorry?

21              THE COURT:  I sustained the objection because it's

22  bean asked and answered, and we're trying this case once.  I

23  mean the effort has been to try the case once, my effort.

24  BY MS. MESIDOR:

25  Q.  At the time that Mr. Carmona had the discussion with you

D8snjoh1              Stein - cross

1   about what happens with a person who is a hundred percent

2   funded by the grant, that was approximately around April or May

3   of 2012, correct?

4          MS. KREBS:  Objection.  She said Mr. Carmona?

5          MS. MESIDOR:  I'm sorry.  Mr. Weinberg.

6   A.  Can you repeat the question.

7   Q.  Sure.  When you had the conversation with Mr. Weinberg

8   about what happens when somebody who is a hundred percent

9   funded by a grant and that grant ends, what happens, that is a

10  conversation that took place in around April or May of 2012,

11  correct?

12  A.  Correct.

13  Q.  By that time you had already been notified that Ms. Johnson

14  had a complaint against you and Mr. Carmona, correct?

15  A.  Correct.

16  Q.  Now, this lawsuit was actually files on June 7, 2012, isn't

17  that correct?

18  A.  I think --

19          MS. KREBS:  Objection.

20          THE COURT:  If you remember.

21          MS. MESIDOR:  If you recall.

22  A.  I think I would need more specificity.  There were

23  obviously some stages of the complaints.

24  Q.  OK.

25  A.  So that's just --

D8snjoh1                    Stein - cross

1   Q.  Let me refresh your recollection.  Go to Plaintiff's

2   Exhibit 9.

3          MS. KREBS:  Your Honor, objection.  Relevance.

4          THE COURT:  We'll accept your view.  Let's move on.

5          MS. MESIDOR:  OK.

6   BY MS. MESIDOR:

7   Q.  I'm going to represent to you that this lawsuit was filed

8   on June 7, 2012.  OK?

9   A.  OK.

10  Q.  And Ms. Johnson was terminated June 11, 2012, isn't that

11  correct?

12  A.  Yes.

13  Q.  Just four days later, correct?

14  A.  Yes.

15  Q.  Ms. Johnson was not terminated for poor performance, was

16  she?

17  A.  No.

18  Q.  After Ms. Johnson was terminated, STRIVE posted a position

19  that was substantially similar to the one that Ms. Johnson had,

20  isn't that correct?

21  A.  No.

22          MS. MESIDOR:  May I approach the witness, your Honor?

23          THE COURT:  You may.

24          MS. MESIDOR:  Your Honor, I have a copy for you as

25  well.

D8snjoh1                    Stein - cross

1    BY MS. MESIDOR:

2    Q.  I have a document for identification purposes only I am

3    going to refer to as Exhibit YY.  Do you have the document

4    before you, Ms. Stein?

5    A.  Yes, I do.

6    Q.  Now I want you to compare that to the previous document

7    that I had given you, Exhibit XX.

8    A.  OK.

9    Q.  Now, Ms. Stein, when you do a comparison of the document

10   that I have previously marked as Exhibit YY -- which is a

11   posting of an idealist position dated August 14, 2012 from

12   STRIVE, correct?

13   A.  I'm sorry.  I was reading the document.  I apologize.

14   Q.  Exhibit YY.

15   A.  Can you repeat.  Which one is YY?

16   Q.  The one that looks like this one.

17   A.  This one.

18   Q.  Do you see?

19   A.  The idealist, OK.

20   Q.  It is an idealist posting, correct?

21   A.  Yes.

22   Q.  It was posted on August 14, 2012, correct?

23   A.  Yes.

24   Q.  Just a month after Ms. Johnson was terminated, isn't that

25   correct?

D8snjoh1               Stein - cross

1    A.  A little longer than that.

2    Q.  When you compare that idealist posting to Exhibit XX, which

3    I previously gave to you?

4    A.  Yes.

5    Q.  Do you see that?

6    A.  Yes.

7    Q.  They are substantially similar, aren't they, in terms of

8    the duties and responsibilities?

9    A.  I think I would ask you to be specific because I think

10   there is some distinct differences.

11   Q.  Would you like me to go through line by line with you?

12   A.  I could highlight what I think is significantly different.

13   Q.  I submit to you that there are one, two, three, four, five,

14   six, seven, eight bullet points on the job duties list --

15        MS. KREBS:  Objection, your Honor.

16   Q.  -- that is on the document marked for identification YY,

17   correct?

18        THE COURT:  I don't think we ought to spend this much

19   time on this.  Why don't you put it in evidence and the jury

20   can make their own decision.

21        MS. MESIDOR:  Your Honor, we would like to move

22   Exhibit YY into evidence.

23        THE COURT:  Without objection I presume, but if there

24   is an objection it's overruled, YY will be admitted and XX will

25   be admitted.

D8snjoh1                    Stein - cross

1          (Plaintiff's Exhibit YY received in evidence)

2          MS. MESIDOR:  Your Honor, I'm producing document over

3    to the jury?

4          THE COURT:  But you keep asking questions.

5          MS. MESIDOR:  OK.

6          THE COURT:  Not too many either.

7          MS. MESIDOR:  Understood, your Honor.

8          THE COURT:  Do you have a question?

9          MS. MESIDOR:  Yes, I do, your Honor.

10         THE COURT:  Will you put it.

11         MS. MESIDOR:  Thank you.

12   BY MS. MESIDOR:

13   Q.  Moving away from these two documents, Ms. Stein.

14   A.  Uh-huh.

15   Q.  Now that both documents are in evidence and the jury has

16   both documents, they can compare and contrast the two.

17         MS. KREBS:  Objection, your Honor.

18         MS. MESIDOR:  Moving along.

19         THE COURT:  Yes.  We are moving along.  Please just

20   ask questions.  It's really enough of a job for you.

21         If you have any more.  But if you don't, none of us

22   will be unhappy.

23         MS. MESIDOR:  I am just reviewing my notes, your

24   Honor.  I may be completed.

25         I have no further questions for this witness, your

1   Honor.

2               THE COURT:  Do you have any brief redirect?

3               MS. KREBS:  I have some redirect, your Honor.  Thank

4   you.

5   REDIRECT EXAMINATION

6   BY MS. KREBS:

7   Q.  Good morning, Ms. Stein.

8   A.  Good morning.

9   Q.  You testified on cross that you did not specifically tell

10  Ms. Johnson that the date of her ending her employment was

11  either January 28, 2012 or June 30, 2012.  Do you recall that

12  testimony?

13  A.  Yes.

14  Q.  But without identifying those specific dates, had you told

15  her that her term of employment was tied to, connected to the

16  grant?

17  A.  Ms. Johnson was clearly aware that her position was 100

18  percent funded by the grant.

19  Q.  You testified on cross that you did not, in response to a

20  specific question about the original job description, that you

21  had not produced one during discovery.  Do you still have a

22  copy of that?

23  A.  Job descriptions would evolve over time.  I would usually

24  go in and edit a document and save it, and I didn't necessarily

25  have a need to save previous versions.

D8snjoh1              Stein - redirect

1            However, what I find interesting --

2            THE COURT:  Please.

3            THE WITNESS:  No, I --

4            MS. MESIDOR:  Objection.

5            THE COURT:  There's no question pending.

6            THE WITNESS:  OK.

7            THE COURT:  This woman has been asking question for

8    years.  She knows how to ask questions.  She is going to ask

9    you some more.

10            THE WITNESS:  All right.  It sounds like a plan.

11   Q.  I would like you to turn to Exhibit H, which is the

12   performance evaluation that was dated September 15, 2010.

13            MS. MESIDOR:  Objection, your Honor.  Outside the

14   scope of cross.

15            MS. KREBS:  No, it's not, your Honor.  I'm directly

16   responding to one of the points that she made, and I will show

17   that in a moment, your Honor.

18            THE COURT:  I wish you would all just let me do my

19   job.  I know it is a little one, like I told the witness

20   yesterday, but whatever it is, your tax dollars are paying for

21   it.  You wouldn't want them to go to waste, right?  You

22   referred her to H?

23            MS. KREBS:  Yes, your Honor.

24            THE COURT:  And the question is?

25   Q.  Do you recall in your testimony on cross that you were

1   asked about a rating of a 3 under point number one accuracy and

2   thoroughness of work?

3   A.   Yes.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D8snjoh1                    Stein - redirect

1    BY MS. KREBS:

2    Q.  Do you recall that that was asked of you in the context of

3    your comment about the rewriting of narratives by Ms. Johnson?

4            MS. MESIDOR:  Objection.

5            THE COURT:  I will let you answer it, but one more

6    leading question and your examination is over.

7            MS. KREBS:  Yes, your Honor.

8    A.  Yes.

9    Q.  Can you identify, if at all, any other location in this

10   document discussing narratives?

11   A.  Yes.  If you go to Bullet 4 under Organizational Skills, a

12   rating of two is provided and a narrative stating:  In

13   preparation of quarterly reporting the same issue has also

14   occurred.  The final review and editing taking place on the day

15   the report is due.  Pieces of the report can be done in advance

16   and reviewed so that when we final data from other entities is

17   being reviewed at the last minute.

18   Q.  Thank you.  You can put that document away.

19           With respect to the questions regarding the

20   notification of the grant, when did STRIVE actually receive

21   notification of the grant?

22           MS. MESIDOR:  Objection, your Honor.  Outside --

23           THE COURT:  Overruled.

24   A.  Can you specify which grant?

25   Q.  I apologize.  The Pathways Out of Property grant, the one

1   that had the initiation date of January 28th, 2010.

2   A.   If you look at the date of the grant officer who signed and

3   authorized the funding, it is February 19th.  So I can't recall

4   the exact day, but it would be some time after that date that

5   we received notification and then it takes a couple of weeks

6   you have to execute your contract, you have to set up your bank

7   account for funds to draw.  It takes about three weeks, four

8   weeks to get operational.  So, in fact, I would say that we did

9   not start operations --

10          MS. MESIDOR:  Objection, move to strike.

11  A.   -- until about March.

12          THE COURT:  It seems to me that we have heard most of

13  this before, which is really what I try desperately not to have

14  happen.  I will sustain the objection.  Strike the answer.

15  Q.   Do you recall being asked about a woman by the name of Jill

16  Poklemba?

17  A.   Yes.

18  Q.   When Ms. Poklemba was originally with STRIVE prior to the

19  grant being granted, what was her position?

20  A.   Development.

21  Q.   What does that mean?

22  A.   Grant writing.

23  Q.   Prior to the grant, the Pathways grant being granted, what,

24  if any, involvement did she have with that process?

25  A.   To clarify, grant writing?

1    Q.  With respect specifically to the Pathways grant?

2    A.  She took the lead in writing the application to the

3    Department of Labor and working with everyone who needed to

4    produce some piece for that document and she submitted online

5    an assistant called Grant.gov and when you submit online, you

6    are listed as the contact.  I think they call it, yeah, the

7    program contact.

8    Q.  Subsequent to the grant being approved what, if any,

9    changes occurred with respect to Ms. Poklemba?

10   A.  To clarify, before the grant was approved?

11   Q.  Upon the grant being approved.

12   A.  Ms. Poklemba was offered the position of affiliate services

13   coordinator.

14   Q.  Did she accept?

15   A.  Yes.

16   Q.  And what occurred with that?

17   A.  She began and about three or four weeks into that new

18   position, she resigned from the organization.

19   Q.  I don't want to go through everything before, but at that

20   point is that where the search began that resulted in

21   Ms. Johnson?

22              MS. MESIDOR:  Objection.

23              THE COURT:  Sustained.

24   Q.  With respect to your deposition testimony about the

25   incident regarding Dwayne Hubbard where you testified that you

D8snjoh1              Stein - redirect

1      didn't recall who was in the office at the time, was that --

2                MS. MESIDOR:  Objection.

3                THE COURT:  Overruled.

4      Q.  -- was that your truthful testimony at the time you gave it

5      in the deposition?

6      A.  Yes.

7      Q.  What, if anything, has refreshed your recollection with

8      respect to that incident?

9      A.  The discussions that have been subsequent to the

10     proceedings that we have seen here this week.

11     Q.  With respect to Exhibit L that opposing counsel showed you

12     with the January 27th, 2012 writeup to Ms. Johnson --

13     A.  Yes.

14     Q.  -- can you please identify where, if at all, there is a

15     mention of an incident that occurred in January as opposed to

16     the incident that occurred in December?

17               MS. MESIDOR:  Objection, your Honor.

18               THE COURT:  Overruled.

19     A.  I don't see a specific listing of the incident.

20     Q.  I apologize.  Not description of the incident, but the fact

21     that there was an incident that occurred in January looking at

22     the first page and first paragraph.

23               MS. MESIDOR:  Objection, your Honor.

24               THE COURT:  I will allow it.

25     A.  Can you clarify the question, please?

D8snjoh1                    Stein - redirect

1    Q.  I would ask you to demonstrate or to identify for the jury

2    where, if at all, in this document you mention there was

3    another incident that occurred in January as opposed to the

4    incident that you were asked about before December?

5              THE COURT:  How is she going to demonstrate that?

6    A.  End of paragraph one.

7              THE COURT:  When I am talking, you don't talk.

8              THE WITNESS:  Sorry.

9              THE COURT:  She can't really get it.  So it is useful.

10   It is like an exercise in futility.  It is not that I care.

11   You can talk over me any time you want, but we're not going to

12   have a record.  There is no sense of you talking over me

13   because there will not be any record.

14             Is that perfectly clear?

15             THE WITNESS:  I got it.

16             THE COURT:  Let's start again.

17             MS. KREBS:  Your Honor, would you like me to restate

18   my question?

19             THE COURT:  Please.

20             MS. KREBS:  Thank you, your Honor.

21   BY MS. KREBS:

22   Q.  Please identify or point out to the jury where, if at all,

23   in this document does it indicate that there was another

24   incident that occurred in January as opposed to the incident

25   that you described previously in December?

1          MS. MESIDOR:  Objection.

2          THE COURT:  You have an objection.  You don't need to

3    have two objections to the same question.  You would be

4    embarrassed in front of the Court of Appeals if they were to

5    see that.  They would think that you figured they could not

6    read it the first time.

7          You can answer if you have a recollection now of the

8    question since we talked about it.

9    A.  The last sentence of the first paragraph in the cover of

10   the memo.

11         THE COURT:  Everybody has a copy I suppose so you can

12   read it if you like.

13   A.  However, on January 25th there was another incident that

14   demonstrated a continued inability to maintain this as a status

15   quo.

16   Q.  Turning your attention to the portion of your testimony on

17   cross-examination about the incident where there was a meeting

18   and the door was closed when Ms. Johnson came to that meeting.

19   Directing your attention to that incident what, if anything, do

20   you recall being told to Ms. Johnson in response to her wanting

21   to come in and talk to Mr. Weinberg?

22   A.  I am not sure what you are asking.

23   Q.  Let me restate.  In terms of the conversation that occurred

24   when Ms. Johnson opened the door what, if anything, do you

25   recall being told to her in response to her statement that she

D8snjoh1                    Stein - redirect

1    wanted to speak to Mr. Weinberg at that time?

2    A.  I mean, I recall Phil indicating to her he would speak to

3    her afterwards.

4    Q.  Do you recall any mention of the purpose of why the three

5    of you were in that office at that time?

6    A.  I recall indicating we were in a meeting.

7    Q.  Ms. Sharp used the word "slam" when talking about the door

8    closing.  What is your recollection as to how the door was

9    closed?

10   A.  Rob closed the door.

11   Q.  And in terms of the strength or force of the door closing,

12   could you please identify your recollection of that?

13              THE COURT:  You know, this is all material you could

14   is elicited on direct.  That is not what redirect is about.

15              MS. KREBS:  Actually, your Honor, this is one of the

16   incidents that your Honor did not allow me to ask.

17              THE COURT:  Oh, no.  I have heard about the door

18   closing from the first opening statement I think.

19              MS. KREBS:  Yes.  But you had told me respectfully,

20   your Honor, that I could not ask.

21              THE COURT:  You had enough to do it already.  We just

22   don't need it two or three different times.  My view, which may

23   differ from yours, is that we have heard this testimony about

24   the door slamming the relevance of which in any event in my

25   view is minimal.  But that is not my task happily.  That is

1   your task.

2   BY MS. KREBS:

3   Q.  During your cross-examination you were asked about an

4   indication of the Pathways Out of Property grant in materials

5   that were provided to Ms. Johnson at or around the time of her

6   hire.  Do you recall that line of questioning?

7   A.  Can you specify, please?

8   Q.  Yes.  Do you recall that you were asked questions about

9   documents such as the job description that were provided to

10  Ms. Johnson at or around the time of her hire and asked

11  questions about the contents relating to the Pathways grant do

12  you recall that section of questioning?

13  A.  Yes.

14  Q.  I would like you to look at Defendant's Exhibit U.

15  A.  Yes.

16  Q.  Just for the record this is an e-mail that you sent to

17  Ms. Johnson prior to her actual start date?

18  A.  Yes.

19  Q.  Welcoming her to the organization?

20  A.  Yes.

21  Q.  I would like you to look at the last sentence in the short

22  paragraph that is the content.  Could you read that aloud,

23  please?

24  A.  We look forward to seeing you on the 3rd and I will send

25  you some program background next week.

D8snjoh1          Stein - redirect

1   Q.  What is program background?  What did program background

2   refer to when you were referring to it there?

3          MS. MESIDOR:  Objection.

4          THE COURT:  Sustained.  Did you introduce this letter

5   on your direct testimony?

6          MS. KREBS:  I did not.  It was actually introduced on

7   plaintiff's testimony.

8          THE COURT:  It is in evidence, right?

9          MS. KREBS:  It is.

10          THE COURT:  Somebody has read it or at least the jury

11   has read it?

12          MS. KREBS:  Yes, your Honor.

13          THE COURT:  If you think you need to figure out what

14   it is that the program -- overruled.  You can ask the question.

15          MS. KREBS:  Thank you.

16          THE COURT:  Tell us what program material is.

17          THE WITNESS:  I sent the program narrative.

18   BY MS. KREBS:

19   Q.  When you say "program," which program?

20   A.  Pathways Out of Property narrative.

21   Q.  During your cross-examination you were asked about the

22   posting that has now been entered into evidence as Exhibit YY

23   for the job of program director at STRIVE.

24   A.  Correct.

25   Q.  Could you please describe what that posting was -- what

1    that job was about?

2              THE COURT:  Do you have that in front of you?

3              THE WITNESS:  I do.

4    A.  This position was specific to a new initiative to work with

5    juvenile offenders, which means specifically youth who have not

6    been convicted as adults and could be as young as 14 years of

7    age.  It was highly technical and very detailed in level of

8    service that needed to be provided to the participants.  And

9    therefore for this position, we absolutely needed somebody who

10   had experience working with juvenile offenders and technical

11   knowledged of very complicated rules and regulations and laws

12   pertaining to minors involved in the criminal justice system.

13             THE COURT:  Where is some of that language in YY?

14             THE WITNESS:  Under qualifications professional

15   experience with reentry of ex-offenders and/or youth

16   development required.  Must have knowledge of and experience

17   with criminal justice system, programs and issues.  In

18   addition --

19             THE COURT:  That's enough for me.

20             THE WITNESS:  Okay.

21             THE COURT:  I don't want to take anymore time than

22   necessary.

23             MS. KREBS:  I want to direct her to one more bullet

24   point to be highlighted.

25   Q.  Under essential duties and responsibilities of the program

D8snjoh1                    Stein - redirect

1    director, could you please read into the record the fourth

2    bullet?

3    A.   Provide technical assistance to affiliate sites on program

4    design launch and implementation.

5    Q.   Was Ms. Johnson's position one that involved for her grant

6    development, implementation and technical assistance of the

7    substance of the program?

8    A.   No.

9    Q.   In this program director position did it require such --

10              THE COURT:  That's it, my dear.  It is over now.

11              MS. KREBS:  Thank you, your Honor.  Thank you

12   Ms. Stein.

13              THE COURT:  You are excused.  Thank you very much.

14              (Witness excused)

15              THE COURT:  Do you have another witness?

16              MS. KREBS:  We call Mr. Robert Carmona to the stand.

17              THE COURT:  Let me caution you in front of the jury,

18   Ms. Krebs, I do not want to hear the the same testimony about

19   the same incidents a second and third time.  I don't know how

20   to make that any clearer.  Actually, why don't you wait.  It

21   may make it clearer if we take a 10-minute recess.  Why don't

22   we take a recess with the jury.

23              (Jury excused)

24              (Continued on next page)

25

D8snjoh1                    Stein - redirect

1           (In open court; jury not present)

2           THE COURT:  Ms. Krebs, let's make this absolutely

3     clear.  These incidents that we have now heard from day one,

4     they are repetitious and indeed sometimes different and indeed

5     each defendant has an opportunity as I noted when a witness was

6     on the stand yesterday.  They each have an opportunity to tell

7     their story.  That does not mean that they can tell the

8     identical same story as two or three previous witnesses have

9     already told us.  Is that clear?  If you read 402 and 403 under

10    the Federal Rules you will probably get that picture fairly

11    clearly.  So all I want to be sure about is that you and I are

12    on the same wavelength with respect to that concern.

13          MS. KREBS:  May I respond to that, your Honor?

14          THE COURT:  Yeah, if you have a response.

15          MS. KREBS:  I do, your Honor.

16          THE COURT:  I will anxious to hear your response.

17          MS. KREBS:  Obviously given the facts that of the

18    order of testimony in this case, plaintiff gets the opportunity

19    to put on her case first and describe her version of the events

20    of each of these incidents.  She is making specific allegations

21    with respect it each of the individual defendants and their

22    conduct with respect to these incidents.  Now that it is

23    defendants' turn to puts on the case, we require the

24    opportunity to have my clients tell their side of the story and

25    describe the incidents as they perceive it occurred.  And, of

1    course, it would be up to the jury to make the ultimate

2    decision as to which side is telling the correct version as

3    they see it to the extent those versions differ.

4         It is imperative to my clients so that they are not

5    prejudiced in putting on their case that they have the

6    opportunity to discuss those incidents and describe it how they

7    say that it happened.  Now, I am not saying, your Honor, that I

8    need to go over every single incident if we do not dispute the

9    version of events that was already put on by the plaintiff's

10   case; but if we do, your Honor, it is imperative and in order

11   for it not be prejudicial that my clients be allowed to tell

12   the jury what they say happened.  That is where my concern has

13   been and why, your Honor, to the extent, and I apologize if it

14   came off as impertinent or disrespectful, but that is where my

15   frustration had been coming when I was being told that I could

16   not -- I was not allowed to question Ms. Stein with respect to

17   some of these incidents.

18        For example, the incident with the --

19        THE COURT:  This is not summation.  I don't want to

20   not let you have your five-minute recess.  So I think I've

21   heard everything you've said and I think you've heard

22   everything I have said.  So be guided accordingly and I think

23   we'll get along fine.

24        I will repeat for the third time that these are your

25   witnesses and they are defendants and they are entitled to tell

1    their story.  All I am telling you is we are not going to have

2    a repetition of the same stories from the same mouths as we

3    have had before.

4              Is that clear?

5              MS. KREBS:  That's understood, your Honor.

6              THE COURT:  Good.

7              MS. KREBS:  Thank you.

8              THE COURT:  Take five.

9              (Recess)

10             THE COURT:  Ms. Krebs, we were waiting for you

11   especially so that we could read in case there was any

12   misunderstanding about my view with respect to your testimony

13   or your eliciting of testimony in the future.  I thought it

14   would be valuable if I just head into the record Federal Rule

15   of Evidence 403 and you can keep it close to your heart.  It

16   reads like this:  The Court may exclude relevant evidence if

17   its probative value is substantially outweighed by a danger of

18   one or more of the following:  Unfair prejudice, confusing the

19   issue, misleading the jury, undue delay, wasting time, or

20   needlessly presenting cumulative evidence.

21             I would urge you to keep that in mind during the

22   course of this testimony and then I think we'll all get along

23   swimmingly.

24             THE DEPUTY CLERK:  Jury entering.

25             (Continued on next page)

1                    (In open court; jury present.

2                    THE DEPUTY CLERK:  Please be seated.

3                    Mr. Carmona, please raise your right hand.

4       ROBERT CARMONA ,

5            called as a witness by the Defendants,

6            having been duly sworn, testified as follows:

7       DIRECT EXAMINATION

8       BY MS. KREBS:

9       Q.  Good morning, Mr. Carmona.

10      A.  Good morning.

11      Q.  How old are you?

12      A.  61.

13      Q.  Are you married?

14      A.  Yes.

15      Q.  Do you have any children?

16      A.  Yes.  I have two.  My first born is sitting there and my

17      youngest was there yesterday.  They are tag-teaming.

