D8t6joh1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

BRANDI JOHNSON,

                    Plaintiff,

          v.                              12 CV 4460(HB)

LISA STEIN, ROB CARMONA and
PHIL WEINBERG,

                    Defendants.

------------------------------x

                                          New York, N.Y.
                                          August 29, 2013
                                          9:40 a.m.

Before:

                    HON. HAROLD BAER, JR.,

                                          District Judge

                              APPEARANCES

PHILLIPS & PHILLIPS
        Attorneys for Plaintiff
BY:  MARJORIE MESIDOR
        ALEX UMANSKY

GORDON & REES, LLP
        Attorneys for Defendants
BY:  DIANE KREBS
        KUUKU ANGATE MINNAH-DONKOH

Also present:  Daphney Guillaume, Esq.

1          (In robing room)

2          THE COURT:  I am sorry I didn't get these to you last

3    night, but you now have copies of all the charges and there

4    were a couple of changes in the boilerplate that we did talk

5    about yesterday pursuant to your concerns.  One with the

6    respect to impeachment on page 10 and the other with respect to

7    the city human rights law on page 15.  I think those are the

8    only changes or so John tells me.  I have Ms. Krebs letter of

9    August 29th and I am glad to talk about that first or second.

10   It may be valuable to go through the charges first.

11         MS. KREBS:  One question.  The other issue that I had

12   raised yesterday had to do with all parties under the law,

13   corporations.

14         THE COURT:  I think we added something.

15         THE LAW CLERK:  It is in the last part, page 25.

16         THE COURT:  It's in the end?

17         THE LAW CLERK:  Yes.

18         THE COURT:  I don't know that we actually got to the

19   part three of the charge, which is really about the jury, but I

20   guess it is in there on page 25 and I suppose that that is as

21   good a place as any.  You can do it in both places.

22         MS. KREBS:  Your Honor, page 25 in the middle of

23   damages.  I am not sure if that is it.

24         THE COURT:  29.

25         MS. KREBS:  Thank you.

1            THE COURT:  So we're now on 17.

2            I am now on 20 if all of you are with me.

3            MS. KREBS:  Sorry, your Honor.  I am still reading.

4            THE COURT:  I will wait for you.

5            MS. KREBS:  Are we going one by one?

6            THE COURT:  If you would like to do it one by one,

7    that is the way I usually do it.  But if you have any reason to

8    do it otherwise, you are welcome to tell me.

9            MS. KREBS:  I thought we would read through the whole

10   thing as we did yesterday and come back with our comments.

11           THE COURT:  Whatever strikes your fancy.

12           MS. MESIDOR:  Your Honor, may I make a request as a

13   courtesy?  I do not have defendant's letter application.  I

14   just looked on my phone and I looked at the e-mail.  The only

15   attachment that I can see is excerpts from the transcripts, not

16   the actual letter itself.  I don't know whether it is just an

17   issue with my phone and I was wondering if as a courtesy if I

18   could have a copy of defendant's letter?

19           THE COURT:  That's fine with me.  I will be glad do

20   give you mine it is just that I have some notes ton.

21           MS. MESIDOR:  Your Honor, my co-counsel can see it on

22   his phone.

23           THE COURT:  Otherwise you can have my hard copy.  Just

24   disregard the notes on the top.

25           MS. MESIDOR:  Well, your Honor, I would not to be

1  privy to your notes.

2           THE COURT:  I want you to do whatever makes you happy.

3           MS. MESIDOR:  Thank you, your Honor.  I will make due

4  with mine.  Thank you.

5           THE COURT:  Let's go, guys.  We have half an hour or

6  thereabouts and I don't want to waste it.

7           MS. KREBS:  Yes, your Honor, I am still --

8           THE COURT:  I don't care what you are doing.

9           Any problems on page 18 with the hostile work

10  environment or 18 or 19.

11           MS. KREBS:  Yes, your Honor.

12           MR. UNAMSKY:  No, your Honor.

13           MS. KREBS:  Yes, your Honor.

14           THE COURT:  I will let you go first.

15           MS. KREBS:  I thought they said no.

16           MR. UNAMSKY:  We have no problems with 17 or 18.

17           THE COURT:  I didn't hear that.

18           MR. UNAMSKY:  What page are you on?

19           MS. KREBS:  Starting on page 17.  In number two, that

20  says "twice," it says "motivated at least in part."  I would

21  like the the words "at least in part" taken out.  The law is

22  that it has to be motivated by the gender, race.  I will say in

23  both charges that were proposed both by plaintiff and defense

24  went under the hostile work environment prong nobody used "at

25  least in part."  Everybody said motivated by.

1        MS. MESIDOR:  Your Honor --

2        THE COURT:  Don't worry.  It is denied.

3        What is next?

4        MS. KREBS:  Your Honor indicates on page 18 that there

5   is an affirmative defense on the defendant's part to

6   demonstrate that it was nothing more than petty slights or

7   trivial inconveniences and the standard is first that it is

8   plaintiff's burden to show that it was more than petty slights

9   or trivial inconveniences.  So it is reversing the burden.

10        THE COURT:  Wait a minute.  I am reading where it

11   says, then you turn on the middle, almost of the middle to the

12   defendants affirmative defenses to which the defendants have

13   burden of proof, right?

14        MS. KREBS:  That is right.  Let me read the language.

15   It says, "The defendants' affirmative defenses in substance are

16   that the unwanted treatment complained of by the plaintiff

17   consists of nothing more that what a reasonable victim of

18   discrimination would considerable petty slights or trivial

19   inconveniences."  I am just going to that piece of it.

20        THE COURT:  Yes.

21        MS. KREBS:  It is actually the plaintiff's initial

22   burden to prove not only that the conduct is unwelcome but that

23   it rises to the level beyond petty slights and inconveniences.

24   By indicating that it is defendants' burden to show it wasn't

25   at that level, that reverses the burden of proof.

1          THE COURT:  Wait a minute.  Let me just read it again.

2     It is your burden of proof, right, to prove the affirmative

3     defense?  Isn't that what an affirmative defense is about?

4          MS. KREBS:  It would be our burden of proof, yes, your

5     Honor, if that was the affirmative defense.  But, in fact, what

6     I am saying, your Honor, is that the requirement to demonstrate

7     that it is above a petty slight or trivial inconvenience is

8     part of the -- incorporated into the demonstration that

9     something is unwelcomed, which is part of the initial burden of

10    proof on plaintiff.

11         MS. MESIDOR:  No.

12         THE COURT:  Yes.

13         MS. MESIDOR:  I agree in part and disagree in part.

14    The portion that I disagree with is the petty slight or trivial

15    inconvenience is the standard that must be met to determine

16    whether there is a hostile work environment.  I agree with

17    that.  What I do not agree is that portion as part of the

18    elements of it being unwelcomed.  It is not part of an element

19    that plaintiff has to prove in terms of it being unwelcomed.

20    The petty slights and trivial inconvenience is the standard by

21    which the -- it is the objective standard by which the juror

22    must look at what was done or said and ask was this a joke, was

23    it light, was it petty.

24         THE COURT:  That is what I thought I was trying to get

25    across.

1          MS. MESIDOR:  Right.  But I believe counsel is correct

2     in that that it is not an affirmative defense.  It is just a

3     bar in which that needs to be proven to say that it was indeed

4     a hostile work environment.

5          MS. KREBS:  So I guess, your Honor --

6          THE COURT:  I don't think so.

7          MS. KREBS:  Your Honor, may I speak?

8          THE COURT:  That Williams case seems to say it is an

9     affirmative defense and that is what I was looking at.  I may

10    have brought it with me.  No, I didn't.

11         MS. KREBS:  May I respond?

12         MS. MESIDOR:  Your Honor, you are correct that

13    Williams does say that.  That is true.  I am very familiar with

14    the Williams case.  Williams does indeed say that.  It is

15    something we use all the time.  I will leave it there.

16         MS. KREBS:  However, again it has always been, and I

17    am sorry I don't have the Williams case in front of me right

18    now, but that in order to prove the plaintiff's case again it

19    is not merely that it is unwelcomed.  This, let's call it,

20    petty-slight-trivial-inconvenience level is for lack of a

21    better metaphor the counterpart to the severe evasive

22    obligation that is under the federal law, which again is part

23    of the plaintiff's initial case.  It not only the demonstration

24    not only that it was unwelcomed but objectively the level was

25    such that it rises in some fashion to the level of being

1  considered a hostile work environment on the law.

2          THE COURT:  Denied.  Let's go.

3          What's next.

4          Discriminatory termination.

5          MS. KREBS:  Yes, your Honor.

6          THE COURT:  I don't want to make this only more

7  confusing for the jury.  I assume I can use some of that

8  language in this here and it wouldn't cause any nobody any

9  problem, but it seems like it would cause the jury some concern

10 and I think this does it enough.

11         MS. MESIDOR:  We have no issue with either 20 or 21.

12         THE COURT:  Well, what about you?

13         MS. KREBS:  Yes, your Honor.  In the first paragraph

14 on page 20 where you discuss motivating factor, you then

15 describe it by saying in the last sentence of that first

16 paragraph that plaintiff must prove by a preponderance of the

17 evidence that conscious consideration of her race or gender

18 played at least some part in the decision to terminate her.  It

19 is the "at least some part" provision that I have objection to.

20         THE COURT:  That is the law.

21         MS. KREBS:  Well, I will just say even in plaintiff's

22 proposed charges when they defined motivated or motivating

23 factor, they defined it as either but for the race or the

24 gender it would not have occurred or that that was the factor

25 that made a difference in the decision.  That is a different

1   level than at least some part.

2              MS. MESIDOR:  Your Honor, that language is consistent

3   with your prior instruction.  It is at least some part is the

4   same -- that is the same consideration that was given in the

5   prior instruction in regard to --

6              THE COURT:  You know what they say about consistency?

7   So I don't know mind changing both.  It is just that I think

8   this does reflect my understanding of the law.

9              MS. MESIDOR:  That is a reflection of the law.  It

10  does say at least some part.  In terms of what is a motivating

11  factor, there are different ways that it has been defined but

12  at least some part is consistent with the law.

13             MS. KREBS:  Your Honor, respectfully that would infer

14  to the jury that they can actually look at a lesser level that

15  is required by the law.  It is more important than just it had

16  some part.  It is either a but for or it was the factor that

17  may help them make the decision.

18             THE COURT:  "A factor" is the same as "some part."

19             MS. KREBS:  No, "the factor."

20             THE COURT:  Oh, "the factor."

21             MS. KREBS:  That made a difference in the decision.

22             MS. MESIDOR:  No.  That is not the law.  What

23  plaintiff's counsel is talking about is a mixed motive theory

24  and it is the mixed motive theory that indicates it must be the

25  factor, the catalyst, the true factor where other things could

1    be considered but this was the quote/unquote game changer.

2    This is not mixed motive, your Honor.

3              MS. KREBS:  I will say that they were not discussing

4    mixed motive.  They were talking about motivating factor,

5    regular burden of proof.  Again, I think it lessens the jury's

6    responsibility.

7              THE COURT:  "No factor" would certainly make a big

8    difference and certainly not the law.  "No motive" would

9    certainly not be the law.  So this is "some motive" or some

10   part of "the decision."  I don't know what you would put in.  I

11   know what you would like to put in.  I would like to know what

12   you would put in.

13             MS. KREBS:  As I said I actually went back like I said

14   to plaintiff's charge to just to look at their language so I

15   could pick language that they had already approved and the

16   language that they wrote was that in defining what motivating

17   factor means but for the plaintiff's race or gender they

18   wouldn't have terminated her or it was the factor that made a

19   difference in the decision to terminate.

20             THE COURT:  I think that is what this says.  It is a

21   factor or in some part is a factor that made a difference in

22   the decision to terminate her.

23             MS. KREBS:  Again, your Honor, if you believe that it

24   is the same, then I would request to change to my language.

25             THE COURT:  You want me to put in was "a factor"?

D8t6joh1          Charge conference

 1          MS. KREBS:  Instead of saying at least played some

 2     part --

 3          THE COURT:  No.  I am give you a choice.  Do you want

 4     me to put in "a factor" instead of "some part"?

 5          MS. KREBS:  I would like "a factor that made a

 6     difference in the decision to terminate."

 7          MS. MESIDOR:  No, your Honor.  That changes the

 8     standard.

 9          MS. KREBS:  I am taking the language --

10          MS. MESIDOR:  Well, your Honor --

11          THE COURT:  She wants to retreat.

12          MR. UNAMSKY:  The plaintiff is not the Second Circuit

13     here.  The law is the law.

14          MS. MESIDOR:  Even if both parties had agreed that

15     there was a different standard, it wouldn't be bound upon the

16     Court.  It wouldn't make it any less reversible on any appeal.

17     The fact that the parties agree is of no consequence.  The law

18     is the law.

19          MS. KREBS:  Again, I don't believe that it is an

20     incorrect statement of the law to say that it was a factor that

21     that made a difference in the decision to terminate.

22          THE COURT:  I have an hour and three quarters

23     listening to you.  I will think about it.  I will put it down

24     with your preferred language.  I agree with plaintiff at her

25     current thinking that this is really a statement which the law

D8t6joh1          Charge conference

1    respects, we'll say.  A factor that made a difference -- I will

2    be glad to think about all during your summation if I can

3    control myself from listening for a moment -- that made a

4    difference.

5              MS. KREBS:  It is going to be riveting, your Honor.

6              THE COURT:  If I really saw the difference -- I guess

7    I can see a difference.  A factor that made a difference.

8    Well, let me think about it.

9              MS. KREBS:  Okay.

10             THE COURT:  Anything else on 20 or 21?

11             MS. KREBS:  Yes.  One other thing on page 21, your

12   Honor.  At the top of the page it was the continuation from the

13   paragraph at the bottom of the last page.  You state that, "If

14   the jury determines that the reason was pretextual, that it

15   wasn't the real reason for the decision, that they may infer it

16   was made up to conceal gender or race discrimination," I would

17   also ask for a countervailing instruction that they can also

18   conclude that even if it wasn't the real reason, the real

19   reason was a different reason that also was not discriminatory.

20             MS. MESIDOR:  No, your Honor.  That is completely

21   contradictory to the law.  If you give me 15 minutes, your

22   Honor, there is case law that specifically says that if defense

23   gives a specific reason for termination and later switched,

24   that in and of itself can infer discrimination.  So to give the

25   jury an instruction that defendants can put one reason before

1   the jury but then that they can consider another reason, not

2   the actual articulated reason, your Honor, that would be

3   clearly contradictory to the law and dually prejudicial to

4   plaintiff.

5        MS. KREBS:  Your Honor, I think Ms. Mesidor is

6   misconstruing my request.  I am not talking about a reason

7   proposed by defendants that is a switch or different.  I am

8   talking about what the jury is allowed to do in terms of

9   inferences.  The jury is allowed as you have said to infer that

10  if they decide that the reasons proposed by the defense were

11  not the real reasons, that it was designed to conceal; but they

12  also on their own may determine that that is not necessarily

13  the case, that if even if it wasn't the real reason, the real

14  reason on their own they have determined they don't think it

15  was a discriminatory reason for it.  By not having the

16  countervailing point there and by only saying this direction,

17  it has the impact of almost instructing them that if you find

18  that it was not true then it almost leads to almost

19  indisputable to the conclusion that the real reason was the

20  discriminatory reason, was the race or gender discrimination.

21  I want to make sure it is clear that that is not required.  It

22  can go either way.  It can determine that it was false and the

23  reason was the discrimination or they can determine that it was

24  false but they don't think the real reason was discrimination.

25       MS. MESIDOR:  That is why the word says "you may

1    infer" not that "you must infer."

2            Please allow me to finish.

3            MS. KREBS:  I thought you were done.

4            MS. MESIDOR:  When the instruction says you may infer,

5    that means that they could go in one way in which they find it

6    was done to conceal the gender or race discrimination or they

7    could go in the other way.  By indicating that if you find that

8    the reason that they presented to you which has been

9    consistently testified to in this case was that there was a

10   lack of funding for her position and therefore there was no

11   necessity for it, if you find that that was not the real reason

12   why you weren't terminated, you could make a determination that

13   it was concealed.  But if you put in the language that

14   Ms. Krebs is requesting, what you are essentially saying to the

15   jury is that even if you find that stated reason for her

16   termination that they had lack of funding was not the real

17   reason, but you find that they could have fired her because of

18   poor performance, you can find that there was no concealment of

19   gender discrimination.  That is not the state of the law, your

20   Honor.  That is just another way to do exactly what I indicated

21   in my first argument, and I will not repeat because I learning

22   that your Honor doesn't like it --

23           THE COURT:  Not me, but the jury doesn't like it.

24           Suppose we changed it so that it read, "Then you may

25   but need not infer," would that help, Ms. Krebs, make you feel

1   like either way either way to go?

2           MS. KREBS:  But need not would be much more

3   acceptable, your Honor.

4           MS. MESIDOR:  That's fine with defense, your Honor.

5           THE COURT:  Done.

6           Anything on 22 or 23?  I gather there is no problem on

7   22 or 23?

8           MS. KREBS:  I do, your Honor.  You had indicated that

9   you wanted plaintiff to go first.

10          MS. MESIDOR:  No, your Honor.

11          MS. KREBS:  I have only one issue, your Honor.  In the

12  last paragraph on page 22 you indicate that she must have

13  complained of discrimination based on a reasonable and good

14  faith belief and then you indicate later down to describe or to

15  explain that you say what she must prove, however, is that it

16  was reasonable for her to believe that the underlying conduct

17  that she holds was unlawful or race discrimination.  That is

18  correct as to the reasonable part but not the good faith part

19  and I would request there also needs to be something in there

20  that says, She also must prove that she did actually believe

21  that there was gender or race discrimination.  They are two

22  different standards.

23          THE COURT:  Well, no.  I wasn't symmetrical in terms

24  of the the good faith, but I don't know that we have to go

25  further.  There is something we can add.

1        What is plaintiff's view?

2            MS. MESIDOR:  Your Honor, requiring that a plaintiff

3   actually know something is discriminatory, your Honor, there is

4   some days that I am not even sure what is discriminatory and I

5   have a JD.  To require it that a plaintiff actually know that

6   something is discriminatory, I don't believe is supported by

7   any case law even with the heighten standard with the federal

8   statute.  A good-faith belief and a reasonable belief goes with

9   an objective and subjective standard.  So it must be reasonable

10  in that people looking reasonable people looking at it could

11  come to the similar conclusion but that she herself believes

12  that she is experiencing some level of race or gender

13  discrimination but not that she is required to know that she is

14  experiencing race and discrimination.

