D93njoh1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

BRANDI JOHNSON,

                    Plaintiff,

          v.                              12 CV 4460(HB)

LISA STEIN, ROB CARMONA and
PHIL WEINBERG,

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          September 3, 2013
                                          10:40 a.m.

Before:

                    HON. HAROLD BAER, JR.,

                                          District Judge

                         APPEARANCES

PHILLIPS & PHILLIPS
     Attorneys for Plaintiff
BY:  MARJORIE MESIDOR
     ALEX UMANSKY

GORDON & REES, LLP
     Attorneys for Defendants
BY:  DIANE KREBS
     KUUKU ANGATE MINNAH-DONKOH

Also present:  Daphney Guillaume, Esq.

D93njoh1

1

2          (Trial resumed)

3          (In open court; jury not present)

4          THE COURT:  I gather you have a couple of open items,

5   and I would be glad to try and resolve them so that we don't

6   keep the jury waiting any longer.  As you know it's really not

7   my choice.

8          MS. MESIDOR:  Good morning, your Honor.  May I address

9   the Court from here, or would you like me to go to the podium?

10         THE COURT:  You can do whatever you would like.

11         MS. MESIDOR:  Good morning, your Honor.

12         Apologies.  My legal team and I tried to look at the

13  documentation that we received from defendants as quickly as

14  possible so that we would not waste the Court's time.

15         There are a number of issues that are presented and a

16  couple of outstanding issues from our original application.  As

17  it relates to what has been presented by defendants to present

18  to the jury today, we were given a Citibank account that

19  belongs jointly to Mr. Carmona and his wife with a number of

20  redacted items that shows a move of approximately $15,000, but

21  where these things have been moved to and from, your Honor, we

22  cannot tell because it's completely redacted.  That's the first

23  issue.

24         I have discussed the matter with counsel.  It's been

25  represented to me that counsel has the unredacted copy.  If

D93njoh1

your Honor is so inclined, we would consent to an in camera

review of that to see where these funds have been transferred

from.

That's the first issue.  Would you like me to

continue, your Honor, or would you like to take them one at a

time?

THE COURT:  I would be glad to hear anything that the

defendant wants to say.  I mean, if she wants to represent that

it all went to an orphanage, I suppose we could forego further

conversation.  She is apparently doesn't want to say that.

MS. KREBS:  I'm sorry.  If I want to say?  I didn't

hear the end of it.

THE COURT:  If the $15,000 that is in question went to

an orphanage, then we don't have to pursue it.  If it went to

somewhere else where indeed it might be reachable, then we

ought to look at it.

MS. KREBS:  Your Honor, they did not go to an

orphanage.  Most of the transfers actually were between the

checking and the money market account, which again for an in

camera review we are happy for your Honor to take a look at it.

There were some checks that were just regular bills that were

paid just as part of normal process.

Again, I make that representation, but I am more than

happy to have your Honor do an in camera review -- it is not a

very long document -- to substantiate that.  It is not as

D93njoh1

1    though items were being transferred out offshore or to another

2    account that has not been already disclosed.

3            THE COURT:  Your position is it was used for everyday

4    living expenses?

5            MS. KREBS:  Yes.  For the most part it's everyday

6    living expenses.

7            THE COURT:  I will be glad to look at it.

8            Next item?

9            MS. MESIDOR:  Your Honor, to the extent that counsel

10   represents it went to a money market account, we also have the

11   money market account.  That shows an opening balance of $3,990,

12   and then the amount added was $4,875.  So that $15,000 is not

13   reflected in the money market account.

14           THE COURT:  Well, not all of it anyway.  We'll look at

15   it.  We don't have to pursue it now.  I am going to see it.

16           MS. MESIDOR:  Absolutely, your Honor.

17           The second matter is we were given a sheet that I

18   presume was done by counsel that is supposed to be a flowchart

19   for the ease of the jury to follow from one item to the next

20   item.

21           However, the basic numbers that have been represented

22   here, specifically Mr. Carmona's net worth account, the

23   mortgage and home equity loan amount that they are indicating

24   here do not match the home mortgage and equity numbers that

25   have been provided to us by counsel.  In addition, the home --

D93njoh1

1    THE COURT:  So you just have to ask that question,

2    right?  I am not going to be able to decipher it.

3    MS. MESIDOR:  I understand that, your Honor.  But to

4    the extent that there's other -- our only issue, your Honor, it

5    seems that the documentation we have been provided is

6    incomplete because the numbers are not matching up.

7    THE COURT:  Then you ought to discuss it on cross.

8    MS. MESIDOR:  OK.

9    THE COURT:  What would you like me to do?

10    MS. MESIDOR:  Your Honor, only to the extent I just

11    want to make sure that I have all the documentation.

12    THE COURT:  That is a different question.

13    MS. MESIDOR:  OK.  So then to the extent that the

14    numbers that are on this flowchart are not being supported by

15    the documentation -- and, your Honor, again, we are looking at

16    four, five documents that don't match up here, not everything.

17    THE COURT:  Yes.

18    MS. MESIDOR:  I just want to make sure that I have

19    everything.  That is number two.

20    THE COURT:  All I can do is say ask him on cross.

21    MS. MESIDOR:  Then the other issue is, as it relates

22    to our application, we had specifically requested to see

23    defendant STRIVE's insurance policy.  The reason we had asked

24    to see defendant's STRIVE insurance policy, while we understand

25    that it is well settled in the law that punitive damages cannot

D93njoh1

1    be paid out of insurance, however, compensatory damages and

2    attorney's fees can be.

3           So, to the extent that the jury is led to believe that

4    the $250,000 compensatory fees that they have already awarded

5    to the plaintiff is going to be paid directly from STRIVE when

6    they have an insurance policy that is going to cover that

7    amount, we wanted to be able to take a look at the certified

8    copy of the insurance policy so that we can make the

9    appropriate arguments and ask the appropriate questions on

10   cross.

11          THE COURT:  I think it's fair to say that if the

12   STRIVE policy indemnifies for the compensatory damages, that

13   that's admissible.  I don't know what the defendant's view is,

14   but that's my view.

15          MS. KREBS:  Our view is that it is not admissible,

16   your Honor.  Insurance coverage is typically not admissible

17   during trials.  That would have come up during the main portion

18   of the trial.  In fact, in trials that we've dealt with before

19   it has been ruled explicitly that the jury is not supposed to

20   consider insurance when it comes to the question of deciding on

21   an award.  It's Federal Rule of Evidence 411 that deals with

22   insurance.

23          THE COURT:  Have you read Mathie v. Fries, which is a

24   Second Circuit decision from 1997?  If you read it, you will

25   see, and I'll read you the holding to make you feel better or

worse, "A fact-finder can properly consider the existence of an

indemnification agreement as obviating the need to determine

whether a defendant's limited financial resources justify some

reduction in the amount that would otherwise be awarded in

punitive damages."

Now, what she is doing is essentially asking for just

that issue to be resolved.  If you have an insurance policy,

which is going to indemnify any part of the compensatory

damages, then the jury is deserving to know that -- well, not

if it's the two that are out.  But if it's STRIVE or Carmona

the jury is entitled to see that under Mathie, since it will

defray what it is they provided in the way of a verdict for

compensatories.

So there is nothing more I can tell you about that.

It is a fairly recent Second Circuit case.  If you want to look

at it some more, I'll show you more.  But that's what it says.

Take my word for it.

MS. KREBS:  Your Honor, again, we still take the

position that it is not, but obviously we are going to comply

with your Honor's ruling.

THE COURT:  Not my ruling.  I just sit here reading

other cases, mostly from the circuit.

OK.  It's done.  What else?

MS. MESIDOR:  Your Honor, one final issue.  On the

flow charts that defendant proposes to give to the jury, it

1    puts restricted and unrestricted funds all together.  Your

2    Honor, for the purposes of clarification, unrestricted funds in

3    terms of gifts and contributions are those that have not been

4    given for any specific purpose.  Case law indicates that

5    unrestricted funds in terms of being able to pay a judgment

6    against a not-for-profit organization are essentially fair

7    game, your Honor.  So we would make an application to preclude

8    defendants from making any representation that somehow

9    contributions and gifts from donors all together, whether

10   restricted or unrestricted, should not be considered in terms

11   of the total worth of the not-for-profit.

12          THE COURT:  What does the defendant have to say about

13   that?  I thought we talked about this Friday, which, of course,

14   as the defendant points out, quite cogently, was a time when we

15   should have discussed this problem or these problems, and you

16   stood mute, unlikely as that is for you.

17          OK.  What does the defendant have to say about this

18   unrestricted and restricted fund business?

19          MS. KREBS:  Well, your Honor, the flowchart is merely

20   created to explain for the jury in a manner that is more easily

21   understandable sources of revenue and the forms of expenses.

22          During the testimony, the CFO is going to explain

23   what, if any, legally bound provisions there are with respect

24   to the category.  With respect to those categories that there

25   are not binding, we are not going to say that.  They are.

1      THE COURT:  I think that's fair.  We will let the jury

2  make a decision.  But I think what she says makes sense.

3      Are you ready for the jury, guys?  I really hate to

4  keep them waiting.  I don't know how long you are going to be.

5  But Bill would like to know if he's supposed to order them

6  lunch.

7      MS. MESIDOR:  Your Honor, this is the end of

8  plaintiff's application.  If we could just take a quick look at

9  the insurance policy, then we would be ready for the jury.

10      THE COURT:  You have to answer my question.  How long

11  do you think this testimony is going to take?

12      MS. KREBS:  All told maybe about an hourish.

13  Somewhere in the neighborhood, in that neck of the woods.

14      THE COURT:  You don't mean all told including cross,

15  do you?

16      MS. KREBS:  No, I mean all told including my direct,

17  my three witnesses.

18      THE COURT:  I guess you better take that lunch order.

19  That will give everybody a time to look at whatever they can

20  look at and I can put on my robe.

21      You can let me see whatever you think I should look at

22  in camera.

23      MS. KREBS:  Your Honor, may I approach?

24      THE COURT:  To make the defendant feel more

25  comfortable why don't you show the Mathie case to her.

D93njoh1

1          MS. KREBS:  Your Honor, may I approach.

2          THE COURT:  Yes.  Absolutely.

3          Give it to her.

4          MS. KREBS:  May I?

5          THE COURT:  Give it back, though.

6          MS. KREBS:  Yes, your Honor.

7          THE COURT:  Ms. Krebs, what is it you want me to do

8   here?

9          MS. KREBS:  Your Honor, shall I show you?

10          THE COURT:  Come right up.  Be my guest.

11          (Discussion off the record)

12          (Jury present)

13          THE COURT:  Good morning, ladies and gentlemen.  I'm

14   truly saddened that we have to bring you back after a long

15   weekend, although I guess that's the time when everybody comes

16   back.  I hope you all had a good one.

17          What we are going to do here, as I think I suggested

18   Thursday, should not take long, even though I gather that the

19   United States is buying you another lunch.  So whatever

20   happens, we'll probably be able to feed you, although with

21   sequestration you never know.  It may not come up to the 22nd

22   or 23rd floor, but the odds are good.

23          This is an opportunity now to flesh out the punitive

24   damage aspect, and that's all there is that we are talking

25   about this afternoon -- or this morning, happily this morning,

1    I'm sorry to have kept you waiting for an hour, but I think

2    it's valuable we've put most of the pegs in a row so that it

3    shouldn't take any longer than I had hoped.

4            I suppose the defendant is going to essentially spell

5    out what there is in the way of assets for the two defendants

6    for whom you found against, both STRIVE and Mr. Carmona, and

7    of course plaintiff will have the opportunity to cross.

8            OK.  Ms. Krebs, we're ready when you are.

9            MS. KREBS:  OK, your Honor.  I call as a witness

10   Mr. Andrew Milton.

11    ANDREW MELTON,

12        called as a witness by the Defendants,

13        having been duly sworn, testified as follows:

14   DIRECT EXAMINATION

15   BY MS. KREBS:

16   Q.  Good morning, Mr. Melton.

17   A.  Good morning.

18   Q.  What is your current position in connection with STRIVE?

19   A.  I'm the chief financial officer of STRIVE.

20   Q.  Just a brief, very brief background.

21           What is your highest level of schooling?

22   A.  Bachelor's degree.

23   Q.  In?

24   A.  In accounting.

25   Q.  And a brief history of your employment in the area of

D93njoh1                    Melton - direct

1   accounting and financial areas?

2   A.  I have been a CPA for over 20 years.  I ran an accounting

3   firm in Detroit for many years, and I have now migrated to New

4   York and practice as a consultant and started at STRIVE in

5   March of this year as the CFO, the chief financial offer.

6          THE COURT:  Probably sorry to have left Detroit.

7          THE WITNESS:  As it seems, sir.

8   Q.  You mentioned consultant.  What do you mean by that?

9   A.  Well, in New York, I specialize in nonprofit consulting as

10  a turnaround restructuring expert, and providing CFO-to-go

11  services as well as consulting services to nonprofits.

12  Q.  Is STRIVE your only client?

13  A.  No, it's not.

14         MS. KREBS:  Your Honor, may I approach?

15         THE COURT:  You may.

16         THE WITNESS:  Thank you.

17  Q.  Mr. Melton?

18  A.  Yes, ma'am.

19  Q.  I've handed you a document that is marked as PD-1.

20  A.  Yes.

21         THE COURT:  For identification.  Right?

22         MS. KREBS:  I'm sorry.

23         THE COURT:  For identification?

24         MS. KREBS:  For identification, yes.

25         I ask that this exhibit be admitted into evidence.

D93njoh1          Melton – direct

1          THE COURT:  Any objection?

2          MS. MESIDOR:  What is the basis, your Honor?

3          THE COURT:  I didn't hear you, but I will assume it is

4    a no.

5          MS. MESIDOR:  No.  Thank you, your Honor.

6          THE COURT:  Go ahead.

7          (Defendant's Exhibit PD-1 received in evidence)

8    Q.  Mr. Melton, what is the document that has now been entered

9    into evidence as PD1?

10   A.  This is the certified audit of STRIVE for the years 2011

11   and 2010.

12   Q.  Just briefly, what does that mean?  What is this document

13   functionally?

14   A.  Organizations and companies will typically receive an

15   external audit by a CPA, certified public accounting firm to

16   provide assurance to third parties and the general public of

17   their financial position results of operations for a certain

18   time period.  This is that document as it relates to STRIVE for

19   2011 and 2010.

20          (Continued on next page)

21

22

23

24

25

1    BY MS. KREBS:

2    Q.  Now, I just want to take you through a couple points in the

3    report.  Look at the page that is marked at the bottom, page

4    two?

