BRANDI JOHNSON,

               Plaintiff,

     -against-

STRIVE EAST HARLEM EMPLOYMENT
GROUP, LISA STEIN, individually, ROB
CARMONA, Individually and PHIL
WEINBERG, Individually,

               Defendants.

**Case No.: 12-CIV-4460 (HB)(MHD)**

---

## **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' POST-TRIAL MOTIONS**

---

**GORDON & REES, LLP**
ATTORNEYS FOR DEFENDANTS
90 BROAD STREET
NEW YORK, NEW YORK 10014
TEL: (212) 269-5500
FAX: (212) 269-5505

# TABLE OF CONTENTS

Page No.

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ......................................................................................1

    A.    STRIVE'S RECEIPT OF THE PATHWAYS OUT OF POVERTY GRANT ...........1

    B.    PLAINTIFF'S COMMENCEMENT OF EMPLOYMENT WITH STRIVE .............1

    C.    INTERACTIONS DURING HER FIRST SIX MONTHS OF EMPLOYMENT. ......2

    D.    INTERACTIONS AFTER STEIN BECAME HER SUPERVISOR. .........................2

        1.    "Happy to Be Getting a Check" Comment ....................................................3

        2.    Incident with Precious .................................................................................3

        3.    Dwayne Hubbard Incident .............................................................................3

        4.    March 14, 2012 "N" Word Incident ..............................................................4

    E.    JANUARY 2012 EXTENSION OF THE GRANT. ...............................................5

    F.    PLAINTIFF'S APRIL 2012 COMPLAINT AND ALLEGED RETALIATION ........6

        1.    "Wrap it Up" Incident ..................................................................................6

        2.    Jamar Cooks Incident ...................................................................................7

        3.    "Put This Bitch In a Smash" Incident ..........................................................7

    G.    PLAINTIFF'S TERMINATION AND COMMENCEMENT OF THIS LAWSUIT .7

    H.    PLAINTIFF'S ALLEGED DAMAGES ................................................................8

ARGUMENT ..........................................................................................................8

POINT I:  DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ............8

    A.    Applicable Standard Under Fed. R. Civ. P. Rule 50(b). .................................8

    B.    Plaintiff's City Human Rights Law ("CHRL") Claims Fail As A Matter of Law. .......9

        1.    Plaintiff's Race and Gender Discrimination Claims Fail As A Matter of Law 9

        2.    Plaintiff's Gender and Race Harassment Claims Fail As A Matter of Law ... 11

        3.    Plaintiff's Retaliation Claims Fail As A Matter of Law. .............................. 14

    C.    Plaintiff Is Not Entitled to Punitive Damages As A Matter of Law. ....................... 16

POINT II:  IN THE ALTERNATIVE, THE COURT SHOULD GRANT A NEW TRIAL ............. 17

    A.    The Jury's Verdict is Against the Clear Weight of The Evidence ........................... 17

    B.    The Trial Court Was Not Fair And/Or Substantial Evidentiary Errors Occurred ...... 18

        1.    Defendants Were Prevented From Fully Testifying ..................................... 18

        2.    Plaintiff's Criminal Conviction .................................................................. 19

        3.    Testimony Regarding Plaintiff's Therapists ................................................ 19

        4.    Testimony By Maria Ortiz ........................................................................... 20

i

Page No.

     5.    Impeachment of Plaintiff Regarding "Put This Bitch In a Smash" Incident..20

     6.    Preclusion of Phil Weinberg's Investigation Notes ......................................20

   C.    The Damages Awarded to Plaintiff Were Excessive and Should Be Remitted ........21

POINT III:  DISMISSAL IS WARRANTED FOR INTENTIONAL DISCOVERY
           VIOLATIONS. ........................................................................................................23

CONCLUSION ..................................................................................................................25

# TABLE OF AUTHORITIES

Page No.

**Cases**

*Abel v. Town Sports Int'l*, LLC,
  U.S. Dist. LEXIS 183444 (S.D.N.Y. Dec. 18, 2012)....................................................... 11

*Adam v. Glen Cove Sch.*,
  2008 U.S. Dist. LEXIS 13039 (E.D.N.Y. 2008) ............................................................. 14

*Adams v. Canon USA, Inc.*,
  2009 U.S. Dist. LEXIS 86722 (E.D.N.Y. 2009) ............................................................. 11

*Agiwal v. Mid Island Mortgage Corp.*,
  555 F.3d 298 (2d Cir. 2009) .......................................................................................... 25

*Albunio v. City of New York*,
  67 A.D.3d 407 (1st Dep't 2009) .................................................................................... 21

*Alfaro v. Wal-Mart Stores, Inc.*,
  210 F.3d 111 (2d Cir. 2000) ............................................................................................ 9

*Becerril v. Ease Bronx NAACP Child Dev. Ctr.*,
  2009 U.S. Dist. LEXIS 85383 (S.D.N.Y. Sept. 17, 2009) .............................................. 16

*Bermudez v. City of New York*,
  783 F. Supp. 2d 560 (S.D.N.Y. 2011) ........................................................................... 10

*Binder v. Long Island Lighting Co.*,
  847 F. Supp. 1007 (E.D.N.Y. 1994)......................................................................... 21, 22

*Brightman v Prison Health Serv., Inc.*,
  108 A.D.3d 739 (2d Dep't 2013) .................................................................................. 15

*Campbell v. Cellco P'ship*,
  2012 U.S. Dist. LEXIS 110346 (S.D.N.Y. Aug. 6, 2012) .............................................. 21

*Cullen v. Nassau County Civil Serv. Comm'n*,
  53 N.Y.2d 492, 442 N.Y.S.2d 470 (1981) ..................................................................... 22

*Diagne v. New York Life Ins. Co.*,
  2010 U.S. Dist. LEXIS 129530 (S.D.N.Y. Dec. 9, 2010).............................................. 14

*Diagne v. New York Life Ins. Co.*,
  2011 U.S. Dist. LEXIS 6037 (S.D.N.Y. Jan. 21, 2011)................................................. 14

*DiBella v. Hopkins*,
  403 F.3d 102 (2d Cir. 2005).............................................................................................. 9

iii

Page No.

*Dorrilus v. St. Rose's Home*,
  234 F. Supp. 2d 326 (S.D.N.Y. 2002) ................................................... 14

*Dowrich-Weeks v. Cooper Square Realty, Inc.*,
  2013 U.S. App. LEXIS 17466 (2d Cir. Aug. 21, 2013) ....................... 12

*Drake v. Delta Air Lines, Inc.*,
  2005 U.S. Dist. LEXIS 14789 (E.D.N.Y. July 21, 2005) ...................... 9

*Farias v. Instructional Sys.*,
  259 F.3d 91 (2d Cir. 2001) ................................................................. 16

*Francis v. Chemical Banking Corp.*,
  62 F. Supp. 2d 948 (E.D.N.Y. 1999) .................................................. 14

*Hollander v Am. Cynamid Co.*,
  172 F.3d 192 (2d Cir. 1999) ............................................................... 10

*Holowecki v. Fed. Express Corp.*,
  644 F. Supp. 2d 338 (S.D.N.Y. 2009) ................................................ 11

*Julius v. Dep't of Human Res. Admin.*,
  2010 U.S. Dist. LEXIS 33259 (S.D.N.Y. Mar. 23, 2010) ...................... 9

*Kaur v. N.Y. City Health & Hosps. Corp.*,
  688 F. Supp. 2d 317 (S.D.N.Y. 2010) .................................................. 9

*Khan v. HIP Centralized Lab. Servs.*,
  2008 U.S. Dist. LEXIS 76721 (E.D.N.Y. Sept. 17, 2008) ................... 23

*Kogut v. City of Nassau*,
  2013 U.S. Dist. LEXIS 102198 (E.D.N.Y. July 22, 2013) ................... 18

*Kolenovic v. ABM Indus., Inc.*,
  2012 N.Y. Misc. LEXIS 3560 (Sup. Ct. N.Y. Co. July 13, 2012) ........ 12

*Kolstad v. Am. Dental Ass'n*,
  527 U.S. 526 (1999) ........................................................................... 16

*Lambert v. Macy's E., Inc.*,
  34 Misc. 3d 1228(A) (N.Y. Sup. Ct. 2010) ........................................ 14

*Levitan v. City of New York Human Res. Admin.*,
  914 F. Supp. 2d 281 (E.D.N.Y. 2012) ................................................ 19

Page No.

*LNC Invs. v. First Fid. Bank,*
    126 F. Supp. 2d 778 (S.D.N.Y. 2001) .................................................................. 18

*Lodge v. United Homes, LLC,*
    787 F. Supp. 2d 247 (E.D.N.Y. 2011) ................................................................. 23

*Lore v. City of Syracuse,*
    670 F.3d 127 (2d Cir. 2012) ................................................................................ 21

*Macmillan v. Millenium Broadway Hotel,*
    873 F. Supp. 2d 546 (S.D.N.Y. 2012) ............................................................ 21, 22

*Manley v. AmBase Corp.,*
    337 F.3d 237 (2d Cir. 2003) ................................................................................ 17

*Mathirampuzha v. Potter,*
    548 F.3d 70 (2d Cir. 2008) .................................................................................. 10

*Melman v. Montefiore Med. Ctr.,*
    98 A.D.3d 107 (1st Dep't 2012) ....................................................................... 9, 10

*Mendez-Nouel v. Gucci Am., Inc.,*
    2012 U.S. Dist. LEXIS 160530 (S.D.N.Y. Nov. 8, 2012) ................................... 20

*N.Y.S. Office of Mental Retardation & Dev. Disabilities v. N.Y.S. Div. of Human Rights,*
    183 A.D.2d 943 (3d Dep't 1992) ......................................................................... 22

*Nelson v. HSBC Bank USA,*
    87 A.D.3d 995 (2d Dep't 2011) ...................................................................... 11, 12

*New York City Transit Auth. v. State Div. of Human Rights,*
    78 N.Y.2d 207, 573 N.Y.S.2d 49 (1991) ............................................................. 22

*Olsen v. County of Nassau,*
    615 F. Supp. 2d 35 (E.D.N.Y. 2009) ................................................................... 22

*Rainone v. Potter,*
    388 F. Supp. 2d 120 (E.D.N.Y. 2005) ................................................................. 22

*Reynolds v. Barrett,*
    685 F.3d 193 (2d Cir. 2012) .................................................................................. 9

*Schnabel v. Abramson,*
    232 F.3d 83 (2d Cir. 2000) .................................................................................. 11

v

Page No.

