UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
BRANDI JOHNSON,                                        :
       Plaintiff,            :
            :
 -against-                                        :   12 Civ. 4460 (HB)
            :
STRIVE EAST HARLEM EMPLOYMENT        :   OPINION & ORDER
GROUP, LISA STEIN, individually, ROB        :
CARMONA, individually, and PHIL        :
WEINBERG, individually,                        :
       Defendants.        :
--------------------------------------------------------------X

Hon. HAROLD BAER, JR., District Judge:

  Plaintiff Brandi Johnson brings claims of gender and race-based employment discrimination and retaliation under Title VII, 42 U.S.C. § 2000e *et seq*., the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107 *et seq*.  Following a five-day trial concluding on September 3, 2013, the jury found STRIVE East Harlem Employment Group as well as Rob Carmona liable for unlawful discrimination.  Defendants now move for judgment as a matter of law, a new trial, remittitur of damages, and dismissal for discovery violations.  For the reasons below, Defendants' motion for remittitur is GRANTED.  The Court therefore will grant a new trial on damages unless Plaintiff accepts a reduced compensatory award of $128,109.59.  But Defendants' remaining motions are DENIED.

## BACKGROUND

  STRIVE is an organization designed to assist low-income individuals with securing and maintaining gainful employment.  On February 19, 2010, the U.S. Department of Labor awarded STRIVE a federal grant worth over $4.7 million.  (Krebs Decl. Ex. B.)  The initial grant stated that its "[p]eriod of [p]erformance" would be from January 29, 2010 through January 28, 2012.  (*Id.*)  Shortly after receiving this grant, STRIVE hired Plaintiff, an African-American woman, as an Affiliate Services Coordinator on May 3, 2010.  (*Id.* Ex. C.)  Essentially her position was to oversee the work done under the grant.  Her position was funded entirely through the grant.  Plaintiff's annual salary throughout her tenure was $60,000.  On January 24, 2012, the grant's period of performance was extended to June 30, 2012.  (Krebs Decl. Ex. H, at JOHNSON 125.)

1

Carmona, STRIVE's president and founder, a dark-skinned Puerto Rican male, was Plaintiff's first supervisor. (*Id.* Ex. C.) According to Plaintiff, Carmona was a difficult supervisor to work under. For example, soon after she was hired, Carmona purportedly "yelled and screamed at [Plaintiff] in an offensive tone." (Trial Tr. 49:22–50:8.) This followed a time when Carmona came to believe that Plaintiff was spreading rumors about other STRIVE employees. Carmona also told Plaintiff that she was "the kind [of] woman who [would] throw a woman under the bus" and that she "had a sick way about [her]self." (*Id.* 50:8–10.) He then threatened to terminate Plaintiff if she were involved in any similar incidents. Sometime after this confrontation and within the first six months of Plaintiff's tenure, Lisa Stein, STRIVE's then-CFO, replaced Carmona as Plaintiff's direct supervisor.

Throughout her employment at STRIVE, Plaintiff testified that she "tried to initiate a friendship" with Carmona so that he would "leave [her] alone." (*Id.* 53:12–15.) But at one point, Plaintiff brought to Carmona's attention that a STRIVE employee may have sexually harassed one of STRIVE's female clients. As Plaintiff testified at trial, Carmona criticized Plaintiff's judgment in bringing the issue to him, commenting that this participant was "ugly as shit" and "she would have enjoyed it anyway." (*Id.* 58:5–10.) He also urged Plaintiff to "stop being so emotional." (*Id.* 58:12–13.) And according to Plaintiff, Carmona's practice of forcefully berating Plaintiff for perceived transgressions continued unabated. (*Id.* 60:2–15.)

At some point, Plaintiff then began to surreptitiously record her conversations with Carmona. One of those recordings captured an incident on March 14, 2012 during which Carmona criticized both Plaintiff and another woman. Carmona noted that while Plaintiff and this woman were "both smart," both were also "really knuckleheads." (Krebs Decl. Ex. G, at 2:11–13.) Carmona then repeatedly described Plaintiff as a "nigger" and that both she and the other woman "acted like niggers all the time." (*Id.* 2:20–6:4.) When Plaintiff complained that she was "really offended by that," Carmona repeated his statement and noted that "niggers let their feelings rule them." (*Id.* 3:2–9.) Despite this exchange's heated nature, Carmona urged that he was not "using the term 'nigger'" in a "derogatory" manner because "sometimes it's good to know when to act like a nigger." (*Id.* 2:21–24.) Carmona also testified at trial that in this instance, he had used the term "out of love" and to motivate Plaintiff to improve her behavior. (Trial Tr. 398:21–12; 429:23–25.) According to Carmona, by using the term "nigger," he meant

2

to convey that Plaintiff was "[t]oo emotional" and too "wrapped up in . . . the negative aspects of human nature" for her to succeed professionally.  (*Id.* 398:25–399:12.)

Carmona also made other comments during Plaintiff's employment at STRIVE that could be construed as demonstrating his discriminatory animus.  First, Carmona acknowledged that he "may have" told Plaintiff that "black women get in the way of themselves."  (Trial Tr. 421:14–18.)  While he claimed not to remember this specific conversation, Carmona then affirmed that he truly believed black women could "get in the way of themselves."  (*Id.* 422:23–424:7.)  In his defense, Carmona then urged that while he was at times "a male chauvinist[,] . . . in [his] head [he] knew it didn't make sense because [he] was raised by a woman that defied all of that stereotypical type of thinking."  (*Id.* 388:4–17.)  Nevertheless, Carmona acknowledged that he had a "tendency" as a "Puerto Rican male" to feel that "the man . . . rules in his house," that a man's "word is law," and that women "are too emotional" while men are not.  (*Id.* 418:3–13.)

Less than one month after the March 14 incident, Plaintiff's counsel sent a draft complaint to Phil Weinberg, STRIVE's chief executive officer, on April 11, 2012.  In response, Weinberg headed an internal investigation into Plaintiff's allegations of employment discrimination.  (*Id.* 474:9–20.)  And by April 26, a STRIVE attorney interviewed Carmona regarding Plaintiff's complaints.  (*Id.* 432:22–25.)  Yet after Plaintiff complained about discrimination, Carmona had another dispute with Plaintiff.  This time, Carmona complained about Plaintiff eating her lunch with other STRIVE employees outside of Carmona's office.  (*Id.* 400:3–11.)  After telling the group to "wrap it up," Carmona advised Plaintiff's lunch companions that they should "not allow [themselves] to be used."  (*Id.* 70:11–21; 402:4–10.)  Carmona also asked a STRIVE client to stop associating with Plaintiff "because there [was] something going on with her and the company, and [Carmona] didn't really want [the client] to get mixed up in it."  (*Id.* 215:11–16.)  Plaintiff further testified that at one point after notifying STRIVE of her potential lawsuit, Carmona walked by her desk and threatened that he would "[p]ut this bitch in a smash."  (*Id.* 72:20–23.)  Although the parties were precluded from introducing evidence of Plaintiff's text messages at trial, one text message indicated that Plaintiff had previously reported that Carmona had used the word "[s]hit" instead of "bitch."  (Krebs Decl. Ex. J.)  And the text message suggested that Plaintiff had some uncertainty as to whether Carmona had directed the comment at her.