18      Q.  Do you have any siblings?

19      A.  Yes.  I have an older brother, an older sister, and a

20      younger brother.

21      Q.  Can you tell us briefly about your young home life?

22      A.  We were raised by a single mom in a housing project here in

23      New York City.  My dad left, I guess, when I was seven years

24      old, and my mother raised the four of us in the projects.

25      Q.  How was your mother off financially?

1  A.  She started out struggling because she was an orphan.  She

2  came in 1940.  She got her GED then she got an LPN then she

3  ended being an RN by the time she retired.

4  Q.  What position within your mindset does your mother hold for

5  you?

6  A.  My moms was the world.  I mean, she was a very strong

7  woman.  I still have a hard time understanding how -- because

8  she came here in 1940 before the war, she was on her own by the

9  time she was 16.  I don't know how she did it.

10  Q.  In terms of your race and ethnicity, how do you

11  self-identify?

12  A.  Sorry?

13  Q.  In terms of your race and ethnicity, how do you

14  self-identify?

15  A.  I am a black man of Latino descent.

16  Q.  I want to ask you briefly about your young adulthood.

17  A.  I started using drugs early on.  I was about 13.  At the

18  time I was 15, I was addicted to heroin and stayed addicted for

19  eight or nine years.

20  Q.  At any point in time did you have any encounters with the

21  law?

22  A.  Yeah.  I have a pretty long rap sheet, in and out of jail.

23  I was using drugs.  Yes, I do.

24  Q.  And in connection with your use of drugs what, if any,

25  connection did the use of your drugs have with respect to

D8s6joh2                    Carmona - direct

1    eventual arrests that you had in this your early 20s?

2    A.  I was stealing money to support my habit and I got arrested

3    when I was 23 years old.  I eventually pleaded guilty to a

4    five-year sentence.  At that time in New York City, if you

5    could show that your involvement with the criminal justice

6    system had to do with using drugs, you could get an alternative

7    sentence to a drug program.  My mother borrowed the money from

8    my aunt, bailed m out of jail and I went to Daytop Village and

9    they came with the Court for sentencing.  I was sentenced to

10   Daytop Village with the proviso if I didn't complete, I had to

11   do the five years.

12   Q.  What is Daytop Village?

13   A.  Daytop Village is a residential drug-free therapeutic

14   community.  It is a 24-, 30-month process.  You actually live

15   there.  There are a number of them that exist around the

16   country -- Phoenix House, Daytop Village, Odyssey House.  There

17   are organizations like that.  It is a very harsh treatment

18   process, but it works.

19              THE COURT:  In your earlier answer when you say if you

20   didn't complete you would have to serve the five years, you

21   mean if you didn't complete the Daytop program, right?

22              THE WITNESS:  Yes, your Honor.

23              THE COURT:  How long was that program?

24              THE WITNESS:  I was in Daytop for about 26 months.

25              THE COURT:  Then they concluded that you were clean?

D8s6joh2                    Carmona - direct

1          THE WITNESS:  Yes.  Yes.

2     BY MS. KREBS:

3     Q.  Since going into Daytop village, have you taken any illegal

4     drugs?

5     A.  No.

6     Q.  What year was it approximately that you went into Daytop

7     Village?

8     A.  I would tell you exactly.  October 6, 1976.

9     Q.  Now, you mentioned a harsh environment.  Could you please

10    elaborate on that?

11    A.  The thinking in the therapeutic community is the best

12    person to work with a drug addict or alcoholic is a drug addict

13    or alcoholic because they know the nuances of how they think.

14    The push is that in order to stop using drugs, you first have

15    to own the fact without excuses that you made this decisions

16    and you ended up with you being strung out.  In groups they

17    have, they could be pretty harsh in your face and the intent

18    ultimately is to get the individual to accept that they have

19    some -- they had responsibility for how they ended up there.

20    For me it was the -- it changed my life.

21    Q.  Throughout the course of this environment in this treatment

22    what, if any, particular stories or counselings did you receive

23    that helped you particularly to move on and accept

24    responsibility?

25          MR. UNAMSKY:  Objection.

1          THE COURT:  Sustained.

2     Q.  You pointed out your daughter before in the courtroom?

3     A.  Sorry?

4     Q.  You pointed out your daughter in the courtroom?

5     A.  Yes.

6     Q.  How old was she when you went into Daytop Village?

7     A.  Eight months old.

8     Q.  What, if any, impact did her existence have on your ability

9     to change?

10    A.  When I originally went into Daytop, I really didn't go in

11    with the notion of changing.  I thought it was an easier bit.

12    It was co-ed, woman and men, rather than the prison

13    environment.  So my first six to eight months in the program,

14    it was tough because I was jailing.

15    Q.  Could you just explain what that means?

16    A.  Jailing, I was doing time.  I was doing time like I was in

17    jail rather than a program.  And they have these groups and

18    they started talking to me about, um, what kind of life this

19    eight-month old girl would live if I kept doing what I was

20    doing and that resonated with me and when I accepted that I

21    delved knee-deep into the process.

22    Q.  What, if any, comparisons were given to you with respect to

23    other members of your family and the difference between where

24    you ended up and remained?

25          MR. UNAMSKY:  Objection.

1          THE COURT:  Sustained.

2     Q.  What, if any, other discussions in the group did you have

3     that resonated with you?

4     A.  Okay.  So the focus was to for people to own their

5     disposition in life.  My older brother became an ordained

6     minister.  In fact, he was a chaplain for the state prison

7     system before he retired several years ago.  In the groups, you

8     know, at first I resisted owning my decisions if you may.  And

9     then it was pointed out to me in a very robust fashion, well,

10    if you guys were raised in the same house by the same mother,

11    why is it that you are in the program using drugs and your

12    brother is an ordained minister?  That -- I couldn't say that

13    and that is what made me say, Wow, it was me.  Not that bad

14    things don't happen to good people, but our decisions guide our

15    life.

16         THE COURT:  I think we can move on now into this

17    lawsuit.

18         MS. KREBS:  Just one last question.

19         THE COURT:  No.

20    Q.  I would like to discuss for a moment just your educational

21    history.

22    A.  Yes.

23         MS. KREBS:  Is that all right, your Honor?

24         THE COURT:  I assume it will only be a moment.

25         Tell us where you went to school.

D8s6joh2                    Carmona - direct

1          THE WITNESS:  I have a baccalaureate from the College

2    of New Rochelle and a masters in social work administration

3    from Columbia University.

4    Q.  I would like you to briefly, very briefly, describe your

5    employment history in the not-for-profit sector leading up to

6    joining STRIVE.

7          MR. UNAMSKY:  Objection.

8          THE COURT:  Overruled.

9    A.  I was in Colombia and you have to do internships to get

10   your masters.  I did the -- well, let me backtrack.

11         I started my undergraduate and got my baccalaureate

12   while ways in Daytop Village.  I worked during the day, lived

13   in the facility and went to school at night.  I graduated about

14   a year after I left the facility.  I several years later went

15   to Columbia University and I did an internship at United Way

16   and I was hired by United Way and became the gatekeeper for

17   United Way an organization seeking funding.  Then I worked for

18   several organizations.  I work for the Koch administration for

19   a while and then at the Wild Cat Service Corporation.  And then

20   I was introduced to two guys Sam Hartwell and Tom Rodman, and

21   together we put together this state and alcohol STRIVE.

22   Q.  Let's turn to STRIVE now.

23         Your title, your current title is founder, correct?

24   A.  Yes.

25   Q.  So how is it that you came to the title of founder?  What

1    did you do to be a founder?

2    A.  Well, I actually -- they had a notion, Sam and Tom, that

3    people in poor communities they have something that we all take

4    for granted or they lack something that we take for granted in

5    what we describe as work culture, the ability to take

6    constructive criticism, punctuality, teamwork, owning

7    responsibility for if you mess up on the job.  That kind of

8    thing.  Sam and Tom had the idea, which they wanted done and I

9    brought the concept, I thought that the concept that

10   therapeutic communities use, which is empowerment model to

11   begin not look at yourself as a victim.  I thought that had

12   resonance for the employment arena and predicated STRIVE on

13   those principles and also that every client that comes through

14   we would give them a lifetime commitment of service so that

15   somebody could come back 10 years later and still get service

16   from the organization.

17   Q.  Now, are you familiar with the plaintiff Brandi Johnson?

18   A.  Yes, I am.

19   Q.  How do you know her?

20   A.  She worked for STRIVE for three years.

21   Q.  When did you first become introduced to her in some

22   fashion?

23   A.  She was -- we have a partner organization called the

24   Consortium For Worker Education.  They do the same kind of work

25   we do, but with union members.  She had worked there and a

1    friend of mine, the senior director there, asked me if I would

2    give her a shot, you know, because the contract that she was on

3    as CWE had ended and they did not have a line or need for her

4    skill set so they sent her to me and we interviewed her and

5    hired her.

6    Q.  When you say "we interviewed her and hired her," who is the

7    we?

8    A.  Myself, Lisa Stein, and Eric Treworgy, who was acting CEO

9    at the time.

10   Q.  Did you actually take part in the decision to hire her?

11   A.  Yes.  It was the three of us who made the decision.  Yes, I

12   did.

13   Q.  I am not going to ask questions about the Pathway Out of

14   Property.  I want as a frame of reference.  We're talking about

15   the position that has been previously testified to, the

16   affiliate service coordinator position through the Pathway of

17   Property grant, correct?

18              MR. UNAMSKY:  Objection.

19              THE COURT:  Correct.

20   A.  Can you repeat the question?

21              THE COURT:  No.  Put another question.

22              MS. KREBS:  Yes, your Honor.

23   Q.  Plaintiff was hired into the affiliate services coordinator

24   position for the Pathways Out of Property grant?

25   A.  Yes.

1   Q.  Now, at the beginning of her employment, who was her

2   supervisor?

3   A.  I was to supervise her initially.

4   Q.  At some point did that change?

5   A.  That had changed very much pretty quickly actually.

6   Q.  Why did that change?

7   A.  I was on the road a lot with the other affiliates and stuff

8   and also we realized that the person that supervised her had to

9   be steeped in government contracts, particularly labor

10  contracts and alike, and that was Lisa's strong suit.

11  Q.  Did you participate in the decision to transfer her

12  supervision from yourself to Ms. Stein?

13  A.  Yes, I did.

14  Q.  How would you describe your relationship with Ms. Johnson

15  starting from the outset of her employment?

16  A.  It was cordial.  It was amicable.  Actually, it was a good

17  relationship.

18  Q.  Could you please describe, if any, personal conversations

19  that you had with Ms. Johnson about her personal life?

20              MR. UNAMSKY:  Objection.

21              THE COURT:  I am not sure.  That is sort of a broad,

22  open-ended question.  Do you think you can be more specific?

23              MS. KREBS:  I will try, your Honor I am trying to be

24  broad and open-ended.

25  Q.  Did you have opportunities at any time to have

D8s6joh2                    Carmona - direct

 1  conversations with Ms. Johnson about her personal life?

 2  A.  Yes.  And that happened pretty early on and probably lasted

 3  for almost her entire time there.

 4  Q.  At whose initiation were these conversations?

 5  A.  It was Brandi's.

 6  Q.  Could you please identify some of the topics that

 7  Ms. Johnson came to speak about?

 8  A.  Sure.

 9          MR. UNAMSKY:  Objection.

10          THE COURT:  Overruled.

11  A.  In the first year that she worked with me at STRIVE, she

12  came to me about challenges she was having with one of her

13  kid's fathers crying and wondering and asking me why a man

14  would treat a woman the way she was being treated when she felt

15  she was demonstrating commitment and alike.  Ultimately what I

16  said to her was that this gentleman, if my memory serves me

17  correctly, was living life on the left side of the street if

18  you may, a street guy.  And I said you have aspirations to be a

19  professional and you cannot live life with your legs planted in

20  both worlds.  So it may be in your interest to just walk away

21  from it.

22  Q.  Did she share with you any other personal details about

23  herself?

24  A.  Yes, she did.  She, you know, would relate to me about the

25  challenges that she had with her mother, challenges she had

1   with maintaining friendships, relationships.  Things of that

2   nature.

3   Q.  Did she ever come to you for assistance with anything?

4   A.  Yeah.  Quite a few times.  I remember, you know, regretful

5   that I think it was in 2011 we were at a conference that we had

6   for the national network up in White Plains and she came to me

7   speaking about her troubles and her depressions and stuff and I

8   had asked her if she had ever been to therapy and she told me

9   no and I suggested that she attend therapy and provided her

10  with the name of a friend of mine that has a therapy friend

11  down on Madison Avenue.

12  Q.  Did you ever have any follow-up conversations with her

13  about that?

14  A.  Yes, I did.  I didn't do it specifically with her about the

15  content of what she would discuss with John as a professional,

16  but I asked her how it was going and she told me that she

17  stopped after two sessions.

18  Q.  Did she give you any reason why?

19  A.  She said it was too painful and at that point I said to

20  her, You have to go through the pain.  You know, it is not just

21  going to go away.  She chose not to do that.

22  Q.  Did she ever come to you for any assistance with respect to

23  schooling?

24              MR. UNAMSKY:  Objection.

25              THE COURT:  Sustained.

 1  Q.  Did she ever come to you for any other assistance?

 2              MR. UNAMSKY:  Objection.

 3              THE COURT:  Sustained.

 4  Q.  Did she ever make any personal requests of you?

 5              THE COURT:  Sustained.

 6              MR. UNAMSKY:  Objection.

 7  Q.  Mr. Carmona, do you ever use profanity in the STRIVE

 8  workplace?

 9  A.  Yes, I do.

10  Q.  Could you describe the way you use profanity?

11  A.  It could be, now, I am having a conversation with one of my

12  colleagues -- Phil, Lisa, Brandi, whoever -- and I might say

13  something like -- if we're meeting and it it is about

14  statistics, I might to say something like, We got is to get

15  this shit together.  That kind of thing.

16  Q.  In that same type of context have you ever used the word

17  fuck?

18  A.  Yes.

19  Q.  When you have used profanity in sentences, what were the

20  genders of the individuals to whom you were speaking?

21              MR. UNAMSKY:  Objection.

22              THE COURT:  Overruled.

23  A.  Guys, gals, men, women.

24  Q.  And when you used profanity in sentences, what were the

25  races of the individuals to whom you were speaking?

1    A.   The race?

2    Q.   Races, yes.

3    A.   Black, Latino, white, Asian.

4    Q.   Mr. Carmona, have you ever referred to yourself as a male

5    chauvinist?

6    A.   Yes, I have.

7    Q.   Would you please describe the basis for that statement and

8    the context in which it was used?

9    A.   Certainly.  When my mother passed away and did her eulogy.

10   The title of the eulogy was:  For the Orphan, the Journey Ends.

11   And we had a women's cohort workshop.  It was just women and I

12   always have a part in the orientation of incoming clients.  I

13   brought in the eulogy with me and I said to them as a Latino

14   man growing up in the '50s and '60s, our culture had a lot

15   machismo, etc., but that in my head I knew it didn't make sense

16   because I was raised by a woman that defied all of that

17   stereotypical kind of thinking.  I had in fact left that eulogy

18   with the women in that classroom so they could refer to it over

19   the four weeks of their training.

20            I think I closed that by saying that in my experience

21   that women demonstrated to me that they are not in fact not

22   only as strong as men but in fact may be stronger as they

23   always been the backbone of the black and Latino community.

24   Q.   I would like to turn your attention to an incident

25   involving an individual by the name of @Jamark Cooks?

1   A.  Yes.

2   Q.  Do you know this man?

3   A.  Yes, I do.

4   Q.  Who is he?

5   A.  He was a client of STRIVE.

6   Q.  Do you recall an incident where you had a conversation with

7   Mr. Cooks?

8   A.  Yes, I do.

9   Q.  Can you describe immediately preceding the circumstances

10  that led up to your conversation with him?

11  A.  I came around to the offices, going around Phil's way.  I

12  am on the other side of the office.  It is a great big office.

13  @Jamark was sitting at Brandi's desk.  She had been spoken

14  about that before.  I waited and I didn't say anything and I

15  waited until he went to use the fiscal department to get a

16  Metrocard.  One of the things we do when we give a client a job

17  is we give him or her Metrocards to engage them.  I went up to

18  him and said, Look, in the future, you know, refrain from

19  coming back here, sitting at her desk.  You should not be back

20  here unless you have business with the fiscal department.

21  There is no need to be in that area of the office.

22  Q.  What, if any, experiences with Ms. Johnson led you to feel

23  the need to have that conversation with him?

24          MR. UNAMSKY:  Objection.

25          THE COURT:  Overruled.  I think the easier and better

1     question is:  Was it her job that to have the kind of

2     conversation you understood was being had with her and him?

3              THE WITNESS:  No.  She didn't not have either the

4     skill set nor was it part of her job description to counsel

5     clients and, in fact, she had been told on a number of

6     occasions to refrain from that because the fear was she would

7     open up a can of worms with a client that she wouldn't know how

8     to close because it wasn't her skill set.

9     BY MS. KREBS:

10    Q.  Shortly after that discussion with Mr. Cooks, did you have

11    a meeting with Ms. Stein and Mr. Weinberg?  I am just asking

12    chronologically.

13    A.  That same day that you are asking me?

14    Q.  At some point after that.

15    A.  Yes.  Yes, we did.

16    Q.  Where was that meeting?

17    A.  In Phil's office.

18    Q.  Who was there in the meeting?

19    A.  Phil Weinberg, Lisa Stein and myself.

20    Q.  Thank you.  I was just going to make sure you identify.

21             Was your door open or closed?

22    A.  The door was closed.

23    Q.  I am sorry.  I apologize.  I don't know if I asked this

24    question.  In whose office was it?

25    A.  Phil Weinberg's.

1              Oh, no.  Lisa's office.  I am sorry.  It was Lisa's

2     office.

3     Q.  At some point was there a knock at the door?

4     A.  Yes, there was.

5     Q.  What happened then?

6     A.  There was a knock at the door.  I think Phil said, Yes, or

7     something like that.  The door opened.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A.   D8snjoh3                    Carmona - direct

Q.   Who was at the door?

A.   Brandi Johnson.  And she said, I have to speak to you

right, right now.  There was something take place, and I said

something to the effect like, No, you don't.  We are in a

meeting.

          And she said, I have to speak right now.

          I said, Excuse me, to close the door.

          She kept on, and I said, Excuse me.

          Finally I just closed the door.

Q.   Where were you physically situated in the office when you

closed the door -- when she walked in or opened the door?

A.   I was sitting by the door.  Lisa's office is small, and her

desk, if you are sitting in front of Lisa's desk, the guy, the

person to her right is right by the door.

Q.   Where was Ms. Stein?  Within the setting of the office,

where was she sitting?

A.   I can't recollect the sitting.  I think Lisa might have

been behind her desk and Phil was to my right, I think.  I

don't recall that.

Q.   What was the level of force that you used to close the

door?

A.   I closed it.  You know, I didn't slam it.  I closed it,

just closed it with my hand.

          THE COURT:  You heard the plaintiff's testimony about

1    that incident?  You have to answer because otherwise the

2    reporter can't take it down?  The answer is yes?

3           THE WITNESS:  Yes.

4    BY MS. KREBS:

5    Q.  You can't nod.  You need to actually verbalize your

6    response so the court reporter can take it down.

7    A.  I'm sorry.  OK.

8    Q.  Did you have any subsequent conversations with anyone about

9    this brief encounter?

10   A.  Yes.  I had a conversation with Phil about it.

11   Q.  That's Mr. --

12   A.  Phil Weinberg.

13   Q.  And could you please describe the substance of that

14   conversation?

15   A.  He admonished me that that was inappropriate, and I agreed.

16   Q.  That what was inappropriate?

17   A.  Closing the door like that when she was trying to walk in.

18   Q.  Do you recall an incident in which Ms. Johnson came to you

19   with respect to a complaint by a graduate?

20   A.  Yes, I do.

21   Q.  Can you please describe how you came to know of the

22   complaint by the graduate?

23   A.  OK.  We were getting ready to have a full staff meeting,

24   and, you know, we were all walking into the meeting and I -- if

25   my memory serves me correctly, the meeting was pretty

1   important. Ernie and different people were going to report on

2   some stuff that was going on. As I was getting ready to go in

3   the meeting, Brandi came to me and said she had to talk to me.

4   And I went, We're getting ready to go into a meeting.

5           She said, I have somebody at my desk that has

6   something you ought to hear.

7           And I went and I got Ernie, Ernest Johnson, who is our

8   senior director of support services, and I went to get Ernie.

9           I said, Ernie we have to go see Brandi. She has a

10  client there.

11          Ernie gave me a look and was a bit annoyed with me

12  because he had to make a presentation in our staff meeting, but

13  I said, She asked me, I think it was important.

14          So we went back to the desk and there was a young lady

15  sitting there with Brandi at the desk. And Ernie asked her,

16  you know, What happened?

17          And Brandi began to explain that the young lady felt

18  that she was sexually -- I don't know what the word is, touched

19  or whatever by a staff member.

20  Q.  Did she identify the name of the staff member?

21  A.  Yes, she did.

22  Q.  Which staff member was that?

23  A.  It was a trainer named Angel Garito.

24  Q.  OK. Did the young lady describe the specifics of her

25  encounter with Mr. Garito?

1    A.  Yes, she did.  Ernie asked her what, in fact, Mr. Garito

2    did, and she said that he touched her on the arm and said, I

3    think it was, Maybe when you get a job you can take me to

4    lunch.

5          And then Ernie asked the young lady how long ago this

6    happened and the lady said a year and a half ago.

7          So Ernie looked at Brandi and said, Write it up, have

8    her write it up and set up an appointment for her to see me.

9          THE COURT:  This was the sort of counseling you were

10   talking about before for which she in your view had no skill

11   sets, right?

12         THE WITNESS:  Exactly.

13         THE COURT:  You don't know how it came about a second

14   time that she was in a similar position?

15         THE WITNESS:  No.  I don't know what the girl was --

16   but, yeah, she would keep doing that.

17         THE COURT:  When you were saying you were going into a

18   staff meeting, and it was a big staff meeting --

19         THE WITNESS:  Yes.

20         THE COURT:  -- and an important staff meeting, how

21   many people are on your staff or were at that time?

22         THE WITNESS:  Probably around 30.

23         THE COURT:  Thanks.

24   BY MS. KREBS:

25   Q.  Of those 30 individuals, was everybody in the office

1    attending that meeting?

2    A.  Everybody with the exception of the phone person that has

3    to answer the phones and Brandi.

4    Q.  Was Ms. Johnson originally scheduled to attend the meeting?

5    A.  Oh, yeah, everybody was.

6    Q.  After Mr. Johnson said to the young lady to write up the

7    complaint and provide it to him, what did Mr. Johnson do?

8    A.  We both went back to the staff meeting because he had to

9    make a presentation.

10   Q.  The two of you then at the same time go back together?

11   A.  We went back together, yes.

12   Q.  Was there any other communication after he said that she

13   could write a complaint?

14   A.  No.

15   Q.  Did you have any follow-up communications with Ms. Johnson

16   about this encounter?

17   A.  No, I didn't.

18   Q.  Did you ever tell her that the participant was ugly as

19   shit?

20   A.  No, I didn't.

21   Q.  Did you ever say any other derogatory comments about the

22   participant?

23   A.  No, I didn't.

24   Q.  Now, you were in this courtroom the other day when opposing

25   counsel played a tape of a communication between you and

1  Ms. Johnson in which you used the word nigger?

2  A.  Yes.

3  Q.  The first thing I would like to ask you is, was there an

4  incident or a communication or an encounter prior to that that

5  led up to that discussion?

6  A.  Yes.  There was a prior situation, yeah.

7  Q.  Could you please describe the prior exchange, the prior

8  one?

9  A.  OK.

10 Q.  Yes.

11 A.  At STRIVE we have a lunch club, it's about four main

12 characters to it and people float in and out of the meeting.

13 So we were in the lunch -- where we have our lunch and also

14 present was this girl named Leticia that worked for CWE, and

15 she was dressed --

16 Q.  I don't mean to interrupt.  I just want to specify.  I

17 think there had been potentially more than one Leticia

18 mentioned.  Was there also a different Leticia that worked for

19 STRIVE?

20 A.  There is a Leticia that works for STRIVE as director of

21 training?

22 Q.  So, this particular Leticia, could you just say her last

23 name so the record is clear.  The other Leticia from CWE, was

24 that Leticia Thomas.

25 A.  Yes.

1   Q.  I apologize for interrupting.  I just didn't want there to

2   be confusion.  Could you continue?

3   A.  We're in there having lunch, and Leticia was dressed like

4   she was going to a club or something.  And I said, Hey, Tish,

5   are you going to a club?  Or something like that.

6          And she laughed and said, These aren't my club

7   clothes.  You should see what I dress like when I really go to

8   clubs.