15          THE COURT:  I see.  I guess you are all on one tack

16  but I am on another.

17          MS. KREBS:  Ms. Mesidor just made my point.  I didn't

18  say, and the record can reflect, that the plaintiff had to

19  know.  I was saying exactly what Ms. Mesidor Sharpe just said,

20  which is there should be a description in there that says she

21  had to have a subjective belief that she truly had to believe

22  that when she was taking that action she was complaining about

23  discrimination.  That is a factor in this case, your Honor.

24          THE COURT:  I don't have a problem.  I guess I

25  analogize it to go faith and I didn't use that language in the

1    last sentence.  I only used reasonable.

2            MS. KREBS:  Yes.  I agree, your Honor.  It is just

3    given the fact that there are two components, the objective and

4    subjective, since the objective one was defined a little bit

5    further, I don't know that the way it is written right now that

6    the jury is going to understand just by the words in that first

7    sentence in the paragraph, good faith belief there is also a

8    subjective standard that she had to honestly hold a belief that

9    she was being subjected to race or gender discrimination.  I

10   want to make it clear to the jury that they have to believe she

11   really believed that.  Quite frankly, your Honor, we believe it

12   is an issue in this case.

13           MS. MESIDOR:  Your Honor, the one protected activity

14   that everybody agrees with is the draft complaint that was sent

15   on April 10th, 2012 to defendants.  In that draft complaint

16   that was a complaint that was drafted by Ms. Johnson's

17   attorneys it says that it is discriminatory.  So how defendants

18   believe that this is an issue --

19           THE COURT:  I he don't think it is an issue.  I am a

20   lot simpler than either of you.  You are in more rarer

21   atmosphere.  All I am concerned about is that in some sense

22   what Ms. Krebs says is reflected in the last sentence or the

23   penultimate sentence, which it now is not, all it says is that

24   she must prove however is that it was reasonable and I am

25   saying, and I think she is saying but she is much brighter than

1    I am --

2              MS. KREBS:  Hardly, your Honor.

3              THE COURT:  -- that there really has to be something

4    in the good faith realm in addition.  Now, it can be phrased in

5    the subjective, but it has to be phrased in some fashion.

6              Do you have in language you would like to tell me?

7              MS. KREBS:  Your Honor, I can pull out some language.

8    I was thinking about adding another sentence after this

9    sentence that what she also must prove is that from a

10   subjective standpoint, she truly believed that she was the

11   victim of race or gender discrimination.  That is just off the

12   cuff.  I have haven't pulled that language out.  I am not very

13   artistic.

14             MS. MESIDOR:  I don't think it is necessary.  We can

15   put a comma after was reasonable for her to belief, and that

16   she in fact believed, comma, that the underlying, and the

17   sentence continues.

18             THE COURT:  Well, she in fact believed --

19             MS. MESIDOR:  Or that she believed.

20             THE COURT:  -- or Ms. Krebs would like truly.

21             Do you think that is okay?

22             MS. MESIDOR:  In fact or truly, either one is fine

23   with plaintiff.

24             THE COURT:  That's okay?

25             MS. MESIDOR:  Yes, your Honor.

1          THE COURT:  How is that, Ms. Krebs?  So it will be

2    reasonable for her to believe and she in fact truly believed

3    that the underlying conduct that she opposed was unlawful and

4    in fact truly believed.

5          Do you want me to read it back?

6          MS. KREBS:  Would you please, your Honor.

7          THE COURT:  It is the penultimate sentence on page 22

8    and it reads:  What she must prove however, is that it was

9    reasonable for her to believe and in fact she truly believed

10   that the underlying conduct that she opposed was unlawful

11   gender or race discrimination.

12         MS. KREBS:  Thank you, your Honor.

13         THE COURT:  That makes you relatively happy.  I don't

14   want to suggest it makes you fully happy.  It goes part of the

15   way.  It takes care of my problem and it is agreeable to the

16   plaintiffs.

17         MS. MESIDOR:  Yes, your Honor.

18         MS. KREBS:  That is a good actual summary how it works

19   all around.

20         THE COURT:  Anything else on retaliation?  I think the

21   rest of this is petty pro forma but certainly let's look at

22   damages.  I am more than happy to take your thinking.

23         MS. MESIDOR:  Your Honor, we don't have any issue on

24   page 24.  We have a concern on page 25 as it relates to -- it

25   is the second to last paragraph where you begin "second."

1            THE COURT:  Yes.

2            MS. MESIDOR:  The last sentence says, However whether

3    there is only limited evidence presented --

4            THE COURT:  However, where there is only, yes.

5            MS. MESIDOR:  Limited evidence presented of mental

6    anguish or humiliation, etc., pain and suffering could be

7    nominal or zero.  We wanted a line indicating that however

8    testimony by the parties is sufficient.

9            THE COURT:  It is in here later.

10           MS. MESIDOR:  Not as it relates to the mental and

11   emotional damages because here is my only concern, your Honor,

12   and perhaps we might be able to figure out another way to

13   address it other than what I have suggested, my concern is if

14   you say that if there is limited evidence presented on any

15   issue that you can decide such then the limited evidence can be

16   interpreted to mean just one thing.  For instance, if we had

17   evidence, for instance, in this case plaintiff testified how

18   this affected her how her testimony was corroborated by Ms.

19   Ortiz, etc., that is two people discussing it and if they

20   interpret limited evidence to mean a number then they may

21   believe that it is nominal or zero.  But depending on what the

22   person is actually saying, there is case law that indicates

23   that the testimony of the plaintiff is sufficient, the

24   testimony of plaintiff, the coworkers and others may be

25   sufficient but even plaintiff's testimony alone is sufficient

D8t6joh1             Charge conference

1   for it to be above garden variety emotional distress.

2            THE COURT:  I don't argue about that.  I just don't

3   understand why you would come to that conclusion reading this

4   paragraph.

5            MS. KREBS:  May I?

6            MS. MESIDOR:  If I could respond to your Honor's

7   question.

8            THE COURT:  It is too exciting here.  I don't think I

9   can handle it.  Why don't I hear from the defendant and then

10  you can respond to everybody.

11           MS. KREBS:  There is a specific instruction that your

12  Honor has given already that I believe we looked at yesterday

13  that specifically says that when we're talking about the

14  determination, it is not the quantity of the evidence but the

15  quality of the evidence that needs to be considered and you

16  have a whole discussion about how it doesn't matter how many

17  things, it is just how much you value what the quality of it

18  is.  So that issue has already been addressed by the Court and

19  the Court has specifically instructing the jury it is not based

20  on quantity, it is based on quality.  So, again, I don't see

21  how this is of any concern at all because it need to be

22  understood in the context of your Honor's instruction that you

23  judge quality not quantity.

24           MS. MESIDOR:  Your Honor, my concern is that we

25  discussed the evidence to be considered on page six.  This

1  limitation on evidence now is on page 25.

2              THE COURT:  There is no limitation.

3              MS. MESIDOR:  It says limited.

4              THE COURT:  It says where there is only limited

5   evidence.  It doesn't mean that there is only one witness.  It

6   just means that there were 11 witnesses and there was as in

7   your case no doctor.  That could make a difference to them, but

8   it need not.

9              MS. MESIDOR:  Your Honor, to the extent that when I

10  read it that I have the interpretation, couldn't we make the

11  argument that a reasonable jury could also make the juror could

12  make the same interpretations.  Our only concern is that the

13  word "limited" is ambiguous when used in this context, which is

14  why we wanted to add something to the effect of testimony by a

15  single witness may be sufficient or something to that effect.

16             THE COURT:  I can say again it is not the quantity but

17  the quality of evidence that counts.

18             MS. MESIDOR:  Yes.  That's fine.

19             MS. KREBS:  Your Honor, I had just jotted down a note

20  and I thought perhaps you could say however had whether there

21  is only evidence of limited quality presented rather than

22  having the separate thing afterwards and restating the rule.

23  Evidence of limited quality gives that same feeling about all

24  the extra words.

25             MS. MESIDOR:  Your Honor, plaintiff prefers your

1 | Honor's suggestion.

2 |      THE COURT: They always do. I will add my thought.

3 | It is just a repetition of what we have done on page six.

4 |      MS. KREBS: Another alternative, your Honor, is to put

5 | that thought again at the end of everything. One last time as

6 | a reminder. So it is not just specific as to this and that it

7 | is a reminder overall again for the entirety of the case as

8 | opposed to of singling out this one particular category.

9 |      THE COURT: I am saying it again. It is also on page

10 | six generally.

11 |      MS. MESIDOR: Right.

12 |      THE COURT: It doesn't matter how many times you say

13 | it. If you would like me to say it here and again at the end,

14 | I will be glad to say it three times. It is just a little more

15 | breath.

16 |      MS. KREBS: I am saying, your Honor, if it is supposed

17 | to be a general instruction, putting it very specifically next

18 | to this one category could then be interpreted by a jury.

19 |      THE COURT: Ms. Krebs, where would you like it best if

20 | we're going to add it? Let's assume we're going to buy the

21 | plaintiff's concern. Where would you put it now?

22 |      MS. MESIDOR: Your Honor, if I may there is no other

23 | area in the charge where there has been any accusation of

24 | ambiguity. It resolves our concern because you put it next to

25 | what we believe is an ambiguous term. If you put it far away,

1    it doesn't resolve the ambiguity.

2         THE COURT:  In my view it is not deserving to be put

3    anywhere.  If you don't put it where she wants me to put it,

4    we'll forget it altogether.  Those are the choices, but she

5    hasn't found a place.

6         MS. KREBS:  Your Honor, I was thinking perhaps it

7    would be at the very beginning of the damages section and to

8    remind the jury that as with the substance of the case with

9    damages, it is the quality and not quantity that counts.  At

10   the beginning so it is not specific for any one particular

11   time.

12        THE COURT:  Very creative.

13        The end of that paragraph we're going to put again,

14   Let me remind you it is quality not the quantity of the

15   credible evidence that counts.

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

D8tnjoh2          Charge Conference

1          THE COURT:  OK.  What is next?

2          MS. KREBS:  Did you have any other issues with

3     damages?

4          MS. MESIDOR:  What pages are we talking about?  To the

5     end?

6          MS. KREBS:  Were we just looking at 24 to 26 at this

7     point, your Honor?

8          THE COURT:  Yes.  Look at the whole thing.

9          MS. MESIDOR:  That was the only issue that we had as

10    it relates to those pages.

11         MS. KREBS:  The only request that I had, your Honor,

12    with respect to the charge that's 24 through 26 is that there

13    is no instruction to the jury that they should not presume that

14    the plaintiff has been damaged, and it is her burden to prove

15    each element of her damages by the preponderance of the

16    evidence.

17         Our concern, your Honor, is that, and this does come

18    up in particularly in the emotional distress context, but I

19    didn't want to make it specifically about emotional distress, I

20    just want it general so it doesn't skew anything, is that there

21    is case law that does indicate that just because there is a

22    finding of unlawful discrimination doesn't mean that the person

23    has demonstrated that they have been distressed.  And they do

24    have to prove that aspect of it as well.  I just would like

25    there to be, again not specific to emotional distress, but to

1    damages, that there is no presumption that if there is a

2    finding on liability that the person has been damaged and that

3    must also be proven separately.

4            THE COURT:  The last paragraph on 26 seems to talk

5    about the burden that is the plaintiff's, and it's about

6    damages.  I am not sure how we would make that any more to your

7    liking.

8            MS. MESIDOR:  Your Honor, in addition, on page 24 you

9    indicate the same thing as well.  The second sentence right in

10   the beginning of the damage section it says, However, you

11   should not infer that plaintiff is entitled to recover damages

12   merely because I am instructing you on the element of damages.

13           MS. KREBS:  But that, your Honor, is a regular

14   instruction that just because I am talking to you about damages

15   doesn't mean that you should find on liability.

16           The concept that I am discussing is somewhat

17   different.  In looking at the last paragraph, when you cited

18   the sentence the plaintiff must prove the damages she sustained

19   by a preponderance of the evidence, all I would ask is that in

20   connection with that sentence there is an indication that you

21   may not presume that the plaintiff has been damaged merely if

22   you find on liability, merely if you find that there has been

23   harassment, discrimination.

24           THE COURT:  Let's move along, everybody.  That's not

25   going to happen.  That is here embedded and it probably meets

1    your purposes.

2            I hate to tell you how big a bite you should take

3    Ms. Krebs.  Can we do the balance now of the charges rather

4    than do one at a time?

5            MS. KREBS:  Sure, your Honor.  That is why I had asked

6    for your guidance in the beginning.

7            THE COURT:  It seemed clear to me that you preferred

8    to do it one by one.  I assure you that's the only reason I sat

9    here doing nothing for 20 minutes while you went through all

10   it.

11           MS. MESIDOR:  Your Honor, for plaintiff we do not have

12   any further issues with the remainder of the charges.

13           THE COURT:  I assume we have a jury.

14           Anything else?

15           MS. KREBS:  Your Honor, with respect to punitive

16   damages, we would request that there be some additional

17   language included with respect to explaining to the jury that

18   this is a very high level that must be reached in order to

19   award punitive damages and that it is only appropriate for

20   especially shocking or offensive misconduct.

21           THE COURT:  Malice and reckless disregard doesn't

22   appeal to you as high?

23           MS. KREBS:  Your Honor, I think that it is -- yes,

24   your Honor, I think it's not sufficient for the purposes of

25   communicating to the jury the level required for punitive

1  damages.  It is a much more significant level than anything

2  else and I -- it is, your Honor.

3       THE COURT:  Yes.  But I think probably there are very

4  few areas in which the burden is higher than malice and

5  recklessness.  I mean, if you have another phrase that you

6  think is more pertinent, let me know.

7       MS. KREBS:  Your Honor, at a minimum we would request

8  that malice and reckless indifference have definitions included

9  so that it could be further explained to the jury what that

10  means.  Malice could be intentional wrongdoing or an

11  evil-minded act.  That is what actual malice is.

12       THE COURT:  We will look at Black's Dictionary and

13  take out the definitions and see if I like them.  If so, we

14  will put them in.

15       MS. KREBS:  Your Honor?

16       THE COURT:  Yes.

17       MS. KREBS:  I don't believe I saw a no double

18  recovery.

19       THE COURT:  You may not have seen it, but it's here.

20  At least I saw it.

21       MS. KREBS:  I didn't know where it was.

22       THE COURT:  There is language about how there's only

23  one recovery no matter whether you find, for instance, if there

24  were two theories under which they could collect.

25       THE LAW CLERK:  It is page 24.

 1          MS. KREBS:  What page?

 2          THE COURT:  24.

 3          MS. KREBS:  24.  Thank you.

 4          THE COURT:  Yes.

 5          MS. KREBS:  OK.  Thank you, your Honor.

 6          THE COURT:  The second full paragraph.

 7          MS. KREBS:  I have no further issues with respect to

 8  the remainder.

 9          I will say, of course, your Honor, I haven't gone back

10  and looked at the changes that you made in the first, because

11  we just jumped to the second half.

12          THE COURT:  We made those changes, those changes I was

13  prepared to make.  So there are two or three changes here that

14  we can make and I will be glad to look at any definitions.

15          On the other item that you wrote a letter on, I assume

16  the plaintiff has now seen the letter?

17          MS. MESIDOR:  Yes, your Honor.

18          THE COURT:  In addition to the concerns that I voiced

19  yesterday, and because I think this was the overarching

20  concern, but may not have been spelled out to your

21  satisfaction, there is a case I would urge you look at because

22  I have had admiration for all the magistrate judges, but

23  probably more than most I have admiration for Francis.

24          If you look at the Gary Lewis case, which is 149

25  F.R.D. 474, you will see that the test that he prescribes in

1  great length, probably 20 pages of decision, really makes it

2  absolutely clear that to let the CEO, Mr. Weinberg, have an

3  investigative report that would affect essentially not only his

4  position but certainly the position of the president depending

5  on how it came out, to say nothing of the prestige and perhaps

6  the grants of the organization itself, seems like far and away

7  the kind of evidence that should be excluded.

8          Let me read you just a little bit of that from a

9  Second Circuit case that was affirmed by the Supreme Court.

10  "Furthermore, memoranda or reports prepared after an incident

11  have been held inadmissible where the preparer of the report

12  knows at the time of making the report that he or she is very

13  likely in a probable lawsuit relating to that incident to be

14  charged with wrongdoing as a participant in the incident."  As

15  you know, Mr. Weinberg eventually, if not early on, was a

16  defendant himself although that doesn't seem to be necessary.

17          "So that he is almost certain when making the

18  memoranda or report to be affected by a desire to exculpate

19  himself and to relieve himself and/or his employer of

20  liability."

21          In any event, the letter is articulate, but the offer

22  to reopen the case is denied.

23          MS. KREBS:  Your Honor, I apologize.  There is one

24  more thing I wanted to address to the Court that your Honor

25  raised the other day.  I wanted to do it outside the jury.

1      In connection with the testimony of Maria Ortiz, I had

2   made an application after the testimony that she gave revealed

3   that one of the incidents she had testified to was actually not

4   based on a conversation that she had with Mr. Carmona and

5   therefore was not based on her personal knowledge.

6      I wanted to revisit that before the case gets handed

7   to the jury so that we could determine whether or not that

8   portion of her testimony should be stricken.  I have

9   transcripts here that I can point out the testimony that I was

10  referring to.

11      THE COURT:  Sorry.  It's just too little too late.  If

12  you want to give me the language, I will be glad to look at it

13  on the bench.

14      MS. MESIDOR:  Your Honor, if I may?

15      THE COURT:  Do you have it?  Do you have a copy?

16      MS. MESIDOR:  Do I have a copy of the transcript?  I

17  do have a copy of the transcript.  Yes, sir.

18      THE COURT:  Yes.

19      MS. MESIDOR:  What I was saying is that, is that what

20  we would disagree with is Ms. Krebs' conclusion that it is not

21  based on her personal knowledge.  She knew what happened with

22  the male participant because she was there.  That's what the

23  basis of her personal knowledge was.

24      The question that preceded it was how did the

25  treatment of one female participant compare to the treatment of

D8tnjoh2          Charge Conference

1   another male participant, and she highlighted a conversation

2   that she had with Mr. Carmona regarding how to handle a female

3   participant and recalling what she witnessed what happened with

4   a male participant.