5    A.  Yes.

6    Q.  Do you see that?

7    A.  Yes, I have it.

8    Q.  Just generally what is this page describing?

9    A.  This is the statement of financial position or commonly

10   referred to as your balance sheet.  It has two columns.  One

11   for 2010 and one for 2011.  It shows the total assets, total

12   liabilities, and the net worth if you will of the company.

13   Q.  When you talk about total assets, what is included in total

14   assets?

15   A.  They include cash investments, account receivables, loans

16   to employees, and property plant and equipment commonly

17   referred to as fixed assets.

18   Q.  Now, I see a line for loan to employees.  What is that in

19   reference?

20   A.  STRIVE has a program whereby they extend loans to employees

21   that are in position of hardship, temporary hardship, and the

22   employee has the ability to obtain a loan from their employer

23   and we deduct payment out of their paycheck over a certain

24   period of time.

25   Q.  Now, looking at under assets investments.  It shows that

1    there was investment money in 2010 but none in 2011.

2    A.   Yes.

3    Q.   Could you explain that?

4    A.   Well, at the end of 2010 they had approximately $250,000 in

5    marketable securities.  In 2011 they no longer had that amount.

6    It is related to a loan they had with Citibank that they

7    defaulted on and they reached a settlement whereby they applied

8    that -- those marketable securities to the balance of the loan

9    and there was a short fall in which the bank agreed to waive.

10              THE COURT:  Do you have another copy for the Court by

11   any chance?  Apparently not.  Well, it is not the first time.

12              MS. MESIDOR:  Your Honor, plaintiff has a copy if the

13   Court would like it.

14              MS. KREBS:  Your Honor, I have an extra copy.

15              THE COURT:  I know as I have said that I don't have

16   much to do here, but I would like to follow along.

17              MS. KREBS:  Yes, your Honor.  I am not sure what

18   happened.  We have extra copies.  May I approach?

19              THE COURT:  Thank you.

20   BY MS. KREBS:

21   Q.   I am sorry.  You were speaking about the defaulting on the

22   credit line.

23   A.   Yes.  They had a workout plan whereby they applied the

24   balance in the marketable securities to the balance of the

25   loan, which was 349,000, the difference that the bank agreed to

1    waive.

2    Q.  As of today, does STRIVE have any investments or

3    securities?

4    A.  No, they do not.

5    Q.  As of today does STRIVE from have any line of credit?

6    A.  No, they do not.

7    Q.  You made a reference to fixed assets?

8    A.  Yes.  Fixed assets are property plant and equipment that

9    STRIVE has on their books that they use in their day-to-day

10   operations.

11   Q.  Now, does STRIVE own any real property?

12   A.  Yes, they do.  They own the assets that I identified in

13   detail as equipment and software, furniture and fixtures and

14   lease hold improvements.

15   Q.  Now, when you say "lease hold improvements," do you they

16   own any not internal property but real estate property?

17   A.  They do not own any hard assets or real estate.

18   Q.  Now, when you mention lease holds, what does that mean?

19   A.  Lease hold improvements relate to the office that STRIVE

20   occupies.  Many years ago when they leased the office, it

21   needed significant improvements to make it suitable for them to

22   occupy the space.  As is typical when you lease commercial

23   entity, any improvements you make goes on your books.

24   Improvement, however, they stay when you leave.  You don't get

25   to take them.  You don't get to leverage them or anything with

1    them.

2    Q.  Can you explain some categories of what would be considered

3    a lease hold improvement that is carried on the books as an

4    asset?

5    A.  Replacing carpet, replacing drywall, ceilings, fixtures,

6    light fixtures, bathroom improvements.  Anything that attaches

7    to the physical structure of the office.

8    Q.  Now, I guess turning to page 3, what were the results of

9    operations for STRIVE for 2010?

10   A.  The bottom line for 2010 STRIVE lost money to the tune of

11   $144,484 and for 2011 they lost money to the tune of $101,713.

12             MS. KREBS:  Your Honor, may I approach?

13             THE COURT:  You may.

14             THE WITNESS:  Thank you.

15   Q.  I have put in front of you a document that has been marked

16   as PD-2 for identification.

17   A.  Yes.

18             MS. KREBS:  Your Honor, I request it be moved into

19   evidence.

20             THE COURT:  I haven't seen it, but is there any

21   objection?

22             MS. KREBS:  Your Honor, may I approach and give you a

23   copy?

24             THE COURT:  You may.

25             MS. MESIDOR:  I don't have a copy.  Our only objection

1    is lack of foundation, your Honor.

2              THE COURT:  You don't want it in.  It is all right

3    with me.  We'll take it.  Is probably really what she wants.

4    Go ahead.  Admitted.

5              (Plaintiff's Exhibit PD-2 received in evidence)

6    BY MS. KREBS:

7    Q.  Mr. Milton.

8    A.  Yes, ma'am.

9    Q.  Can you please identify the document that is in front of

10   you that is now in evidence as document PD-2?

11   A.  These are the internally prepared financial statements for

12   STRIVE for 2012.

13   Q.  Now, I see the first two pages say balance sheet.  The last

14   two pages say statement of revenue and expense.

15   A.  Yes.

16   Q.  This document looks a little different than the last

17   exhibit.  Could you explain the difference?

18   A.  Yes.  The previous document was the certified audit.  It

19   would consist of this document, this exact document, for 2011

20   and 2012 given to the auditors.  They perform their audit.

21   They reform it into that document for presentation to the

22   public and third parties.  This is the internally prepared

23   document for 2012, which is in the process of being audited by

24   the external auditors and will ultimately be in the same

25   format.

1              THE COURT:  Are these calendar years?

2              THE WITNESS:  Yes, your Honor.

3    Q.  Just to confirm.  These are numbers for the entirety of

4    calendar year 2012?

5    A.  Yes, ma'am.

6    Q.  You said that it is currently being audited right now by

7    the auditors?

8    A.  Yes, ma'am.

9    Q.  How close is it to final?

10   A.  It's -- it should be done by the end of the month.

11   Q.  With respect to these numbers that have been reviewed, have

12   you received any feedback from the auditors with respect to the

13   accuracy of these numbers?

14   A.  Yes.  We do not expect any audit adjustments.

15   Q.  Based on and looking at this document what were the result

16   of operation for 2012?

17   A.  The bottom line for 2012 is that STRIVE made money to the

18   tune of $194,750.  That's a surplus.

19   Q.  That was after December 31st, 2012?

20   A.  Yes, ma'am.

21   Q.  What, if any, obligations are you aware of that would have

22   come upon STRIVE immediately beginning in 2013?

23              MS. MESIDOR:  Objection.

24              THE COURT:  Overruled.

25   A.  The results related to that surplus would be indicated in

1  the cash accounts at the end of the year which is approximately

2  120, $130,000, which would have been designated for the next

3  payroll and the next week or so as well as the first of the

4  month rent paying, substantial rent payments, employee benefits

5  and the like.

6  Q.  Can you please approximate the dollar amount that would

7  have been going out in and around the first week of 2013 for

8  those items that you just mentioned?

9          MS. MESIDOR:  Objection.

10          THE COURT:  Sustained.  I think he just did that.

11          MS. KREBS:  I asked for a specific dollar figure, your

12  Honor.

13          THE COURT:  If he has it.

14  Q.  An approximate dollar figure?

15  A.  It would -- the payroll is approximately 70,000.  We have

16  22,000 in rent.  We've got various other accounts, various

17  other items.  So slightly over a hundred thousand.

18  Approximately $100,000.

19          MS. KREBS:  May I approach, your Honor?

20          THE COURT:  You may.  You really don't have to ask me

21  to approach.  When I think you are going to stab a witness, and

22  it doesn't appear to me that you will be scaring him, so you

23  don't even have to ask.

24          Unless you feel differently about that?

25          THE WITNESS:  No.  Not at all, your Honor.

1            MS. KREBS:  I am a pussy cat, your Honor.

2            THE COURT:  No question about that.

3            MS. MESIDOR:  Your Honor, may we know what document

4      has been given to the witness so we can follow along?

5            THE COURT:  You are certainly entitled to.

6            MS. MESIDOR:  Thank you.

7            THE COURT:  You apparently have that?

8            MS. MESIDOR:  Yes.  I do have that document.  Thank

9      you, your Honor.

10            MS. KREBS:  Your Honor, we ask this document be

11      admitted into evidence.

12            THE COURT:  Any objection?

13            MS. MESIDOR:  No objection, your Honor.

14            THE COURT:  PD-3, is that what we're up to?

15            MS. KREBS:  Yes, your Honor.

16            THE COURT:  Will be admitted.

17            (Plaintiff's Exhibit PD-3 received in evidence)

18      BY MS. KREBS:

19      Q.  Mr. Milton, what is this document that is just marked and

20      entered into evidence as PD-3?

21      A.  This is the current year year-to-date financial statements

22      for 2013.  However, I believe this is a previous version.

23            MS. MESIDOR:  Your Honor, to the extent that the

24      witness just indicated that this is a previous version of this

25      time period, we would ask that the document be taken away from

1    the jury until the most accurate --

2             THE COURT:  That this document be what?

3             MS. MESIDOR:  That the document be taken away from the

4    jury until the correct and most up to date version is provided.

5             THE COURT:  Yeah.  I think that is fair.  Will you put

6    the last PD-3 up on the banister in front of you and we'll try

7    to straighten this out.  I have two page ones.  Actually, I may

8    have two copies.  That may be what I have.  No, I just have two

9    versions.  There must be one version.

10            Why don't you look at this and see if one of them is

11   the latest version that we have so we use that one.

12            THE WITNESS:  There are two documents.  The entire

13   package is not the latest version.

14            THE COURT:  Are we going to get to the latest version?

15            THE WITNESS:  I can speak to it based on the flow

16   chart.

17            MS. MESIDOR:  We would object to that, your Honor.  We

18   have no way of following or otherwise verifying or looking for

19   ourselves as to what the witness is testifying to.

20            THE COURT:  What are the differences?  Can you tell us

21   what they are?  Listen, it is your problem.

22            MS. KREBS:  Your Honor, we do have, which is what I

23   thought was most recent version that was handed up, but I have

24   it on an e-mail if your Honor would permit us to take two

25   minutes to print out the most recent one.  We can resolve this

1   problem very quickly.

2          THE COURT:  Sure.  Can we all sit and listen or

3   watch?  We're not going to go back and forth in and out.  That

4   is what I find time-consuming and useless, but you can print it

5   out.

6          MS. KREBS:  May I consult with your law clerk, your

7   Honor?

8          THE COURT:  Yeah.  He certainly knows more than I do.

9          Is there anything else we can do in the meantime?

10         MS. KREBS:  Your Honor, the next exhibit that I have

11  is a jury aide and we can begin to discuss that, which is based

12  upon the document that will be arriving momentarily.

13         THE COURT:  Very well.  Let me take back my exhibit,

14  Mr. Milton.  I gave you my exhibit.

15  BY MS. KREBS:

16  Q.  Mr. Milton?

17  A.  Yes, ma'am.

18  Q.  The document --

19         THE COURT:  I assume that the plaintiff has seen this?

20         MS. KREBS:  The jury aide, yes, your Honor.

21         MS. MESIDOR:  Your Honor, I don't have any objection

22  so long as we have a representation on the record that the jury

23  aide is based on the most recent PD-3 and not the one that was

24  previously given to the jury.

25         MS. KREBS:  I will make that representation, but I

1    will ask the witness if that is --

2    A.  Yes.  That would be correct.

3             MS. MESIDOR:  And we also want to be sure this is for

4    demonstrative purposes only because I believe the document was

5    prepared by counsel.

6             THE COURT:  You believe what?

7             MS. MESIDOR:  That the document was prepared by

8    counsel.

9             THE COURT:  It is not going to the injury room.  It is

10   just an aide now for them to look at.  You don't have to worry

11   about who prepared it as long as it is authentic.  As long as

12   the CPA tells us about it.

13            MS. MESIDOR:  No objection, your Honor.

14            THE COURT:  Mark it for identification PD-4.  We'll

15   have a hiatus of PD-3.

16            MS. KREBS:  Thank you, your Honor.

17   BY MS. KREBS:

18   Q.  Mr. Milton.

19   A.  Yes, ma'am.

20   Q.  The document that will be arriving momentarily, the

21   up-dated, current PD-3, can you please identify first what it

22   is?

23   A.  That document will be similar to the document to the

24   previous years.  It represents the results of operation for the

25   first seven months of this year.

1    Q.  First seven months through July?

2    A.  Through July.

3    Q.  Have you closed the books or do you have available yet for

4    August of 2013?

5    A.  No.  Those will not be available typically until the 10th

6    of the month or so.

7    Q.  Now, looking at the document that has been marked as PD-4

8    for identification, could you please first just briefly

9    describe what this chart is?

10   A.  For clarification this chart was actually prepared by

11   myself so it was prepared by me.  This represents -- this is a

12   flow chart representation of the profit and loss statement that

13   you will be receiving for the first seven months of this year

14   to July 31st.

15   Q.  So looking at the first column where it says "revenues,"

16   could you please explain again just generally what that column

17   is explaining?

18   A.  That represents all the monies received by STRIVE for the

19   first seven months of this year by category.

20   Q.  Each box is a different category?

21   A.  Yes.

22   Q.  I would like to go through them one by one.  The first box

23   reads, Direct public support, individuals, corporations and

24   board members.  Could you please explain to the jury what that

25   source of revenue is?

1    A.  Those would represent unincumbered direct contributions

2    from individuals and companies and from board members for

3    STRIVE's general operating use.

4    Q.  When you say unincumbered, what do you mean by that?

5    A.  No strings attached.

6    Q.  Now, the second box says, Indirect public support

7    foundations and trusts.  Could you please explain that

8    category?

9    A.  That represents typically encumbered money or money given

10   by foundations and trusts to STRIVE for certain purposes.

11   Q.  When you say it is given for certain purposes, how is it

12   given that that creates for certain purposes?

13   A.  Usually there is a contractual arrangement in the way of a

14   grant award or grant agreement whereby they expend the funds to

15   STRIVE on the condition that you use them for a spelled out

16   specific purpose, contractually bound or legally bound.

17   Q.  Are these programmatic purposes, background purposes, or

18   anything else?

19            MS. MESIDOR:  Objection.

20            THE COURT:  Overruled.

21   A.  Yes.  Foundations typically fund programs.  Occasionally

22   we'll receive general operating funds, but for the most part

23   they are specifically related to doing good works for our

24   population.

25   Q.  The third box says, Program income federal, state and city

1   contract service.  Could you please explain that source of

2   income?

3   A.  Those are actual contracts -- government contracts that we

4   have as a result of typically a bidding process in response to

5   an RFP to provide certain programs to our population of youth

6   or offenders or what have you.  They are contractual agreements

7   to perform these services, contractually bound.