*Short v. Deutsche Bank Sec., Inc.*,
  79 A.D.3d 503 (1st Dep't 2010) ........................................................ 12

*Sorrenti v. City of New York*,
  851 N.Y.S.2d 61 (Sup. Ct. N.Y. Co. 2007) ...................................... 21

*Southern New England Telephone Co. v. Global NAPs Inc.*,
  624 F.3d 123 (2d Cir. 2010) ............................................................ 25

*Spiegel v. Schulmann*,
  604 F.3d 72 (2d Cir. 2010) ................................................................ 9

*Syrnik v. Polones Constr. Corp.*,
  918 F. Supp. 2d 262 (S.D.N.Y. 2013) .............................................. 16

*Tanzini v. Marine Midland Bank*,
  978 F. Supp. 70 (N.D.N.Y. 1997) .................................................... 22

*Turley v. ISG Lackawanna, Inc.*,
  803 F. Supp. 2d 217 (W.D.N.Y. 2011) ............................................ 20

*United States v. Rahman*,
  189 F.3d 88 (2d Cir. 1999) .............................................................. 18

*Welch v. UPS*,
  871 F. Supp. 2d 164 (E.D.N.Y. 2012) ........................................ 17, 21

*Williams v. New York City Housing Auth.*,
  61 A.D.3d 62 (1st Dep't 2009) .................................... 9, 13, 15, 16

*Wilson v. N.Y.P Holdings, Inc.*,
  2009 U.S. Dist. LEXIS 28876 (S.D.N.Y. 2009) ...................... 11, 12, 14

*Woodard v. TWC Media Solutions, Inc.*,
  2011 U.S. Dist. LEXIS 1536 (S.D.N.Y. Jan. 3, 2011) ...................... 14

*Wright v. New York City Off-Track Betting Corp.*,
  2008 U.S. Dist. LEXIS 22567 (S.D.N.Y. Mar. 24, 2008) .................. 15

**Other Authorities**

12 Moore's Federal Practice,
  Section 59.13[1] (3d Ed. 2005) ........................................................ 17

Page No.

**Rules**

Federal Rules of Civil Procedure Rule 26 ................................................................................ 23

Federal Rules of Civil Procedure Rule 37 ........................................................................... 23, 25

Federal Rules of Civil Procedure Rule 50 ............................................................................. 1, 8

Federal Rules of Civil Procedure Rule 56 .................................................................................. 8

Federal Rules of Civil Procedure Rule 59 ....................................................................... 1, 17, 21

Federal Rules of Civil Procedure Rule 61 ................................................................................ 18

New York Civil Practice of Laws & Rules Section 5501 ........................................................ 21

**PRELIMINARY STATEMENT**

Defendants Strive East Harlem Employment Group ("STRIVE") and Rob Carmona ("Carmona") ("Defendants")[1] move for: (1) judgment as a matter of law, pursuant to Rule 50(b); (2) a new trial on the merits pursuant to Rule 59; (3) a remittitur, or in the alternative a new trial, on damages pursuant to Rule 59; and (4) dismissal pursuant to Rule 37, to sanction Plaintiff's intentional failure to comply with Court-ordered discovery.

**STATEMENT OF FACTS**

**A.      STRIVE'S RECEIPT OF THE PATHWAYS OUT OF POVERTY GRANT.**

On or about February 19, 2010, the U.S. Department of Labor ("DOL") notified STRIVE that it had been awarded the Green Construction or Pathways Out of Poverty Grant ("Grant").  Trial Transcript ("TT"), annexed as Exhibit ("Ex.") A, 264:5-266:19, 268:1-3; Ex. B/T.Ex. A.[2]  Jill Proklemba ("Proklemba") – a then-STRIVE grant writer – had taken the lead in writing and submitting STRIVE's application to the DOL.  *Id.* 331:10-13, 18-20, 362:18-363:7.  The initial grant term – *i.e.*, the specific period of time during which STRIVE was permitted to incur costs under the Grant – was January 29, 2010 through January 28, 2012.  Ex. B/T.Ex. A; TT 75:25-76:3, 265:20-23, 266:20-267:4.

**B.      PLAINTIFF'S COMMENCEMENT OF EMPLOYMENT WITH STRIVE.**

STRIVE's application included a budget that, *inter alia*, identified an Affiliate Services Coordinator ("ASC") position.  *Id.* 267:5-19.  The Grant created and funded 100% of the ASC position. *Id.* 267:20-25.  After STRIVE was awarded the Grant, Proklemba was offered, and accepted, the ASC position.  *Id.* 363:8-15.  Three or four weeks in, Proklemba resigned from STRIVE.  *Id.* 363:16-18.

Thereafter, Plaintiff Brandi Johnson ("Plaintiff") applied for the position and was subsequently interviewed.  *Id.* 45:17-25, 46:1-3.  Her first interview was with three of STRIVE's executive staff:  Eric Treworgy ("Treworgy"), then-CEO of STRIVE; Stein; and Carmona.  *Id.* 94:15 – 95:8, 18-22, 257:22-258:12.  Carmona self-identifies as a black man of Latino descent.  *Id.* 376:13-15.  After a second interview with other staff members, Plaintiff became the ASC at an annual salary of $60,000 and began

---

[1]      Defendants Phil Weinberg ("Weinberg"), STRIVE's CEO, and Lisa Stein ("Stein"), STRIVE's former Chief Financial Officer and Chief Operating Officer, were absolved of all liability.

[2]      Unless otherwise indicated, all exhibits referenced herein are annexed to the Declaration of Diane Krebs, dated October 15, 2013.  In addition, any exhibits that were also trial exhibits are referred to as "Ex. __/T.Ex. __."

her employment with STRIVE on May 3, 2010. *Id.* 81:19-22, 95:18-96:3, 98:6-8, 331:4-5; 334:3-4; Ex. C/T.Ex. 19. Plaintiff was a black female at the time she was hired. TT 96:9-21. On May 4, 2010, Carmona sent an email to Plaintiff and STRIVE's affiliates, stating: "To all Colleagues, it is my pleasure to introduce STRIVE's [ASC], Ms. Brandi Johnson ..." *Id.* 98:18-99:23; Ex. D/T.Ex. F.

**C.      INTERACTIONS DURING HER FIRST SIX MONTHS OF EMPLOYMENT.**

Plaintiff initially reported directly to Carmona. TT 48:20-22, 273:19-21, 384:1-4; Ex. C/T.Ex. 19. Plaintiff testified, "Initially, STRIVE was a great place to work" and she "was happy." TT 49:6-9. But she then testified that about 30 to 45 days in, Carmona confronted her about allegedly disclosing a romantic relationship between two employees to Treworgy. *Id.* 49:6-50-10. Plaintiff claims Carmona "yell[ed] and scream[ed] at [her] in an offensive tone," told her she was "the kind of woman who throw a woman [sic] under the bus," and said she "had a sick [sic] way about [herself]." *Id.* 49:23-25, 50:8-10. Plaintiff said she went to Treworgy's office – which he shared with Carmona – to ask whether she could speak to him, and Carmona stated, "No you fucking can't." *Id.* 50-24-51:8. "Possibly" that same week, Carmona said Plaintiff was "walking around here with [her] head down like [she] want some fucking attention just do [her] fucking job." *Id.* 51:18-52:2. Other than these two incidents, Plaintiff could not recall any other encounters with Carmona during her first six months of employment. *Id.* 53:4-6.

After the two incidents described above, and sometime within Plaintiff's first six months of employment, Stein became Plaintiff's direct supervisor. *Id.* 52:19-24, 273:19-274:3, 384:1-13.[3] Plaintiff testified that after Stein took over her supervision, she could not "recall having any conversations with [Carmona] at that point." *Id.* 52:25-53:6.

**D.      INTERACTIONS AFTER STEIN BECAME HER SUPERVISOR.**

When asked about any conversations she had with Carmona in the six months after Stein became her supervisor, Plaintiff testified "[she] can't give … exact details" but "just know[s] it was a hostile place for her." *Id.* 53:7-54:2. She specified only a few incidents:[4]

---

[3]      The record is uncontested that this occurred because, given the nature of the work, Carmona's lack of responsibility over grant implementation, and his travel schedule, Stein was the more appropriate supervisor – and this also applied to another individual who worked on Grant data and program compliance. *Id.* 273:19-274:11, 384:1-13.

[4]      Notably, despite Carmona's alleged horrible treatment of her, on February 24, 2012, Plaintiff sent an email to him simply stating, "I need you to critique my admission essay." *Id.* 129:1-130:6; Ex. E/T.Ex. N. Plaintiff's explanation for this request (in such an informal and familiar manner, no less) was that she "would have done anything for [Carmona] to leave [her] alone to befriend [her] so the harassment would stop." TT 129:15-22.

### 1.      "Happy to Be Getting a Check" Comment

Plaintiff brought a concern to Carmona about staff morale being low, to which Carmona responded in a staff meeting that the staff should be happy to be getting a check.  *Id*. 54:11-55:15.

### 2.      Incident with Precious

Precious, one of STRIVE's female clients, told Plaintiff that former STRIVE trainer Angel Garrido had made sexual advances toward her.  *Id.* 55:16-56:12, 394:20-395:4.  A full staff meeting was about to occur that everyone (other than the receptionist), including Plaintiff, was to attend.  *Id.* 393:23, 395:17-396:5.  Plaintiff sought out Carmona, who then immediately got Ernest Johnson ("Johnson"), STRIVE's Senior Director of Supportive Services, even though Johnson was to present a report during the meeting.  *Id.* 56:14-22, 393:18-394:13.  Precious told Carmona and Johnson that Garrido touched her arm and asked her to take him to lunch when she got a job.  *Id.* 56:18-22, 394:24-395:4.  Precious stated that the incident occurred a year and a half prior.  *Id.* 395:5-6.  Johnson told Plaintiff to have Precious write down her complaint and to set up an appointment to see him.  *Id.* 57:10-12, 395:7-8.