On June 11, 2012, two months after she complained of discrimination and just over two years after she was first hired, Weinberg informed Plaintiff that STRIVE was terminating her. That termination, according to Weinberg, became necessary with the expiration on June 30 of the grant funding Plaintiff's employment.  Indeed, that grant allocated $135,171.49 to Plaintiff's position.  (Krebs Decl. Ex. H, at JOHNSON 128.)  But the same grant also assigned $522,328.51 to other positions, including $19,326.08 to Carmona as STRIVE's president and $3,690.84 to Weinberg as STRIVE's CEO.  (*Id.*)  And the grant apportioned $113,538.58 to the "Outcomes Data Specialist"—an amount comparable with the allocation to Plaintiff's position.  (*Id.*)  Yet the grant's expiration did not affect anyone else's employment or salary.  (Trial Tr. 75:13–17; 332:23–333:12.)

Carmona also testified that he played no role in Plaintiff's termination.  (*Id.* 404:13–16.) But it is undisputed that Weinberg communicated to Carmona the results of his investigation of Plaintiff's complaints before her ultimate termination.  (*Id.* 492:20–22.)  STRIVE's board of directors also admonished Carmona following that investigation.  (*Id.* 497:6–10.)  Yet despite this reprimand, Plaintiff testified that Carmona's role at STRIVE "never changed."  (*Id.* 76:25– 77:4.)  And in general, testimony revealed that Carmona played a significant role in personnel actions at STRIVE, including with regard to Plaintiff.  Indeed, Carmona interviewed Plaintiff when she was first hired.  (*Id.* 95:7–8.)  And Plaintiff testified to previous occasions where Carmona had threatened to terminate her "on the spot."  (*Id.* 50:11–23.)  Finally, Carmona still remains "the face of STRIVE."  (*Id.* 76:25–77:4; 509:6–8.)

After her termination, Plaintiff was unemployed for just over six months.  On January 7, 2013, Plaintiff obtained a new position that pays $50,000 annually.  (*Id.* 80:13–81:20.)  Plaintiff also testified that while she was still employed at STRIVE, she began seeing a therapist as a result of these events.  But Plaintiff declined to take any prescribed medication.  (*Id.* 80:5–8.) Nor did Plaintiff testify as to any physical manifestations of her distress.  Instead, she urged that when Carmona "call[ed] [her] a nigger" and implied that she was "low class," it "sh[ook] [her] character."  (*Id.* 78:4–14.)  Yet at trial, current STRIVE employees testified that Plaintiff also used the word "nigger" in the workplace, including to describe her own son.  (Trial Tr. 235:1– 18; 247:5–13; 399:13–18.)  Nevertheless, despite counsel's claim that this testimony was "unrefuted," Plaintiff unequivocally disputes these accounts.  (*Id.* 90:7–11.)  And immediately following the confrontation with Carmona, Plaintiff urges that she cried in the bathroom for

"about 45 minutes." (*Id.* 66:12–22.) She also had trouble sleeping that night, crying again at home. (*Id.* 66:25–67:4.) Ultimately, as a result of her treatment, Plaintiff claims she has suffered from reduced confidence, has become a less effective parent, and sometimes needs to "muster up the energy to get [herself] together" just to get out of bed. (*Id.* 78:18–24.)

Following the trial, the jury concluded that both STRIVE and Carmona had (1) "subjected [Plaintiff] to a hostile work environment," (2) "discriminated against [Plaintiff] because of her gender or race when STRIVE East Harlem Employment Group terminated her employment," and (3) "retaliated against [Plaintiff] because of her complaints of gender or race discrimination." (Ct. Ex. F.) The jury awarded Plaintiff $250,000 in compensatory damages. Following a subsequent bifurcated proceeding, the jury also awarded punitive damages in the amounts of $25,000 against Carmona and $5,000 against STRIVE. But the jury absolved Weinberg and Stein of all liability.

## DISCUSSION

### A. Sufficiency of the Evidence

On these facts, Defendants first move for judgment as a matter of law or a new trial based upon the sufficiency of the evidence. To succeed on their motion for judgment as a matter of law under Rule 50, Defendants must demonstrate that "there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011) (alterations in original) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)) (internal quotation marks omitted); *see* Fed. R. Civ. P. 50. And "[i]n assessing the sufficiency of evidence to support a jury verdict, [the Court] must view the record in the light most favorable to the opposing party, assuming all reasonable inferences were drawn and all credibility disputes resolved in its favor." *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 390 (2d Cir. 2004).

But Defendants' hurdle is lower as to their motion for a new trial under Rule 59(a). In that regard, "(1) a new trial under Rule 59(a) 'may be granted even if there is substantial evidence supporting the jury's verdict,' and (2) 'a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner.'" *Manley v. AmBase Corp.*, 337 F.3d 237, 244–45 (2d Cir. 2003) (quoting *DLC Mgmt. Corp. v. Town of*

*Hyde Park*, 163 F.3d 124, 133–34 (2d Cir. 1988)); *see* Fed. R. Civ. P. 59(a).  Still, to order a new

trial on this basis, the Court must conclude that "'the jury has reached a seriously erroneous

result or . . . the verdict is a miscarriage of justice,' i.e., it must view the jury's verdict as 'against

the weight of the evidence.'"  *Id.* at 245 (alterations in original) (quoting *DLC Mgmt. Corp.*, 163

F.3d at 133) (internal quotation marks omitted).  And even under Rule 59(a), "[a] jury's

credibility assessments are entitled to deference."  *Pouncy v. Danka Office Imaging Co.*, No. 06

Civ. 4777, 2009 WL 3415142, at *1 (S.D.N.Y. Oct. 22, 2009) (quoting *United States v. Landau*,

155 F.3d 93, 104–05 (2d Cir. 1998)).

        Here, applying either the standard for judgment as a matter of law or a new trial, the

evidence on liability passes muster.  In reaching this conclusion, the Court notes that the verdict

sheet combined Plaintiff's claims of race and gender discrimination.  Accordingly, the jury was

not required to specify whether they found racial animus, gender animus, or both.  (*See* Ct. Ex.

F.)  Because the Court also declined Defendants' invitation to inquire separately as to the

different types of discrimination, the verdict "must be reversed and a new trial ordered if the

court cannot determine whether the verdict was based upon [an] invalid theory."  *AIG Global*

*Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 646 F. Supp. 2d 385, 406 (S.D.N.Y. 2009) (citing

*Bruneau v. S. Kortright Cent. Sch. Dist.*, 163 F.3d 749, 759 (2d Cir. 1998)), *aff'd*, 386 F. App'x 5

(2d Cir. 2010); *see also* Trial Tr. 510:22–511:10; Ct. Ex. C.  But here, there is more than enough

evidence to support discrimination on the basis of both race and gender.  Therefore, neither

judgment as a matter of law nor a new trial as to liability is appropriate.  *See AIG Global*, 646 F.