9          And I said to her:  You're like Brandi.  You guys,

10  you're so smart, you but act like a nigger sometimes.

11  Q.  Now, did you use the word nigger during that conversation

12  with Ms. Thomas?

13  A.  I'm not sure if I said that or said ghetto.  I said one or

14  the other.  I couldn't really recall, because it was all a goof

15  quite frankly.

16  Q.  During this exchange did anybody express any offense?

17  A.  No.  We were all laughing, including Leticia.

18  Q.  Now, after that exchange Ms. Johnson at some point

19  thereafter came to your office?

20  A.  Yes, she did.

21  Q.  Then I'm not going to go through the discussion because we

22  have all heard it on the tape and we don't need you to explain

23  it or to describe it, but I did want to ask you a couple of

24  questions about it.

25          When you used the word nigger in that conversation

1  with Ms. Johnson, what was the meaning you were intending for

2  it?

3  A.  Too emotional, wrapped up in her, at least the negative

4  aspects of human nature, if you may, and as a barrier for her

5  to move forward professionally the way she indicated to me over

6  time that she wanted to move forward.

7  Q.  What was your intent in using the word nigger in the

8  context of the overall conversation?

9  A.  I was trying to get the message across to Brandi that she

10  has the potential to go as far as she wants, but she holds

11  herself back.  And this was really a culmination of a number of

12  discussions with Brandi that were like that.

13  Q.  Now, had Ms. Johnson used the word nigger before when

14  speaking with you?

15  A.  Frequently.

16  Q.  Including in those personal conversations you described

17  before where she would share information with you?

18  A.  Oh, yes, absolutely.

19  Q.  Do you recall a conversation with Ms. Lynette Hall,

20  Ms. Cammie Crawford, and Ms. Johnson in which the phrase "wrap

21  it up" or "break it up" was used?

22  A.  Yes, I do.

23  Q.  I am going to direct your attention to that conversation at

24  this point, OK?

25  A.  Uh-huh.

1   Q.  Approximately when did this conversation take place?

2   A.  It was last year, in 2012.  I can't recall the exact time.

3   Q.  Can you recall whether it was before or after Ms. Johnson's

4   attorneys sent the allegations to STRIVE's offices?

5   A.  It was after.

6   Q.  Now, where did this conversation take place?

7   A.  They were sitting at Nettie's desk -- I'm sorry Lynette's

8   desk, we call her Nettie -- Lynette's desk.  When you come out

9   of my office, the first desk you hit is Cammie, then Nettie's

10   desk.  They were sitting at Nettie's desk eating, laughing,

11   joking kind of loud.

12   Q.  Approximately how far from your office is Ms. Hall's desk?

13   A.  Maybe to this gentleman right here.

14   Q.  You are referring to the first juror?

15   A.  The first gentleman with the striped shirt, yes.

16   Q.  Let the record reflect that is approximately --

17   A.  Eight feet maybe?

18          MR. UMANSKY:  Objection.

19          THE COURT:  I think it's probably as good for her as

20   for me.  Why don't we say eight feet.

21   BY MS. KREBS:

22   Q.  Prior to this occasion of them eating lunch at Ms. Hall's

23   desk, had they ever, all three of them, eaten lunch at either

24   Ms. Crawford's or Ms. Hall's desk?

25   A.  They did it a lot, about three or four times in that time

1    period around then.

2    Q.  About three or four times prior to that?

3    A.  Right.

4    Q.  Those three or four times, were those all after

5    Ms. Johnson's attorneys had filed the allegations with STRIVE?

6    A.  Yes, they were.

7    Q.  What was their demeanor while they were at the desk?

8    A.  They were just laughing, joking, eating food, carrying on,

9    talking and stuff.

10   Q.  What was the volume?

11   A.  It was high, because it's like right outside, my -- yeah,

12   it was high.

13   Q.  Where were you?

14   A.  In my office.

15   Q.  How, if at all, did this affect your work environment?

16   A.  The first few times they did it, it made me uncomfortable

17   because I began to feel that Brandi was going to them being

18   loud out side my office to try to provoke me.

19        So the fourth time or so I told them to break it up.

20   The other thing was that we had a policy I think that we had a

21   vermin problem.  We said not to eat at our desks.

22   Q.  After you went out to them and told them to break it up or

23   wrap it up, did you say anything else to them at that moment in

24   time?

25   A.  Not at that moment, no.

1    Q.  What, if anything, did they do in response to your

2    statement?

3    A.  They broke it up.

4    Q.  Did you have any follow-up conversations with Ms. Crawford

5    and Ms. Hall?

6    A.  Yeah, about I guess ten minutes after that they came into

7    my office and I said to them that they were doing well at the

8    organization, I had seen a lot professional development from

9    them over the years, and that they should not allow themselves,

10   to be careful to not allow yourself to be used.

11   Q.  Did you mention Ms. Johnson by name when you made the

12   statement to them?

13   A.  I did not.

14   Q.  Did you mention the document that her lawyers had sent or

15   any of the allegations in that document?

16   A.  I did not.

17   Q.  Did they ask you what you meant by that?

18   A.  No.

19   Q.  Did anything further occur in the conversation other than

20   what you have already described?

21   A.  No.  Then they left.

22   Q.  Did you have additional or follow-up conversations with

23   them of this nature?

24   A.  No.

25   Q.  After these conversations, did you ever see those three

1    ladies having lunch together at either Ms. Crawford's or

2    Ms. Hall's desks?

3    A.   No.

4    Q.   Did you ever see them having lunch, all three of them

5    together, elsewhere?

6    A.   Yeah.  In the conference room where people have lunch.

7    Q.   And at any point in time when you saw them having lunch

8    together, again, did you ever tell them to wrap it up or break

9    it up?

10   A.   No.

11   Q.   You were present in the courtroom when there was testimony

12   alleging that you at one point in time said, Put this bitch in

13   a smash.

14             Do you recall that testimony?

15   A.   Yes, I do.

16   Q.   Did you ever say that about Ms. Johnson?

17   A.   No, I did not.  And it's not a statement I would make.

18   That's more the kind of language a younger generation uses.

19   Q.   Did you have any conversations with Mr. Weinberg or

20   Ms. Stein around Ms. Johnson's termination in the last several

21   months of her employment?

22   A.   I missed the last part.

23   Q.   I'm sorry.  Let me rephrase.

24             During the last few months of Ms. Johnson's

25   employment, did you have any conversations with Mr. Weinberg or

1  Ms. Stein about Ms. Johnson's termination?

2  A.  Yes, we did.  One particular time Lisa had had, you know, a

3  number of documentations of not-cool behavior on the part of

4  Brandi, and we were talking about her potential termination.

5  Now, Phil Weinberg had not been on board for that long

6  a period at the time, so he didn't really have the data points

7  about Brandi that Lisa and I may have had.  And I advocated for

8  us to give her another shot and not terminate her and see if

9  she would work through this.

10  Q.  Do you recall approximately when that was?

11  A.  I would have to say it had to have been between late 2012

12  and early 2013 -- late '11 and early 2012.

13  Q.  After the complaint from Ms. Johnson's attorneys came into

14  the STRIVE offices, did you ever have any conversations about

15  Ms. Johnson's termination?

16  A.  No.

17  MS. KREBS:  May I just have a moment, your Honor.

18  THE COURT:  You may.

19  BY MS. KREBS:

20  Q.  Mr. Carmona, have you ever been referred to as a nigger?

21  A.  Yeah.

22  Q.  In what context?

23  A.  Oh, probably about three or four different contexts.  You

24  know, in the African-American and similarly in the Latino

25  community, that word has multiple contexts.  It could be a

feeling indicating love; it could be indicating anger.  It

could be indicating love for a person or indicating anger,

depending on the context of the conversation.

Q.  Could you explain a bit more about the usage or the

presence, placement of the word nigger in that community?

MR. UMANSKY:  Objection.

THE COURT:  I don't know.  He probably has some

experiences.  He's hardly a sociologist.  But I will let you

give us your view from your experience.

THE WITNESS:  OK.

A.  If I am walking down, the street with Kuuku and we bump

into Phil, and Phil is somebody I grew up with and knew 25

years ago and he's African-American, in this context, I might

put my arm around Phil and say, to Kuuku, This is my nigger for

30 years.  That means my boy, I love him, or whatever.

Conversely, I could be walking down the street with

Kuuku and see Phil, and Phil -- I don't know -- beat me up when

we were 12 years old or something, I would say to Kuuku, That

nigger over there beat me up when we were kids.  In that case

it was a different connotation.

Q.  Now, are there other intermediary connotations as well?

A.  A bunch.  It could be substituted for the word dude, like

you said, Hey, dude, or something like that.  It could be

substituted for it.  It has about five different connotations

really.

1    Q.  Did Ms. Johnson ever tell you she thought that you had any

2    sort of animus against her because she was black?

3    A.  No.

4    Q.  Did she ever say that she thought you had any sort of

5    animus against her because she was a woman?

6    A.  No.

7    Q.  Did you have any sort of animus against her because she was

8    black?

9    A.  No.

10   Q.  Did you have any negative feelings towards her because she

11   was a woman?

12   A.  No.

13   Q.  Were you ever referred to as a nigger when you were at Day

14   Top Village?

15   A.  Oh, yeah, absolutely.

16            THE COURT:  Sustained.

17            MR. UMANSKY:  Your Honor, move to strike.

18            THE COURT:  Stricken.

19            MS. KREBS:  I have nothing further, your Honor.

20            Thank you, very much, Mr. Carmona.

21            THE COURT:  Any cross?

22            MR. UMANSKY:  Yes, your Honor.

23   CROSS EXAMINATION

24   BY MR. UMANSKY:

25   Q.  Good afternoon, Mr. Carmona.

D8snjoh3                    Carmona - cross

1    A.  Good afternoon, sir.

2    Q.  Good morning.  We have never met before, correct?

3    A.  No.

4    Q.  We have never spoken before, correct?

5    A.  No.

6    Q.  You have previously given testimony in this case at a

7    deposition on June 4, 2013, correct?

8    A.  I gave -- I don't remember the date, but, yes, I guess so.

9    Q.  You told the truth during the deposition, correct?

10   A.  Yes.

11   Q.  Then you reviewed this deposition for its accuracy and

12   honesty, correct?

13   A.  Yes, I did.

14   Q.  On direct examination when counsel asked you if you were

15   married, you said you married, correct?

16   A.  Yes.

17   Q.  When did you become married?

18   A.  I got together with my wife in '78.  We lived together for

19   two years and we married in '90.  But I counted two years off

20   the front.  So we have been together since 1978.

21   Q.  Isn't it true that you actually separated from your wife?

22   A.  At the moment --

23            MS. KREBS:  Objection, your Honor.  Relevance.

24            THE COURT:  Sustained.

25            MS. KREBS:  Move to strike the beginning of the

D8snjoh3                    Carmona - cross

1   response.

2   BY MR. UMANSKY:

3   Q.  Mr. Carmona, during your deposition on June 4, 2013, were

4   you asked the following questions and did you give the

5   following answer.

6           MS. KREBS:  Objection, your Honor.

7           THE COURT:  You are going to tell us where it is,

8   right?

9           MR. UMANSKY:  Page 12, line 23.  Would you like a

10  chance to pull out your deposition testimony?

11          THE COURT:  I would like a chance to pull out his

12  deposition testimony.

13          THE WITNESS:  I don't know what I am looking at.

14          THE COURT:  Neither do I.

15          MR. UMANSKY:  Exhibit 3.

16  A.  Exhibit 3, volume 3 of 3 or volume 2 of 3?

17  Q.  It would be volume 1 of 3.

18  A.  That is not up here.

19          MS. KREBS:  Objection, your Honor.  He's laid no

20  foundation to provide deposition testimony at this point in

21  time.

22          THE COURT:  I don't know what you mean by -- I'm glad

23  to have him look at his deposition testimony and ask questions

24  about it.

25          THE WITNESS:  There's another thing up here.  I don't

D8snjoh3                    Carmona - cross

1    know if this is -- OK.

2              THE COURT:  When you were deposed, I presume you were

3    under oath, is that correct?

4              THE WITNESS:  Yes.  So what am I looking at?

5    BY MR. UMANSKY:

6    Q.  Mr. Carmona, please turn to page 12 in your deposition.

7    A.  OK.

8              MS. KREBS:  Objection, your Honor.  Relevance, lack of

9    foundation.

10              MR. UMANSKY:  Your Honor, I didn't ask the question.

11              MS. KREBS:  Your Honor just sustained the objection.

12    You identified what page it is on.  I can see the deposition

13    testimony myself.

14              MR. UMANSKY:  Your Honor, can we move on?

15              THE COURT:  I thought I would look at it, too, since

16    there is an objection.

17              What lines on page 12 are you anxious to read?

18              MR. UMANSKY:  Page 12, line 24.

19              THE WITNESS:  How many times --

20              THE COURT:  Please, don't you read it.

21              THE WITNESS:  I'm sorry.

22              THE COURT:  I'm asking a question to see whether or

23    not we should read it, whether or not it is relevant.  I have

24    ruled now that it is not, so you need not answer that question

25    at all.  And he's going to move right along.

1          THE WITNESS:  Thank you.

2          MR. UMANSKY:  Thank you, your Honor.

3    BY MR. UMANSKY:

4    Q.  Mr. Carmona, when Mr. Eric Treworgy was acting CEO for

5    STRIVE you sat on STRIVE's board of directors, isn't that true?

6    A.  Yes.

7    Q.  Mr. Treworgy left STRIVE in early 2011, correct?

8          MS. KREBS:  Objection.  Outside the scope of direct.

9          THE COURT:  I will allow it.

10   BY MR. UMANSKY:

11   Q.  You may answer.

12   A.  I'm sorry.  Could you repeat the question.

13   Q.  Mr. Treworgy left STRIVE in early 2011, correct?

14   A.  Yes I believe so.

15   Q.  In November 2011, Mr. Philip Weinberg was brought in as the

16   CEO of STRIVE, correct?

17   A.  Correct.

18   Q.  Now, when Mr. Weinberg came on as CEO in November 2011, you

19   relinquished the same duties and responsibilities that you had

20   relinquished to Mr. Treworgy before, correct?

21   A.  Correct.

22   Q.  In fact, the reason Mr. Weinberg was brought in as the CEO

23   was because he was white, correct?

24   A.  No.

25   Q.  No?  I would like you to turn to page 42 of your

D8snjoh3                    Carmona – cross

1    deposition.

2    A.   Page what?

3    Q.   42.

4    A.   OK.

5    Q.   Mr. Carmona --

6           MS. KREBS:  I'm sorry, your Honor.  I would first like

7    to know what lines he's going to be reading so I can identify

8    whether I think there needs to be more read into the record

9    pursuant to your Honor's prior instructions that we should do

10   this all at once.

11          THE COURT:  Yes.

12          I think we are always supposed to tell the line.

13   Otherwise how do you expect us to find it before you start to

14   read it?

15          MR. UMANSKY:  My apologies, your Honor.  Line 12, page

16   42.

17          MS. KREBS:  Your Honor, I would ask that there be

18   additional portions read into the record if that's going to be

19   allowed to be read into the record.

20          THE COURT:  If it creates a better context.  I will

21   read it and determine whether that should happen or not.

22   BY MR. UMANSKY:

23   Q.   Mr. Carmona --

24          MS. KREBS:  I'm sorry, your Honor.  Shall I tell you

25   that now or do you want it after he reads this portion?

D8snjoh3                    Carmona - cross

1              THE COURT:  I think we can wait.

2              MS. KREBS:  OK.

3              THE COURT:  I can wait.  I don't know about you.

4              MS. KREBS:  That is fine, your Honor.  I just wanted

5      to take your direction.

6      BY MR. UMANSKY:

7      Q.  Mr. Carmona.

8      A.  Yes.

9      Q.  Looking at page 42, line 12 of your deposition, were you

10     asked the following question and did you give the following

11     answer:

12     "Q.  So what did Mr. Weinberg bring to the table that you

13     didn't already have?

14     "A.  What did he bring to the table that I didn't have?

15     "Q.  Yes, sir.

16     "A.  He's white."

17             Do you recall being asked those questions and do you

18     recall giving that testimony?

19     A.  Yes, I do.

20             THE COURT:  Do you want to read something further than

21     that, Ms. Krebs?

22             MS. KREBS:  I certainly do, your Honor.

23             MR. UMANSKY:  Sure, your Honor.

24             How much do you want me to read?

25             MS. KREBS:  I actually would like to begin with page

D8snjoh3                    Carmona - cross

1   41.

2          MR. UMANSKY:  Your Honor, she is not conducting the

3   cross here.

4          THE COURT:  She is telling you what she would like.  I

5   have not yet ruled on it.  So don't fear anything yet.

6          MS. KREBS:  I would like it to be read starting on

7   page 41, line 23, through 43, line 7, and then page 45.

8          THE COURT:  Wait a minute.  We are on 43 -- you are

9   talking about 41, and now you are on 43 and he read 42.

10          MS. KREBS:  I would like there to be part of it right

11   before and part of it right after of what he read.

12          THE COURT:  You can read line 23 on page 41 and

13   through the end of that answer, which I guess is 11.

14          MS. KREBS:  Then, your Honor, additionally, there is

15   further testimony on that page 42, line 21, to page 43, line 7,

16   and then again page 45.

17          MR. UMANSKY:  Your Honor maybe counsel wants me to

18   read the entire deposition.

19          MS. KREBS:  I wouldn't mind reading the several pages

20   if that's what it takes to put the entire answer in context,

21   but I'm trying to be more limited, your Honor.

22          In addition, page 45, line 10, through page 46, line

23   18.

24          MR. UMANSKY:  Your Honor, defendant has an opportunity

25   to redirect.

1          THE COURT:  The object -- I thought I made this clear

2     yesterday.  It is obviously true that she could do it on

3     redirect.  The way I think the jury gets a better picture is if

4     we do it in context.

5          So I'm prepared to let you read what she thinks is

6     appropriate on pages 42 and 43 and that's it.

7          MR. UMANSKY:  Thank you, Your Honor.

8          MS. KREBS:  I'm sorry, your Honor.

9          THE COURT:  I told you what I thought.

10         MS. KREBS:  Yes, your Honor.

11         MR. UMANSKY:  Page 41, line 23:

12    "Q.  How is it that Mr. Weinberg then came to be chosen as CEO?

13    "A.  Because he has the skills.  He has the, you know, I'm

14    befuddled by your question, I've already articulated that I

15    have been in the business for 32 years.  I have all these

16    relationships, time on tasks, experience, etc.  Phil's a young

17    man that we recruited for the agency, right, to take into the

18    future.  There's no way at 39 years of age he has the same

19    relationships and time on task as somebody who is 62.

20    "Q.  So what did Mr. Weinberg bring to the table that you

21    didn't already have?

22    "A.  What did he bring to the table that I didn't have?

23    "Q.  Yes, sir.

24    "A.  He's white.

25    "Q.  And what does his whiteness have anything to do with what

1  he brought to the table?

2  "A.  Probably nothing, you know.  I'm not sure, to be quite

3  blunt, what your question is.

4  "Q.  If you don't my question, you can always answer.

5  "A.  I understand what you are trying to ask.  I guess what I'm

6  throwing back at you is that your question makes no sense.

7  "Q.  What is it about my question that doesn't make any sense?

8  "A.  When you ask me something like what does Phil bring to the

9  table that I didn't have, that, that I didn't step out of the

10  role because I lacked in any responsible nonprofit, right,

11  after a number of years particularly the founder seeks to make

12  a transition."

13          MR. UMANSKY:  Do you want me to read from the other

14  page?

15          THE COURT:  Sure.

16  "Q.  Is it your belief that that's what my question was

17  implying, because that's not what I was asking?

18  "A.  Your question clearly implied, right, why did he get the

19  job if he didn't have as much relationships and stature that I

20  may have brought to the table, which is quite frankly, you

21  know, silly.  He's a young -- he's a young man, and I'm an old

22  dog in the business, right.  I have all these relationships

23  with nonprofits I started for a cofounder and what have you.

24          "Phil's a young guy at the beginning of his career,

25  right, and being able to manage the organization, supervise

 1    staff and all of that is a very separate item that now he has

 2    relationships and etc."

 3              THE COURT:  Let's go ahead.

 4    BY MR. UMANSKY:

 5    Q.  Mr. Carmona, on direct examination you testified that you

 6    are the founder of STRIVE, correct?

 7    A.  Cofounder.

 8    Q.  Thank you.

 9              You first became familiar with the plaintiff,

10    Ms. Brandi Johnson, when she applied for a job with STRIVE in

11    2010, correct?

12    A.  Yes.

13    Q.  Ms. Johnson was hired for that affiliate service

14    coordinator position, correct?

15    A.  Yes.

16    Q.  Isn't it true that the position Ms. Johnson was hired for,

17    the affiliate service coordinator position, had existed before

18    she came on board?

19    A.  Yes.

20    Q.  Mr. Carmona, on direct there was some question and you gave

21    testimony about being a male chauvinist.

22              Do you recall that?

23    A.  Yes.

24    Q.  You were talking about a eulogy for your mother, correct?

25    A.  Yes.

1   Q.  I would like to direct your attention to page 241 of your

2   deposition.

3   A.  Got it.

4   Q.  Before we ask questions from the deposition, I have a

5   question.

6           You referred to yourself as a male chauvinist because

7   you are a Puerto Rican male, that your word is the law, that

8   women are emotional and you're not, isn't that true?

9   A.  Not quite.

10  Q.  No.  All right.

11          Referring to page 241 of your deposition testimony,

12  line 12.

13  A.  Yes.

14  Q.  Were you asked the following question and did give the

15  following answer.

16          MS. KREBS:  I'm sorry, your Honor.  Could I please

17  know what the full length is so I know if I need to add

18  anything thereafter.

19          THE COURT:  You mean how far he's going to read?

20          MS. KREBS:  Yes, your Honor.

21          MR. UMANSKY:  From line 12 to line 25.

22          THE COURT:  All right.

23          MS. KREBS:  Then, your Honor, I would also ask that he

24  continue through on to page 242 through line 19.

25          THE COURT:  I will look at it and we will see whether

D8snjoh3                    Carmona - cross

1    that is appropriate.  Go right ahead.

2              MR. UMANSKY:

3    "Q.  So the question that I have for you is what

4    characteristics that you believe are characteristics of a male

5    chauvinist that you also agree that you have, and it's limited

6    to just that.

7    "A.  I don't want to agree that I have it.  I have a tendency

8    to feel that, and then I go to my head and say that makes no

9    sense, but, like, you know, being I am a Puerto Rican male, the

10   man who rules in his house, whatever rule means, my word is

11   law.  You are too emotional and I'm not.  You know, these

12   characteristics that I know in my head are not necessarily

13   correct."

14             Were you asked that question and did you give that

15   answer?

16   A.  Yes.

17   Q.  And you were being truthful when you gave that answer,

18   correct?

19   A.  Yes.

20             THE COURT:  You can read the next 19 lines I guess.

21   Q.  Turning to page 242:

22             "Secondly, and this is something that everybody knows,

23   including Brandi, you know.  I was raised by a single mother.

24   My mother is not -- was an orphan.  She raised four of us.  I'm

25   the next for the last in that food chain.  She was on her own

D8snjoh3                    Carmona - cross

1    since was two and came here to this country when she was 16.  I

2    grew up seeing a woman go from being left by my father, to

3    going on welfare and becoming a bedpan lady in the hospital, to

4    becoming an LPN, to becoming an RN.  And it was clear to me

5    that women were every bit as strong as guys, and so I treated

6    them in a lot of respects in that way.

7            "And it's kind of contradictory because I know that I

8    would say, you know, I'm a chauvinist.  But the other part of

9    me knows that women are just as strong as men and my mother

10   exemplified that for me."

11           MS. KREBS:  Thank you, your Honor.

12   BY MR. UMANSKY:

13   Q.  Mr. Carmona, you regarded yourself as a male chauvinist for

14   20-something years, correct?

15   A.  No.

16   Q.  Directing your attention to page 73 of your deposition

17   testimony.

18   A.  73.

19   Q.  Line 16?

20   A.  73?

21   Q.  73.

22   A.  Line 16.  OK.

23   Q.  Were you asked the following question and did you give the

24   following answer:

25   "Q.  The instance in which you recall might have saying that

1   about yourself, do you recall saying that you agreed with that

2   classification?

3   "A.  I have been saying that about myself for 20-something

4   years, so that's not new."

5           did you give that answer?

6   A.  Yes, I did.

7   Q.  Now, isn't it true that almost immediately after

8   Ms. Johnson began her employment with STRIVE you treated her

9   like a male chauvinist?

10  A.  No.

11  Q.  You told Ms. Johnson that, "You're the type of woman to

12  throw someone under the bus."  Correct?