5          So any application that any part of her testimony

6   should be stricken because it was not based on her personal

7   knowledge in that respect we would submit to your Honor should

8   be denied.

9          THE COURT:  OK.  If you let me look at it, I will be

10  glad to make a decision before the end of the day.

11         (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          MS. KREBS:  Your Honor.

3          THE COURT:  Bring in the jury.

4          MS. KREBS:  Your Honor, may I ask you one question?

5          THE DEPUTY CLERK:  Jury entering.

6          (Jury present)

7          THE COURT:  Good morning, everybody.  I think we have

8    concluded the charging conference in two or three phases, but

9    we are concluded, so we're ready for the summations.

10         The way that works in civil cases for sure is that the

11   plaintiff with the burden of proof goes last.  Ergo, the

12   defendant goes first.

13         So we're ready, Ms. Krebs or whomever is going to sum

14   up, we're ready for defendants' summation.

15         MR. MINNAH-DONKOH:  Thank you, your Honor.

16         Good morning, members of the jury.

17         Now, at the beginning of this trial, my cocounsel,

18   Ms. Krebs, told you that this case can be boiled down to one

19   single concept:  No good deed goes unpunished.

20         Well, we have reached the end of this case, and the

21   evidence has proved that in fact, no good deed goes unpunished.

22         Now, in this case, plaintiff alleges that she was

23   subjected to a hostile work environment based on her race and

24   gender and also discriminated against based on her race and

25   gender.

1          Race and gender.  Race and gender.

2          When you go back into the deliberation room to

3    consider all of the evidence in this case, and to render year

4    verdict, I want you to ask yourselves, the conduct that

5    plaintiff complained of and testified to, was any of that

6    conduct directed towards her based on her race or gender or

7    motivated by her race or gender?

8          When you ask yourselves those questions, you will come

9    to the only logical conclusion possible.  That is, none of the

10   conduct that Ms. Johnson complains of was specifically

11   motivated by her race or her gender.

12         We'll come back to plaintiff's claims in a little bit,

13   but for now I want to express the honor myself and Ms. Krebs

14   have to represent our clients in this case, Mr. Carmona,

15   Mr. Weinberg, Ms. Stein, and STRIVE.

16         You have heard a lot about STRIVE, so I am not going

17   to go into great detail about what STRIVE does.  You know what

18   STRIVE does.

19         STRIVE is a not-for-profit organization.  It does good

20   things for the community.  Plaintiff herself had no choice but

21   to admit that STRIVE does good things for the community.  Our

22   clients in this case, all three of them, have dedicated their

23   professional lives to public service and making a real

24   difference in the lives of individuals every single day.

25         Now let's go back and discuss plaintiff's claims in

1    this case.

2            Let's start with her claim of hostile work environment

3    based on gender.  Now, what's odd is Ms. Johnson has sued both

4    Mr. Weinberg and Ms. Stein in this case.  But Ms. Johnson told

5    you, she sat right there and looked you in the eye and told you

6    that neither Mr. Weinberg or Ms. Stein ever made any derogatory

7    comments towards her, never gave her tough love.

8            But don't take my word for it.  I'm going to read her

9    testimony directly from the trial transcript.

10   "Q.  Just to get this out of the way in this case, you sued

11   Phil Weinberg as an individual defendant?

12   "A.  Yes.

13   "Q.  Mr. Weinberg never made any derogatory comments to you,

14   did he?

15   "A.  No, he never gave me tough love.

16   "Q.  Ms. Stein never made any derogatory comments to you about

17   your gender, did she?

18   "A.  No, she never gave me tough love.

19   "Q.  Ms. Stein never made derogatory statements to you about

20   your race?

21   "A.  No.  She did not."

22           Well, why are Mr. Weinberg and Ms. Stein sitting here

23   today as defendants if they never made any derogatory comments

24   to Ms. Johnson?  Why is she dragging them through the mud?

25           We will talk about that a little down the line, but

1  let's focus on Mr. Carmona.

2          You heard a lot of testimony about screaming and

3  cursing that Ms. Johnson claims she was subjected to by

4  Mr. Carmona.

5          But what you did not hear, members of the jury, are

6  any comments made to her specifically based on her gender.  You

7  never heard any testimony about Mr. Carmona calling her words

8  like bitch.  You never heard any testimony about Mr. Carmona

9  calling her words like slut.  You never heard any testimony

10  about Mr. Carmona calling her a word such as whore.  What you

11  simply heard was that Mr. Carmona yelled and cursed.

12          But you also heard that Mr. Carmona's yelling and

13  cursing was not limited to women.  Mr. Carmona admitted to

14  you -- he was genuine.  He told you about his background, his

15  criminal background, everything.  He was genuine with you.  He

16  told you, yes, I do use profanity in the office.  Yes, I do

17  yell.

18          Phil Weinberg told you that Mr. Carmona does yell and

19  use profanity in conversations, even with him.

20          Plaintiff herself admitted that Mr. Carmona does use

21  profanity and yell in conversations with men.

22          If you recall, plaintiff testified about the incident

23  with Dwayne Hubbard where the auditor was present in the STRIVE

24  office.  She told you that Mr. Carmona pulled Dwayne Hubbard,

25  an employee who had relapsed, into his office and proceeded to

1    yell and engage in a confrontation with Mr. Hubbard.

2              So it's not disputed that Mr. Carmona does yell and

3    does curse with both women and men alike.  But in this case

4    Ms. Johnson is alleging that he singled her out because she is

5    a woman.

6              Well, folks, if there is undisputed evidence that

7    Mr. Carmona treats both women and men alike, there is no claim

8    for a hostile work environment based on gender.

9              Knowing that her evidence on this gender-related

10   hostile work environment is very thin, what does Ms. Johnson

11   do?  She attempts to create a smoke screen by testifying about

12   a comment Mr. Carmona made during a woman's group about being a

13   male chauvinist.

14             But what Ms. Johnson and her attorneys did not do was

15   give you the full context of that conversation.  Mr. Carmona

16   provided you with the full context.  He told you about his

17   upbringing.  He told you that in his culture there is a

18   stereotypical view of a man's role and a woman's role.

19             But he knows better.  He knows better because his

20   single mother who came to this country as an orphan raised both

21   him and his three siblings in the projects.  She picked herself

22   up from the ground and ultimately retired as an RN.  Based on

23   seeing his own mother raise the four of them by herself,

24   Mr. Carmona told you that he knows women are just as strong if

25   not stronger than men are.

1          But you don't have to believe Mr. Carmona's words if

2     you don't want to.  Just take a look at the undisputed

3     evidence.  You heard testimony from April Bland, who works at

4     STRIVE as the director of programming.

5          You heard testimony from Lisa Stein, the CFO, COO.

6          You heard testimony from Virginia Barr, who's been

7     with STRIVE since 1998.

8          April Bland has been with STRIVE for approximately 20

9     years.  April Bland told you that her relationship with

10    Mr. Carmona is good.

11         Ms. Barr told you that her relationship with

12    Mr. Carmona is great.

13         Then you have Lisa Stein.  She was on the executive

14    committee.  She was CFO and COO.  If Mr. Carmona is such a

15    horrible man who does not respect women and thinks women are

16    below men, I guarantee you, members of the jury, Ms. Stein

17    would have never been hired to the executive committee at

18    STRIVE.

19         Also, you heard testimony, and it has not been

20    disputed by plaintiff certainly, that half of the employees at

21    STRIVE are women.

22         Again, Mr. Carmona is a cofounder at STRIVE.  If

23    Mr. Carmona harbored any discriminatory or hostile animus

24    against women, why would he hire women to work for him?  Why

25    would 50 percent of his workforce be comprised of women?  It

1    simply does not add up.

2         Ms. Johnson called an individual that she now

3    supervises and is friends with, Ms. Maria Ortiz, to I guess

4    support her story that women are treated terribly at STRIVE.

5         Ms. Ortiz told you that she left STRIVE because she

6    was sick of the abuse.  What you did not hear from Ms. Ortiz's

7    mouth was that she was sick of abuse because of her gender.

8    That specifically never came out.  Ms. Johnson's attorneys

9    never asked that question because they knew what the answer

10   would be.

11        To the extent Ms. Ortiz in her mind felt abused, she

12   knew it had nothing to do with her gender or her race.

13        Now, let's talk about Ms. Johnson's claim of hostile

14   work environment based on her race.  We all know what the basis

15   for her claim is, the one conversation where Mr. Carmona did

16   use the word nigger.

17        Now, Ms. Johnson told you that in the 26 months that

18   she worked for STRIVE that one conversation was the only time

19   Mr. Carmona used the word nigger or said that she acted like a

20   nigger.  Again, you don't have to take my word for it.  I will

21   read you the trial transcript.

22   "Q.  And as you -- as you testified on direct, the one and only

23   time in your two-year employment with STRIVE that Mr. Carmona

24   used the word nigger in conversations with you or called you a

25   nigger was in a tape recording that was played for the jury

1   early on?

2   "A.  Yes.  That's the only time he called me a nigger, yes.  It

3   was three times in that conversation but that was the one and

4   only time."

5            Now Ms. Johnson told you or wants you to believe that

6   starting just 30 days after she started working for STRIVE

7   Mr. Carmona started to harass her.

8            Well, members of the jury, if Mr. Carmona himself

9   identifies as a black man of Puerto Rican descent, harbored any

10  discriminatory animus or animosity against Ms. Johnson simply

11  because she was black, I guarantee you there would have been

12  more than one just one occasion on which Mr. Carmona referred

13  to her in racial, or what Ms. Johnson wants you to believe is a

14  racially derogatory word, but in this case there is one time.

15           What Ms. Johnson wants to do is isolate the word

16  nigger as it was used by Mr. Carmona during that conversation

17  and forget about everything else that was said during the

18  conversation.  She doesn't want you to put it into context.

19           But you all heard the audiotapes.  You have the

20  transcript in front of you.  Mr. Carmona told her, he

21  specifically mentioned the word, and I don't mean the word

22  nigger derogatory.

23           He told her, You and Leticia are both smart as shit.

24  And if you ever get ahold of yourselves, you can rise to the

25  top.

1          If this is a man, a black Hispanic man who harbors

2     racial or any animus against Ms. Johnson because she is black,

3     why would he be telling her that you can rise to the top if you

4     simply get ahold of yourself?

5          It simply does not add up.

6          Ms. Johnson, and you can request to see any piece of

7     evidence that has come in during this trial when you go back to

8     deliberate.  You can listen to the audiotape for yourselves.

9     Ms. Johnson was not offended by Mr. Carmona's use of the word

10    nigger or telling her that she acted like a nigger.  Ms.

11    Johnson was offended by the fact that Mr. Carmona compared her

12    to Leticia Thomas.  As you all heard, the day before Leticia

13    Thomas had come into the STRIVE office wearing attire that

14    appeared to resemble club attire.

15         Ms. Johnson was not offended by the use of that word

16    even though she will now have you believe that.

17         To prove that point let's take a look at Ms. Johnson's

18    testimony during this trial.  Ms. Johnson sat right there in

19    that stand, looked you in the eye and lied to you, and told you

20    that she had never used the word nigger in the workplace.

21         It was not part of her vocabulary.  She sat right

22    there looked you in the eye and lied to you.

23         But again let's look at her trial testimony.

24    "Q.  You have used the word nigger on several occasions while

25    employed at STRIVE, correct?

1    "A.  Incorrect."

2              But before we get to the evidence that shows, that

3    utterly disproves the lie that she told you, let's take a look

4    at the witnesses that Ms. Johnson put on the stand.

5              She put on Maria Ortiz, Cammie Crawford, Jamar Cooks.

6              You were all here during their testimony.  At any time

7    did plaintiff's attorney Ms. Mesidor corroborate her own

8    client's testimony about whether she had never used the word

9    nigger?

10             No, she did not.  That question was never asked of

11   Ms. Ortiz, it was never asked of Mr. Cooks, and it was never

12   asked of Ms. Crawford.

13             You know why it was never asked, because they know the

14   answer.  Even though she sat up there and lied to you, they

15   know the answer.

16             But you heard contrary testimony.  You heard from

17   Mr. Carmona that Ms. Johnson would use the word nigger

18   frequently.

19             You heard testimony from Ms. Barr, an elderly woman,

20   who told you that on one occasion she went to ask or she would

21   regularly ask Ms. Johnson how her children were doing.

22             And how does Ms. Johnson respond on one occasion?

23   "That little nigger.  He's all right."

24             You heard testimony from April Bland.  She told you

25   that in conversations in the office with Ms. Johnson the word

1    nigger was used.

2         Despite that fact, Ms. Johnson not only lied to you

3    about never using the word, but expects you to believe that she

4    was somehow so offended by Mr. Carmona's use of that word

5    during that one conversation in her 26 months at work at

6    STRIVE.

7         Members of the jury, it simply does not add up.

8         Just as with her hostile work environment based on

9    gender, as I already read to you, she's admitted that

10   Mr. Weinberg and Ms. Stein never made any comments to her that

11   she perceived to be derogatory.

12        So, again, why are Mr. Weinberg and Ms. Stein sitting

13   here today, being taken away from their duties helping folks,

14   the folks that they help every day?

15        Now, just to sort of discuss her hostile work

16   environment claim based on race and gender together.  You heard

17   testimony from Ms. Stein that sometime in 2011 Ms. Johnson came

18   to her and said she was tired of working at STRIVE and that she

19   had different job opportunities.

20        Well, members of the jury, if STRIVE was such a

21   horrible place for her to work, if STRIVE was such a horrible

22   place for her to work as a black woman, why did she come back

23   if she had other job opportunities?

24        Again, it simply does not make sense.

25        Further evidence that Ms. Johnson's claims don't make

1    sense is the e-mail that you saw, the e-mail from February

2    2012, which is in evidence.

3              MS. MESIDOR:  Objection.

4              That e-mail was specifically not in evidence, your

5    Honor.  It was marked inadmissible, and we would move to strike

6    any portion of defense counsel's summation that refers to that

7    exhibit because it was deemed inadmissible by your Honor.

8              MR. MINNAH-DONKOH:  Your Honor, we have the exhibit

9    sheet.  It was specifically allowed into evidence on the

10   defense exhibit sheet and the was used during the trial.

11             THE COURT:  Very well.

12             We'll worry about it after the summation.  As I

13   instructed you both, better if we reserve any objections to

14   until the end of the summations because it is the only time the

15   jury actually gets a narrative from each of you as to what the

16   case really is about in their view and we can put that on the

17   record at the end just as easily.

18             I also told you once the genie is out of the bottle

19   it's not going to go put back in in any event.  So it's best to

20   let each of you have an opportunity to tell the jury your view,

21   and then we can put anything you choose on the record at the

22   end.

23             MR. MINNAH-DONKOH:  Your Honor, as the jury can tell

24   for themselves, they were provided with copies of this

25   particular document, so it is in evidence.

1        But, in any event, you were shown Defendant's Exhibit

2    N, which is an e-mail from Brandi Johnson to Robert Carmona

3    dated Friday, February 24, 2012.  In that e-mail, Ms. Johnson

4    stated, I need you to critique my admission essay.

5        Now, if Mr. Carmona was so horrible to Ms. Johnson

6    because of her race and gender and was so horrible to her

7    starting 30 days after she started working for STRIVE in May of

8    2010, why almost two years later, in February 2012, is she

9    asking him for help to critique her essay.

10        She could have gone to someone else to ask for help.

11    She could have gone to Ms. Stein.  Phil Weinberg was the CEO at

12    that time.  She could have gone to Phil Weinberg.

13        No.  She chose Mr. Carmona.  It is a little

14    disconcerting that Ms. Johnson will sit up here and again lie

15    to you that the reason she went to him was because she was so

16    afraid of him she wanted to get in his good graces.  She wanted

17    to get on his good side.

18        Well, members of the jury, look at the language of

19    that e-mail.  This is not language that someone who is afraid

20    would use.

21        She does not say in this e-mail, Mr. Carmona, can you

22    please review my admission essay.  She does not say in this

23    e-mail, Mr. Carmona, can you please do me a favor.  She uses

24    very cavalier language.  I need you to critique my admission

25    essay.

575

D8tnjoh2            Summation - Mr. Minnah-Donkoh

1      Members of the jury, based on that language, it's

2   clear that Ms. Johnson did not have this fear of Mr. Carmona

3   that she wants you to believe.

4      Just one last thing on this hostile work environment

5   claim based on race and gender.  Again, at the end of this

6   case, your Honor will provide you with the law that guides

7   plaintiff's claims.

8      If you recall, during opening statement, I stood

9   before you and I told you that the law defines discrimination

10  as well as hostile work environment in a way that is different

11  from what your everyday person, a layperson would describe or

12  characterize discrimination and a hostile work environment.

13     I asked you, can you apply the facts to the law as the

14  judge gives them to you even if you disagree with the law?  And

15  you all said that you could.

16     Well, members of the jury, I am going to hold you to

17  that promise.

18     If you fulfill your promise and apply the facts to the

19  law as the judge gives to you, you will come out with the only

20  verdict consistent with the facts and with the law, and you

21  will find that Ms. Johnson was not subjected to a hostile work

22  environment based on her race or based on her gender.

23     The next claim that Ms. Johnson makes is that she was

24  subjected to discrimination.  Again the judge will instruct you

25  on not what just the everyday use of the word discrimination

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    means, but what the law says discrimination is.  Ms. Johnson,

2    in order to prove her race and gender discrimination claim, has

3    to show you that an adverse employment action was taken against

4    her because of her race and her gender.

5         You will recall when I began my summation I used the

6    words race and gender several times.  Race and gender, race and

7    gender.

8         To prove her discrimination claim, she has the burden

9    on all her claims to show you that she was subjected to an

10   adverse employment action because of her race and gender.

11        Now, in this case, Ms. Johnson claims that the adverse

12   employment action was her termination.  She claims that she was

13   not aware that the position was tied in any way to the Pathways

14   Out of Poverty grant.  She claims that her termination was

15   simply because of her race and gender.

16        But, members of the jury, before I get to the actual

17   nuts and bolts, her claim does not make sense.  Again, you have

18   50 percent of the STRIVE workforce that are women.  You heard

19   testimony that the majority of STRIVE's employees are black or

20   Hispanic.

21        All the witnesses that Ms. Johnson called on this case

22   were black.  Ms. Ortiz, Cammie Crawford.  Jamar Cooks is not an

23   employee, but Ms. Ortiz was a former employee, and Cammie

24   Crawford is a current employee.  They are all black.  They are

25   all women.