8           MS. KREBS:  Your Honor, may I briefly interrupt to

9   hand out PD-3?

10          THE COURT:  You may.  This is to replace PD-2?  It was

11  incorrect or not final.  I think it was two.

12          MS. KREBS:  Three, your Honor.

13  BY MS. KREBS:

14  Q.  Mr. Milton I just handed you what is now in evidence as

15  PD-3, which is stapled into two parts.

16          THE COURT:  Why don't we make it 3A just in case

17  anything goes wrong.  We had three already and this is the

18  up-to-date one, right?

19          MS. KREBS:  Thank you, your Honor.

20  Q.  Now that we've given those documents, can you please

21  identify those for the record and confirm that is the correct

22  version?

23  A.  Yes.  These are the financial statements for STRIVE for the

24  first seven months of 2013, including the balance sheet and the

25  profit and loss statement.

1    Q.  Now, as we're going through the flow chart for the

2    revenues, could you please just identify the source in PD-3A

3    for where this information can be found?

4    A.  Well, if you look in the revenue column under the first

5    box, the $237,000 that directly relates to the first page of

6    the profit and loss statement, it gives you a breakdown of

7    three categories that total that for $237,000.  So on and so

8    forth down that row each category represents a balance on the P

9    and L, profit and loss statement.

10   Q.  Where does the listing of the revenue on the actual profit

11   and loss sheet on PD-3 A, where does that end?

12   A.  The total revenue ends on the line that says total income

13   of $2,732,170.  That is the slightly past halfway on page 1 and

14   it agrees with the total in the first column from the flow

15   chart.

16   Q.  Thank you, Mr. Milton.  I want to return back to the flow

17   chart to explain the remaining categories of revenue.  We left

18   off at government contracts I explained those were actual

19   government contracts with government agencies.  The next

20   category is program service revenue, which represents direct

21   contracts to provide direct services to a noncorporate entity

22   in the community.  Specifically this one is to provide job

23   placement, job recruitment for the Tiago or East River Plaza.

24        The next category is Women's Fundraising Empowerment

25   Luncheon.  We put on an actual large event this year, the

1    women's Empowerment Luncheon.  It raised approximately

2    $101,000.  The difference of a couple thousand dollars was

3    miscellaneous fundraising efforts for total of 103,000.  That

4    ties into the revenue category on page 1.

5    Q.  Now, the fundraising category --

6    A.  Yes.

7    Q.  -- in terms of the purpose for which those monies were

8    donated through the luncheon itself, how would you categorize

9    those funds?

10   A.  The purpose of the event was to raise money to provide an

11   enhancement of our women services to women essentially.  Those

12   were especially designated for our programs to assist women

13   with our workforce efforts.

14   Q.  So in terms of your encumbered versus unincumbered

15   dichotomy that you have been where would that fall?

16   A.  We would view those as encumbered for a special purpose.

17   Q.  Then the last box that says "other rent income," what is

18   that?

19   A.  That is space within our office that we sublease to another

20   entity.

21   Q.  So that amount is for the total of rent income that you've

22   gotten through July of 2013?

23   A.  Yes.

24   Q.  So now in looking at all of the different categories of

25   revenue and using your encumbered versus unincumbered, how much

1  of the revenue that has come in falls into the unencumbered

2  versus encumbered categories?

3  A.  If you look down the list basically speaking you are

4  talking the first category of direct contributions that is

5  designated for general operating or not encumbered.  Then you

6  look all the way down to program service to 49,000.  That is

7  just for program service revenue.  That would go into general

8  operating.  Then you look all the way down to rent income, the

9  other $20,000 or so.

10 Q.  So the rest of it -- the 660,000, the 1.65 million, the

11 103,000 -- is all encumbered?

12 A.  That would be considered encumbered for special purposes.

13 Q.  Before turning to the expenses column, I just want to go

14 back to Exhibit PD-3A.  I specifically want to go to the

15 balance sheet.  I want to draw your attention to the top of the

16 first page where it identifies the different accounts.

17 A.  Yes.

18 Q.  Do you see that?

19 A.  Yes, ma'am.

20 Q.  I just want to go through each one very briefly so you can

21 explain what each account is for and why you have different

22 ones.

23 A.  The general checking is for general operating purposes,

24 day-to-day operations.  The stipend checking is used for a

25 specific within a program to provide stipends and incentives to

1  the participants.  The federal checking is used for federal

2  government contracts that requires the funds to be segregated.

3  The payroll checking is used for payroll in its entirety.  The

4  Dazny was a grant, a contract to perform improvements for the

5  office.  It required us to have a separate bank account to

6  segregate those funds.  The money market fund is used for

7  monies that we placed there that we're not going to use

8  immediately.  So it is not to get it used in general operating,

9  but will be used shortly thereafter.  Petty cash is petty cash

10 around the office.

11 Q.  Now, you indicated that payroll is where all the payroll

12 comes out of?

13 A.  Yes, ma'am.

14 Q.  The things like rent and others, where would that come out

15 of?

16 A.  General operating -- general checking.

17 Q.  General checking.

18       By the way, does STRIVE have any endowment or other

19 sources of income other than the revenue that you listed here?

20 A.  We have no endowments, ma'am.  All the sources of revenue

21 are listed.

22 Q.  Now, looking back at the flow chart, I want to turn your

23 attention to the expenses side of the page.  Could you just

24 very briefly explain generally what we're looking at on that

25 side?

1    A.  That represents all the dollars spent by STRIVE for the

2    first seven months of this year by category.

3    Q.  In looking at the profit and loss document portion of

4    PD-3A, where would we find the backup to represent the flow

5    chart?

6    A.  This would start near the bottom of page 1 where it says

7    "cost of goods sold."  Those numbers have been somewhat

8    reclassified for the flow chart.  However, the total at the

9    bottom of the 2,723,533 directly would tie into the total of

10   the two expense categories on the profit and loss for cost of

11   sales and total expense.

12   Q.  Going to the flow chart.  I would like to go briefly to

13   each category of expense that STRIVE has or has had in the past

14   seven months during 2013.  The first one says cost of sales,

15   subcontracts, other program costs.  What does that represent?

16   A.  Subcontracts are entities that we hire to assist us in

17   providing the programs to the recipients.  It is direct pass

18   through costs.  They are out there in providing service and we

19   provide them to do so.  Other program costs are related to that

20   program like supplies, things that we would provide to the

21   participants, etc.

22   Q.  Now, the second box says cost of sales, affiliate subaward.

23   What does that represent?

24   A.  Same principle as the cost of sales subcontracts except it

25   goes to our affiliates and other locations that provide the

1    same type of service for us in those programs.

2    Q.  Now, these two categories, where does STRIVE get the funds

3    in order to provide them to the subcontractors, subaward.

4    A.  These would primarily come from the foundation and trusts

5    as well as the program income from federal, state and city

6    contracts.

7    Q.  Part of that money that comes to you goes through them?

8    A.  Passes directly through the subs and affiliates.

9    Q.  The third box says other operating expenses.

10   A.  Yes.  We combine several categories for that line item --

11   business expenses, operational insurance, travel insurance,

12   meetings and alike.

13   Q.  So what kind of business expenses are we talking about in

14   that category?

15   A.  If you look on page 2 of the document.

16   Q.  Of the document, are you referring to the --

17   A.  The profit and loss statements.  Business expenses are at

18   the top.  Bank charges, credit card fees and registration fees.

19   If you look down to operations, that would be half way down the

20   page, the total of all those line item book subscriptions,

21   postage, mailings, printing, telephone total 56,428.  You keep

22   going down to the three quarters of the way down the page for

23   other types, you see insurance there.  That is included.  You

24   keep going down to the bottom of the page where you see the

25   travel insurance and meetings.  Travel is included,

1  conferences, conventions, meals, and travel on the last page.

2  All of that would be included there as well.

3  Q.  One question on that.  One of the categories is insurance?

4  A.  Yes.

5  Q.  What kind of insurance does STRIVE have?

6  A.  We have all the required insurance you would typically see

7  in a business.  We have general liability.  We have got

8  insurance for directors and officers and alike.

9  Q.  Do you have any insurance that could potentially cover

10 STRIVE for this proceeding?

11 A.  It is my understanding based on review of the policy, not

12 being an insurance professional, that we're covered --

13        MS. MESIDOR:  Objection.  Your Honor, if he is not an

14 insurance professional and cannot testify as to whether any of

15 the insurance is going to be covered in these proceeding then

16 we would move to strike any testimony regarding same.

17        THE COURT:  Well, tell us about your experience in the

18 world of insurance.

19        THE WITNESS:  Well, I am a CPA.  I have audited over

20 300 companies, including the insurance categories.  I would

21 think that I will be able to interpret basic insurance policy

22 by review.  I have reviewed hundreds of them.

23        THE COURT:  Did you review this policy as well.

24        THE WITNESS:  Yes, on a regular basis.  It is part of

25 my job of risk management.

1        THE COURT:  I will take it.  Overruled.

2   A.  It is my understanding and belief that we're covered for

3   the compensatory aspect of the results of this trial.

4        THE COURT:  Do you want to withdraw your objection?

5        MS. MESIDOR:  I withdraw my objection, your Honor.

6        THE COURT:  You what?

7        MS. MESIDOR:  I withdraw my objection, your Honor.

8   BY MS. KREBS:

9   Q.  Is there any coverage for punitive damages?

10  A.  To my understanding, there is not.

11  Q.  Moving down to professional services, the fourth box on the

12  expenses flow chart.

13  A.  Yes.

14  Q.  What does that cover?

15  A.  That covers outside accountants, auditors, and consultants

16  like myself, as well as the CPA firm that does the audit.

17  Q.  The next box that says facilities and equipment, could you

18  explain that, that category of expense?

19  A.  That would be near the middle of page 2 under facilities

20  and equipment.  It shows the depreciation and repair and

21  maintenance, rent.  All the occupancy-type expenses would be

22  included there.

23  Q.  What is STRIVE's annual rent?

24  A.  The annual rent for STRIVE -- well, it is approximately --

25  the year-to-date rent as of July 31st was $156,000.  So spread

1    over certain months.  The actual annual amount would be for

2    last year was -- last year was approximately $260,000.

3    Q.  That of course doesn't include the slight offset that you

4    get from the --

5              MS. MESIDOR:  Objection.

6    A.  That is correct.

7              THE COURT:  Do you have an objection?

8              MS. MESIDOR:  Yes, your Honor.

9              THE COURT:  Overruled.

10   Q.  Could you answer?

11   A.  That is correct.

12   Q.  Then the next box is the fundraising expense.  What is

13   that?

14   A.  That would exclude the expenses directly related to the

15   cost of putting on the events for the fundraiser.  In this fact

16   it would have been the Women's Empowerment Luncheon.

17   Q.  The last box salary, wages and fringe.

18   A.  That is the direct cost to pay for or employees, wages and

19   benefits.

20   Q.  So now the bottom line again.  What were the results of

21   operation thus far to the end of July in 2013?

22   A.  Year to date July 31st, 2013, STRIVE had an income of

23   $8,638, and that is a surplus.

24             MS. KREBS:  I have no further questions of this

25   witness, your Honor.

D936JOH2                   Milton - direct

1            THE COURT:  Any cross?

2            MS. MESIDOR:  Yes, your Honor.

3    CROSS-EXAMINATION

4    BY MS. MESIDOR:

5    Q.  Good morning, Mr. Milton.

6    A.  Good morning.

7    Q.  Mr. Milton, STRIVE just doesn't have $8,638 in its bank

8    accounts, correct?

9    A.  Sorry.

10   Q.  The $8,638 that you mentioned that was a surplus, that is

11   not the balance of STRIVE's bank account, correct?

12   A.  No, ma'am.

13   Q.  Now, what this chart is actually representing is all the

14   money that came in so far in 2013 and all the money that has

15   exited so far in 2013 as of July 31st, is that correct?

16   A.  Yes, ma'am.

17   Q.  It does not take into consideration the years of surplus or

18   losses that already exists that STRIVE has, correct?

19   A.  No, ma'am.

20            THE COURT:  2010 and 2011 did it have eye surplus like

21   this $8,000 that you know of that you gave us?

22            THE WITNESS:  No, sir.  It had deficits of that

23   144,000 for 210 and the 100 -- if I remember.

24            THE COURT:  Nine.

25            THE WITNESS:  Yes.  Those two amounts would have been

1    on page 3 of the certified audit report, 144,484 for 2010.

2    That was a deficit.  And then 2011 it would have been 101,713

3    deficit.

4    BY MS. MESIDOR:

5    Q.  Now, Mr. Milton, going back to Defendant's PD-1 to the

6    third page where the 101 number and the 144 number are

7    reflected, do you see that?

8    A.  Yes, ma'am.

9    Q.  Now, those losses are reflected in the total net assets?

10   A.  Yes, ma'am.

11   Q.  That is at the end of the year that shows $762,655, correct

12   for 2011?

13   A.  Yes, ma'am.

14   Q.  Those numbers -- that loss of 144,000 is reflected in the

15   net assets of the end of the year for 2010 of $864,368, is that

16   correct?

17   A.  Yes, ma'am.

18   Q.  You previously mentioned that STRIVE has directors and

19   officers insurance.  What is the insurance policy on that?

20   What is the policy?

21   A.  I am sorry?

22   Q.  What is the amount of the policy?

23            MS. KREBS:  Objection, your Honor.

24            THE COURT:  If you know you can answer.

25   A.  I can -- I don't know the actual limits that it will cover

1    if that is what you are asking.

2    Q.   Yes.

3    A.   No, I don't know the limits.

4    Q.   But the insurance policy also covers attorneys fees, is

5    that correct?

6    A.   I don't know specifically that that is correct or not,

7    ma'am.

8    Q.   Are the attorneys' fees that you accumulated in this

9    litigation reflected in any the balance sheets as you presented

10   to us?

11   A.   No, ma'am.

12   Q.   So where are those reflected?

13   A.   We have not incurred any attorney fees to date, ma'am.

14   Q.   Now, you have previously testified about the restrictive

15   versus unrestricted cash.  Do you recall that testimony?

16            MS. KREBS:  Objection.  Misstates the testimony.

17            THE COURT:  Sustained.  Do you want to rephrase it?

18            MS. MESIDOR:  Sure.

19   Q.   You have previously given testimony regarding encumbered

20   fund versus unencumbered funds.  Do you recall that testimony?

21   A.   Yes, ma'am.

22   Q.   Now, in the flow chart that you previously given to the

23   jury, you had previously indicated that the 237,424 is

24   unencumbered funds, is that correct?

25   A.   Yes, ma'am.

D936joh2                    Milton - cross

1    Q.  That is the revenue that you have accumulated of

2    unencumbered funds so far, is that correct?

3    A.  No.  That is the revenue that has come in the door that has

4    been used for general operating purposes and not a designated

5    purpose.