The next day, Stein told Plaintiff she was "disappointed in the manner in which [Plaintiff] handled the situation," that "it was code yellow and not a code red and [Plaintiff] need[ed] to use better judgment."  *Id.* 57:19-21, 58:3-4.[5]  Plaintiff further testified that later that same day, Carmona told her that "[she] used poor judgment," "allowed [her] own personal judgments to skew [her] judgment," "[to] take [her] emotions out of it or stop being so emotional."  *Id.* 58:3-13.  Plaintiff testified that Carmona also made a comment to the effect of "Precious was ugly as shit and she wasn't Angel's type, but she would have enjoyed it anyway."  *Id.* 58:7-9.

### 3.      Dwayne Hubbard Incident

Plaintiff testified she closed the door to Carmona's office while he was in there yelling and screaming at Dwayne Hubbard ("Hubbard"), a then-former STRIVE employee who had relapsed and abandoned his position with STRIVE.  *Id.* 58:20-60:14.  Plaintiff testified that after Carmona was done speaking with Hubbard, Carmona called her into his office, "pointed in [her] face" and stated, "If I want my fucking door closed, I would have fucking closed it myself."  *Id.* 59:24-60:9.  Plaintiff claims Stein

---

[5]      Stein explained to Plaintiff:  she was to attend a meeting; the situation was not urgent because it occurred long ago with a terminated staff member; and thus it did not have to be handled in the moment.  *Id.* 302:14-303:21.

walked into Carmona's office while Carmona was speaking to her and walked back out. *Id.* 60:14-22.

Plaintiff testified that later the same day, she complained to Stein that Carmona "yelled and screamed … in [her] face." *Id.* 60:23-61:2.[6] According to Plaintiff, Stein responded, "Well, you, know, that is just Rob [Carmona]," and Plaintiff "needed to get tougher skin because that is just how – that is who Rob is." *Id.* 61:3-7. There was undisputed testimony at trial that Carmona yelled and used foul language with men, women, and individuals of all races.[7]

### 4. March 14, 2012 "N" Word Incident

On or about March 13, 2012, Leticia Thomas, an African-American woman employed by another organization (CWE), came to the STRIVE office dressed inappropriately. *Id.* 62:2-18, 397:3-398:10. Plaintiff testified that in response to Thomas' attire, Carmona stated to Plaintiff – in front of some clients and staff – that she and Thomas were just alike. *Id.* 62:6-12. Plaintiff "was bothered because [she] didn't see [herself] coming to work with an inappropriate attire that Ms. Thomas had on or [she] didn't see herself as being like Ms. Thomas." *Id.* 62:6-13-16.[8]

On March 14, 2012, Plaintiff confronted Carmona to ask him what he meant by his comment. *Id.* 62:19-25; Ex. F/T.Ex. 106; Ex. G/T.Ex. 107.[9] The ensuing conversation between Carmona ("C") and Plaintiff ("P") included the following:

C:   'Cause you--yous are just alike. I aint going to get into that with you. You done--you and her are just alike. You, uh--you're both smart, but both of y'all are really knuckleheads. … Seriously, you guys are alike. Smart as shit, but dumb as shit, really. Both of you--you know what it is? Both of you are niggers. And you do--and I'm not say--and I'm not saying--using the term "nigger" derogatory, 'cause sometimes it's good to know when to act like a nigger. But y'all act like niggers all the time.

P:   I am really offended by that. I don't think that I do. … I don't believe I do. I think, in my time here, I have grown.

\*       \*       \*

---

[6]   Plaintiff did not indicate she felt Carmona spoke to her in that manner because of her race and/or gender. *Id.* 299:8-23, 300:11-21. Indeed, Plaintiff never told Stein at any point during her employment that she felt she was being treated negatively by Carmona because of her race and/or gender. *Id.* 300:22-301:3.

[7]   Weinberg testified Carmona has yelled and used foul language in conversations with him fairly regularly. *Id.* 457:20-21, 488:14-23. April Bland, STRIVE's Director of Program Compliance, who has been employed by STRIVE for 20 years, testified she has personally observed Carmona yell at male STRIVE employees. *Id.* 231:10-13, 236:13-237:17. Carmona also testified he has used profanity in the STRIVE workplace in conversations with men, women, Blacks, Latinos, Caucasians and Asians. *Id.* 387:7-388:3. *See also* Plaintiff's testimony, TT 50:19, 50:13-20.

[8]   But Plaintiff conceded she had previously been spoken to about her attire. *Id.* 107:20-109:8, 233:19-234:16.

[9]   This document – the transcript of T.Ex. 106 – was published to the jury as an aid only. *See* TT 63:5-23.

C:      Brandi, you and her act like niggers.  And niggers let their feelings rule them.  …
        So--but, you know, you--you—I'm going to give it to you hard core.  You and
        her are--are--are--are the same.  Both of you are very bright, but you--if you ever
        got a hold of your brightness, in a substantive way, you'd go to the top.  But you-
        -you--you---you know.  Um. But y'all act like niggers.  Seriously.

P:      Well, for the record, I beg to differ.  But I'm 'a leave it alone.

                        *       *       *

P:      … But, for me, honestly, I would appreciate, next time, pull me into the office
        and tell me that.  Don't tell me that in front of people, 'cause I--I was very
        offended [when you said in front of other people] "Y'all are just alike."  Rob,
        I'm --I don't think I'm like her.

                        *       *       *

C:      And—and, uh, why is it--why are you making such a big deal about it?

P:      Because I have to, uh, figure out--I--I--I'm trying my best to--to improve on me.
        And--and I don't--and I don't want to be constantly compared to somebody who
        is not improving on them.  Honestly.

                        *       *       *

C:      … Both of yous are very--like I said.  Both very bright, but both of y'all act like
        niggers at inappropriate times.

P:      I disagree, but okay.

Ex. F/T.Ex. 106; Ex. G/T.Ex. 107.   This conversation was the only time Carmona called Plaintiff a

"nigger."  TT 127:5-11.  She also had never heard him call anyone else a "nigger."  *Id.* 67:5-9.  Plaintiff

testified she did not recall whether she had ever used the word "nigger" in the STRIVE office.  *Id.* 90:9-

93:24, 147:12-148:22.  However, there was unrefuted testimony from multiple witnesses that she had.[10]

    Plaintiff claims she was "offended … degraded … felt disrespected … [and] was embarrassed"

by the March 14, 2012 incident.  *Id.* 65:18-21.  She testified that after the incident she cried in the

bathroom and remained there for about 45 minutes.  *Id.* 66:18-22.  She then tried to work but could not

because she felt ashamed.  *Id.* 66:23-67:3.  She "went home, cried and went to sleep".  *Id*. 67:3-4.

## E.      JANUARY 2012 EXTENSION OF THE GRANT.

    By letter dated January 24, 2012, DOL granted STRIVE a no cost modification to extend the

Grant term to June 30, 2012.  *Id.* 133:23-134:15; Ex. H/T.Ex. 40.  Plaintiff worked on the extension

request.  TT 133:23-134:4.  The modification contained, *inter alia*, a budget narrative, which included

---

[10]      Carmona testified Plaintiff used it frequently, including in conversations with him.  *Id.* 399:13-18.  Virginia
Barr, a STRIVE Employment Specialist, testified to one occasion when "[she] asked how [Plaintiff's] son was doing
and [Plaintiff] told [her] that little nigger is doing well."  *Id.* 244:24-245:2, 251:24-252:7.  Bland testified that in her
general personal conversations with Plaintiff in the STRIVE office, Plaintiff would use the word "nigger."  *Id.* 235:1-19.

the STRIVE personnel being paid in any amount from the Grant, the original two year Grant budget for each position, and the amounts reimbursed as of September 28, 2012. Ex. H/T.Ex. 40; TT 285:20-288:7. The budget narrative reflected that the ASC position was 100% funded by the Grant, having been initially allocated $130,000.00. *Id.* 333:17-21; Ex. H/T.Ex. 40. An additional $5,171.49 was allocated, bringing the total budget for the ASC position for the entire grant term to $135,171.49. *Id.* Stein received notice of the extension before the end of the original Grant term. TT 289:5-14.

**F.      PLAINTIFF'S APRIL 2012 COMPLAINT AND ALLEGED RETALIATION**

On April 11, 2012, Weinberg received a written complaint from Plaintiff's attorneys, alleging Plaintiff had been subjected to discrimination and harassment because of her race and gender. TT 67:19-68:19, 472:10-473:2. This was the first notice Plaintiff ever gave to Weinberg of any such claims. *Id.* 473:3-6.[11] Plaintiff testified that after STRIVE became aware of her complaint, "[Carmona] became infuriated and [she] was made to pay [by being isolated]." *Id.* 68:25-69:7.

**1.      "Wrap it Up" Incident**

Plaintiff was having lunch with two co-workers – Cammie Crawford and Lynette Hall – at Lynette's desk outside Carmona's office, and Carmona approached them and told them to "Wrap it up. Wrap it up now." *Id.* 69:5-71:5. These lunches right outside of Carmona's office – approximately three or four times – began after Plaintiff filed her internal complaint, and Carmona eventually told them not to eat there because they were being loud and distracting, and he felt Plaintiff was purposely trying to provoke him. *Id.* 399:19-401:21. Later, Carmona met with Crawford and Hall in his office, told them not to let themselves be used, and to take that statement for what it was worth. *Id.* 70:8-23, 200:4-10, 203:3-6. Carmona did not refer to Plaintiff or that she had filed a complaint. *Id.* 402:4-21. Crawford testified she did not know what Carmona meant, did not ask him what he meant, and did not understand or learn that it was in reference to Plaintiff. *Id.* 200:23-201:1, 204:5-11, 209:18-23.

---

[11]      Weinberg took the complaint "very seriously" and immediately "sprung into action." *Id.* 473:9-10. He spoke with Stein, STRIVE's pro bono counsel, and the chairman of STRIVE's board of directors about the course of action to take to properly investigate and address the complaint. *Id.* 473:11-474:8. Ultimately, Weinberg and an attorney on STRIVE's board, Andy Rahl, jointly investigated. *Id.* 474:13-474:14. Weinberg and Rahl spoke with all key individuals identified in the complaint, emphasizing confidentiality, and explored all of Plaintiff allegations. *Id.* 482:1-21, 484:5-16. Their ultimate conclusion was that, although there had been conduct inappropriate for the workplace (for which Carmona was admonished by the board), there was no discrimination due to gender or race. *Id.* 475:15-20, 497:6-10. Weinberg, in the normal course of his duties, prepared written notes of all the interviews and a written record of the findings of the investigation. *Id.* 478:14-479:24. A copy of the investigation notes are contained in Ex. I.