Supp. 2d at 407 ("[E]ven if the general verdict rule applied to this case, there is no basis for

upsetting the general verdict . . . because none of the allegations or theories were either legally

defective or so lacking in evidence as to warrant either a new trial or judgment as a matter of law

in favor of the defendant."); *Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 260 (S.D.N.Y.

1999) (no reversal if "there is sufficient evidence to support both . . . theories" submitted to the

jury).

        In addition, Plaintiff originally brought all of her claims pursuant to federal, state, as well

as city law.  But in passing the NYCHRL, the New York City Council determined that "state and

federal civil rights statutes can serve only 'as a *floor* below which the City's Human Rights law

cannot fall.'"  *Mihalik v. Credit Agricole Cheuvreux N. Am.*, 715 F.3d 102, 109 (2d Cir. 2013)

(quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)) (internal

quotation marks omitted).  Accordingly, the Court instructed the jury in accordance with the standard applicable under the NYCHRL only.  *See, e.g.*, *Katt v. City of N.Y.*, 151 F. Supp. 2d 313, 328 n.10 (S.D.N.Y. 2001) (noting "risk [of] confusion" from "instructing the jury separately on each of plaintiff's claims" under state, federal, and city antidiscrimination laws).  Thus, the Court will consider the entire jury award as if it were allocated pursuant to Plaintiff's NYCHRL claim.  *See Singleton v. City of N.Y.*, 496 F. Supp. 2d 390, 393 (S.D.N.Y. 2007) ("[W]here only a single award of damages, not segregated into separate components, is made, the preferable rule, we think, is that the successful plaintiff be paid under the theory of liability that provides the most complete recovery." (alteration in original) (quoting *Magee v. U.S. Lines, Inc.*, 976 F.2d 821, 822 (2d Cir. 1992))).

### 1. Gender and Race Discrimination

The Court turns then to Plaintiff's discrimination claims under the NYCHRL.  Although the Court instructed the jury separately as to Plaintiff's hostile work environment claims as well as her discriminatory termination claims, "[u]nder the NYCHRL, there are not separate standards for 'discrimination' and 'harassment' claims."  *Clarke v. InterContinental Hotels Grp., PLC*, No. 12 Civ. 2671, 2013 WL 2358596, at *11 (S.D.N.Y. May 30, 2013).  Instead, "there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based" on a protected characteristic.  *Id.* (quoting *Sotomayor v. City of N.Y.*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012) (internal quotation marks omitted)).  Thus, "the plaintiff need only demonstrate by a preponderance of the evidence that she has been treated less well than other employees" because of a protected trait.  *Mihalik*, 715 F.3d at 110 (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39 (1st Dep't 2009)) (internal quotation marks omitted).

And in that regard, any "unwanted . . . conduct" on the basis of a protected characteristic "imposes a different term or condition of employment[,] . . . even if the harassing conduct does not rise to the level of being 'severe and pervasive.'"  *Id.* (quoting *Williams*, 872 N.Y.S.2d at 38).  Questions surrounding "the conduct's severity and pervasiveness are relevant only to the issue of damages."  *Id.*  This "focus on unequal treatment" applies "regardless of whether the conduct is 'tangible' (like hiring or firing)."  *Id.* at 114 (quoting *Williams*, 872 N.Y.S.2d at 40).  But if Plaintiff establishes such unequal treatment, Defendants "can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of

discrimination would consider 'petty slights and trivial inconveniences.'" *Id.* at 111 (quoting *Williams*, 872 N.Y.S.2d at 41).

### a. Carmona's Animus

I examine Carmona's racial animus first. In that regard, whatever context Defendants seek to attach to Carmona's behavior, the jury could have easily concluded that Carmona's racial animus became apparent when he called Plaintiff a nigger less than three months prior to her termination. To be clear, under no circumstances that I can conceive of would calling a subordinate a nigger be acceptable conduct. Further, to suggest as Defendants do that the jury was compelled to accept Carmona's after-the-fact rationalizations is equally far-fetched. *See La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 210 (2d Cir. 2010) ("[P]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." (alteration in original) (quoting *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993))). Carmona's later admission that black women "get in the way of themselves" also contributes to the conclusion that race could well have motivated Carmona's harsh treatment of Plaintiff. (Trial Tr. 422:23–424:7.)

And Carmona's comments about black women also support a finding of gender discrimination. Indeed, despite what Carmona described as his best attempts to change, the jury could have reasonably concluded that he still viewed black women as inferior. Carmona's response to Plaintiff's concerns that a STRIVE employee had sexually harassed a client only supports a finding of gender animus. By accusing Plaintiff of bad judgment in bringing this serious issue to him, not only ridiculing the complainant as "ugly as shit" but also stating that she "would have enjoyed it," (Trial Tr. 58:5–10.), Carmona "clearly signaled that [he] considered it appropriate to foster an office environment that degraded women." *Hernandez v. Kaisman*, 957 N.Y.S.2d 53, 59 (1st Dep't 2012). While Carmona disputed that he made these statements, it was within the jury's purview to reject his denials. And with his additional accusation that Plaintiff was "the kind [of] woman who [would] throw a woman under the bus," (Trial Tr. 50:8–10.), it was not difficult for the jury to conclude that gender motivated his treatment of Plaintiff. Together with Carmona's general views about women, the jury could have reasonably concluded that all these confrontations were tainted with gender animus.

**b. Defendants' Affirmative Defense**

As an affirmative defense, Defendants urge that Carmona's treatment of Plaintiff constituted nothing more than petty slights or trivial inconveniences.  In that regard, Defendants seek to separate the March 14 "nigger" accusations from the rest of Carmona's tirades.  Similarly, Defendants also ask the Court to view in isolation Carmona's comment that Plaintiff was "the kind [of] woman" to sabotage other women.  But "[a]s with most affirmative defenses, the employer has the burden of proving the conduct's triviality under the NYCHRL." *Mihalik*, 715 F.3d at 111.  And in weighing both "the plaintiff's claim and the defendant's affirmative defense, courts must consider the 'totality of the circumstances'" without ignoring the "overall context in which [the challenged conduct occurs]." *Id.* (alteration in original) (quoting *Hernandez*, 957 N.Y.S.2d at 59).  Indeed, under the NYCHRL "even a single comment may be actionable in the proper context." *Id.* at 113 (citing *Williams*, 872 N.Y.S.2d at 41 & n.30).

Applying this standard, the Court cannot sustain Defendants' contention that Carmona's conduct was trivial.  Indeed, when considered within the entire context of Carmona's interactions with Plaintiff, Defendants' requests to consider in a vacuum either the "kind [of] woman" comment or the "nigger" comment make little sense.  Rather, Carmona's own attempts to explain his thought processes support the reasonable conclusion that his treatment of Plaintiff was consistently motivated by his views that black women behave too emotionally.