13  A.  No.

14  Q.  You also told Ms. Johnson to stop walking around with her

15  fucking head down and to do her fucking job, isn't that true?

16  A.  No.

17  Q.  Please turn to your deposition testimony page 71, line 8.

18  A.  OK.

19          MS. KREBS:  Could I just have the lines first, please.

20          MR. UMANSKY:  Line 8.

21          MS. KREBS:  Through?

22          MR. UMANSKY:  12.

23  BY MR. UMANSKY:

24  "Q.  Do you recall having a conversation with Ms. Johnson in or

25  around 2010 in which you told her to stop walking around with

D8snjoh3                    Carmona - cross

1    her fucking head down and to do her fucking job?

2    "A.  Not specifically."

3           Did you give that answer?

4    A.  Yes, I did.

5    Q.  Were you asked that question?

6    A.  Yes, I did.

7    Q.  What did you mean by "not specifically"?

8    A.  Because I couldn't recall the specificity of this.

9           THE COURT:  The four-letter words, do you remember

10   them?

11          THE WITNESS:  I use them a lot, your Honor, no.

12   Q.  Mr. Carmona --

13   A.  Yes.

14   Q.  -- isn't it also true that you told Ms. Johnson that black

15   women get in the way of themselves, correct?

16   A.  I may have.

17   Q.  You may have or you did?

18   A.  I may have.

19   Q.  Page 134 of your deposition.

20          MS. KREBS:  What lines, please?

21          MR. UMANSKY:  Line 10 through 14.

22          THE COURT:  134?

23          THE WITNESS:  134?

24          MR. UMANSKY:  Yes.

25          MS. KREBS:  Your Honor, I don't see how this is

1    impeachment to the response he just gave.

2              THE COURT:  What line?

3              MR. UMANSKY:  Lines 10 through 14.

4    "Q.  Do you recall --

5              MS. KREBS:  I'm sorry, your Honor.

6              I would just ask for a ruling first I don't see how

7    this is impeachment.  I don't see how this is in way

8    contradictory to what he just said.

9              THE COURT:  This is the fourth time I said this.  I

10   think I am going to make it just as clear as I possibly can.

11   So long as there's anything that's close to impeachment, it's

12   an issue for the jury to make that decision.  Indeed, I think

13   you gave me a charge that says that.

14             Go ahead.

15             MR. UMANSKY:  Thank you, your Honor.

16             THE COURT:  When I say charge, the lawyers submit

17   requests to charge on the law.  So that when this testimony is

18   over, we have a charging conference and we go over their

19   charges or their requests and put together what it is that in

20   the last analysis we are going to tell you is the law,

21   hopefully correctly.

22             MR. UMANSKY:

23   "Q.  Do you recall making any comments to Ms. Johnson that

24   black women get in the way of themselves or any variation

25   thereof?

1    "A.  That's possible.  But they can get in the way of

2    themselves.  They can."

3    Q.  Do you recall being asked that question and did you give

4    that answer?

5    A.  Yes, I did.

6    Q.  You were being honest when you gave that answer, correct?

7    A.  Yes, I did, yes.

8    Q.  In 2011 during an audit conducted by the Department of

9    Labor, you had a meeting with Mr. Dwayne Hubbard in your

10   office, correct?

11   A.  Yes.

12   Q.  And during that time Ms. Johnson walked over and closed

13   your office door, isn't that true?

14   A.  She may have.  I don't recollect it.

15   Q.  After your meeting with Mr. Hubbard, you called Ms. Johnson

16   into your office and yelled at her, "If I wanted my fucking

17   door closed, then I would have fucking closed it myself."

18           Isn't that true?

19   A.  No.

20   Q.  You were so loud that Ms. Lisa Stein heard the yelling,

21   true?

22   A.  She heard --

23           MS. KREBS:  Objection, speculation.

24           THE COURT:  Sustained.

25   Q.  Isn't it true that Ms. Lisa Stein came into your office

D8snjoh3                    Carmona - cross

1   after you yelled at Ms. Johnson?

2           MS. KREBS:  Objection.  Foundation.

3           THE COURT:  Overruled.  If she came in, she came it.

4   Whether she heard anything before she came in, I have no idea.

5   A.  She may have.

6           MS. KREBS:  I'm sorry, your Honor.  I apologize.  I

7   was directing it to the foundation on the first half, not the

8   second half.

9           THE COURT:  Overruled.  He can answer the question if

10  he can.

11  A.  The question again?

12  Q.  Ms. Stein actually came into your office after you yelled

13  at Ms. Johnson, correct?

14  A.  She may have.

15  Q.  Ms. Johnson actually complained to Ms. Stein about this

16  incident, isn't that true?

17          MS. KREBS:  Objection.  Speculation.  Lack of

18  foundation.

19          MR. UMANSKY:  Your Honor, the speaking objections,

20  I'll object to that.

21          THE COURT:  Sustained.

22  BY MR. UMANSKY:

23  Q.  In fact, Ms. Stein informed you that Ms. Johnson was upset

24  when you yelled at her, "If I wanted my fucking door closed,

25  then I would have fucking closed it myself," correct?

1   A.  I don't recall that.

2   Q.  But Ms. Stein couldn't admonish you for your behavior,

3   could she?

4   A.  I'm sorry.

5   Q.  Ms. Stein could not admonish you for your behavior, could

6   she?

7           MS. KREBS:  Objection.

8           THE COURT:  I don't know what that means.  But I will

9   sustain the objection.

10  Q.  Ms. Stein couldn't admonish you because you were her boss,

11  isn't that true?

12          MS. KREBS:  Objection.

13          THE COURT:  Overruled.  Is that your view?

14  A.  Was that true you said?  No, it's not.

15  Q.  It's not?

16  A.  Uh-uh.

17  Q.  Please turn to page 101 of your deposition, line 6.

18  A.  OK.

19  Q.  Ready.

20  A.  Uh-huh.

21  Q.  "Q  Do you recall ever having a conversation with, with

22  Ms. Stein in which she ever admonished you about the way you

23  spoke to Ms. Johnson?

24  "A.  No, I don't recall.  And further she couldn't admonish

25  she.  I was her boss."

1          Do you recall being asked that question and gave that

2    answer.

3    A.  Sure, I do.

4    Q.  Now you're saying no?

5    A.  Yes.

6    Q.  Yet at that time Ms. Stein was the head of human resources,

7    correct?

8    A.  Yes.

9    Q.  And she couldn't admonish you, you were her boss, isn't

10   that true?

11         MS. KREBS:  Objection.  Asked and answered.

12         THE COURT:  Sustained.

13   BY MR. UMANSKY:

14   Q.  Now, in March of 2012 you were having lunch with several

15   colleagues when Leticia Thomas came into the office, is that

16   true?

17   A.  Yes.

18   Q.  At that time you said to Ms. Thomas, You are just like

19   Brandi, you are smart as all, but you act like niggers, and

20   then you all laughed, correct?

21   A.  Yes.

22   Q.  Ms. Johnson wasn't there when you laughed at that

23   conversation, correct?

24   A.  No.

25   Q.  Ms. Johnson wasn't there when you told Leticia Thompson

D8snjoh3                    Carmona - cross

1    that you're smart as all, but you act like niggers?

2            MS. KREBS:  I'm sorry.  Leticia Thomas.  You said

3    Thompson.

4            MR. UMANSKY:  Sorry, Leticia Thomas.

5    Q.  Ms. Johnson wasn't present when you told Leticia Thomas,

6    You're just like Brandi, you're smart as all, but you act like

7    niggers, correct?

8    A.  No, she wasn't there.

9            THE COURT:  How much more of this do you suppose we

10   have?

11           MR. UMANSKY:  I would say probably another 20 to 30

12   minutes.

13           THE COURT:  OK.  We will go a little while.  We are

14   going to break at 12:30 or 12:40, something like that.  But you

15   have time.

16           MR. UMANSKY:  Thank you, your Honor.

17   BY MR. UMANSKY:

18   Q.  You then walked by Ms. Johnson and in front of her

19   colleagues screamed in sum and substance, You and Leticia are

20   just alike, isn't that true?

21   A.  Repeat that.

22   Q.  After you told Leticia Thomas that you and Brandi are just

23   alike, you're like niggers, and then you laughed about it,

24   later on you walked by Ms. Johnson and in front of her

25   colleagues you told her you and Leticia are just alike, isn't

D8snjoh3                    Carmona - cross

1    that true?

2    A.  I don't recall that, no.

3    Q.  Isn't that why Ms. Johnson came to your office the next day

4    to discuss this incident?

5    A.  No.

6    Q.  Isn't it true that Ms. Johnson specifically asked you about

7    what you meant when you said Leticia Thomas and her were just

8    alike?

9    A.  Yes.

10   Q.  And Ms. Johnson recorded that conversation, correct?

11   A.  Yes, she did.

12   Q.  Do you remember how you responded?

13   A.  Yes.

14   Q.  How did you respond?

15   A.  To what specifically, sir?

16   Q.  When Ms. Johnson asked you what did you mean by her and

17   Leticia Thomas being alike?

18   A.  I think I said something like both of you are smart as shit

19   but you're dumb as shit I said.  You guys could rise to the top

20   if you got ahold of yourselves, something to that effect.

21   Q.  Isn't it true you also said, You know what it is, both of

22   you are niggers, you act like niggers all the time, correct?

23   A.  Yes.

24   Q.  Didn't you also say, You and her act like niggers, and

25   niggers let their feelings rule them.  I'm going to give it to

```
 1   you hard core.  You and her are the same.  You and her are very

 2   bright, but you all act like niggers, seriously.

 3             Did you say that?

 4             MS. KREBS:  Your Honor, don't we have this on tape.

 5             Objection.

 6             THE COURT:  Overruled.

 7   A.  What is that?

 8   Q.  Didn't you also say, You and her act like niggers, and

 9   niggers let their feelings rule them.  I'm going give it to you

10   hard core you and her are the same?

11   A.  Something like that, yeah.

12   Q.  Now, defense counsel asked you on direct about the

13   different connotations you interpret for the word nigger,

14   correct?

15   A.  Yes.

16   Q.  And one of the connotations you said that it indicates

17   love?

18   A.  I'm sorry.

19   Q.  That it indicates love, correct?

20   A.  At times, yeah.

21   Q.  In fact, you even gave an example if you were walking --

22             THE COURT:  We got it.  We just heard it.

23   Q.  When you called Ms. Johnson a nigger, did you indicate

24   love?  Did you say that out of love?

25   A.  Yes, I did.
```

1    Q.  You did.

2           When you called Ms. Johnson a nigger, you didn't mean

3    that as a term of endearment, did you?

4    A.  Not the term nigger, no.  But the context of the

5    conversation, when I said to, her you guys could go to the top,

6    I was trying to tell her you could be whatever you want to be,

7    but you hold yourself back.  That was the full context, sir.

8    Q.  Move to strike as nonresponsive.

9           Please go to page 123 of your deposition.

10   A.  Got it.

11   Q.  Lines 9 through 12.

12   "Q.  When you were speaking to Ms. Johnson about it, were you

13   saying it as a term of endearment?

14   "A.  No."

15          Do you recall being asked that question.

16   A.  Yes.

17   Q.  And giving that answer?

18   A.  Yes, I do.

19   Q.  When Ms. Johnson disagreed to you calling her a nigger,

20   what did you do?  You told her there's nothing to disagree

21   with, Brandi.  I'm telling you.  Disagree all you want.  If you

22   go out there and ask people, they are going to tell you the

23   same thing.

24          Correct?

25   A.  Absolutely.

1    Q.  In fact, you stated that everybody that knows Ms. Johnson

2    at STRIVE and at CWE would agree with your colorful assessment

3    that she acts like a nigger, isn't that true?

4    A.  Yes, I did.

5    Q.  Now, on direct you were asked if Ms. Johnson ever called

6    you a nigger or ever used the N word in general, correct?

7    A.  Yes.

8    Q.  Do you recall the instances when she used the N word

9    against you?

10   A.  I can't recall specific conversations, but she typically

11   used that in everyday conversation, so I don't recollect.  It's

12   like asking me if I remember her saying the word the.

13   Q.  You can't recall one specific instance when Ms. Johnson

14   called you the N word?

15   A.  Called me the N word?

16   Q.  Yes.

17   A.  No, I can't.

18   Q.  You also can't recall one specific instance when

19   Ms. Johnson used the N word in general, correct?

20   A.  Yes, I can.

21   Q.  You can?  Please give it to us.

22   A.  When she was speaking about her husband or one of her kids'

23   fathers, you know, she understand why the nigger treats her

24   like that.

25   Q.  Please go to page 130 of your deposition.

1  A.  Got it.

2  Q.  Line 22.

3  A.  All right.

4          MS. KREBS:  Sorry.  What line?

5          MR. UMANSKY:  Through page 131, line 12.

6  "Q.  Did Ms. Johnson ever call you a nigger?

7  "A.  Yes, she has.

8  "Q.  Did she ever tell you that you act like a nigger?

9  "A.  Yes.

10  "Q.  OK.  When?

11  "A.  I can't recall specifically when.

12  "Q.  Do you recall a surrounding circumstance in which she said

13  it?

14  "A.  I can't recall surrounding circumstance.

15  "Q.  Do you recall there being any witnesses?

16  "A.  I don't know, possibly."

17          Isn't it true you can't recall any circumstance when

18  Ms. Johnson used the N word, correct?

19          MS. KREBS:  Objection.  Asked and answered.

20          THE COURT:  I'll allow it.  It's cross.

21  A.  Not specifically, sir.

22  Q.  Now, Mr. Carmona, on April 26, 2012, do you recall being

23  interviewed by Andy Rahl regarding Ms. Johnson's complaint

24  about you calling her a nigger?

25  A.  Yes.

D8snjoh3                    Carmona - cross

1    Q.  During that interview you told Mr. Rahl that Ms. Johnson

2    did not say she was offended when you called her a nigger,

3    isn't that right?

4    A.  Yes.  I probably said that.

5    Q.  But we know now that that's just not true, correct?

6              MS. KREBS:  Objection.

7              THE COURT:  Overruled.

8    A.  Repeat that.

9    Q.  We now know that that's not true she was offended and she

10   you that when you call her a nigger, correct?

11   A.  Incorrect.  She was offended by me comparing her to

12   Leticia.

13   Q.  Ms. Johnson specifically stated to you, "I'm really

14   offended by that, I don't think, I don't think that I do,"

15   When you called her a nigger, didn't she?

16             MS. KREBS:  Objection, your Honor.

17             THE COURT:  Yeah.  If you don't understand that

18   context, he'll be glad to explain it further.  But if you do,

19   you can answer it.

20             MS. KREBS:  Your Honor, if he's going to mention that,

21   I would request that the entire thing be taken this context.

22   There was more to that conversation and to her statement.

23             MR. UMANSKY:  Your Honor, may I have a second, please.

24             THE COURT:  Sure.

25             MR. UMANSKY:  Your Honor, may I approach the witness?

D8snjoh3                    Carmona - cross

1              THE COURT:  You may.

2    BY MR. UMANSKY:

3    Q.  If you go through the books in front of you?

4    A.  Which one.

5    Q.  I want you to pull out Exhibit 18.

6    A.  Which book?

7    Q.  It would probably be volume 2 of 3.

8    A.  OK.  Volume 2 of 3?

9    Q.  Yes.

10   A.  OK.  Got it.

11              Where am I going?

12   Q.  Looking at Exhibit 18, page 2, paragraph 66.

13              Now, Exhibit 18, do you recall what that is?

14   A.  I'm trying to get it.  Hold on a minute.

15              OK.  Exhibit 18, paragraph -- where am I now.

16   Q.  Just going to the first page.  Do you know what this

17   document is?

18   A.  Yes.  It seems to be a writeup.

19   Q.  This is Andy Rahl's interview notes, correct, of the entire

20   investigation?

21   A.  OK.

22   Q.  Involving Ms. Johnson?

23   A.  OK.

24   Q.  Go to page 2, paragraph 66.

25   A.  OK.

1   Q.  Actually, can you please read for the record paragraphs 65

2   and 66?

3   A.  "RC said that he had this conversation with BJ, but in this

4   context, but not in this context.  And that BJ had not told him

5   she was offended."

6   Q.  Mr. Carmona please start with paragraph 65 and go to 66.

7   When you say RC, is that Robert Carmona?

8   A.  That's me right.

9        "RC said that he had said ghetto, not nigger.  And

10  this conversation (otherwise) did happen, but there was no

11  hostility at all.

12       "By ghetto, RC meant you can act really low class.  RC

13  also said that (in this context) nigger is a word used in

14  conversation, but not disparagingly."

15  Q.  So in that interview with Andy Rahl, you told Mr. Rahl that

16  you called Ms. Johnson ghetto, not a nigger, isn't that true?

17  A.  Yes, but I didn't recall really.

18  Q.  Then your story changes.  You told Philip Weinberg that you

19  may have called Ms. Johnson a nigger, didn't you?

20  A.  Yes, I guess.

21  Q.  Story number three.  At your deposition you testified that

22  you never denied using the word nigger, isn't that true?

23  A.  Yes, I guess.

24  Q.  In fact you testified "I never deny it.  Yes.  I never

25  denied it.  What I said to him was that I might have said that

D8snjoh3                    Carmona - cross

1   I used the word ghetto or nigger.  I didn't really recollect

2   because it wasn't all of that to me.  It wasn't something that

3   was at the forefront of my mind."

4            Really, Mr. Carmona?

5            MS. KREBS:  Objection Your Honor.

6   Q.  Calling Ms. Johnson a nigger wasn't all of that to you?

7            MS. KREBS:  Objection, your Honor.

8            THE COURT:  Overruled.

9   Q.  Calling Ms. Johnson --

10           THE COURT:  You are not going to repeat it a third

11  time.

12           MR. UMANSKY:  I have another question, your Honor.

13           THE COURT:  You don't want him to answer that one?

14           MR. UMANSKY:  No, your Honor.

15  BY MR. UMANSKY:

16  Q.  Calling Ms. Johnson a nigger wasn't something that was at

17  the forefront of your mind?

18  A.  No, it wasn't.

19  Q.  But now we know that you did in fact call Ms. Johnson a

20  nigger, isn't that true?

21  A.  Yes.

22  Q.  During your conversation with Philip Weinberg in this

23  investigation, he responded to you calling Ms. Johnson a nigger

24  by simply stating, Oh, OK, isn't that true?

25  A.  Yes.

1    Q.  When you elaborated to Mr. Weinberg that you called

2    Ms. Johnson a nigger because you believed that her behavior

3    wasn't helpful to her own efforts, Mr. Weinberg responded by

4    saying, That's interesting.  Isn't that true?

5    A.  I don't recollect all of that 'I guess.

6    Q.  Page 124 of your deposition, line 17?

7    A.  Where am I now?

8    Q.  Page 124 of your deposition.

9    A.  Is that volume 1 of 3.

10   Q.  It would be volume 1 of 3.

11   A.  1 of 3.  124?

12   Q.  124.

13   A.  Huh?

14   Q.  Yes.  Exhibit 3?

15   A.  OK.  Got it.  I think.

16   Q.  Line 12 through line 22.

17   "Q.  And which one of those categories, if any, did you

18   indicate to Mr. Weinberg was the one that Ms. Johnson fell into

19   the category of?

20   "A.  The latter.

21   "Q.  And which one was that?

22   "A.  That her behavior wasn't helpful to her own efforts.

23   "Q.  And what, if anything, did Mr. Weinberg say in response to

24   that?

25   "A.  That's interesting."

1          Do you recall being asked those questions and giving

2    that testimony.

3    A.   I remember being asked the questions, yes.

4    Q.   You then met with Mr. Weinberg and Mr. Rahl, and Mr. Andy

5    Rahl told you that if you used that kind of nomenclature again

6    you could be subject to termination, isn't that true?

7    A.   Yes, he did.

8    Q.   Isn't it also true that Mr. Rahl was referring to the word

9    ghetto as nomenclature, not nigger, correct?

10   A.   I don't know.  I don't know.  To me they were

11   interchangeable, so I don't know.

12   Q.   I didn't ask you that, Mr. Carmona?

13   A.   Well, that's my response.

14   Q.   Isn't it also true that Mr. Rahl was referring to the word

15   ghetto not the word nigger when he said that to you?  Yes or

16   no?

17          THE COURT:  Sustained.

18   A.   Well, it's --

19          THE COURT:  You don't have to answer that.

20          MS. KREBS:  Move to strike.

21          THE COURT:  Stricken.

22   Q.   When Mr. Rahl interviewed you, you have already testified,

23   you indicated to him that you didn't use the word nigger, you

24   called Ms. Johnson ghetto, correct?

25          MS. KREBS:  Objection.

1       THE COURT:  If he said it, it's OK.  The other

2   question called for some operation of his mind, so it was not

3   admissible.  But you may answer this question.

4   BY MR. UMANSKY:

5   Q.  Mr. Carmona, you have already testified --

6   A.  Right.

7   Q.  -- that when Mr. Andy Rahl interviewed you in regards to

8   this investigation you told him that you called Ms. Johnson

9   ghetto, you didn't call her a nigger, correct?

10      THE COURT:  I think asked and answered is not a bad

11  objection.  I will sustain it.

12  BY MR. UMANSKY:

13  Q.  Mr. Carmona, are you aware that STRIVE contains an

14  antidiscrimination and antiharassment policy?

15  A.  Yes, I am.

16  Q.  Where is that policy found?

17  A.  It would be in the -- where is it found you said?

18  Q.  Yes.

19  A.  Well, it's given out to staff, but the body of it is housed

20  I think in the HR office.

21  Q.  That policy is in the employee handbook of STRIVE, correct?

22  A.  Yes.

23  Q.  In fact, you actually received training in STRIVE's

24  antidiscrimination and antiharassment policy, correct?

25  A.  Yes, we have.

D8snjoh3                    Carmona - cross

1          THE COURT:  Is that it, Mr. Umansky?

2          MR. UMANSKY:  I'm sorry, your Honor.  Just one more

3   minute.

4   Q.  Mr. Carmona, can you please pull up Exhibit 33.

5   A.  In which book.

6   Q.  Which would probably be volume 2 of 3.

7   A.  2 of 3?  Which one?

8   Q.  Exhibit 33?

9   A.  33?

10  Q.  Yes.

11         THE COURT:  I am sure you have read my ruling so that

12  we will, as we did a day or two ago -- it seems like a year --

13  we will only be asking him about Section 5.

14         MR. UMANSKY:  Your Honor, we are publishing Exhibit 33

15  to the jury.

16         THE COURT:  Only 5?

17         MS. MESIDOR:  Yes, your Honor.

18         MR. UMANSKY:  Only 5.

19         THE COURT:  It seems to me I have heard this before.

20  We really don't need to do this, to try this case too many

21  times.

22         He's testified that he knows it's here and he knows

23  it's in the handbook and we have discussed it before.  So let's

24  move on Mr. Umansky, unless you're finished, which is another

25  option.

1      MR. UMANSKY:  Your Honor, I would just request that I

2   could ask him a few more questions about this.

3      THE COURT:  No.

4   BY MR. UMANSKY:

5   Q.  Mr. Carmona, you agree that using the word nigger is not

6   appropriate in any work setting, correct?

7      THE COURT:  Sustained.

8      This 33 is in evidence, but as I made clear, and I

9   think counsel understood it, there are other sections but they

10  are inapplicable to this lawsuit.  So that's why I have

11  admitted only Section 5 which you have before you.

12  BY MR. UMANSKY:

13  Q.  Mr. Carmona, being admonished by Andy Rahl and threatened

14  with termination didn't derail your conduct at all, did it?

15  A.  Sorry.

16  Q.  Being admonished by Andy Rahl and being threatened with

17  termination didn't derail your conduct at all, did it?

18      MS. KREBS:  Objection.

19      THE COURT:  He can answer.  It's cross-examination.

20  Overruled.

21  A.  Yes, it did.

22  Q.  It did?

23      Isn't it true that after STRIVE received Ms. Johnson's

24  complaint you then began to retaliate against her?

25  A.  No.

1    Q.  You told Jamar Cooks that he is no longer to visit

2    Ms. Johnson, isn't that true?

3    A.  Yes.

4    Q.  You said this to Mr. Cooks, that he can't visit Ms. Johnson

5    in front of Crystal Batista, correct?

6    A.  I'm sorry?

7    Q.  You told Mr. Jamar Cooks that he cannot visit Ms. Johnson

8    anymore in front of Crystal Batista, isn't that true?

9    A.  Yes.

10   Q.  Then, when Ms. Johnson attempted to complain to Lisa Stein

11   about what you said to Jamar Cooks, you slammed the door in her

12   face, correct?

13   A.  No, I did not slam the door.

14   Q.  You testified on direct that you didn't slam the door, you

15   closed it, correct?