1          You heard testimony from April Bland, Virginia Barr.

2     They hadn't been terminated.  They are black.  They are women.

3     They still work at STRIVE.  Ms. Bland has been there for 20

4     years.  Ms. Barr has been there since 1998.

5          Let's delve a little deeper into another lie that

6     Ms. Johnson expects to you believe.  Which is that her position

7     was not tied to the Pathways Out of Poverty grant.

8          When you go back into the jury deliberation room, you

9     can ask to see Plaintiff's Exhibit 40 in evidence.

10          Plaintiff's Exhibit 40 is the January 24, 2012, letter

11     that was sent by the Department of Labor to STRIVE informing

12     STRIVE that a no-cost extension of the Pathways Out of Poverty

13     grant had been extended until June 30, 2012.  Now, Ms. Johnson

14     told you that she worked with Ms. Stein in submitting the

15     request to the Department of Labor to get this no-cost

16     extension.

17          Guess what, folks?  If you go to the second-to-last

18     page of Plaintiff's Exhibit 40, there it is.  Under personnel,

19     third line, affiliate services coordinator.  On that third line

20     there are some numbers.

21          I know we have someone who does finance sitting in the

22     back here in the jury.  Numbers don't lie.  People can lie.

23     But numbers don't lie.  It is a little early in the morning,

24     but let's do a little crunching of the numbers.

25          Under affiliate services coordinator on the second to

1    last page of Plaintiff's Exhibit 40, it says that the original

2    budget when the grant was initially received was $130,000.

3            It says in the next column as of September 28 of 2011,

4    the amount that had been used of that $130,000 was

5    approximately $89,000.

6            In the next column it tells you what the remaining

7    amount is as of September 28, 2011, which was approximately

8    $40,000.

9            And in the next column it shows you the modification

10   that STRIVE was requesting, the no-cost modification that

11   STRIVE was requesting, which was approximately $5,000.

12           If you add the modification, the no-cost increase that

13   STRIVE was asking for and you add it to the total budget that

14   it had for that particular position, affiliate services

15   coordinator, you get a total of $135,000, $135,171.49.

16           This is the key number, members of the jury, and you

17   can do the math yourself if you dispute the crunching that I'm

18   doing here.  This is the key number, $135,171.49.  That's the

19   key number.  That's the total budget for the position.

20           Now we know a couple of things.  Ms. Johnson worked

21   for STRIVE from May 2010 until June 2012.  That's 26 months.

22           OK.  We know that Ms. Johnson earned salary for the

23   affiliate services position.  The salary for that position was

24   $60,000.

25           If you divide $60,000, or if you divide this total

1   budget of $135,171.49 by 60 you get approximately 27.1 months.

2          So here we have it, folks.  The entire budget covered

3   27 months, and Ms. Johnson worked 26 months.

4          You may be asking yourselves, Well, what happened to

5   that one-month difference?

6          Well, if you remember, Ms. Stein told you, that before

7   Ms. Johnson was hired, there was a lady by the name of Jill

8   Poklemba.  Jill Poklemba was the grant writer.  Jill Poklemba,

9   after she wrote the grant and after STRIVE received the grant

10  was hired into the position of affiliate services coordinator.

11  Jill Poklemba worked for STRIVE for approximately a month

12  thereafter, at which point she left, and Ms. Johnson was hired.

13  So that one-month difference can be accounted for by Jill

14  Poklemba.

15         Members of the jury, math does not lie.  Although

16  plaintiff would like you to believe that my clients conjured or

17  made up this whole elaborate story about what funded her

18  position, the numbers and the documents don't lie.

19         She told you she helped Ms. Stein submit this very

20  document, plaintiff's Exhibit 40, but now she expects you to

21  believe that she had no idea that her position was funded by

22  the grant.  It does not hold any water.

23         Also, she told you that she helped manage the grant.

24  You saw the job description.

25         Now, Ms. Johnson sat up there and again told you that

1    she never saw the job description that I showed to her.  She

2    tried to separate herself from the Pathways Out of Poverty

3    grant.

4           That certainly is convenient, because she knows, she

5    knows that her position was funded by the grant.  She knows

6    that her termination or her separation, however you want to

7    call it, and I don't like to use the word termination, because

8    her position simply came to an end.  You heard testimony from

9    Phil Weinberg, from Lisa Stein, there was nothing more for her

10   to do as of the end of the grant.

11          Plaintiff may get up here and try to tell you or argue

12   to you that, Oh, well, you know, if the grant was ending on

13   June 30, why was she let go on June 11.

14          Well, you heard from Mr. Weinberg.  Mr. Weinberg told

15   you that it was his opinion that if there was nothing else left

16   for her to do with respect to the grant, it was probably best

17   to give her an opportunity three weeks or so to go look for

18   another job.  What's the point of having her come to work every

19   day when she can spend that time going to interviews or

20   whatever the case may be.

21          But, again, you don't have to take Mr. Weinberg's word

22   for it.  You heard the audio recording that we played for you.

23          In that audio recording you heard what Ms. Johnson's

24   reaction was when Mr. Weinberg told her that her position, as

25   she knows, was funded by the grant and was coming to an end.

1   "Uh-huh.  OK.  OK.  OK."

2          Now, Ms. Johnson tape recorded that conversation.

3   That conversation was held on June 11, 2012.  Mr. Weinberg told

4   you that he did not receive the federal complaint for which we

5   are here today until after he had that conversation with

6   Ms. Johnson.

7          I want you to understand the difference.  STRIVE did

8   receive an internal complaint from Ms. Johnson's attorneys on

9   April 11, or April 12 rather of 2012.  And then a federal

10  complaint, an actual lawsuit subsequently came in, in June.

11         Mr. Weinberg told you that that conversation with

12  Johnson during which he told her that her position was tied to

13  the grant, was coming to an end, was held before they received

14  that federal complaint.

15         All this to say that when Ms. Johnson tape recorded

16  that conversation, she knew she was going to use that recording

17  as part of her lawsuit.  That would have been the best time to

18  voice her opposition or her surprise that she did not know her

19  position was tied to the grant.

20         But did we hear any of that?  No, we did not.

21         She realized that so now she tries to make up a whole

22  elaborate story, oh, she never knew and STRIVE never told her.

23         That's another thing that I want to go over with you

24  folks.  Irrespective of whether she knew or whether she didn't,

25  and we already know that she knew, irrespective of whether she

1   knew or she do not know that her position was funded by the

2   grant, all my clients have to show you is that her employment

3   came to an end based on a legitimate nondiscriminatory business

4   reason and not because of her race or her gender.

5           Again, the proof is in the pudding.  The math speaks

6   for itself.  There was no funding left for her position.  There

7   was nothing else for her to do under this Pathways Out of

8   Poverty grant.  It had nothing to do with her race or her

9   gender.

10          So we've covered the hostile work environment based on

11  race and gender.  We've covered discrimination based on race

12  and gender.

13          Now let's talk about retaliation.

14          Ms. Johnson testified that after she filed her

15  complaint or after STRIVE received her complaint in April of

16  2012 she was isolated, ostracized.  But as the evidence

17  actually showed, that's not really what happened.

18          Mr. Carmona told you that after Ms. Johnson filed her

19  complaint she would come and perch herself right by his office

20  and have lunch with Cammie and Lynette, and that they would be

21  loud, they would be joking, and his office was eight feet

22  approximately away from where they would be having lunch.

23          After the complaint was received by STRIVE, this

24  occurred approximately three or four times where Mr. Carmona

25  never did anything about it.

1      Then, finally, he got tired of it.  He knew what

2   Ms. Johnson was trying to do.  Ms. Johnson was purposely trying

3   to provoke him, was trying to get a reaction out of him.  Why

4   else would she go into his office and have that conversation

5   and tape it of him using the N word that one time if she wasn't

6   trying to elicit some kind of response from him?

7      Ms. Carmona knew exactly what Ms. Johnson was trying

8   to do.  So after a third or fourth time of them perching

9   outside or her coming to perch herself right outside his

10  office, what does he do?

11     He tells her, All right, wrap it up.  To the extent

12  you want to have lunch together go in the conference room or go

13  to the kitchen.

14     It is undisputed that Mr. Carmona never told Cammie

15  Crawford or Lynette Hall that they could no longer have lunch

16  with Ms. Johnson.  That was never testimony you heard in this

17  courtroom during this trial.

18     As a matter of fact, you heard that subsequent to

19  Mr. Carmona telling the three of them to wrap it up or break it

20  up that the three of them did continue to have lunch but in the

21  conference room as opposed to right in front of his office.

22     As part of her retaliation claim, obviously

23  Ms. Johnson also claims that her termination was in retaliation

24  for her filing of the complaint and that her termination was so

25  close in time to when she filed the complaint.  But, members of

1   the jury, there is nothing STRIVE could have done about when

2   the grant was ending.

3          The grant was ending in June.  So, to the extent she

4   filed her complaint in or around March or April, STRIVE could

5   not help her employment ending in June because the grant was

6   ending, as has already been established.

7          If anyone was retaliating against STRIVE, it was

8   Ms. Johnson.  She knew her employment was going to end, and she

9   was upset about it.  She knew that she had performance issues

10  that had been constantly documented, and she said to herself,

11  you know what, I'm going to go out with a bang.

12         That's what happened in this case, members of the

13  jury.  There was absolutely no retaliatory conduct or action

14  taken against Ms. Johnson because she filed her complaint.

15         This case, it is really a simple case if you boil it

16  down and think about it.  It's a simple case.  There is no

17  liability.

18         She was not subjected to a hostile work environment

19  based on her race and gender.  She was not discriminated

20  against based on her race and gender.  And she was not

21  terminated or retaliated against based on her race and gender.

22         Now, by all means, some of you and maybe all of you

23  may think that Mr. Carmona communicated in inappropriate ways

24  at times or communicates in inappropriate ways in the office.

25  But, again, I remind you, and I am holding you to your promise

1    to consider the law as the judge gives it to you.

2              The law is not a civility code.  You will hear the

3    actual substance of the laws that govern Ms. Johnson's claims.

4    The laws are not a civility code.  You can have a boss that you

5    hate, that screams and yells at you and curses at you.  Is that

6    necessarily condoned?  No, maybe not.

7              But as long as the conduct is not specifically

8    directed at you because of you belonging to a protected class,

9    such as a black woman, there is no liability.

10             OK.  It is a simple case.

11             Now that we discussed the actual claims and the

12   nonexistence of any liability, I want to briefly talk to you

13   about damages.

14             Now being that there is no liability in this case, you

15   should not even have damages in your mind.  But I am going to

16   discuss it to show you another example of just how hollow

17   Ms. Johnson's claims are.

18             Ms. Johnson was earning $60,000 a year while she was

19   employed at STRIVE.

20             She testified that approximately seven months later or

21   six months later she obtained her current position where she

22   makes $50,000.  So we are talking about a six- to seven-month

23   gap during which she is unemployed.

24             During that time period she told you that she received

25   unemployment insurance benefits.  So what are her real damages,

1    members of the jury?  What are her real damages?  Let's talk

2    about her emotional damages.

3            Ms. Johnson told you -- well, the only thing that she

4    told you was that she felt sad and that was pretty much it.

5    She felt sad by the conduct that Mr. Carmona allegedly

6    subjected to her, that she went to see a therapist.

7            Now, members of the jury, if you recall -- actually,

8    they are right up there still, you have three huge binders of

9    plaintiff's exhibits.  At no point in time during this trial

10   were you shown any medical psychiatric or therapy notes.

11           If she was as emotionally damaged as she claims, I

12   guarantee you she would have been showing you medical,

13   psychiatric or therapy notes.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          MR. MINNAH-DONKOH:  Last, let's talk about punitive

2    damages.  Punitive damages, as the judge will give it to you is

3    to punish an individual for malice disregard of the law.  In

4    this case, again, based on the facts that there is no liability

5    and you should not find any liability because no conduct was

6    directed at Ms. Johnson because of her race or gender.

7    Punitive damages should not enter your mind nor should any

8    other damages.

9          We have an organization that does nothing but good

10   things for the community.  You have three individuals, my

11   clients, who have done nothing but dedicated themselves to help

12   every day.  We heard Mr. Mr. Carmona's personal story.  You

13   heard about him rising from the ground up, picking himself up

14   from the ground up.  He was incarcerated at a young age.  He

15   went to jail while his eight-month-old baby was home.  You

16   heard about him picking himself up, getting an undergraduate

17   degree, getting a masters in social work from Columbia

18   University.

19         Now, a lot of people who have had a more privileged,

20   for lack of a better world, upbringing than Mr. Carmona, cannot

21   get into Columbia University.  Mr. Carmona did.  He did it

22   based on help he received at Daytop, the drug rehabilitation

23   program.  He told you that at Daytop once he overcame his

24   demons was the "tough low, hard core, I am going told you like

25   it is" mentality and that is the same ideas that he used when

1    he cofounded STRIVE.  Members of the jury, if you have any

2    shadow of a doubt that Mr. Carmona's system of this "direct, I

3    am going to tell you how it is" system trying to improve

4    individuals such as the individuals that STRIVE helps or just

5    the general organization itself, look no further than the

6    testimony you heard from Phil Weinberg as your Honor questioned

7    Mr. Weinberg questioned about the affiliates.  You heard

8    testimony about numerous affiliates in the United States as

9    well as Israel and united Kingdom who adopted the STRIVE model.

10          Members of the jury, it was in that same vain of this

11    "tough love, I am going give it to you like it is" theory that

12    during that conversation with Ms. Johnson he told her, Listen,

13    you are a bright woman.  You can rise to the top.  You just

14    need to get ahold of yourself again.  You don't have to take my

15    word for it.  You can listen to the audio recording and read

16    the transcript.  He told her, it is okay to act like a nigga,

17    but you guys act like niggas all the time.  In other words,

18    your conduct, you allowed yourself to get in your only way.

19          It is not disputed that Mr. Carmona was not the only

20    one who found issues with the way that Ms. Johnson conducted

21    herself in the workplace.  You have performance evaluations

22    Ms. Stein, which is Defendant's Exhibit J in evidence.

23    Defendant's Exhibit J which is the October 21st, 2011

24    performance evaluation that Lisa Stein wrote specifically

25    states on the third page under interpersonal relations

1   teamwork, "Brandi shows come passion and personal interest in

2   her colleagues.  However, I have had several conversations with

3   Brandi regarding her communication style with colleagues and

4   management.  She is often confrontational and emotional in her

5   initial reactions to a situation where she has a different

6   opinion.

7          Members of the jury, it is conduct like that that Mr.

8   Carmona is referring to when he said.  It is okay act like a

9   nigga sometimes, but you guys act like niggas all the time.  He

10  gave the context in which the the word can be used in the black

11  and Hispanic community.  It could be used in a loving way like

12  Mr. Cameron told you, with your good friends, "That's my

13  nigga."  Or it can be used in a way to show that you are acting

14  uncouth.  Plaintiff herself said he said she was low class.

15  Mr. Carmona was not saying plaintiff was low class.  He said

16  you act in a way manner that gets in the way of your own

17  professional aspirations.  He was trying to help her.  Ms.

18  Johnson knows that.  That is why she reached out to him in

19  February of 2012 to critique here essay.

20         Members of the jury, at the end of the day, go back to

21  deliberate again and I want to hold you to your promise, apply

22  the facts to the law and you will come back with the only

23  verdict that is consistent.  You will find that Ms. Johnson was

24  not subjected to a hostile work environment based on her race

25  or gender.  You will find that Ms. Johnson was not treated on

1    her race or gender and you will find that Ms. Johnson was not

2    retaliated against based on her complaint.

3         One last thing that I forgot, which I think is

4    important.  During my direct examination of Mr. Weinberg, you

5    obviously were not given an opportunity to see Mr. Weinberg's

6    investigation notes, which were quite thorough and detailed,

7    but he did tell you that an investigation was conducted.  So it

8    is not that STRIVE simply brushed Ms. Johnson aside when she

9    made a complaint.  They conducted a thorough investigation, an

10   investigation into a complaint that Ms. Johnson had had no

11   good-faith basis to find that her employment was coming to an

12   end and she was also going to commence a lawsuit.  Again,

13   please, apply the facts to the law and find in favor of my

14   clients.

15        Thank you very much for your time in this trial.

16        THE COURT:  Plaintiff, if you are ready to sum up.

17        MS. MESIDOR:  Yes, your Honor.

18        Is it permissible to move the podium?

19        THE COURT:  I think I told you at the outset to move

20   it where ever you want as long as it is not in the jury box.

21        MS. MESIDOR:  Ladies and gentlemen of the jury, I

22   think over the course of the past three days you have had the

23   opportunity to meet myself, my colleagues, my client, to meet

24   defendants and their attorneys and a various amount of

25   witnesses that we're here to testify in regard to the facts of

1    this particular case.  When I opened with you, I told you that

2    this case was about a failure to take responsibility and that I

3    would show you throughout the case how the individual

4    defendants and the corporate defendant STRIVE failed to take

5    responsibility in this particular case.

6           Now, defense counsel was just before you and gave you

7    a tidbit of what the law says, but I submit to you, ladies and

8    gentlemen, and his Honor will do the same, that it is only the

9    judge who can tell you exactly about the law that is applied in

10   this particular case.  I submit to you that the law that was

11   quoted just before you has nothing to do with the claims in

12   this case.  This is a hostile work environment case.  We're not

13   saying that the claims in this case are not that every single

14   black woman at STRIVE was treated exactly the way my client

15   was.  That is not the claim.  That is not hostile work

16   environment.  And when the judge reads you what hostile work

17   environment is, you will see nothing of that sort here.

18          What we are saying is that the comments that my client

19   was subjected to, the treatment that she was subjected to were

20   offensive and related to her race or her gender.  When you use

21   the word nigger to an African-American no matter how much

22   context that you try to quote around it, no matter how many

23   alternative definitions that you may try to substitute with the

24   word nigger, if you are an African-American and I call you

25   nigger, that is no different than calling a Hispanic by the

1    worst possible word you can call Hispanic, calling a homosexual

2    male the worst possible word that you can call a homosexual

3    male.  It was geared toward that person to offend them and any

4    evidence that defendants put forth to the contrary is simply

5    ridiculous.

6          They will tell you that STRIVE has a culture of tough

7    love.  I had an opportunity to view STRIVE's website.  Yes --

8          MR. MINNAH-DONKOH:  Objection, your Honor.

9          THE COURT:  Sustained.  We're not going to discuss any

10   of these objections until the end.