6    Q.  Right.  But that is what has been generated as revenue so

7    far up until July 31st, 2013?

8    A.  Yes, ma'am.

9    Q.  The program service you had indicated that that also is

10   unencumbered and that is 49,147, is that correct?

11   A.  Yes, ma'am.  That is come in and used for general operating

12   purposes.  Not a specifically encumbered designated purpose.

13   Yes, ma'am.

14   Q.  The rental income is 20,615?

15   A.  Yes, ma'am.

16   Q.  Now, STRIVE and affiliates pay an amount to STRIVE,

17   correct?

18   A.  STRIVE affiliates in some instances they pay a service fee.

19   Yes, ma'am.

20   Q.  In order to become affiliates, they also pay a fee, is that

21   right?

22   A.  Again, in some instances they do.

23   Q.  I am going to draw your attention to PD-3A.  Do you have it

24   before you?

25   A.  Yes, ma'am.

D936joh2                    Milton - cross

1    Q.  In the section that is marked "total income," the $2.7

2    million number, do you see that there?

3    A.  Yes, ma'am.

4    Q.  Do you see the section marked total expense on page 3 for

5    the $1.5 million number?

6    A.  Yes, ma'am.

7    Q.  Both of these numbers are accurate numbers, correct?

8    A.  Yes, ma'am.

9    Q.  Going to PD-2, which is the balance sheet at the end of

10   2012, do you see that?

11   A.  Yes, ma'am.

12   Q.  The $1.140 million number is the total assets, is that

13   correct?

14   A.  Yes, ma'am.

15   Q.  The total liability is reflected on the second page, which

16   is the $183,489, number, is that correct?

17   A.  Yes, ma'am.

18   Q.  So the total net assets of 2012 are approximately 957,000,

19   isn't that correct?

20   A.  That would be correct and it includes those net fixed

21   assets that most of which don't belong to us.

22   Q.  You said that it includes net fixed asset that don't belong

23   to you?

24   A.  The fixed assets including most of which don't belong to us

25   for the lease hold improvement category.

1   Q.  I understand that you explained what the lease hold

2   improvement category were and my recollection of your testimony

3   was that it was the amount that STRIVE had improved upon the

4   building in order to make it suitable for them to use the

5   space, is that correct?

6   A.  Yes.  Accounting principles require that we book those, but

7   they don't belong to us?

8   Q.  However, they are counted to you as assets, isn't that

9   correct?

10  A.  Accounting purposes require we book them as assets but

11  again they don't belong to us and we couldn't do anything with

12  them.

13  Q.  Sir, is it your testimony that your attorneys have not

14  proffered to you any bill or invoice for their services?

15          MS. KREBS:  Objection.

16          THE COURT:  You can answer.

17  A.  My -- the question you asked me was?

18  Q.  I would like you to focus on the question that is before

19  you right now.

20  A.  Sure, ma'am.

21  Q.  Do you need me to restate it?

22  A.  No, ma'am.

23  Q.  What is the answer to that question, sir?

24  A.  We have not received invoices thus far this year for

25  attorney fees, no.

D936joh2                    Milton - cross

1   Q.  Does your insurance company give you any documentation to

2   reflect any claims or any monies paid on your behalf?

3   A.  They have not thus far, ma'am.

4   Q.  The assets and liabilities as you have testified to them

5   are also reported in your 990, is that correct?

6   A.  Yes, ma'am.

7   Q.  Do you have your insurance policy with you here today, sir?

8   A.  No, ma'am.

9   Q.  We don't have any documentation of what the policy covers

10  and doesn't cover, sir, with you here today?

11  A.  I do not have that in my possession, ma'am.

12          MS. MESIDOR:  One moment, your Honor, to take a look

13  at my notes and confer with my co-counsel.  I may be finished

14  with my cross.

15          THE COURT:  Very well.

16  Q.  Final question, Mr. Milton.  For the year 2012 were you

17  given any invoices by your attorneys for services rendered for

18  the year 2012?

19  A.  I was not here in 2012, but I will reference the document

20  and look for the line item for legal fees and it does appear

21  there is $2,506 expended for legal fees in 2012.  I am

22  uncertain as to who that went to and what the purpose was,

23  ma'am.

24          MS. MESIDOR:  No further questions, your Honor.

25          THE COURT:  Any redirect?

1            MS. KREBS:  Very, very briefly, your Honor.

2     REDIRECT EXAMINATION

3     BY MS. KREBS:

4     Q.  You were asked on cross-examination about net assets and

5     moneys that you have in the bank.  Do you recall those

6     questions?

7     A.  Yes, ma'am.

8     Q.  Of the money that you are aware of at least through the end

9     July of 2013 in the bank, how much of that was encumbered

10    versus unencumbered percentage-wise based on your knowledge?

11    A.  Approximately 90 percent, ma'am.

12    Q.  90 percent was which, encumbered or unencumbered?

13    A.  Encumbered.

14    Q.  Thank you.

15           You were also asked by opposing counsel about service

16    fees by affiliates?

17    A.  Yes, ma'am.

18    Q.  To the extent that there was any such income from service

19    fees, where would that be reflected in the categories?

20    A.  If you look at the July financial statement middle of the

21    first statement of the affiliate service revenue $8,730.80 for

22    the first seven months of 2013.

23    Q.  In terms of the flow chart where was that included within

24    the flow chart categories that you had identified?

25    A.  That would be included in program income.

1    Q.  And you were asked --

2    A.  So I --

3    Q.  What is a 990?

4    A.  990 is the tax return that is used for nonprofits.  That is

5    the number associated with that form.

6    Q.  What, if any, documents are used as the basis to prepare

7    the 990?

8    A.  The financial statements are used for the basis of

9    preparing that tax return.  All the documents we have been

10   reviewing today.

11   Q.  The 990, what is the last 990 that has been filed thus far

12   by --

13   A.  2011.

14   Q.  Based on that financial audited financial statement you

15   provide?

16   A.  Yes, ma'am.

17   Q.  You testified during direct that the next audited financial

18   statement for 2012 was going to be completed by the end of the

19   year?

20   A.  Yes, ma'am.

21              (Continued on next page)

22

23

24

25

1    Q.  At what point would a new, a 994 2012 be generated

2    thereafter?

3    A.  Shortly thereafter.

4           MS. KREBS:  Thank you.  No further questions.

5           THE COURT:  You are excused.

6           Thank you very much.

7           (Witness excused)

8           THE COURT:  What is next?

9           MS. KREBS:  I call Philip Weinberg to the stand.

10          THE COURT:  Is this your only other witness?

11          MS. KREBS:  One last witness, I have Mr. Carmona.

12          THE COURT:  One last witness, and Mr. Carmona, that is

13   two witnesses?  Or one more, that is Mr. Carmona?

14          MS. KREBS:  I have Mr. Weinberg and then Mr. Carmona

15   and that is it.

16    PHILIP WEINBERG,

17        re-called as a witness by the Defendants,

18        having been previously sworn, testified as follows:

19          THE COURT:  You are still under oath to tell the

20   truth.

21          THE WITNESS:  Understood.  Thank you.

22          THE DEPUTY CLERK:  Be seated.

23   DIRECT EXAMINATION

24   BY MS. KREBS:

25   Q.  Good morning, Mr. Weinberg.

1   A.  Good morning.

2   Q.  You have been here for the testimony by Mr. Melton,

3   correct?

4   A.  Correct.

5   Q.  I am not going to go over all of the nuts and bolts of the

6   finances.  I would like you to just give a description, big

7   picture of STRIVE's financial position.

8            MS. MESIDOR:  Objection, your Honor.

9            THE COURT:  Overruled.

10  A.  It has been a long struggle for STRIVE financially.  We

11  have had deficits in two of the last three years.  We struggle

12  to make many payments.  Such as every two weeks we need to make

13  payroll, and it is often a struggle for us to identify the

14  funds to use to pay for our employee salaries to pay rent each

15  month, to pay health insurance.  We are very much like a family

16  that lives paycheck to paycheck.

17           MS. MESIDOR:  Objection, your Honor.

18           THE COURT:  Overruled.

19  Q.  You have identified some different challenges that you have

20  had in --

21           THE COURT:  He testified to that last week.  I don't

22  know why it should bother you this week.  Never mind.  Don't

23  answer it.  I lost my head.

24  BY MS. KREBS:

25  Q.  How did you ever overcome some of those challenges at the

1   times that you were facing them?

2   A.  Well, it is tough to operate in a deficit and not have an

3   endowment and not have a reserve, so we would take

4   extraordinary measures.  We had to be crafty and creative.

5           We would not pay bills until the very last possible

6   moment to maintain cash on hand.  We would hold paychecks.

7   Those of us in the senior positions would not cash our

8   paychecks until we were able to meet our other obligations.

9   Q.  When you say those in senior management, which individuals

10  in particular are you referring to today?

11  A.  There are only three individuals who we would ask to hold

12  paychecks, myself, Rob Carmona, and Lisa Stein.

13  Q.  Any other matters in which you overcame challenges of the

14  financial struggles?

15  A.  Well, Rob and I both took a voluntary pay cut for chunks of

16  2012 and 2013.  Understanding that we had other bills to pay,

17  we reduced our salaries accordingly.

18          Then, frankly, all of that wouldn't have been enough.

19  We relied upon generous donations from our board of directors

20  to help us overcome extraordinarily challenging times when

21  frankly we had nowhere else to cut, we had no sources of money

22  to tap into.  Were it not for those generous moments that we

23  had, I am not sure STRIVE would have survived.

24  Q.  Mr. Weinberg, in light of the jury's decision last week,

25  what, if any, changes will you be implementing at STRIVE?

1          MS. MESIDOR:  Objection.

2          THE COURT:  Yes.  Sustained.

3          It is a little early for that.

4          MS. KREBS:  Well --

5          THE COURT:  I guess my concern is, listening to your

6     testimony and juxtaposing it with financials that we just heard

7     from Mr. Melton, it would appear that, as the plaintiff's

8     counsel brought out, that the net assets at the beginning of

9     2011 were $864,000 and in 2010 was $1,008,852.  What happened

10    to all of that, or how is it that I am misreading or not

11    accounting properly for it that created the problems you have

12    been testifying about?

13          Do you want to look at the exhibit?

14          THE WITNESS:  Please.

15          THE COURT:  It is the penultimate line on the exhibit.

16          THE WITNESS:  The question, your Honor, you would like

17    me to address?

18          THE COURT:  Yes.

19          What did you do with the $1,008,000.

20          THE WITNESS:  I think as Mr. Melton, Andrew testified,

21    for accounting reasons these things get listed as assets,

22    things that are listed as assets for an accounting purpose that

23    really have no liquid value.

24          So the biggest thing that it looks like we have that

25    creates our assets, your Honor, is our facility, which we don't

1  own, and really from an accounting standpoint we're given

2  credit for the fact that we painted it and put in new carpets,

3  and it's making us look a lot wealthier, your Honor, than we

4  are, when in fact we had very little liquid assets at any given

5  time.

6          MS. KREBS:  Thank you, Mr. Weinberg.

7          THE COURT:  I will take back my exhibit.

8          THE WITNESS:  Yes, sir.

9          MS. KREBS:  Your Honor, I would like to explore which,

10  I believe is relevant from a punitive damages standpoint, the

11  reflection that STRIVE has made thus far based on the jury's

12  decision.

13          THE COURT:  How can they?

14          MS. KREBS:  Mr. Weinberg can answer the question and

15  indicate what, if any, reflection he has had based on it and

16  what, if any, steps he intends to take.

17          THE COURT:  All right.  I will listen over the

18  objection of the plaintiff.  The jury will take this, obviously

19  you will take it for what it is worth.

20          THE WITNESS:  There are a couple of things we would

21  like to put in place right away and a couple of decisions that

22  I have made in reflection upon the jury's decision, one of

23  which is to institute an annual training for all staff related

24  to diversity training, antidiscrimination, antiharassment

25  training, and a second of which I think I testified in during

1   the proceeding that when I first started at STRIVE I met

2   individually one on one with each staff member, and upon

3   reflection I think it's a good idea to do that each year.  So I

4   will be institutionalizing that and really creating an open

5   forum for each staff member to share with me what it is they

6   would want to bring to that conversation.

7   BY MS. KREBS:

8   Q.  Are there any other changes at this point being

9   contemplated?

10  A.  At this point we are still consulting with our board of

11  directors.  The proceeding happened on a Thursday.  We had one

12  business day following that on Friday.  Folks were scattered

13  for the holidays.  We intend to have a careful, thoughtful

14  deliberative process to determine other steps.  But at this

15  point we just haven't had an opportunity to do so.

16  Q.  Thank you, Mr. Weinberg.  No further questions.

17          THE COURT:  Any cross?

18  CROSS EXAMINATION

19  BY MS. MESIDOR:

20  Q.  Mr. Weinberg, you had previously testified that after your

21  investigation into the matter the board had taken certain steps

22  to reprimand Mr. Carmona, is that correct?

23          MS. KREBS:  Objection.

24          Outside the scope of the direct.

25          MS. MESIDOR:  If I may respond, your Honor?

D93njoh3                    Weinberg - cross

1          THE COURT:  No.  I will allow it.

2   A.  That's correct.

3   Q.  That took place in approximately May of 2012, correct?

4   A.  I think it would have been June, but approximately.

5   Q.  So STRIVE has had a year to make any changes or do any

6   training that it wanted to do, isn't that correct?

7   A.  Correct.  There is a number of things STRIVE has done,

8   including doing a training along this line.

9   Q.  Are you referring to the sexual harassment training that

10  STRIVE did?

11  A.  Correct, harassment training.

12  Q.  Thank you.

13          Now, you had previously mentioned that the

14  approximately $1.2 million that his Honor had asked you about,

15  that predominantly had to deal with your fixed assets, is that

16  correct?

17  A.  Correct.

18  Q.  Now, of that $1.2 million, your fixed assets are only about

19  $770,000, is that correct?

20  A.  I don't have the document in front of me, but I will agree

21  to that.

22  Q.  So that leaves an approximate 650,000-and-somewhat dollars

23  after that, is that correct.

24          THE COURT:  You can look at this if it will make you

25  more comfortable.

1              THE WITNESS:  Thank you, sir.

2    A.   OK.  I'm prepared.  What was your question?

3    Q.   So my question is, after you took out the approximate seven

4    hundred, I'll say 35,000 -- hold on.  Let me see if I'm reading

5    this correctly.

6              Yes.  In taking out the approximate $768,000 fixed

7    assets, it leaves approximately a million dollars for the rest

8    of the assets?

9    A.   I am not following that by this exhibit.  Are you talking

10   about 2011.