After this incident, Carmona would see Plaintiff, Hall and Crawford having lunch in the conference room and did not admonish them for having lunch together.  *Id*. 403:4-10.

### 2.    **Jamar Cooks Incident**

Jamar Cooks – a STRIVE client Plaintiff would assist – testified Carmona told him not to see Plaintiff anymore "because there is something going on with her and [STRIVE], and [Carmona] didn't really want [him] to get mixed up in it …"  *Id*. 215:11-16.  Plaintiff was not supposed to be assisting clients like Cooks, as that was not within her job duties or skills set; indeed, she had been previously instructed not to provide counseling services to clients for this reason.  TT 57:22-24, 303:22-304:4, 388:24-90:8.  That was what led Carmona to direct Cooks to no longer see Plaintiff.  *Id*. 389:6-390:8.

Plaintiff testified that when she "went to approach to tell [Weinberg] what had happened, [Carmona] slammed the door on [her] face in front of [Weinberg] and [Stein].  *Id*. 72:19-20.

### 3.    **"Put This Bitch In a Smash" Incident**

Plaintiff testified that Carmona and Johnson once walked past her desk, said "'Put this bitch in a smash,' and turned around and looked at [Plaintiff]."  *Id*. 72:20-23.  Plaintiff took this as a threat.  *Id*. 72:24-25.  On cross-examination, Defendants were precluded from impeaching Plaintiff with a copy of a contemporaneous text message she had sent to Crawford.  *Id*. 141:15-142:17.  It read:  "They keep walking past my desk Ernie and Rob and [R]ob just told Ernie we bout to bring this Shit to a smash … Don't know what he means by that but I'm almost certain they are referring to me."  Ex. J.[12]

## G.    **PLAINTIFF'S TERMINATION AND COMMENCEMENT OF THIS LAWSUIT**

On June 11, 2012, Weinberg met with Plaintiff and informed her that her employment with STRIVE was ending effective that day due to the Grant's impending expiration.  Ex. K/T.Ex. S; TT 73:16-18, 134:16-21, 354:10-13, 486:6-13.  Stein and Weinberg previously discussed the fact that the Grant was ending and the "business need for [Plaintiff's] position and her roles and responsibilities did not exist."  *Id*. 311:5-17.  The decision to end Plaintiff's employment was Weinberg's, and Carmona had no discussions with him or anyone else about that issue.  *Id*. 404:13-16, 506:21-508:8.  Weinberg made the decision to end Plaintiff's employment on June 11, 2012, before the Grant expired on June 30, 2012,

---

[12]     This document, which was deemed inadmissible, was produced by Plaintiff during discovery and was part of a group of text messages that Plaintiff sought to use at trial as Plaintiff's proposed exhibit 45.

because "[t]he reality was that the substance of work that needed to happen as part of the grant was largely complete.  And it seemed best for [Plaintiff] to give her three weeks of time to manage her transition and look for new work, so it just seemed like the right thing to do."  TT 488:1-9.  Plaintiff did not express any surprise when Weinberg informed her.  *Id*. 138:7-15; Ex. L/T.Ex. 49; Ex. M/T.Ex. 50.[13] Plaintiff was paid her salary through the remainder of the Grant term.  *Id.* 487:20-25.

On June 7, 2012, she commenced the lawsuit in this matter.  *Id.* 354:7-9.  STRIVE – through Weinberg – first became aware of the lawsuit on June 11, 2012, after Plaintiff had already been informed of her termination.  *Id.* 506:17-20.

## H.   PLAINTIFF'S ALLEGED DAMAGES

Plaintiff was unemployed until January 7, 2013 and received unemployment benefits.  *Id.* 80:13-22.  Since then, Plaintiff has been employed at an annual salary of $50,000.  *Id.* 81:19-24.

Plaintiff testified she was very bothered by her experience at STRIVE and "[m]ore so with [Weinberg] because [she] trusted him."  *Id.* 78:4-12.  Plaintiff testified, "I wasn't always an effective parent to my kids because of this.  There were times when I would laugh to keep from crying, times when I was in the house in my bed and didn't want to be bothered and had to muster up the energy to get myself together.  The confidence when you go out on another interview are you going to be perceived as how these people perceive you."  *Id.* 78:15-24.  She claimed to have sought therapy from two therapists, Ethan Gorgahor and Diane Schneider.  *Id.* 78:25-79:5.  She saw Dr. Gorgahor just three times, and saw Dr. Schneider "twice a week for months" beginning in February or March 2012, though not for the two or three months prior to trial.  *Id.* 79:6-25.  Moreover, according to Plaintiff, even though Dr. Schneider gave her a referral to obtain prescription medication, she has never taken that medication, and does not even know which medication supposedly would have been prescribed.  *Id*. 80:5-11.

## <u>ARGUMENT</u>

## <u>POINT I:  DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.</u>

## A.   Applicable Standard Under Fed. R. Civ. P. Rule 50(b).

"The standard that applies to a pretrial motion for summary judgment pursuant to Fed. R. Civ. P. 56 also applies to motions for judgment as a matter of law during or after trial pursuant to Rule 50."

---

[13]        This document was marked for identification to assist the jury as an aid.  TT 137:9-138:4.

*Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (internal quotations and citations omitted). A court may set aside a verdict where "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on the issue." *Drake v. Delta Air Lines, Inc.*, No. 94 civ. 5944 (FB), 2005 U.S. Dist. LEXIS 14789, at *3 (E.D.N.Y. July 21, 2005). The court must consider all the evidence in the record, viewed in the light most favorable to the non-movant, without making credibility determinations or weighing the evidence. *DiBella v. Hopkins*, 403 F.3d 102, 116 (2d Cir. 2005). Here, Plaintiff's claims failed as a matter of law and should be dismissed.

**B.     Plaintiff's City Human Rights Law ("CHRL") Claims Fail As A Matter of Law.[14]**

       **1.     Plaintiff's Race and Gender Discrimination Claims Fail As A Matter of Law**

Although the CHRL is to be given a more liberal interpretation than its state and federal counterparts, "none of the 2005 Restoration Act's amendments to the []CHRL altered the standard by which a court should determine whether a discriminatory act has occurred." *Kaur v. N.Y. City Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 340 (S.D.N.Y. 2010) (citation omitted); *see also Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) ("a plaintiff's discrimination claims under … the []CHRL are subject to the burden-shifting analysis applied to discrimination claims under Title VII"). A plaintiff "must still establish 'by a preponderance of the evidence that she has been treated less well than other employees' due to protected status." *Julius v. Dep't of Human Res. Admin.*, No. 08 Civ. 3091 (PKC), 2010 U.S. Dist. LEXIS 33259, at *13 (S.D.N.Y. Mar. 23, 2010) (quoting *Williams*, 61 A.D.3d at 78).

> Under the *McDonnell Douglas* framework, a plaintiff establishes a *prima facie* case of intentional discrimination by showing that (1) [s]he is a member of a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to [an] inference of discrimination.

*Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (internal quotation marks omitted).[15] If a *prima facie* case is established, the burden of production, but not persuasion, shifts to the employer to set forth a legitimate non-discriminatory reason. Once that burden is satisfied, the employee must then show that

---

[14]     The state and federal counterparts to the CHRL "are viewed as a floor below which the [CHRL] cannot fall." *Williams v. New York City Housing Auth.*, 61 A.D.3d 62, 66-67 (1st Dep't 2009). Thus, for the same reasons that Plaintiff's claims under the more liberal CHRL fail as a matter of law, her claims under § 1981 also fail.

[15]     "The *McDonnell Douglas* framework has been adopted for use in discrimination actions brought under the" CHRL and "neither the [Restoration Act] nor the City Council … [has] indicate[d] that the *McDonnell Douglas* framework is to be discarded." *Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 112-13 (1st Dep't 2012).

the reason advanced is pretextual, *i.e.*, that it masks the employer's true discriminatory reason. *Hollander v. Am. Cynamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999) *cert. denied* 528 U.S. 965 (1999).[16]

Here, the only adverse action taken against Plaintiff was her termination on June 11, 2012.[17] However, the record is devoid of any evidence to show that it took place under circumstances giving rise to an inference of discrimination or was motivated in part by discrimination on the basis of her gender or race. There are no remarks alleged to have been made by the decision-maker, Weinberg, evidencing gender-based or racial discriminatory animus, whether in connection with Plaintiff's termination or otherwise. Moreover, irrespective of whether Plaintiff was ever told that her position was fully tied to the Grant, the budget submitted to the DOL unequivocally establishes this to be the case. The numbers do not lie: the total budget allocated to the ASC position for the entire, extended period of performance under the Grant was $135,171.49. Ex. H/T.Ex. 40. At an annual salary of $60,000, or $5,000 a month, this translates into funding for approximately 27 months. Plaintiff was employed by STRIVE for 26 months, from May 2010 through June 2012, and prior to that, Proklemba held the position for approximately a month before resigning. Thus, the ASC position was 100% funded by the Grant, and after the Grant expired, STRIVE no longer had the money to fund the position. The position was never filled after Plaintiff's termination, nor was there a need for the position, its purpose having expired. TT 285:10-17, 311:5 – 312:14, 313:13-19. This not only demonstrates the absence of an inference of discrimination, but also establishes a legitimate, non-discriminatory reason for Plaintiff's termination.

Aside from this uncontroverted evidence, the jury determined that neither Weinberg nor Stein subjected Plaintiff to discrimination. Thus, the jury could only have determined Carmona made the decision to terminate and was motivated in doing so by discriminatory animus based upon Plaintiff's

---

[16]     CHRL discrimination claims must also be analyzed for "mixed motive." *Melman*, 98 A.D.3d at 113. In this context, a plaintiff must prove "unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for an adverse employment decision." *Id*. at 127. "If a plaintiff can prevail on a mixed motive theory … the employer's production of evidence of a legitimate reason for the challenged action shifts to the plaintiff the lesser burden of raising an issue as to whether the action was motivated at least in part by discrimination." *Id*. at 127.