Further, the evidence demonstrates that Carmona brought these views into the workplace. First, after Plaintiff reported the sexual harassment complaint and Carmona responded by belittling the complainant's appearance and sexual choices, Carmona told Plaintiff she should "stop being so emotional."  (Trial Tr. 58:12–13.)  Then, during the March 12 incident in which he called Plaintiff a "nigger," Carmona explained his view that "niggers let their feelings rule them."  (Krebs Decl. Ex. G, at 3:2–9.)  Carmona later justified calling Plaintiff a "nigger" as only seeking to convey that she was "too emotional."  (Trial Tr. 398:25–399:12.)  Finally, when asked to explain his "male chauvinist" views, Carmona explained that "black women get in the way of themselves," that women in general are "too emotional," and that women should obey men.  (*Id.* 418:3–13.)

To be sure, Carmona minimized these views as a "tendency" of his that contradicted some of his other experiences with women.  (*Id.* 418:3–13.)  But the story that these comments and rationalizations tell the jury is that of an individual whose demeaning treatment of

Plaintiff—regardless whether Carmona made a gender- or race-based comment during each confrontation—was in fact motivated by both her gender and her race. *See Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) ("The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be.").

### c. Carmona's Role in Plaintiff's Termination

Defendants next urge that because Weinberg was not found liable for discrimination, Plaintiff's claim for discriminatory termination must fail. But while no direct testimony confirmed Carmona's influence in Plaintiff's termination, that inference was well within the jury's ability to draw. Although Weinberg claimed that he alone made the decision to terminate Plaintiff, the jury disregarded that testimony when it found both Carmona and STRIVE liable for Plaintiff's discriminatory termination. That credibility determination is entitled to deference. *Pouncy*, 2009 WL 3415142, at *1. Indeed, a termination may be discriminatory "even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the" adverse action. *Zagaja v. Vill. of Freeport*, No. 10 Civ. 3660, 2013 WL 2405440, at *1 (E.D.N.Y. June 3, 2013) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999)). The evidence here establishes that given Carmona's role at STRIVE, the jury was not unreasonable in concluding that his influence permeated Plaintiff's firing despite absolving Weinberg of liability.

In that regard, several facts pierce the wall that Defendants seek to erect around Carmona. First, Carmona had a direct hand in the decision to hire Plaintiff, as well as subsequent decisions not to terminate her. Indeed, Carmona interviewed Plaintiff when she was first hired. (Trial Tr. 95:7–8.) Carmona had also previously threatened to terminate Plaintiff "on the spot" after determining that she was "the kind [of] woman" to sabotage other women. (*Id.* 50:8–23.) As noted above, the weight of the evidence supports the conclusion that this termination threat was tainted with discriminatory animus. Second, Carmona was interviewed regarding Plaintiff's discrimination complaints before her termination. Weinberg then spoke with Carmona to communicate the results of his investigation, resulting in an admonishment from STRIVE's board. (*Id.* 438:4–7; 441:13–25.)

But nothing else changed regarding Carmona's general role in the organization. (*Id.* 76:25–77:4; 509:6–8.) Indeed, Carmona continued to exercise disciplinary authority over

Plaintiff, admonishing both her and her colleagues for eating lunch outside his office.  And Carmona advised both STRIVE employees as well as STRIVE's clients to keep their distance from Plaintiff because of her ongoing complaints of discrimination.  By continuing to assert himself in personnel matters regarding Plaintiff after she complained, along with his prior role in matters relating to her hiring and firing as well as his unchanged prominence within the organization, the jury reasonably inferred Carmona's involvement in the decision to fire Plaintiff. *See Morgan v. NYS Att'y Gen.'s Office*, No. 11 Civ. 9389, 2013 WL 491525, at *13 (S.D.N.Y. Feb. 8, 2013) ("Individual employees may be held personally liable under the . . . NYCHRL if they participate in discriminatory conduct.").

### d.  The Grant's Expiration

Defendants also proffer the expiration of the grant funding Plaintiff's position as the legitimate explanation for Plaintiff's termination.  But the weight of the evidence supports the jury's rejection of that theory as well.  Indeed, Defendants do not dispute that the grant partially funded several other positions, including Carmona's and Weinberg's.  And the grant allocated $113,538.58 to the "Outcomes Data Specialist"—an amount comparable with the $135,171.49 set aside for Plaintiff's position.  (Krebs Decl. Ex. H, at JOHNSON 128.)  That none of these positions suffered any financial impact upon the grant's expiration belies Defendants' claim that STRIVE was constrained to terminate Plaintiff.  When presented with such conflicting evidence, the Court will defer to the jury's determination that discrimination was the actual reason for Plaintiff's firing.  *See Furfero v. St. John's Univ.*, 941 N.Y.S.2d 639, 642 (2d Dep't 2012) (determining existence of discrimination is generally left to the jury where "the plaintiff responds with some evidence that at least one of the reasons proffered by the defendant[s] [is] false, misleading, or incomplete" (alterations in original) (quoting *Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 123 (1st Dep't 2011)) (internal quotation marks omitted)).  Coupled with the ample evidence of discriminatory animus on Carmona's part, it was well within the jury's purview to conclude that Plaintiff's race and gender played a role in her firing despite the grant's expiration.  *See Mihalik*, 715 F.3d at 110 n.8 (to succeed under NYCHRL, "the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason").

### 2.  Retaliation

Similarly, the weight of the evidence also supports a finding of retaliation based on Plaintiff's termination as well as Carmona's treatment of her after she complained.  To support a

retaliation claim under the NYCHRL, "the plaintiff must show that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Id.* at 112 (citations omitted). Plaintiff's draft complaint on April 11, 2012 is obviously protected activity about which all Defendants received notice. Further, not only did Plaintiff's termination follow within two months of that complaint and closely on the heels of STRIVE's internal investigation, *see Schupbach v. Shinseki*, 905 F. Supp. 2d 422, 436 (E.D.N.Y. 2012) ("[A] period of only two months between a protected activity and an adverse action may permit a reasonable jury to find the acts to be temporally proximate and causally related." (alteration in original) (quoting *Ashok v. Barnhart*, 289 F. Supp. 2d 305, 315 (E.D.N.Y. 2003))), but Carmona also advised multiple individuals at STRIVE to "not allow [themselves] to be used" by Plaintiff because of her complaints of discrimination. These comments, made close in time with Plaintiff's termination, are direct evidence of Carmona's retaliatory animus. *See Tomassi*, 478 F.3d at 115 (supervisor's remarks are more probative of intent when made close in time to the adverse action). Coupled with the evidence of pretext described above that undercuts Defendants' proffered reliance on the grant's expiration, sufficient evidence supports a finding of retaliatory termination.