16   A.  I closed the door.

17   Q.  Please go to your deposition testimony, Exhibit 3.

18   A.  1 of 3?

19   Q.  1 of 3.  It should be in front of you by now.

20   A.  Well, I have both of them.  What page am I going to?

21   Q.  101?

22   A.  Got it.

23            MS. KREBS:  Would you identify the lines, please.

24            MR. UMANSKY:  Sure.

25   A.  Got it.

1          MR. UMANSKY:  Lines 21 through 25.

2     "Q.  When did that conversation take place?

3     "A.  When I got angry at her, at one point when she barged in

4     on a meeting we were having, and I slammed the door."

5          Were you asked that question and did you give that

6     answer at your deposition?

7     A.  Yes, I did.

8     Q.  So which one is it, Mr. Carmona, were you lying then or are

9     you lying now?

10    A.  Neither.

11         MS. KREBS:  Objection, your Honor.

12         THE COURT:  You've got to wait until I rule.

13         THE WITNESS:  Oh, sorry.

14         THE COURT:  That's all right.

15         THE WITNESS:  Sorry.

16         THE COURT:  I will overrule the objection since in

17    fact you answered the question.

18    BY MR. UMANSKY:

19    Q.  You slammed the door on Ms. Johnson even though she clearly

20    stated, Don't slam the door on me, didn't you?

21    A.  No.

22         MR. UMANSKY:  Your Honor, considering the answer, I

23    request to play a recording which is Exhibit 82, audio

24    recording No. 18, and also the transcript, No. 83.

25         THE COURT:  Denied.

D8snjoh3                    Carmona - cross

1          MR. UMANSKY:  Your Honor, Mr. Carmona's testimony is

2     inconsistent with the audio recording.

3          THE COURT:  Well, unfortunately, your transcripts are

4     inconsistent with the audio recordings, to say nothing of four

5     other objections, all of which I put on the record heretofore,

6     and I've ruled.

7          MR. UMANSKY:  Your Honor, I misspoke.  There is no

8     transcript to this recording.

9          THE COURT:  I am not listening to it.  I can't

10    understand the ones that you think that you have or think you

11    have transcripts for.

12    BY MR. UMANSKY:

13    Q.  Mr. Carmona, when you slammed the door on Ms. Johnson's

14    face, your behavior was so unacceptable that Mr. Weinberg even

15    admonished you for that, isn't that true?  Mr. Carmona, I'm

16    asking you the questions here.  Isn't it true --

17         MS. KREBS:  Objection, your Honor.

18         THE COURT:  He can ask the question.  Did you hear the

19    question?

20         THE WITNESS:  Yes, I did.

21         THE COURT:  All right.  Sustained.

22         Once again -- never mind.  It is not worth it.

23         MR. UMANSKY:  Your Honor, is that a sustained

24    objection to which question?

25         THE COURT:  Your question to him about, your last

D8snjoh3                    Carmona - cross

1    question to him.  When you slammed the door.  You want me to

2    read it back to you?

3              MR. UMANSKY:  No, that's fine.

4    BY MR. UMANSKY:

5    Q.  You admitted to Mr. Weinberg that it was wrong for you to

6    slam the door on Ms. Johnson, correct?

7    A.  It was wrong for me to close the door, yeah.

8    Q.  That wasn't my question.

9              Did you admit to Mr. Weinberg that it was wrong for

10   you to slam the door on Ms. Johnson?

11   A.  Yes.

12   Q.  When Ms. Johnson was having lunch with Cammie Crawford and

13   Lynette Hall, you walked by and told them to wrap it up, isn't

14   that true?

15   A.  Yes, sir.

16             THE COURT:  You are 20 minutes from the time I asked

17   you about how long you would be.

18             MR. UMANSKY:  Your Honor, I'm almost done.

19   BY MR. UMANSKY:

20   Q.  Then you summoned Cammie Crawford and Lynette Hall into

21   your office and warned them not to be used by Ms. Johnson,

22   correct?

23   A.  No, I did not.

24   Q.  Please go to page 135 of your deposition, line 25.

25   A.  Got it.

1          MS. KREBS:  Where are you reading to?

2          MR. UMANSKY:  Line 25, page 135, to line 5, page 136.

3     A.  I got it.

4          MS. KREBS:  Your Honor.

5          THE COURT:  Yes.

6          MS. KREBS:  If he's going to read that, I would also

7     request that he read from page 137, line 4, which is in the

8     middle, cutting short a very long thing, through 137, line 11.

9          THE COURT:  I don't think that helps or hurts either

10    of you.  I will deny your application for the additional

11    language.

12         If you choose to read it, you can read that on your

13    redirect, although I am not sure why you would.

14         Go ahead.  You have your lines together on 135.  Go

15    ahead and read them, Mr. Umansky.

16    BY MR. UMANSKY:

17    Q.  Mr. Carmona, page 135 of your deposition, line 25.

18    A.  Right.

19    Q.  "Q   Do you remember having a conversation with

20    Ms. Lynette Hall or Ms. Cammie Crawford in which you told them

21    not to be used by Ms. Johnson?

22    "A.  Yes, I did."

23         Were you asked the following question and did you give

24    the following answer during deposition testimony?

25    A.  Yes.  The answer was wrong.  I did not mention Brandi's

D8snjoh3                     Carmona – cross

1   name at all.

2          MR. UMANSKY:  Your Honor, move to strike at

3   nonresponsive.

4          THE COURT:  Overruled.

5          Once again it is the jury's decision as to whether or

6   not that's impeachment material at all.

7          Are you done?

8          MR. UMANSKY:  I'm almost done, your Honor.

9   BY MR. UMANSKY:

10  Q.  During direct you testified that STRIVE had a policy in

11  place for no congregating near the desks during lunch hours,

12  correct?

13  A.  I said I thought they did.

14  Q.  You thought they did.

15         Isn't it true that that policy was implemented

16  immediately after you told Ms. Crawford, Ms. Hall, and

17  Ms. Johnson to wrap it up?

18  A.  I don't recollect that.

19  Q.  I would like you to go to Exhibit 6?

20  A.  In my testimony?

21  Q.  No.

22  A.  What page?

23  Q.  Exhibit 6 would probably be in book 2 of 3.

24         MS. KREBS:  What is Exhibit 6?

25         MR. UMANSKY:  It is the deposition of Philip Weinberg.

D8snjoh3                    Carmona - cross

1           MS. KREBS:  I'm sorry, your Honor.  I don't understand

2     how he can use Mr. Weinberg's testimony to impeach Mr. Carmona.

3           THE COURT:  I don't either, but we'll find out, right.

4     A.  I don't have an exhibit 6 in 2 of 3.  Is it 2 of 3?

5           THE COURT:  Well, it is not really worthwhile taking

6     the time to do this.

7           We will adjourn now.  We will see you at 2:15.

8           Have a good lunch and do not discuss the case among

9     yourselves or with anybody else.

10           (Luncheon recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D8snjoh3                    Carmona - cross

1                A F T E R N O O N   S E S S I O N

2                          2:20 p.m.

3           (In open court; jury present)

4           THE COURT:  You have about five or 10 minutes, Mr.

5      Unamsky, because I assume you put it altogether over lunch.  So

6      let's start.

7           MR. UNAMSKY:  Thank you, your Honor.

8      BY MR. UNAMSKY:

9      Q.  Mr. Carmona, you still call people at STRIVE a nigger,

10     correct?

11          MS. KREBS:  Objection, relevance.

12          THE COURT:  Overruled.

13     A.  In conversations with friends, yes, I uses the word.

14     Q.  You still call employees at STRIVE nigger, correct?

15     A.  Friends, yes.

16     Q.  Mr. Carmona, you recall attending a mediation in this case,

17     don't you?

18          MS. KREBS:  Objection, your Honor.

19          MR. UNAMSKY:  I will not be discussing anything about

20     the mediation.

21          MS. KREBS:  Objection, your Honor.

22          THE COURT:  He can mention the word.

23          Yeah, he recalls it.  What is the question?

24     Q.  Mr. Carmona, after that mediation, you had three separate

25     conversations with Mr. Weinberg and Ms. Stein during which you

D8snjoh3                    Carmona - cross

1    all discussed that this case was just a giant waste of time,

2    isn't that true?

3    A.  Yes.

4    Q.  Isn't it also true that Mr. Weinberg believed you to be

5    such a hothead that prior to your deposition, he told you to

6    maintain your cool?

7             MS. KREBS:  Objection.

8             THE COURT:  Sustained.  You have to rephrase it if you

9    can.

10   Q.  Isn't it in fact true that Mr. Weinberg prior to your

11   deposition told you to maintain your cool?

12   A.  Yeah.

13   Q.  Mr. Weinberg also told you that my law firm was going to

14   try to set you up, correct?

15            MS. KREBS:  Objection.

16            THE COURT:  What does that mean?  Sustained.

17   Q.  In fact, heading into your deposition, you thought that

18   plaintiff Brandi Johnson's case was so bad you had to pretend

19   that you were taking all of this seriously, isn't that true?

20            MS. KREBS:  Objection.

21            THE COURT:  I will allow it.  If that is true, you can

22   say yes.  If it is not true, you can say no, and we'll keep

23   moving.

24   A.  No.

25   Q.  I am waiting for your answer.

1        THE COURT:  He said no.

2    A.  I did.

3    Q.  You had so much indifference to this case at one point

4    during your deposition you insisted on playing with your phone

5    instead of testifying?

6        THE COURT:  Sustained.

7    Q.  You were playing with your phone while Marjorie Mesidor, a

8    black female, was taking your deposition testimony, isn't that

9    true?

10       THE COURT:  Sustained.

11   Q.  Mr. Carmona, are you taking this case seriously now?

12       MS. KREBS:  Objection.

13       THE COURT:  Sustained.

14       MR. UNAMSKY:  Two more questions, your Honor, I

15   promise.

16       THE COURT:  Can I count?

17       MR. UNAMSKY:  Sure.

18   Q.  Mr. Carmona, did you ever apologize to Ms. Johnson for

19   calling her a nigger?

20   A.  No.

21   Q.  Would you like to apologize to her now?

22   A.  No.

23       MR. UNAMSKY:  No further questions.

24       THE COURT:  Any redirect briefly?

25       MS. KREBS:  Yes, very briefly, your Honor.

1    REDIRECT EXAMINATION

2    BY MS. KREBS:

3    Q.  Good afternoon, Mr. Carmona.

4    A.  Good afternoon.

5    Q.  Just a very few brief questions.

6            On your cross-examination you were asked about saying

7    that you may have said black women get in the way of

8    themselves.

9            Do you recall that testimony?

10   A.  Yes.  Yes.

11   Q.  What do you mean by that?

12   A.  I think that a lot of times, you know, that women in the

13   black community have been subject to a lot of pain, right.  It

14   could be that, you know, they get married to the guy, he is

15   upstate, they get holding children, holing up the community.

16   Sometimes that pain turns into a whole bunch of anger.  It

17   sometimes gets in the way of communication.

18   Q.  Who, if anyone, else do you believe can get in their own

19   way?

20   A.  Everybody in some respects.

21   Q.  You recall testimony with respect to your statement that

22   Ms. Stein was not your boss?

23   A.  Yes.

24   Q.  You discussed before --

25            THE COURT:  It was the reverse.

 1            MS. KREBS:  I am sorry.  Well, right.  Yes.  Thank

 2   you, your Honor.

 3   Q.  Who, if anyone, has the authority to discipline you?

 4   A.  The board.

 5   Q.  Who, if anyone, has the authority to fire you?

 6   A.  The board.

 7   Q.  You testified about communications that you had with

 8   Mr. Andy Rahl and Mr. Phil Weinberg with respect to --

 9   A.  Yes.

10   Q.  -- their investigation of the allegations.

11            Do you recall that on cross-examination?

12   A.  Yes.

13   Q.  Was that in two separate meetings, one with Mr. Rahl and

14   one with Mr. Weinberg, or was that in one meeting with both of

15   them together in the room?

16   A.  That was one meeting.

17   Q.  They were both there at the same time?

18   A.  Yes.

19   Q.  You said your story one time?

20   A.  Right.

21   Q.  And do you have any personal knowledge of their note-taking

22   process?

23   A.  No.

24            MR. UNAMSKY:  Objection, outside the cross.

25            THE COURT:  I thought I sustained the objection in

1    that area anyway, but go ahead.

2            MS. KREBS:  May he answer that question?

3            THE COURT:  Yes.

4    A.  What was the question again?

5    Q.  Do you have any personal knowledge of their note-taking

6    process?

7    A.  No, I do not.

8            MS. KREBS:  Your Honor, pursuant to your comment

9    earlier that I would be allowed to read in a little bit of

10   deposition testimony on the topic of the communication that he

11   had, that Mr. Carmona had with Ms. Hall and Ms. Crawford --

12           THE COURT:  Tell me the page and line number instead

13   of trying to explain it and I will tell you if I agree.

14           MS. KREBS:  Sure.  Page 137 starting toward the end of

15   line 4 through line 11.

16           MR. UNAMSKY:  Objection, your Honor.  I ask that it

17   start from the previous page and the entire answer be read.

18           MS. KREBS:  I was trying to cut to the chase, but if

19   your Honor prefers --

20           MR. UNAMSKY:  She has been putting in context all day

21   so we want it in context.

22           THE COURT:  I have the line 4 to 11 on 137 is what I

23   thought that is what you read, but that is what you want to

24   read?

25           MS. KREBS:  Yes.  That had not been read.  What had

 1    been previously read --

 2              THE COURT:  It's okay.

 3              Mr. Umansky, what is it that you think you need to

 4    read to be contextual?

 5              MR. UNAMSKY:  We ask that she read from page 136, line

 6    6 to page 137, line 11.

 7              MS. KREBS:  Your Honor, I probably should then start

 8    with where they started previously because it is a follow-up

 9    question where they are starting on line 6.  Page 135, line 25.

10              MR. UNAMSKY:  That's fine.

11              THE COURT:  Through 137, line 11?

12              MS. KREBS:  Correct.

13              THE COURT:  We've heard that so many times.  I can't

14    believe it.  If you both want to do it that, you go right

15    ahead.

16              MS. KREBS:  Thank you, your Honor.

17    BY MS. KREBS:

18    Q.

19    "Q.  Do you remember having a conversation with Ms. Layette

20    Hall or Ms. Cammie Crawford in which you told them not to be

21    used by Ms. Johnson?

22    "A.  Yes, I did.

23    "Q.  And what did you mean by that?

24    "A.  What Brandi started to do was both of them are located

25    outside my office directly.  The first two desks you had was

1   theirs.  When, you know, Brandi and I were incommunicado

2   because we were in lawsuit mode, right, what she would do is

3   sit herself at Cammie's desk or Lynette's desk and just jawbone

4   and laugh and hang out in front of my office and eat.  I think

5   there was a thing where if you are going to eat, you have eat

6   in the kitchen or conference room.  You shouldn't eat at your

7   desk because, you know, mice and, you know, etc., and so staff

8   was instructed that if you are going to eat, you go on to the

9   other areas.  But Brandi, as I said, would come and hang out

10  outside my office and at one point they were eating there and I

11  came out and I said, Break this up, right.  And I looked and I

12  said, You have to break this up now and get going and they

13  broke it up.  And then they came to my office.

14  "Q.  Who is they?

15  "A.  Cammie and Layette.

16  "Q.  What did they say?

17  "A.  They basically asked me what that was about and I said,

18  Just don't allow yourselves to be used, and I left it at that."

19          Were you asked those questions and did you give those

20  answers during your deposition?

21  A.  Yes.

22          MS. KREBS:  I have nothing further.

23          THE COURT:  You are excused.

24          (Witness excused)

25          THE COURT:  What is next?

1          MR. MINNAH-DONKOH:  At this time, your Honor, the

2     defendants call Philip Weinberg to the stand.

3      PHILIP WEINBERG,

4          called as a witness by the Defendants,

5          having been duly sworn, testified as follows:

6     DIRECT EXAMINATION

7     BY MR. MINNAH-DONKOH:

8     Q.  Good afternoon, Mr. Weinberg.

9     A.  Good afternoon.

10    Q.  Mr. Weinberg, how old are you?

11    A.  39.

12    Q.  Are you married?

13    A.  I am.

14    Q.  Any children?

15    A.  I have a four-year-old daughter.

16    Q.  And are you currently employed?

17    A.  I am.

18    Q.  Who are you employed by?

19    A.  STRIVE.

20    Q.  What is your position with STRIVE?

21    A.  Chief executive office.

22    Q.  Please tell the jury what your general duties and

23    responsibilities as chief executive officer with STRIVE are?

24    A.  There is a lot, but to keep it simple I can probably

25    describe it in a few key responsibilities.  One is around our

1   clients, to make sure that we've got the right programs and

2   strategies to properly serve our participants.  Two is around

3   funding, to make sure we have got the proper resources and

4   funds to deliver our services.  The third is around our people,

5   to make sure we have the right team with the right talents who

6   are motivated to deliver services to our clients.

7   Q.  We'll come back to your employment with STRIVE in a moment,

8   but let's take a step back and tell us about your educational

9   background.

10  A.  Sure.  I have got a bachelors of arts from Northwestern

11  University and masters of business administration from the

12  Working School at the University of Pennsylvania.

13  Q.  Now, we've heard a lot so far about what STRIVE does.  So I

14  won't get into it, but is STRIVE the first time you held

15  employment in sort of the public arena or providing public

16  service?

17  A.  No.  No.  My passion, my career has been devoted to having

18  impact, public service.  I have done that working for the

19  government.  I have done that working for non profits.  I have

20  done that working for-profit social ventures that were helping

21  the community.

22  Q.  Give us a few examples of those positions that you just

23  testified to.

24  A.  Sure.  Immediately prior to joining STRIVE, I worked for

25  the City of New York.  I was what was called the president of

1  an agency called the New York City Workforce Investment Board

2  and this was appointed by the mayor to set policy to help New

3  Yorkers get back to work.

4          Previously I had worked in more than one organization

5  helping to improve public schools.  One is called Victory

6  Schools.  That was focused on helping to improve public schools

7  in cities across the country.

8  Q.  How did you come to learn of the position with STRIVE as

9  CEO?

10 A.  I was contacted by a recruiter by a headhunter that I

11 learned was doing a search for new CEO for STRIVE.

12 Q.  Do you recall what year that was?

13 A.  That would have been the summer of 2011.

14 Q.  And what happened after you were contacted by that

15 recruiter with respect to the CEO position with STRIVE?

16 A.  I went through an interview process.  I got to know both

17 the board of trustees, board of directors and the staff.  I was

18 ultimately selected to be the CEO.

19 Q.  When you say you went through an interview process, do you

20 recall the individuals that interviewed you?

21 A.  I do.

22 Q.  Who were those individuals?

23 A.  There were -- there was a committee of the board of

24 directors that was charged with leading the search.  So my

25 first stop was the board.  I then was invited to come up to

1   Harlem to STRIVE and met with the senior team.  I recall

2   meeting with Rob Carmona, Lisa, other members of the senior

3   team.  I remember Larry Jackson, Earnest Johnson, Allen

4   Hartwell.  And then I was brought back for a subsequent meeting

5   with the broader group of the board of directors.

6   Q.  Now, you mentioned before that you met with or met with the

7   senior team as part of the interview process.  Who were those

8   individuals?

9   A.  At that time?

10  Q.  Yes.

11  A.  The senior team at that time would have been Rob; Lisa;

12  Earnest Johnson, the senior director of support services; Larry

13  Jackson, senior director career services; April Bland, director

14  to compliance; Maria Ortiz at that time the director of

15  training.

16           THE COURT:  Was there a separate board of trustees

17  from the board of directors?

18           THE WITNESS:  My apologies.  It is one in the same.

19  We refer to them as the board of directors.

20  Q.  Now, we have already met Ms. Bland and Ms. Ortiz during

21  this trial?

22  A.  Correct.

23  Q.  With respect to Earnest Johnson, what is his race?

24  A.  He is an African-American male.

25  Q.  What about Larry Jackson?

1    A.  Also an African-American male.

2    Q.  At some point after going through this interview process

3    were you in fact offered the position of CEO at STRIVE?

4    A.  I was.

5    Q.  Do you recall approximately when the first day you worked

6    as a CEO of STRIVE was?

7    A.  I do.  It was right after Thanksgiving 2011.  So

8    November 2011.

9    Q.  And what was the reason for you deciding to take upon this

10   role as CEO of STRIVE?

11   A.  Well, I was passionate about the work -- the notion of

12   helping individuals realize their potential, gain skills and

13   have opportunity.  And I have been doing this for the city for

14   the previous years on a macro level.  I was really excited

15   about the opportunity to go into the community and have a more

16   direct impact on an issue that I felt very passionate about.

17   Q.  And as the newly mentioned CEO of STRIVE what was one of

18   the first steps you took to sort of acclimate yourself to the

19   position?

20   A.  Well, there was a lot to it.  It was important for me to

21   establish relationships and trust with the staff.  Probably

22   about 30 people worked full-time at STRIVE at that time.  So

23   one of the first things I did was I set up an individual,

24   one-on-one conversation with every person who worked at STRIVE

25   just for the purpose of getting to know them, them getting to

1    know me, me to understanding their job and what they do, and

2    then to learn about their ideas for how we can move STRIVE

3    forward.  It was also important for me to signal that my door

4    is open.  I wanted to be accessible to everyone on the team.

5    Q.  And as part of that meeting or meetings where you met with

6    different individuals, do you have a specific recollection of

7    meeting with the plaintiff in this case Brandi Johnson?

8    A.  I believe I met with just about every person in the staff

9    who was employed at that time.

10   Q.  And just focusing on the black female staff at STRIVE with

11   whom you met as part of these meeting.  Do you recall any

12   complaints being made to you or any concerns being voiced to

13   you during any of these meetings about sort of the culture as

14   STRIVE as it pertains to black women?

15            MR. UNAMSKY:  Objection.

16            THE COURT:  I will allow it.

17   A.  No.

18   Q.  Now, Mr. Weinberg, you are familiar with the plaintiff in

19   this case, Ms. Brandi Johnson?

20   A.  I am.

21   Q.  And after you became CEO at STRIVE of November in 2011, did

22   there ever come a time when issues regarding Ms. Johnson's

23   performance were brought to your attention?

24   A.  Yes.

25   Q.  Approximately when was the first time you recall issues

1   regarding Ms. Johnson's performance being brought to your

2   attention?

3   A.  I would have to say it was -- if I started in November it

4   started in later December, certainly in January.

5   Q.  And please tell the jury what -- withdrawn.

6          In or around December of 2011 or January of 2012, who

7   first brought issues to your attention regarding Ms. Johnson's

8   performance?

9   A.  It would have been Lisa.

10  Q.  Lisa Stein?

11  A.  Correct.

12  Q.  And please tell the jury generally speaking what those

13  issues that were brought to your attention by Lisa Stein in or

14  around December 2011, January 2012?

15  A.  I was aware from Lisa that she was having significant

16  challenges.

17          THE COURT:  If these are assumptions and awareness,

18  that is really all inadmissible.  If you had a conversation

19  with her --

20          THE WITNESS:  Yes.

21          THE COURT:  -- happily you might give us a date or a

22  month or maybe a year and you can give us what you said to her

23  and what she said to you.  That would be admissible.

24          THE WITNESS:  Right.

25          THE COURT:  Not that I haven't let a lot of it.  The

1    fact is, we ought to do it right if we can.

2              THE WITNESS:  Thank you, your Honor.

3              Beginning in December and January Lisa brought to my

4    attention on multiple --

5              THE COURT:  Is this a conversation?

6              THE WITNESS:  Yes.  Lisa had multiple conversations

7    with me that there were two staff members on her team, Brandi

8    and Christina, who were disruptive.  There were communications

9    challenges.  They were having trouble getting along and

10   honestly it was very concerning for me because I knew that Lisa

11   was spending a lot of time and energy trying to coach them,

12   guide them, support them and in some cases intervene on this

13   conduct.

14   BY MR. MINNAH-DONKOH:

15   Q.  When you say it posed a lot of concern for you because Lisa

16   had to sort of intervene and deal with these issues between

17   Brandi and Christina, can you tell us more about what those

18   concerns were for you?

19   A.  I can.  We had a lot to do.  We were in a very tough

20   financial position at that time with cash flow.  We had a

21   number of programs that we were in the throes of implementing

22   and I really needed Lisa's attention focused on what I

23   considered top priorities of the organization and it was clear

24   to me through these conversations that Lisa was spending a lot

25   of time and energy mediating a conflict between two employees

1    and that was concerning for me.