11         It is there -- nevermind.  I wanted you to go forward

12   as I wanted him to.

13         MS. MESIDOR:  I apologize, ladies and gentlemen.  I

14   will withdraw my last statement.

15         You heard evidence that the tough love rhetoric that

16   STRIVE touts is for participants.  And the reason why they have

17   tough love for the participants is that many of them were

18   previously incarcerated, many of them had prior drug-related

19   issues, many of them did not have what they call the work

20   culture necessary to acclimate them to a job that they could

21   hold on for any given period of time.  Which demographic does

22   Brandi Johnson belong to?  She was not previously incarcerated.

23   There was no evidence that she had any prior drug addiction.

24   Why was she subjected to that tough love?  If defendants are

25   submitting to you that part of that tough love is calling her a

1    nigger and that she was dumb as shit, then they are just saying

2    just discrimination is part of our culture.  That is not okay.

3            We sat here for three days and listened to all the

4    good work that STRIVE is doing.  I will not dispute that.  You

5    sat and defendants, each and every one of them, told you about

6    the level of passion that they have to serve the community.

7    Where is that passion protected in the handling of

8    Ms. Johnson's complaint?  Where is that passion considered when

9    you pull a woman who is running a program and managing a

10   program and you have a conversation with her that completely

11   demoralizes her to the point where she the bathroom for 45

12   minutes crying.  They will try to suggest to you that she

13   indicated that she never indicated that she was offended.

14           You have the Exhibit 107 of the transcript.  They said

15   to you that the only thing that she was being offended about

16   was that she was being compared to this Latesha Thomas.  As my

17   opposing counsel said, documents do not lie and the recording

18   does not lie.  Robert Carmona specifically says, Because both

19   of you are alike.  I am not going to get into this with you.

20   Go figure it out.  Seriously, you guys are alike.  Smart as

21   shit, but dumb as shit.  Really.  Both of you -- you know what

22   it is?  You know what it is?  Both of you are niggers.  And you

23   do.  I am not say -- I am not saying using the word derogatory

24   because sometimes it is know how to act like a nigger, but

25   y'all act like niggers all the time.  That is the last

1    statement that he says before Ms. Johnson replies, I am really

2    offended by that -- I don't think that I do.

3            What is she saying?  I don't think that I do.  I don't

4    think that I act like a nigger.  And he responds, You can be

5    offended but it is true.  It is true.  He insisted that it was

6    true.  He said it as a fact.  He even went on to say that every

7    one at STRIVE would agree with him, that she acted like a

8    nigger, that she was a nigger.  That is not intentional?  That

9    is to build her up to show her love?

10           He gave you different context that people can use the

11   the word nigger.  "That's my nigger" or out of a term of

12   endearment.  She said it was specifically not said it is not

13   said to be a term of endearment.  He said that specifically.

14   If it is not meant to be a term of endearment and the only

15   alternative he gave you was that the nigger who beat me up,

16   then it is a derogatory term.

17           Moreover, STRIVE, as in Exhibit 33, had an

18   antidiscrimination policy, that is specifically said no racial

19   slurs.  So you have this tough love culture that makes it okay

20   for you to call him a nigger, but they you have an

21   antidiscrimination policy that says no racial slurs.  That in

22   effect makes the discrimination policy ineffective.  It is

23   useless, not worth the paper it is written on.

24           Defendants will try to make you believe that

25   Ms. Johnson walked into the conversation with Mr. Carmona and

1    tried to elicit or provoke him in some way so she could have

2    some good stuff in her bag.  You hear the entirety of the tape.

3    She comes to him before he goes on his four-minute nigger

4    tirade.  The only question she poses to him, So my question for

5    you is this:  First you told me to go with the opposite of how

6    I feel.  Remember?  He responds, yeah.  So yesterday you said

7    you and your girl from CWE is just alike.  What do you mean?

8    Carmona opens the box and he goes on.  First he says, I am not

9    going to get into this with you.  And then she says, Why did

10   you compare me -- and then he responds, Because both of you are

11   alike.  The paragraph that I just read to you when he said both

12   y'all are niggers, that came after, right after that.  She

13   didn't say did you mean we act like niggers.  She didn't do any

14   of those things that sometimes you can hear in recordings that

15   make you believe that the person is trying to elicit a specific

16   response.  She let Carmona be Rob Carmona and this was the

17   first time that she recorded him.

18        Mr. Carmona is so used to using the word nigger in the

19   context that he used it with Ms. Johnson that when asked what

20   he thought about it, he says it was not in the forefront of his

21   mind.  It was an afterthought.  For him it was just Tuesday.

22   Why is this recording so important?  Defendants would have you

23   devalue this.  But when you have testimony from two different

24   people, oh, the conversation went this way.  No, the

25   conversation went that way.  There is room there for

interpretation.  Maybe somebody misinterpreted something.

Maybe this happened.  Maybe that happened.  But when you have a

recording and an independent witness, it is just what it is.

They want you to have it in a larger context of STRIVE

culture.  That culture of tough love had nothing to do with

Ms. Johnson or any of the other staffers at STRIVE that were

not formal participants.  Ms. Johnson is not a formal

participant.  She is an educated whom who maintained her

bachelors degree when she came to STRIVE and she completed her

masters while she was there.  Where is it that her life needed

to coming together?  Where is it that she be counseled on a

relapse?

The hostile work environment claim that we brought

before here was not just based on race but also on gender.

Now, defendants went on in the summation that our evidence on

the issue of gender is very weak.  I would submit to you that

it is not.  One, Mr. Carmona admitted in saying that black

women have a tendency to get in their way.  When asked if he

recalled making the statement, You are the type of woman to

throw a man under the bus, he didn't recall.  When asked if he

had made the statement -- when asked if he had ever indicated

that he was a male chauvinist, his initial response is, I have

been saying that for 20 years.  Then defendants said, Well, you

didn't put it in context.  What he was referring to is the

dynamic between his culture upbringing and being raised by a

1  strong woman that is his mother.

2        Mr. Carmona said a lot more than that.  He admitted

3  that both reside within him.  The part of him that believes

4  that his word is law, that he rules the house, that women are

5  too emotional exist to him but goes head to head of how he

6  feels about being raised by his mother.  But both are there and

7  what we're submitting to you is the way that he dealt with Ms.

8  Johnson was not in the way that brings honor to the memory of

9  his mother, but is consistent with the part of him that

10  believes that his word is law, that women are too emotional and

11  he is not and that he is the head.

12        Now, when we brought Maria Ortiz before you a few days

13  ago, it wasn't because we wanted to show you that he treated

14  all the women the same.  We just wanted to show you and

15  corroborate that this is just part of the way that Mr. Carmona

16  is.  It is an example that what Ms. Johnson experienced was not

17  particularly unique.

18        Now, defendants will say Ms. Ortiz is Ms. Johnson's

19  subordinate and her friend.  That is not something that came

20  out in cross.  I brought that to you.  I brought that to you so

21  that you could see that we're laying our cards out all on the

22  table.  Each one of our witnesses told you about their biases.

23  Yes, she is my supervisor.  Yes, she is is my friend.  But she

24  said that she wasn't going to lie for her and she said that she

25  has no way of retaliating against her if whatever she said was

1    inconsistent.  Ms. Ortiz didn't give you elaborate stories that

2    were completely ridiculous or inconsistent with any of the

3    independent evidence that we brought to you.  She gave you

4    examples of what she observed as Mr. Carmona treating men and

5    women differently.  She gave you her personal experience.

6          You also heard elaborate testimony and argument that

7    Ms. Johnson had never made a complaint before.  Now, Ms.

8    Johnson indicated to you that she had complained to Eric

9    Treworgy when she first got there to STRIVE.  In fact, she

10   recalled to you an instance when Mr. Carmona had spoken to her

11   in a particular harsh way, the instance when he said you are

12   the type of woman who will throw the man under a bus, and she

13   tried to speak to Mr. Treworgy in front of Mr. Carmona.  She

14   asked Mr. Treworgy, Can I speak to you?  And Mr. Carmona

15   responded, No, you fucking can't.  Mr. Treworgy said nothing.

16   They never had an opportunity to speak.

17         Now, if I am a new employee and I am trying to bring a

18   complaint to a CEO and I say, Mr. CEO, Can I speak to you and

19   the founder says in response, No, you fucking can't, and the

20   CEO does nothing, how much power do you really think that I

21   believe the CEO actually has?  So what did Ms. Johnson testify

22   that she did?  She withdrew.  Kept her head down, just

23   continued to work.  In response to that, Mr. Carmona took the

24   opportunity to break her.  Stop fucking walking around here

25   with your fucking head down and do your fucking work.

1          Then they indicate to you that she could have

2     complained to Lisa Stein who was the head of HR.  Ms. Johnson

3     gave you an example in which Mr. Carmona was yelling at her for

4     closing his fucking door and Ms. Stein walks in and she walks

5     out.  Mr. Carmona himself said, How is Lisa Stein going to

6     reprimand me?  I am her boss.  What is the point of complaining

7     to her then?  We're not submitting to you that she didn't

8     complain.  We're just indicating that even if you believed

9     defendants that she had not complained before that April 2012

10    draft complaint that it would not have been unreasonable for

11    her not to.

12         Let's see how they behave after they got the

13    complaint.  After they got the complaint, Mr. Carmona continued

14    to make life very difficult for Ms. Johnson.  He attempted to

15    isolate her from her colleagues, pulling two colleagues in her

16    office and telling them, Don't allow yourselves to be used

17    immediately after asking them to break up the lunch, a practice

18    that Ms. Crawford indicated to you that they had done many

19    times before.  He tried to isolate her from participants,

20    pulling Jamark Cooks aside and telling him, Don't come back

21    here to visit Brandi.

22         Now, defendants will have you believe that the reason

23    why they said that was because Brandi Johnson has the tendency

24    to counsel people and that could be counterproductive.  Call a

25    spade a spade.  Mr. Jamark Cooks, who doesn't have a dog in

1    this fight, told you that Mr. Carmona specifically told him

2    that the reason I don't want you to come back here and see Ms.

3    Johnson is because she has an issue with the organization and I

4    don't want you to get caught up with it.  The same issue he is

5    referencing is the one that he previously testified that Mr.

6    Weinberg had told him to keep confidential.

7         When Ms. Johnson learns about this, she goes into Lisa

8    Stein's office, she opens the door, she knocks on the door, she

9    is told to come in, she opens it and she says to Mr. Weinberg,

10   I need to speak to you an incident that just involved

11   Mr. Cooks.  Mr. Carmona says, No, you don't and slams the door.

12   Mr. Weinberg, head of the investigation, does nothing.

13   Ms. Stein, head of HR, does nothing.

14        Ms. Johnson is so upset that Mr. Weinberg out of his

15   own mouth testified -- and I don't want you to just take my

16   word for it -- that she was at a heightened state of anxiety.

17   She as disturbed that the door was closed like that.  She was

18   very agitated, emotional and fervent, almost hysterical.  At

19   that point it was just too much.  How much disrespect do you

20   have to take before any action is taken?  Right after that Mr.

21   Weinberg comes up with a solution.  You are going to work from

22   home and she does work from home.  She works from home from

23   approximately June 6th to June 11th.  She comes in on June 11th

24   at the request of Mr. Weinberg for the sole purpose of

25   terminating her on that day.

1          Now, why is that day important?  People are usually

2     terminated on a Friday or right before the end of a pay period.

3     June 11th, 2012 is not a Friday.  It is a Monday.  Mr. Weinberg

4     told you why that day.  He admitted out of his own mouth that

5     he learned that the draft complaint was now an official

6     complaint and had been filed with the court the same day.  Now

7     defense will try to submit to you organization that

8     conversation took place before we knew that it was actually

9     filed.  Well, this is either the biggest coincidence known to

10    man, but I think that you can infer that since defendants

11    already told you that they received the draft complaint that

12    they had contacted their counsel, that before they decided to

13    terminate Ms. Johnson, they contacted their counsel too and

14    that that conversation did not take place after.  The

15    conversation regarding being served with the actual complaint,

16    did not take place after but before.

17         Defendants spent some time in their summation

18    discussing why is Mr. Weinberg and Stein here.  Ms. Johnson

19    admitted that they never called her a derogatory term.  Ms.

20    Johnson admitted that they never used any racial slurs to her.

21    I have to wonder whether that argument seeks to insult your

22    intelligence.  Do they want to present to you that a reason why

23    Ms. Stein and Mr. Weinberg is here is because plaintiff just

24    wanted to add additional defendants?  Ms. Stein and Mr.

25    Weinberg are here because they are the executive staff of

1   STRIVE.  Ms. Stein was the head of HR.  Both of them had a duty

2   and an obligation under STRIVE's own policy that labels them as

3   the people who you bring discriminatory complaints to to do

4   something about it and they did nothing.  Ms. Stein did nothing

5   when she saw Mr. Carmona cursing Brandi out about closing his

6   fucking door.  Ms. Stein did nothing when she saw Mr. Carmona

7   slam the door in Ms. Johnson's face when she tried to bring

8   another complaint.  Mr. Weinberg similarly did nothing.

9          Now, they will say to you but there was an

10  investigation.  Okay.  Mr. Weinberg sat in the witness box and

11  told you that each one of the five complaints that Ms. Johnson

12  made after the April draft complaint was submitted were

13  founded.  What was the result of their investigation?  No

14  discrimination.  When asked why they came to that conclusion,

15  Mr. Weinberg indicated because Mr. Carmona and Ms. Johnson are

16  both people of color.  Wow.  So I suppose then if you have two

17  people of color having a conversation about the N word they

18  must also have the same perspective.  I am a person of color

19  and I represent plaintiff.  Defense counsel is a person of

20  color and he represents defendants.  We're arguing on opposite

21  sides.  That means people of color can have differing opinions

22  about the categorization and the use of the N word.

23          They submit to you that Ms. Johnson could not have

24  been offended by the use of the N the word because she herself

25  had used the N word and they gave you three witnesses to

1    support that fact.  Let's look at those three witnesses.  First

2    you had April Bland.  Now, Ms. Johnson continues to maintain

3    that she did not use the N word while working at STRIVE.

4    However, if I play devil's advocate let's say you believe April

5    Bland that she used the the word.  April Bland specifically

6    testified that she never called anyone at STRIVE a nigger, that

7    she never used it in work related conversation, but was having

8    a personal and private conversation with Ms. Johnson where she

9    believed that the word was used.

10          Let's look at Ms. Barr.  Again, Ms. Johnson still

11   maintains that she did not use the N the word at STRIVE.

12   Ms. Barr says that she recalls one instance, okay, that

13   Ms. Johnson purportedly referred to her seven-year-old son as a

14   little nigger.  Ladies and gentlemen, you have had the

15   opportunity to observe my client on the witness stand for

16   several hours.  If you believe that she would call her youngest

17   child a little nigger to a witness who admittedly had very

18   limited to no interaction with her; two, worked part-time; and

19   three, has been working at STRIVE for almost 20 years, then I

20   really don't know what else to say.

21          The last person that seems to corroborate

22   Ms. Johnson's use of the world nigger is Mr. Carmona.  Now, I

23   sat there while they called my client a liar on a number of

24   occasions.  But I can only recall, and the record will reflect,

25   two times in which defendant went back to my client's

1    deposition to try to show that there was some inconsistency

2    with what she previously testified to.  However, by comparison

3    in Mr. Carmona's cross-examination, 18 times did we have to go

4    back to his deposition to remind him of what he said before and

5    how it is inconsistent with what he is saying now.  Another 14

6    times did we have to reconcile what he told Mr. Weinberg versus

7    what he told Mr. Rahl.  Did he use the N word?  Did he not use

8    the N word.  Was it ghetto?  Was it low class?  At one point I

9    was sitting at my counsel's table and I was embarrassed for him

10   taking up so much time on the record page after page because he

11   can't even remember the lie that he told at deposition to make

12   it consistent with the lie he is saying at trial.

13           Even if you believe Mr. Carmona that Ms. Johnson used

14   the N word and to quote him he said she uses the N word like

15   the word "the" wouldn't he have been able to recall a

16   particular instance?  He couldn't.

17           Furthermore Ms. Johnson is nobody's supervisor, okay.

18   Ms. Johnson did not sit in her office across the table from a

19   subordinate and say that you are a nigger or that you act like

20   a nigger.  That did not happen.  Furthermore, no one that they

21   even brought said that they were offended by Ms. Johnson's use

22   of the word nigger.  You have a tape and a transcript that

23   clearly states that she was.

24           Moving along to the retaliation claim.  I already

25   discussed with you the five instances in which Ms. Johnson says

1   that she was retaliated against, isolated from coworkers,

2   isolated from participants, slammed the door, and now finally

3   the termination.  There is a nuisance here that I think is very

4   important.  Ms. Johnson does not deny that she worked on the

5   Pathways Out of Property grant.  You will find nowhere in her

6   testimony that she denies it.  Ms. Johnson did not deny that

7   she managed her program.  When we brought Exhibit XX, which was

8   the duties and responsibilities that Ms. Johnson got at her

9   interview?  We brought that for one purpose and one purpose

10  only.  The Pathways Out of Property grant were not part of her

11  initial duties an responsibilities and the only written job

12  description that she ever gave her was the one in question.

13          Ms. Stein when asked about this particular job

14  description says she doesn't recall.  However, when we

15  submitted XX to you, we were able to confirm that unlike

16  defendants G, XX accurately stated Ms. Johnson's department at

17  the time of her hire, it accurately stated her supervisor at

18  the time of hire and her duties and responsibilities.  The

19  issue is not whether Ms. Johnson had an idea or even knowledge

20  that some or even all of her salary was coming from the fund.

21  The issue is whether Ms. Johnson was told when the fund ends

22  your position ends.  That is why I asked the question, Did you

23  ever tell Ms. Johnson that her position was going to end on

24  January 28th, 2012, the original date, or June 30th, 2012, the

25  original date.  That is why we emphasized the date because as

1    defendants themselves admitted, as you will see in Exhibit L,

2    is that there were several personnel positions that were funded

3    out of that grant.  I am not saying those personnel position

4    were 100 percent funded out of that grant.  But there was a

5    significant amount allotted for the president, a significant

6    amount allotted the for the CFO.  They indicated that

7    Ms. Saenz' salary was substantially allotted by that grant.

8    None of those people got a pay cuts and none of those people's

9    positions terminated at the end of the grant.