11   Q.   No.  I am looking at 2013.  PD-A.

12             THE COURT:  He doesn't have that in front of him.

13   Q.   Do you have the exhibits that Mr. Melton used in front of

14   you?

15   A.   I do not.

16   Q.   I don't want to give you my exhibit because it has notes on

17   it.

18             MS. MESIDOR:  Your Honor, can we locate the exhibits

19   that were used by the prior witness.  I am not sure why they

20   were taken away from the witness stand.

21             THE COURT:  Sure.  If you find them, you're welcome to

22   use them.

23             MS. MESIDOR:  Your Honor, just in the interest of

24   time.

25   Q.   Mr. Weinberg, I am going to read to you from PD-A.

D93njoh3                    Weinberg - cross

1          THE COURT:  3?

2    Q.  It was PD-3, but now it was redubbed PD-3A, and it is the

3    balance sheet as of July 31, 2013.  It shows a total assets of

4    approximately $1.6 million.

5          When we deduct the approximate $768,000 which you

6    indicated were fixed assets and that they were added for

7    accounting purposes and essentially really aren't assets, you

8    still have approximately 900 some-odd thousand dollars in

9    assets, is that correct?

10   A.  I don't have the document in front of me.

11         THE COURT:  I just don't happen to have a P&L, nobody

12   gave it to me, but I do have the balance sheet, so you're

13   welcome to it.

14   BY MS. MESIDOR:

15   Q.  I am looking at the first page, sir.  Does the first page

16   say balance sheet as of July 31, 2013?

17   A.  Correct.

18   Q.  Do you see the bottom, where it says total assets of $1.6

19   million?

20   A.  I do.

21   Q.  Do you see the portion where it says fixed assets 768,000

22   some-odd dollars?

23   A.  I do.

24   Q.  What I am saying is when you deduct the $768,000, minus

25   from the $1.6 million, that leaves approximately $900,000, does

1   it not?

2   A.  I think what Mr. Melton --

3   Q.  Can you answer my question, Mr. Weinberg.

4   A.  I could with an explanation.

5   Q.  I am not asking you for an explanation.  I am asking you to

6   do arithmetic.

7           MS. KREBS:  Your Honor, I would ask that the witness

8   be allowed to answer the question as he sees fit.

9           THE COURT:  Well --

10          MS. MESIDOR:  Your Honor, the witness has to answer

11  the question as it is posed.

12          THE COURT:  Is that true?  I'm missing your role.  Do

13  you have one?  Do you want to answer the question?

14          MS. MESIDOR:  Your Honor, I'm sorry?

15          THE COURT:  You can answer the question with the

16  explanation.

17  A.  So, your characterization is correct, but I think that if

18  you look at the line items, I thought Andrew walked us through

19  rather cogently through the point that just about all the

20  assets left, if you look under current assets and receivables,

21  those are foundation grants, those are government contract, and

22  then there is some cash in the bank, but just about 90 percent

23  of that is locked up, meaning that it is obligated based on

24  contract, based on the grant, to be spent on a particular

25  purpose.

D93njoh3                         Weinberg - cross

1   Q.  Then the response as to how many assets are left over after

2   you deduct the fixed assets from the total number of assets is?

3   A.  I don't have that math in front of me.  I think Andrew made

4   clear the amount of money that we thought was nonencumbered, in

5   that sense.  So I thought that that testimony was quite clear.

6   Q.  Is the amount left over after fixed assets already moved

7   from the total amount of assets $900,000?

8   A.  Is the amount of money we have available?  Not even close.

9   Q.  I am not asking the amount of money that is available.  I

10  am talking about in assets.

11  A.  If you're asking me if 1.6 minus 768 is somewhere in the

12  range of 900,000, then I think the math holds.

13  Q.  Thank you.

14          THE COURT:  Any redirect?

15          MS. KREBS:  Yes, your Honor.  Very briefly.

16          THE COURT:  Very briefly.

17  REDIRECT EXAMINATION

18  BY MS. KREBS:

19  Q.  Mr. Weinberg, you already gave an explanation as to the

20  encumbered, and unencumbered of the assets.  I just want to ask

21  one other question.

22          In looking at the list of assets, is that gross assets

23  or net assets?  In other words, does that take into account

24  liabilities, the numbers that opposing counsel was just talking

25  about?

1   A.   This is gross.  This is the amount of money we get, and

2   then we spend an awful lot of money to do the things we were

3   given the funds for.  So it's a gross number, not a net number.

4           MS. KREBS:  Thank you, your Honor.

5           THE COURT:  You are excused.

6           THE WITNESS:  Thank you very much.

7           THE COURT:  Thank you.

8           That's mine.  You can give it back to me.

9           I was reticent to give it to you in the first place.

10          THE WITNESS:  Yes, sir.

11          (Witness excused)

12          MS. KREBS:  Your Honor, may we take a two-minute break

13   before the last witness?

14          THE COURT:  No.

15          MS. KREBS:  I call Rob Carmona to the stand.

16    ROB CARMONA,

17       the defendant herein,

18       having been previously sworn, testified as follows:

19          THE DEPUTY CLERK:  You are still under oath.

20          THE WITNESS:  Yes.

21          THE COURT:  You are still under oath to tell the

22   truth, Mr. Carmona.

23          THE WITNESS:  Yes, sir.

24   DIRECT EXAMINATION

25   BY MS. KREBS:

1    Q.  Good afternoon, Mr. Carmona.

2    A.  Good afternoon.

3              MS. KREBS:  Your Honor, before I begin my questioning,

4    I would just like to approach to hand the witness an aid.

5              THE COURT:  Sure.

6              THE WITNESS:  Thank you.

7              THE COURT:  You are going to mark it for

8    identification as 5.  Is that what we are up to?

9              MS. KREBS:  I believe we are up to PD-5, your Honor.

10             MS. MESIDOR:  Your Honor, can we please know the

11   document that was given to the witness.

12             THE COURT:  I would hope that they would give you a

13   copy even before me, believe it or not, but I gather they

14   waited.

15             MS. MESIDOR:  Thank you, your Honor.

16             THE COURT:  It is a jury aid.  It is not in evidence.

17   You are welcome to use it during the course of the testimony,

18   but I think we all agree that it won't go into the jury room

19   with you.  Yes.

20             MS. KREBS:  Thank you, your Honor.

21   BY MS. KREBS:

22   Q.  Mr. Carmona, I would like to take some time now and go

23   through the assets that you have.

24             First I would like to go through the assets, your

25   assets that you own jointly with another individual.

1   A.  Yes.

2   Q.  Do you own a home in New Jersey?

3   A.  Yes, I do.

4   Q.  Have you recently had it appraised?

5   A.  No.

6           MS. KREBS:  Your Honor, permission to approach.

7           THE COURT:  Yes.

8           MS. KREBS:  Your Honor, we ask that this document be

9   admitted into evidence.

10          MS. MESIDOR:  We would object, your Honor.  This is a

11  website printout.

12          MS. KREBS:  Your Honor, the --

13          THE COURT:  I am not sure.  Is that good or bad?

14          MS. MESIDOR:  Your Honor, if I may?

15          THE COURT:  I'm asking you.

16          MS. MESIDOR:  OK.

17          If the defendant is attempting for us to take a

18  website printout as a declared value for the home, we would

19  object.  There is a particular process within the real estate

20  industry in which homes are valued, and a website printout from

21  whatever, Yahoo.com would be insufficient to show the value of

22  the home as being one number as opposed to another.

23          THE COURT:  We won't take it for value.

24          MS. KREBS:  Your Honor, this is indicated mainly to

25  give an estimation, because the witness had no reason to have

1   the house appraised recently.  If counsel is looking to find

2   out what the value of his assets are, we need to have at least

3   some estimation or approximation.

4              THE COURT:  Yes.  So we are getting it.

5              We'll see what this does for us, if anything.

6              MS. KREBS:  Your Honor, I would request that this be

7   admitted into evidence as PD-6.

8              THE COURT:  It will be admitted as PD-6 subject to

9   connection.

10             (Defendant's Exhibit PD-6 received in evidence)

11             THE COURT:  We will see what you believe the

12  connection with.

13             MS. MESIDOR:  Your Honor, could the defendants please

14  clarify.  Are they using both websites as PD-6 or just the one

15  website printout.  I mean, your Honor --

16             THE COURT:  I have a two-page exhibit.  Is that what

17  you would like to have cut in half?

18             MS. MESIDOR:  Your Honor, I have two different

19  exhibits that were given to us.  Both of them have website

20  printouts of values of homes, and I just want to know which one

21  is being marked as PD-6.  That's all.

22             THE COURT:  I only have one.  So we are going to

23  assume it's the one I have, which you are welcome to come up

24  and look at.

25             MS. MESIDOR:  If defendants can state it on the

1    record, then I have no objection.

2              MS. KREBS:  Your Honor, I was just about to get to

3    that.

4    Q.  Mr. Carmona, what is your home address at the property that

5    we were just saying that you owned in New Jersey?

6    A.  1656 Shelbourne Street, Teaneck, New Jersey.

7    Q.  Is that the address that is reflected in what is now in

8    evidence as PD-6?

9    A.  Yes, ma'am.

10   Q.  Is this the document that you used as the basis for

11   estimating the range of value for your home for purposes of

12   this proceeding?

13   A.  Yes, ma'am.

14             MS. KREBS:  Your Honor, I apologize.  Just a moment.

15   Q.  Mr. Carmona, do you own your home free and clear?

16   A.  No, I do not.

17   Q.  What, if any, encumbrances do you have on this home?

18   A.  I have an outstanding mortgage and a home equity loan.

19             MS. KREBS:  Your Honor, may I approach?

20             THE COURT:  Yes.  But I am not taking PD-6 at the

21   moment, because I have no idea what it is supposed to tell me.

22   If it is a point comparable it is being used for, that won't

23   do.

24             MS. KREBS:  It indicates on the right-hand side --

25   your Honor asked.  May I respond to your question, your Honor?

D93njoh3                    Carmona - direct

1          THE COURT:  Yes.

2          MS. KREBS:  On the right-hand side, about a third of

3     the way down, it identifies from two different sources a home

4     value estimate for this particular address, which provides a

5     range of the value for the home.

6          THE COURT:  But the one comparable that it lists is

7     from '91.

8          MS. KREBS:  That is not comparable, your Honor.  It

9     indicates the sale history.  That indicates when this home was

10    originally purchased.  We obviously can't use the sale price

11    because that was from too many years ago.  So this, those two

12    items up, the Zillow and E-Appraisal.com are the two estimates

13    by those two separate independent entities to provide a range

14    of what the value of the house is today.

15         THE COURT:  I don't even know who they are, Zillow.

16    Anyway, I'm not taking it.  It is out.

17         Let's go.  You can ask him more about his mortgage and

18    his home equity loan.

19         MS. MESIDOR:  Your Honor, we would request that it be

20    removed from the jury, please.

21         THE COURT:  Please remove it from the jury.

22    BY MS. KREBS:

23    Q.  Mr. Carmona, you have in front of you the document that's

24    been marked as PD-7.  Do you see it?

25    A.  Yes.

1   Q.  Does this reflect the home equity and mortgage balances

2   that you have just mentioned?

3   A.  Yes, it does.

4           MS. KREBS:  Your Honor, we ask that this be admitted

5   into evidence.

6           THE COURT:  I am afraid you are ahead of me.  I marked

7   PD-7 a document from Merrill Lynch that has on the left-hand

8   side the word "Balances."

9           Is that the one to which you're referring?

10          MS. KREBS:  Yes, your Honor.

11          THE COURT:  It is here for identification.  Tell us

12  what it is, Mr. Carmona.

13          THE WITNESS:  The top one is what I have left on my

14  mortgage to pay.

15          THE COURT:  That amounts to?

16          THE WITNESS:  $94,104.

17          MS. KREBS:  No, no.

18          THE WITNESS:  No?

19          MS. MESIDOR:  Objection.

20          THE COURT:  Sustained.

21          MS. KREBS:  Your Honor, may I conduct by questioning

22  of this document in order to demonstrate its authenticity?

23          THE COURT:  Please.

24          MS. KREBS:  Thank you.

25  BY MS. KREBS:

1 | Q.  Mr. Carmona, would you please look down under the heading

2 | credits and loans.  Do you see that on the left-hand side,

3 | under credits and loans?

4 | A.  Yes, ma'am.

5 | Q.  Looking across, we have redacted for personal reasons the

6 | account numbers.  But looking underneath, in that column under

7 | account registration, do you see the two references, home

8 | equity and mortgage?

9 | A.  Yes, I do.

10 | Q.  In looking across the column, this home equity and

11 | mortgage, with respect to which property do those two accounts

12 | reflect?

13 | A.  The Teaneck property.

14 | Q.  In looking along the line for the home equity, what does it

15 | indicate the outstanding balance is on your home equity loan?

16 | MS. MESIDOR:  Objection.

17 | THE COURT:  Overruled.

18 | A.  $47,567.73.

19 | Q.  And in looking at the line marked mortgage, what is your

20 | outstanding balance on your mortgage?

21 | A.  $136,604.93.

22 | Q.  So the total outstanding balance between those two

23 | encumbrances on your Teaneck property, what do they total?

24 | A.  $184,172.66.

25 | MS. KREBS:  Your Honor, I ask that this document be

D93njoh3                    Carmona - direct

1  admitted into evidence?

2            THE COURT:  Any objection?

3            MS. MESIDOR:  No objection.

4            THE COURT:  Very well.  7 will be admitted.

5            (Defendant's Exhibit PD-7 received in evidence)

6  BY MS. KREBS:

7  Q.  Do you own any other properties, Mr. Carmona?

8  A.  Yes, I do.

9  Q.  How many?

10  A.  One.

11  Q.  Where is that located?

12  A.  In Tampa, Florida.

13  Q.  Is that a residence or rental property?  Is that a

14  residence of yours or to generate income?

15  A.  It is a rental.

16            MS. KREBS:  Your Honor, I have another document that

17  reflects the range of value for that.  May I assume that your

18  Honor is not going to admit that as your Honor did not admit

19  the other?

20            THE COURT:  Correct.  If it's the same or similar.

21            MS. KREBS:  It is similar, but for this property.

22  BY MS. KREBS:

23  Q.  What is the address of the property in Tampa?

24  A.  8201 Cypress Breeze Way, Tampa.

25  Q.  When did you purchase the property?

1          THE COURT:  I will allow it.

2   A.  I want to say eight or nine years ago.

3   Q.  Do you own it outright, or do you have any encumbrances on

4   it?

5   A.  No, we have a mortgage on it.

6   Q.  When you say we, who is we?

7   A.  Myself and my wife, who is back there.

8   Q.  Was your wife's name?

9   A.  Christina Carmona.  Lucila Christina Carmona.

10          MS. KREBS:  Your Honor, may I approach?

11          THE COURT:  You may.

12          I am not sure what those two figures mean,

13   Mr. Carmona.  The $44,000 and the $78,000.

14          Can you tell us?

15          THE WITNESS:  I'm sorry, your Honor.  Where are you

16   looking?