[17]     "An adverse employment action is 'a materially adverse change in the terms and conditions of employment.'" *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (citation omitted). It requires "a change in working conditions … more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples … include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.; see also Bermudez v. City of New York*, 783 F. Supp. 2d 560, 577 (S.D.N.Y. 2011) ("an adverse employment action under the [CHRL] is defined the same under its [state and federal counterparts]").

race and/or gender. However, the uncontroverted evidence at trial established that it was Weinberg who made the decision to terminate Plaintiff's employment, and that Carmona was completely removed from the process. TT 506:21-508:8, 404:13-16.[18]

Even the Court expressed its opinion that the discrimination claim was thin. TT 71:14-16. Accordingly, Plaintiff's discrimination claims should be dismissed as a matter of law.

### 2.  Plaintiff's Gender and Race Harassment Claims Fail As A Matter of Law.

"Under the [CHRL], liability for a harassment/hostile work environment claim is proven where a plaintiff proves that he or she was treated less well than other employees *because of* the relevant characteristic." *Nelson v. HSBC Bank USA*, 87 A.D.3d 995, 999 (2d Dep't 2011) (emphasis added). The inquiry "should be a focus on unequal treatment based on gender to prevent *too much* unwanted gender-based conduct to continue befouling the workplace." *Wilson v. N.Y.P Holdings, Inc.*, No. 05-civ-10355 (LTS)(DFE), 2009 U.S. Dist. LEXIS 28876, at *88 (S.D.N.Y. 2009) (citation omitted; emphasis added). "Recognizing … the broader purposes of the [CHRL] do not connote an intention that the law operate as a general civility code, the [NY] Court [of Appeals] [has] recognized an affirmative defense whereby defendants can still avoid liability if they prove that the conduct complained of

---

[18]   Recognizing the inherent inconsistency in the jury's decision of discriminatory termination, Plaintiff has raised the specter of a "cat's paw" theory of liability for Carmona. However, this presents two significant problems. First, Plaintiff never argued such a theory at trial nor even asked the Court for such a jury instruction, and so none was provided. *Id.* 620:18-642:19. The Court's jury charge stated that an individual Defendant "must have been personally involved in or personally participated in the discriminatory conduct" to be liable. *Id.* 631:5-9. Thus, there is no basis for the jury having utilized or even comprehended a "cat's paw" theory of liability. Second, there is a glaring factual problem – the record is devoid of any evidence on which such liability could be sustained. "Under a 'cat's paw' theory of liability, an employer may be held liable on a discriminatory termination claim if a supervisor with a discriminatory motive influenced the termination decision, even if that supervisor was not the ultimate decision-maker." *Abel v. Town Sports Int'l, LLC*, No. 09 Civ. 10388 (DF) U.S. Dist. LEXIS 183444, at *61 (S.D.N.Y. Dec. 18, 2012). However, here there was zero testimony that Carmona was involved in the termination decision, whether directly or indirectly. Indeed, the uncontested evidence revealed Carmona was entirely removed from that process, and it was Weinberg who made the decision based on his own assessment. There was thus no opportunity for Carmona to influence the process.

In any event, it is undisputed that Carmona, who self-identifies as a black man, was part of the executive team that interviewed and hired Plaintiff for the ASC position. TT 94:15-95:8, 18-22, 98:18-99:23, 376:13-15; Ex. D/T.Ex. F. It is well recognized that an inference of discrimination becomes less plausible when the individual who allegedly made the adverse employment decision belongs to the same protected class as Plaintiff and/or was involved in the decision to hire Plaintiff. *See, e.g.*, *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) ("where the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire"); *Adams v. Canon USA, Inc.*, No. 07-Civ-3512 (DRH)(WDW), 2009 U.S. Dist. LEXIS 86722, at *45-46 (E.D.N.Y. Sept. 22, 2009) ("The fact that the decisionmaker is a member of Plaintiff's protected class not only weakens any suggestion of discrimination but strongly suggest[s] that invidious discrimination is unlikely") (internal quotations omitted). Moreover, there is no evidence in the record of Carmona making any discriminatory comments related to Plaintiff's termination. *See Holowecki v. Fed. Express Corp.*, 644 F. Supp. 2d 338, 358 (S.D.N.Y. 2009) ("'stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given weight'") (citation omitted).

consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences." *Nelson*, 87 A.D.3d at 999 (internal quotations and citations omitted).[19]

Even under the CHRL's more liberal standard, Plaintiff's gender and race-based hostile work environment claims fail as a matter of law. First, regarding the gender claim, Plaintiff did not testify to any gender-related comments directed by Carmona toward her that rise to the requisite level. The only comment that was arguably gender-related was that Plaintiff was "the kind of woman who throw a woman [sic] under the bus." *Id.* 49:23-25, 50:8-10. Notwithstanding the fact that Carmona's alleged comment lacked any gender-related derogatory words, it was an isolated incident in Plaintiff's two-year employment. Indeed, gender-based harassment claims under the CHRL – involving *much more egregious* comments – have been dismissed as a matter of law. *See e.g.*, *Kolenovic v. ABM Indus., Inc.*, Index No. 402422/10, 2012 N.Y. Misc. LEXIS 3560 (Sup. Ct. N.Y. Co. July 13, 2012) (supervisor's use of the word "bitch" on several occasions, reference to plaintiff as "my bitch," and saying "Get over here my bitch" during approximate one year period offensive but insufficient under CHRL to rise above petty slights and trivial inconveniences in light of infrequency of the comments); *Wilson*, 2009 U.S. Dist. LEXIS at *88-89 (yelling and screaming at plaintiffs by their supervisors, and comments by supervisors such as "training females is like training a dog" and "women need to be horsewhipped," found to be nothing more than petty slights and inconveniences, and thus not actionable under CHRL).

Other than the "bus" comment, all of the other "harassment" alleged by Plaintiff was gender-neutral in nature. And all evidence provided during trial related to that issue – including Plaintiff's own testimony – demonstrated that the type of conduct forming the basis of Plaintiff's claim, such as yelling and cursing, was directed by Carmona at both genders. *See*, *e.g.*, TT 50:19, 59:13-20, 236:13-237:17, 387:7-23, 488:14-23. Issues regarding one's general style of interaction, unrelated to membership in a protected class, does not create a claim. *See*, *e.g.*, *Short v. Deutsche Bank Sec., Inc.*, 79 A.D.3d 503, 505-506 (1st Dep't 2010) ("The various complaints about [Plaintiff's manager's] conduct in the workplace … may be viewed by a reasonable employee as a function of [the manager's] management

---

[19]     Under federal law, applicable to Plaintiff's § 1981 claim, a plaintiff must show that "the complained of conduct: (1) is objectively severe or pervasive – that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected class]." *Dowrich-Weeks v. Cooper Square Realty, Inc.*, Case No. 12-cv-3952, 2013 U.S. App. LEXIS 17466, at *7-8 (2d Cir. Aug. 21, 2013) (internal quotations omitted).

style, unrelated to [ ] discrimination") (citations omitted); *Williams*, 61 A.D.3d at 79 (the CHRL does not "operate as a 'general civility code'") (citations omitted).

Similarly, almost all of the alleged incidents on which Plaintiff's racial harassment claim is based are race-neutral, and the evidence demonstrated that Carmona engaged in such behavior towards individuals of all races.   TT 50:19, 387:7-388:3, 488:14-23.   The only incident involving conduct arguably connected to race was the March 14, 2012 conversation between Plaintiff and Carmona, during which he used the word "nigger."   However, the context in which Carmona used the word, Plaintiff's response to the word, Plaintiff's own use of the word, and the isolated nature of that conversation, leads to only one conclusion:  it does not rise to a level above a petty slight and trivial inconvenience.

First, it is clear the crux of Carmona's message to Plaintiff was that she and Thomas were alike in that they were both smart but acted like "knuckleheads" at times.   Ex. F/T.Ex. 106; Ex. G/T.Ex. 107. Indeed, Carmona told Plaintiff, "Both of you are very bright, … if you ever got a hold of your brightness, in a substantive way, you'd go to the top."   *Id*.   With respect to Carmona's statements that Plaintiff and Thomas acted like "niggers," immediately after Carmona first uttered the word he stated: "And … I'm not say—and I'm not saying—using the term 'nigger' derogatory, 'cause sometimes it's good to know when to act like a nigger.   But y'all act like niggers all the time."   *Id*.   Thus, Carmona specifically advised Plaintiff at the outset he did not intend to be derogatory.   *Id*.; TT 127:12-15.

Moreover, Plaintiff's responses to Carmona's comments reflect that her main issue with his comments was not his use of the word "nigger," but rather his comparison of her to Thomas.   Ex. F/T.Ex. 106; Ex. G/T.Ex. 107.   For example, when Carmona first said to Plaintiff that she and Thomas "act like niggers all the time," Plaintiff's response was not that she was offended by the word but rather by the accusation that she acted that way:  "I am really offended by that.   *I don't think that I do*."   *Id*. (emphasis added).[20]   Furthermore, Plaintiff later reaffirmed, directly, that her concern was over the comparison, not the language:  when asked by Carmona why she was "making such a big deal about it," Plaintiff responded, "… I--I--I'm trying my best to--to improve on me.   And--and I don't--and I don't want to be constantly compared to somebody who is not improving on them.   Honestly."   *Id*.

---

[20]      Indeed, Plaintiff used the exact word "offended" again and reinforced that her offense was being told she acted as Thomas did:  "I would appreciate, next time, … [d]on't tell me that in front of people, 'cause I--I was very offended [when you said in front of other people] "Y'all are just alike."  Rob, I'm --I don't think I'm like her."

In addition, although Plaintiff said she could not recall whether she ever used the word "nigger" in the office, there was other testimony that it was part of her vocabulary during everyday conversation, showing an inherent lack of issues with the word.  TT 90:9-93:24, 147:12-148:22, 235:1-19, 244:24-245:2, 251:24-252:7, 399:13-18.   But perhaps most fatal to Plaintiff's race-based hostile work environment claim is the fact that the conversation was one isolated incident in Plaintiff's employment. Plaintiff testified that it was the first and only time during her two-year employment with STRIVE that she heard Carmona refer to her, or anyone else, by the word "nigger."  TT 67:5-9, 127:5-1. Thus, even under the uniquely broad and remedial purposes of the CHRL, that one incident during Plaintiff's two-year employment at STRIVE – as a matter of law – cannot be deemed anything more than what a reasonable victim of discrimination would consider a petty slight and trivial inconvenience.[21]

Based on the above, Plaintiff's harassment claims should be dismissed as a matter of law.