And not only do Carmona's comments demonstrate his retaliatory animus regarding her termination, but they also support a retaliation claim independent of Plaintiff's firing. *See Mihalik*, 715 F.3d at 116 ("[A] jury could reasonably find that publicly humiliating [an employee] in front of [other employees] and otherwise shunning her was likely to deter a reasonable person from opposing his harassing behavior in the future."). Defendants urge that those comments would not have deterred a reasonable person from complaining about discrimination. But "the 'chilling effect' of particular conduct is context dependent." *Id.* at 116. Here, that context includes Carmona's prominent role at STRIVE as its founder as well as the weight his words carry within that organization in comparison with other employees. Especially coming from an individual of Carmona's stature, his admonishments to avoid contact with Plaintiff have an even greater chilling effect. *See Mihalik*, 715 F.3d at 112 (assessment of adverse conduct must be "made with a keen sense of workplace realities" (quoting *Williams*, 872 N.Y.S.2d at 34)); *cf. EEOC v. Bloomberg L.P.*, No. 07 Civ. 8383, 2013 WL 4799161, at *21 (S.D.N.Y. Sept. 9, 2013) (sufficient adversity where "a person in [Plaintiff's] position may be deterred from pursuing her complaint out of fear that a supervisor . . . would continue to try to

affect her career negatively"). Sufficient evidence thus supports liability on all claims against Carmona and STRIVE. Accordingly, neither judgment as a matter of law nor a new trial on liability is warranted.

## B. Punitive Damages

Defendants next urge that Plaintiff did not prove punitive damages as a matter of law. In analyzing punitive damages, the same "federal standard applies . . . under the [NYCHRL]" as well as under federal law. *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 563 (S.D.N.Y. 2012) (alteration in original) (quoting *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 101 (2d Cir. 2001)). Plaintiff's punitive damages award thus turns on whether the evidence supports an inference of "intentional discrimination . . . 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Id.* (alteration in original) (quoting *Zimmermann v. Assoc. First Capital Corp.*, 251 F.3d 376, 384 (2d Cir. 2001)) (internal quotation marks omitted). That "requisite state of mind may be inferred from the circumstances," *Manzo v. Sovereign Motor Cars, Ltd.*, No. 08 Civ. 1229, 2010 WL 1930237, at *2 (E.D.N.Y. May 11, 2010), and may be proved where "[e]gregious or outrageous acts" themselves "support[] an inference of the requisite evil motive." *MacMillan*, 873 F. Supp. 2d at 563 (first alteration in original) (quoting *Hill v. Airborne Freight Corp.*, 212 F. Supp. 2d 59, 75 (2d Cir. 2002)). Further, "[e]vidence that the employer was generally familiar with anti-discrimination law when it committed the discriminatory act is sufficient to permit the inference that it acted with the requisite state of mind to justify an award of punitive damages." *Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 309 (S.D.N.Y. 2008).

Here, Carmona's plethora of discriminatory comments supports the jury's finding of malice or reckless indifference to Plaintiff's right to work free from race and gender discrimination. For example, Defendants do not dispute that Carmona directly referred to Plaintiff as a "nigger." Yet STRIVE's employee handbook expressly bans "[a]ll forms of illegal discrimination." (Trial Ex. 33, at STRIVE 000054.) That handbook also prohibits conduct "that creates a hostile environment," including "racial remarks." (*Id.*) And according to STRIVE's policy, discriminatory harassment also includes "commentary or conduct that would offend others on the basis of . . . race, [or] . . . sex." (*Id.*) Carmona acknowledged that he was aware of and received training regarding these antidiscrimination and antiharassment policies. (Trial Tr. 439:13–25.) The evidence therefore supports the jury's inference that Carmona acted at least

13

with reckless indifference to Plaintiff's rights.  Judgment as a matter of law as to punitive damages is thus inappropriate.

## C.  Additional Arguments for a New Trial on Liability

Next, Defendants argue that evidentiary errors warrant a new trial.  Where there has been an objection, a new trial is warranted if the Court's evidentiary ruling was "clearly prejudicial to the outcome of the trial," taking into account "the record as a whole."  *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005) (quoting *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 17 (2d Cir. 1996)).  In undertaking this harmless error analysis, courts consider "whether the testimony bore on an issue that is plainly critical to the jury's decision, whether that testimony was material to the establishment of the critical fact or whether it was instead corroborated and cumulative, and whether the wrongly admitted evidence was emphasized in arguments to the jury."  *Cameron v. City of N.Y.*, 598 F.3d 50, 61 (2d Cir. 2010) (quoting *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000)).  But where Defendants did not object, a new trial is warranted only for plain error "so serious and flagrant that it goes to the very integrity of the trial."  *Marcic*, 397 F.3d at 124 (quoting *Greenway v. Buffalo Hilston Hotel*, 143 F.3d 47, 51 (2d Cir. 1998)).  Here, no such errors were made.

### 1.  Defendants' Testimony

Defendants first urge that they were prevented from fully testifying with regard to the various incidents of harassment that Plaintiff experienced.  Here, the Court exercised its discretion pursuant to Rule 403 to exclude cumulative evidence that "replicate[d] other admitted evidence."  *United States v. Valle*, No. 12 Cr. 847, 2013 WL 440687, at *7 (S.D.N.Y. Feb. 2, 2013) (quoting *United States v. Jamil*, 707 F.2d 638, 643 (2d Cir. 1983)); *see* Fed. R. Evid. 403 (permitting court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . undue delay, wasting time, or needlessly presenting cumulative evidence").  Regarding the various incidents about which Defendants maintain they were precluded from testifying, the Court stated on the record that all of the Defendants had "an opportunity to tell their story" but "[t]hat does not mean that they can tell the identical same story as two or three previous witnesses have already told us."  (Trial Tr. 372:6–9.)  The Court then reiterated this point, observing that "these are your witnesses and they are defendants and they are entitled to tell their story."  (*Id.* 373:24–374:1.)  And the Court further clarified that "[a]ll I am telling [Defendants] is we are not going to have a repetition of the same stories from the same mouths as

14

we have had before." (*Id.* 374:1–3.)  Accordingly, each Defendant testified at length regarding Plaintiff's perceived performance issues as well as their characterizations of the incidents described above. (*See, e.g.*, *id.* 289:19–304:4, 388:24–404:16, 462:21–470:19.)  The record thus contradicts Defendants' claim that they were unable to provide their side of the story.

To the extent that Defendants also urge that a new trial is warranted because the Court precluded redirect examination of Weinberg, the Court notes that "[t]he scope of redirect examination is a matter entrusted to a trial judge's broad discretion." *United States v. Vasquez*, 267 F.3d 79, 85 (2d Cir. 2001) (quoting *United States v. Diaz*, 176 F.3d 52, 80 (2d Cir. 1999)). Exercising that discretion, the Court precluded redirect examination because the topics as to which Weinberg had testified on direct and cross-examination were fully examined through his own testimony as well as that of prior witnesses.  Therefore, any probative value to the jury from redirect examination was substantially outweighed by the same concerns of cumulative evidence and wasting time described above.