2    Q.  Separate and apart from issues that were brought to your

3    attention, performance issues that were brought to your

4    attention by Ms. Stein regarding Brandi Johnson, did you

5    personally ever experience any performance issues with

6    Ms. Johnson?

7    A.  I did.

8    Q.  Can you tell us about the performance issues you were

9    directly involved in regarding Ms. Johnson?

10   A.  I can.  Those would be subsequent to my becoming aware from

11   Lisa that there were real disruptive behavior issues.  We began

12   to plan for what we called a Summit, which we were holding in

13   February, and this was an opportunity to bring the executive

14   directors, essentially the leaders from our affiliate

15   organizations -- so these are the nonprofits that are

16   administering the STRIVE program across the country -- we were

17   going to bring them together in for the first time in a long

18   time.  It was a big deal.  I asked Brandi to help me on a

19   number of aspects of that initiative.

20   Q.  When you say that you asked Brandi to help you on a number

21   of aspects regarding that initiative, what specifically about

22   her performance as it pertains to that summit did you find to

23   be problematic?

24          MR. UNAMSKY:  Objection.

25          THE COURT:  What is your ground?

1          MR. UNAMSKY:  Relevance.

2          THE COURT:  Overruled.  Go ahead.

3    A.   There were multiple.  I kind of categorize them sort of

4    before the summit, during the summit and after the summit.

5    Before the summit there were a lot of moving parts.  People

6    flying in on different days.  We had hotel arrangements to

7    make.  We had lunches.  We had venues.  We needed materials and

8    supplies.  I had asked Brandi to help me organize this and

9    coordinate it.  It was sloppy.  It was disorganized.  I had

10   trouble understanding who was coming when and how many people

11   were going to be around for each session.  It just made it very

12   hard to properly plan, place lunch orders, determine venue

13   size, how many hotel nights we needed.  So the preplanning I

14   found disorganized and sloppy.

15        During the actual summit itself, I had asked Brandi to

16   help me on some of the day of the event activities.  Namely,

17   the first day of the summit people were coming in and we needed

18   to set up the room.  If the summit was called to start at a

19   certain hour, Brandi was late.  She wasn't just late for the

20   time of the setup -- I was there early -- she was late for the

21   time when everyone else was called in.  And all the advance

22   work we needed to do and set up, name badges and get the room

23   set, I was on my own.  It left a very poor impression she would

24   be late to such a major event.

25        I had asked Brandi to take notes during part of the

1    summit.  So the post-phase is at the conclusion I had asked

2    Brandi to pull together notes that summarized various

3    conversation and the notes were not forthcoming and when they

4    finally were they were of poor quality and not very usable and

5    I ended up having to essentially kind of redo them myself.  So

6    from pre, during and after I found the performance lacking.

7    Q.  Regarding the notes that you just testified to, did you

8    have a conversation with Brandi during which you informed her

9    that you thought her performance regarding the note-taking at

10   the summit was subpar?

11   A.  I did.  Shortly thereafter we determined after the summit

12   that we had a number of activities that we wanted to implement

13   from the summit had a conversation with Brandi about those

14   followup activities and I used that conversation as an

15   opportunity to inform her that I was disappointed with her

16   performance prior, disappointed with her follow-up activities,

17   including the notes, and I expected a higher level of

18   performance on these new initiatives, these new tasks that we

19   needed to do.

20              THE COURT:  That is what you said to her.  What did

21   she say to you?

22              THE WITNESS:  I don't recall getting much of a

23   response from Brandi.

24              MR. MINNAH-DONKOH:  Permission to approach the

25   witness, your Honor?

1              THE COURT:  Yes.

2              MR. MINNAH-DONKOH:  Your Honor, in addition I would

3    like to publish to the jury what is in evidence as Defendant's

4    Exhibit GG.

5              THE COURT:  Very well.  I assume it is admissible?

6    Q.  Mr. Weinberg, what do you recognize Defendant's Exhibit GG

7    in evidence to be?

8    A.  What do I recognize this exhibit to be?

9    Q.  Yes.

10   A.  I recognize it to be a series of e-mails first between

11   Brandi and another colleague at STRIVE, myself copied, with my

12   response and then a separate note that I sent to Lisa Stein who

13   was Brandi's supervisor at the time.

14   Q.  Now, referring you to the middle portion of Exhibit GG,

15   your e-mail to Ms. Johnson at 3:07 p.m.?

16   A.  Yes.

17   Q.  What was your reasoning for telling her to hold off on her

18   notes?

19   A.  They were delayed.  At that point they were late.  If I had

20   seen a version, it was sloppy and at this point I just needed

21   to -- I needed to move forward.

22             MR. MINNAH-DONKOH:  Permission to approach the

23   witness, your Honor.

24             THE COURT:  Very well.  When you say I prefer to go

25   with our memo, are you talking about a memo that the plaintiff

1  prepared or that you and she prepared?

2          THE WITNESS:  That would have been a memo that I

3  prepared.

4          THE COURT:  But then you say on the Weinberg notes

5  which are I assume notes are you prepared?

6          THE WITNESS:  Those were notes I believe, and I hope I

7  am getting right, another staff member had prepared that

8  portion of the notes.  So we had collected various notes from

9  various folks including myself and Brandi's were never

10  forthcoming so we went with that package.

11  Q.  Mr. Weinberg, I handed you a few seconds ago Defense

12  Exhibit O in evidence.

13  A.  Yes.

14  Q.  Give us an opportunity to publish that same exhibit to the

15  jury.

16          THE COURT:  I think we published it once, but it

17  wouldn't surprise me if it was twice.  Anyhow, that's fine.  I

18  am certain we talked about it.

19  Q.  Now, Mr. Weinberg, you testified earlier that subsequent to

20  the summit you had a conversation with Brandi in which you

21  informed her of issues you had with her performance about the

22  summit.  Is that what Defense Exhibit O generally refers to?

23  A.  Yes.

24          THE COURT:  I have L.  Are we talking O?

25          MR. MINNAH-DONKOH:  Yes, your Honor.

1          THE COURT:  Sorry.  That is part of the problem here.

2    Q.  Mr. Weinberg, other than issues that were brought to your

3    attention by Ms. Stein regarding Brandi's relationship with

4    Christina Saenz as well as issues that you personally had with

5    Ms. Johnson regarding the summit, did you also have any other

6    issues regarding her performance specifically that you can

7    recall?

8    A.  I had minor issues on an ongoing basis.

9    Q.  And what were those minor issues generally?

10   A.  Well, they were largely related to the follow-up activities

11   from the summit and I think they are introduced in this Exhibit

12   O, where we had a lot of work to do coming out of the summit.

13   We really wanted to deliver on the goals we had set forth with

14   our affiliates.  So I layed out a game plan, called it an

15   action plan, and I asked Brandi to be the point person, not on

16   the strategy for it but just coordinating the implementation,

17   like a traffic cop, just making sure things are staying on

18   point and I had asked Brandi for regular updates and keeping

19   things moving and I found that lacking as well.

20         THE COURT:  Who are these affiliates that people have

21   been talking about for the whole case?

22         THE WITNESS:  Good question.  STRIVE is a unique

23   organization and it is an incredible thing in that we not only

24   provide services directly in New York City at our Harlem site

25   but across the country as STRIVE gained fame, in part because

D8S6JOH4                         Weinberg – direct

1      we were featured a 60 Minute segment back in the '90s at the

2      height of welfare reform, communities across the country

3      resonated with that personal responsibility of help, some

4      called it a tough love approach, and they wanted to introduce a

5      STRIVE in their own community.

6               So we actually licensed them the STRIVE program and

7      the model and the services.  So nonprofit organizations in

8      cities from Baltimore to Chicago to San Diego are actually

9      delivering the STRIVE training program in their communities.

10     We call these organizations collectively our affiliates.

11              THE COURT:  Do they have their own name or do they all

12     go under STRIVE name?

13              THE WITNESS:  Another good question.  Both.  Some of

14     them were formed exclusively to be STRIVE.  We have STRIVE

15     Boston, STRIVE D.C.  All they do is employment and training

16     related to the STRIVE model.  Some of them might have been

17     preexisting organizations that had another mission and an

18     example of this would be our Baltimore called Center for Urban

19     Families.  They focused on helping parents, dads connects with

20     their kids.  When they wanted to introduce an employment

21     component, they shopped around, they identified STRIVE, and

22     they in turn licensed and incorporated STRIVE as one of the

23     services they provide as part of their portfolio of services.

24     So STRIVE is indeed both the name of the program that some

25     organizations deliver and also the name of some organizations

1   themselves in their communities.

2   BY MR. MINNAH-DONKOH:

3   Q.  Mr. Weinberg, you testified to the affiliates that exist

4   within the United States.  Does STRIVE also have affiliates

5   outside of the United States?

6   A.  Yes.

7   Q.  Can you name a couple examples of outside affiliates?

8   A.  We have affiliates sites in both the United Kingdom and in

9   Israel.

10  Q.  Mr. Weinberg, did there ever come a time when you came to

11  learn of a complaint that Ms. Johnson was filing against

12  STRIVE, specifically Ms. Carmona, for discrimination and

13  harassment?

14  A.  Yes.

15  Q.  When did you first learn of that complaint?

16  A.  I remember it specifically.  It was April 11th of 2012.

17  Q.  How did you come to learn of the complaint?

18  A.  I received a sealed package, an envelope.  I was in my

19  office.  I was probably the receptionist or someone brought me

20  a package.  I shortly thereafter opened it and read what I

21  understood to be a complaint from the plaintiff alleging

22  discrimination.

23  Q.  When you say "from the plaintiff," did the complaint -- the

24  envelope in which the complaint came in was it directly from

25  Ms. Johnson?

1  A.  No, it was not.  It was probably -- it was not from

2  Ms. Johnson.  It was from Ms. Johnson's counsel.

3  Q.  And at any time prior to April 11th, 2012, had Ms. Johnson

4  ever come to you with any complaints she had that she was being

5  discriminated or harassed because she was a black woman?

6  A.  Never.

7  Q.  And what was the first step you took after receiving the

8  complaint on April 11th, 2012?

9  A.  I was concerned and this was a big deal.  I took it very

10  seriously and I sprung into action for lack of a better world.

11  I had a series of conversations that afternoon.  I recall

12  talking to Lisa Stein.  I recall having a conversation with our

13  counsel.  We had a pro bono legal firm who used us on

14  employment related issues who helped nonprofits like us for

15  free.  I recall having a conversation with our board of

16  direct -- chairman of our board of directors.

17  Q.  You mentioned sort of three groups of people that you spoke

18  with.  First, Lisa Stein.  What was your conversation with Lisa

19  Stein?  What did she say to you or what did you say to her

20  rather and what did she say to you?

21  A.  It was -- it was brief.  It was.  We found I am in receipt

22  of this complaint.  Lisa was the head of our human resources

23  department and also named as a defendant in this case and we

24  talked about the course of action we needed to take to properly

25  investigate and address the issue.

1   Q.  We'll come back to the course of action that you decided in

2   just a brief moment, but you just testified that Ms. Stein was

3   named in that particular complaint that STRIVE received as a

4   defendant?

5   A.  Yes.

6   Q.  Were you named as a target or defendant in that particular

7   complaint?

8   A.  I was not.

9   Q.  And going back to the cause of action that you and Lisa

10  decided to take with respect to the complaint that Ms. Johnson

11  was lodging, what was that course of action that was also

12  decided upon?

13  A.  The course of action was that we would mount an

14  investigation, that as the CEO I would lead the investigation

15  in tandem with a member of our board of directors who was

16  assigned by our board.  In this particular case there is a

17  gentleman on our board who is an attorney, somebody's whose

18  judgment I respected significantly, and so he and I were

19  coleading an investigation to get to the bottom of the

20  complaint.

21  Q.  Now, if Ms. Stein was the HR person, why did you take the

22  lead in investigating the complaint?

23  A.  I did not think it was proper for Lisa as somebody who was

24  named in the complaint.  Even though she was the head of human

25  resources and might otherwise have been leading a process like

1  that, I did not think it was proper for her to be involved in

2  that complaint and so the investigation process so I led it

3  personally.

4  Q.  You mentioned that an attorney on the STRIVE's board who

5  assisted with this investigation.  What is the name of that

6  individual?

7  A.  His name is Andy Rahl.

8  Q.  And was there in fact an investigation conducted into the

9  allegations made by Ms. Johnson in the complaint you received

10  on April 11th, 2012?

11  A.  Is the question did we ultimately embark on an

12  investigation.

13  Q.  Yes.

14  A.  Absolutely.

15  Q.  What was the result of that investigation?

16  A.  Well, I thought we conducted what I considered a very

17  thorough investigation into the allegations that were brought

18  and we concluded that while there was behavior that we thought

19  was inappropriate for a workplace that there was no

20  discrimination based on gender or race.

21        MR. MINNAH-DONKOH:  Permission to approach the

22  witness, your Honor?

23        THE COURT:  You may.

24        MR. UNAMSKY:  Your Honor, I ask that counsel provide

25  with us a preview.

1              MR. MINNAH-DONKOH:  I was just about to say --

2              THE COURT:  Why don't you do it first.  When you ask

3     to approach the witness with a new exhibit, on each occasion

4     will you tell us what it is you are proposing.

5              Hello?

6              MR. MINNAH-DONKOH:  Yes, your Honor, I am about to.

7              THE COURT:  I was in the middle of suggesting that you

8     do that on each occasion.  I don't want to take you away from

9     whatever else you decided to do instead.  It would be

10    appreciated if we knew in advance before you handed it to the

11    witness and what the exhibit was and what the exhibit number or

12    letter was and indeed if you could have it identified promptly

13    that would be helpful.

14             MR. MINNAH-DONKOH:  Yes, your Honor.  I am approaching

15    the witness with Plaintiff's Exhibit 15 in evidence.

16             May I have a brief moment, your Honor?

17             THE COURT:  You may.  My understanding from the

18    exhibit list is that plaintiff could introduce this but for you

19    to introduce it, it would be simply hearsay.  I am not taking

20    it.

21             MR. MINNAH-DONKOH:  Your Honor, this was an exhibit

22    that was jointly agreed to by the parties and your Honor

23    indicated that due to the fact that both parties had listed

24    duplicate of exhibits that we would only use one version.

25             THE COURT:  What are you looking at, Exhibit 15?

1          MR. MINNAH-DONKOH:  Yes, your Honor.

2          THE COURT:  I am not clear that is my concern, but

3    let's go ahead.  It is clearly not a party admission when you

4    are introducing it.  But if both parties stipulated to its

5    admissibility, I think probably I will allow it, but I am not

6    at all clear why the plaintiff would let you introduce it.

7          Go ahead.  If they have done it, that is fine with me.

8          Soon.

9          MR. UNAMSKY:  Your Honor, this exhibit was part of a

10   larger exhibit.  It was part of Exhibit EE, which is out.

11         THE COURT:  It has been introduced?

12         MR. MINNAH-DONKOH:  Your Honor, prior to the trial and

13   on the first day of trial, your clerk Jonathan Wong gave us an

14   exhibit list with both plaintiff's list and Defense exhibit

15   list.  Exhibit 15 on that list was specifically in evidence.

16         THE COURT:  What I have on my exhibit list is in as a

17   party admission offered by the plaintiff.  This is not offered

18   by the plaintiff.

19         MR. UNAMSKY:  I ask that be taken away.

20         THE COURT:  If in fact you agreed with it, that is

21   okay with me.

22         MR. UNAMSKY:  We had not agreed to it.  I ask that it

23   be taken away from the jury.

24         THE COURT:  You distributed it already?

25         MR. MINNAH-DONKOH:  Yes, your Honor.

1          THE COURT:  Take it away.

2          MR. MINNAH-DONKOH:  Your Honor, I would place on the

3    record that we'll place our exception and note this is a

4    business record.

5          THE COURT:  Nobody told me about a business record.

6    That is the first time I heard that exception to the hearsay

7    rule utilized in this case.  You say that as if the Court

8    should understand that and why.  You have done nothing to

9    support it as a business record.

10         MR. MINNAH-DONKOH:  May I lay the foundation then,

11   your Honor?

12         THE COURT:  It is up to you.

13   BY MR. MINNAH-DONKOH:

14   Q.  Mr. Weinberg, in your role as CEO, is it part of your

15   duties and responsibility to address complaints that are made

16   by employees with respect to discrimination and harassment?

17   A.  Yes.

18   Q.  Is it part of your duties and responsibilities to

19   investigate those complaints?

20   A.  Yes.

21   Q.  And as the regular course of business when you investigate

22   those complaints, do you make findings?

23   A.  Yes.

24   Q.  Are those findings reduced to writing?

25   A.  Yes.

D8S6JOH4                         Weinberg - direct

1    Q.  As part of the investigation of those complaints, do you

2    meet with individuals to as part of the investigation?

3    A.  Yes.

4    Q.  Do you take notes?

5    A.  Yes.

6    Q.  Are those notes taken contemporaneously, at the same time,

7    you had the meetings with individuals?

8    A.  Yes.

9    Q.  In this case regarding Ms. Johnson, do you follow the same

10   steps that you testified to with respect to her?

11   A.  Yes.

12              MR. MINNAH-DONKOH:  At this time, your Honor, I would

13   now like to move what was identified as Plaintiff's Exhibit 15

14   into evidence.

15              MR. UNAMSKY:  Objection, your Honor.  Lack of

16   foundation.  Not offered for its truth.

17              THE COURT:  Is this a record that you keep in the

18   regular course of your business?  I guess I assume that there

19   are not of lot of investigations like this.

20              THE WITNESS:  Correct.

21              THE COURT:  So this is essentially a unique business

22   record?

23              THE WITNESS:  So far during my time at STRIVE, that's

24   correct.

25              THE COURT:  I am keeping it out.

1   BY MR. MINNAH-DONKOH:

2   Q.  Well, Mr. Weinberg, as part of the investigation into

3   Ms. Johnson --

4           THE COURT:  I should tell you hearsay is a complicated

5   evidentiary issue.  We will not discuss all of the problems.

6   It essentially relates to not under oath out-of-court

7   statements, but there are a lot of exceptions.  The key to why

8   we have a hearsay rule is reliability.  We don't like the

9   courts, not just me, don't want to take into evidence for the

10  jury to look at or read or listen to anything that is

11  unreliable.  One of the exceptions to that rule is called a

12  business record exception because the legislature believes and

13  believed that if there is a record that is kept in the regular

14  course of business of an entity that it would be reliable.

15  Indeed, it is not really black and white.  When it is the only

16  one of its kind even though it sounds right, I am not allowing

17  it.  That's an overview of where we are.

18          Go right ahead, sir.

19  BY MR. MINNAH-DONKOH:

20  Q.  Mr. Weinberg, after the conclusion of your investigation

21  into Ms. Johnson's complaint was there a written record of your

22  conclusion?

23  A.  Yes.

24  Q.  And do you recall exactly what was written on that

25  document?

1          THE COURT:  We don't need exactly.  Unless you have

2     verbatim in your head.

3     A.  I do not have it verbatim.  I am --

4          THE COURT:  I think he already testified.

5     Q.  Is there anything that would refresh your recollection?

6          THE COURT:  He has already testified to how they came

7     out.  That is what we've been talking about for the last few

8     days.  We try a case once.

9     Q.  Mr. Weinberg, as part of the investigation along with

10    yourself and Mr. Rahl, what was the first step you took to

11    investigate Ms. Johnson's complaint?

12         THE COURT:  He talked to Ms. Stein.

13    A.  Correct.  The first step I talked to Ms. Stein.

14         THE COURT:  The concept here is really not tricky.

15    What we would like to do is get as much before the jury and do

16    it as succinctly as we can because that is the way they

17    remember and indeed they don't get tired listening.

18         MR. MINNAH-DONKOH:  Your Honor, with all due respect

19    he testified the first conversation he had with Mr. Stein --

20    Ms. Stein rather was with himself alone.  I am now asking him

21    as part of the actual investigation what he and Mr. Rahl took,

22    the first steps.

23         THE COURT:  Very well.  We'll listen to that in terms

24    of what he did.  I don't know anything about Mr. Rahl, but it

25    certainly would be hearsay.

1   A.   So the very first thing we did is we set up interviews with

2   the key individuals who were named in the complaint and

3   Mr. Rahl came to STRIVE.  It was within a week.  It was the

4   following week after the complaint was alleged -- was

5   delivered.  Mr. Rahl came and we conducted together a series of

6   interviews with folks that had been named.

7   Q.   Now, during those interviews that you conducted with

8   Mr. Rahl, were these interviews conducted separately or did you

9   conduct them at the same time with Mr. Rahl?

10  A.   At the same time with Mr. Rahl.

11  Q.   And what, if anything, did you tell the individuals who

12  were interviewed as part of the investigation process as to

13  confidentiality of what they told you?

14  A.   Everything was always confidential.  It was clearly in the

15  case Rob and Lisa they were aware there had been a complaint

16  brought by Brandi.  In the case of anybody else that I had to

17  bring in as part of the investigation, I was very careful to

18  either not mention the name of the person who had brought the

19  complaint or if they had to be privy to that because of certain

20  circumstances that this was to be a confidential matter to be

21  discreet and not to be discussed outside of the investigation.

22  Q.   As part of your investigation of Ms. Johnson's complaint,

23  did you speak with Ms. Johnson to find out more details about

24  what she had alleged in the complain?

25  A.   I tried to.

1    Q.  When you say you tried to, what do you mean by that?

2    A.  I mean that -- if I could offer some brief timeline on this

3    because it might be helpful to the jury.

4    Q.  Sure.

5    A.  I received the complaint on the 11th.  On the 12th I asked

6    Brandi to come into my office and I informed her that I was in

7    receipt of her complaint, that I would be leading an

8    investigation.  She informed me that she was going on vacation

9    for the week.  In that meantime I started the investigation.

10   When Brandi returned to the office the following week, I asked

11   her to come back to my office.  I informed her that I had in

12   fact begun the investigation and as part of that investigation,

13   myself and Andy Rahl from our board were interested in setting

14   up an appointment with her to discuss the allegations made in

15   the complaint.

16   Q.  And what was Ms. Johnson's response to you telling her that

17   you wanted to set up an appointment with her and Mr. Rahl to

18   discuss the allegations?

19   A.  That her counsel had advised her not to participate in the

20   investigation.

21   Q.  Now, Mr. Weinberg, during the course of this trial, you

22   heard two audio recordings?

23   A.  Correct.

24   Q.  At any time starting from the date that you received

25   Ms. Johnson's complaint on April 11th, 2012 until Ms. Johnson's

1    employment ended on June 11th, 2012, were you provided any

2    audio recordings that Ms. Johnson had taken of any

3    conversations of any STRIVE employees?

4    A.  No.

5    Q.  With respect to Ms. Johnson's allegation that she was

6    harassed and discriminated against because she was a black

7    woman, what specific steps if any did you take to investigate

8    that aspect of her complaint?

9    A.  We investigated each and every allegation that was raised

10   in the complaint itself.

11   Q.  Did you speak with any black women at STRIVE to see how

12   they felt about the general environment at STRIVE and

13   specifically with respect to Ms. Carmona?

14           MR. UNAMSKY:  Objection.

15   A.  Yes.

16           THE COURT:  Overruled.

17   Q.  And what was the feedback received from the black female

18   staff that you interviewed with respect to how they felt about

19   the culture at STRIVE?

20           MR. UNAMSKY:  Objection.

21           THE COURT:  Sustained.

22   Q.  Did any of the black female staff you interviewed express

23   concern about the culture at STRIVE as it pertains to them as

24   black women?

25           THE COURT:  Sustained.

1  A.  No.

2          MR. UNAMSKY:  Move to strike, please.

3          THE COURT:  I strike that answer.

4          It is helpful if you wait for my rulings.  Maybe it is

5  the only one, but it will be helpful.

6          THE WITNESS:  Yes, sir.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Mr. Weinberg, as part of your investigations of

2    Ms. Johnson's complaint, were you ever given an opportunity by

3    Ms. Johnson to sit down with her and speak with her about the

4    specific allegations contained in her complaint.

5            THE COURT:  Sustained.

6    Q.  Mr. Weinberg, did there come a time when you had a meeting

7    with Ms. Johnson during which you advised her that her

8    employment was coming to an end as a result of the Pathways Out

9    of Poverty grant also coming to an end?

10   A.  Yes.

11   Q.  Do you recall the date on which you had that conversation

12   with her?

13   A.  Yes, June 11.

14           MR. MINNAH-DONKOH:  Permission to approach the

15   witness, your Honor, with Defendants' Exhibit S, which is in

16   evidence, a June 11, 2012 e-mail from Mr. Weinberg to

17   Ms. Johnson.

18           THE COURT:  Excellent.  Yes, you may.

19   BY MR. MINNAH-DONKOH:

20   Q.  Mr. Weinberg, do you recognize Defendants' Exhibit S in

21   evidence?