10        So was it reasonable for Ms. Johnson to believe that

11   even though a portion or all of her salary was part of that

12   funding that her position would continue?  Of course.  Nobody

13   else's position or salary was affected by it in any way.  They

14   found money to supplement that.  Nobody got a note in their

15   paycheck saying, Oh, by the way the Pathways Out of Property

16   grant has ended and we'll have to reduce your salary by x

17   amount until we fill your salary up.  There was no evidence

18   that a note like that was presented.

19        Then defendants submitted to you that prior to Ms.

20   Johnson the affiliates coordinator position didn't even exist,

21   that this was the first time under this grant that we ever had

22   such a position.  That is what Ms. Stein says.  Mr. Carmona

23   says the affiliated coordinated position always existed.  At

24   first Ms. Stein on her direct says that nobody had the position

25   before Ms. Johnson.  But when I crossed her and I bring out the

1    fact that Jill Poklemba was on all the press releases regarding

2    this grant and I asked her isn't it because she was managing

3    the grant, she said no.  It was because Jill Poklemba wrote the

4    grant.  But what happened on redirect?  Who is Jill Poklemba?

5    Oh, Jill Poklemba had the affiliate's coordinator position

6    before Ms. Johnson.  She only had it for a month and she

7    resigned and then we hired Ms. Johnson.  That was convenient.

8    It is not the first time that defendants own up to the truth

9    when they are actually presented with the evidence.  You saw it

10   a number of times with Mr. Carmona.  To get Mr. Carmona to own

11   up to the truth, you either have to impeach him with his

12   deposition testimony or play him a tape.

13          Ladies and gentlemen, you cannot ignore the fact that

14   Ms. Johnson was fired on the same day that defendants became

15   aware that the lawsuit was filed.  That is a coincidence that

16   cannot be ignored and that is an admission by Mr. Weinberg

17   himself.  You cannot ignore that after the draft complaint came

18   in April all of a sudden Ms. Johnson can't have lunch with her

19   friends outside of Mr. Carmona's office.  He says that was to

20   provoke him.  Ladies and gentlemen, I submit to you it doesn't

21   take much to provoke Mr. Carmona.

22          After the April complaint, all of a sudden she cannot

23   speak to participants.  There is an issue with Brandi and the

24   company, don't speak to Brandi.  We're slamming doors in her

25   face.  They will continue to say to you, at least try to say to

1    you that Mr. Carmona was not Ms. Johnson's supervisor.  Because

2    they know that if these discriminatory actions are done by a

3    supervisor, it implies that the company is actually doing the

4    discrimination.  Now, now I am not going to instruct you what

5    to do with information, his Honor will, but that is why they

6    want to separate Ms. Mr. Carmona from Ms. Johnson.  So Mr.

7    Carmona and Ms. Stein all testified to having reprimanded

8    Ms. Johnson after she was under Ms. Stein's supervision.  At

9    one point Ms. Stein concocts a story how Carmona saved

10   Ms. Johnson's job.  They are not separating his supervisor

11   authority or influence then.

12        Then they bring to you this issue of poor performance.

13   Now, ladies and gentlemen, if there are any smoke and mirrors

14   in this case, it is this issue of poor performance.  Why is it

15   smoke and mirrors?  The stated reason for her termination is

16   lack of grant funding.  So the fact in 2011 you reprimanded her

17   about improper dress and in 2011 you remanded her about a

18   matter she was having with her colleague.  What does that have

19   to do with the stated reason why she was terminated was

20   improper funding?  The only reason they are bringing this

21   information to you is to smear her name.  They want to have you

22   believe she was an unprofessional, hard-to-get-along-with

23   person that they gave many, many, many chances to but never did

24   any good any good work ever but was never fired.

25        The theory of their case is no good deed goes

1   unpunished.  What any evidence of good deeds do we have here?

2   What is STRIVE's good deeds toward Ms. Johnson?  What are Mr.

3   Carmona's good deeds towards Ms. Johnson.  What are Lisa

4   Stein's good deeds towards Ms. Johnson.  What are Mr.

5   Weinberg's good deeds towards many Johnson?  Calling her a

6   nigger is not a good deed.  Watching her be disrespected by a

7   co-workeer is not a good deed.  Failing to give her complaint

8   due consideration and fair chance, not a good deed.

9           They also emphasized to that you that Ms. Johnson

10  didn't turn over the tapes when Mr. Weinberg was doing his

11  investigation.  Okay.  That is true.  Mr. Weinberg has heard

12  the tapes now and so has everybody in this case and as my

13  co-counsel brought out in the cross of both Mr. Carmona, Mr.

14  Weinberg, Mr. Carmona is still the face of STRIVE.  Mr.

15  Weinberg was asked that in light of hearing the tapes and all

16  this testimony, would you change your determination.  No.  Now,

17  he will be quick to tell you he is not an attorney and doesn't

18  know what discrimination is, but he was charged with doing the

19  investigation and determining whether discrimination took

20  place.  They will try to tell you that he had some assistance

21  from an attorney, but we also brought out on cross that the

22  attorney has no experience in employment law or employment

23  discrimination.

24          THE COURT:  Your timing estimate to do your summation

25  is just about done.

1          MS. MESIDOR:  Your Honor, I am almost finished.

2          THE COURT:  Just a reminder.

3          MS. MESIDOR:  Yes, your Honor.

4          Ladies and gentlemen, we showed you evidence that was

5     brought out in the testimony that Ms. Johnson makes $60,000 a

6     year.  She was out of work for approximately seven months and

7     although she has a new job now she earns $10,000 less than she

8     did at STRIVE, which means even though she has been able to

9     close the gap a little, unless she gets her raise or another

10    higher paying job, she continues to lose money.  Emotionally

11    you heard evidence that over a period of two years Ms. Johnson

12    was demoralized, berated and made to feel less than a person.

13    Ms. Ortiz corroborated to seeing Ms. Johnson crying on a number

14    of occasions, shaking physically and visibly upset, having

15    headaches.  Ms. Stein corroborates seeing Ms. Johnson cry after

16    an interaction with Mr. Carmona.  Even Mr. Weinberg after the

17    incident of the door slam describes to you in great detail

18    about her heightened anxiety, her fervent and emotional state,

19    that she was crying and that she was yelling all to the point

20    where she had to get therapy.  And Ms. Johnson has been going

21    to therapy that we brought out in evidence through her

22    testimony since March of 2012, around the same time that the

23    conversation which Mr. Carmona called her a nigger came out and

24    has continued to go to therapy at least twice a week to this

25    day.

1          Now, they will tell you that we didn't bring any

2     medical records, we didn't bring any therapeutic notes or

3     anything of the sort.  If any of you have any experience with

4     therapy, you will note that when you go to your therapist, your

5     therapist doesn't give you the notes, the notes that she takes

6     because the actual patient seeing the note may or may not be

7     helpful.  The therapist' notes is for their own assertion and

8     their own reflections of how to continue to treat you.

9          In addition, to the compensatory damages of lost pay

10    and emotional distress that we're seeking, we're also seeking

11    punitive damages.  If you believe that defendants acted either

12    intentionally or with reckless indifference to Ms. Johnson's

13    complaints, the use of the word nigger, and otherwise, then

14    what we're asking you to do is to punish STRIVE and the

15    individual defendants.

16         No individual defendants in this case is unfamiliar

17    with STRIVE's antidiscrimination policy, which prohibits the

18    use of a racial slur and prohibits a hostile work environment.

19    When Mr. Carmona called Ms. Johnson a nigger eight times in a

20    single conversation, he knew that it was not a term of

21    endearment.  He knew that nigger is a racial slur.  Mr.

22    Weinberg terminated Ms. Johnson the same day that he learned

23    that the lawsuit was being filed.  He also knew that there was

24    an anti-retaliation policy and he also knew that that too was

25    improper.  When Ms. Stein in example after example was

1  indifferent to what she was actually witnessing was happening

2  to Ms. Johnson, she too was staying hands off and allowing it

3  to happen.

4           When all three of these people who are part of the

5  executive team at STRIVE do this, it is just like STRIVE doing

6  it.  But instead of apologizing, instead of making amends,

7  instead of having any level of compassion for what the

8  plaintiff has gone through, they tell you it is just part of

9  their tough love.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      Well, if calling a person a nigger and subjecting them

2  to a hostile work environment is part of STRIVE's tough love,

3  then STRIVE needs to be reminded that this type of behavior is

4  illegal and cannot be tolerated.  And no matter what kind of

5  good you may do in the community, you cannot discriminate.

6      Ladies and gentlemen, I thank you for your time.  I

7  thank you for your attention to everything that I have laid out

8  before you.  As my opposing counsel said, if you want any of

9  the transcript read back to you or you want to see any document

10  in the evidence or you want to hear any of the recordings, you

11  can decide to in your deliberation.

12      Most of all, ladies and gentlemen, I thank you for

13  just the opportunity to lay out Ms. Johnson's case before you.

14  It has a significance to her that it is perhaps impossible for

15  you to imagine.  To seen have her day in court, where there may

16  be some justification that what she endured was not in vain,

17  allows a healing to begin that otherwise she would have not

18  been able to have.

19      And I thank you for that.

20      THE COURT:  Very well.  Ladies and gentlemen, your

21  lunch is here.  We will let you go and get it.  We will see you

22  I think probably at about 1:15.  I don't think it will take you

23  any longer even for this lunch.  But the case is not yours yet,

24  so do not discuss it until after you come back and hear my

25  charge.  You are excused.

1        (Jury not present)

2            THE COURT:  If indeed either of you want to put

3    objections to the summation on the record, you are perfectly

4    able to do that now.  If you have anything else that we ought

5    to talk about you can do that, too.  I have a hearing in less

6    in about 25 minutes, so you are going to have to have lunch

7    very shortly, even though it's earlier than your likely or

8    usual time for lunch.  We will see you back here at 1:15.

9            MS. KREBS:  Thank you, your Honor.

10           Your Honor, did you say you want us to deal with any

11   objections?

12           THE COURT:  Right now.

13           MS. KREBS:  Right now.

14           Your Honor, there is one thing I want to raise with

15   respect to opposing counsel's closing remarks.  During the

16   course of Ms. Mesidor-Sharpe's closing arguments she was making

17   a comparison or a distinction between Ms. Johnson and the other

18   participants about the fact that they did not, she did not at

19   all come from a similar background as they did.

20           One of the things she said is that she was not

21   previously incarcerated.  Now, as your Honor knows, there is a

22   criminal history in this case that was excluded based on

23   609(b).

24           However, by making that statement, I believe that

25   opposing counsel has opened the door and created a

1   misperception on the record with respect to Ms. Johnson's

2   history indicating and certainly implying that she had no

3   criminal history.

4          At this point in time, we ask that the jury be given

5   judicial notice of the fact that Ms. Johnson had been

6   previously convicted of grand larceny and for which she paid

7   restitution for 11 years.

8          THE COURT:  $100,000.

9          MS. KREBS:  $100,000, yes, your Honor.

10         MS. MESIDOR:  Your Honor, may I respond.  Your Honor

11  my words were very specific.

12         THE COURT:  You can go to the podium or bend over and

13  use your mic, whatever you would like.

14         MS. MESIDOR:  Your Honor, my words were very specific.

15  She was not previously incarcerated and that she was not a

16  participant.  We were not trying to allude to the jury that she

17  did not have a criminal background or anything in that regard

18  at all.  All we are saying is that, based on what defendants

19  indicated was their tough love philosophy with their

20  participants and their use of that tough love to staffers who

21  were former participants who needed to get their lives together

22  or who were suffering a relapse, that was the specific context

23  in which I raised that she had not been previously

24  incarcerated, nor was she a former drug addict or had used

25  illicit drugs in any way.

1    I did not open any door because I did not indicate

2  that she was pristine and she had no criminal record or

3  anything of the sort.  To now bring it out just as judicial

4  notice that, one, that she was convicted and, two, that she

5  paid restitution without allowing for me to put her conviction

6  in context I think would be unduly prejudicial.

7        THE COURT:  How would you put her conviction in

8  context?

9        MS. MESIDOR:  I'll let you know, your Honor.

10        THE COURT:  That's very kind of you.

11        MS. MESIDOR:  Your Honor, my client used to work at

12  Chase bank.  She was only working there for seven days when she

13  was questioned by management about her till being under.  She

14  found out by management that her supervisor had been taking

15  money out of her till and putting a code to make up the

16  difference.

17        Because she didn't know that this was taking place,

18  when they questioned her, she didn't have a response to them as

19  to where the money went or what happened.  She had only been

20  working there as a teller for seven days and she did not have

21  any other significant banking experience.

22        So she was arrested and she was charged and she was

23  assigned a public defender, and the case dragged on for two

24  years.  When it came to the point of when the prosecution was

25  offering my client a plea, my client had a two-year-old

1    daughter and nobody to look after her, and she and her private

2    counsel made the decision that she would take the plea so long

3    as she had no jail time, which is why she took the five years'

4    probation and paid the restitution for $100,000.

5         THE COURT:  I don't understand.  Why didn't her lawyer

6    investigate so that they got the supervisor?

7         MS. MESIDOR:  Your Honor, there was no way for her to

8    continue to do that with a private attorney.  She could not

9    afford to continue her defense in that regard.

10        THE COURT:  Public defenders are as good as most

11   private lawyers, if not better in my experience.

12        All right.  I hear you.

13        MS. MESIDOR:  Right.  The main point of that is she

14   had a two-year-old daughter with nobody else to care

15   information him.

16        THE COURT:  I heard that, too.  Yes.

17        MS. KREBS:  May I respond, your Honor?

18        THE COURT:  You may.

19        MS. KREBS:  Your Honor, we are not here to retry what

20   occurs with Ms. Johnson's prior criminal history.  The fact is

21   she had a prior criminal history.  The fact is she did plead,

22   although I still find it hard to believe somebody would take a

23   plea to repay $100,000 when they didn't do it, and that somehow

24   it would not be found or determined that if that $100,000

25   happened over a course of time and she was only there for seven

1    days that it wouldn't have been determined anyway.

2           Again, putting that aside, we are not here to retry

3    that case.  The fact is she did plead guilty.  She was

4    convicted of grand larceny.  She did repay $100,000.  She did

5    get five years probation.  She did repay it over the course of

6    11 years.

7           If you look at the manner in which opposing counsel

8    brought it up, used the words "not previously incarcerated" in

9    the context of her closing remarks, I would ask the Court to

10   please look through the whole thing.  It was a definite

11   comparison there.  Not just specific to incarceration, but it

12   was a comparison of the lifestyle that she had versus the

13   lifestyle of a person who had been a participant or former

14   participant in the program.  That created an implication.

15          THE COURT:  Why don't I ask the reporter, I don't even

16   know which whether it was Sam or Jenn, to find that portion and

17   see if they can provide it to me by 2:15 or 1:15 whenever we

18   are going to see the jury.  I think we have each of your views

19   and it will take the reporter a little time, so I'm going to

20   look at it.  I am going to let him go and you can go to lunch.

21          MS. KREBS:  Thank you, your Honor.

22          MS. MESIDOR:  Thank you, your Honor.

23          (Luncheon recess)

24

25

1          A F T E R N O O N     S E S S I O N

2                    (1:20 p.m.)

3

4          THE COURT:  I am glad to have the jury come by and

5    resolve these two issues with them so we don't waste any time.

6          You have your leader?

7          MR. MINNAH-DONKOH:  Your Honor, I believe she was on

8    the eighth floor.  We are looking for her.

9          THE COURT:  I looked at both of these items, and as

10   long as we have lawyers from both sides, insofar as the item

11   with respect to the summation, there isn't any question but

12   that it was an ill-considered comment, which I suppose the jury

13   could ruminate meant that there was no conviction for

14   Ms. Johnson, but it's really not enough for me to open the case

15   and start all over again, not start all over again, but

16   introduce the conviction that I kept out.  It is unfortunate,

17   but I am not about to do what Ms. Krebs sought.

18          The other item, with respect to Ortiz, once again,

19   there isn't any doubt in my mind nor in the transcript that in

20   fact Ortiz in the first instance was either misled or didn't

21   really know what she was talking about.  But then the question

22   was relatively clearly put to her by Ms. Mesidor that in

23   fact -- or maybe it was Ms. Krebs, I don't know, this is cross:

24   The question was asked and answered the question, I didn't have

25   a conversation with Bob Carmona about a participant doing

1    that -- which was cock sucking -- I had a conversation with Rob

2    Carmona in regard to him wanting me to terminate the female

3    participant.

4            So in essence, what I understood the problem to be was

5    really resolved on a later question and answer.  So I didn't

6    quite understand what Ms. Krebs was anxious for me to do.

7            Would you know?

8            MR. MINNAH-DONKOH:  I do not, your Honor.  I have

9    knowledge regarding the criminal conviction issue, but with

10   respect to the second issue you just addressed --

11           THE COURT:  I am not going to wait for her.  I am

12   going to bring in the jury and we're going to start the charge,

13   which I will explain.  Maybe she will be here by that time, but

14   I don't want to waste any more time.

15           So, in any event, I don't know what I would do about

16   that, but it seems to me that it was corrected.

17           (Jury present)

18           THE COURT:  Ladies and gentlemen, this is the last

19   aspect of any civil or criminal trial, and that doesn't mean

20   that it's unimportant, or at least judges like to think that.

21   It essentially tells you what the law is.

22           We have had a charging conference which took us

23   through both the last portion of last evening as well as this

24   morning, and we have gone over what I suggested and we have

25   made a couple of changes.  I think probably for the most part

1    everyone is of the same mind, that this is the law.

2            So you may hear me repeat some of what I said at the

3    time we had a preliminary charge.  The difference is that was

4    all sort of without any, extemporaneous I guess is the word.

5    Just to be sure that I don't leave anything out, I am going to

6    read this to you.  It may not be as exciting as my inflection

7    when we talk extemporaneously, but it will indeed avoid any

8    error or any errors that I saw when we put this together with

9    counsel.

10           Now that the evidence in this case has been presented

11   and the attorneys for the parties have concluded their closing

12   arguments, it is my responsibility to instruct you as to the

13   law that governs this case.  You must pay close attention, and

14   I will be as clear as possible.

15           My instructions will be in three parts.

16           All three parts, just so that you know how long it may

17   take, I think there are less than 35, or indeed 32 pages, and

18   many of them are not full pages, so it's really 20-odd pages.

19           My instructions will be in three parts.

20           First, I will give you instructions regarding the

21   general rules that govern a jury in a civil case;

22           Second, I will instruct you as to the legal elements

23   of the causes or claims here alleged by the plaintiff;

24           Finally, I will give you instructions regarding the

25   general rules governing your deliberations as jurors.