17          MS. MESIDOR:  Your Honor --

18          THE COURT:  The jury aid, the Florida property, less

19   mortgage.  Less mortgage reflects the $78,000 figure.  Is that

20   what the mortgage is at this point in time?

21          MS. KREBS:  Your Honor, may I authenticate this

22   document?

23          THE COURT:  Excuse me.

24          MS. KREBS:  May I question the witness to authenticate

25   the document.

D93njoh3                    Carmona - direct

1          THE COURT:  Is that a trick question?

2          Shall we see if he can answer it?

3          MS. KREBS:  I'm sorry, your Honor, I don't know where

4    you are looking.

5          THE COURT:  I am going to go through this one more.

6    You have PD-5 for identification, the jury aid in front of you.

7          MS. KREBS:  The jury aid.  I apologize, your Honor.

8          THE COURT:  That's perfectly all right.  We'll go

9    through it a fourth time if you like.  If you look at the

10   second box, you will see it says Florida property, which he

11   testified that he bought some eight or nine years ago or would

12   like to say eight or nine years ago, and there are two figures.

13         One is next to or adjacent to the less mortgage

14   language.  All I asked is whether that represented the amount

15   of the mortgage.

16         THE WITNESS:  I am not sure what you are looking at.

17         THE COURT:  We are going to go through this a fifth

18   time.  It's going to be easy.

19         THE WITNESS:  I just have the one page.

20         THE COURT:  No.  We are looking at this.  Do you have

21   this?

22         THE WITNESS:  Oh, yeah.  OK.  I'm sorry.  I was

23   looking at the other thing.

24         THE COURT:  That is perfectly all right Mr. Carmona.

25         THE WITNESS:  OK.

1           THE COURT:  Let's go through it again.

2           You see the second box.

3           THE WITNESS:  OK.

4           THE COURT:  It talks about the less mortgage language.

5    Do you see that?

6           THE WITNESS:  Yes.

7           THE COURT:  Do you see where it says $78,772.98?

8           THE WITNESS:  Yes, sir.

9           THE COURT:  What does that figure represent?

10          THE WITNESS:  Well, there were two ranges, like in the

11   Zillow and the other one, they gave ranges of value because --

12          THE COURT:  So this is not a mortgage amount?

13          THE WITNESS:  That is what I would owe.  This is those

14   figures minus what I still owe on the property in the

15   mortgages.

16          THE COURT:  Those figures minus what you still owe.

17          Tell me what you still owe on the property.

18          THE WITNESS:  I still owe $94,315.

19          THE COURT:  What then is your equity that you have in

20   the house.  Can you figure that?

21          THE WITNESS:  I guess I arrive at it, if I hear your

22   question correctly, by taking the original principal balance

23   and what I paid and what I have left to pay.  That looks like

24   maybe $33,000, if my math is right.

25          THE COURT:  I think if we do it your way that's pretty

1  close.  That is what the house is worth free and clear for your

2  purposes, is that right?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  OK.  Thank you very much.

5          You may proceed.

6          MS. KREBS:  Thank you, your Honor.

7          Mr. Carmona was just referring to the document that

8  has been marked as PD-8.  I ask that it be admitted into

9  evidence.

10          MS. MESIDOR:  We would object, your Honor.  To the

11  extent that this document is reflective of the Zillow numbers

12  that are not in evidence, then all the calculations or numbers

13  that are listed for the purposes of assessing home value are

14  therefore incorrect and we would object to it being admitted

15  into evidence.

16          THE COURT:  I am not sure it matters anything other

17  than the questions I asked him.

18          MS. KREBS:  Your Honor, just to clarify for the

19  record, PD-8 that I was just referring to is the document that

20  was the recent mortgage loan statement that identifies as of

21  the end of August 2013 what Mr. Carmona's unpaid principal

22  balance is on his mortgage for the Tampa property.

23          THE COURT:  It is addressed to him at the Teaneck

24  property address, right?

25          THE WITNESS:  Yes, sir.

D93njoh3                    Carmona - direct

1              MS. KREBS:  Yes, your Honor.

2              THE COURT:  OK.  That's fine with me.  I am not sure

3    we need it, but I will take it over the objection of the

4    plaintiff.

5              So you have PD-8 in front of you, Mr. Carmona?

6              THE WITNESS:  Yes, your Honor.

7              THE COURT:  I don't think -- I don't know.

8              MS. KREBS:  Your Honor, I think we have already

9    discussed it enough that I don't have any additional questions.

10             THE COURT:  I would say more than enough.

11             MS. KREBS:  Thank you, your Honor.

12   BY MS. KREBS:

13   Q.  In addition to these two properties, real estate properties

14   that you jointly own with your wife, do you have any other

15   holdings that you and your wife own together?

16   A.  Yes, ma'am.

17   Q.  Do you have a checking, savings, credit card account with

18   your wife?

19   A.  Yes, I do.

20             MS. KREBS:  Permission to approach.

21             THE COURT:  Very well.

22   BY MS. KREBS:

23   Q.  Mr. Carmona, you have in front of you what has been marked

24   for identification as PD-9.

25             Do you see that?

1   A.  Yes.

2   Q.  Could you please just identify for the Court and the jury

3   what that is?

4   A.  This is my bank statements from Citibank from July 18 to

5   August 18 of this year.

6   Q.  This statement indicates the status of your accounts as of

7   August 18, 2013?

8   A.  Yes, ma'am.

9           MS. KREBS:  Your Honor, we request that this be

10  admitted into evidence.

11          THE COURT:  Any objection?

12          MS. MESIDOR:  No, your Honor.

13          THE COURT:  Very well.

14          PD-9 is admitted without objection.

15          (Defendant's Exhibit PD-9 received in evidence)

16          THE COURT:  You see some of it is blacked out.  It's

17  simply a redaction I made as a consequence of determining that

18  it was either some sort of confidential nature or irrelevant or

19  both.

20  BY MS. KREBS:

21  Q.  Mr. Carmona, as of August 18, 2013, how much money did you

22  and your wife have together in your checking account, looking

23  at page 1?

24  A.  Page 1?  At the end of the month, $275.

25          THE COURT:  It wasn't the end of the month, but it was

1    as of the statement period, right?

2            THE WITNESS:  Yes, right.  $275.

3    BY MS. KREBS:

4    Q.  As of August 18, 2013, how much money did you have in

5    regular savings?

6    A.  $5.

7    Q.  And how much did you and your wife jointly have in your

8    account, in your preferred money market account as of August

9    18, 2013?

10   A.  $7,020.53.

11   Q.  Thank you, Mr. Carmona.  As of the August 18, 2013, what

12   did you owe in credit card debt, you and your wife together?

13   A.  $2,452.

14   Q.  Now, do you and your wife also have a joint account through

15   Merrill Lynch, an investment type of account?

16   A.  Yes.  We do.

17           MS. KREBS:  Your Honor, permission to approach?

18           THE COURT:  Yes.

19   BY MS. KREBS:

20   Q.  Mr. Carmona, do you have in front of you what's been marked

21   for identification as PD-10?

22   A.  Yes, I do.

23   Q.  Is this a statement of the joint account that you and your

24   wife have through Merrill Lynch?

25   A.  Yes, it does.

D93njoh3                    Carmona - direct

1          MS. KREBS:  Your Honor, I ask that this be admitted

2     into evidence.

3          THE COURT:  Any objection?

4          MS. MESIDOR:  None, your Honor.

5          THE COURT:  Very well.

6          10 will be admitted without objection.

7          (Defendant's Exhibit PD-10 received in evidence)

8     BY MS. KREBS:

9     Q.  As of August 30, 2013, how much did you and your wife

10    jointly own in this account as part of cash and money?

11    A.  All told, $72,782.13.

12    Q.  OK.  Now please listen to my question.  Let's break it down

13    one by one?

14    A.  OK.

15    Q.  First with respect to actual cash and money as of August

16    30, how much did you and your wife have together?

17    A.  $117.52.

18    Q.  And with respect to the equities in this account, how much

19    did you and your wife have together?

20    A.  $7,116.86.

21    Q.  Then turning your attention to the second to last page of

22    the exhibit --

23    A.  Yes.

24    Q.  -- there is something here that indicates Retirement

25    Optimizer.  Do you see that?

D93njoh3                    Carmona - direct

1    A.  Yes, I do.

2    Q.  Is that a joint annuity between you and your wife?

3    A.  Yes, it is.

4    Q.  What is the value of that?

5    A.  $65,547.75.

6    Q.  Thank you.  Mr. Carmona, do you also have a joint holding

7    with your brother?

8    A.  Yes, I do.

9              THE COURT:  Let me interrupt you.  Just so I'm sure,

10   the fifth box down on this jury aid, which is PD-5 for

11   identification, is that not what we have been talking about,

12   just this moment?

13             MS. KREBS:  Are you asking me, your Honor?

14             THE COURT:  Yes.

15             MS. KREBS:  What we have been talking about are the

16   two different ones, the one that's the fifth box down and the

17   sixth box down.

18             The fifth box down is the assets that are listed

19   between the cash money and the equities for a total of

20   $72,034.38.  Then there is a separate annuity that's called the

21   retirement optimizer that we just referred to, and that's the

22   next box down.

23             THE COURT:  Very well.  OK.

24             I am putting them together.  But that's fine.

25             MS. KREBS:  Permission to approach, your Honor?

1          THE COURT:  Yes.

2          I presume the plaintiff has been graced with a copy?

3          MS. MESIDOR:  We have one, your Honor.  Thank you.

4     BY MS. KREBS:

5     Q.  I am showing you a document that's been marked, I think

6     it's PD-11 for identification.

7     A.  Yes.

8     Q.  Is this the account that you were just speaking about a

9     moment ago that you jointly hold your brother?

10    A.  Yes, my brother Raul, my younger brother.

11    Q.  I'm sorry?

12    A.  My younger brother.

13    Q.  I'm sorry.  What was his name?

14    A.  Raul.

15    Q.  Raul.  Your younger brother Raul.

16          When you opened this account how much money was

17    initially put in, in total?

18    A.  $10,000.

19    Q.  And how much of that did you put in?

20    A.  Five.

21    Q.  And how much did he put in?

22    A.  Five.

23    Q.  And according to this, as of July 12, 2013, what is the

24    account balance, the value of this account?

25    A.  $12,380.43.

D93njoh3                    Carmona - direct

1          MS. KREBS:  Your Honor, we ask that this document be

2     admitted into evidence.

3          THE COURT:  Any objection?

4          MS. MESIDOR:  No objection, your Honor.

5          THE COURT:  Very well.  PD-11 for identification will

6     be admitted.

7          (Defendant's Exhibit PD-11 received in evidence)

8     Q.  In addition to joint holdings that you have with your wife

9     and/or your brother, do you have any holdings that are yours

10    alone?

11    A.  Yes, I do.

12         MS. KREBS:  Permission to approach, your Honor?

13         THE COURT:  Yes.

14    BY MS. KREBS:

15    Q.  Mr. Carmona, does this reflect --

16         MS. MESIDOR:  Objection, your Honor.  We don't know

17    what document we are looking at.

18         MS. KREBS:  I'm sorry.

19         I forgot to show you when I was walking up.

20         MS. MESIDOR:  Thank you.

21         MS. KREBS:  My apologies.

22    BY MS. KREBS:

23    Q.  Mr. Carmona, is this document reflective of an account that

24    you hold in only your own name at Merrill Lynch?

25    A.  Yes, it does, ma'am.

1    Q.  According to the documentation, as of August 30, 2013, how

2    much did you have in the account in terms of cash and money?

3    A.  $675.20.

4    Q.  Then, going to the second to last page of this document, do

5    you see the mention of Pru Premier Retirement X?

6    A.  Uh-huh.

7    Q.  Yes?

8    A.  Oh, yes.

9    Q.  Do you see it?  I'm sorry "uh-huh" won't show up on the

10   record.

11   A.  OK.

12   Q.  As of the date of this statement, what is the value of the

13   account?

14   A.  21,440 bucks.

15            MS. KREBS:  Your Honor, we ask that this document be

16   admitted into evidence.

17            THE COURT:  Any objection.

18            MS. MESIDOR:  No objection, your Honor.

19            THE COURT:  Very well.  12 for identification will be

20   admitted.

21            (Defendant's Exhibit PD-12 received in evidence)

22            MS. KREBS:  Permission to approach.

23            THE COURT:  Very well.

24   BY MS. KREBS:

25   Q.  Do you have in front of you the document that's been marked

1    PD-13 for identification?

2    A.  Yes, I do.

3    Q.  What does this document reflect?

4    A.  The total value of the account as of July 31, 2013.

5    Q.  Which account is this?

6    A.  The Axa investment account.

7    Q.  As of July 31, 2013, what was the value of that account?

8    A.  $1,024.55.

9    Q.  $1,024?

10   A.  Twenty-four dollars and fifty-five cents, right.

11            MS. KREBS:  Your Honor, we ask that this document be

12   admitted into evidence.

13            THE COURT:  Any objection?

14            MS. MESIDOR:  No objection, Your Honor.

15            THE COURT:  All right.

16            13 is admitted without objection.

17            (Defendant's Exhibit PD-13 received in evidence)

18            MS. KREBS:  Permission to approach?

19            THE COURT:  Very well.

20   BY MS. KREBS:

21   Q.  Mr. Carmona, do you have in front of a document that's been

22   marked as Exhibit PD-14?

23   A.  Yes, I do.

24   Q.  What is this?

25   A.  My tax returns from last year.

D93njoh3                    Carmona - direct

1   Q.  For the year 2012?

2   A.  '12, right.

3   Q.  This is a joint tax return?

4   A.  Yes, it is.

5   Q.  What was your taxable wages for the year 2012?

6   A.  $157,354.

7   Q.  The number that is on there, the taxable wages of the

8   $157,354, you are filing jointly, but is that solely your

9   income?

10  A.  Yes.

11          MS. KREBS:  Your Honor, we ask that this document be

12  admitted into evidence.

13          THE COURT:  Any objection?

14          MS. MESIDOR:  No objection, your Honor.

15          THE COURT:  PD-14 is admitted without objection.

16          (Defendant's Exhibit PD-14 received in evidence)

17  BY MS. KREBS:

18  Q.  Mr. Carmona, assuming that your employment were to continue

19  as it has been, what do you anticipate your taxable wages will

20  be for the year 2013?

21  A.  About 152,000.

22  Q.  Do you receive any bonuses from STRIVE?

23  A.  No.

24  Q.  Have we encompassed all of the holdings that you have that

25  may be considered for purposes of punitive damages?