### 3.     Plaintiff's Retaliation Claims Fail As A Matter of Law.

To establish her retaliation claim, Plaintiff must show that: (1) she engaged in a protected activity as that term is defined under the CHRL; (2) Defendants were aware she participated in such

---

[21]      *See e.g.*, *Diagne v. New York Life Ins. Co.*, No. 09-civ.-5157 (GBD)(GWG), 2010 U.S. Dist. LEXIS 129530, at *50 (S.D.N.Y. Dec. 9, 2010) (where plaintiff called a "nigger" in hostile and negative manner, "the evidence of racial and/or religious slurs is of such a minimal character … that a reasonable jury would have to conclude that it represents, at best, petty slights or trivial inconveniences") *adopted by*, *summary judgment granted by Diagne v. New York Life Ins. Co.*, 2011 U.S. Dist. LEXIS 6037 (S.D.N.Y. Jan. 21, 2011); *Woodard v. TWC Media Solutions, Inc.*, No. 09-civ.-3000 (BSJ)(AJP), 2011 U.S. Dist. LEXIS 1536 (S.D.N.Y. Jan. 3, 2011) (comments made by a supervisor to a Jamaican-American plaintiff, such as Jamaicans do not have a strong work ethic, Jamaicans think they are better than other blacks but they are not, and black males only wanted to "sow their seed" and have children with multiple women to prove their masculinity, found insufficient to establish a hostile work environment claim under the CHRL); *Lambert v. Macy's E., Inc.*, 34 Misc. 3d 1228(A) (N.Y. Sup. Ct. 2010) (executive staff member's racial jokes and slurs – including use of the word "nigger" on one occasion to describe an African-American person in plaintiff's presence – deemed insufficient to establish a hostile work environment claim under the CHRL), *aff'd*, 84 A.D.3d 744 (2d Dep't 2011); *Wilson*, 2009 U.S. Dist. LEXIS, at *88-89 (reference to black female celebrities as "whores" and "sluts," writing of the word "nigger" on a locker and in the bathroom, and a comment that "blacks are only good for playing basketball," could not "amount to more than such petty slights and inconveniences").

Although the Court need look no further to dismiss these claims in their entirety, Defendants note that it is even more clear that Plaintiff's claim does not succeed under the "severe or pervasive" standard applicable to her § 1981 claim.  *See, e.g.*, *Adam v. Glen Cove Sch.*, 2008 U.S. Dist. LEXIS 13039, at *37-42 (E.D.N.Y. 2008) (two alleged uses of "nigger" insufficient to sustain a claim for a hostile work environment under federal law); *Dorrilus v. St. Rose's Home*, 234 F. Supp. 2d 326, 335 (S.D.N.Y. 2002) (supervisor's use of racially derogatory slur to refer to plaintiff on four or more occasions did not alter conditions of employment significantly enough to create hostile work environment); *Francis v. Chemical Banking Corp.*, 62 F. Supp. 2d 948, 958-60 (E.D.N.Y. 1999), *aff'd*, 2000 U.S. App. LEXIS 11896 (2d Cir. May 24, 2000), *cert. denied*, 532 U.S. 949 (2001) (no hostile work environment where plaintiff heard someone refer to group of black employees as "fucking moolies," supervisor allegedly left a note on plaintiff's desk that read "All niggers should go back to Africa with a Jew under each arm," and supervisor told plaintiff, in reference to another African-American employee, "that nigger is a disgrace to all of yous").  These cases also provide guidance to the Court for Plaintiff's CHRL claim.

14

activity; (3) Defendants engaged in conduct reasonably likely to deter a person from engaging in the protected activity; and (4) there is a causal connection between the protected activity and the alleged retaliatory conduct.  *Brightman v Prison Health Serv., Inc.*, 108 A.D.3d 739, 740 (2d Dep't 2013).  If Plaintiff meets this initial burden, the burden then shifts to Defendants to present a legitimate, independent, and nonretaliatory reason to support their actions.  If Defendants do so, Plaintiff "has the obligation to show that the reasons put forth by [ ] Defendant[s] were merely a pretext." *Id.*

Plaintiff cannot meet this standard.  With respect to the "wrap it up incident," it is undisputed Carmona directed not only Plaintiff but also Crawford and Hall – neither of whom engaged in any protected activity – not to eat directly outside of his office.  TT 69:5-71:5.  As Plaintiff was treated the same as her colleagues who did not engage in any protected activity, this incident cannot form the basis for a retaliation claim under the CHRL.  *Williams*, 61 A.D.3d at 71-72 (conduct not targeting plaintiff only but other employees as well – who did not engaged in protected activity – cannot form the basis for a retaliation claim).  Moreover, being told to "wrap it up" on one occasion is hardly the type of conduct that would deter a reasonable individual from engaging in protected activity.  Furthermore, Carmona testified that after several incidents of lunch right outside his office, he told them not to eat there because they were being loud and distracting.  *Id.* 399:19-401:21.  There is no evidence in the record to dispute his testimony about the impact of their conduct.  Thus, aside from the other impediments, Carmona had a legitimate, nonretaliatory reason for his action.  This is reinforced by the fact that, when the three women ate together away from Carmona's office, he did not interfere.  TT 403:4-10.

Carmona similarly had a legitimate, nonretaliatory reason for directing Cooks to no longer see Plaintiff for services.  Plaintiff had previously been instructed not to provide counseling services to clients because it was not part of her duties, and, more importantly, she was not qualified to do so.  TT 57:22-24, 388:24-390:8.  "If an employer's conduct before and after an employee complaint is consistent, the post-complaint conduct is not retaliatory."  *Wright v. New York City Off-Track Betting Corp.*, No. 05 Civ. 9790 (WHP), 2008 U.S. Dist. LEXIS 22567, at *13-14 (S.D.N.Y. Mar. 24, 2008).

With respect to the door slamming incident, Plaintiff failed to establish that it was connected in any way to filing her complaint.  Rather, it followed on the heels of Carmona instructing Cooks not to see Plaintiff for services, and Plaintiff attempted to enter a closed door meeting between Carmona, Stein

15

and Weinberg.   TT 72:16-20, 390:10-392:24.   This minor incident does not rise to the level of complaint-deterring conduct.  Moreover, Crawford – who did not engage in protected activity – had also complained of Carmona slamming doors.   *Id*. 72:1-3.   This renders the incident non-retaliatory. *Williams*, *supra*, 61 A.D.3d at 71-72.[22]

Regarding the "put this bitch in a smash" comment, there was no evidence to establish that it was specifically directed toward Plaintiff.[23]  In any event, one stray remark of this nature does not rise to the level of conduct that would dissuade a reasonable person from engaging in protected activity.

With respect to Plaintiff's termination, as discussed in great length above, it cannot form the basis for a retaliation claim because the individual who made the termination decision –Weinberg – was found not liable for retaliation, and there is no evidence that Carmona influenced that decision in any way.  Moreover, Defendants had a legitimate, non-retaliatory reason for the termination – the expiration of the Grant that fully funded Plaintiff's position – that Plaintiff cannot demonstrate to be pretext.

Based on the foregoing, Plaintiff's retaliation claim fails as a matter of law.

**C.     Plaintiff Is Not Entitled to Punitive Damages As A Matter of Law.**

The jury assessed punitive damages of $5,000 against STRIVE, and $25,000 against Carmona. Punitive damages under both federal and local law – in the employment context – are limited to intentional discrimination with malice or with reckless indifference to the protected rights of an employee.  *See Farias v. Instructional Sys.*, 259 F.3d 91, 101-02 (2d Cir. 2001).  *See also Becerril v. Ease Bronx NAACP Child Dev. Ctr.*, No. 08 Civ. 10283 (PAC)(KNF), 2009 U.S. Dist. LEXIS 85383, at *7-8 (S.D.N.Y. Sept. 17, 2009) ("To recover punitive damages under NYCHRL, a plaintiff must show either: (1) that the employer acted with malice and reckless indifference, referring to the employer's knowledge that it may be acting in violation of [the] law, or (2) egregious or outrageous acts by the employer that support an inference of the requisite evil motive") (citing *Farias*, 259 F.3d at 101-02).[24]

---

[22]     With respect to this particular incident, the Court even stated that "… we have heard this testimony about the door slamming the relevance of which in any event in my view is minimal."  TT 367:23-25.

[23]     Indeed, Plaintiff's own contemporaneous text message – which was not permitted into evidence – contradicts Plaintiff's trial testimony as to Carmona's exact words and her understanding of what his comment meant.  Ex. J.

[24]     The terms "malice" and "reckless indifference" refer to "the employer's knowledge that it may be acting in violation of [] law."   *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999).   A "positive element of conscious wrongdoing is always required" for an award of punitive damages, which must be based solely on a defendant's subjective belief and state of mind.  *Id.* at 535, 538; *see also Syrnik v. Polones Constr. Corp.* ), 918 F. Supp. 2d 262, 264

Plaintiff presented no evidence that Defendants acted with the conscious knowledge they were violating the law, nor was the conduct alleged sufficiently egregious to support an inference of the requisite evil motive.  Indeed, as discussed above, none of the alleged acts by Carmona rise to actionable conduct under the law, much less malice and reckless indifference.  With respect to the focal point of Plaintiff's claims – Carmona use of the word "nigger" – when the context of that entire conversation is taken into account, it is clear Carmona was attempting to coach her, as opposed to maliciously degrade her; he even said explicitly he did not mean to use the word in a derogatory fashion.  In fact, Plaintiff's reaction to his comments reflect that even she knew he was not acting with malicious intent.

### POINT II:  IN THE ALTERNATIVE, THE COURT SHOULD GRANT A NEW TRIAL

Under Fed. R. Civ. P. Rule 59, a court "may, on motion, grant a new trial on all or some of the issues—and to any party—after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  A motion for a new trial should be granted when the court concludes that the jury reached a "seriously erroneous result" or the verdict is a "miscarriage of justice."  *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003).  "The general grounds for a new trial are that (1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions to the jury; or (4) damages are excessive."  *Welch v. UPS*, 871 F. Supp. 2d 164, 174 (E.D.N.Y. 2012) (citing 12 Moore's Federal Practice, § 59.13[1] at 59-43 (3d Ed. 2005)).