But even if the Court's rulings prevented Defendants from presenting some new version of these events to the jury, that error was harmless.  Indeed, Defendants make no attempt to provide the Court with any excluded testimony that might have swayed the jury's decision. *See Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 152 (2d Cir. 2010) ("[A]n offer of proof . . . is required where, as here, 'the significance of the excluded evidence is not obvious or where it is not clear what the testimony of the witness would have been or that he was even qualified to give any testimony at all.'" (quoting *Fortunato v. Ford Motor Co.*, 464 F.2d 962, 967 (2d Cir. 1972))).  This failure robs the Court of its ability "to reevaluate [its] decision in light of the actual evidence to be offered" or otherwise "determine if the exclusion affected the substantial rights of the party offering it."  *Fortunato*, 464 F.2d at 967 (citations omitted).  The Court will not grant a new trial "simply on [Defendants'] claim that [they] would have proven a certain fact or facts had [they] been given a chance."  *Id.*

### 2. Plaintiff's Prior Conviction

Defendants next contend that the Court erred in refusing to admit Plaintiff's 13-year-old conviction for fraud as evidence of Carmona's state of mind and the need to be firm with Plaintiff.  First, Defendants failed to make this argument in their opposition to Plaintiff's motion in limine to preclude evidence of the prior conviction under Federal Rule of Evidence 609(b). (*See* Trial Tr. 6:1–14; 614:14–23.)  In that opposition, Defendants instead argued within the

framework of Rule 609(b) regarding the permissible use of convictions for impeachment purposes. *See Zinman v. Black & Decker (U.S.), Inc.*, 983 F.2d 431, 434 (2d Cir. 1993) (noting that Rule 609(b) concerns use of convictions "to attack a witness's credibility"). Because Defendants did not raise their alternative evidentiary purpose, their argument now is subject to plain error review. *See Marcic*, 397 F.3d at 124 (noting that "unpreserved error[s]" are examined only for "plain error"); *United States v. Ruffin*, 575 F.2d 346, 355 (2d Cir. 1978) (noting that defendant's objection was waived when he raised new ground for evidentiary error not previously asserted at trial). And given the evidence of Carmona's rough treatment of STRIVE employees regardless of any convictions, (*see, e.g.*, Trial Tr. 236:3–237:15, 248:22–249:22, 261:13–263:4; 488:14–23), Defendants had ample opportunity to paint Carmona's communication style in a nondiscriminatory light. Excluding the conviction as evidence of Carmona's state of mind thus did not affect the integrity of the trial. *See N.Y. Univ. v. Planet Earth Found.*, 163 F. App'x 13, 15 (2d Cir. 2005) (no reversal where defendant failed to show harm).

Defendants also urge that Plaintiff's summation related to this issue warrants a new trial. In that regard, Plaintiff urged in closing that she "was not previously incarcerated" and therefore Carmona had no reason to subject her to his rough motivation techniques apart from discrimination. (Trial Tr. 592:15–24.) Plaintiff in fact was not incarcerated in connection with her fraud conviction, but the jury could have erroneously concluded from these comments that Plaintiff had a clean record. Of course it is also possible for the jury to have inferred that she had a criminal conviction but that she had avoided incarceration. Despite this lapse in judgment on the part of Plaintiff's counsel, a new trial is not warranted on this ground. Indeed, "[n]ot every improper or poorly supported remark made in summation irreparably taints the proceedings; only if counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury, should a new trial be granted." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 581 (S.D.N.Y. 2011) (quoting *Marcic*, 397 F.3d at 127)). Here, the "effect of any improprieties . . . assessed within the totality of the circumstances of the case" supports the verdict despite any potential confusion regarding Plaintiff's criminal record. *Marcoux v. Farm Serv. & Supplies, Inc.*, 290 F. Supp. 2d 457, 472 (S.D.N.Y. 2003). Coupled with the substantial independent evidence described above regarding liability, any error was not significant enough to raise the "'reasonable probability' that the jury's verdict was influenced by the improper

conduct of counsel." *Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, No. 09 Civ. 5251, 2013 WL 3820671, at *32 (E.D.N.Y. July 24, 2013) (quoting *Chang v. City of Albany*, 150 F.R.D. 456, 459 (N.D.N.Y. 1993)).

### 3. Weinberg's Investigation Notes

Defendants also ask for a new trial on the basis of the Court's refusal to admit Weinberg's notes regarding his investigation of Plaintiff's complaints. During trial, Defendants offered this evidence pursuant to the hearsay exception for business records. *See* Fed. R. Evid. 803(6). But as the Court concluded at trial, Weinberg's admission that these were "unique" business records, (Trial Tr. 479:21–24), meant that they fell outside the scope of the business record hearsay exception. *See Park W. Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314, 331 (S.D.N.Y. 2009) (business record exception does not apply where evidence is a "unique document not kept in the regular course of business"). Further, the Court found that the notes "indicate[d] a lack of trustworthiness" given that the investigation came in response to Plaintiff's draft complaint against STRIVE. Fed. R. Evid. 803(6)(E); *see Lewis v. Velez*, 149 F.R.D. 474, 488 (S.D.N.Y. 1993) (noting that exclusion of "investigative reports" most often arises where they are "compiled in anticipation of litigation" (quoting *Gentile v. Cnty. of Suffolk*, 129 F.R.D. 435, 457 (E.D.N.Y. 1990)). Indeed, the notes suggest "[a] strong likelihood of improper motivation" given that Weinberg "[was] almost certain, when making the memorandum or report, to be sharply affected by a desire to exculpate himself and to relieve himself *or his employer* of liability," *Lewis*, 149 F.R.D. at 488 (emphasis added) (quoting *Hoffman v. Palmer*, 129 F.2d 976, 991 (2d Cir. 1942)), even though Weinberg had not yet been named as a defendant in the draft complaint. The Court sees no reason to depart from that conclusion now.

To the extent Defendants now recast their argument, urging that Weinberg's notes were admissible evidence of his state of mind—i.e., a nonhearsay purpose—that alternative theory was waived at trial when they sought to introduce these records pursuant only to a hearsay exception. Nor did refusing to admit these records for this nonhearsay purpose constitute plain error, as Weinberg testified at length regarding his own participation in the investigation. (*See, e.g.*, Trial Tr. 473:475:20; 481:9–484:15.) Indeed, without prejudice as to Defendants' ability to demonstrate the scope of the investigation through testimony or any serious dispute from Plaintiff as to whether an investigation in fact occurred, a new trial is not warranted. *See Marcic*,

397 F.3d at 124 (reversal appropriate for evidentiary error "only if an erroneous ruling affected a party's substantial rights").

### 4.  Remaining Evidentiary Concerns

Defendants next urge that the Court should not have permitted Maria Ortiz to testify regarding Carmona's treatment of a male STRIVE client as compared with a female STRIVE client.  Defendants do not even bother to identify any possible unfair prejudice from this testimony.  And regardless whether Plaintiff witnessed these incidents, they are clearly relevant to any animus Carmona holds towards women and the likelihood that he discriminated against Plaintiff on the basis of her gender.  The jury was therefore well-positioned to decide the testimony's probative value.  Fed. R. Evid. 401 ("Evidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."); Fed. R. Evid. 402 (noting that "[r]elevant evidence is admissible" unless otherwise provided).