22   A.  Yes.

23           THE COURT:  What do you recognize it as?

24           THE WITNESS:  I recognize this to be the memo that I

25   provided to Brandi to summarize and codify our discussion about

D8SNJOH5                    Weinberg – direct

1    the end of her employment as well as to advise her on next

2    steps regarding her benefits.

3    BY MR. MINNAH-DONKOH:

4    Q.  Now, Ms. Johnson, as referenced in this document, her

5    employment ended on June 11, 2012, correct?

6    A.  Correct.

7    Q.  Pursuant to the Pathways Out of Poverty grant, which funded

8    her position, that grant was supposed to end on June 30, 2011.

9    A.  Correct.

10   Q.  2012, rather.

11           MR. UMANSKY:  Objection.

12           THE COURT:  I didn't hear you.

13           MR. UMANSKY:  Objection.  Leading the witness.

14           THE COURT:  It is nothing new.

15           MR. MINNAH-DONKOH:  I will withdraw the question, your

16   Honor, and rephrase it.

17   BY MR. MINNAH-DONKOH:

18   Q.  When was the Pathways Out of Poverty grant supposed to end?

19   A.  At the end of June 2012.

20   Q.  After Ms. Johnson's employment ended on June 11, 2012,

21   what, if anything, was done with respect to her salary or

22   paying her salary?

23   A.  We continued paying Brandi through the remainder of the

24   grant term, which would have been the remainder of the month.

25   I think that was three weeks of pay.

1    Q.  And what was the reason for her employment ending on June

2    11, 2012 if the grant was ending at the end of June?

3             MR. UMANSKY:  Objection.

4             THE COURT:  Overruled.

5    A.  The reality was that the substance of work that needed to

6    happen as part of the grant was largely complete.  And it

7    seemed best for Brandi to give her three weeks of time to

8    manage her transition and look for new work, so it just seemed

9    like the right thing to do.

10            MR. MINNAH-DONKOH:  Can I have a brief moment, your

11   Honor.

12            THE COURT:  You may.

13   BY MR. MINNAH-DONKOH:

14   Q.  Mr. Weinberg, during your tenure with STRIVE, has

15   Mr. Carmona used foul language at any time in conversations

16   with you?

17   A.  Indeed.

18   Q.  Has Mr. Carmona ever yelled in conversations with you, a

19   male?

20   A.  Yes.

21   Q.  How frequently or how often would you say Mr. Carmona has

22   used foul language in communications with you, a male.

23   A.  I would say fairly regularly.

24            MR. MINNAH-DONKOH:  No further questions, your Honor.

25            THE COURT:  Very well.  Any cross?

1    MR. UMANSKY:  Please, your Honor.

2    CROSS EXAMINATION

3    BY MR. UMANSKY:

4    Q.  Good afternoon, Mr. Weinberg.

5    A.  Good afternoon.

6    Q.  We have never met before, correct?

7    A.  Correct.

8    Q.  We have never spoken before, correct?

9    A.  Correct.

10   Q.  You have previously given sworn testimony at a deposition

11   relating to this case on June 5, 2013, correct?

12   A.  Correct.

13   Q.  Mr. Weinberg, other than being the chief executive officer

14   of STRIVE, you are also a member of STRIVE's board of

15   directors, correct?

16   A.  Correct.

17   Q.  During your direct counsel spent about 40 minutes with you

18   discussing Ms. Johnson's performance issues.

19        Do you recall that?

20   A.  I recall the questions.

21   Q.  You never terminated Brandi Johnson for her performance

22   issues, did you?

23   A.  No.

24   Q.  You could have terminated Brandi Johnson in January of

25   2012, correct?

1          MR. MINNAH-DONKOH:  Objection.

2          THE COURT:  Overruled.

3     A.  I don't follow the question.

4     Q.  Could you have terminated Brandi Johnson if you wanted to

5     for her performance issues in January of 2012?

6     A.  Brandi could have been terminated by her supervisor at that

7     time, I am sure.

8     Q.  That answers my question.

9          Could you have terminated Brandi Johnson in February

10    of 2012 if you wanted to?  Yes or no?

11    A.  Possibly.

12    Q.  Isn't it true that this case has nothing to do with Brandi

13    Johnson's performance issues?

14         MR. MINNAH-DONKOH:  Objection.

15         THE COURT:  Yes.  That's really not true.  As I

16    explained to the jury, and you were right here, some of this

17    has to do with performance issues.  If you would like me to

18    tell them again, I will be glad to, but I doubt that you would

19    like that.

20         MR. UMANSKY:  No, that's fine, your Honor.

21    BY MR. UMANSKY:

22    Q.  You were also given Exhibit O by your attorney.

23    A.  That's correct.

24    Q.  That was the e-mail for regarding Brandi Johnson for the

25    personnel file?

D8SNJOH5                    Weinberg - cross

1   A.  Correct.

2   Q.  Ms. Johnson never had an opportunity to review this e-mail,

3   did she?

4   A.  Correct.  It was just for the files.

5   Q.  She was not cc'd on this e-mail, correct?

6   A.  Correct.

7   Q.  And she never had an opportunity to object or reply to this

8   e-mail, correct?

9   A.  Correct.

10  Q.  You also testified on direct that when you received a draft

11  complaint in April of 2012 you sprung into action, do you

12  recall that?

13  A.  I do.

14  Q.  And you spoke with Lisa Stein, you spoke with your board of

15  directors, and you also spoke with your pro bono counsel,

16  correct?

17  A.  Correct.

18  Q.  You understand pro bono to mean free, correct?

19  A.  Correct.

20  Q.  Your current attorneys, they don't work for free, correct?

21          MR. MINNAH-DONKOH:  Objection.  Relevance.

22          THE COURT:  Sustained.

23  BY MR. UMANSKY:

24  Q.  Mr. Weinberg, you already testified that you were in charge

25  of conducting the investigation into Ms. Johnson's claim of

1   race and gender discrimination, correct?

2   A.  Correct.

3   Q.  You were put in charge of that investigation by the board

4   of directors, correct?

5   A.  Correct.

6   Q.  When they put you in charge of that investigation, they

7   knew you didn't have a legal background, correct?

8   A.  Correct.

9   Q.  So they paired with you Andy Rahl, who is an attorney,

10  correct?

11  A.  Correct.

12  Q.  Mr. Rahl's legal background is in corporate law,

13  specifically bankruptcy and reconstructions, correct?

14  A.  Correct.

15          MR. MINNAH-DONKOH:  Objection.

16  Q.  Mr. Rahl doesn't have any experience in employment

17  discrimination, does he?

18          THE COURT:  Overruled.  If you know.

19  A.  I do not know.

20  Q.  You shared the results of your investigation with the

21  board, Mr. Carmona, and plaintiff, correct?

22  A.  Correct.

23  Q.  But you didn't include Ms. Johnson in your investigation,

24  did you?

25  A.  I tried to.

D8SNJOH5                    Weinberg - cross

1   Q.  Isn't it true that Ms. Johnson agreed to fully participate

2   in this investigation?

3           THE COURT:  I am not sure I understand.  The last

4   question was you shared the results of your investigation with

5   the board, Mr. Carmona and the plaintiff, correct?  And you

6   answered correct.  Isn't the plaintiff Ms. Johnson.

7   Q.  You shared the results of the investigation with --

8           THE COURT:  Yes.

9   Q.  Isn't it true that Ms. Johnson agreed to fully participate

10  in this investigation, but simply requested that her attorneys

11  be present during any discussions?

12  A.  That's not correct.

13  Q.  In fact isn't it true that Ms. Johnson told you that she

14  would do, quote, anything to assist you with your

15  investigation, isn't that true?

16  A.  Her actions did not follow those words.

17          THE COURT:  I didn't understand your answer.

18  A.  I am not aware that she said that, but she certainly did

19  not help in the investigation, your Honor.

20  Q.  During your investigation, you and Mr. Rahl interviewed Rob

21  Carmona, correct?

22  A.  Correct.

23  Q.  You investigated Ms. Johnson's complaint that Rob Carmona

24  told Ms. Johnson "If I wanted this fucking door closed, I would

25  have fucking closed it myself," correct?

1    A.  Correct.

2    Q.  You questioned Ms. Stein regarding this incident, correct?

3    A.  Correct.

4    Q.  And Ms. Stein confirmed to you that Ms. Johnson was

5    agitated and upset when she complained to her about the way Rob

6    Carmona had spoken to her, correct?

7              MR. MINNAH-DONKOH:  Objection, your Honor.

8              Outside the scope.

9              THE COURT:  Sustained.

10   BY MR. UMANSKY:

11   Q.  During the investigation you conducted, Rob Carmona also

12   told you that he said to Leticia Thomas, referring to her and

13   Ms. Johnson, "You guys are so alike, smart as shit, but so

14   dumb," correct?

15             MR. MINNAH-DONKOH:  Note my objection again.  Outside

16   the scope.

17             THE COURT:  Sustained.

18   Q.  During your investigation, Mr. Carmona never actually

19   admitted to calling Ms. Johnson a nigger, did he?

20             MR. MINNAH-DONKOH:  Note my objection.

21             THE COURT:  I will allow it.

22   A.  He said that he could have used that language.

23   Q.  But he did not recall using those words, did he?

24   A.  He recalled using the word ghetto, but he suggested that he

25   could well have used that language.

1    Q.  I asked you if he -- I asked you if Mr. Carmona admitted to

2    you calling Ms. Johnson a nigger?

3    A.  The same answer, which is he did not think he used that

4    word, but he certainly thought he could have used that word.

5    Q.  Mr. Weinberg, I would like you to pull up your deposition

6    testimony, which is Exhibit 6.  It should be in one of those

7    big binders.

8    A.  Exhibit 6.  Plaintiff's Exhibit.  Excuse me.  OK.

9    Q.  Let me know when you're done.

10   A.  I'm there.

11   Q.  Can you please turn to page 39, and I focus your attention

12   to line 12 to line 15.

13           Do you see that?

14   A.  Line 12 through 15?

15   Q.  Yes.

16   A.  Yes.

17   Q.  "Q   Now, during the course of your conversation with

18   Mr. Carmona, did he admit to you that he called Ms. Johnson a

19   nigger?

20   "A.  He did not.  He did not recall using those words."

21           Do you recall being asked that question, and do you

22   recall giving that testimony?

23   A.  Yes.

24   Q.  You were telling the truth during your deposition, correct?

25   A.  Yes.

 1    Q.  You had an opportunity to review your transcript of your

 2    deposition after it was completed, correct?

 3    A.  Yes.

 4    Q.  You signed your name on that, correct?

 5    A.  Yes.  This is my deposition.

 6    Q.  Mr. Carmona never actually admitted that he told

 7    Ms. Johnson that she was acting like a nigger during your

 8    investigation, did he?

 9    A.  I'm sorry.  Repeat the question.

10    Q.  During your investigation of Ms. Johnson's complaints,

11    Mr. Carmona never admitted to you that he stated to Ms. Johnson

12    that Ms. Johnson was acting like a nigger, did he?

13    A.  He did not remember using those words.

14    Q.  In fact, what he told you is that he may have used that

15    term, correct?

16    A.  Correct.

17    Q.  At some point you and the STRIVE board of directors learned

18    that Mr. Carmona did in fact call Ms. Johnson a nigger, isn't

19    that true?

20             MR. MINNAH-DONKOH:  Objection.

21             THE COURT:  Sustained.

22    Q.  Rob Carmona wasn't terminated after you found out that he

23    called Ms. Johnson a nigger, was he?

24             MR. MINNAH-DONKOH:  Objection.

25             THE COURT:  Well, you can answer.

1    A.  No.

2    Q.  Isn't it also true that Rob Carmona told you that by

3    calling Ms. Johnson, as we now know, a nigger, he meant to

4    constructively support her professional growth?

5    A.  Correct.

6    Q.  And Rob Carmona was admonished by the board, correct?

7    A.  Correct.

8    Q.  You and the board of trustees gave Rob Carmona a talking

9    to, correct?

10   A.  That's correct.

11   Q.  Yet amazingly you and Andy Rahl conclude in your

12   investigation that Rob Carmona did not discriminate against

13   Ms. Johnson, isn't that true?

14           MR. MINNAH-DONKOH:  Objection.

15           THE COURT:  Overruled.

16   A.  That is true.

17   Q.  In fact, you yourself testified "in no way did I interpret

18   Rob's comment as being discriminating towards Brandi," isn't

19   that true?

20   A.  True.

21   Q.  You as the chief executive officer of STRIVE stand by your

22   findings because Rob Carmona and Ms. Johnson are people of

23   color, isn't that true?

24           MR. MINNAH-DONKOH:  Note my objection.

25           THE COURT:  I am not sure.  I will sustain the

1    objection.

2    BY MR. UMANSKY:

3    Q.  Isn't it true that you didn't find Rob Carmona's calling

4    Ms. Johnson a nigger, you didn't substantiate it because both

5    Ms. Johnson and Mr. Carmona are people of color?

6            MR. MINNAH-DONKOH:  Objection.

7            THE COURT:  Overruled.  Is that right?

8            Do you understand that question?

9            THE WITNESS:  I don't understand the distinction

10   between the two questions, so perhaps I need clarification.

11   BY MR. UMANSKY:

12   Q.  One of the reasons that you did not find discrimination

13   based on Rob Carmona's conduct toward Ms. Johnson was because

14   both Ms. Johnson and Rob Carmona are people of color, isn't

15   that true?

16   A.  We took context into consideration.

17   Q.  Please go to your deposition, page 118, line 5.  This is

18   going to page 119, line 3.

19           MR. MINNAH-DONKOH:  Your Honor, I would note my

20   objection.  This is invading the province of the jury.

21           THE COURT:  118, line 3?

22           MR. UMANSKY:  118 -- I'm sorry, your Honor.

23           118, line 5, to 119, line 3.

24           THE COURT:  There comes a time when the Court has to

25   conclude that there is no prior inconsistency in the

1    statements, and I am there.  Maybe you can point it out to me

2    amongst those 30 lines that you would like to read, and I'll

3    get it.  It doesn't have to be much because it is their

4    problem, but if there's nothing that has to be my decision.

5              MR. UMANSKY:  It goes between line 12 and really

6    towards 119, line 3.

7              THE COURT:  Let me read these fewer lines.

8              I don't think so.  I think we will pass on that one.

9              MR. UMANSKY:  OK.

10   Q.  Mr. Weinberg, even after you listened to the recording of

11   Rob Carmona calling Ms. Johnson a nigger, you weren't surprised

12   by that, correct?

13             MR. MINNAH-DONKOH:  Note my objection.

14             THE COURT:  Overruled.

15   A.  Correct.

16   Q.  In fact, you actually agreed with Rob Carmona that he

17   called Ms. Johnson a nigger to support her personal growth,

18   isn't that true?

19             MR. MINNAH-DONKOH:  Objection.

20             THE COURT:  I think you have done this.  Been there.

21   BY MR. UMANSKY:

22   Q.  Isn't it also true that you testified that Rob Carmona

23   calling Ms. Johnson a nigger was not any less effective than

24   the language you would use when providing constructive

25   criticism, isn't that true?

1           MR. MINNAH-DONKOH:  Objection.

2           THE COURT:  Sustained.

3    BY MR. UMANSKY:

4    Q.  After Ms. Johnson complained of race and gender

5    discrimination, isn't it true that STRIVE retaliated against

6    her?

7           MR. MINNAH-DONKOH:  Objection.

8           THE COURT:  Overruled.

9    A.  Absolutely not.

10   Q.  On May 7, 2012, after Dwayne Hubbard visited Ms. Johnson,

11   you immediately implemented a policy that states in sum and

12   substance, no former STRIVE personnel are to be allowed on site

13   unless you provide prior approval, isn't that true?

14          MR. MINNAH-DONKOH:  Objection.  Outside the scope.

15          THE COURT:  Sustained.

16   BY MR. UMANSKY:

17   Q.  Aside from Ms. Johnson complaining about being called a

18   nigger, she made numerous other complaints, isn't that true?

19   A.  That is correct.

20   Q.  At one point Ms. Johnson, Cammie Crawford, and Lynette

21   Thomas were having lunch outside Mr. Carmona's office, correct?

22          THE COURT:  Oh, my God.

23          MR. MINNAH-DONKOH:  Objection.

24          THE COURT:  I don't --

25          MR. UMANSKY:  I promise, your Honor.  We are not going

D8SNJOH5                    Weinberg - cross

1   too much into those.

2          THE COURT:  Yes.  Well, take five minutes to go

3   through it at the most, because we have all heard it from time

4   immemorial in this lawsuit.  I won't characterize it.

5   BY MR. UMANSKY:

6   Q.  Do you recall that incident?

7   A.  If you could repeat the question, please.

8   Q.  Do you recall the incident when Ms. Johnson, Cammie

9   Crawford, and Lynette Thomas were having lunch outside Rob

10  Carmona's office?

11  A.  I do recall that.

12  Q.  At that time Rob Carmona told them to wrap it up, correct?

13         MR. MINNAH-DONKOH:  Objection.  Personal knowledge.

14         THE COURT:  He doesn't know.  But for his being here,

15  he doesn't know it.  If you would like to --

16  BY MR. UMANSKY:

17  Q.  Isn't it true that Ms. Johnson, Cammie Crawford, and

18  Lynette Thomas came to you and told you they were uncomfortable

19  with that comment?

20  A.  Two of those women I did have a conversation with and

21  shared their discomfort with that episode.

22  Q.  You substantiated that complaint, didn't you?

23  A.  I certainly substantiated that they felt uncomfortable by

24  it.

25  Q.  Immediately after that STRIVE implements a policy of no

1    congregating at the workspace for lunch, correct?

2            MR. MINNAH-DONKOH:  Objection.

3            THE COURT:  Sustained.

4    BY MR. UMANSKY:

5    Q.  Do you recall Mr. Carmona's testimony earlier today?

6    A.  I do.

7    Q.  Do you recall Mr. Carmona testifying that the policy of no

8    congregating at the workspace for lunch was already in place?

9            MR. MINNAH-DONKOH:  Objection.

10           THE COURT:  Do you recall that testimony?  You can

11   answer yes or no.

12           THE WITNESS:  I recall the testimony.

13   BY MR. UMANSKY:

14   Q.  Isn't it true that that policy was implemented after

15   Ms. Crawford, Ms. Thomas, and Ms. Johnson came to you in

16   regards to the wrap-it-up comment?

17           MR. MINNAH-DONKOH:  Objection.

18           THE COURT:  Sustained.

19   BY MR. UMANSKY:

20   Q.  Isn't it true that you also substantiated Ms. Johnson's

21   complaint of the door being slammed on her?

22   A.  That's not true.  That's not how I would characterize that

23   incident.

24   Q.  Please turn to your deposition testimony, page 220.

25           THE COURT:  Do you have a line?

D8SNJOH5                    Weinberg - cross

1           MR. UMANSKY:  You know what, your Honor, I am not

2   going to go with that.

3   Q.  Isn't it you also true that after Rob Carmona slammed the

4   door on Ms. Johnson, she was so distraught she went home?

5           MR. MINNAH-DONKOH:  Objection.

6           THE COURT:  If you know what Ms. Johnson did after

7   that experience, you should tell us.  Even if you know where

8   her home, is it would be nice, but I doubt you know any of

9   those answers, so I will sustain the objection.

10  BY MR. UMANSKY:

11  Q.  Didn't you in fact testify that you have never seen

12  Ms. Johnson so emotional?

13  A.  Are we speaking about this incident or a different incident

14  now?

15  Q.  Speaking about the incident where Rob Carmona slammed the

16  door on Ms. Johnson?  Isn't it true that you testified that

17  never seen Ms. Johnson so emotional?

18  A.  I am sure I did.

19  Q.  In fact, in your opinion, Ms. Johnson was so disturbed and

20  emotional that Carmona slammed the door on her that you

21  described her to be in a heightened state of anxiety, correct?

22          MR. MINNAH-DONKOH:  Objection.

23          THE COURT:  If you did that, you can answer.

24  A.  I don't recall how I described her.  I recall that she was

25  upset, emotional, distraught, loud, making outbursts, and I

1   invited her into my office so we could have a discussion about

2   this situation and also to pull her conduct outside of the

3   workspace.

4   Q.  Mr. Weinberg, yes or no, did you not describe Ms. Johnson's

5   emotional state at that point as in a very heightened state of

6   anxiety?

7           MR. MINNAH-DONKOH:  Objection.  Asked and answered.

8           THE COURT:  Answer it again.  It's cross-examination.

9   A.  If there are certain words in my deposition you would like

10  me to refer to, I would be happy to look at them.  I don't

11  recall the exact language that you are specifying.

12  Q.  I would refer you to those specific words, page 163?

13          THE COURT:  Oh, please.  You already have from him the

14  heightened state of emotion.

15          MR. UMANSKY:  Fine.  Let's move on, your Honor.

16  BY MR. UMANSKY:

17  Q.  This all occurred after Ms. Johnson came back from a

18  two-week leave, correct?

19          MR. MINNAH-DONKOH:  Objection.  Outside the scope.

20          THE COURT:  I will allow it.  If you know, if you

21  remember.

22  A.  If my memory serves me correctly, Ms. Johnson, Brandi was

23  not on a two-week leave.

24  Q.  Isn't it true that Ms. Johnson was out from May 14 to May

25  29?

D8SNJOH5                    Weinberg - cross

 1   A.  She had requested an accommodation to work from home, and I

 2   had granted that accommodation.  I would not characterize her

 3   working from home as a leave.

 4   Q.  But she was working from home from May 14 to May 29,

 5   correct?

 6   A.  Correct.  However you characterize it.

 7   Q.  Only after one week after returning to the office, you

 8   instructed Ms. Johnson to work from home again, isn't that

 9   true?

10           MR. MINNAH-DONKOH:  Objection.  Outside the scope.

11           THE COURT:  Sustained.

12   BY MR. UMANSKY:

13   Q.  Isn't it true that you also substantiated Ms. Johnson's

14   complaint that Rob Carmona told her coworkers not to be used by

15   her?

16           MR. MINNAH-DONKOH:  Objection.

17           THE COURT:  I will allow it.  I think we're going to

18   be finished here shortly.  You can answer it.  I know we are

19   going to be finished here shortly.

20   A.  Yes.  When I spoke to -- when Brandi brought that incident

21   to my attention, I immediately wanted to talk to the other

22   women involved in that, and at that point they informed me that

23   Rob had made those comments.

24   Q.  After STRIVE was served with Ms. Johnson's complaint of

25   race and gender discrimination, there were at least five

D8SNJOH5                    Weinberg - cross

1    incidents in which Ms. Johnson complained to you, correct?

2              MR. MINNAH-DONKOH:  Objection.

3              THE COURT:  Sustained.

4              This isn't your summation, in case you thought you

5    were going to go through them again.

6    BY MR. UMANSKY:

7    Q.  Mr. Weinberg, the Pathways Out of Poverty grant ended on

8    June 30, 2012, correct?

9    A.  Correct, thereabout.

10   Q.  Yet Ms. Johnson was let go on June 11, 2012, correct?

11   A.  Corrects.

12   Q.  That was four days after she filed a lawsuit in this case,

13   correct?

14             MR. MINNAH-DONKOH:  Objection.

15             THE COURT:  Overruled.

16   A.  If you would like to know the timing, I was made aware --

17   Q.  I'm not asking for the timing.  I said wasn't she let go on

18   June 11, four days after she filed a lawsuit in this case?

19   A.  I was made aware of a lawsuit on June 11, after I had a

20   conversation with Brandi about her position ending.

21   Q.  It was your decision to terminate -- to let go of

22   Ms. Johnson, correct?

23   A.  That's correct.

24   Q.  You consulted with Ms. Lisa Stein regarding that decision,

25   correct?

D8SNJOH5                    Weinberg - cross

1    A.  I did not.

2    Q.  You did not.  Turn to your deposition page 242, lines 7

3    through 17.

4              MS. KREBS:  I'm sorry, the lines?

5              MR. UMANSKY:  7 through 17.

6              MS. KREBS:  Which page?

7              MR. UMANSKY:  242.  "Question" --

8              MR. MINNAH-DONKOH:  May I place my objection, please.

9              Your Honor, to place this in context I would also

10   request that plaintiff's counsel read from page 241, line 25 --

11             MR. UMANSKY:  Your Honor, this is a giant waste of

12   time.

13             MR. MINNAH-DONKOH:  I agree with that.

14             MR. UMANSKY:  The question was whether he consulted

15   with Lisa Stein.  That answers it right there.

16             THE COURT:  Let me read it so I can see the magnitude.

17   We just heard -- no, go right ahead.  You read what you think

18   is a prior inconsistent statement.

19             MR. UMANSKY:  Thank you, your Honor.

20   "Q.  Was that decision discussed with anyone?