1          It is your responsibility and duty to find the facts

2      from all the evidence in the case.  You are the sole judges of

3      the facts, not counsel and not I.  I want to impress upon you

4      again the importance of that role.

5          It is for you and you alone to pass upon the weight of

6      the evidence, to resolve such conflicts as may have appeared in

7      the evidence, and to draw such inferences as you deem to be

8      reasonable and warranted from the evidence or lack of evidence,

9      to resolve such conflicts as may have appeared in the evidence,

10     and to draw such inferences as you deem to be reasonable and

11     warranted from the evidence or lack of evidence.

12         With respect to any questions concerning the facts, it

13     is your recollection of the evidence and yours alone that

14     controls.  Remember, you are the sole and exclusive judges of

15     the facts.  You pass upon the weight of the evidence, you

16     determine the credibility of the witnesses, you resolve

17     conflicts as there may be in the testimony, and you draw

18     whatever reasonable inferences you decide to draw from the

19     facts as you have determined them.

20         I shall later discuss with you how to think about the

21     credibility, or believability, of the witnesses.  In

22     determining the facts, you must rely upon your own recollection

23     of the evidence.  Anything that counsel may have said while

24     questioning witnesses or during arguments is not to be

25     substituted for your own recollection and evaluation of the

1    evidence.

2           With respect to a fact matter, nothing I have said

3    during the trial or may say during these instructions should be

4    taken in substitution for your own independent recollection.

5    Because you are the sole and exclusive judges of the facts, I

6    do not mean to indicate any opinion as to the facts or what

7    your verdict should be.  Indeed, I have no power to tell you

8    what your verdict should be.  If I allude to a fact and should

9    your recollection differ from mine, it is your recollection

10   that governs.  I am usually, and indeed in this case, careful

11   to avoid talking about facts or what I thought facts were just

12   so that we don't get into that pickle.

13          During the trial, I have been called upon to make

14   rulings on various questions.  Those rulings are not evidence

15   and need not be considered by you.  Procedural matters are

16   matters of law, and although you may have been curious about

17   them, you should not consider them.  The rulings I have made

18   during the trial are not any indication of my views of what

19   your decision should be.

20          I also ask you to draw no inference from the fact that

21   upon occasion I may have asked questions of certain witnesses.

22   Such questions were only intended for clarification or to

23   expedite matters, and certainly were not intended to suggest

24   any opinions on my part as to the verdict you should render or

25   whether any of the witnesses may have been more credible than

1    any other witnesses.  That is your job.

2          Your job is to consider only the evidence and find

3    facts from what you consider to be the believable evidence and

4    apply the law as I will later give it to you.  Your verdict

5    will be determined by the conclusions you reach no matter whom

6    the verdict helps or hurts.  Sympathy and speculation should

7    play no part in your decision.

8          The evidence upon which you are to decide what the

9    facts are in this case comes from one sworn testimony of

10   witnesses both on direct and cross-examination -- and I guess

11   we had some redirect as well -- regardless of who called the

12   witness, and from exhibits that the Court received in evidence

13   and from any stipulations or agreements.  I don't remember any

14   stipulations or agreements.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  In any event, let me go on to what is not

2     evidence.  Certain things are not evidence and are to be

3     discarded in deciding what the facts are.  Arguments or

4     statements by lawyers, including openings and summations

5     objections to questions, testimony that has been included

6     stricken or that you have been instructed to discard and

7     anything you have seen or heard outside the courtroom, all

8     those things are not evidence.

9          In making a determination, you may consider evidence

10    that is either direct or circumstantial.  Direct evidence is

11    that to which a witness testifies that the witness has

12    perceived.  Direct evidence may also be in the form of an

13    exhibit admitted into evidence.

14         Circumstantial evidence is proof of a chain of facts

15    and circumstances from which other inferences may be drawn.

16    You are allowed to make reasonable inferences from particular

17    facts that are established by direct evidence and this is

18    called circumstantial evidence.  The law does not distinguish

19    between direct and circumstantial evidence.  You may give equal

20    weight to both.  The question in the case is whether based upon

21    all the evidence, both direct and circumstantial, the party

22    with the burden has proved its case by a preponderance of the

23    evidence.

24         As a reminder, I gave you an example at the beginning

25    of the trial to illustrate circumstantial evidence.  As you

1   recall it was about the subway and rain and umbrellas.  I will

2   not doing it again.

3           As you can see or recall, the matter of drawing

4   inferences from facts in evidence is not a matter of guesswork

5   for speculation.  An inference is a logical, factual conclusion

6   which you might reasonably draw from other facts that have been

7   proved.  You are permitted to draw inferences but you are not

8   required to do so and you may do it either are from direct or

9   circumstantial evidence.  In drawing inferences, you should

10  exercise your common sense.  Actually, you should always

11  exercise your common sense.  I will have to change that.

12          Many material facts as a state of mind are rarely

13  suspectable and proved by direct evidence.  Usually such facts

14  are established by circumstantial evidence.  Circumstantial

15  evidence is of no less value than direct evidence.  In either

16  case, you must be convinced that the party with the burden of

17  proof has proved its case by a preponderance of the evidence.

18          There are times when different inferences may be drawn

19  from facts whether they are proved by direct or circumstantial

20  evidence.  Plaintiff may ask you to draw one set of inferences.

21  The defendant may ask you to draw another.  It is for you, and

22  you alone, to decide what inferences you will draw.

23          You have had the opportunity to observe all the

24  witnesses.  It is now your job to decide how believable each

25  witness was in his or her testimony.  Again, you are the sole

1    judges of the credibility of each witness and the importance of

2    his or her testimony.  It must be clear to you by now that you

3    are being called upon to resolve various factual issues in the

4    face of the different pictures painted by the plaintiff and

5    defendant which cannot be reconciled without your help.  You

6    have to decide where the truth lies and the vital part of your

7    decision will involve making judgments about the testimony of

8    the witnesses you have listened to and observed.

9         In making those judgments, you should carefully

10   scrutinize all of the testimony of each witness, the

11   circumstances under which witness testified and any other

12   matter in evidence which may help you decide what witnesses

13   were telling you the truth and which witnesses were not and the

14   importance of each witness's testimony.

15        A witness may be discredited or impeached by

16   contradictory evidence of other witnesses or by evidence at a

17   prior time that the witness said or done or done something or

18   failed to do or say something which is inconsistent with the

19   witness's testimony on the witness stand.  The earlier

20   contradictory statements are admissible only to impeach the

21   credibility of the witness and not to establish the truth of

22   those statements.  It is your responsibility to determine the

23   credibility, if any, to be given the testimony of a witness who

24   has been impeached.  If a witness is showing knowingly to

25   testify falsely concerning a material matter, you have a right

1    to distrust that witness's testimony and other particulars and

2    you may reject all the testimony of that witness or give it

3    such a credibility as you may think deserves.

4           In evaluating the credibility of the witnesses, you

5    may take into account that the witness who testified may

6    benefit in some way from the outcome of this case.  Such an

7    interest in the outcome may sway the witness to testify in a

8    way that advances his or her own interest.  Therefore, if you

9    find that any witness whose testimony you are considering may

10   have an interest in the outcome of that case, you should bear

11   that factor in mind when evaluating that credibility of his or

12   her testimony.

13          On the other hand, this is not to suggest that every

14   witness who has an interest in the outcome of a trial will

15   testify falsely or conversely, that witnesses with no apparent

16   interest in the case will always tell you the truth.  It is for

17   you to decide to what extent, if at all, the witness's interest

18   has affected or colored his or her testimony.

19          The law does not require any party to call as

20   witnesses all persons who may have been present at any time or

21   place involved in the case or who may appear to have some

22   knowledge of the matters in issue if it is at the trial.  Keep

23   in mind, too, that with respect to witnesses, they are all

24   equally available to both sides.  Put another wait either side

25   was able to call any witness it chose to to call.

1          Burden of proof.  The plaintiff has the burden of

2     proof and must prove her claim by a preponderance of the

3     evidence.  But the defendants have the burden of proof as to

4     their affirmative defense, which we'll mention in the fullness

5     of time and you will see or hear about one of them here.  To

6     establish by a preponderance of the evidence means to prove

7     that something is more likely so than not so.  A preponderance

8     of the evidence means the greater weight of the evidence.  It

9     refers to the quality and persuasiveness of the evidence,

10    notice to the number of witnessed or documents.

11         If you find that the credible evidence on an issue is

12    evenly divided between the parties, that it is equally probable

13    that one side is right as it is that the other side is right,

14    then you must decide that issue against the party having the

15    burden of proof.  That is because the party who has the burden

16    or shoulders the burden of proof must prove more than simple

17    equality of evidence.  That party must prove its claim by a

18    preponderance of the evidence.  Put another way so long as you

19    find that the scales tip however slightly in favor of the party

20    that bears the burden of proof that what they claim is more

21    likely true than not true and the claim will have been proved

22    by a preponderance of the evidence.  In determining whether any

23    fact has been proved by a preponderance of the evidence of the

24    credible evidence in the case, you may consider the testimony

25    of all the witnesses regardless of who may have called them and

1    all the exhibits received in evidence regardless of who may

2    have introduced them.

3            That's it, folks, for the first portion.  Let me go on

4    to the claims in this case.

5            In this case, the plaintiff Brandi Johnson brings

6    claims for employment discrimination on the basis of her race

7    and gender in violation of Section 1981 of Title 14 of the

8    United States Code and the New York City Human Rights Law.

9    Section 1981 makes it unlawful for an employer to discriminate

10   against an employee on account of her race.  The New York City

11   Human Rights Law makes it unlawful for an employer to

12   discriminate on the basis of gender or race.  Specifically the

13   plaintiff alleges that she was subject to a hostile work

14   environment and was terminated from her employment at Strive

15   East Harlem Employment Group because of her race and gender.

16   The plaintiff also alleges that she was subjected to a hostile

17   work environment and was terminated in retaliation for

18   complaining about race and gender discrimination.

19           Plaintiff seeks compensatory and punitive damages

20   under both these statutes.  The defendants deny the alligations

21   and contend that the plaintiff was not subjected to a hostile

22   work environment because of her race, gender or in retaliation

23   for her discrimination.  The defendants also contend that the

24   plaintiff was terminated because the federal grant funding her

25   position had expired and that the decision to terminate the

1    plaintiff had nothing to do with plaintiff's race, gender or

2    her discrimination complaints.

3            In addition to the defendant's organization, STRIVE,

4    plaintiff has also named three individual defendants -- Rob

5    Carmona, Phil Weinberg and Lisa Stein.  For any of these

6    individual defendants to be personally liable on any of the

7    plaintiff's claims, they must have been personally involved in

8    or personally participated in the discriminatory conduct

9    against the plaintiff, if any, you find.  Personal involvement

10   includes not only direct participation in the alleged violation

11   but also gross negligence in the supervision of subordinates

12   who committed the wrongful acts and failure to take action upon

13   receiving information that discrimination was occurring.  In

14   considering the defendant's liability, you must consider each

15   defendant separately.

16           Hostile work environment.  As you heard this morning

17   there are separate claims.  We're going to go through each

18   claim separately.  The plaintiff contends that the

19   discriminatory employment action taken against her created what

20   is called a hostile work environment.  For the plaintiff to

21   succeed against the individual defendants on this claim, she

22   must prove the following by a preponderance of the evidence:

23   One, that the plaintiff was subjected to unwanted treatment by

24   a STRIVE employee; number two, that the unwanted treatment was

25   motivated at least in part by the plaintiff's gender, race or

1    the by the plaintiff having complained of gender or racial

2    discrimination.  Again, you must consider each defendant's

3    personal involvement separately.  With respect to the claim

4    asserted against STRIVE, the plaintiff must prove.  One and two

5    above, and I will read them to you again.  The plaintiff was

6    subjected to unwanted treatment by a STRIVE employee and two

7    the unwanted treatment was motivated at least in part by the

8    plaintiff's gender, race or by the plaintiff's having

9    complained of gender or racial discrimination.

10        In addition, with respect to STRIVE, the plaintiff

11    must also prove one of the following three elements:  That

12    STRIVE's managerial or supervisory employees participated in

13    the unwanted treatment or that STRIVE knew of its employee's

14    discriminatory conduct and acquiescenced in such conduct or

15    failed to take immediate and appropriate corrective action, or

16    three that STRIVE should have known of its employee's

17    discriminatory conduct and failed to exercise reasonable

18    diligence to prevent such conduct.

19        STRIVE is deemed to have knowledge of its employees'

20    discriminatory conduct where that conduct was known by its

21    managerial or supervisory employees.  If, and only if, you find

22    that the plaintiff has met her burden on each of the requisite

23    elements and plaintiff has proved each by a preponderance of

24    the evidence, then you may turn to the defendants' affirmative

25    defenses for which the defendants have the burden of proof.

1    Not the plaintiff.  They must prove them by a preponderance of

2    the evidence.  The defendants' affirmative defenses in

3    substance are that the unwanted treatment complained of by the

4    plaintiff consisted nothing more than what a reasonable victim

5    of discrimination would consider petty slights or trivial

6    inconveniences if proved by a preponderance of the evidence,

7    your verdict must be for defendants on this claim.  If you

8    determine that the defendants have failed to prove that the

9    unwanted treatment was nothing more than petty slights or

10   trivial inconveniences, your verdict must be for the plaintiff

11   on this claim.  That is assuming that the plaintiff has proven

12   her elements by a preponderance of the evidence so that you

13   reach the affirmative defense.

14           Discriminatory termination.  The plaintiff also

15   contends that she was terminated because of her race or gender.

16   For this claim there is only one issue genuinely in dispute and

17   therefore only one issue you must decide.  That is, whether the

18   plaintiff has proved by a preponderance of the evidence that

19   the plaintiff's race or gender were motivating factors in her

20   determination.  Plaintiff is not required to prove that the

21   defendants terminated her solely or primarily because of her

22   race or gender, but the plaintiff must prove by a preponderance

23   of the evidence that conscious consideration to race or gender

24   played at least some part in the decision so terminate her.

25           The defendants have offered evidence that while

1    plaintiff was terminated, it was entirely for nondiscriminatory

2    reasons.  On this score, keep in mind that an employer may take

3    adverse action against an employee for a whole host of reasons,

4    good or bad, so long as it is not discriminatory.  So when you

5    consider the evidence of whether reasons advanced by the

6    defendants is the true reason for the plaintiff's

7    determination, the question is not whether the defendant showed

8    poor or erroneous judgment, you may not judge the defendants'

9    business decision or second guess the defendants' business

10   decision.  Your role to examine the reason the defendants

11   advanced just as you would any other evidence.

12          If you find that the defendants' reasons were in fact

13   pretextual -- I think we talk a little bit about this during

14   the trial -- or put another way that if the truth be known they

15   were not the real reasons for the decision then you may but

16   need not infer that they were made up simply to conceal gender

17   or race discrimination.  Keep in mind that direct evidence of

18   the discriminatory intent is not always easy to prove and the

19   plaintiff need only show facts that give rise to a inference

20   that is circumstantial evidence that the plaintiff's gender or

21   race motivated or contributed to the defendant's decision.

22          Retaliation.  Plaintiff also contends that the

23   defendants retaliated against her for her complaining about

24   gender and race discrimination at STRIVE.  Opposing

25   discrimination in employment is a protected activity that's

1    part of the statute, but we'll go through those elements.

2    Accordingly, to make out her claim of retaliation the plaintiff

3    must prove by a preponderance of the evidence each of the

4    following elements:  One, she complained of discrimination in

5    employment at STRIVE, due to gender or race.  Two, the

6    defendants were aware of her complaint.  Three, the plaintiff

7    was then subjected to conduct that was reasonably likely to

8    deter a person from engaging in protected activity.  Four, that

9    this conduct was motivated at least in part by the plaintiff's

10   complaint.

11        The plaintiff must have complained of discrimination

12   based on a reasonable and good faith belief that she

13   experienced gender or race discrimination.  To succeed on this

14   claim the plaintiff is not required to prove that the conduct

15   complained of was in fact gender or race discrimination.  What

16   she must prove, however, is that it was reasonable for her to

17   believe and in fact she truly believed that the underlying

18   conduct that she opposed was unlawful gender or race

19   discrimination.  Again, you may not second guess whether the

20   defendants made the right decision when the plaintiff was

21   terminated.  In other words, you may not substitute your

22   judgment for that of the defendants'.  Your job is to determine

23   whether the action taken was retaliatory or not.

24        That is the second part.  Well, I guess damages comes

25   into the second part actually.  So we're still in the second

1    part.

2            If you find in favor of the plaintiff, under the law

3    as I have explained it to you then you must determine the

4    damages to which he is entitled.  However, you should not infer

5    that the plaintiff is entitled to her to recover damages merely

6    because I am instruct you on the element of damages.  I am

7    telling you about damages now simply so that should you reach

8    that juncture, I don't have to bring you back be talk to you

9    about damages separately a second time.

10           Again, let me remind you that it is the quality not

11   the quantity of the credible evidence that counts.  The purpose

12   of the law of damages is to award as far as possible just and

13   fair compensation for the loss, if any, which resulted from the

14   defendant's violation of the plaintiff's rights.  These are

15   known as compensatory damages.  Put another way, compensatory

16   damages seek to make the plaintiff whole that is to compensate

17   her for the damage she suffered.  Compensatory damages are not

18   limited merely to expenses that the plaintiff may have borne,

19   but keep in mind you may not award damages more than once for

20   the same injury.  For example, if the plaintiff were to prevail

21   on two different theories and establish a $1 injury, you are

22   not permitted to award the plaintiff $1 on each theory.

23           The plaintiff is not entitled to recover more than you

24   determine she has lost.  If you find in favor of the plaintiff,

25   then you must reward her such sums as you find by the

1    preponderance of the evidence will fairly and justly compensate

2    the plaintiff for any damages you find she sustained as a

3    direct result of the defendants' unlawful conduct.  Plaintiff's

4    claim to damages includes two distinct types of damages and you

5    must consider them separately.  First, you must determine the

6    amount of wages and fringe benefits if any that the plaintiff

7    would have earned if she had not been terminated.  You may

8    award damages only for harm suffered by the plaintiff for the

9    period following the termination.  These may include back bay,

10   which is the amount of damages or lost earnings, through the

11   date of your verdict.  When considering back pay, you are to

12   take the plaintiff's reduced earnings and her new employment

13   into consideration.  As with any aspect of damages back pay

14   cannot be awarded on speculation or guesswork.