1   A.  Yes, we have.

2   Q.  I'm done asking you about the financial component of it.  I

3   just have a couple of questions to ask you.

4           Mr. Carmona, what were your intentions when you

5   communicated with Ms. Johnson during her employment?

6           MS. MESIDOR:  Objection, your Honor.

7           THE COURT:  Overruled.

8   A.  We had been talking for the whole time she was there, and I

9   was just trying to help her, as all our conversations were

10  about.

11  Q.  What, if anything, has the jury's verdict instructed you?

12  A.  Excuse me.  Well, this has really made me kind of take

13  stock on when I communicate with people that I am trying to

14  help and try to elicit or get them to understand up front that

15  what I am doing is trying to help.

16          In a lot of respects I come from a different time.

17  Hence the transition.  I guess it's showing me that I got to

18  really take stock about that at my age.

19          MS. KREBS:  Thank you, Mr. Carmona.

20          I have no further questions.

21          THE COURT:  Any cross?

22          There is a Kleenex box if you like.

23          THE WITNESS:  Thank you.

24          (Continued on next page)

25

1    CROSS-EXAMINATION

2    BY MS. MESIDOR:

3    Q.  Mr. Carmona, your current address 170 Prospect Avenue in

4    Hackensack, New Jersey, is that correct?

5    A.  No.

6    Q.  When you were deposed in June 4th, 2013, your address was

7    70 Prospect Avenue Hackensack, New Jersey, is that right?

8            MS. KREBS:  Objection, your Honor.

9            THE COURT:  Overruled.  I have no idea where she is

10   going, but I will listen.

11   A.  No.  It was 175 Prospect Street.

12   Q.  Is your address currently 175 Prospect?

13   A.  At this moment, yes.

14   Q.  So you don't live in the house in Teaneck, is that correct?

15   A.  Not at the moment.

16   Q.  You don't live in the house in Teaneck because you and your

17   wife are separated, is that correct?

18           MS. KREBS:  Objection, your Honor.

19           THE COURT:  Overruled.

20   A.  Yes, we are.

21   Q.  In the tax returns that you filed jointly with your wife,

22   Mr. Carmona, your wife's income is not reflected in the tax

23   returns, is that correct?

24           MS. KREBS:  Objection, your Honor.

25           THE COURT:  Overruled.

1          THE WITNESS:  Yes, it is.

2     Q.  Can you please show us on PD-14 where your wife's income is

3     reflected on the tax return that you provided to the jury?

4          MS. KREBS:  Objection, your Honor.  Confidential.

5          THE COURT:  Indeed on the tax return how much is it,

6     do you know?

7          THE WITNESS:  My wife's income?

8          THE COURT:  Yes.

9          THE WITNESS:  I can a hazard a guess, your Honor.

10         THE COURT:  We're talking a lot of money?

11         THE WITNESS:  No.  I would hazard a guess it is under

12    $15,000.

13    BY MS. MESIDOR:

14    Q.  Going also in your tax returns I am going to draw your

15    attention to page 6 of your tax return.  It is the schedule

16    your tax return and your tax return is Exhibit PD-14.

17    A.  Which page again?

18    Q.  It is the Schedule E.  It is the sixth page.  You will have

19    to count it out.

20    A.  I got it.

21    Q.  Do you see the Schedule E?

22    A.  Sorry.  Yeah, I got it.

23    Q.  You get $16,000 in rent on the Teaneck property, isn't that

24    correct?

25         THE COURT:  Line three.  It is not a trick question.

1    A.   Yes.

2    Q.   Could you show us in the flow chart that you have provided

3    to the jury as a jury aide where that $16,000 in rent is

4    reflected?

5    A.   Not there.

6    Q.   Moving along.  We're not going to the bank account

7    statement.

8    A.   Which one?

9    Q.   I am going to tell you in just one moment.  The Citibank

10   statement.

11   A.   Got it.

12   Q.   Now, your basic checking has -- you previously testified

13   that the your basic checking has a balance of $275.  But you

14   have preferred money market balance of over $7,000, isn't that

15   correct?

16   A.   Yes, it is.

17            MS. KREBS:  Objection, asked and answered.

18            THE COURT:  Not on cross.  The other side, they get an

19   opportunity to cross-examine.

20   Q.   You have an individual retirement account with Citibank, is

21   that correct?

22            MS. KREBS:  Objection.

23            THE COURT:  Overruled.

24            MS. KREBS:  Objection.

25   Q.   Do you have an individual retirement account at Citibank?

1    A.  Me, myself?

2    Q.  Yes, sir?

3    A.  No.  It's my wife's.

4            THE COURT:  If it were, you weren't supposed to ask

5    about it.

6            MS. MESIDOR:  Your Honor, there is no indication who

7    it belongs to.  That is why I asked about it.

8            THE COURT:  Is that right?  It didn't matter who it

9    belonged to.  It would have been preferable if you asked me

10   first if you could inquire since it is petty clear what the law

11   is with respect to IRAs.

12           MS. MESIDOR:  Your Honor, then I withdraw my question.

13           THE COURT:  That's kind of you.  Like I said earlier

14   on it didn't matter in this instance, because it is very hard

15   once the genie is out to put it back in the bottle.

16           MS. MESIDOR:  My sincere apologies.  We had gone over

17   the other investment and retirement accounts and I thought it

18   was appropriate, but I stand firmly corrected.

19           THE COURT:  Very well.  Why don't we adjourn to lunch

20   everybody.  That will make it easy.  We'll see you in, let's

21   say, quarter to 2:00.  Since your lunch is here, it will not

22   take you so long to eat it.

23           (Jury excused)

24           (Continued on next page)

25

1          (In open court; jury not present)

2          THE COURT:  I have a charge and a verdict sheet.  Why

3     don't we come back in 35 minutes and I'll go over it with you.

4     We can come back in 40 minutes and it will still be plenty of

5     time.  Have a good lunch.

6          (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          A F T E R N O O N   S E S S I O N

2                          1:45 p.m.

3          (In robing room)

4          THE COURT:  I think you all have this charge.  If

5     there are any problems in this punitive damages charge, this is

6     the time to let me know.  The verdict sheet is underneath or on

7     top.

8          Anything?

9          MS. MESIDOR:  Yes, your Honor.  Being that the prior

10    verdict form already did the analysis that your Honor is

11    requesting in paragraph two, we would ask that that entire

12    paragraph be removed as well as the first two sentences on page

13    3 on the last paragraph.  If memory serves correctly, your

14    Honor, the last verdict sheet asks the jurors whether they

15    thought that punitive damages should be awarded and they

16    indicated yes.  That instruction was already given to them as

17    to whether or not they believe punitive damages should be

18    awarded.  They indicated it should be awarded.  At this point

19    it is just a matter of putting down a specific amount.

20          However, the second paragraph goes into if you think

21    punitive damages should be awarded, here is what punitive

22    means, etc., etc., and you give the definition of reckless

23    indifference and malice which all goes towards the issue of

24    whether punitive damages should be given, which is an issue

25    that has already been decide.  I think what your Honor states

1    in the first paragraph and the three bullet items on the third

2    page is the requisite analysis that they should be making at

3    this point.  So I feel that the second paragraph as well as the

4    first three sentences in the last paragraph of page three

5    should be taken out.

6              THE COURT:  Do defendants share that view?

7              MS. KREBS:  No, your Honor.  We're happy with the

8    charge the way it is written.  I think it is appropriate to

9    restate the standard especially since it has been over a long

10   weekend and the jury is not expected to recall the exact

11   standard by which they are to apply it.  Given the fact that

12   punitive damages are discretionary, not only overall but

13   certainly with respect to each particular defendant, I think

14   that the charge is correct and we would ask that it be

15   delivered exactly as written.

16             THE COURT:  I think I will leave it this way.

17             MS. MESIDOR:  Your Honor, we simply request our

18   objection be noted for the record.  That's it.

19             THE COURT:  Let's go.  Maybe we'll get the jury out

20   and ready to go.

21             (Continued on next page)

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  All right everybody.  I hope you enjoyed

3     the government's fare.  I think we'll continue with cross.

4          MS. MESIDOR:  Your Honor, is it possible that we can

5     have the last question and answer read so that I know where I

6     left off.  I don't believe I have much left.

7          THE COURT:  You have to say that again.

8          MS. MESIDOR:  I am sorry, your Honor.  I was inquiring

9     whether it be permissible for you to instruct the court

10    reporter to read back the last question and the last answer.

11         THE COURT:  Absolutely.  If she could find it.

12         There are simply areas like there are in other

13    situations in which there are exclusions from what can be

14    utilized for punitive damages and IRAs are one of them.  It is

15    a fairly clear statutory requirement.  So how much it is,

16    whether there is one, whether it is his or hers, it doesn't

17    really matter.  It should not have been gone into and she

18    understood that.

19         MS. MESIDOR:  My apologies again, your Honor.

20         THE COURT:  That's all right.

21    BY MS. MESIDOR:

22    Q.  Moving on to what has been marked as PD-11, do you have

23    that exhibit before you, Mr. Carmona?

24    A.  Yeah.

25    Q.  Mr. Carmona, you previously testified that this account

1   reflected an investment fund that you have with your brother?

2   A.  Yes.

3   Q.  Is your brother named on this account?

4   A.  No, it is not.

5   Q.  Thank you.

6       Mr. Carmona, isn't it true that your home in Teaneck

7   has a tax assessed value of $407,000?

8   A.  I don't know.  What are you looking at?

9       MS. MESIDOR:  Your Honor, may I approach the witness?

10      THE COURT:  You may.

11      MS. MESIDOR:  Your Honor, I have a document for

12  impeachment purposes.  I would like to give it to the Court

13  before I show it to the witness.

14      THE COURT:  Very well.  Is this your only copy, is

15  that what you are trying to tell me?

16      MS. MESIDOR:  Yes, your Honor.  It is only for

17  impeachment purposes.

18      MS. KREBS:  I understand it is for refreshing

19  recollection purposes to the extent that it does that.

20      THE COURT:  We'll see what it does.  It is really a

21  jury question.  In any event if that is what it is for, I have

22  no reason to examine it more carefully.

23      Look at it, Mr. Carmona.  See if it refreshes your

24  recollection.  That doesn't mean it has to turn a little light

25  on in your head.  It is not a question of reading it off the

1  piece of paper.

2  BY MS. MESIDOR:

3  Q.  Mr. Carmona, I will draw your attention to the second page

4  of the document.

5  A.  Uh-huh.

6  Q.  Do you see highlighted portion?

7  A.  Yes.

8  Q.  Do you see where it --

9          MS. KREBS:  Objection.  She is reading a document that

10  is not admitted into evidence.

11          THE COURT:  We're going to ask him if it refreshes his

12  recollection.  You mentioned what you believe it says and what

13  it means is another issue, but we'll not go into it.

14          MS. MESIDOR:  Absolutely, your Honor.  That was going

15  to be my next question.

16  Q.  Do you see the highlighted portion there, sir?

17  A.  Yes, I do.

18  Q.  Does that refresh your recollection as to what the tax

19  assessed value of the home is?

20  A.  I never seen this paper before.

21          THE COURT:  So the answer is no.

22  Q.  You can remove the document from you, sir.

23          Do you currently pay taxes at the Teaneck home?

24  A.  Yes, we do.

25  Q.  Approximately what are the taxes that you pay per year on

1    that home?

2    A.  I don't know.  I don't care of that stuff.  My wife has

3    been doing that for years.  I really don't.

4    Q.  As it relates to your Tampa, Florida home, isn't it true,

5    Mr. Carmona, that that land has -- that property has a tax

6    assessed value of $114,000?

7    A.  Excuse me?

8    Q.  Isn't it true that the Tampa home -- it is not on the

9    document, sir.  I am asking you you question.  The Tampa home

10   has an assessed value -- tax value of $114,000?

11   A.  I don't know.

12   Q.  Mr. Carmona, when you were asked on direct how you feel

13   about the verdict now, you had indicated that it was requiring

14   you to take a certain amount of stock, is that correct?

15   A.  Yes.

16   Q.  Mr. Carmona, previously when you were being cross-examined

17   on this case, you were pointed to various aspects in your

18   conversation with Ms. Johnson when she indicated to you that

19   she was offended by your comment, is that right?

20   A.  Yeah.

21             MS. KREBS:  Objection.

22             THE COURT:  I will allow it.  It is cross.

23   Q.  Mr. Carmona, in response to her saying that you were

24   offended, you said you didn't care that she was offended, isn't

25   that correct?

1   A.  No.  I didn't say that.

2   Q.  You didn't say that, Mr. Carmona?

3   A.  That I didn't care?

4   Q.  Yes.  You said you can be offended if you want to, but it

5   is true.  Isn't that what you said?

6   A.  Yes, I did say that.

7   Q.  And, Mr. Carmona, when my opposing counsel gave you an

8   opportunity to apologize to Ms. Johnson, you declined to do so,

9   is that right?

10  A.  Yes.

11  Q.  That was Wednesday, was it not, Mr. Carmona?

12  A.  Yes, it was.

13          MS. MESIDOR:  No further questions for this witness.

14          THE COURT:  Any redirect?

15          MS. KREBS:  Yes, very briefly, your Honor.

16  REDIRECT EXAMINATION

17  BY MS. KREBS:

18  Q.  Mr. Carmona, you were asked on cross-examination about that

19  you currently reside in an address of 175 Prospect Street.  Do

20  you recall that?

21  A.  Yes.

22  Q.  Do you own that property?

23  A.  No.

24  Q.  Do you pay a rental amount on that property?

25  A.  Yes.

1   Q.  You also were asked about a flow chart that was provided as

2   a jury aide.  Just for clarification, did you write that flow

3   chart?

4   A.  No, I did not.

5   Q.  You were asked about the exhibit with your tax return?

6   A.  Right.

7   Q.  You were asked about --

8           THE COURT:  14.

9           MS. KREBS:  Excuse me, your Honor?

10          THE COURT:  14.

11          MS. KREBS:  Thank you, your Honor.

12  Q.  Exhibit PD-14 you were asked about the alleged rental

13  income --

14  A.  Yes.

15  Q.  -- that you have earned from the Tampa property?

16  A.  Yes.

17  Q.  Do you have the document in front of you?

18  A.  Yes, I do.

19  Q.  Could you turn to that page.  I believe it is the sixth

20  page in the document itself.

21          THE COURT:  Schedule E.

22  A.  Yes.

23  Q.  In looking at the entirely of that page as opposed to that

24  first line about rents received, after expenses and alike did

25  you show a profit or a loss on that home?