> In comparison to a Rule 50 motion …, the Second Circuit has held that the standard for a Rule 59 motion in some respects is less onerous for the moving party in two ways: first, [u]nlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Second, in deciding a Rule 59 motion a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner.

*Welch*, 871 F. Supp. 2d at 174 (internal quotations and citation omitted).

### A.    The Jury's Verdict is Against the Clear Weight of The Evidence

Once the Court evaluates the evidence independently, as articulated and put into context in Point I above, Defendants respectfully submit that, in the alternative, the Court should grant a new trial on all of Plaintiff's claims against STRIVE and Carmona.

---

(S.D.N.Y. 2013 ("In an employment discrimination case, like this one, eligibility for punitive damages is characterized in terms of a defendant's motive or intent") (internal quotations and citation omitted).

**B.**      **The Trial Court Was Not Fair And/Or Substantial Evidentiary Errors Occurred.**

"Where a party seeks a new trial based upon evidentiary errors … [courts] look to the standard of [Fed. R. Civ. P. Rule 61]."  *Kogut v. City of Nassau*, No. 06 Civ. 6695 (JS)(WDW), 2013 U.S. Dist. LEXIS 102198, at *6-7 (E.D.N.Y. July 22, 2013).[25]   Errors in evidentiary rulings that affect a party's substantial rights are grounds for a new trial.  *Kogut*, 2013 U.S. Dist. LEXIS at *7.  "The Second Circuit has clarified that a substantial right has been affected only where a jury's judgment was likely to have been swayed by the error. … Relevant to this inquiry is whether or not the evidence bears on an issue that is plainly critical to the jury's decision."  *Id*. at *7-8 (internal quotations and citations omitted). Moreover, under the "cumulative error" doctrine, errors that would not mandate reversal when viewed individually may require it when viewed in the aggregate.  *See, e.g.*, *United States v. Rahman*, 189 F.3d 88, 145 (2d Cir. 1999) ("It is true that the effect of multiple errors in a single trial may cast such doubt on the fairness of the proceedings that a new trial is warranted, even if no single error requires reversal") (citations omitted)  Defendants respectfully submit that the below errors – when considered individually and/or cumulatively – warrant a new trial.

### 1.      Defendants Were Prevented From Fully Testifying

During Plaintiff's direct, the Court did not curtail Plaintiff's ability to testify to the alleged incidents that formed the basis for her claims.  However, the Court unfairly limited Defendants' ability on direct examination to fully address certain incidents testified to by Plaintiff.  TT 300:6-10, 301:15-302:10, 372:2-374:23.  Moreover, the Court permitted redirect testimony for each witness – including non-party witnesses – with the exception of Weinberg, a named Defendant.  *Id*. 509:9-11.  This prevented the jury from hearing Defendants' full version of relevant events and incidents testified to by Plaintiff, and may have led the jury to simply believe Plaintiff's version.  *LNC Invs. v. First Fid. Bank*, 126 F. Supp. 2d 778, 787-88 (S.D.N.Y. 2001) (court's exclusion of probative evidence or testimony at trial constitutes grounds for new trial if it affected a substantial right of one of the parties).

---

[25]      Rule 61 provides:

Unless justice requires otherwise, no error in admitting or excluding evidence--or any other error by the court or a party--is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order.  At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

### 2.     Plaintiff's Criminal Conviction

The Court granted Plaintiff's motion *in limine* to preclude evidence of her prior conviction for grand larceny, on the grounds that "if there's been ten years without another incident and there's no direct connection between the conviction and the cause of action on trial that [the Court does] not let the conviction in." *Id.* 4:4-6:16, 9:12-24.   This in itself was reversible error, as knowledge of that background would have provided further context for the nature of Carmona's communications with Plaintiff, especially with respect to the "tough love" approach that was part of his personal philosophy. The erroneous nature of this ruling was reinforced by Plaintiff's summation, during which counsel attempted to contrast Plaintiff's history with that of STRIVE clients and other employees by stating that Plaintiff had never been incarcerated.  TT 592:15-24.  This served no other purpose than to mislead the jury as to Plaintiff's involvement with the criminal justice system and proved the relevance of Plaintiff's criminal history.   Recognizing the misleading nature of counsel's comment, the Court conceded that the comment was "ill-conceived" but refused to give judicial notice of the conviction to the jury:   "*It is unfortunate*, but I am not about to do what [defense counsel] sought."   *Id.* 614:13-619:17 (emphasis added).  Plaintiff's prior criminal conviction, especially given counsel's remark in summation, may well have swayed the jury to render a different verdict.  *See Levitant v. City of New York Human Res. Admin.*, 914 F. Supp. 2d 281, 312 (E.D.N.Y. 2012) (improper statements by counsel during summation warrant a new trial where those comments unfairly prejudice defendant and mislead the jury).

### 3.     Testimony Regarding Plaintiff's Therapists

Although the Court granted Defendants' motion *in limine* to preclude Plaintiff's therapists from testifying at trial (TT 7:19-8:12), it permitted Plaintiff to testify that she sought treatment from them, despite the fact that she failed to disclose during discovery the existence of these witnesses and that she had sought medical treatment.[26]  In essence, Defendants' hands were tied with respect to Plaintiff's trial testimony about treatment she purportedly sought, without the benefit of any treatment records or therapist depositions to verify whether she did in fact receive treatment, and if so, to explore the underlying reason(s) for her treatment and possible alternate causes for her distress.

---

[26]        To avoid unnecessary repetition, Defendants respectfully refer this Court to their *in limine* motion papers seeking the preclusion of doctor and treatment testimony, annexed as Ex. N, and seeking the disqualification of Plaintiff's counsel, annexed as Ex. O, incorporated herein by reference.

### 4.   Testimony By Maria Ortiz

Over objection, the Court allowed witness Maria Ortiz to testify about a purported contrasting example of how Carmona supposedly treated one random male participant versus one random female participant.  *Id.* 169:12-172:14.  But Plaintiff was not around for these incidents, which means they were irrelevant to her work environment.  In addition, this self-selected comparison does not even relate to Carmona's treatment of employees.  However, allowing the jury to hear skewed and irrelevant testimony like this could have improperly influenced their assessment of how Carmona treated Plaintiff.

### 5.   Impeachment of Plaintiff Regarding "Put This Bitch In a Smash" Incident

Defendants sought to impeach Plaintiff's testimony regarding this incident with a contemporaneous text message she sent to Crawford.  *Id.* 141:15-142:17; Ex. J.  Despite the fact that this document, produced by Plaintiff, was a party-opponent admission, the Court would not allow Defendants to impeach Plaintiff with it.   TT 141:15-142:17.   Had the jury heard evidence that (1) Carmona used the word "shit" instead of "bitch," (2) there was no contemporaneous mention of a look at her, and (3) she contemporaneously admitted she was engaging in pure speculation regarding whether they were talking about her, the jury may have been swayed to decide differently on Plaintiff's claims.

### 6.   Preclusion of Phil Weinberg's Investigation Notes

Plaintiff implied that nothing was done by STRIVE to investigate her complaint.  *Id.* 77:5-78:8.  But the Court rejected Defendants' attempt to introduce Weinberg's investigation notes into evidence.  *Id.* 476:14-480:18; Ex. I.  These notes, which included contemporaneous notes taken during Weinberg's interviews of STRIVE staff, would have demonstrated the fact and magnitude of the investigation conducted.  The jury's deprivation of Weinberg's notes may very well have played a role in it finding STRIVE and Carmona liable on all claims, to the extent the jury was misled to believe that Plaintiff's complaint fell on deaf ears and was not investigated.  *See Mendez-Nouel v. Gucci Am., Inc.*, No. 10 Civ. 3388 (PAE), 2012 U.S. Dist. LEXIS 160530, at *8-10 (S.D.N.Y. Nov. 8, 2012) (investigation reports – including statements made by individuals during the investigation – are admissible to consider the effect on the person conducting the investigation); *Turley v. ISG Lackawanna, Inc.*, 803 F. Supp. 2d 217, 231 (W.D.N.Y. 2011) (investigation notes pertaining to investigation of alleged harassment important to defense and considered non-hearsay if offered not for its truth, but to show investigation was done).

**C.**     **The Damages Awarded to Plaintiff Were Excessive and Should Be Remitted**

In the event the Court does not grant Defendants complete judgment as a matter of law, the damages award should be remitted by the Court pursuant to Rule 59(e). "While it is properly within the province of the jury to calculate damages, there is an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable persons may differ, but a question of law." *Macmillan v. Millenium Broadway Hotel*, 873 F. Supp. 2d 546, 559 (S.D.N.Y. 2012) (punctuation and citations omitted). "Under federal law, an award will not be disturbed unless it is 'so high as to shock the judicial conscience and constitute a denial of justice.'" *Welch*, 871 F. Supp. 2d at 191 (citation omitted). Under New York law, "an award is deemed excessive 'if it deviates materially from what would be reasonable compensation.'" *Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012) (citing N.Y. C.P.L.R. § 5501(c)). "The New York "deviates materially" standard is less deferential to a jury verdict than the federal "shock the conscience" standard.'" *Welch*, 871 F. Supp. 2d at 191.

To the extent only one or more of Plaintiff's claims under the CHRL survive, the Court should apply the New York standard in assessing the damages awarded to Plaintiff.[27]  If any of Plaintiff's § 1981 claims survive, then the federal standard should apply.  Irrespective of what standard ultimately applies, the damages awarded to Plaintiff were excessive.

The jury awarded Plaintiff $250,000 in compensatory damages, which, based on the Court's instructions, could only have consisted of back pay damages through the date of the verdict and emotional distress damages.  Regarding back pay, Plaintiff testified she was without a salary for six months, for a loss of approximately $38,000, and that her new employment has an annual salary $10,000 less than what she was earning at STRIVE.  TT 80:13-81:12, 81:19-24.  Based on those facts, as applied to the Court's instructions, the only reasonable interpretation of the jury's verdict is that over $200,000 of the $250,000 compensatory damages awarded to Plaintiff was for emotional distress.