Finally, Defendants assign error to the preclusion of Plaintiff's text messages for impeachment purposes.  At trial, Plaintiff testified that Carmona threatened that he would "[p]ut this bitch in a smash."  (Trial Tr. 72:20–23.)  But Plaintiff's text message indicated both that she previously reported that he said "[s]hit" instead of "bitch" and that she was slightly uncertain as to whether Carmona was referring to her.  (Krebs Decl. Ex. J.)  But even if preclusion of this statement were error, it is harmless and therefore does not support a new trial.  *See United States v. Williams*, 271 F. App'x 81, 84 (2d Cir. 2008) ("Because the value (if any) of the excluded evidence to [the] defense was *de minimus*, any error in the district court's evidentiary ruling was harmless.").  Regardless whether Carmona used the term "shit" or "bitch" after Plaintiff complained of her treatment, that distinction was minor.  Indeed, both Plaintiff's trial testimony and the contents of the text message convey a similar threat, even if Plaintiff were only "almost certain," instead of completely certain, that Carmona had been referring to her.

And the significant independent evidence of gender discrimination and retaliation also supports a finding of harmless error.  For example, Carmona himself admitted that he generally viewed black women as inferior.  He also admitted that he had sought to keep STRIVE employees from interacting with Plaintiff following her complaint.  Thus, in the context of the trial as a whole, the record still supports gender discrimination and retaliation even if Plaintiff had been impeached with her text messages.  *See Marcic*, 397 F.3d at 124 (new trial requires an

error that was "clearly prejudicial to the outcome of the trial . . . in light of the record as a whole" (quoting *Pescatore*, 97 F.3d at 17)); *McLean v. McGinnis*, 29 F. Supp. 2d 83, 99 (E.D.N.Y. 1998) (harmless error where evidence was otherwise "overwhelming").

**D.  Discovery Issues**

Defendants also ask the Court to award Defendants either dismissal or a new trial because of Plaintiff's discovery violations.  First, Defendants argue that the Court did not go far enough in sanctioning Plaintiff for failing timely to disclose the identities of Plaintiff's therapists.  The Court precluded these doctors from testifying a trial.  But Defendants now ask for a new trial based on Plaintiff's testimony in which she told the jury that she saw these therapists as a result of her experience at STRIVE.  In that regard, the Court "has broad discretion to determine an appropriate sanction for discovery violations based on the facts of the particular case." *R.F.M.A.S., Inc. v. So.*, 271 F.R.D. 13, 24 (S.D.N.Y. 2010) (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 101 (2d  Cir. 2002)).  "An appropriate sanction is one that will:  (1) deter parties from violating discovery obligations; (2) place the risk of an erroneous judgment on the party that wrongfully created the risk; and (3) restore the prejudiced party to the same position that it would have been in absent the discovery violation by an opposing party." *Id.* (citing *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)).

Here, Defendants did not have the opportunity to depose Plaintiff's therapists and Plaintiff did not offer a convincing explanation for her failure to disclose.  Therefore, preclusion of the therapists' testimony was warranted.  *See Patterson v. Balsamico*, 440 F.3d 104, 118 (2d Cir. 2006) (approving preclusion of "belatedly-identified witnesses").  But nothing prevented Defendants from asking Plaintiff at her deposition about any medical treatment or professional help she had received.  Indeed, the amended complaint filed on August 20, 2012, over one year before the trial in this action, specifically noted that Plaintiff sought medical treatment.  (Am. Compl. ¶ 62.)  Further, Plaintiff disclosed these therapists' identities during her deposition on May 22, 2013.  (Johnson Dep. 264:13–265:8; Krebs Decl. Ex. N, at 3.)  But rather than seek an extension of discovery or a continuance of the trial when they learned the identities of these therapists, Defendants sought instead to preclude all testimony related to Plaintiff's medical treatment.  (*See* Krebs Decl. Ex. N.)  And while the Court permitted Plaintiff to testify as to seeking medical treatment, Defendants chose not to cross-examine her as to that treatment.

Given these options available to Defendants to dispute Plaintiff's testimony, their tactical decisions do not warrant a new trial. Preclusion was therefore sufficient to remedy any prejudice from Plaintiff's failure to disclose.

Second, Defendants ask for dismissal of Plaintiff's claims as a consequence of these discovery violations as well as because of issues regarding her failure to disclose certain audio tapes prior to trial. To be sure, Plaintiff's failure to comply with her discovery obligations is of concern. But dismissal of her case is unwarranted here. Indeed, the Court already not only excluded most of the audio tapes with the exception of those to which Defendants had no objection, but also precluded the therapists from testifying as noted above. And given its harsh nature, dismissal on the basis of discovery violations generally requires a prior warning from the Court. *In re Consol. RNC Cases*, No. 05 Civ. 1564, 2009 WL 130178, at *4 (S.D.N.Y. 2009) (citing *Simmons v. Abruzzo*, 49 F.3d 83, 88 (2d Cir. 1995)). No such warning was given here. Accordingly, the Court declines to dismiss the action at this juncture.

**E.  Damages Remittitur**

Finally, Defendants ask the Court to reduce the jury's compensatory damages award. "When a trial court finds a damage verdict to be excessive, it may order a new trial on all issues or only on the question of damages. Alternatively, the court may grant remittitur . . . ." *MacMillan*, 873 F. Supp. 2d at 559 (alteration in original) (quoting *Iannone v. Frederic R. Harris, Inc.*, 941 F. Supp. 403, 411 (S.D.N.Y. 1996)). By ordering a remittitur, the Court "compels a plaintiff to choose between a reduction of an excessive verdict and a new trial." *Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 579 (S.D.N.Y. 2011) (quoting *Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 257 (S.D.N.Y. 2007)). "Where the basis for the remittitur order is the district court's view that the award is 'intrinsically excessive,' *i.e.*, is greater than the amount a reasonable jury could have awarded but the excess is not attributable to a discernible error, the court should reduce the award 'only to the maximum amount that would be upheld by the district court as not excessive.'" *Rangolan v. Cnty. of Nassau*, 370 F.3d 239, 244 (2d Cir. 2004) (citations omitted) (quoting *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1330 (2d Cir. 1990)). Here, because the jury did not differentiate between the different categories of damages in reaching the total award, the Court "will consider whether the award as a whole is excessive to compensate [Plaintiff] for the injuries and losses that were supported by the evidence." *Tatum v. Jackson*, 668 F. Supp. 2d 584, 601–02 (S.D.N.Y. 2009).