21   "A.   I'm sure that it was.  It was my decision.  It was my

22   conversation with Brandi.  Lisa was our CFO and had been

23   supervising that project.  I am sure I had consultations with

24   Lisa Stein on that.

25             "We certainly have our counsel who advises us on many

D8SNJOH5                    Weinberg - cross

 1    of our employment-related issues, and I'm sure I sought

 2    counsel's guidance on that as well."

 3         Were you asked that question and did you give that

 4    answer?

 5    A.  Correct.

 6    Q.  So did you, in fact, consult with Lisa Stein?

 7         THE COURT:  Sustained.  It speaks for itself.  I think

 8    we don't have to beat it to death.

 9    BY MR. UMANSKY:

10    Q.  Isn't it true that you in fact terminated Ms. Johnson's

11    employment in retaliation for her multiple complaints of

12    discrimination?

13         MR. MINNAH-DONKOH:  Objection.

14         THE COURT:  Sustained.

15    BY MR. UMANSKY:

16    Q.  Mr. Weinberg, today Rob Carmona continues to advocate on

17    behalf of STRIVE, is that correct?

18    A.  That's correct.

19    Q.  Rob Carmona participates in fundraisers and asks for

20    donations, correct?

21    A.  That's correct.

22    Q.  In fact, if you were going to the STRIVE website, you would

23    see a giant photo of Rob Carmona, and next to that it says

24    donate today?

25    A.  I think we have a video on our home page.  It might be

1   Rob's face that is on the frame, but that would be generally

2   correct.

3   Q.  Before you click on the video, you would see his face,

4   correct?

5   A.  I believe that's the case.

6   Q.  The face of your organization is Rob Carmona.  That's

7   correct?

8   A.  Rob is a very prominent face in our organization.

9            MR. UMANSKY:  No further questions.

10           THE COURT:  You're excused.

11           MR. MINNAH-DONKOH:  Brief redirect, your Honor?

12           THE COURT:  No.

13           (Witness excused)

14           THE COURT:  What's next?

15           MS. KREBS:  Your Honor, the defense rests.

16           THE COURT:  Very well.  That's exciting.

17           What I think we will do, since it's 10 of 4 and we

18  haven't had a recess at all, is we will let you go home.  We

19  will have a charging conference.  We'll get everybody in the

20  counsel world ten minutes to get together.  I am just trying to

21  figure out when to ask you to come in.

22           I suppose, to be safe, if you come in at 10:30 we will

23  be ready for summations and charge.  I think that will work.

24           Both sides rest, right?  I don't want to start this

25  over again.

1          MS. MESIDOR:  Plaintiffs rest, your Honor.

2          THE COURT:  The defendant has, so I think that will

3     work.

4          I don't know when we'll finish, but the United States

5     will buy your lunch.  Have a good evening.  Don't discuss this

6     case amongst yourselves or with anybody else.  We will see you

7     at 10:30.  Come a little earlier so Bill can order your

8     three-star choices.

9          The case is not yours, yet so don't discuss it.

10         (Jury not present)

11         THE COURT:  OK.  Why don't we do this, if you all are

12    still on your feet here after the day.  Why don't we have a

13    charging conference in my robing room in about 15 minutes, if

14    that's doable.  Maybe we'll finish by 5:30, maybe we won't.  If

15    we have to go further, we have a little extra time.

16         Does that sound OK to all of you?

17         MS. MESIDOR:  That is fine for plaintiff, your Honor.

18         MS. KREBS:  Yes, your Honor.

19         THE COURT:  Very well.  We will see you at 5 after 4.

20         (Recess)

21         (In the robing room)

22         THE COURT:  I think I mentioned this to you at the

23    outset that indeed I would mark your verdict sheets and

24    requests as court exhibits.  I have done that already.  So that

25    the defendants proposed verdict sheet is Exhibit C, and the

1    defendants proposed verdict sheet on punitive damages is D and

2    plaintiff's requests D and the plaintiff's proposed verdict

3    sheet is E, and the defendants' requested jury instructions is

4    A.

5            They are all court exhibits and should make it easier

6    for us at the end of the charge when I ask you to come up with

7    any additions or corrections.  You will know that anything

8    that's in any of what you have provided me is objected to if

9    not utilized by me, which I presume is the only reason you

10   would object.

11           I will provide you momentarily with the first 15 pages

12   of my charge.  What I have done is I have taken your material

13   and essentially condensed it, which is a good word for what I

14   to a degree achieved in connection with this particular

15   lawsuit.  But I'm only going to do the first 15 pages with you.

16   You will understand what that is when he comes.  But they are

17   the boilerplate portion of the charge.

18           The substantive portion, which in my proposed charge

19   is another 15 page, we will do at 9:30 tomorrow morning.

20   Actually it's another 16 pages.  But I presume that we won't

21   have a lot of trouble with the boilerplate, and I really don't

22   feel like going over the others if I can avoid it in the late

23   afternoon and early evening.

24           You have copies of the boilerplate portion?

25           THE DEPUTY CLERK:  Yes.

1          MS. KREBS:  Your Honor, may I ask you a question?

2          THE COURT:  Anything.  You can make any motion you

3    would like to make again at the end of the plaintiff's case.

4    The plaintiff might want to make a motion.

5          MS. KREBS:  I just have --

6          THE COURT:  Go ahead.  I don't want you to lose your

7    place.

8          MS. KREBS:  I just had an orchestral question.  The

9    next 15 or 16 pages that we are going to be discussing tomorrow

10   morning, are you going to give that to us to consider this

11   evening?  Give it to us before we leave today?

12         THE COURT:  No.  Because I haven't considered it.  So

13   we are going to all consider it tomorrow together.  If I finish

14   it tonight -- I'm not going home when we finish but I am not

15   staying very late.  If we finish it, I will be glad to e-mail

16   to each of you, assuming you are going back to work.

17         MS. KREBS:  I doubt I am going home yet, your Honor.

18         THE COURT:  OK.  So I will do that if I possibly can

19   to each of you so that you will have it with you in the

20   morning, as well as the verdict sheet that I propose.  But

21   right now I just want to go through the boilerplate, which

22   includes all of your thoughts, albeit in a form that's more at

23   least reminiscent of my charge.

24         We can start on page 3, if you see a problem, which is

25   a standard part 1 or the beginning of part 1 of a civil charge,

1   and just keep rolling right along.  When you have a problem or

2   a concern or a question, just ask me.

3           (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In the robing room)

2          THE COURT:  Any concerns anyone has ought not keep

3   quiet.

4          MS. MESIDOR:  Your Honor, we do have one concern on

5   page 14 of the instructions on the law in regard to the claim

6   of action, your Honor.

7          Let me know when you are there, Judge, and I will.

8          THE COURT:  Excuse me?

9          MS. MESIDOR:  Let me know when you are there.

10          THE COURT:  This is the time.

11          MS. MESIDOR:  I just wanted to make sure you were on

12   the same page I was.  It is the first full paragraph where it

13   indicates that for the purposes of this case Section 1981 and

14   the New York City Human Rights Law apply the same standard for

15   determining liability, and our concern because this is a

16   hostile work environment case under Federal Law Section 1981,

17   the standard for hostile work environment should be pervasive

18   where as to the New York City Human Rights Law, the standard

19   for hostile work environment is a petit, slight or trivial

20   inconvenience.  I believe in the jury instructions that we had

21   submitted to your Honor when we divided each claim up, we

22   provided the necessary case law for each of the articulated

23   standards.

24          THE COURT:  This is really sort of an overview.  When

25   we get into the specific discriminatory or retaliatory sections

1    of the law, we will have made that clear.

2              MS. MESIDOR:  Your Honor, is it possible for that one

3    sentence not to be there.  Everything else I think supports

4    what your Honor just stated about what the specific claim was

5    and how each statute prohibits -- one statute prohibits race

6    claims and the other statute can prohibit race and gender

7    claims and alike.  That way if the jury is comparing one

8    instruction to the other, there is no sense of confusion that

9    the same standard would apply for the hostile work environment

10   case.

11             THE COURT:  So what would you take out?

12             MS. MESIDOR:  I would take out, For the purposes of

13   this case Section 1981, the New York City Human Rights Law,

14   apply the same standard for determining liability.  That would

15   be the own portion that I would take out.

16             THE COURT:  I will be glad to think about it in terms

17   of the balance of the charge.

18             MS. KREBS:  The defendants have no objection to the

19   language.  We were very happy with that.

20             MR. MINNAH-DONKOH:  We would refer to the case law

21   that defendants cited with respect to request to charge 18 of

22   their request Footnote 18.

23             THE COURT:  To their request?

24             MR. MINNAH-DONKOH:  No defendants, our requests.

25             MS. KREBS:  In considering it.  Obviously it is not

1    something that needs to be looked at right now.  We want to

2    make reference to it.

3             THE COURT:  We only have one more page here.  We may

4    as well look at it.  I assume that the plaintiff has looked at

5    your charges as well as her own.  What is it that 18 is going

6    to do for me?

7             MR. MINNAH-DONKOH:  That they are analyzed under the

8    same legal standard.

9             THE COURT:  I don't think there is any question about

10   that, but she seems to think there is a way in which

11   distinguished, which I don't know about.  I gather you don't

12   think there is any distinction?

13            MR. MINNAH-DONKOH:  No, your Honor.

14            THE COURT:  The defendants do not share your view.

15            MS. MESIDOR:  It wouldn't be the first time, your

16   Honor.

17            MS. KREBS:  Nor will it be the last time.

18            THE COURT:  I will look and see.  Their 18th request

19   apparently, although I haven't found it, provides some law that

20   they are analyzed, Footnote 18.

21            MS. MESIDOR:  We have clear case law.  If I can give a

22   little background, your Honor.  The New York City Human Rights

23   Law and the Restoration Act of 2005 updated its standard

24   specifically for the hostile work environment and further

25   elaborated the statute.  The cases that defendants cite here

1   are all pre2005 and therefore in applicable as it relates to a

2   determination of the New York City Human rights Law issue as it

3   relates specifically to the hostile work environment.

4        The only case that defendants submit that is after

5   2005 is a 2009 case that just does a comparison between the

6   elements of the strict discrimination claim.  Our issue is not

7   that there is a difference between the elements for strict

8   discrimination claim between Section 1981 and New York City

9   Human Rights Law.  Our only issue is that as it relates to the

10  standard of what needs to be proven to prove a hostile

11  environment that those two standard are separate and distinct

12  and the case law that defendants have cited do not cover that

13  issue.  Primarily I already stated four of them are pre2005.

14       THE COURT:  I heard it once.  You must be back there

15  in front of the jury.

16       MS. MESIDOR:  I am sorry, your Honor.

17       THE COURT:  At least for me you can understand I get

18  it the first time.  You may not feel that way about the jury.

19       I will be glad to look at the Pilgrim and see if you

20  are right.  That is the case from 2009 wherein they talk about

21  as you suggest the standard for all the Title 7, Section 1981

22  and the Human Rights Law and CHRL are the same.  I gather you

23  are saying that your concern is somewhat different.

24       MS. MESIDOR:  Yes, your Honor.  We also cited to

25  Zakrewska v. New School, which is also a 2009 case.

1          THE COURT:  I have yours.  Why don't I look at your

2     charges.

3          MS. MESIDOR:  Coincidentally my charge and my case law

4     in this that regard is actually on page 18.

5          THE COURT:  Should I find your charge that will make

6     it easy.  Employer liability, is that where it is?

7          MS. MESIDOR:  It is right above that section.  Hold on

8     one second, your Honor.

9          THE COURT:  You have almost all last century cases,

10    right?

11         MS. MESIDOR:  One second, your Honor.  I might have

12    misspoke.

13         THE COURT:  They are earlier than the defendants'

14    cases.

15         MS. MESIDOR:  Your Honor, beginning on page 14.

16         THE COURT:  14.

17         MS. MESIDOR:  Not 18.  My apologies.

18         THE COURT:  Where are the cases that you think I ought

19    to read?

20         MS. MESIDOR:  They are immediately following the last

21    sentence on page 14.  They are all on page 15.  It cites to the

22    clear statute and it also cites to two cases that are

23    interpreting the New York City Human Rights Law.  One is a 2006

24    case the other is a 2009 case.

25         THE COURT:  Zakrewska v. New school?

D8snjoh5          Charge Conference

1          MS. MESIDOR:  Yes.

2          THE COURT:  That is a 2009 case.  I don't see a 2006

3    case.

4          MS. MESIDOR:  Immediately in the paragraph right above

5    it.

6          THE COURT:  Williams.

7          MS. MESIDOR:  Farrugia v. Williams.

8          THE COURT:  I know Farrugia.  That is a state case.

9          MS. MESIDOR:  Only because usually New York City human

10   rights claims are brought in state courts unless there is some

11   kind of federal claim they can bring it.

12         THE COURT:  I am glad to look at both your cases and

13   theirs.

14         Any other boilerplate problems that we can take back

15   to chambers with us?

16         MS. KREBS:  Your Honor, I just had a few requests for

17   some language insertions from our proposed instructions.  I

18   think what the easiest thing to do is just identify this page,

19   this paragraph of what we would prefer to have in and there are

20   a few locations.

21         THE COURT:  Sure.

22         MS. KREBS:  I am now referring to Court Exhibit A,

23   which was our proposed jury instructions.  From page 14, the

24   last paragraph on page 14, we would request that that paragraph

25   or language similar to that would be inserted at the end of the

1    instruction -- at the end of instruction regarding direct and

2    circumstantial evidence, which end on page 8 of your Honor's

3    proposed charge.

4              THE COURT:  Let me read it just so I can tell you if I

5    will be with you right away.

6              No thank you.  Denied.

7              What else?

8              MS. KREBS:  From page 15 to 16 in Court Exhibit A

9    discussing the fact that certain witnesses when they believe

10   one part of it may not believe the other part of it and you are

11   allowed to make choices, infer if one part is untrue that the

12   other part is untrue or not.  I think that is something that is

13   important.

14             THE COURT:  I thought probably I had it in my charge.

15             MS. KREBS:  I did not see that.  Your Honor's proposed

16   charge on witness credibility is on page 9.

17             THE COURT:  No.  It is not in there.  There is a

18   charge that talks about you can believe some or none of the

19   testimony of a witness whose credibility has been impeached.

20   It is essentially saying what this says but I will be glad to

21   utilize this language if I think I missed it.

22             MS. MESIDOR:  Your Honor, what portion of their

23   language are you saying you are going to utilize?

24             THE COURT:  The last paragraph of 15, Court Exhibit A

25   and the first two lines on 16.

1          MS. MESIDOR:  Your Honor, there is a portion of that

2     that does not have to do with what your Honor just indicated.

3     For instance, they say two or more persons witnessing an

4     incident or transaction may hear it differently and innocent

5     misrecollection like failure to recollect is not an uncommon

6     experience.  That additional language, your Honor, is a little

7     bit different than believing one portion of it and not

8     believing another.  It provides or it guides a level or an

9     inference for the jurors that the portion of your Honor's

10    instructions does not do.

11         MS. KREBS:  We do believe that that part of it as well

12    as the following paragraph on page 16 --

13         THE COURT:  Of the whole paragraph?

14         MS. KREBS:  No.  It was the first paragraph.  Two

15    paragraphs, your Honor.  The first one starts at the bottom of

16    page 15 and then the next one continues at the top of page 16

17    and all of the contents in it I think are important for a jury

18    to understand.

19         THE COURT:  I am sure that the second paragraph or the

20    first full paragraph on 16 is part of my charge.

21         MS. KREBS:  Thank you, your Honor.  I did look and I

22    apologize if I missed it, but I looked and I didn't see it.

23         THE COURT:  I will tell you in the morning before you

24    need to apologize.

25         MS. KREBS:  Thank you, your Honor.

1          THE COURT:  That is my guess it should be there.

2          MS. KREBS:  I would have anticipated it would be on

3    page 9 and I didn't see it.  That's all, your Honor.

4          THE COURT:  That certainly should be there so it will

5    be.

6          MS. KREBS:  Thank you, your Honor.

7          MS. MESIDOR:  Which section, your Honor?

8          THE COURT:  Do you have something?

9          MS. MESIDOR:  I didn't hear what section.  You said it

10   certainly should be there and would be.

11         THE COURT:  The balance of the second paragraph.  The

12   first paragraph we're going to think about.  After making your

13   own judgment paragraph will certainly be there.

14         MS. MESIDOR:  Thank you.

15         MS. KREBS:  The only other request that we have is an

16   instruction in accordance that was proposed on page 23, the

17   last several sentences.

18         THE COURT:  Of your charge.

19         MS. KREBS:  Of my proposed charges, your Honor.  To

20   make sure that the jurors are aware to not treat companies any

21   differently than they treat people.

22         THE COURT:  That certainly ought to be there, too.

23         MS. KREBS:  There is a charge, which certainly will be

24   included which says that everybody is treated equally whether

25   man, woman or entity.

1          Thank you, your Honor.

2          THE COURT:  Anything from plaintiff on the boilerplate

3     charges?

4          MS. MESIDOR:  No, your Honor.

5          THE COURT:  Then we will resolve these concerns.  If I

6     can hang in there until I finish the substantive charges, I

7     will send them all to you.

8          MS. MESIDOR:  Your Honor, I have one procedural

9     question.  I believe what I understood that you said that if

10    there were any additional instructions that we wanted you to

11    consider that there would be an opportunity to provide that.

12    Did I hear that right?

13         THE COURT:  I never said that, but I will certainly

14    look at anything that you send me.

15         MS. MESIDOR:  Thank you.

16         THE COURT:  I would like to know what your view is

17    about summation time so that we can figure out what to do about

18    ordering lunch and marshals and things like that.

19         MS. KREBS:  Your Honor, before we move onto that, is

20    it possible for us to return for a moment to an issue that

21    arose in the court today that I can request further

22    clarification.

23         THE COURT:  Sure.

24         MS. KREBS:  During the examination of Mr. Weinberg,

25    there was a point in time where your Honor indicated that we

1    were not allowed to put in exhibits that connected to the

2    investigation that was done in response to Ms. Johnson's

3    complaints.

4              THE COURT:  That you couldn't, the plaintiff could.

5              MS. KREBS:  Yes.  However, it was our understanding

6    that that ruling was -- let me take a step back.  Your Honor

7    had given us instructions either directly and/or through your

8    law clerk.  There were several exhibits that were in both lists

9    and we were therefore to identify which ones were and eliminate

10   from one of the lists one set that was duplicative and you

11   would rule on the other set.

12             THE COURT:  I did that primarily so that there

13   wouldn't be overlapping of exhibits not because of rulings.

14             MS. KREBS:  Yes.  But in terms of overlapping of

15   exhibits so you would indicate one was out and the other one

16   would be in.  That was our understanding.

17             THE COURT:  No.  I don't think it directly matters.

18   All I didn't want was two Xs that were the same as 8s.  So I

19   was anxious that you had together put one set of exhibits, but

20   indeed I was going to rule as to who it was that was

21   introducing or may seek to introduce them.  So that if the

22   plaintiffs took numbers and the defendant took letters, I would

23   look at them and rule depending on which they were if they were

24   the plaintiff or defendant.

25             MS. KREBS:  I apologize.  That was not our

1    understanding.  We thought you were only going to be ruling if

2    there were duplicates on each one once and say if the document

3    was acceptable and the stipulated to then you would agree that

4    it would be in for all and you would just have it out on the

5    other list so there would be no duplication.

6         THE COURT:  None of that makes any sense to me, but I

7    mean I can tell you once more what I was doing.  With respect

8    to the two recordings I let in, they were both agreed to both

9    of you.  So I didn't really try and understand what they said,

10   which was not always easy.  But in any event with respect to

11   the wanting separate exhibits, it was simply your thought is

12   more much more complicated than I am and my operation is, which

13   is all I wanted do as I said was have 1, 2, 3, 4 and A, B, C,

14   D.  So the A, B, C, D was the defendants and the 1, 2, 3, 4 was

15   the plaintiff's and never between shall meet.  Then I ruled on

16   the plaintiff exhibits and the defendant exhibits separately.

17        MS. KREBS:  I apologize, your Honor.  That was not our

18   understanding and therefore when we saw that it was in on

19   plaintiff's list, it was our understanding that it was in

20   because both had put them on their list and therefore both had

21   indicated that they should be -- the documents should be

22   allowed into evidence.

23        THE COURT:  That was not true if in deed you

24   misunderstood me.  I thought I made it clear as to what my

25   concern was so that if the plaintiffs had introduced it, it

1    would not have been hearsay because it would have been party

2    admissions.  It was not in that situation when you sought to

3    admit it.

4         MS. KREBS:  Yes, your Honor.  We would like the

5    opportunity to submit an application of additional support to

6    allow the documents relating to the investigation in.

7         THE COURT:  That final report that I didn't let in, is

8    that we're talking about?

9         MS. KREBS:  The report and investigation notes that

10   were taken by Mr. Weinberg, which my colleague once you said

11   nothing relating to the investigation would be allowed in no

12   longer pursued.

13        THE COURT:  I am glad to look at them.  I don't

14   remember any discussion about the notes at all, but maybe I had

15   an umbrella.

16        MS. KREBS:  That was our understanding that your

17   ruling on that because it all this had to do with the

18   investigation and it was all from defendants' side that you

19   were applying the ruling to all of the documents relating to

20   the investigation.

21        THE COURT:  I doubt it because there is a separate

22   number for the notes I presume.

23        MS. KREBS:  But the ruling that you gave in and the

24   explanation that you gave was identical to all of the documents

25   relating to the investigation.

1      THE COURT:  If you thought it covered all the

2 documents, I will be glad to look at them again.

3      MS. KREBS:  Thank you.  Your Honor, we wanted to have

4 the opportunity to do that given the nature of not only the

5 case but of the affirmative defenses that exist.

6      MS. MESIDOR:  Your Honor, if that is indeed the case,

7 does that mean we're reopening the examination of Mr. Weinberg?

8      THE COURT:  No.  We just take the piece of paper into

9 the jury.

10      MS. MESIDOR:  The reason I ask --

11      THE COURT:  That's the answer, though.  You asked and

12 the answer is no.

13      MS. MESIDOR:  Okay.

14      THE COURT:  But for an exhibit or perhaps two or

15 perhaps none.

16      MS. MESIDOR:  Okay.

17      THE COURT:  Shall we come back to my concern now as to

18 the length of summations?  The defendant goes first but

19 nonetheless I would be glad to hear what the defendants'

20 timetable is and the plaintiff's timetable.  If you have an

21 approximation not that I will not hold you to it, but an

22 approximate is okay for moment.

23      MS. KREBS:  Our approximation is that we will expect

24 perhaps an hour.

25      THE COURT:  What does the plaintiff think?

1           MS. MESIDOR:  Probably 30 to 45 minutes, your Honor.

2           THE COURT:  So if we start at 10:30, 11:30.  So we can

3    certainly go a little longer here.  We can certainly have lunch

4    by 12:00 or I can charge.  But I will figure that out.  It is

5    not your problem.  We'll see you at 9:30 in the morning and

6    we'll make an effort to examine all your concerns as well as

7    get you copies of substantive charges before the end of the

8    night, but I guarantee you nothing.

9           MR. MINNAH-DONKOH:  One quick question with respect to

10   the verdict sheet.  To the extent we wish to use it during

11   summation, will we be given sufficient time tomorrow or tonight

12   to see the Court's final verdict sheet?

13          THE COURT:  I have a verdict sheet, but I really

14   haven't looked at it carefully.  Where is it?  Didn't you give

15   me one?  Let me look at it and maybe we can do it right here

16   while we're here.  I am not sure of how much of this, but I

17   only have one copy so why don't I look at it more carefully and

18   send it to you.

19          MR. MINNAH-DONKOH:  Thank you, your Honor.

20          MS. MESIDOR:  Thank you.

21          THE COURT:  Anything else?

22          MS. KREBS:  No, your Honor.

23          THE COURT:  Anything from the plaintiff?

24          MS. MESIDOR:  No, your Honor.  Thank you.

25          (Adjourned to August 29, 2013, at 9:30 a.m.)

INDEX OF EXAMINATION

Examination of:                              Page

LISA STEIN

Cross By Ms. Mesidor . . . . . . . . . . . . 323

Redirect By Ms. Krebs . . . . . . . . . . . 358


Direct By Ms. Krebs . . . . . . . . . . . . 375

Cross By Mr. Umansky . . . . . . . . . . . . 406

Redirect By Ms. Krebs . . . . . . . . . . . 452

PHILIP WEINBERG

Direct By Mr. Minnah-Donkoh . . . . . . . . 457

Cross By Mr. Umansky . . . . . . . . . . . . 489

PLAINTIFF EXHIBITS

Exhibit No.                              Received

 XX    . . . . . . . . . . . . . . . . . . 327

 YY    . . . . . . . . . . . . . . . . . . 357