15          Second, you must determine the amount of any pain and

16   suffering damages sustained by plaintiff such as mental

17   anguish, future pecuniary losses, emotional pain, suffering,

18   inconvenience or loss of enjoyment of life.  However, where

19   there is only limited evidence presented of mental anguish or

20   damages for pain and suffering could be nominal or zero even if

21   cases even where discrimination or retaliation is found.  In

22   awarding compensatory damages, if you decide to award any, you

23   must be guided by dispassionate common sense.  Computing

24   damages may be difficult, but you must not let that difficulty

25   lead you to engage in speculation or arbitrary guesswork.  On

1    the other hand, the law does not require the plaintiff to prove

2    the amount of her losses with mathematical precision but only

3    with as much definitiveness and accuracy as the circumstances

4    permit.  In all instances you are to use your sound discretion

5    in fixing an award of damages, drawing reasonable differences

6    where you deem appropriate from the facts and circumstances in

7    evidence.

8         Burden of proof to show the damages were sustained is

9    on the plaintiff.  Plaintiff must prove her damages or if the

10   damages she sustained by a preponderance of the evidence of the

11   credible evidence.  Do not add an amount for interest.  This

12   will be automatic calculated by me after you reach your

13   verdict.

14        Normal damages.  If you return a verdict for the

15   plaintiff but you find that the plaintiff's damages has no

16   monetary value and therefore she is not entitled to

17   compensatory damages, you may award nominal damages of up to

18   $1.  Nominal damages are designed to acknowledge the

19   depravation of a protected right even when no actual injury

20   occurred.  You should not award nominal damages out of sympathy

21   for the plaintiff if you believe that the plaintiff has failed

22   to prove her case.

23        Punitive damages.  In addition to compensatory damages

24   and nominal damages, the law permits the jury under limited

25   circumstances to award an injured party, person of punitive

damages.  If you find that one or more defendants discriminated

or retaliated against the plaintiff, then you must decide

whether the defendants acted with malice or with reckless

indifference of the plaintiff's rights.  Malice is defined as

the intent without justification or excuse to commit a wrongful

act.  Reckless difference is defined as the conscious disregard

of a harm that one's action could do the interest or rights of

another.

        If you find that the defendants acted with malice or

reckless disregard then in addition to any actual or nominal

damages to which you find the plaintiff is entitled, you may

but are not required to award the plaintiff an additional

amount as punitive damages if you find that it is appropriate

to punish the defendants or to deter the defendants from

similar conduct in the future.  The amount of punitive damages

is something we can decide at a later hearing.  Your verdict

sheet which you will get at time you enter on to your

deliberations will just have a line and a yes or a no for that

item.

        Now we're at part three, deliberations.  Juror

conduct.  You are to conduct your deliberations in an

atmosphere of complete fairness and impartiality without bias

for or against the plaintiff or the defendants.  This case

should be considered and decided by you as an action between

parties of equal standing in the community.  No party, whether

1    an individual or an organization, is entitled to sympathy or

2    favor.  It would be improper for you to consider any personal

3    feelings you may have about one of the party's race, religion,

4    national origin, sex or age.  It would be equally improper for

5    to you allow any feelings you might have about the nature of

6    the claim to influence you in any way.

7          Parties in this case are entitled to a trial free from

8    prejudice.  You must reach your verdict through a fair and

9    impartial consideration of the evidence.

10          The case will be decided on the basis answers that you

11   give to certain questions, which will be on a verdict sheet,

12   which I indicated will be given to you when we're finished.  In

13   this thought the jury must be unanimous.  When all of you have

14   agreed on any answer, the foreperson or the jury will write the

15   answer in the space provided.  When you have answered requisite

16   question, the foreperson will sign the verdict sheet and signal

17   the marshal that you are ready to report your verdict to the

18   Court and the foreperson will be taken through the verdict

19   sheet by my courtroom deputy.  Do not assume from the questions

20   or from the wording of the questions or from my instruction

21   about them what the answers should be or any view I might have

22   about what the answers should be.  Again, I have no power to

23   tell you what the answers should be.

24          It is your duty as jurors to consult with one another

25   and to deliberate with a view to reaching an agreement.  Each

1    of you has decided case for himself or herself but you should

2    do so only after a consideration of the case with from your

3    fellow jurors.  You should not hesitate to change an opinion

4    when convinced that it is erroneous.  You are not bound to

5    surrender your honest convictions concerning the effect or

6    weight of the evidence for the mere of purpose of returning a

7    verdict based on opinion of other jurors.  Discuss and weigh

8    your opinions dispassionately without regard to prejudice or

9    favor for either party and adopt that conclusion, which in your

10   good conscious appears to be in accordance with the truth.

11          Once you get into the jury room, your foreperson,

12   Juror No. 1, unless you agree on another, will be responsible

13   for signing any and all communications to the Court and to

14   handing them to the marshal during your deliberations.

15          If during your deliberations you want to see any of

16   the exhibits, you may consider that they be brought to you in

17   the jury room.  If you want any testimony read back, you may

18   also request that.  Remember that it is not always easy to

19   locate what you might want so be as specific as you possibly

20   can and if you request a portion let me know the witness,

21   subject matter and if possible whether it is direct or cross or

22   both that you desire.

23          In addition, you may request a portion or all of my

24   instructions on the law.  Your request for exhibits or

25   testimony or my instructions, in fact, any communication with

1    the Court should be made to me in writing signed by the

2    foreperson and given to me by one the marshals.  In any event,

3    do not tell me or anyone else how you, the jury, stands on any

4    issue until a unanimous verdict should be reached.

5              I think that is the complete charge.

6              Wait one second.  Somebody is looking over my

7    shoulder.  Let me see.  There is a last sentence on punitive

8    damages that I totally omitted and it read the plaintiff may

9    recover punitive damages even absent an award of either actual

10   or nominal damages.

11             Do we have a marshal?

12             THE DEPUTY CLERK:  Yes we do.

13             THE COURT:  Should we swear him?

14             THE DEPUTY CLERK:  Yes, your Honor.

15             THE COURT:  Two marshals?

16             THE DEPUTY CLERK:  Like two deputies.

17             (Marshal sworn)

18             THE COURT:  Very well.  You may take them away.

19             (Jury retired to deliberate)

20

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  I have one verdict sheet.  Do you have any

3    other?  Before I go, we should go to the side bar and see if

4    there are additions or corrections for which we have to call

5    them back and tell them about.  As I indicated to you earlier

6    on I marked all of your requests.  Let's get reporter.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              THE COURT:  I have marked, and I think I went through

3      this yesterday as well, the defendants; request to jury

4      instructions as Court Exhibit A, Plaintiff's requested jury

5      instructions as Exhibit B, Defendants' proposed verdict sheet

6      is C, Defendant's proposed verdict sheet as E, and I think that

7      is all.

8              Anything that is in here that I didn't do in my charge

9      and that you object to you have an objection.

10             Anything else?

11             MS. MESIDOR:  No, your Honor.  Not in respect to that.

12     We just had an inquiry regarding what exactly would your Honor

13     like for us to do with the evidence.  We have compiled all the

14     evidence.

15             THE COURT:  You are talking about exhibits.

16             MS. MESIDOR:  Yes, sir.

17             THE COURT:  I think you have to wait until they tell

18     us that they want them.

19             MS. MESIDOR:  We compiled everything there as well as

20     deposition transcript testimony.

21             THE COURT:  As long as you are here, you should --

22             MS. MESIDOR:  My inquiry is in regards to the

23     recording, I played everything off of my lap top.  I do have

24     the CD that I can provide.  I do not have a clean device other

25     than my lap to to play the recording for the jurors.  However,

1   I do have a CD that I provided to your Honor and it is

2   appropriately labeled, but I was not sure whether your Honor

3   had the capability to actually play the CD.

4           THE COURT:  I don't have any capabilities in that

5   area.  That doesn't mean the court doesn't.  I have no idea.

6           Do you?

7           THE DEPUTY CLERK:  I will check.

8           MS. MESIDOR:  I don't have an objection to leaving my

9   lap top, but there are many, many other things on that lap top

10  other than the recording.

11          THE COURT:  I think that might be in error.

12          MR. MINNAH-DONKOH:  To the extent the jurors want to

13  hear the audio recording, it would be played in open court.

14          THE COURT:  We can do it in open court, but we can

15  also send it in.  There is no reason why we have to sit here

16  and listen -- again.  That might be safest way to avoid any

17  problem.

18          MS. MESIDOR:  I agree.

19          THE COURT:  They are not that long.

20          MS. MESIDOR:  No, they are not.

21          THE COURT:  You understand that as I said to the jury

22  that that is the exhibit.  I think of you have to pass out the

23  transcripts if we bring them out which is the way we would do

24  it if we send it in.

25          MS. MESIDOR:  That's correct.

1        THE COURT:  You have them?

2        MS. MESIDOR:  Yes, I do, your Honor.

3        THE COURT:  Anything else?

4        It was my turn before.  With respect to the exhibits,

5  they should be cataloged at the back of each transcript what

6  went into evidence.  I just didn't have a chance to look in the

7  transcripts, but obviously it is only as my rules suggest.  You

8  can only give them what was discussed with a witness.  You

9  cannot give them the hundred.

10        MS. MESIDOR:  I understand that, your Honor.  The pile

11  looks large because all the deposition transcripts are there.

12  So I didn't want to just pick and choose from the record.

13        MS. KREBS:  Your Honor, the deposition transcripts are

14  not in evidence and wouldn't be shown anyway?

15        MS. MESIDOR:  Right.

16        THE COURT:  They are not in the pile?

17        MS. MESIDOR:  We are not presenting the deposition

18  transcripts as though they are part of the evidence, but to the

19  extent the record may refer --

20        THE COURT:  I have the official transcript.

21        MS. MESIDOR:  Understood.

22        THE COURT:  We'll work out what we need to give them.

23        MS. KREBS:  I was confused, your Honor.

24        THE COURT:  I don't believe that.

25        MS. KREBS:  Because the trial transcript contains the

1  transcription of all the relevant pieces of the deposition

2  transcript read into the record.  So I guess I am not certain

3  why they would need the deposition transcripts.  They would

4  just need to be read back the portion the trial transcript that

5  contained the relevant portion of the deposition.

6            THE COURT:  When we get to that, that is the way we'll

7  handle it.

8            MS. KREBS:  Thank you.

9            MS. MESIDOR:  Our pulling them is not indicative that

10  they should be substituted.

11            THE COURT:  No.  I see the pile.

12            MS. MESIDOR:  Your Honor, one other matter.  Now that

13  the jurors are going into deliberation, I guess it is more of a

14  procedural question, at what point are the alternates excused?

15            THE COURT:  I want you to understand, as I thought I

16  did at the beginning, but there has been a lot of water under

17  the dam.  In the state court the alternates are dismissed.

18            MS. MESIDOR:  Right.

19            THE COURT:  And indeed they could have a verdict of

20  5-1 as I recall those days in the Medieval times, but in any

21  event here both unanimity and all the people who were impaneled

22  deliberate just like ordinary full fledged jurors.

23            MS. MESIDOR:  Understood.

24            THE COURT:  Anything else?

25            MS. MESIDOR:  No, your Honor.  Thank you.

1          THE COURT:  Believe it or not, I have a 3:00 problem

2     just like I had a 1:00 problem.  I am going to try to get

3     something to eat, but you are all going to be here, right?

4          MS. KREBS:  Yes.  I apologize when I came into the

5     back into the courtroom at 1:15 when you told us to be back,

6     the marshal said you said 1:45.

7          THE DEPUTY CLERK:  They were mistaken.

8          MS. KREBS:  I apologize.

9          THE COURT:  I explained so that they were all happy

10    that you came at all.

11         MS. KREBS:  Wonderful, your Honor.

12         MS. MESIDOR:  Thank you, Judge.

13         (Recess pending verdict)

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  We received a not from the jury.

2          Dear Judge Baer, we have a question about Question No.

3     4.  We would like to know if we decide to give compensatory

4     damages to the plaintiff what amount do we allocate for monthly

5     benefits as well as pain and suffering?

6          Both the plaintiff and defendant is welcome to look at

7     this note and tell me what it is that you think we should do

8     with it, Court exhibit G.  In any event, my view is simply we

9     tell them that this is a single sum that they ought to put in

10    that line.  I have no idea where they got the word "monthly"

11    from.

12          MS. MESIDOR:  Monthly benefits.

13          THE COURT:  Do you talk about that?

14          MS. MESIDOR:  No.

15          THE COURT:  Do you see that in No. 4?

16          MS. MESIDOR:  No, your Honor.  I think they are just

17    trying to be thorough.

18          THE COURT:  Thorough?  Whatever.

19          MS. MESIDOR:  Our view would be that is something that

20    is up to them.

21          MS. KREBS:  Based on whatever evidence has already

22    been presented, they can rely on what evidence has been

23    presented and they have to come to a decision on their own.

24          THE DEPUTY CLERK:  Jury entering.

25          (In open court; jury present)

1          THE DEPUTY CLERK:  Please be seated.

2          THE COURT:  I have your note, which I read into the

3     record and all I can tell you, and I think all counsel has

4     suggested, is that you have heard all of the evidence and to

5     our recollection this is a question that calls for a single

6     dollar amount.  I don't know where the word "monthly" came

7     from.  I don't care.  It is nice that you are working, but the

8     fact it just calls for a single number.  You are excused.

9          (Jury deliberations continued)

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  I guess they will want a long Labor Day

2     weekend.  We'll see you shortly.  That didn't take long, right?

3          (Recess pending verdict)

4          THE MARSHAL:  All rise.

5          THE DEPUTY CLERK:  Please be seated everyone.

6          THE COURT:  Exhibit H, which as we may as well put on

7     record, reads:  We have come to a verdict, and it is signed by

8     the foreperson.

9          Mr. Foreperson, I gather that you have reached a

10    verdict?

11         THE FOREPERSON:  Yes.

12         THE COURT:  My clerk will take you through it.

13         Well, I don't have one then, but I guess you don't

14    care.

15         THE DEPUTY CLERK:  Brandi Johnson v. STRIVE, Lisa

16    Stein, Rob Carmona and Phil Weinberg.

17         One:  Did the plaintiff prove by a preponderance of

18    the evidence that any of the following defendants subjected her

19    to a hostile work environment in accordance with required

20    finding as set forth in my charge.

21         Rob Carmona?

22         THE FOREPERSON:  Yes.

23         THE DEPUTY CLERK:  Phil Weinberg?

24         THE FOREPERSON:  No.

25         THE DEPUTY CLERK:  Lisa Stein.

1          THE FOREPERSON:  No.

2          THE DEPUTY CLERK:  STRIVE East Harlem?

3          THE FOREPERSON:  Yes.

4          THE COURT:  Two:  Did the plaintiff prove by a

5    preponderance of the evidence that any of the following

6    defendants intentionally discriminated against her because of

7    her gender or race when STRIVE East Harlem Group terminated her

8    employment, Rob Carmona?

9          THE FOREPERSON:  Yes.

10          THE DEPUTY CLERK:  Phil Weinberg?

11          THE FOREPERSON:  No.

12          THE DEPUTY CLERK:  Lisa Stein?

13          THE FOREPERSON:  No.

14          THE DEPUTY CLERK:  STRIVE East Harlem?

15          THE FOREPERSON:  Yes.

16          THE DEPUTY CLERK:  Three, did the plaintiff prove by a

17    preponderance of the evidence that any of the following

18    defendants retaliated against her because of her complaints of

19    gender or race discrimination in accordance with the required

20    findings as set forth in my charge, Rob Carmona?

21          THE FOREPERSON:  Yes.

22          THE DEPUTY CLERK:  Phil Weinberg?

23          THE FOREPERSON:  No.

24          THE DEPUTY CLERK:  Lisa Stein?

25          THE FOREPERSON:  No.

1          THE DEPUTY CLERK:  STRIVE East Harlem?

2          THE FOREPERSON:  Yes.

3          THE COURT:  Four, what amount of compensatory damages,

4     if any, did the plaintiff prove by a preponderance of the

5     evidence?

6          THE FOREPERSON:  $250,000.

7          THE DEPUTY CLERK:  Five, if you found no compensatory

8     damage amount, did it exceed 1 dollar?

9          THE FOREPERSON:  We did not.

10          THE DEPUTY CLERK:  Did you find the plaintiff has to

11    provide by a preponderance of the evidence that she is entitled

12    to punitive damages?

13          THE FOREPERSON:  Yes.

14          THE COURT:  Thank you.

15          THE DEPUTY CLERK:  Jury is unanimous signed by the

16    foreperson, Judge.

17          THE COURT:  Thank you very much.  I think if we need

18    to have a hearing with respect to punitives, it will simply be

19    a question of what it is that there is in the way of resources

20    that are available.  It should not take long, but I certainly

21    would like to have the same jury.  Unless we find another way

22    to resolve it, maybe we ought to agree that we'll see you again

23    come Tuesday morning at 10:00.  Does that sound like something

24    you can all provide us with in the way of time?  It will take

25    no great lenth of time.  It is not like a three-day trial.  So

1    we'll expect to see you hear having concluded as you did that

2    punitives are appropriate.  But as I say it really has to do

3    with the wherewithal of the defendants that you found liable.

4    So it shouldn't take too long.

5         I thank you for having gone through all of this and

6    sat here and been punctual and attentive throughout.  We will

7    see you Tuesday morning for no more than a couple hours at the

8    most.  Have a good Labor Day weekend.  If there are any of you

9    who have a grave problem planning to take the day off or the

10   week, you ought to tell me now because I don't want to

11   inconvenience you.  We can do it the following week.  It is not

12   likely you will forget.  It is not likely you will hear much of

13   what you heard.  If you are all game, I am game to join you.

14   We'll see you on Tuesday at 10:00.

15             MS. KREBS:  Excuse me, your Honor.

16             THE COURT:  You want to poll the jury.  Good idea.

17             MS. KREBS:  Thank you, your Honor.

18             (Jury polled; each juror answered in the affirmative)

19             THE COURT:  See you Tuesday.

20             (Jury excused)

21             THE COURT:  This is essentially a problem for the

22   defendant.  I am not sure what we can do here altogether with

23   punatives.  I suppose you better get together whatever it is

24   that STRIVE and the Mr. Carmona have in the way of assets and

25   we'll see what they can testify to on Tuesday.

D8T6JOH5                    Charge

1            See you then.

2            (Adjourned to September 3 at 10:00 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25