1   A.  We showed a loss of 500 bucks and change.

2            MS. KREBS:  Nothing further, your Honor.

3            THE COURT:  You are excused.  Thank you very much.

4            What is next?

5            MS. KREBS:  We have no more witnesses, your Honor.

6            THE COURT:  You may step down, Mr. Carmona.

7            (Witness excused)

8            THE COURT:  Does the plaintiff have any witnesses?

9            MS. MESIDOR:  No, your Honor.

10            THE COURT:  Why don't I charge you now.  Why waste any

11   time.  You just had lunch.  You are shall bright eyed and bushy

12   tailed and ready to work.  So here we go.  It is a single

13   charge.

14            MS. KREBS:  Your Honor, I apologize for interrupting.

15   I wanted to know are the parties going to get a few minutes to

16   just sum up on the punitive damages part?

17            THE COURT:  If you want to sum up, you can do that.  I

18   will be glad to let you do that now.  You want time to think it

19   over?

20            MS. KREBS:  No.  I wanted to know if your Honor was

21   going to allow us the opportunity.

22            THE COURT:  I am perfectly happy.  If you want to sum

23   up, I want you to sum up.  You go first.

24            MS. KREBS:  Thank you, your Honor.

25            THE COURT:  Keep in mind it was very brief here.

1          MS. KREBS:  And I intend my closing remarks on this to

2     be equally brief.

3          THE COURT:  Well, I am sorry I pushed you further than

4     maybe I should have.  You can turn it towards the jury, the

5     podium, if you like or you can stay right there.

6          MS. KREBS:  I am fine, your Honor.  I can see each of

7     the jurors.  I think they can see me.

8          THE COURT:  If you are fine, I am fine.

9          MS. KREBS:  Thank you, your Honor.  Ladies and

10    gentlemen of the jury, I just want to address you for a few

11    moments with respect to the issue of punitive damages.

12    Obviously this is an important decision for you to make.  I

13    want to take a few moments because there was a lot of number

14    crunching and listing.  I wanted to crunch it a little bit

15    together for you and address that aspect.

16          First, I just want to talk about STRIVE.  I think the

17    testimony was very demonstrative of the fact that STRIVE is not

18    in a great financial situation.  Almost 90 percent of their

19    income as testified to by Mr. Milton is encumbered, which means

20    it is designated for various specific purposes by contract or

21    law and therefore cannot be used to pay any sort of punitive

22    damages award.  I understand that plaintiff's counsel tried to

23    draw your attention time and time again to listing of assets,

24    but of course looking at assets really doesn't mean looking at

25    liability as well.  It is not gross assets that matter.  It is

1    damages that matter.  Particularly we are talking about their

2    assets.  A very significant portion of their assets are in

3    these lease hold improvements that they cannot take with them.

4    It is paint on the wall, carpet on the floor.  Things that

5    cannot be turned into liquidity for purposes of paying punitive

6    damages award.

7        Mr. Milton, CPA, with many years of experience

8    testified about the financial condition of STRIVE.  I think it

9    is important to note that as he pointed out he is not an actual

10   employee the STRIVE.  He is an independent contractor,

11   consultant.  He has a certain amount of separateness

12   objectivity that he brings to his testimony.  He explained that

13   as of the end of July of 2013, STRIVE was barely in the black.

14   It was just over $8,600 in terms of its net assets.

15       In addition, Mr. Weinberg testified and he told you

16   that STRIVE is taking your decision on the compensatory damages

17   stage of the case very seriously.  They have already decided to

18   implement certain changes based on that to try and improve the

19   circumstances at STRIVE.  He indicated that there may be very

20   well be more on the way, but it has been a short time since the

21   decision was rendered.  So there has not been too much time to

22   contemplate other types of changes.

23       Plaintiff herself during her own testimony during the

24   primary portion of the case admitted that STRIVE does good

25   work.  I would like you to just keep that in mind when you

1   think about how much, if any, punitive damages to assess

2   against STRIVE.

3          Now I want to turn for a moment to Mr. Carmona.  I am

4   not going to tell you that Mr. Carmona is in dire straits as

5   STRIVE is as an individual, but we're not talking about an

6   individual who is rich.  Other than the houses, which are both

7   heavily encumbered, over $130,000 on his house in New York --

8   rather in New Jersey and $94,000 on his house in Tampa, other

9   than that he has very few other assets.  He has about $23,000

10  in assets that are solely in his name and he has approximately

11  a total of maybe, again aside from the house, approximately

12  $90,000 in assets.  Those are co-owned with other individuals.

13  Those two other individuals are either his brother or his wife.

14  Neither of whom are parties in this case.

15         Mr. Carmona also did testify that your verdict the

16  other day has caused him to reassess how he communicates and

17  the fact that though he may have intentions of trying be

18  helpful and positive and constructive, perhaps others don't see

19  it the same way.  Again, I just ask you to take all of those

20  things into account when you consider the amount, if any, of

21  punitive damages that are needed to award against Mr. Carmona

22  in accordance with purposes of punitive damages, which the

23  Court will instruct you momentarily.

24         I thank you very much for your time, not only today

25  but throughout the course of this trial.  I realize it has been

1    many days and we do appreciate your service.  Thank you.

2              THE COURT:  Does the plaintiff wish to sum up?

3              MS. MESIDOR:  Yes, your Honor.  Ladies and gentlemen

4    of the jury, I find myself before you again to address the

5    level of offense which Mr. Carmona and STRIVE did to my client

6    Ms. Brandi Johnson.  As you look upon the financial condition

7    of both parties and move forward as to what can be

8    appropriately assessed, the questions that I would ask that you

9    ask yourselves are:  How reprehensible or offensive was that

10   which STRIVE and Mr. Carmona did to Ms. Johnson?  The second

11   question I would like you to ask yourselves is:  How much based

12   on each of their individual financial condition do you believe

13   would serve as a sufficient deterrent so that they never do

14   this again?

15             A lot of numbers have been laid out before you.  I've

16   addressed and I have highlighted my issues regarding these

17   numbers.  Because while we do have a flow chart that shows the

18   amount of revenue that came in this year and the amount of

19   money that was spent this year, the flow chart does not

20   represent how much they already had at the beginning of the

21   year.  The other issue that I highlighted to you was how much

22   of the money that came in this year and was spent this year was

23   actually restricted.  Now, this number of 90 percent of it is

24   indeed restricted has been thrown around.  However, when you

25   look at very chart that defendants give you, if you add up the

1  three categories of unrestricted funds, it actually totals up

2  to more than 10 percent of it being unencumbered in any way.

3       While STRIVE can tell you right now how they've had

4  difficulty making ends meet and alike, you also must take into

5  consideration that STRIVE stood by this decision.  They stood

6  by Mr. Carmona when he used the N-word and called my client the

7  N-word and tried to adapt it as part of their tough-love

8  culture.  If indeed they had any fear or wanted to protect the

9  good work that they did, they should have done more than what

10  they have done to date.  The only corrective action that you

11  heard about anything in regards to the year and change that

12  they have known about this litigation and the accusation

13  therein is one sexual harassment course.  While Mr. Weinberg

14  can get on the stand and tell you about his plans about what he

15  plans to do, it would seem that what has already been

16  established of what they have done over the past year is nil.

17       Ladies and gentlemen, calling somebody the N-word is a

18  very serious thing.  I have already highlighted to you during

19  the first portion of our trial as well as my summation the

20  level of impact that doing such a thing has.  However, you've

21  also heard that the compensatory damages that you've already

22  awarded will probably be covered by insurance and if you give

23  the defendants no punitive damages, you have essentially let

24  them get away with it because no money out of their own

25  operating account, out of STRIVE's own pocket, out of Mr.

1   Carmona's own pocket is going to toward the punitive damages.

2   If what you heard in this trial is indeed reprehensible, if

3   what happened to my client is something that you indeed are

4   taking a stand against, we need more than just you saying they

5   discriminated against you.  We need you to hit where it hurts

6   and that is directly in the pocket.  We're not indicating that

7   STRIVE should be bankrupt and they should not continue in doing

8   what they have done.  What we are indicating is that there need

9   to be a serious look and serious change as to how they continue

10  to conduct business.  Without the message that if you do this

11  it is going to hurt in your pockets, I am not convinced anymore

12  than I am convinced by Mr. Carmona's ghost tears on the stand

13  that any change will indeed come.  Thank you.

14          THE COURT:  You've already determined that the

15  plaintiff is entitled to punitive damages.  Now you have heard

16  all of the evidence in this case.  The only issue remaining is

17  the amount, if any, of punitive damages to which you find the

18  plaintiff is entitled.  As you know in addition to the

19  compensatory damages that you've already awarded the plaintiff,

20  the law permits the jury under limited circumstances to award

21  an injured person punitive damages.

22          Now that you have found that STRIVE and Mr. Carmona

23  discriminated and retaliated against the plaintiff, you must

24  decide whether these defendants acted with a requisite malice

25  or reckless indifference that permits you to award punitive

1    damages.  Malice is, as I explained last week, defined as the

2    intent without justification or excuse to commit a wrongful

3    acts.  Reckless indifference is defined as the conscious

4    disregard of harm that one's actions could do for the interests

5    or rights of another.  If you find that these defendants acted

6    with malice or reckless disregard then in addition to any

7    actual or nominal damages to which you find the plaintiff

8    entitled, you may, but are not required to award the plaintiff

9    an additional amount as punitive damages if you find it is

10   appropriate to punish these defendants or to deter these

11   defendants and others from similar conduct in the future.

12        You must consider Mr. Carmona and STRIVE separately

13   when determining what amount, if any, to award in punitive

14   damages against either defendant.  If you determine that either

15   of the defendants' conduct justifies an award of punitive

16   damages, then you may award an amount of punitive damages which

17   all jurors agree is proper.  In fixing the amount you should

18   consider the following questions:

19        How offensive was the conduct?

20        What amount is needed considering each defendants'

21   financial condition to prevent future repetition of this

22   conduct

23        Does the amount of punitive damages have a reasonable

24   relationship to the actual damages awarded?

25        The award of punitive damages is within your

1    discretion.  You are not required to award them.  If you decide

2    to award punitive damages, you must use sound reason in setting

3    the amount -- it must not reflect bias, prejudice or sympathy

4    toward any party.  But the amount may be as large as you

5    believe necessary to fulfill the purposes of punitive damages.

6    You may impose punitive damages against one of the defendants

7    and not the other or against both defendants in different

8    amounts.

9              Again, ladies and gentlemen, all of what I told you in

10   my earlier charge and all of the role of the jury plays is the

11   same as it was last week.  Indeed, there is a verdict form

12   which I will also hand out after the marshal has been sworn and

13   you begin your deliberations.

14             Again, if there is any part of the testimony or any

15   part of my charge, this charge, that you want, all you need do

16   is ask the foreman write me a note and we'll provide it to you.

17             Do we have a marshal?

18             THE DEPUTY CLERK:  Yes, your Honor.

19             (Marshal sworn)

20             THE COURT:  Please don't take the two jury aides that

21   were passed out since they are not in evidence.

22             (At 2:15 p.m., the jury retired to deliberate)

23             THE COURT:  Everybody, you are welcome to sit down and

24   wait.  We'll be available.

25             (Recess pending verdict)

1          (In open court; jury not present)

2          THE COURT:  There is a note from the jury that we will

3     put on the record.  It reads, We the jury have come to a

4     verdict.  It is 9-3-2013, Richard Schwartz, 3:45 p.m.  I don't

5     know what number court exhibit it is.

6          THE DEPUTY CLERK:  Court Exhibit J.

7          THE COURT:  Thank you.

8          THE DEPUTY CLERK:  Jury entering.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D936joh6

1        (In open court; jury present)

2        THE COURT:  Are you going to take them through it.

3        THE DEPUTY CLERK:  Will do.

4        THE COURT:  The foreperson should rise and my clerk

5   will take the verdict.

6        THE DEPUTY CLERK:  12 CV 4460, Brandi Johnson V STRIVE

7   East and Robert Carmona.

8        Verdict Form One:  What amount of punitive damages, if

9   any, did plaintiff prove by a preponderance of the evidence to

10  each defendant, Rob Carmona?

11       THE FOREPERSON:  $25,000.

12       THE DEPUTY CLERK:  STRIVE East Harlem?

13       THE FOREPERSON:  $5,000.

14       THE COURT:  Thank you.

15       Do you want the jury polled this time?

16       MS. MESIDOR:  Yes, your Honor.

17       THE COURT:  Very well.

18       (Jury polled; each juror answered in the affirmative)

19       THE COURT:  Ladies and gentlemen, you have worked

20  beyond the call of duty.  I thank you for your efforts.  I

21  think we have come to the end of the line.  So with my thanks,

22  you are discharged.

23       (Jury discharged)

24       THE COURT:  Ladies and gentlemen, any motions that you

25  choose to make, please make in conformity with the federal

1  rules, which I am sure you will find fairly generous but indeed

2  there need be more time, although I think it is jurisdictional,

3  if you both agree, I assume we can give you more time.

4         Thank you all.  Have a good week and I think probably

5  we may or may not see you again.

6         MS. MESIDOR:  Thank you your Honor.

7         MS. KREBS:  Thank you, your Honor.

8         THE DEPUTY CLERK:  All rise.

9                        o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination of:                          Page

3    ANDREW MELTON

4    Direct By Ms. Krebs . . . . . . . . . . . 668

5    Cross By Ms. Mesidor . . . . . . . . . . . 694

6    Redirect By Ms. Krebs . . . . . . . . . . 701

7    PHILIP WEINBERG

8    Direct By Ms. Krebs . . . . . . . . . . . 703

9    Cross By Ms. Mesidor . . . . . . . . . . . 708

10   Redirect By Ms. Krebs . . . . . . . . . . 713

11   ROB CARMONA

12   Direct By Ms. Krebs . . . . . . . . . . . 714

13   Cross By Ms. Mesidor . . . . . . . . . . . 738

14   Redirect By Ms. Krebs . . . . . . . . . . 749

15                    PLAINTIFF EXHIBITS

16   Exhibit No.                          Received

17    PD-2  . . . . . . . . . . . . . . . . . 675

18    PD-3  . . . . . . . . . . . . . . . . . 678

19                    DEFENDANT EXHIBITS

20   Exhibit No.                          Received

21    PD-1  . . . . . . . . . . . . . . . . . 670

22    PD-6  . . . . . . . . . . . . . . . . . 717

23    PD-7  . . . . . . . . . . . . . . . . . 722

24    PD-9  . . . . . . . . . . . . . . . . . 728

25    PD-10 . . . . . . . . . . . . . . . . . 730

1    PD-11  . . . . . . . . . . . . . . . . . 733

2    PD-12  . . . . . . . . . . . . . . . . . 734

3    PD-13  . . . . . . . . . . . . . . . . . 735

4    PD-14  . . . . . . . . . . . . . . . . . 736

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25