However, "[d]amages for pain and suffering are compensatory, not exemplary, in nature." *Binder v. Long Island Lighting Co.*, 847 F. Supp. 1007, 1027 (E.D.N.Y. 1994), *aff'd in relevant part*, 57 F.3d 198 (2d Cir. 1995).  "There must therefore be some evidence of the magnitude of the injury to

---

[27]     *See Campbell v. Cellco P'ship*, No. 10 Civ. 9168 (SAS), 2012 U.S. Dist. LEXIS 110346, at *13 (S.D.N.Y. Aug. 6, 2012) (applying CPLR § 5501(c) to CHRL claims); *Sorrenti v. City of New York*, 851 N.Y.S.2d 61 (Sup. Ct. N.Y. Co. 2007) (same), aff'd *sub nom Albunio v. City of New York*, 67 A.D.3d 407 (1st Dep't 2009).

ensure that the award is not punitive." *Id*. at 1028 (*citing New York City Transit Auth. v. State Div. of Human Rights*, 78 N.Y.2d 207, 573 N.Y.S.2d 49 (1991)); 36 N.Y. Jur. 2d Damages § 64 ("The amount allowed [for pain and suffering] must be fair, free from sentiment or fanciful standards, and based on the facts disclosed").  Moreover, a plaintiff may not rely on the extent of a defendant's wrongful acts to establish a claim for emotional distress damages, which are not presumed from establishment of a claim for liability but must be separately proven.  *Tanzini v. Marine Midland Bank*, 978 F. Supp. 70, 78 (N.D.N.Y. 1997) (citations omitted); *Cullen v. Nassau County Civil Serv. Comm'n*, 53 N.Y.2d 492, 442 N.Y.S.2d 470, 473 (1981).   In other words, a plaintiff "'is not permitted to throw himself on the generosity of the jury.  If he wants damages, he must prove them.'"  *Rainone v. Potter*, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005) (citation omitted).   Factors to be considered include duration, severity, consequences and physical manifestations of the mental anguish, as well as any medical treatment that plaintiff underwent as a result of the discriminatory conduct.  *N.Y.S. Office of Mental Retardation & Dev. Disabilities v. N.Y.S. Div. of Human Rights*, 183 A.D.2d 943 (3d Dep't 1992).

"Emotional distress awards within the Second Circuit can generally be grouped into three categories of claims: garden-variety, significant and egregious."  *Macmillan*, 873 F. Supp. 2d at 560.  Evidence of mental suffering in garden-variety claims is "generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury.  Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration."  *Id*.[28]   "In the Second Circuit, garden variety emotional distress claims generally merit $30,000 to $125,000 awards."  873 F. Supp. 2d at 561.

In the instant case, Plaintiff established – at best – garden-variety emotional distress.  She did not, for example:  testify to any ongoing physical manifestations of her alleged emotional distress; present testimony of any medical or mental health professionals; present any medical or mental health treatment records; or take any medication as a consequence of her alleged distress.  Indeed, Plaintiff presented no evidence of any real long-term symptoms or effects at all (other than her unsupported testimony that she felt the need to seek continuing counseling from a mental health professional); to the

---

[28]      By contrast, in cases exceeding garden-variety, "there is typically evidence of 'debilitating and permanent alterations in lifestyle.'"  *Olsen v. County of Nassau*, 615 F. Supp. 2d 35, 47 (E.D.N.Y. 2009) (citations omitted).

contrary, she immediately began looking for a job and secured one in about six months, demonstrating the lack of any impact on her ability to continue functioning. At most, Plaintiff's "evidence" amounted to her claim that she was very upset by the working environment. When coupled with the fact that the evidence supporting Plaintiff's discrimination and hostile work environment claims is virtually non-existent (and most of the "upsetting" events were facially-neutral and thus any distress from those events would not be compensable), it is clear the jury's award of compensatory damages was excessive as a matter of law.[29] Damages did not exceed garden variety and should be remitted accordingly.

## POINT III: DISMISSAL IS WARRANTED FOR INTENTIONAL DISCOVERY VIOLATIONS.

Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure permits a court, among other sanctions, to dismiss an action if the plaintiff fails to obey an order to provide or permit discovery. A party requesting sanctions under Rule 37 must show the opposing party failed to timely disclose information required by Rule 26. To meet this burden, the moving party must show that: (1) the party having control over the evidence had an obligation to timely produce it; (2) the party that failed to timely produce the evidence had a culpable state of mind; and (3) the missing evidence is relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Lodge v. United Homes, LLC*, 787 F. Supp. 2d 247, 258 (E.D.N.Y. 2011).

As part of Defendants' motions *in limine*, Defendants argued for preclusion of all but two audio recordings because Plaintiff failed to timely produce the audio recordings, despite two orders from Magistrate Judge Dolinger directing Plaintiff to do so. In ruling on Defendants' motion *in limine* to preclude the audio recordings, the Court specifically stated:

> There isn't much doubt that there was disobedience to the magistrate judge's order on at least one and maybe on two occasions. There is also probably a likelihood, and again I'm really not a psychiatrist, but it would seem that what the defendant says makes some sense, that the reason for this delay, and I'm not sure there isn't some indication from some of the plaintiff's material, the reason in part at least for this delay was to make sure that there was no tailoring. And, as you saw from the order from the magistrate, he didn't see any, and he made it clear in any event that the material was to be fully disclosed by the 25th of February.

---

[29]     Indeed, Plaintiff testified she was most upset about Weinberg's conduct. TT 78:4-9. However, Weinberg was exonerated, which means any distress from his actions was not compensable. *See Khan v. HIP Centralized Lab. Servs.*, No. 03 Civ 2411 (DGT), 2008 U.S. Dist. LEXIS 76721 (E.D.N.Y. Sept. 17, 2008) (plaintiff not entitled to damages windfall for emotional distress resulting from actions found lawful by jury at trial). This further supports the conclusion that the award was excessive, given that a significant portion of it was due to lawful conduct.

TT 10:6-17.  The Court also stated:  "…at the moment, I have no reason to let any of them in.  I think they violated the discovery rules"; and "I think you violated the orders of the magistrate judge in producing them, and why you produced 12 or 13 on the first occasion and then 30, all of them on the next occasion with overlapping on each occasion, indeed overlapping in what you provided to me, I just don't know."  *Id.* 11:11-12, 14-18.  Thus, the Court has already opined that Plaintiff had a culpable state of mind in failing to produce the audio recordings.

In addition, as part of Plaintiff's attempt to defeat Defendants' motion *in limine* to preclude Plaintiff's therapists, counsel produced a document entitled "Initial Disclosures," dated September 10, 2012, which had been purportedly served upon Defendants' counsel by email and regular mail.  At trial, the Court directed Plaintiff to "produce some documentary evidence of [Plaintiff's] September 10 [initial] disclosure or its receipt by [Defendants]." TT 8:4-7.  To date, Plaintiff has not provided Defendants with any such proof, and upon information and belief, has not provided any to the Court either.  Defendants have already put on the record that no such document was ever received by defense counsel.  Exs. N, O.  Moreover, and as discussed above, Defendants were prejudiced by the inability to conduct any discovery regarding treatment Plaintiff received from any doctors, due to Plaintiff's failure to disclose the identities of any such doctors until the close of discovery.

Despite the magistrate judge's ruling and Court's admonition regarding Plaintiff's blatant disregard of prior discovery orders, Defendants were flabbergasted to learn during the course of the trial that Plaintiff and her counsel had inexplicably ***withheld another audio recording***.  They admitted on the record that they had obtained in or about June 2012, and still possessed, an audio recording of the conversation Crawford had with Carmona after the "wrap it up" incident.  *Id.* 69:16-17; 202:11-14; 205:21-208:25.  This recording was clearly relevant to the case, as it was direct evidence of an incident Plaintiff alleged to be unlawful.  However, it was not produced to Defendants during discovery, nor did Plaintiff ever put Defendants on notice that she was in possession of it.[30]  Indeed, in prior *in limine* motion briefing, Plaintiff and her counsel represented that, although the first failure to produce recordings was a law office failure of sorts, all recordings had by then been produced.  Ex. Q.  Based on

---

[30]       This recording clearly fell within Defendants' demands during discovery.  *See, e.g.*, Defendants' First Set of Document Requests to Plaintiff Brandi Johnson, dated September 19, 2011 (Ex. P), Definitions 1 and 9, Request Nos. 6, 7, 15, 18, 32, 43, 44.

the Court's previous comments regarding Plaintiff's recording-related conduct, it is astonishing that Plaintiff would blatantly fail to produce another recording, despite two separate court orders.  This is nothing less than a deliberate and knowing disregard of her obligations, flaunting her contempt of the court's instructions and the rules of discovery.[31]

These multiple incidents demonstrate a pattern of deliberate non-compliance with discovery obligations, even through the time of trial, with the latest an exact repetition of a violation already noted by the Court.  The egregious nature of this pattern warrants dismissal of the case as a sanction pursuant to Rule 37.  *See, e.g.*, *Southern New England Telephone Co. v. Global NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010) (dismissal of an action is justified if court finds that failure to comply with discovery order was due to willfulness, bad faith or any fault of the plaintiff); *Agiwal v. Mid Island Mortgage Corp.*, 555 F.3d 298, 302 (2d Cir. 2009) (failure to comply with court orders may result in sanctions, including dismissal of action with prejudice, pursuant to Rule 37).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant their motion: (1) for judgment as a matter of law in its entirety; or (2) for a new trial on the merits; or (3) for a remittitur, or in the alternative for a new trial, on damages; or (4) for sanctions in the form of dismissal, and for such other and further relief as this Court deems just and proper.

Dated:      New York, New York
            October 15, 2013

                          Respectfully submitted,

                          GORDON & REES, LLP

                  By:      */s/ Diane Krebs*
                          Diane Krebs
                          Kuuku Minnah-Donkoh
                          *Attorneys for Defendants*

---

[31]    Though not rising to the same level as this impropriety, Plaintiff and her counsel revealed another discovery violation during the trial that reinforces the pattern.  Plaintiff sought, and was allowed, to introduce a document never before produced – a job description she supposedly received during her employment.  Ex. R/T.Ex. XX.  TT 324:13-325:22, 327:8-21.  This document had been requested during discovery.  *See, e.g.*, Ex. P, Request No. 17.  Plaintiff had previously produced only what appeared to be a photograph of that document, which was difficult to read.  *See* Ex. S.  There is simply no excuse or explanation for Plaintiff withholding the "best evidence" in the form of the actual document.  In addition, this constitutes an additional basis for reversible error under Rule 59; given Plaintiff's discovery violation, the document should not have been allowed, even though it was used under the heading of impeachment.