Considering back pay first, the evidence supports an award of $38,109.59.  The Court defined back pay for the jury as "the amount of damages or lost earnings through the date of your verdict."  (Ct. Ex. E, at 25.)  Plaintiff was terminated on June 11, 2012, but continued to be paid through June 29, 2012.  (Trial Ex. S.)  Given her reemployment on January 7, 2013, Plaintiff was unemployed without pay for 192 days.  And prorating her annual $60,000 salary at STRIVE for that period results in a back pay award of $31,561.64.  But Plaintiff's new salary is also $10,000 per year less than her salary at STRIVE.  Accordingly, from January 7, 2013 through the date of the verdict on September 3, 2013, Plaintiff proved an additional back pay award of $6,547.95, for a total back pay award of $38,109.59.

Turning to front pay, Defendants dispute whether front pay could have been awarded based on the lack of a specific charge to the jury mentioning front pay.  But in describing compensatory damages, the Court instructed the jurors that "[i]f you find in favor of the Plaintiff, then you must award her such sum as you find by the preponderance of the evidence will fairly and justly compensate the Plaintiff for any damages you find she sustained as a direct result of the Defendants' unlawful conduct."  (Ct. Ex. E, at 24–25.)  This language permits the jury to find front pay in addition to back pay.  *See Broadnax v. City of New Haven*, 141 F. App'x 18, 23–24 (2d Cir. 2005) (finding that jury could award front pay despite district court's failure to instruct jury on factors to consider in awarding front pay).

But even given an award of front pay, the amount of proven front pay is limited.  Indeed, while the jury reasonably concluded that the expiration of the grant funding Plaintiff's position was an insufficient explanation for Plaintiff's immediate termination, that expiration necessarily affected STRIVE's ability to pay Plaintiff's salary.  With no evidence as to how STRIVE would be able to make up that $4.7 million shortfall over the long term, Plaintiff has not proved that she would have stayed employed at STRIVE for longer than an additional year.  *See Chisholm*, 824 F. Supp. 2d at 577 (reducing front pay award to two years where longer award "would be unduly speculative").  Plaintiff's strained relationship with Weinberg—who remains STRIVE's CEO and against whom no discrimination was found—also supports the conclusion that Plaintiff has failed to prove a more substantial front pay award.  *Id.* (citing "a poor working relationship with the management structure" as reason to reduce front pay).  Accordingly, the evidence supports an award of only $10,000 in front pay representing one year of additional employment.

As Plaintiff did not prove the value of any lost fringe benefits, *see Becerril v. E. Bronx NAACP Child Dev. Ctr.*, No. 08 Civ. 10283, 2009 WL 2611950, *3 (S.D.N.Y. Aug. 18, 2009) (defining back pay as including "fringe benefits"), the remaining damages must therefore be allocated to emotional distress.  Here, assuming Plaintiff has proved at best "garden variety emotional distress," such proof generally merits only "$30,000 to $125,000" in compensation. *Thorsen v. Cnty. of Nassau*, 722 F. Supp. 2d 277, 292 (S.D.N.Y. 2010) (quoting *Olsen v. Cnty. of Nassau*, 615 F. Supp. 2d 35, 46–47 (E.D.N.Y. 2009)).  As is the case here, evidence supporting such awards is typically "limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury." *Olsen*, 615 F. Supp. 2d at 46 (quoting *Khan v. Hip Centralized Lab. Servs., Inc.*, No. 03 Civ. 2411, 2008 WL 4283348, at *11 (S.D.N.Y. Sept. 17, 2008)).  More significant awards must be "based on more substantial harm or more offensive conduct" and "are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." *Thorsen*, 722 F. Supp. 2d at 292 (quoting *Olsen*, 615 F. Supp. 2d at 46–47).  No such evidence was adduced here.

Here, to prove her emotional distress, Plaintiff relies only on her own testimony regarding seeing two therapists, her immediate emotional reaction to being called a nigger, as well as the lingering effects that Carmona's treatment has had upon her emotional state.  To be sure, being subjected to racial epithets as well as the harsh treatment Carmona regularly inflicted upon Plaintiff was undoubtedly distressing.  But while Plaintiff testified that she saw a therapist and was prescribed some form of medication, Plaintiff declined to take that medication.  (Trial Tr. 80:5–11.)  Nor did she explain what that medication's purpose would have been or what it was intended to do for her.  Indeed, Plaintiff described only in vague terms why she needed therapy, noting only that she lacked energy and confidence as a result of her treatment at STRIVE.  Plaintiff also failed as well to testify as to any physical manifestations of her distress.

Additionally, Plaintiff's decision to record her interactions with Carmona also supports a reduced emotional distress award.  Indeed, the recording played at trial indicates that Plaintiff herself asked Carmona to explain his statement from the previous day that "You and your girl from TW is just alike."  (Krebs Decl. Ex. G, at 2:6–8.)  There is no evidence that this first statement was recorded.  Only after Plaintiff's prompting did Carmona then refer to her as a "nigger."  (*Id.* 2:20–24.)  Thus, Plaintiff's recordings, while surely helpful in proving her case,

also demonstrate a willingness to engage Carmona to document his animus.  And while not detracting from the fact that these comments were made, they pretty clearly reveal Plaintiff's efforts to invite a confrontation with Carmona and fail to bolster support for an award that is founded on extreme emotional distress.

Given this limited evidence, Plaintiff has proved at most $80,000 in emotional distress. This figure, falling within the upper half of the range for garden variety emotional distress, recognizes the continuous, egregious behavior that Carmona displayed toward Plaintiff, along with Plaintiff's resulting therapy.  But this reduction also recognizes the limited evidence of any lasting physical or emotional impact on Plaintiff as well as the lack of corroborative testimony. *See, e.g.*, *Patterson*, 440 F.3d at 120 (approving $100,000 emotional distress award where "plaintiff offered testimony of his humiliation, embarrassment, and loss of self-confidence, as well as testimony relating to his sleeplessness, headaches, stomach pains, and burning in his eyes from the use of mace in the attack"); *MacMillan*, 873 F. Supp. 2d at 561–63 (collecting cases and reducing award to $30,000 based upon "the conclusory nature" of the Plaintiff's testimony "and the lack of any supporting detail or specific examples of emotional injuries"); *Khan*, 2008 WL 4283348, at *12 (reducing award to $50,000 where there were no "physical manifestations of mental anguish or more severe evidence of emotional distress (such as suicidal ideation)"); *Watson v. E.S. Sutton, Inc.*, No. 02 Civ. 2739, 2005 WL 2170659, at *15 (S.D.N.Y. 2005) (reducing award to $120,000 where plaintiff suffered "no permanent psychological damage or disability resulting from the harassment" but still suffered "considerable distress").

## CONCLUSION

The Court has considered the parties' remaining arguments and finds them meritless. After aggregating the awards for back pay, front pay, and emotional distress described above, the Court will order a new trial unless Plaintiff accepts a compensatory award of $128,109.59.  The jury's punitive damages award remains undisturbed.  Defendants' remaining motions are DENIED.  Plaintiff is directed to inform the Court of her decision no later than Wednesday,

January 15, 2014.  The Clerk of Court is instructed to close this motion and remove it from my docket.

**SO ORDERED.**

Date: _____
New York, New York

_____
**HAROLD BAER, JR.**
**United States District Judge**

24